## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MBI Group, Inc.** | : | |
| **7200 Wisconsin Avenue, Suite 702** | : | |
| **Bethesda, Maryland 20814** | : | |
| | : | |
| **And** | : | |
| | : | |
| **Atlantic Group, SCI** | : | |
| **7200 Wisconsin Avenue, Suite 702** | : | |
| **Bethesda, MD 20814** | : | |
| **And** | : | |
| **40 Rue Gullien** | : | **Case No:** |
| **Douala, Cameroon** | : | |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| | : | |
| **Crédit Foncier du Cameroun** | : | |
| **Boulevard du 20 Mai** | : | |
| **Yaounde, Cameroon** | : | |
| | : | |
| **And** | : | |
| | : | |
| **The Government of** | : | |
| **The Republic of Cameroon** | : | |
| **Yaounde, Cameroon** | : | |
| **Defendants** | : | |

## COMPLAINT

COME NOW plaintiffs MBI Group, Inc. (hereinafter "MBI"), and Atlantic Group SCI ("Atlantic" collectively with MBI "Plaintiffs"), by and through undersigned counsel, and pursuant to Fed.R.Civ.P. 7 and for a claim and cause of action against Credit Foncier du Cameroun, ( "CFC") and the Government of the Republic of Cameroon ("Cameroon," collectively with CFC "Defendants"), state and aver as follows:

## VENUE AND JURISDICTION

1.     Jurisdiction arises pursuant to 28 U.S.C.§§ 1330 and 1332(a)(2) and the Foreign Sovereign Immunities Act, 28 U.S.C. §§1602 *et. seq.* ("FSIA"). The matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. Plaintiffs reserve the right to assert jurisdiction pursuant to 28 U.S.C. § 1350.

2.     Defendants are not immune from the jurisdiction of the court because this action is based on a commercial activity carried on in the United States by Defendants, and because this action is based on an act or acts performed in the United States in connection with a commercial activity of Defendants elsewhere, and because this action is based upon an act or acts outside of the territory of the United States in connection with a commercial activity of Defendants elsewhere, and that act or those acts caused a direct effect in the United States.

3.     Venue in the District of Columbia is proper under 28 U.S.C. §§1391(b), (d) and (f).

## THE PARTIES

4.    MBI is and was at all times relevant hereto a corporation organized under the laws of the state of Delaware and which does, engages in and transacts business in the District of Columbia, including business out of which this claim arises.

5.    Atlantic is and was at all times relevant hereto a corporation organized under the OHADA laws which apply to the Cameroon. Atlantic Group maintains, and at all times relevant hereto, has maintained an office in Douala, Cameroon. Atlantic maintains, and at all times relevant hereto, has maintained an office in Maryland and it does, engages in and transacts business in the District of Columbia.

6.    CFC is and was at all times relevant hereto an agency and an instrumentality or a political subdivision of Cameroon. CFC is a financial institution whose mission is to provide mortgage loans. Each salaried private sector and public sector employee commits 2% of his or her annual salary to the CFC fund. Against these funds, mortgage funds are made available to homebuyers.

7.    Cameroon is and was at all times relevant hereto was a foreign state.

3

## FACTS COMMON TO ALL COUNTS

8.      Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through seven of the Complaint.

**MBI and American Housing Projects for Africa**

9.      MBI had designed and developed a business plan, program and model for the construction, marketing, sale and operation of large scale, modern, efficient and attractive affordable housing in regions of the world with limited or undeveloped housing infrastructure (the "MBI Affordable Housing Program.").

10.     In 2002, the United States announced the creation of the Millennium Challenge Corporation ("MCC").  MCC  determines a nation's eligibility for U.S. aid based on its record of fighting corruption and fostering entrepreneurship.

11.     In  July 2003, the United States announced the  Africa Mortgage Market Initiative ( the "US Initiative"). The US Initiative was designed to assist in overcoming the lack of access in Africa to capital for  business and  for home purchases.

12.     The United States  Overseas Private Investment Corporation ("OPIC") was the agency designated to  work through the MCC and the US Initiative with Africans to develop "robust housing markets" through construction of affordable homes in developing nations with the goal of bolstering retail banking and fueling local capital markets as "engines of entrepreneurship."

13.     Financial participation by OPIC in the development of programs in Africa and elsewhere required financial participation by American investors or entities.

**Defendants' Initial Solicitations to MBI, MBI's Preliminary Response, and the Preliminary Agreement to Proceed**

14.    In November 2003, CFC approached MBI and solicited MBI's participation in the development and the implementation of an affordable housing program in the Cameroon. That approach and solicitation was made by Joseph Edou ("Edou"), who was at that time CFC's Managing Director.

15.    CFC, through Edou, affirmatively and explicitly represented to MBI in December 2003 in Yaounde, Cameroon (the "Initial Representations") that:

      a.    Cameroon had a shortage of over 600,000 housing units;

      b.    CFC had, held, owned and had control over funds sufficient to provide mortgage lending for more than 5000 purchasers;

      c.    CFC was aware of many eligible buyers ready to purchase homes.

      d.    there was little or no supply of new affordable housing in the Cameroon.

      e.    CFC desired to enter into an agreement with an entity that would serve as a developer which would undertake, on its own initiative, the feasibility studies necessary to financially and economically justify an affordable housing project, and then implement an affordable housing program which would be rolled out in various cities in Cameroon.

      f.    CFC desired to attract financing and support for an affordable housing program from agencies such as OPIC and the International Finance Corporation ("IFC").

5

g. CFC understood that financial support from OPIC required substantial financial participation from an American entity.

h. CFC understood that to attract financial support from organizations such as OPIC and the IFC, CFC would be required to have successfully commenced an affordable housing project, and that organizations such as OPIC and IFC would provide financing for expansion of such projects.

i. CFC understood that, in order for the project to succeed, the parties would have to treat the project as a commercial undertaking for profit, controlled by industry standards and norms.

16. As a result of CFC's Initial Representations, and MBI's experience and expertise and familiarity with its Affordable Housing Program, and its familiarity with the MCC, the US Initiative and OPIC, officers of MBI in January and February of 2004 traveled to the Cameroon to investigate and assess the potential of the proposed affordable housing project in Cameroon ( the "Cameroon Housing Project").

17. On February 27, 2004, pursuant to CFC's request, MBI delivered to CFC a formal expression of interest, setting out in detail the anticipated terms, conditions and participants of the Cameroon Housing Project. The proposal included the construction of between 1000 to 1200 homes in the capital city of Yaounde in the Cameroon Housing Project's initial phase ( the Yaounde Phase I Project"), and contemplated contribution of land and financing by CFC.

18. On February 27, 2004, CFC reviewed the proposal and advised MBI that the proposal conformed with CFC's requirements. CFC thereupon authorized MBI to commence master planning, project costing and architectural design work.

19.    On that date, in the presence of CFC, MBI contacted the South African firms of Sivest, SA ("Sivest")and Atelier & Associates ("Atelier") to discuss their participation in the Cameroon Housing Project and the Yaounde Phase I Project. Both Sivest and Atelier agreed to participate with MBI in the Cameroon Housing Project and the Yaounde Phase I Project.

20.    On March 24, 2004, Atlantic was incorporated in Cameroon specifically for the development and implementation of the Cameroon Housing Project and the Yaounde Phase I Project .

21.    In March 2004, CFC and MBI retained Sivest and MBI retained Atelier to prepare master plans, architectural designs and architectural drawings ( the "Initial Housing Plans") for the Project.

22.    Commencing in March 2004, Plaintiffs retained other firms to conduct soil testing, land surveys, engineering studies, drawings and infrastructure layouts, including without limitation studies of water and sewer availability and construction, drainage, electricity distribution and roadways for the Project (the "Development Studies").

**The Negotiation and Ratification of Agreements for the First Project**

24.    By letter dated May 11, 2004 to Plaintiffs from Edou, CFC advised Plaintiffs as follows: CFC had available "more than 50 million US dollars" for construction of 2000 houses, and was "prepared to provide additional funding" for 10,000 houses. CFC then requested that Plaintiffs confirm "as soon as possible, your intention to carry out this test program of 2,000 units within the price range you provided to me." CFC also asked for confirmation a follows:

7

(i)n order to ensure the success of this program, that your Group, as Credit Foncier's promoter and sole representative, has selected and signed contracts with the builder, and project manager, and/or any other consultant, in compliance with the pertinent regulations, along with the compensation modalities defined and agreed to by the parties.

25.    For approximately two weeks, commencing approximately May 9, 2004, Edou traveled to and remained in the United States for the purpose of facilitating the Cameroon Housing Project, including the Yaounde Phase I Project and extensions thereof. During that trip, MBI arranged for and conducted inspections with Edou and other CFC officials of several housing developments in the Washington DC metropolitan area. During that trip, MBI introduced Edou and other CFC officials to officials of OPIC and officials of the United States Department of Housing and Urban Development, and the United States Department of the Treasury, International Division, and participated in meetings with those officials.

26.    On May 18, 2004, a Memorandum of Agreement was signed in Bethesda Maryland among CFC, Atlantic and MBI ( the "May 2004 Agreement"). A true and accurate copy of the May 2004 Agreement is annexed hereto as **Exhibit A**, and is adopted and incorporated herein by reference as if specifically set forth herein.

27.    The May 2004 Agreement, *inter alia*, required CFC to provide to Plaintiffs for the Yaounde Phase I Project and, in part, extensions thereof: (a) project development and construction financing of approximately forty nine million dollars (US$49,000,000.00) and all necessary financial guarantees for the Yaounde Phase I Project; (b) land on which approximately 1,100 affordable housing units would be constructed by Plaintiffs for the

8

Yaounde Phase I Project; (c) mortgage financing for the "buyers of the 1100 units" for

the Yaounde Phase I Project;  and (d) the identity of over 50,000 potential home buyers.

CFC also confirmed "the availability of mortgage funds for at least 5,000 to 6,000"

houses "over the next four years."

28.     The  May  2004 Agreement, *inter alia*,  provided  that:

> Atlantic Group and MBI Group shall be responsible for the selection and
> supervision of the contractors and consultants for the housing project.  In
> addition, Atlantic Group and MBI Group shall be responsible for the
> selection of a prime contractor that will deliver a turn-key project for
> 1,100 housing units (including infrastructure development).

29.     The May 2004 Agreement, *inter alia*, provided that:

> MBI Group and Atlantic Group shall carry out a feasibility study for the
> housing project (including but not limited to preparation of a master-plan,
> land and geological surveys, architectural drawings, construction
> drawings, etc.) and shall have the role of Developer.

30.     The May 2004 Agreement, *inter alia*, provided that:

> The Parties to this Agreement are to act in good faith and are to comply
> with all the provisions of this Agreement.  Failure by any of the Parties to
> perform their obligations, or to fail to act in good faith, shall result in the
> injured Party or Parties in seeking compensation for direct, indirect or
> consequential losses whatsoever and however arising.

31.     Commencing no later than May 2004, Plaintiffs entered into discussions with

Group Five International, as agent for Group Five Construction (Pty) Ltd. ("Group

Five").  Group Five is and was at all times pertinent to the averments herein a  publicly-

traded  South African construction company with annual revenues of approximately five

hundred million dollars ($500,000,000.00). Shortly after ratification of the May 2004

Agreement, and in conformity therewith, Plaintiffs retained Group Five to carry out pre-construction studies of the Project and to prepare detailed cost estimates.

32.    Commencing no later than May 2004, Plaintiffs, Sivest, Atelier and Group Five, initiated and carried out a feasibility study, including but not limited to preparation of a master-plan, land and geological surveys, architectural drawings, construction drawings, and related work, including further work on the Initial Housing Plans and the Development Studies.

33.    On November 17, 2004, Atlantic hand-delivered to CFC, in conformity with the May 2004 Agreement, documents constituting a feasibility study, including but not limited to preparation of a master-plan, land and geological surveys, architectural drawings, construction drawings, and related work, including further work on the Initial Housing Plans and the Development Studies ( the November 2004 Plan Documents.")

34.    CFC requested certain changes to the November 2004 Plan Documents.

35.    Atlantic and MBI promptly and timely made changes to the November 2004 Plan Documents.

36.    On December 8, 2004, Atlantic hand-delivered to CFC, in conformity with the May 2004 Agreement and the changes requested by CFC to the November 2004 Plan Documents, documents constituting a feasibility study, including but not limited to preparation of a master-plan, land and geological surveys, architectural drawings, construction drawings, and related work, including further work on the Initial Housing Plans and the Development Studies ( the "December 2004 Plan Documents").

37.    The December 2004 Plan Documents provided for the construction of 1034 houses on 102 hectares of land, including roads and common areas.

38.    In December 2004, CFC approved the December 2004 Plan Documents.

39.    On or about January 28, 2005, Atlantic and Group Five ratified a Federation Internationale des Ingeneurs-Conseils ("FIDIC") Contract for Construction and Building of Engineering Works contract for the construction of one thousand thirty four (1,034) units at Olembe II, a suburb of Yaoundé in the amount of twenty one million four hundred forty thousand two hundred twenty three dollars ($21,440,223.00) (the "Yaounde Phase I FIDIC Contract"). A representative of CFC witnessed the Yaounde Phase I FIDIC Contract, which provided, *inter alia*, that:

> CFC ... in agreement with appropriate partners will operate as the Employer's Financial Partner. The Employer's Financier will provide a financial facility directly to the Contractor and a Payment Guarantee from an international first class bank acceptable by Group Five and will incur the liability to make payments directly to the Contractor in terms of this Agreement for all amounts as detailed in the drawdown schedule attached....

40.    The Yaounde Phase I FIDIC Contract provided, *inter alia*, that: Group Five would be paid an advance payment ( the "Group Five Advance Payment") of 20% of the total contract value;  Group Five would deliver to CFC, as "financier" an advance payment guarantee; and, Group Five would deliver to CFC a Parent Company Guarantee.

41.    On January 26, 2005 Group Five, in conformity with the Yaounde Phase I FIDIC Contract, issued an Advance Payment Guarantee in the amount of four million seven hundred and fifty thousand dollars ($4,750,000.00) to CFC.

40.    In April, 2005, pursuant to the May 2004 Agreement and the Yaounde Phase I FIDIC Contract, CFC delivered funds for the Advance Payment.

41.     On May 11, 2005, pursuant to the Yaounde Phase I FIDIC Contract, and following its receipt of the Advance Payment, Group Five delivered to CFC a Parent Company Financial Guarantee for the total contract value.

42.     In June 2005, MBI arranged meetings for CFC in Washington and Bethesda, Maryland, with senior executives of OPIC, IFC, the Government National Mortgage Association ("GNMA") of HUD, and the International Division of the U.S. Department of the Treasury, to secure U.S. Government funding and support for the expansion of the Cameroon Project.

43.     On June 24, 2005, CFC wrote to Plaintiffs and stated and represented that:

        a.      CFC recognized and acknowledged Plaintiffs' "hard work and investment in making affordable mass housing a reality in Cameroon, beginning with the 1034 housing unit development project currently underway in Yaounde;"

        b.      there is a 600,000 housing unit shortage in Cameroon;

        c.      CFC has sufficient funds available for 5,000 to 6,000 housing units contemplated by the Cameroon Project over the next four years;

        d.      additional income available to CFC would be sufficient to provide mortgage funding or an additional 2,000 units contemplated by the Cameroon Project; and

        e.      CFC fully supports Plaintiffs' efforts to obtain international construction financing for affordable housing for which CFC would provide mortgage funding.

44.     On June 24, 2005, CFC reiterated in writing its obligation to:

a.      provide mortgage loans for approved buyers of all of the homes constructed by Atlantic;

b.      provide to Atlantic CFC's list of 50,000 eligible and qualified home buyers; and

c.      provide mortgage funding for 5,000 to 6,000 housing units in a price range of $25,000.00 to $55,000.00 in the next three to four years.

45.      On July 23, 2005, at a public ceremony, CFC handed over to Plaintiffs and to Group Five 102 hectares of land for the construction and the completion of the Yaounde Phase I Project.

46.      On August 9, 2005, CFC, by and through its agent, explicitly approved in writing the design and the construction plans for the Yaounde Phase I Project.

**The Negotiation and Ratification of Expansion Agreements**

47.      On July 15, 2005, Plaintiffs and CFC signed a Memorandum of Agreement which expanded the Cameroon Project (the "July 2005 Agreement"). A true and accurate copy of the July 2005 Agreement is annexed hereto as **Exhibit B**, and is adopted and incorporated herein by reference as if specifically set forth herein.

48.      The July 2005 Agreement provided, *inter alia*, that:

a.      CFC would be the Mortgage Financier for the construction and sale of 1,200 houses in Yaounde as an expansion of the Yaounde Phase I Project (the "Yaounde Phase II Project");

b.      CFC would provide mortgage loans for all approved buyers;

c.      CFC would provide to Atlantic the list of "over 50,000" eligible buyers;

13

     d.     CFC confirmed the availability of mortgage funds for at least 5,000 to 6,000 houses in the price range of $25,000 to $55,000 over four years and would provide the mortgage funds to the buyers of all of the units for the Yaounde Phase II Project.

     e.     Plaintiffs would secure international financing for the project;

     f.     Atlantic would provide the land for the Yaounde Phase II Project;

     g.     Atlantic would engage the contractor for construction of the Yaounde Phase II Project; and

     h.     Each party would exercise "the highest degree of good faith."

49.     A Memorandum of Understanding was signed on July 11, 2005 among Group Five and Plaintiffs pursuant to which Group Five would undertake the construction of the Yaounde Phase II Project.

50.     On July 28, 2005, in conformity with the July 2005 Agreement, Plaintiffs submitted to OPIC in Washington a 250-page application for construction financing for the Yaounde Phase II Project. That application correctly projected as a result of the Yaounde Phase II Project a significant increase in employment in the United States and a significant inflow of capital annually from Cameroon to the United States.

51.     On August 11, 2005, Plaintiffs and CFC signed a Memorandum of Agreement which further expanded the Cameroon Project ( the "August 2005 Agreement"). A true and accurate copy of the July 2005 Agreement is annexed hereto as **Exhibit C**, and is adopted and incorporated herein by reference as if specifically set forth herein.

52.     The August 2005 Agreement provided, *inter alia*, that:

      a.      CFC would be the Mortgage Financier for the construction and sale of 2,000 houses in Douala (the "Douala Phase III Project");

      b.      CFC would provide mortgage loans for all approved buyers;

      c.      CFC would provide to Atlantic the list of "over 50,000" eligible buyers;

      d.      CFC confirmed the availability of mortgage funds for at least 5,000 to 6,000 houses in the price range of $38,000 to $65,000 over four years and would provide the mortgage funds to the buyers of all of the units for the Douala Phase III Project;

      e.      Plaintiffs would secure international financing for the Douala Phase III Project;

      f.      Atlantic would provide the land for the Douala Phase III Project;

      g.      Atlantic would engage the contractor for construction of the Douala Phase III Project; and

      h.      Each party would exercise "the highest degree of good faith."

53.     A Memorandum of Understanding was signed on August 11, 2005 among Group Five, Atlantic Group and MBI Group, pursuant to which Group Five would undertake the construction of the Douala Phase III Project.

54.     On September 22, 2005, pursuant to the August 2005 Agreement, Plaintiffs submitted to the Multilateral Investment Guarantee Agency ("MIGA") of the World Bank a Preliminary Application for Guarantee for the Douala Phase III Project.

55.     On September 23, 2005, MIGA responded that "your investment appears to be eligible for MIGA's guarantee. I am therefore pleased to issue this Notice of Registration" for the Douala Phase III Project.

**Plaintiffs' Performance and Defendants' Breaches**

54.     No later than May 2004, Plaintiffs diligently and timely commenced and performed all work required of Plaintiffs under the May 2004 Agreement.

55.     No later than July 2005, Plaintiffs diligently and timely commenced and performed all work required of Plaintiffs under the July 2005 Agreement.

56.     No later than August 2005, Plaintiffs diligently and timely commenced and performed all work required of Plaintiffs under the August 2005 Agreement.

57.     For the Yaoumbe Phase I Project, Plaintiffs, *inter alia,* and in addition to the averments herein, timely: entered into construction-related contracts with several local companies; arranged for the importation of special-purpose construction equipment; arranged for the relocation to Cameroon of construction engineers; and, assembled over 200 construction workers.

58.     For the Yaoumbe Phase II Project, Plaintiffs, *inter alia* and in addition to the averments herein, and no later than September 2005, entered into an agreement for the acquisition of the land necessary for the Yaounde Phase II Project.

59.     For the Douala Phase III Project, Plaintiffs, *inter alia* and in addition to the averments herein, commenced negotiations for acquisition of land, and entered into one or more construction-related contracts.

60.     In August or September 2005, officials of Cameroon solicited and demanded a bribe in connection the Cameroon Project. The solicitation and the demand was made of, and communicated through CFC's Edou.

61.     Plaintiffs refused to pay any bribe.

16

62.    On information and belief, Edou refused to participate in any bribery.

63.    In September 2005, after refusing to participate in any bribery, Edou was removed from his position at CFC.  On September 13, 2005, Mr. Camille Ekindi ("Ekindi") assumed the office and responsibilities of the Managing Director of CFC.

64.    On September 27, 2005,  Roger Tchoufa ("Tchoufa") of Atlantic and MBI met with Ekindi to discuss the Cameroon Project and in particular the Yaounde Phase I Project.

65.    On September 29, 2005, Ekindi informed  Tchoufa that Ekindi had been "instructed" that he was not to take any action to assist the Yaounde Phase I Project without specific approval from those in the Cameroon government who gave him the instructions. Ekindi declined to identify the source of those instructions.

66.    On or about October 3, 2005, Tchoufa called Ekindi to arrange for the processing of customs material and documents.  Ekindi responded that he had the documents but needed to inform others in the Cameroon government before he could take any action.

67.    On October 11, 2005, Tchoufa again met with Ekindi and discussed in particular the Yaounde Phase I Project and the actions that needed to be taken, including the schedule for draw of the CFC funds.  Ekindi responded that he would not take any action unless instructed to do so by others in the Cameroon government.

Tchoufa pointed out that CFC was bound by its contractual agreements. Ekindi responded that the Cameroon Housing Project and, in particular, the Yaounde Phase I Project  were good projects, but that in Cameroon private parties needed to take into account the "interests" of others, and that the failure to do so was Edou's downfall. Ekindi added that every project must have a "godfather."

68.    Plaintiffs declined and refused to offer or pay any bribe, or to participate in any bribery.

69.    Each of the requests made by Plaintiffs was within the power and the authority and the responsibility of CFC's General Manager.

70.    On October 21, 2005, Ekindi informed Plaintifs that Defendants were unilaterally reducing the available land for the Yaounde Phase I Project from 102 hectares to 70 hectares. CFC unilaterally and without contractual justification demanded, with respect to the Yaounde Phase I Project:  redesign in its entirety; design of a new masterplan; drafting of new  architectural and engineering designs; reworking of  the work plan and work schedules; and re-assignment of expatriate staff already in Cameroon for the project.

71.    CFC's reduction of the available land for the Yaounde Phase I Project was a material breach of the May 2004 Agreement.

72.    CFC's demands for changes in the Yaounde Project were material breaches of the May 2004 Agreement.

73.     CFC's breaches and its demands for changes imposed significantly -increased costs, expenses and delays.

74.    Nonetheless, Plaintiffs undertook to respond to the demanded changes.

75.    On October 26, 2005 Plaintiffs received from OPIC preliminary approval of the Yaounde Phase II Project and received  OPIC's Preliminary Terms of Reference for a $10 million revolving construction financing loan for the Yaounde Phase II Project.

76.     By letter dated October 28, 2005, Atlantic advised CFC that the changes CFC demanded in the Yaounde Phase I project would cost one million three hundred thousand dollars ($1,300,000.00), and would require months of work.

77.     On November 3, 2005, Tchoufa met with Ekindi at Ekindi's office. Ekindi stated that the changes CFC demanded should be made.

78.     By letter dated November 10, 2005, Plaintiffs advised CFC again of the legal ramifications and the increased costs, expenses and delays of CFC's breaches and demands.

79.     On or about November 20, 2005, Tchoufa advised Ekindi that the failure to act on customs requests made it impossible for construction equipment to be delivered to the construction site. Ekindi responded: "you know what to do to help me help you continue the project."

80.     On December 7, 2005, Plaintiffs arranged a meeting with officials from OPIC's Washington office, an official from the American Embassy in Cameroon, officials from Plaintiffs, and Ekindi. The meeting took place in CFC's office. In that meeting, Ekindi explicitly represented that:

        a.      Defendants recognized their agreements with Plaintiffs, and were committed to performing pursuant to the terms of those Agreements

        b.      Ekindi held the mandate for the Cameroon Housing Project;

        c.      Ekindi and the Defendants would support any initiative which conformed to the Cameroon Housing Project;

        d.      the Yaounde Phase I Project was still proceeding smoothly;

19

    e.    the changes demanded by CFC were being completed by Plaintiffs to CFC's complete satisfaction;

    f.    CFC would comply with all its Agreements with Plaintiffs;

    g.    Defendants were honored and excited by OPIC's agreement to provide construction financing to the Plaintiffs for the Yaounde Phase II Project;

    h.    CFC had a substantial pool of over 50,000 eligible home buyers;

    i.    CFC had a pool of funds available for mortgages for the Cameroon Project; and

    j.    there is an extreme shortage of affordable housing in Cameroon.

81.    By letter dated December 12, 2005, CFC, without explanation or justification, instructed Plaintiffs to cease all work on the Yaounde Phase I Project, and threatened the use of all available means to stop Plaintiffs' work on the Yaounde Phase I Project.

82.    On December 20, 2005, Tchoufa met with Ekindi at Ekindi's office. Ekindi informed Tchoufa that Ekindi had been instructed to identify a pretext for the termination of the Cameroon Housing Project and in particular the Yaounde Phase I Project.

83.    Plaintiffs timely advised Group Five of the demands made by Defendants.

84.    In December 2005, Group Five, as a consequence of the breaches and the misconduct of Defendants, and pursuant to the explicit instructions of Defendants, discontinued all work, and Group Five terminated its existing agreements and commenced the repatriation of its employees.

85.    In December 2005 to February 2006, Plaintiffs took all reasonable and prudent steps to continue or resume the Cameroon Housing Project and, in particular, the Yaounde Phase I Project.

86.    On February 7, 2006 Plaintiffs delivered to CFC over five bankers boxes of documents containing the changes and the demands CFC made to the Yaounde Phase I Project. Those documents included: redesign of the Yaounde Phase I Project in its entirety on 70 hectares of land; a new masterplan; new architectural and engineering designs; reworked work plans and work schedules; and re-assignment of expatriate staff.

87.    On February 15, 2006, Tchoufa met with Ekindi at CFC's office. Ekindi admitted that Defendants had no basis for objection to the revised plans, and that those plans had been approved by the relevant Cameroon land development agency, as had the previous plans. Ekindi informed Tchoufa that there was no hope that the Cameroon Housing Project, and in particular the Yaounde Phase I Project would go forward. Ekindi informed Tchoufa that he was following instructions from Cameroon government officials. Tchoufa reiterated that he would not authorize any payments of any bribes.

88.    Tchoufa left Cameroon in March 2006 and returned to the United States.

89.    On or about March 23, 2006, Plaintiffs, through counsel, demanded compensation for the damages caused by Defendants, and wrote, *inter alia*, that:

> MBI declines to speculate here regarding the motivations behind CFC's inexplicable and unjustified behavior, except to note that a new CFC Director General and Board had been appointed prior to the October 21 breaches described above, and to note further that conduct of the sort now in issue is conventionally associated with allegations of graft and corruption.

90.    In August 2006, Cameroon improperly caused the arrest of the secretary of Tchoufa's wife, and imprisoned her without charges for one week, and wrongfully seized

property of Tchoufa and his wife, and wrongfully threatened the arrest of other relatives, including a minor.

91.     In September 2006, Cameroon improperly caused the arrest of a Tchoufa relative, and demanded a bribe in the amount of two hundred thousand dollars ($200,000.00) from the relative to dispose of the case, and threatened the lives of Tchoufa and his wife if either returned to Cameroon.

92.     Notwithstanding the breaches and the misconduct of Defendants, Plaintiffs made every effort to ensure that the disputes were settled amicably. Those efforts, including correspondence dated September 19, 2006 and November 28, 2006, were unsuccessful.

93.     Plaintiffs have sustained loss, damage and injury because of the breaches by Defendants of their agreements with Plaintiffs.

94.     Plaintiffs have sustained loss damage and injury as a result of the misconduct of Defendants.

95.     Plaintiffs' loss, damage and injury, include, but are not limited to, the loss of the benefit of their bargain; and lost profits; costs, expenses, and the incurring of legal obligations; misappropriation of and damage to trade secrets, confidential and proprietary information, and the loss of business opportunities, and business expectancies.

96.     Plaintiffs cannot receive a fair hearing in any court in the Cameroon.

## COUNT I
### (Breach of Contract)

97.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 97 of the Complaint.

22

98.    CFC, for itself and as agent and agency of Cameroon, entered into the May 2004 Agreement with Plaintiffs.

99.    The May 2004 Agreement is a contract.

100.    Plaintiffs fulfilled their obligations under the May 2004 Agreement.

101.    Defendants and each of them breached material terms of the May 2004 Agreement.

102.    Plaintiffs and each of them suffered loss, injury and damage as a result of the breach by Defendants of the May 2004 Agreement.

103.    CFC, for itself and as agent and agency of Cameroon, entered into the July 2005 Agreement with Plaintiffs.

99.    The July 2005 Agreement is a contract.

100.    Plaintiffs fulfilled their obligations under the July 2005 Agreement.

101.    Defendants and each of them breached material terms of the July 2005 Agreement.

102.    Plaintiffs and each of them suffered loss, injury and damage as a result of the breach by Defendants of the July 2005 Agreement.

103.    CFC, for itself and as agent and agency of Cameroon, entered into the August 2005 Agreement with Plaintiffs.

104.    The August 2005 Agreement is a contract.

105.    Plaintiffs fulfilled their obligations under the August 2005 Agreement.

106.    Defendants and each of them breached material terms of the August 2005 Agreement.

107.    Plaintiffs and each of them suffered loss, injury and damage as a result of the breach by Defendants of the August 2005 Agreement.


## COUNT II
## Fraud, Deceit and Misrepresentation

108.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 107 of the Complaint.

109.    Cameroon, by and through its agent CFC, stated, represented and asserted to Plaintiffs that Defendants would perform pursuant to the provisions of the May 2004 Agreement ( the "May 2004 Agreement Representation.").

110.    By entering into the May 2004 Agreement, Cameroon, by and through its agent CFC represented to Plaintiffs that Cameroon and CFC would perform according to the terms of that agreement ( the May 2004 Agreement Representation").

111.    The May 2004 representation was false.

112.    Cameroon, by and through its agent CFC, stated, represented and asserted to Plaintiffs that Defendants would perform pursuant to the provisions of the July 2005 Agreement ( the July 2005 Agreement Representation").

113.    By entering into the July 2005 Agreement, Cameroon, by and through its agent CFC made to Plaintiffs the July 2005 Agreement Representation.

114.    The July 2005 Agreement Representation was false.

115.    Cameroon, by and through its agent CFC, stated, represented and asserted to Plaintiffs that Defendants would perform pursuant to the provisions of the August 2005 Agreement ( the August 2005 Agreement Representation," collectively with the May

2004 Agreement Representation and the July 2005 Agreement Representation the "Contracts Performance Representations").

116.    By entering into the August 2005 Agreement, Cameroon, by and through its agent CFC made to Plaintiffs the August 2005 Agreement Representation.

117.    The August 2005 Agreement representation was false.

118.    Cameroon knew, at all times pertinent to the averments of the Complaint, that neither Cameroon nor CFC would perform under the terms of any agreement for the Cameroon Housing Project, including the May 2004 Agreement, the July 2005 Agreement, and the August 2005 Agreement, unless officials of the Cameroon government received illegal and improper bribes.

116.    Neither Cameroon nor CFC intended at the time of ratification to perform pursuant the terms of the May 2004 Agreement, or the July 2005 Agreement, or the August 2005 Agreement, because officials of the Cameroon government who controlled CFC did not intend to honor any contract for the Cameroon Project unless illegal and improper bribes were paid.

117.    Neither Cameroon nor CFC advised Plaintiffs prior to October 2005 that the payment of illegal and improper bribes was a condition to performance by Defendants of their obligations under the May 2004 Agreement, the July 2005 Agreement, and the August 2005 Agreement.

118.    Cameroon and CFC represented to Plaintiffs, in October 2005, in Cameroon, that if Plaintiffs redesigned the Yaounde Phase I Project from 102 hectares to 70 hectares, and made such other revisions to the Yaounde Phase I project as are set forth hereinabove, Cameroon and CFC would perform according to the terms of the May 2004 Agreement

25

( the May 2004 Modification Representation").

119.    The May 2004 Modification Representation was made by Ekindi to Tchoufa in Cameroon at Ekindi's office in October 2005.

120.    The May 2004 Modification Representation was made by Ekindi to Plaintiffs' officials, and to officials of OPIC, and to officials of the United States Embassy, and other officials, in Ekindi's office on December 7, 2005.

121.    The May 2004 Modification Representation was false when made by Ekindi.

122.    Ekindi knew that the May 2004 Modification Representation was false when he made it, because Ekindi knew that the Cameroon Housing Project, and in particular, the Yaounde Phase I project would not proceed without the payment of illegal and improper bribes, and that Plaintiffs would not pay any bribes, and that the Cameroon Housing Project and in particular the Yaounde Phase I Project would be terminated unless illegal and improper bribes were paid.

123.    Cameroon had no intention in May 2004 of performing pursuant to the terms of the May 2004 Agreement, or of permitting its agent CFC to perform.

124.    Cameroon had no intention in July 2005 of performing pursuant to the terms of the July 2005 Agreement, or of permitting its agent CFC to perform.

125.    Cameroon had no intention in August 2005 of performing pursuant to the terms of the August 2005 Agreement, or of permitting its agent CFC to perform.

126.    Plaintiffs relied on the Contracts Performance Representations, and such reliance was reasonable.

127.    Plaintiffs relied on the May 2004 Modification Representation, and such reliance was reasonable.

128.    Cameroon and CFC failed to disclose to Plaintiffs that illegal and improper bribes were conditions for  performance of the May 2004 Agreement, or its modification, or of the July 2005 Agreement, or of the August 2005 Agreement ( the "Bribery Disclosure").

129.    Plaintiffs relied on the failure by Cameroon and CFC to make the Bribery Disclosure, and such reliance was reasonable.

130.    Plaintiffs sustained loss, damage and injury as a result of the Contracts Performance Representations, and the May 2004 Modification Representation, and the failure to make the Bribery Disclosure, and such loss damage and injury included the expenditure of monies, and the incurring of costs and obligations, and the loss of business opportunities.

### COUNT III
### Negligent Misrepresentation

131.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 130 of the Complaint.

132.    Cameroon and CFC knew and should have known that the Contracts Performance Representations were false.

133.    Cameroon and CFC knew and should have known that the May 2004 Modification Representation was false.

134.    Cameroon and CFC knew and should have known that the Bribery Disclosure was and would have been a  true statement.

135.    Cameroon and CFC knew and should have known that Plaintiffs would rely on the Contracts Performance Representations, and the May 2004 Modification Representation, and the failure to make the Bribery Disclosure, and that such reliance would be reasonable.

27

136.   Plaintiffs sustained loss, injury and damage as a result of the Contracts Performance Representations, and the May 2004 Modification Representation, and the failure to make the Bribery Representation.

## COUNT IV
## Intentional Interference With Contract - Cameroon

137.   Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 136 of the Complaint.

138.   Cameroon knew of the existence of the May 2004 Agreement, and the July 2005 Agreement, and the August 2005 Agreement.

139.   Cameroon instructed the General Managers of CFC to refuse to perform under the May 2004 Agreement, and the July 2005 Agreement, and the August 2005 Agreement.

140.   CFC refused to perform under the May 2004 Agreement, and the July 2005 Agreement, and the August 2005 Agreement for an improper purpose.

141.   Cameroon deliberately, wrongfully, willfully and with intent interfered with the May 2004 Agreement, the July 2005 Agreement and the August 2005 Agreement and, as a result, CFC failed to perform under those agreements.

142.   Plaintiffs sustained loss, injury and damage as a result of Cameroon's interference with the May 2004 Agreement and the July 2005 Agreement and the August 2005 Agreement.

## COUNT V
### Intentional Interference With Contract and Prospective Advantage
### - Cameroon and CFC

143.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 142 of the Complaint.

144.    Cameroon and CFC knew that Plaintiffs had received preliminary approval from OPIC for the financing of construction of the Yaoumbe Phase II Project.

145.    Cameroon and CFC knew that Plaintiffs had secured registration for financing with MIGA for the Douala Phase III Project.

146.    Cameroon and CFC knew that Plaintiffs had successfully pursued prospective business advantages for international financing from OPIC and from other organizations for the MBI Affordable Housing Program.

147.    Cameroon and CFC knew that Plaintiffs would receive international financing from OPIC  and from other organizations for the MBI Affordable Housing Program in various countries in Africa if the Cameroon Housing Project were performed pursuant to the May 2004 Agreement, the July 2005 Agreement or the August 2005 Agreement.

147.    Cameroon and CFC knew or should have known that Plaintiffs would not receive international financing from OPIC  and from other organizations for the MBI Affordable Housing Program in various countries in Africa if the Cameroon Housing Project were not performed pursuant to the May 2004 Agreement, the July 2005 Agreement or the August 2005 Agreement

148.    Cameroon and CFC deliberately, wrongfully, willfully and with intent interfered with Plaintiffs' business expectancy with OPIC with respect to the Yaounde Phase II Project, and with MIGA  with respect to the Douala  Phase III Project.

149.    Cameroon and CFC deliberately, wrongfully, willfully and with intent interfered with Plaintiffs' business expectancy with OPIC ,and with MIGA, and with other international organizations, for financing of the MBI Affordable Housing Program in various countries in Africa.

150.    Plaintiffs sustained loss, injury and damage as a result of Cameroon's and CFC's interference with Plaintiff's business expectancies for financing of the MBI Affordable Housing Program in Cameroon and in various countries in Africa.

### COUNT VI
### Misappropriation of Trade Secrets and Proprietary Information

151.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through 150 of the Complaint.

152.    The MBI Affordable Housing Program was Plaintiffs' trade secret ( the "Program Trade Secrets") and was comprised of confidential and proprietary information.

153.    The designs, plans, and drawings for the Yaounde Phase I Project were Plaintiffs' trade secrets ( the "Project Trade Secrets," collectively with the Program Trade Secrets the "Trade Secrets") and were comprised at least in part of confidential and proprietary information.

154.    Plaintiffs expended substantial sums of money in the development of the Trade secrets.

155.    Plaintiffs took reasonable and prudent steps to protect the confidentiality of the Trade Secrets.

156.    The Trade Secrets were known to only certain employees of Plaintiffs.

157.    Knowledge of the Trade Secrets would provide an advantage to Plaintiffs' competitors.

158.    Defendants have appropriated and misappropriated and taken control of the Trade Secrets, and, by virtue of their breaches of contract and their misconduct as described hereinabove, have wrongfully taken and converted to their own benefit and use the Trade Secrets.

159.    Plaintiffs have sustained loss, injury and damage as a result of Defendants' misappropriation of the Trade Secrets.

WHEREFORE, by all these presents, counsel for Plaintiffs pray for the following relief:

1.    Judgment in favor of Plaintiffs and against defendants, jointly and severally, in the amount of five hundred million dollars ($500,000,000.00) or such other amount as may be proven at trial;

2.    An award of interest;

3.    Such other relief as the court may deem just and proper.

Respectfully Submitted,


Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com


SJR

Sylvia J. Rolinski, Esq. # 430573
Danielle M. Espinet # 478553
*Rolinsko & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

**SUBJECT:  1,100 AFFORDABLE HOUSING UNITS DEVELOPMENT PROJECT AT OLEMBE II, YAOUNDE, CAMEROON**

**MEMORANDUM OF AGREEMENT**

**BETWEEN**

**CREDIT FONCIER DU CAMEROUN**

**("CFC")**

**AND**

**ATLANTIC GROUP SCI**

**("AG")**

**MBI GROUP, INC**

**("MBIG")**

(Collectively hereinafter referred to as "the Parties")

Page 1 of 7



EXHIBIT

A

CFC
AG
MBIG

## 1. INTRODUCTION AND PURPOSE OF MEMORANDUM OF AGREEMENT (AGREEMENT)

The Parties hereby record that it is their intention to work together on the implementation of MBI Group, Inc.'s proposed large-scale affordable mass housing program in Cameroon, ("the Proposal"); the parties being:

**CREDIT FONCIER DU CAMEROUN** represented by Mr. Joseph Edou

and

**ATLANTIC GROUP SCI** represented by Mr. Roger Tchoufa

and

**MBI GROUP, INC.** represented by Mr. John Kamya

The Parties wish to enter into this AGREEMENT to establish the basis upon which they will co-operate and to define the works and/or services and corresponding liabilities apportioned to each of the Parties.

## NOW IT IS HEREBY AGREED:

## 2. DEFINITIONS.

a.    "the Project / Contract" shall mean houses in Olembe II, Yaounde, approximately 1,100 units.

b.    "the AGREEMENT" shall mean this AGREEMENT including the Introduction and    all the Annexures.

c.    "the Parties" means CFC, AG and MBIG collectively;

d.    "Signature date" means the date of signature of this AGREEMENT by the party signing last.

e.    "Effective date" means the date of signature;

## 3. OBJECTIVES

The Parties combine their collective skills and expertise to achieve the delivery of houses in this particular project and in future developments.

a.    CFC shall arrange to provide/arrange/facilitate the land for the project

CFC
AG
MBIG

b.      CFC will provide all construction and project development financing of approximately US$49 million, and shall provide the necessary financial guarantees.

c.      AG and MBIG shall be responsible for the selection and supervision of the contractors and consultants for the housing project. In addition, AG and MBIG shall be responsible for the selection for a prime contractor that will deliver a turn-key project for the 1,100 housing units (including infrastructure development).

d.      AG and MBIG will market the houses to prospective buyers, in Cameroon, as well as in the United States, France, and other countries.

e.      CFC will provide mortgage loans for the approved buyers of the estimated 1,100 housing units to be constructed at Olembe II.

f.      CFC will make available to AG and MBIG the list of eligible buyers (also qualifying for mortgage loans) who currently number over 50,000.

g.      CFC confirms the availability of mortgage funds for at least 5,000 to 6,000 housing units (in a price range of US$25,000 to US$55,000) over the next four years and will commit such mortgage funds to the buyers of the 1,100 units.

## 4.  ROLES OF THE PARTIES

All the Parties will conduct their respective tasks with due diligence according to the best professional practice in the concerned field of expertise.

a.      CFC shall provide/arrange/facilitate the land for the housing project.
b.      MBIG and AG shall carry out a feasibility study for the housing project (including but not limited to preparation of a master-plan, land and geological surveys, architectural drawings, construction drawings, etc.) and shall have the role of Developer.
c.      CFC shall provide construction financing of approximately US$49 million for the housing project, as well as the necessary financial guarantees.
d.      CFC shall provide mortgage financing for all of qualified buyers of the houses, if they require mortgage financing.

## 5.  LIABILITY OF THE PARTIES

The Parties to this Agreement are to act in good faith and are to comply with all the provisions of this Agreement. Failure by any of the Parties to perform their obligations, or to fail to act in good faith, shall result in the injured Party or Parties in seeking compensation for direct, indirect or consequential losses whatsoever and howsoever arising.

Page 3 of 7

CFC
AG
MBIG

## 6. NO PARTNERSHIP

Nothing herein contained shall be deemed or construed to create a partnership relationship of any kind or association or legal entity between the Parties or any of them and any right of ownership in property and assets shall be a sole individual right and not a joint, collective or partnership right.

## 7. DURATION

The Parties agree that this AGREEMENT will be in use for the duration that is necessary to conclude the detailed and comprehensive agreement.

## 8. CONFIDENTIALITY

Excluding information already in the public domain, each Party shall, for a period of 2 years from the date of termination of this AGREEMENT or 2 years after completion of the Project, which ever is the longer, respect and maintain the confidentiality of all documents, the Project and subsequent sub-contracts and any commercial, financial and technical information which may have been acquired from the other Parties, hereafter referred to as "Confidential information".

These obligations and restrictions shall not apply to information which:

   a.  was at the time of receipt otherwise known to the receiving Party as evidenced by documentary material in it or in possession of the receiving Party at the time of receipt thereof;

   b.  became known or available to the receiving Party from a source other than the furnished party without breach of this AGREEMENT by the receiving Party, without obligation to keep confidential; or

   c.  is disclosed in accordance with the written approval of the furnishing Party or must be disclosed for the proper performance of the services.

Each Party undertakes not to divulge any Confidential Information to any party or to use such information other than in the context of the Projects, sub-contracts and the Contracts. The Parties also undertake to ensure that this clause will be complied with by their employees, subcontractors, suppliers and/or legal and/or financial advisors involved in the Project or any other party who may have access to the information for the purpose of the Project and the Contract.

These obligations to respect and maintain confidentiality shall continue notwithstanding the expiration or termination of this AGREEMENT, or withdrawal of a Party.

Page 4 of 7

CFC
AG
MBIG

The Parties agree that they may use the Project, once realized, for publicity and marketing purpose, on condition that the Company is at all times included in such exercise.

## 9.    DISPUTES

The Parties shall make every effort to ensure that all disputes in connection with the present AGREEMENT are settled amicably.

## 10.    BREACH

Should any of the parties commit a breach of this AGREEMENT and persist therein after receipt of written notice calling upon it to remedy such breach within a period of fourteen (14) days, then the other party shall be entitled to cancel this AGREEMENT.

## 11.    APPLICABLE LAW AND LEGAL REQUIREMENTS

This AGREEMENT shall in all respects be construed and interpreted in accordance with laws of the Republic of Cameroon.

## 12.    ENTIRE AGREEMENT

This present AGREEMENT, which shall include the Introduction and any Annexure(s) contains the entire AGREEMENT between the Parties on this subject and cancels and replaces all previous undertakings, whether oral or written.

## 13.    AMENDMENTS

The present AGREEMENT or any of its provisions may only be amended, modified, extended, terminated or cancelled by a written agreement signed by all.

## 14.    LANGUAGE

The language applied to all matters concerning this AGREEMENT is English.

## 16.    GOOD FAITH

The parties acknowledge that this AGREEMENT is based upon mutual trust, good faith and confidence and that each shall in its dealings with the other, exercise the highest degree of good faith.

Page 5 of 7

CFC

AG

MBIG

## 17. DOMICILIUM

The parties choose domicilium citandi et executandi as follows:

### CREDIT FONCIER DU CAMEROUN

BOULEVARD DU 20 MAI
P. O. BOX 1531
YAOUNDE                    TEL. 237 223 15 25
CAMEROON                   FAX. 237 223 52 21


### ATLANTIC GROUP SCI

40 RUE GULLIEN
P. O. BOX 12560
DOUALA                     TEL. 237 342 44 02
CAMEROON                   FAX. 237 342 38 98


### MBI GROUP

7200 WISCONSIN AVENUE, SUITE 702
BETHESDA, MD 20814         TEL. 301 986 1595
UNITED STATES              FAX. 301 986 1464


## 18. NOTICES

Any notice or notices to be given in terms of this AGREEMENT shall be sent to the party to whom it is directed at the domicilium referred to above or such other address or addresses as the parties may agree in writing, and such notice may be delivered by courier, registered or certified mail.

Should the parties so decide, any notice may be directed to the party for whom it is intended by facsimile machine or at a telephone number to be furnished by each party to the other from time to time.

Any notice dispatched by facsimile shall be deemed to have been received the date upon which it is sent and in any other case, seven days from the date of dispatch.

Page 6 of 7

CFC
AG
MBIG

IN THE PRESENCE OF THE UNDERSIGNED WITNESSES

SIGNED THIS ___18___ DAY OF Mai, 2004.

Joseph Edou, Director General

_____
Duly authorized for and on behalf of
CREDIT FONCIER DU CAMEROUN

Roger Tchoufa, Managing Director

_____
Duly authorized for and on behalf of
ATLANTIC GROUP SCI

John M. Kamya, President

_____
Duly authorized for and on behalf of
MBI GROUP, INC.



**SUBJECT: 1,200 AFFORDABLE HOUSING UNITS EXPANSION PROJECT IN YAOUNDÉ, CAMEROON**

## MEMORANDUM OF AGREEMENT

### BETWEEN

### CREDIT FONCIER DU CAMEROUN

### ("CFC")

### AND

### ATLANTIC GROUP SCI

### ("AG")

### AND

### MBI GROUP INC

### ("MBIG")

(Collectively hereinafter referred to as "the Parties")

Page 1 of 7

CFC
AG 7-1
MBIG '7

**EXHIBIT**

B

PENGAD 800-631-6989

## 1. INTRODUCTION AND PURPOSE OF AGREEMENT

The Parties hereby record that it is their intention to work together on the expansion of affordable housing in Cameroon, ("the Proposal"); the parties being:

**CREDIT FONCIER DU CAMEROUN** represented by Mr. Joseph Edou

and

**ATLANTIC GROUP SCI** represented by Mr. Roger Tchoufa

and

**MBI GROUP, INC** represented by Mr. John Kamya.

The Parties wish to enter into this AGREEMENT to establish the basis upon which they will co-operate and to define the works and/or services and corresponding liabilities apportioned to each of the Parties.


## NOW IT IS HEREBY AGREED:

## 2. DEFINITIONS.

    a.    "the Project / Contract" shall mean houses in Yaounde, approximately 1,200 units.

    b.    "the Agreement" shall mean this Agreement including the Introduction and all the Annexures.

    c.    "the Parties means CFC, AG and MBIG collectively;

    d.    "Signature date" means the date of signature of this Agreement by the party signing last.

    e.    "Effective date" means the date of signature;


## 3. OBJECTIVES

The Parties combine their collective skills and expertise to achieve the deliverance of houses in this particular project and in future development.

CFC
AG 7-
MBIG 7

a.   AG will provide the land for the project.

b.   AG will engage a prime contractor that will deliver a turnkey project for the 1,200 housing units.

c.   MBIG and AG will source international financing for the project.

d.   AG will provide marketing and sales services to the prospective purchasers.

e.   CFC will provide mortgage loans for the approved buyers of the estimated 1,200 housing units to be constructed by Atlantic Group SCI.

f.   CFC will make available to Atlantic Group the list of eligible buyers (also qualifying for mortgage loans) who currently number over 50,000.

g.   CFC confirms the availability of mortgage funds for at least 5,000 to 6,000 housing units (in a price range of US$25,000 to $55,000) over the next four years and will commit such mortgage funds to the buyers of the 1,200 units.

## 4. ROLES OF THE PARTIES

All the Parties will conduct their respective tasks with due diligence according to the best professional practice in the concerned field of expertise.

a.   MBIG and AG will source construction financing from international financial institutions.
b.   AG will have the role of Developer.
c.   CFC will have the role of Mortgage Financier and shall also provide the pool of eligible buyers.

## 5. LIMITATION OF LIABILITY

Save as expressly provided for in this Agreement, no Party shall be liable to any other for any direct, indirect or consequential losses whatsoever and howsoever arising.

## 6. NO PARTNERSHIP

Nothing herein contained shall be deemed or construed to create a partnership relationship of any kind or association or legal entity between the Parties or any of them and any right of ownership in property and assets shall be a sole individual right and not a joint, collective or partnership right.

CFC
AG  7-C
MBIG  7(

## 7. DURATION

The Parties agree that this agreement will be in use for the duration that is necessary to conclude the detailed and comprehensive agreement.

## 8. CONFIDENTIALITY

Excluding information already in the public domain, each Party shall, for a period of 2 years from the date of termination of this Agreement or 2 years after completion of the Project, which ever is the longer, respect and maintain the confidentiality of all documents, the Project and subsequent sub-contracts and any commercial, financial and technical information which may have been acquired from the other Parties, hereafter referred to as "Confidential information".

These obligations and restrictions shall not apply to information which:

  a. was at the time of receipt otherwise known to the receiving Party as evidenced by documentary material in it or in possession of the receiving Party at the time of receipt thereof;

  b. became known or available to the receiving Party from a source other than the furnished party without breach of this Agreement by the receiving Party, without obligation to keep confidential; or

  c. is disclosed in accordance with the written approval of the furnishing Party or must be disclosed for the proper performance of the services.

Each Party undertakes not to divulge any Confidential Information to any party or to use such information other than in the context of the Projects, sub-contracts and the Contracts. The Parties also undertake to ensure that this clause will be complied with by their employees, subcontractors, suppliers and/or legal and/or financial advisors involved in the Project or any other party who may have access to the information for the purpose of the Project and the Contract.

These obligations to respect and maintain confidentiality shall continue notwithstanding the expiration or termination of this Agreement, or withdrawal of a Party.

The Parties agree that they may use the Project, once realized, for publicity and marketing purpose, on condition that the Company is at all times included in such exercise.

## 9. DISPUTES

The Parties shall make every effort to ensure that all disputes in connection with the present Agreement are settled amicably.

CFC
AG 7-15
MBIG 7/(

## 10. BREACH

Should any of the parties commit a breach of this Agreement and persist therein after receipt of written notice calling upon it to remedy such breach within a period of fourteen (14) days, then the other party shall be entitled to cancel this Agreement.

## 11. APPLICABLE LAW AND LEGAL REQUIREMENTS

This Agreement shall in all respects be construed and interpreted in accordance with laws of Cameroon.

## 12. ENTIRE AGREEMENT

This present Agreement, which shall include the Introduction and any Annexure(s) contains the entire agreement between the Parties on this subject and cancels and replaces all previous undertakings, whether oral or written.

## 13. AMENDMENTS

The present Agreement or any of its provisions may only be amended, modified, extended, terminated or cancelled by a written agreement signed by all.

## 14. LANGUAGE

The language applied to all matters concerning this Agreement is English.

## 16. GOOD FAITH

The parties acknowledge that this Agreement is based upon mutual trust, good faith and confidence and that each shall in its dealings with the other, exercise the highest degree of good faith.

## 17. DOMICILIUM

The parties choose domicilium citandi et executandi as follows:

CFC
AG 7-(
MBIG

CREDIT FONCIER DU CAMEROUN

BOULEVARD DU 20 MAI
P.O. BOX 1531
YAOUNDE                        TEL. 237 223 15 25
CAMEROON                       FAX. 237 223 52 21


ATLANTIC GROUP SCI
40 RUE GULLIEN
P.O. BOX 12560
DOUALA                         TEL.  237 342 44 02
CAMEROON                       FAX.  237 342 38 98


MBI GROUP
7200 WISCONSIN AVENUE
SUITE 702
BETHESDA, MD 20814             TEL. 301 986 1595
UNITED STATES                  FAX. 301 986 1464

## 18. NOTICES

Any notice or notices to be given in terms of this Agreement shall be sent to the party to whom it is directed at the domicilium referred to above or such other address or addresses as the parties may agree in writing, and such notice may be delivered by courier, registered or certified mail.

Should the parties so decide, any notice may be directed to the party for whom it is intended by facsimile machine or at a telephone number to be furnished by each party to the other from time to time.

Any notice dispatched by facsimile shall be deemed to have been received the date upon which it is sent and in any other case, seven days from the date of dispatch.

CFC
AG  7-'S
MBIG 7(

IN THE PRESENCE OF THE UNDERSIGNED WITNESSES

SIGNED THIS _____ DAY OF 1 5 JUIL. 2005 ____ 2005.

_____
Duly authorized for and on behalf of
**CREDIT FONCIER DU CAMEROUN**

_____
Duly authorized for and on behalf of
**ATLANTIC GROUP SCI**

_____
Duly authorized for and on behalf of
**MBI GROUP, INC**

_____ CFC
_____ AG
_____ MBIG

SUBJECT: 2,000 HOUSING UNITS EXPANSION PROJECT
IN DOUALA, CAMEROON


MEMORANDUM OF AGREEMENT

BETWEEN AND AMONG

CREDIT FONCIER DU CAMEROUN

("CFC")

AND

ATLANTIC GROUP SCI

("AG")

AND

MBI GROUP INC

("MBIG")

(Collectively hereinafter referred to as "the Parties")


Page 1 of 7

CFC
AG
MBIG


EXHIBIT
C

## 1. INTRODUCTION AND PURPOSE OF AGREEMENT

The Parties hereby record that it is their intention to work together on the development of 2,000 housing units in Douala, Cameroon as part of an affordable housing expansion project ("the Proposal"); the parties being:

**CREDIT FONCIER DU CAMEROUN** represented by Mr. Joseph Edou

**and**

**ATLANTIC GROUP SCI** represented by Mr. Roger Tchoufa

**and**

**MBI GROUP, INC** represented by Mr. John Kamya.

The Parties wish to enter into this AGREEMENT to establish the basis upon which they will co-operate and to define the works and/or services and corresponding liabilities apportioned to each of the Parties.

## NOW IT IS HEREBY AGREED:

## 2. DEFINITIONS.

a. "the Project / Contract" shall mean houses in Douala, approximately 2,000 units.

b. "the Agreement" shall mean this Agreement including the Introduction and all the Annexures (if any).

c. "the Parties means CFC, AG and MBIG collectively;

d. "Signature date" means the date of signature of this Agreement by the party signing last.

e. "Effective date" means the date of signature;

## 3. OBJECTIVES

The Parties combine their collective skills and expertise to achieve the deliverance of houses in this particular project and in future development.

CFC
AG
MBIG

a.  AG will provide the land for the project.

b.  AG will engage a prime contractor that will deliver a turnkey project for the 2,000 housing units.

c.  MBIG and AG will source financing for the project from the International Finance Corporation (IFC).

d.  AG will provide marketing and sales services to the prospective purchasers.

e.  CFC will provide mortgage loans for the approved buyers of the estimated 2,000 housing units to be constructed by Atlantic Group SCI.

f.  CFC will make available to Atlantic Group the list of eligible buyers (also qualifying for mortgage loans) who currently number over 50,000.

g.  CFC confirms the availability of mortgage funds for at least 5,000 to 6,000 housing units (in a price range of US$38,000 to $65,000) over the next four years and will commit such mortgage funds to the buyers of the 2,000 units.

## 4. ROLES OF THE PARTIES

All the Parties will conduct their respective tasks with due diligence according to the best professional practice in the concerned field of expertise.

a.  MBIG and AG will source construction financing from the International Finance Corporation.
b.  AG will have the role of Developer.
c.  CFC will have the role of Mortgage Financier and shall also provide the pool of eligible buyers.

## 5. LIMITATION OF LIABILITY

Save as expressly provided for in this Agreement, no Party shall be liable to any other for any direct, indirect or consequential losses whatsoever and howsoever arising.

## 6. NO PARTNERSHIP

Nothing herein contained shall be deemed or construed to create a partnership relationship of any kind or association or legal entity between the Parties or any of them and any right of ownership in property and assets shall be a sole individual right and not a joint, collective or partnership right.

Page 3 of 7

CFC
AG
MBIG

## 7. DURATION

The Parties agree that this agreement will be in use for the duration that is necessary to conclude the detailed and comprehensive agreement.

## 8. CONFIDENTIALITY

Excluding information already in the public domain, each Party shall, for a period of 2 years from the date of termination of this Agreement or 2 years after completion of the Project, which ever is the longer, respect and maintain the confidentiality of all documents, the Project and subsequent sub-contracts and any commercial, financial and technical information which may have been acquired from the other Parties, hereafter referred to as "Confidential information".

These obligations and restrictions shall not apply to information which:

    a. was at the time of receipt otherwise known to the receiving Party as evidenced by documentary material in it or in possession of the receiving Party at the time of receipt thereof;

    b. became known or available to the receiving Party from a source other than the furnished party without breach of this Agreement by the receiving Party, without obligation to keep confidential; or

    c. is disclosed in accordance with the written approval of the furnishing Party or must be disclosed for the proper performance of the services.

Each Party undertakes not to divulge any Confidential Information to any party or to use such information other than in the context of the Projects, sub-contracts and the Contracts. The Parties also undertake to ensure that this clause will be complied with by their employees, subcontractors, suppliers and/or legal and/or financial advisors involved in the Project or any other party who may have access to the information for the purpose of the Project and the Contract.

These obligations to respect and maintain confidentiality shall continue notwithstanding the expiration or termination of this Agreement, or withdrawal of a Party.

The Parties agree that they may use the Project, once realized, for publicity and marketing purpose, on condition that the Company is at all times included in such exercise.

## 9. DISPUTES

The Parties shall make every effort to ensure that all disputes in connection with the present Agreement are settled amicably.

CFC
AG
MBIG

## 10.  BREACH

Should any of the parties commit a breach of this Agreement and persist therein after receipt of written notice calling upon it to remedy such breach within a period of fourteen (14) days, then the other party shall be entitled to cancel this Agreement.

## 11.  APPLICABLE LAW AND LEGAL REQUIREMENTS

This Agreement shall in all respects be construed and interpreted in accordance with laws of Cameroon.

## 12.  ENTIRE AGREEMENT

This present Agreement, which shall include the Introduction and any Annexure(s) contains the entire agreement between the Parties on this subject and cancels and replaces all previous undertakings, whether oral or written.

## 13.  AMENDMENTS

The present Agreement or any of its provisions may only be amended, modified, extended, terminated or cancelled by a written agreement signed by all.

## 14.  LANGUAGE

The language applied to all matters concerning this Agreement is English.

## 16.  GOOD FAITH

The parties acknowledge that this Agreement is based upon mutual trust, good faith and confidence and that each shall in its dealings with the other, exercise the highest degree of good faith.

## 17.  DOMICILIUM

The parties choose domicilium citandi et executandi as follows:

CFC
AG
MBIG

CREDIT FONCIER DU CAMEROUN

BOULEVARD DU 20 MAI
P.O. BOX 1531
YAOUNDE                    TEL. 237 223 15 25
CAMEROON                   FAX. 237 223 52 21


ATLANTIC GROUP SCI
40 RUE GULLIEN
P.O. BOX 12560
DOUALA                     TEL.  237 342 44 02
CAMEROON                   FAX.  237 342 38 98


MBI GROUP
7200 WISCONSIN AVENUE
SUITE 702
BETHESDA, MD 20814         TEL. 301 986 1595
UNITED STATES              FAX. 301 986 1464

## 18. NOTICES

Any notice or notices to be given in terms of this Agreement shall be sent to the party to whom it is directed at the domicilium referred to above or such other address or addresses as the parties may agree in writing, and such notice may be delivered by courier, registered or certified mail.

Should the parties so decide, any notice may be directed to the party for whom it is intended by facsimile machine or at a telephone number to be furnished by each party to the other from time to time.

Any notice dispatched by facsimile shall be deemed to have been received the date upon which it is sent and in any other case, seven days from the date of dispatch.

CFC
AG
MBIG

IN THE PRESENCE OF THE UNDERSIGNED WITNESSES

SIGNED THIS _____11th_____ DAY OF __August__ 2005.

_____
Duly authorized for and on behalf of
**CREDIT FONCIER DU CAMEROUN**


_____
Duly authorized for and on behalf of
**ATLANTIC GROUP SCI**


_____
Duly authorized for and on behalf of
**MBI GROUP, INC**

CFC
AG
MBIG

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MBI Group, Inc. et al. | Crédit Foncier du Cameroun et al. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF MONTGOMERY 88888 (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Cameroun (IN U.S. PLAINTIFF CASES ONLY) _____ NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Philip Musolino Musolino & Dessel 1615 L St., NW #440 Washington, DC 20036 (202) 466-3883        Sylvia Rolinski Danielle Espinet Rolinski & Suarez, LLC Potomac, MD 20854 (240) 632-0903 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ◉ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.  Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.  Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.  General Civil (Other)**    OR    ○ **F.  Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

**○ G. _Habeas Corpus/ 2255_**

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

**○ H. _Employment Discrimination_**

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

**○ I. _FOIA/PRIVACY ACT_**

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

**○ J. _Student Loan_**

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

**○ K. _Labor/ERISA (non-employment)_**

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**○ L. _Other Civil Rights (non-employment)_**

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

**⊙ M. _Contract_**

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☒ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

**○ N. _Three-Judge Court_**

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Foreign Sovereign Immunity Act  —  COMMERCIAL ACTIVITY

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ $500,000,000.00  Check YES only if demanded in complaint
JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☐  If yes, please complete related case form.

DATE April 4, 2007    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.