# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., and | : | |
| | : | |
| Atlantic Group, SCI, | : | |
| | : | |
| *Plaintiffs*, | : | 1:07-cv-00637-JDB |
| | : | |
| v. | : | |
| | : | |
| Crédit Foncier du Cameroun, and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants.* | : | |

## MOTION OF DEFENDANTS,
### CRÉDIT FONCIER DU CAMEROUN AND
### THE GOVERNMENT OF THE REPUBLIC OF CAMEROON
### TO DISMISS PLAINTIFFS' COMPLAINT

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, Defendants, Crédit Foncier du Cameroun and The Government of the Republic of Cameroon, move to dismiss the Complaint of Plaintiffs, MBI Group, Inc., and Atlantic Group, SCI, in this proceeding.

Defendants move to dismiss the Complaint as to both Defendants under Rule 12(b)(1) for lack of jurisdiction over the subject matter because Defendants are entitled to sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602-1611.

Defendants move to dismiss the Complaint as to Crédit Foncier du Cameroun under Rule 12(b)(2) for lack of jurisdiction over the person because Crédit Foncier du Cameroun does not have the minimum contacts with the forum necessary to satisfy the requirement of due process of the Fifth Amendment of the U.S. Constitution.

Defendants move to dismiss the Complaint as to both Defendants under the doctrine of *forum non conveniens* because all the relevant factors favor litigation of this dispute in the courts of Cameroon instead of the United States.

The points and authorities in support of this motion are set out in the Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Complaint filed concurrently herewith.

Respectfully submitted,

_____/s/ Knox Bemis_____

Knox Bemis  #14852
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, D.C.  20006
(202) 955-1886
(202) 778-2201 (fax)

September 26, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MBI Group, Inc., and** | : | |
| | : | |
| **Atlantic Group, SCI,** | : | |
| | : | |
| *Plaintiffs*, | : | **1:07-cv-00637-JDB** |
| | : | |
| **v.** | : | |
| | : | |
| **Crédit Foncier du Cameroun, and** | : | |
| | : | |
| **The Government of the Republic of Cameroon,** | : | |
| | : | |
| *Defendants.* | : | |

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Knox Bemis
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
(202) 955-1500 (telephone)
(202) 778-2201 (facsimile)
*Counsel for Defendants*

September 26, 2007

## **Table of Contents**

Table of Authorities ...............................................................................................iii

Statement of Facts ................................................................................................ 1

    Plaintiffs ............................................................................................................1

    Defendants ........................................................................................................2

    General Manager of CFC ..................................................................................3

    The Falls............................................................................................................4

    Initial Contacts of Joseph Edou with MBI.......................................................5

    Creation of Atlantic..........................................................................................5

    Alleged Activities in the United States.............................................................6

    Lack of Authority on the Part of Joseph Edou.................................................7

    No CFC Approvals of Alleged "Memorandums of Agreements" .....................8

    Atlantic's Purchase of Property for The Falls..................................................8

    Charges against Joseph Edou and Roger Tchoufa .........................................9

ARGUMENT .......................................................................................................10

**I.**    The Court Has No Subject Matter Jurisdiction over Plaintiffs' Lawsuit..........10

    **A.**    Subject Matter Jurisdiction Does Not Exist Unless the Commercial Activity Exception of § 1605(a)(2) of the FSIA Applies. ....................................10

    **B.**    Plaintiffs Allege No Facts That Could Provide A Basis for Subject Matter Jurisdiction Over the Government of Cameroon. ...................................................11

    **C.**    There is No Subject Matter Jurisdiction Over CFC...............................................12

        **1.**    There Was No Act of CFC in the United States Upon Which Plaintiffs' Claim Could be Based. ...........................................................12

            **a.**    The Purported Execution of the May 18, 2004 Memorandum of Agreement Was Not an Act of CFC. ................13

                **(1)**    Joseph Edou had no authority to act for CFC in executing the purported May 18, 2004 Memorandum of Agreement.............................................13

                **(2)**    Apparent authority would not make Joseph Edou's execution of the purported May 18, 2004 Memorandum of Agreement an act of CFC, but in any event no such apparent authority existed. ...................16

        **2.**    No Act of CFC in Cameroon Had a Direct Effect in the United States. ............................................................................................18

**II.**      The Court Lacks Personal Jurisdiction over CFC ............................................................18

**III.**     The Doctrine of *Forum Non Conveniens* Requires Dismissal of this Action in Favor of the Courts of Cameroon. ......................................................................20

        **A.**    The Courts of Cameroon Represent an Adequate Alternative Forum. ..................21

        **B.**    The Relevant Private Interests Favor the Courts of Cameroon. ...........................22

        **C.**    The Public Interests Strongly Favor the Courts of Cameroon. ............................25

        **D.**    Plaintiffs Can Reinstate their Lawsuit in Cameroon ...........................................28

CONCLUSION .....................................................................................................................29

INDEX OF DECLARATIONS AND EXHIBITS

**Table of Authorities**

**CASES**

*Argentine Republic v. Amarada Hess Shipping Corp.*, 488 U.S. 428 (1989)...................10

*Burger King Corp. v. Rudzewicz.*, 471 U.S. 462 (1985)......................................19

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*,
212 F. Supp. 2d 30 (D.D.C. 2002)......................................................21, 28

*Dale v. Colagiovanni*, 443 F.3d 425 (5th Cir. 2006) ........................................15

*First Fidelity Bank N.A. v. Gov't of Antigua & Barbuda - Permanent
Mission*, 877 F.2d 189 (2nd Cir. 1989)........................................................15

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba (Banec)*,
462 U.S. 611 (1983).............................................................................11

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438
(D.C. Cir. 1990) ...........................................................................12, 20

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)..............................................20

*Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170 (5th Cir. 1989) .................12

*In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998)........................................20, 21

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .............................19

*Pain v. United Techs. Corp.*, 637 F.2d 775 (D.C. Cir. 1980) .............................21

*Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (DC Cir. 2005).....................10

*Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36 (DC Cir. 2000)..................10

*Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997) ...............................14, 15

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d. 82
(D.C. Cir. 2002) ................................................................................19

*Republic of Argentina v. Weltover*, 504 U.S. 607 (1992) .................................18

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..............................................13

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296

(D.C. Cir. 2005) ...........................................................................................20, 22

*United World Trade v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232
   (10th cir. 1994)...........................................................................................18

*Velasco v. Gov't of Indonesia*, 370 F.3d 392 (4th Cir. 2004) ...........................................15

## FEDERAL STATUTES

Foreign Sovereign Immunities Act,
   28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602-1611 .....................................1

28 U.S.C. § 1391(f).........................................................................................23

28 U.S.C. § 1391(f)(1)......................................................................................23

28 U.S.C. § 1603(a) .................................................................................2, 10, 13

28 U.S.C. § 1603(b) ....................................................................................2, 10

28 U.S.C. § 1604............................................................................................10

28 U.S.C. § 1605............................................................................................10

28 U.S.C. § 1605(a)(2)................................................................................ *passim*

28 U.S.C. § 1610(a) ........................................................................................22

28 U.S.C. § 1610(a)(2)......................................................................................22

28 U.S.C. § 1610(a)(6)......................................................................................22

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 11 ...........................................................................................2

## MISCELLANEOUS

Restatement (Third) Agency § 2.03 ............................................................................16

F.H.S. Bridge, The Counsel of Europe French-English Legal Dictionary 83
   (Council of Europe Publishing 1994) ........................................................................3

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF**</u>
<u>**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**</u>

Defendants, the Government of the Republic of Cameroon ("Cameroon" or "Government") and Crédit Foncier du Cameroun ("CFC"), move to dismiss the Complaint filed April 4, 2007 by Plaintiffs, MBI Group, Inc. ("MBI"), and Atlantic Group, SCI ("Atlantic").

The Complaint must be dismissed because both the Government and CFC are entitled to sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602-1611 ("FSIA"), and this Court lacks subject matter jurisdiction. The Court also lacks personal jurisdiction over CFC because CFC does not have the minimum contacts with the forum to satisfy the requirements of Constitutional due process. Even if the Court possessed subject matter jurisdiction and personal jurisdiction, the lawsuit should nevertheless be dismissed on the doctrine of *forum non conveniens* because the courts of Cameroon rather than this Court represent the appropriate forum for this dispute.

<u>**Statement of Facts**</u>

<u>**Plaintiffs**</u>

MBI is a U.S. corporation organized under the laws of State of Delaware, with its principal office in Maryland. Complaint ¶ 4; Maryland Complaint ¶ 3.[1]

---

[1]   Plaintiffs in this lawsuit previously filed a Complaint against the defendants in this lawsuit and against others in the U.S. District Court for the District of Maryland, Greenbelt Division. *MBI Group, Inc., et al v. Crédit Foncier du Cameroun, et al*, case number 8:06-cv-03279-PJM (filed December 6, 2006). Plaintiffs voluntarily dismissed the Maryland lawsuit on March 14, 2007. However, the allegations of the Maryland Complaint were made under Fed. R. Civ. P. 11. Plaintiffs Complaint in this lawsuit is referred to herein as "Complaint," and Plaintiffs complaint in the Maryland lawsuit is referred to herein "Maryland Complaint."

Atlantic is a corporation organized in Cameroon. Declaration of Professor Efraim Ngwafor ("Ngwafor Decl."), Ex. EN-3 (Articles of Atlantic Group SCI). Atlantic is a subsidiary of MBI established in Cameroon by MBI specifically for CFC-related affordable housing development projects in Cameroon. Maryland Complaint ¶ 4.

**<u>Defendants</u>**

Cameroon is a sovereign state located in Africa. Complaint ¶ 7; Ngwafor Decl. ¶ 1. Accordingly, the Government of Cameroon is a "foreign state" as defined in § 1603(a) of the FSIA.

CFC is a corporation organized under the laws of Cameroon, and a majority of its shares are owned directly by the Government of Cameroon. Declaration of Henri Mekongo Mbala ("Mekongo Decl.") ¶ 3 and Ex. HMM- 1 (CFC Articles, § 7). Accordingly, CFC is an "agency or instrumentality" of a foreign state, *i.e.*, of Cameroon, as defined in § 1603(b) of the FSIA.

Although CFC is owned by the Government of Cameroon, it operates as a separate entity to serve the purposes for which it is established — principally to make affordable housing available for the people of Cameroon. Mekongo Decl. ¶ 5 and Ex. HMM- 1 (CFC Articles, § 2). CFC's Board of Directors, although appointed for the most part by the Government or Government-owned bodies, directs the activities of CFC as a separate entity to accomplish the purposes stated in CFC's Articles. Mekongo Decl. ¶ 7. The Ministry of Finance provides technical and financial supervision (*see* Mekongo Decl., Ex. HMM 1 (CFC Articles, § 6)), but neither the Ministry nor any other part of the Government of Cameroon directs the manner in which CFC operates or in which it pursues the objectives stated in its Articles (Mekongo Decl. ¶ 7).

**General Manager of CFC**

CFC is administered by its Board of Directors, which has the power to act in the name of CFC.  Mekongo Decl., Ex. HMM-1 (CFC Articles § 33.1).  The General Manager (Directeur Général)[2] of CFC is appointed by the Board of Directors but is not a member of the Board. Mekongo Decl. ¶ 8.  The General Manager is in charge of managing and implementing the CFC's general policy under the supervision of the Board of Directors, to which he is answerable. Mekongo Decl., Ex. HMM-1 (CFC Articles § 40).  The General Manager has specific authority which is stated in the CFC Articles, § 40.  This authority does not include the power to make loans on behalf of CFC or to commit CFC to advance funds to borrowers.  The power to approve loans prepared by the General Manager lies in the Board of Directors.  Mekongo Decl., Ex. HMM 1 (CFC Articles, § 33.1.h).

The General Manager may have additional powers delegated to him by the Board of Directors.  *Id.* § 40.  Pursuant to this authority, the Board delegated to the General Manager the authority to commit to loans by CFC provided that the value of the loan does not exceed 10,000,000 FCFA (equivalent to approximately US$20,000).  Mekongo Decl. ¶ 11 and Ex. HMM-2.  The General Manager was not authorized to commit CFC to any project requiring a CFC expenditure in excess of 10,000,000 FCFA.  Mekongo Decl. ¶ 13.  Loans in excess of 10,000,000 FCFA but no greater than 200,000,000 FCFA (equivalent to approximately US$400,000) may be approved by CFC's Management Committee, which consists of six CFC officials.  Mekongo Decl. ¶ 11 and Ex. HMM-3.  Any loan by CFC in excess of 200,000,000

---

[2]    The title "Directeur Général" used in the CFC Articles is equivalent to "General Manager." *See, e.g.,* F.H.S. Bridge, The Counsel of Europe French-English Legal Dictionary 83 (Council of Europe Publishing 1994).

FCFA must be specifically approved by CFC's Board of Directors. Mekongo Decl. ¶ 12 and Ex. HMM-4.

The General Manager of CFC from January 1999 until September 13, 2005, was Joseph Edou. On September 13, 2005, Camille Ekindi replaced Mr. Edou as General Manager. Mekongo Decl. ¶ 8.

## **The Falls**

On July 21, 2003, The Falls, a public limited company ("Société Anonyme"), was established under the laws of Cameroon. The Falls has a capital of 25,000,000 FCFA (equivalent to approximately US$50,000). The single shareholder of The Falls is stated to be Ateba Minkoulou Gabriel. Ngwafor Decl. ¶ 10 and Ex. EN-1 (Articles of The Falls, Appendix ("Statement of Payment and Subscription")) and Ex. EN-2 ("Report of the Ordinary Decision of the Single Shareholder of The Falls"). Ateba Minkoulou Gabriel is married to Joseph Edou's elder sister — *i.e.,* Ateba Minkoulou Gabriel is Joseph Edou's brother-in-law. Mekongo Decl. ¶ 19. Thus, the nominal owner of all the stock of The Falls is the brother-in-law of the person who was General Manager of CFC at the time The Falls was organized and up until September 13, 2005. The subsequent dealings of The Falls with Atlantic and with Joseph Edou purportedly on behalf of CFC strongly suggest that Ateba Minkoulou Gabriel is the owner of the shares in name only and that the real owner of The Falls is Joseph Edou.

On July 24, 2003, a mere three days after the incorporation of The Falls, Ateba Minkoulou Gabriel delegated to one Koh Koh the power to act in the name of The Falls in all respects. Ngwafor Decl. ¶ 11 and Ex. EN-2 ("Report of the Ordinary Decision of the Single Shareholder of The Falls"). Koh Koh was not previously acquainted with Ateba Minkoulou

Gabriel, and after July 24, 2003, he had no further contact with him.  Declaration of Koh Koh ("Koh Koh Decl.") ¶ 4.  Koh Koh accepted the power of attorney at the request of Joseph Edou with whom he was previously acquainted, and understood that in making the appointment Ateba Minkoulou Gabriel acted at the direction of Joseph Edou.  *Id* ¶ 6.  Prior to his appointment on July 24, 2003, Koh Koh had little experience in business affairs and no experience in acting on behalf of a company such as The Falls.  In acting on behalf of The Falls, Koh Koh followed the instructions of Joseph Edou and made no decisions independent of Joseph Edou's instructions. *Id.* ¶ 7.

**Initial Contacts of Joseph Edou with MBI**

Plaintiffs allege that in November and December 2003, Joseph Edou, purportedly on behalf of CFC, approached MBI and solicited MBI's participation in the development and implementation of an affordable housing program in Cameroon.  Complaint ¶ 14, 15.  Plaintiffs also allege officers of MBI traveled to Cameroon in January and February 2004, and on February 27, 2004, delivered an expression of interest in a project involving construction of between 1,000 and 1,200 houses in Yaoundé, the capital city of Cameroon.  Complaint ¶¶ 16, 17.  Plaintiffs further allege that "CFC" reviewed the proposal and advised MBI that it conformed with CFC's requirements and that "CFC" thereupon authorized MBI to commence master planning project costing and architectural design work.  *Id.* ¶ 18.

**Creation of Atlantic**

On March 24, 2004, Atlantic was organized in Cameroon.  Ngwafor Decl. ¶ 13 and Ex. EN-3 (Articles of Atlantic Group).  Plaintiffs stated that Atlantic was incorporated as MBI's "local Cameroon subsidiary . . . specifically to undertake affordable housing initiatives in Cameroon."  Maryland Complaint ¶ 17.  At the organization of Atlantic, MBI was represented by

Roger Tchoufa, Executive Vice President of MBI, who was expressly authorized by MBI to organize the company.  Ngwafor Decl. Ex. EN-3 (MBI Corporate Resolution attached to Articles of Atlantic Group).

However, Atlantic is not a wholly-owned subsidiary of MBI.  In fact, MBI owns only 35% of the stock of Atlantic.  An additional 20% is held in the name of Roger Tchoufa. However, the remaining 45% of the stock of Atlantic is owned by The Falls, *i.e.,* the corporation all of the stock of which is held in the name of Joseph Edou's brother-in-law.  Ngwafor Decl. ¶ 13, 14 and Ex. EN-3 (Articles of Atlantic Group, Arts. 6 and 7).  Moreover, Atlantic's capitalization is disproportionately small in relation to its contemplated undertakings.  The total capitalization of Atlantic is only 2,000,000 FCFA (equivalent to approximately US$4,000). Ngwafor Decl. ¶ 13.

Thus, Atlantic, the corporation organized to be the developer of the contemplated project, was owned 45% by a company (The Falls) all of whose stock was in the name of the brother-in-law of the General Manager of the state-owned company with whom MBI was negotiating to fund the project.  Moreover, that company (The Falls) paid only 900,000 FCFA (equivalent to approximately US$1,800) to obtain its 45% interest in Atlantic, which stood to profit as the developer of the project.

**<u>Alleged Activities in the United States</u>**

Plaintiffs allege that Joseph Edou traveled to the United States for approximately two weeks commencing May 9, 2004.  Complaint ¶ 25.  They allege that by letter dated May 11, 2004, Joseph Edou advised that CFC had more than US$50 million available for the construction of 2,000 housing units.  *Id.* ¶ 24.

Plaintiffs also allege that on May 18, 2004, in Bethesda, Maryland, Atlantic, MBI and CFC entered into a "Memorandum of Agreement," a copy of which is attached as Ex. A to Plaintiffs' Complaint.  Complaint ¶ 26.  The alleged Memorandum of Agreement bears what purports to be the signature of Joseph Edou and below the signature line the legend "Duly Authorized for and on Behalf of CRÉDIT FONCIER DU CAMEROUN."   The alleged Memorandum of Agreement contains no signature or purported evidence of approval on behalf of CFC other than the signature of Joseph Edou.  Complaint, Ex. A.

The alleged Memorandum of Agreement purports to obligate CFC, among other things, to "provide all construction and project development financing of approximately US$49 million and [to] provide the necessary financial guarantees."  *Id.*, § 3.b.  The alleged Memorandum of Agreement also provides that it "shall in all respects be construed and interpreted in accordance with the laws of the Republic of Cameroon."  *Id.,* § 11.

Plaintiffs allege that the Memorandum of Agreement is a contract (Complaint ¶ 99), and they make claims in this lawsuit based on the alleged contract (*e.g.*, Complaint ¶ 102).

**<u>Lack of Authority on the Part of Joseph Edou</u>**

In fact, Joseph Edou had no authority to enter into the purported Memorandum of Agreement.  As discussed above, Joseph Edou had no authority as General Manager of CFC to enter into a contract in excess of 10,000,000 FCFA (equivalent to approximately US$20,000), and certainly no authority to enter into a contract purporting to obligate CFC to advance US$49 million in loans.  Any proposal for a loan exceeding 10,000,000 FCFA was required to be prepared by Joseph Edou and submitted to the CFC Board of Directors for its review.   Mekongo Decl. ¶¶ 8, 10-14 and Ex. HMM 1 (CFC Articles, §§ 33.1, 33.1.h, 40).

- 7 -

Moreover, no businessman with even a basic acquaintance with funding by government-owned corporations such as CFC could have reasonably believed that one individual, a General Manager, could by himself authorize a commitment of the magnitude of US$49 million. It would be improbable in the extreme that the General Manager of such a corporation would have the sole authority to sign a contract with the scope and value of the purported May 18, 2004 Memorandum of Agreement. Declaration of Ambassador Tibor P. Nagy, Jr. ("Nagy Decl.") ¶ 9-10. Such a contract or commitment typically requires multiple due-diligence reviews, eventual approval by the company's Board of Directors, and often approval by higher government officials. *Id.* Projects of this sort typically require a valuation report, done with due diligence and a thorough exploration of the alternatives. Ngwafor Decl. ¶ 20. Indeed, in Cameroon projects such as that contemplated by the purported May 18, 2004 Memorandum of Agreement are required to be submitted for public bids. *Id.* ¶ 19.

**No CFC Approvals of Alleged "Memorandums of Agreements"**

None of the purported "Memorandums of Agreements" that are Exhibits A, B and C to Plaintiffs' Complaint nor any other purported contract relating to any of the projects in which MBI or Atlantic was involved was submitted to CFC's Board of Directors for approval. Mekongo Decl. ¶ 15. No public tender was made at any time with respect to the Olembé II Project or with respect to any other alleged project in which either MBI or Atlantic was involved. *Id.* ¶ 16.

**Atlantic's Purchase of Property for The Falls**

On August 4, 2005, Sandji Ndongo François sold a residential property to The Falls (*i.e.,* the company whose stock was held in the name of Joseph Edou's brother-in-law). Ngwafor Decl. ¶ 15 and Ex. EN-4 (Deed to property); Declaration of Beatrice R. Assena ("Assena Decl.")

¶ 3 and Ex. BA-1 (Deed to property).  The property sold was in no way related to the purported affordable housing project.  Mekongo Decl. ¶ 18; Ngwafor Decl. ¶ 15.  The purchase price of the property, 80,000,000 FCFA (equivalent to approximately US$160,000), and transaction expenses of 15,954,855 FCFA (equivalent to approximately US$32,000), were paid by checks drawn on Atlantic's account in the Union Bank of Cameroon.  Assena Decl. ¶¶ 4, 5 and Ex. BA-2 (Check) and BA-3 (Check).  After the sale, the tenant's checks for the rental of the property were cashed by Joseph Edou.  Declaration of Boscolo Andrea ¶¶ 2-3.

**<u>Charges against Joseph Edou and Roger Tchoufa</u>**

On September 13, 2005, Joseph Edou was replaced as General Manager of CFC. Mekongo Decl. ¶ 8.  As a result of his dealings with MBI and Atlantic, as well as other activities he allegedly engaged in while General Manager of CFC, Joseph Edou is under criminal indictment charged with misappropriation and embezzlement of public funds, and conspiring with others to misappropriate funds for fictitious services purportedly rendered.  Ngwafor Decl. ¶ 16.  As a result of certain alleged activities on behalf of Atlantic and MBI and his dealings with Joseph Edou, Roger Tchoufa is also under criminal indictment in Cameroon charged with embezzlement and misappropriation of public funds.  Roger Tchoufa fled Cameroon and is the subject of a fugitive warrant for his arrest.  *Id.* ¶ 17.

## ARGUMENT

**I.    The Court Has No Subject Matter Jurisdiction over Plaintiffs' Lawsuit.**

    **A.    Subject Matter Jurisdiction Does Not Exist Unless the Commercial Activity Exception of § 1605(a)(2) of the FSIA Applies.**

Cameroon is a "foreign state" within the meaning § 1603(a) of the FSIA.  Complaint ¶ 7; Ngwafor Decl. ¶ 1.  CFC is an "agency or instrumentality" of Cameroon within the meaning of § 1603(b) of the FSIA because a majority of its stock is owned directly by the Government of Cameroon.  Mekongo Decl. ¶ 3 and Ex. HMM- 1 (CFC Articles, § 7).  Accordingly, both the Government of Cameroon and CFC are "foreign states" as defined in § 1603(a) for purposes of the determination of sovereign immunity under § 1604 and the exceptions to sovereign immunity under § 1605.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amarada Hess Shipping Corp.,* 488 US 428, 434 (1989).  A foreign state enjoys sovereign immunity under the FSIA "unless an international agreement or one of several exceptions in [§ 1605 of] the statute provides otherwise."  *Peterson v. Royal Kingdom of Saudi Arabia,* 416 F.3d 83, 86 (D.C. Cir. 2005) (internal citations omitted).  Thus, "[i]n the absence of an applicable exception, the foreign sovereign's immunity is 'complete' — 'the district court lacks subject matter jurisdiction over the plaintiff's case'" *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C. Cir. 2000).

The only basis Plaintiffs assert for jurisdiction under the FSIA is the commercial activity exception of § 1605(a)(2).  Complaint ¶ 2.  Section 1605(a)(2) provides that a foreign state shall not be immune from jurisdiction in any case —

> In which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

None of the three branches of the commercial exception is applicable in this case.

### B.    Plaintiffs Allege No Facts That Could Provide A Basis for Subject Matter Jurisdiction Over the Government of Cameroon.

Plaintiffs' Complaint contains no allegation of any act by the Government of Cameroon itself that could be a basis for subject matter jurisdiction under § 1605(a)(2).  There is no allegation of a commercial activity carried on in the United States by the Government of Cameroon, nor is there any alleged act by the Government of Cameroon in the United States in connection with commercial activity elsewhere.  Nor is there an allegation of an act by the Government of Cameroon outside the territory of the United States in connection with a commercial activity of the Government that caused a direct effect in the United States.[3]

Jurisdiction over the Government of Cameroon must be established by actions of the Government itself, not on the basis of any alleged actions of CFC.  CFC is an entity separate from the Government and is administered as such by its Board to accomplish the purposes stated in CFC's Articles.  Mekongo Decl. ¶ 7 and Ex. HMM-1 (Articles of CFC).  "[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba (Banec)*, 462 U.S. 611, 626-27 (1983).  "The presumption of the juridical separateness

---

[3]    Neither alleged financial loss to a U.S. corporation (*e.g.* MBI) nor the alleged loss of financing by U.S. institution such as USIA or MIGA would constitute a "direct effect" in the United States.  *See* I.C.2. below.

of entities also applies to jurisdictional issues" including sovereign immunity under the FSIA.

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 446 (D.C. Cir. 1990).   To

establish FSIA jurisdiction over a foreign sovereign through the acts of a corporation it owns

requires a showing of sufficient control by the Government over the corporation to create the

relationship of principal to agent.   *Id.* 447.   Moreover, it is the plaintiff's burden to show that

such a relationship exists.   *Id.*   That burden is not met by showing the Government's ownership

of the corporation and control of its Board.   " Majority shareholding and majority control of a

board of directors, without more, are not sufficient to establish a relationship of principal to

agent under FSIA."   *Id.* 448 (citations omitted); *and see Hester Int'l Corp. v. Fed. Republic of

Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989) ("The two factors of 100% ownership and

appointment of the Board of Directors cannot by themselves force a court to disregard the

separateness of the juridical entities.").

In this case there is nothing that establishes a principal-agent relationship between the

Government of Cameroon and CFC.   There is no basis for subject matter jurisdiction over the

Government of Cameroon either through alleged acts of its own or through the alleged acts of

CFC.

> **C.**    **There is No Subject Matter Jurisdiction Over CFC.**
>
> **1.**    **There Was No Act of CFC in the United States Upon Which Plaintiffs' Claim Could be Based.**

The first two branches of § 1605(a)(2) require an activity or an act of the foreign state in

the United States.   The first branch requires "a commercial activity carried on the in the United

States by the foreign state." The second branch requires "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."[4]

Also, such an action or act cannot be a basis for subject matter jurisdiction unless the plaintiff's claim is "based upon" such act within the meaning of § 1605(a)(2). To satisfy this element of the statute, the alleged act must be part of the "elements of [the plaintiffs'] claim that, if proven, would entitle [plaintiffs] to relief under [their] theory of the case." *Saudi Arabia v. Nelson,* 507 US 349, 357 (1993). The commercial activity that forms the basis for jurisdiction must also serve as the predicate for the plaintiff's substantive cause of action.

      **a.**    **The Purported Execution of the May 18, 2004 Memorandum of Agreement Was Not an Act of CFC.**

      **(1)**    **Joseph Edou had no authority to act for CFC in executing the purported May 18, 2004 Memorandum of Agreement.**

The only act Plaintiffs allege to have occurred in the United States that a claim in their Complaint is "based upon" is the alleged execution of the May 18, 2004 Memorandum of Agreement by Joseph Edou in Bethesda, Maryland.[5] Complaint ¶ 26. However, Joseph Edou's alleged execution of the May 18, 2004 Memorandum of Agreement was not an act of CFC because Joseph Edou had no authority to enter into it on behalf of CFC. The Memorandum of Agreement purported to commit CFC, among other things, to advance US$49 million in

---

[4]    For purposes of § 1605(a)(2), "foreign state" includes an agency or instrumentality such as CFC. 28 U.S.C. § 1603(a).

[5]    Plaintiffs allege that in May 2004 CFC officials inspected housing developments in the Washington, D.C. area and met with various U.S. government officials. Complaint ¶ 25. They also allege that in June 2005, CFC met with various U.S. government officials to secure U.S. government funding and support for the housing projects in Cameroon. Complaint ¶ 42. None of these activities is a basis for claims in Plaintiffs' Complaint.

financing and to provide mortgage loans to the buyers of some 1,100 houses. Joseph Edou had

no authority to incur a commitment on behalf of CFC for anything approaching this magnitude.

Joseph Edou's contracting authority was limited to 10,000,000 FCFA (equivalent to

approximately US$20,000), and his proposals for CFC loans in excess of that amount were

required to be submitted to CFC's Board of Directors for its approval (or to CFC's Management

Committee for loans up to 200,000,000 FCFA, equivalent to approximately US$400,000). *See*

Mekongo Decl. ¶ 10-17.

When the act of an agent of a foreign state is beyond the scope of his authority — as was

Joseph Edou's alleged execution of the May 18, 2004 Memorandum of Agreement — the

unauthorized act does not constitute the act of the foreign state for purposes of § 1605(a)(2). If

the foreign state has not empowered its agent to act, the agent's unauthorized act cannot be

attributed to the foreign state; there is no "activity of the foreign state." *Phaneuf v. Republic of

Indonesia,* 106 F.3d 302, 308 (9th Cir. 1997) (citations omitted). The *Phaneuf* Court held that:

> The language of the commercial activity exception compels the
> conclusion that only evidence of actual authority can be used to
> invoke that exception.
>
> . . . .
>
> If Congress had intended the commercial activity exception to
> apply to an agent's acts committed without actual authority it could
> have so indicated in the language of the exception. Instead, the
> plain meaning of the language "commercial activity of the foreign
> state" illustrates that Congress intended for the exception to apply
> only in cases of actual authority.

Id. at 307-308. The Court cited the parallel to the sovereign immunity of the United States itself:

> When dealing with a purported agent of the United States, the third
> party bears the risk that the agent is acting outside the scope of the
> agent's authority . . . even if the third party reasonably believes the
> agent has authority.

> We hold that agent must have acted with actual authority in order
> to invoke the commercial activity exception against a foreign state.

*Id.* at 308 (citations and footnote omitted).

Other circuits have reached the same conclusion — that the agent of the foreign state

must have actual authority in order for his or her act to be the basis for § 1605(a)(2) jurisdiction:

> Whether a third party reasonably perceives that the sovereign has
> empowered its agent to engage in a transaction, however, is
> irrelevant if the sovereign's constitution or laws proscribe or do not
> authorize the agent's conduct and the third party fails to make a
> proper inquiry.  We conclude that foreign official's manifestation
> of authority to bind the sovereign is insufficient to bind the
> sovereign.

*Velasco v. Gov't of Indonesia,* 370 F.3d 392, 400 (4th Cir. 2004).

The Fifth Circuit reached the same conclusion:

> While this is an issue of first impression in this Circuit, both the
> Fourth and Ninth Circuits, the only Circuits to have directly
> addressed the issue, have concluded that conduct by an agent
> acting with apparent authority is insufficient to trigger the
> commercial activity exception and give a basis for jurisdiction
> against the state under FSIA. . . .
>
> We agree with the Fourth and Ninth Circuits that an agent's acts
> conducted with the apparent authority of the state is insufficient to
> trigger the commercial exception to FSIA.

*Dale v. Colagiovanni,* 443 F.3d 425, 428, 429 (5th Cir. 2006) (citations omitted).[6]

---

[6]    In *First Fidelity Bank N.A. v. Gov't of Antigua & Barbuda — Permanent Mission*, 877 F.2d
189 (2nd Cir. 1989), the court instructed the district court on remand that § 1605(a)(2)
jurisdiction would exist if apparent authority existed.  However, as the 9th Circuit pointed out
in *Phaneuf v. Gov't of Indonesia, supra:*

> The court, however, seems to have assumed the appropriateness of
> invoking the commercial activity exception based on apparent authority.
> The court gave no analysis or explanation of its statements regarding
> apparent authority.

*Phaneuf v. Gov't of Indonesia, supra, at 308 n.4.*

Thus, the agent of a foreign state must possess actual authority to perform the act upon which the plaintiff's claim is based in order to support subject matter jurisdiction under § 1605(a)(2). Joseph Edou possessed no such authority, and accordingly there was no act of CFC in the United States that would support subject matter jurisdiction under § 1605(a)(2).

> **(2)      Apparent authority would not make Joseph Edou's execution of the purported May 18, 2004 Memorandum of Agreement an act of CFC, but in any event no such apparent authority existed.**

As shown in I.C.1.a.(1) above, actual authority is required in order for an agents' act to be the act of the foreign state for purposes of § 1605(a)(2). However, even if apparent authority were sufficient, such authority does not exist in the case of Joseph Edou's execution of the purported May 18, 2007 Memorandum of Agreement. Apparent authority requires that "a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) Agency § 2.03. No such reasonable belief can be attributed to Plaintiffs here.

First, it was not reasonable for Plaintiffs to believe that a single officer of CFC could, on the basis of his signature alone, commit CFC to advance US$49 million and undertake the other obligations of the purported contract. Any such commitment on the part of a state-owned company would normally requires multiple approvals and an evaluation conducted with due diligence and an examination of competing opportunities. Also, such a project in Cameroon requires a public tender for bids. It is inconceivable that Plaintiffs — presumably experienced in government projects in Africa (*see, e.g.,* Complaint ¶ 9) — could have in fact believed that one individual, the General Manager, had the authority on his own to commit a government-owned financial institution, CFC, to advance US$49 million and to approve a project for the

construction of 1,100 houses in Cameroon's capital city.  See Nagy Decl. ¶¶ 7-10; Ngwafor

Decl. ¶ 20.  Moreover, it is not difficult for a U.S. business to obtain information on the general

requirements for contracting with a foreign state-owned company, e.g., by contacting the U.S.

Embassy in the country involved.  Nagy Decl. ¶ 10.  Any inquiries would have immediately

disclosed that it was unlikely in the extreme that a general manager would have the authority to

enter into a multi-million dollar commitment on behalf of a state-owned company.  *Id.* ¶ 9.

Second, apparent authority is lacking for another reason as well.  Forty-five percent of the

stock of Atlantic, one of the other parties to the purported contract, was owned by a corporation

all of the stock of which was held in the name of the brother-in-law of Joseph Edou, the person

who was purporting to sign the Memorandum of Agreement on behalf of CFC.  The Falls had

been permitted to acquire a 45% interest in the Atlantic, which was to be the project developer,

for the equivalent of US$1,800.  It is difficult or impossible to account for Plaintiffs' willingness

to thus dispose of a 45% share in the entity that stood to benefit directly from the profits of the

project unless Plaintiffs were aware that Joseph Edou had an interest in The Falls.  The

likelihood is reinforced by Atlantic's subsequent payment of the equivalent of US$192,000 to

purchase a residential property (unrelated to the purported housing project) for The Falls.  At the

very least, Plaintiffs were on notice of the likelihood of a problem of self-dealing. And it is not

reasonable for Plaintiffs to have believed that Joseph Edou had the authority to commit CFC to

extend US$49 million in loans for the benefit a private company in which he himself had an

interest.

2.    **No Act of CFC in Cameroon Had a Direct Effect in the United States.**

The third branch of the commercial exception of § 1605(a)(2) provides that subject matter jurisdiction can be based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere that causes a direct effect in the United States. Plaintiffs allege a number of acts of CFC outside the territory of the United States — *i.e.*, in Cameroon — upon which claims in Plaintiffs' Complaint are based. However, none of these acts constitutes a basis for § 1605(a)(2) jurisdiction because there is no direct effect of any such act in the United States.

No payment was made in the United States nor did any alleged contract call for payment in the United States. MBI allegedly sustained financial losses, but the financial loss of a U.S. corporation is not a direct effect in the United States for purposes of § 1605(a)(2). *See, e.g., United World Trade v. Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232 (10th Cir. 1994). Plaintiffs allege the Defendants' acts prevented Plaintiffs from obtaining financing from U.S. institutions. However, such an effect is not direct within the meaning of § 1605(a)(2). To be direct the effect must follow "as an immediate consequence of the defendants activity." *Republic of Argentina v. Weltover,* 504 US 607, 618 (1992). Many events would have had to occur before Plaintiffs could have obtained such financing, and many events could have prevented it. For example, if the relationship between Joseph Edou and Atlantic had become known, neither OPIC nor MIGA would have ever considered the financing.

## II.    The Court Lacks Personal Jurisdiction over CFC.

CFC is not authorized to conduct business in the District of Columbia or in any other jurisdiction within the United States. CFC has no office, employee or property in the United

States, nor has CFC ever carried on a commercial activity in the United States. CFC has never brought a legal action in any court in the United States. Mekongo Decl. ¶ 9.

Due process under the Fifth Amendment of the U.S. Constitution requires that a person not present within the forum have "certain minimum contacts with it such that the maintenance of the suit does not 'offend traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). CFC has no such contacts. The only contacts alleged are (1) Joseph Edou's unauthorized execution of the May 18, 2004 Memorandum of Agreement (Complaint ¶ 26) and (2) meetings of "CFC" in Washington with U.S. Government agencies allegedly to obtain funding for the housing projects. As shown above, Joseph Edou's execution of the alleged contract was unauthorized and cannot be deemed the act of CFC. Moreover, CFC did not authorize Joseph Edou in connection with his May 2004 trip to Washington, D.C., to enter into any contract with, or to negotiate any contract with, any party, including MBI or Atlantic. Mekongo Decl. ¶ 17. With respect to the funding allegedly sought, any act of Joseph Edou was also unauthorized; the CFC Board never approved any agreement with respect to the alleged projects of MBI and Atlantic Group. Mekongo Decl. ¶ 15. CFC did not "purposefully direct" its activities toward residents of the District of Columbia, or of the United States. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-476 (1985).

Constitutional due process protection applies if CFC is a "person" within the meaning of the Fifth Amendment. The D.C. Circuit has held that the foreign state itself is not a "person" for purposes of the due process clause. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95-100 (D.C. Cir. 2002). However, the test applied to determine whether a state-owned corporation is likewise excluded from the category of "person" is the same test used to determine the independent status of the corporation for jurisdictional purposes -- i.e., the test described in

*Foremost-McKesson v. Islamic Republic of Iran, supra*, 905 F.2d at 446-448, discussed in I.B. above.

> In *Foremost-McKesson v. Islamic Republic of Iran*, 284 U.S. App. D.C. 333, 905 F.2d 438 (1990), we held the presumption of independent status detailed in *Bancec* also applies to the question of subject matter jurisdiction under the FSIA; that is, a foreign state is amenable to suit based upon an exception in the FSIA and the acts of its instrumentality only if the sovereign exerts "sufficient control [over the instrumentality] ... to create a relationship of principal to agent." *Id.* at 446-47. We believe the same analysis must govern whether the SPF is a "person" within the meaning of the *due process clause* . . . .

*TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).

For the reasons shown in I.B. above, CFC is separate from the Government of Cameroon under the *Foremost-McKesson* test so that CFC's acts cannot give rise to subject matter jurisdiction over the Government of Cameroon.  CFC is a separate juridical entity and is administered as such by its Board to accomplish the purposes stated in CFC's Articles. Mekongo Decl. ¶ 7 and Ex. HMM-1 (Articles of CFC).  For the same reasons and on the same analysis, CFC is a "person" for purposes of the Constitutional due process clause.  Because CFC lacks the requisite minimum contacts with the U.S. forum, the Court lacks personal jurisdiction over it.

## III.    The Doctrine of *Forum Non Conveniens* Requires Dismissal of this Action in Favor of the Courts of Cameroon.

*Forum non conveniens* is doctrine that permits a court to dismiss a case in favor of a more convenient alternative forum, even if jurisdiction exists and venue is proper.  *See, e.g., Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947).  "Forum non conveniens does not raise a jurisdictional bar but instead involves a deliberate abstention from the exercise of jurisdiction." *In re Papandreou*, 139 F.3d 247, 255 (D.C. Cir. 1998).  Accordingly, dismissal under the

doctrine of *forum non conveniens* does not require a prior determination of FSIA jurisdiction. *Id.* at 255-256.

> Application of the doctrine of *forum non conveniens* requires a four-step analysis:

> > As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case. Next, the trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Pain v. United Techs. Corp.*, 637 F.2d 775, 784-85 (D.C. Cir. 1980); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F.Supp.2d 30, 37-38 (D.D.C. 2002).  The factors in this analysis strongly favor dismissal in favor of litigation in the courts of Cameroon.

### A.    The Courts of Cameroon Represent an Adequate Alternative Forum.

MBI and Atlantic may bring the claims in their Complaint in the Courts of Cameroon, which would have jurisdiction over such a lawsuit.  Ngwafor Decl. ¶ 21.  Sovereign immunity would not bar such an action.  Nor would the suit be barred by lapse of time.  Supplemental Declaration of Professor Ephraim Ngwafor ("Ngwafor Supp. Decl.") ¶ 2.  Lawsuits against the Government and Government-owned corporations are decided on the merits of the claims, and the executive branch of the Government cannot direct the Courts' decisions.  Ngwafor Decl. ¶ 21.

Under Cameroon law, Plaintiffs may recover damages on claims such as those that are alleged in their Complaint.  The Government and CFC are required to pay any damages awarded

against them by the Courts of Cameroon. In Cameroon, CFC is subject to the ordinary commercial law relating to the attachment of property, and its property would be subject to attachment to enforce a judgment against it by the courts of Cameroon.[7] Ngwafor Decl. ¶ 22. In all respects, the courts of Cameroon represent an adequate alternative forum for Plaintiffs' claims.

**B.    The Relevant Private Interests Favor the Courts of Cameroon.**

In evaluating the private interests affecting a *forum non conveniens* analysis, the plaintiff's choice of forum is ordinarily accorded substantial weight. However, Plaintiffs here are not entitled to the greater deference given to a plaintiff's choice of its home forum .

Plaintiffs are split as to the identity their home forum. MBI is incorporated in Delaware and has its principal place of business in Maryland. Atlantic is a Cameroon corporation with its

---

[7]    In *TMR Energy Ltd. v. State Prop. Fund of Ukraine, supra,* an action to confirm an arbitration award, the Court rejected the adequacy of the foreign forum. In the enforcement of the order of a U.S. court confirming an arbitration award, 28 U.S.C. § 1610(a)(6) permits the attachment of the foreign state's property located in the United States and used in a commercial activity in the United States, even if the property is not related to the subject matter of the arbitration. Since the order of a foreign forum confirming the award could not be enforced by attachment of the foreign state's commercial property that might be located in the United States, the foreign forum was held to be inadequate. *Id.,* 411 F.3d at 303-304. However, *TMR Energy* is based upon the public policy reflected in the statute favoring the enforcement of arbitration awards; plaintiffs in that case would have been prevented from reaching the commercial property of the foreign state located in the United States to satisfy the award if the U.S. action were dismissed for *forum non conveniens*. Of course, Plaintiffs' lawsuit before this Court does not involve an arbitration award, so the public interest in the enforcement of such awards is not present. Under 28 U.S.C. § 1610(a), the only property of the Government of Cameroon that would be subject to attachment upon the judgment of a U.S. court would be property of the Government of Cameroon located in the United States that was used in the commercial activity upon which Plaintiffs' claim is based. 28 U.S.C. § 1610(a)(2). Of course, there is no such property, and the theoretical possibility that some property fitting the statutory definition might someday come within the United States is so remote as to be *de minimis*.

principal office in Douala, Cameroon.   Ngwafor Decl., Ex. EN-3 (Atlantic Articles, Art. 4). Atlantic is partly owned by MBI, but it is 45% owned by another Cameroon corporation, The Falls.   In any event, neither the District of Columbia nor, more broadly, the United States represents the home forum of Atlantic.   Also, Maryland (or Delaware), not the District of Columbia, would represent the home forum of MBI.[8]   Accordingly, Plaintiffs are not entitled to the deference that is due when a plaintiff brings the action in its home District.

The other private interests overwhelmingly favor the courts of Cameroon.   The central issues in this lawsuit involve a real estate development project in Cameroon.   The dispute will center around Cameroonian legal issues, Cameroonian witnesses, and events that occurred or are alleged to have occurred in Cameroon.   Almost all the transactions and events that could be significant to the disposition of the case on the merits occurred in Cameroon.   Of course, Plaintiffs allege that the May 18, 2004 contract was executed in Bethesda, Maryland.   Even so, virtually all the evidence bearing on the validity of the alleged contract -- i.e., evidence relating to Joseph Edou's lack of authority -- is located in Cameroon.   Of course, the evidence relating to the performance or non-performance of the alleged contracts is located in Cameroon because all CFC's purported obligations relate to activities in Cameroon.   Under the May 18, 2004 Memorandum of Agreement, CFC allegedly undertook to provide construction and project development financing and financial guarantees for the project in Cameroon, and to provide lists of eligible buyers and provide mortgage financing for the housing project in Cameroon. Complaint, Ex. A, ¶¶ 1, 3, 4.  CFC's purported obligations under the two other alleged contracts

---

[8]   Of course, Plaintiffs are required to comply with the venue provisions of 28 U.S.C § 1391(f). However, Plaintiffs did not attempt to bring the present action in Maryland under 28 U.S.C § 1391(f)(1) which offers venue in a district "in which a substantial part of the events or omissions giving rise to the claim occurred," although they allege that the purported May 18, 2004 Memorandum of Agreement was executed in Bethesda, Maryland.  Complaint ¶ 26.

upon which Plaintiffs rely also relate to activities in Cameroon. Under these two purported agreements, CFC undertook to provide lists of eligible buyers and provide mortgage financing for other purported projects in Cameroon. Complaint, Ex. B, ¶¶ 1, 3, 4, and Ex. C, ¶¶ 1, 3, 4.

Moreover, the alleged wrongful acts of CFC and Cameroon upon which Plaintiffs' rely are alleged to have occurred in Cameroon. The alleged solicitation of bribes and the alleged wrongful termination of the projects are alleged to have occurred in Cameroon. Complaint ¶¶ 60-87, 90-91. All the allegedly false or negligent misrepresentations (except for any made by Joseph Edou in the United States) would have been made in Cameroon. Complaint ¶¶ 108-130. Similarly, any alleged intentional interference with contract rights or prospective advantage would have occurred in Cameroon, as would any alleged misappropriation of trade secrets or proprietary information. Complaint ¶¶ 137-150, 151-159.

More important, most of the witnesses that would be called upon to testify as to disputed issues of fact are located in Cameroon. Since the alleged housing projects are located in Cameroon, witnesses to testify about the nature of the projects and activities in connection with them will be located in Cameroon. Witnesses to testify about the dealings of the Cameroon Government and CFC with Plaintiffs are located in Cameroon. Henri Mekongo Mbala, the Inspector General of CFC, whose declaration is submitted in support of this motion, is located in Cameroon. Joseph Edou is in Cameroon, and if he is convicted of the criminal charges for which he is on trial, it will be extremely difficult or impossible for him to appear to testify in the United States. Also, Plaintiffs have specifically accused Camille Ekindi, the current General Manager of CFC, of soliciting bribes, and he and others in the Cameroon Government and CFC would be required to testify to refute Plaintiffs' charges. They are all located in Cameroon.

Also, evidence and witnesses in Cameroon will be required to bring out the facts of the apparently corrupt relationship of Joseph Edou with Atlantic.  Defendants have presented evidence in support of this Motion that tends to show that Joseph Edou, while purportedly representing CFC as its General Manager, held a substantial interest in the corporation (Atlantic) with which he was dealing and which stood to profit from the commitments he was purporting to make on behalf of CFC.  This issue will require testimony not only from Joseph Edou but also from his brother-in-law, Ateba Minkoulou Gabriel, who was the nominal owner of the corporation, The Falls, that held a 45% interest in Atlantic; from Koh Koh, who was used to carry out some of the transactions between Atlantic and The Falls; and from other persons in Cameroon such as Béatrice Assena, who have knowledge of some aspects of the transactions.  It will be difficult or impossible to obtain the testimony of many of these witnesses in the United States, and for those who do appear at a trial in the U.S. court, the cost of transportation and related travel expenses is substantial.

Moreover, almost all the witnesses from Cameroon will require translators.  French is the principal language of Yaounde, the capital of Cameroon, and Douala, its principal commercial city.  Most witnesses, including Government witnesses, speak and understand French as their principal language and would require a translator for any testimony given in the courts of the United States.  Ngwafor Decl. ¶ 23.  In addition, most of the relevant documents are in French and would require translation.  Not only is such translation cumbersome and potentially subject to dispute, it adds another substantial layer of expense to the litigation.

**C.    The Public Interests Strongly Favor the Courts of Cameroon.**

The public interests overwhelmingly favor litigation in Cameroon.  Any interest of the District of Columbia or the United States in this proceeding is outweighed by the interests of

Cameroon.  It is true that one of the Plaintiffs is a United States corporation, and one of the alleged contracts upon which Plaintiffs base their claims was allegedly made in the United States.  However, whatever interests arise from these factors are heavily outweighed by the public interest in the litigation of this dispute in Cameroon.

Plaintiffs' claims raise issues of vital concern to Cameroon.  The case involves an housing project in Cameroon allegedly sponsored by a Government-owned Cameroonian corporation.  Plaintiffs' have alleged that "officials of Cameroon," including the present General Manager of CFC, solicited bribes and have alleged that this was at the direction of their superiors.  *E.g.,* Complaint ¶¶ 60, 63, 67 and 79.  The validity of the contracts upon which Plaintiffs base their claims depends upon acts of the former General Manager of CFC which were grossly in excess of his authority and apparently the result of a corrupt relationship with Atlantic.  This former General Manager, Joseph Edou, is at present on trial in Cameroon for alleged criminal activities, including these very transactions.

Moreover, Plaintiffs in this action are seeking substantial damages: their claim for relief is $500,000,000.  Complaint, Prayer for Relief, ¶ 1.  Any damages awarded would be against the Government of Cameroon or CFC, a Government-owned corporation whose role is to provide affordable housing in Cameroon.  Such a substantial claim based upon such allegations is more appropriately dealt with by the courts of Cameroon than the courts of the United States.

In addition, Plaintiffs' claims will be governed by Cameroonian law.  Each of the three contracts upon which Plaintiffs rely expressly requires the application of the law of Cameroon.  Each provides: "This Agreement shall in all respects be construed and interpreted in accordance

with the laws of Cameroon." Complaint, Ex. A ¶ 11;[9] Ex. B ¶ 11; and Ex. C ¶ 11. The

applicable law of Cameroon is based on the Napoleonic Code, not the common law. In any

event, this Court is not familiar with the interpretation and application of the law of Cameroon,

and explanation and analysis of the law would necessarily be based upon the testimony of

experts in the law of Cameroon. Moreover, the legal source material for the applicable

Cameroonian law is in French and unless the Court is proficient in that language, it would have

to rely upon translations or the interpretations of legal experts.

Moreover, Plaintiffs have alleged in a prior proceeding that there are additional contracts

between CFC and Atlantic relating to the financing and construction of the alleged housing

projects that are the subject of this litigation. Maryland Complaint ¶¶ 25, 31. The alleged

contracts provide that any disputes arising under them that cannot be resolved by negotiation

"shall fall under the jurisdiction of the High Court of Yaounde."[10] This would be interpreted

under Cameroonian law to provide for exclusive jurisdiction over any disputes in the High Court

in Yaounde, Cameroon. Ngwafor Supp. Decl. ¶ 4. The relation of these and other alleged

contracts presented by Plaintiffs in their prior lawsuit to the contracts upon which they rely in

this proceeding will require analysis under Cameroonian law. One issue will be whether any

aspect of this dispute can be adjudicated in the United States when the parties have agreed

---

[9]  Exhibit A ¶ 11 contains differences that are not material. It reads: "This AGREEMENT shall
in all respects be construed and interpreted in accordance with the laws of the Republic of
Cameroon."

[10] The alleged "Convention de Financement" dated March 29, 2005 that is referred to in
Plaintiffs' Maryland Complaint ¶ 25 is attached as an unnumbered exhibit to the Maryland
Complaint. A copy of the alleged "Convention de Financement" and a translation of it are
attached to this Memorandum. The jurisdiction clause appears in Article 21. The same
provision appears in Article 20 of the alleged "Convention de Financement" that is dated
August 19, 2005, which is referred to in Maryland Complaint ¶ 31 and is also appended as an
unnumbered exhibit to the Maryland Complaint.

(according to the alleged contracts presented by Plaintiffs) that essentially the same disputes shall be adjudicated by a specific court in Cameroon.

In sum, the public interests strongly favor litigation in Cameroon. As in *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, *supra*, 212 F.Supp. 2d at 40, "The marginal nature of the United States' interest stands in stark contrast to the magnitude of [the foreign state's] interest."

**D.    Plaintiffs Can Reinstate their Lawsuit in Cameroon.**

There is no obstacle to Plaintiffs bringing their claims in the courts of Cameroon. The law of Cameroon recognizes claims of the nature that Plaintiffs present in this lawsuit. Ngwafor Decl. ¶¶ 20-21. Their lawsuit would not be barred by claims of sovereign immunity or by lapse of time. Ngwafor Supp. Decl. ¶ 2. Under Cameroon law, the Government cannot dictate the outcome in lawsuits against the Government and Government-owned corporations; the courts must decide the suits on the merits of the claims. Ngwafor Decl.¶ 21. The Government of Cameroon and CFC are required to pay any damages awarded against them, and the property of CFC is subject to attachment to enforce a judgment of the Cameroon courts against it. *Id.* ¶ 22.

There are criminal charges pending against Roger Tchoufa in Cameroon, and he will presumably be unwilling to return voluntarily to Cameroon in connection with a potential lawsuit by Plaintiffs there. However, Cameroon follows the Civil Law practice and the proceedings are in writing. Roger Tchoufa's testimony can be presented without his appearance in Cameroon. Moreover, Roger Tchoufa would not be disqualified as a witness because of the charges pending against him. Ngwafor Supp. Decl. ¶ 3.

*          *          *          *          *

Thus, the four-step analysis prescribed by *Pain* strongly favors *forum non conveniens* dismissal. Cameroon courts represent an available alternative forum. Both the private interests and the public interests favor litigation in Cameroon. Plaintiffs can reinstate their claims in Cameroon. This lawsuit should be dismissed in favor of litigation in the Cameroon courts.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' Complaint must be dismissed because the Court lacks subject matter jurisdiction. Alternatively, and for independent reasons, the Court lacks personal jurisdiction over CFC, and the action against CFC must be dismissed even if the Court possessed subject matter jurisdiction. Moreover, independent of the requirements for dismissal for lack of jurisdiction, the suit should be dismissed on the doctrine of *forum non conveniens*.

Respectfully submitted,

_____/s/ Knox Bemis_____
Knox Bemis  #14852
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, D.C.  20006
(202) 955-1886
(202) 778-2201 (fax)

September 26, 2007

**INDEX OF DECLARATIONS AND EXHIBITS
TO DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**Professor Ephraim Ngwafor**

Declaration
Supplemental Declaration

EN-1          Articles of The Falls
              Translation

EN-2          The Falls: Delegation of Power of Single Shareholder
              Translation

EN-3          Articles of Atlantic Group
              Translation

EN-4          Deed
              Translation

**Henri Mekongo Mbala**

Declaration    Translation

HMM-1         Articles of CFC
              Translation

HMM-2         Examples of loans approved by Joseph Edou

HMM-3         Examples of loans approved by the CFC Management Committee

HMM-4         Examples of loans approved by the CFC Board of Directors

**Béatrice R. Assena**

Declaration

BA-1          Deed
              Translation

BA-2          Atlantic Group cheque for 80,000,000 CFAF

BA-3          Atlantic Group cheque for 15,954,855 CFAF

BA-4          Copy of 6 October 2005 letter to land registry
              Translation

BA-5          Copy of papers from land registry

**Koh Koh**

Declaration

**Boscolo Andrea**

Declaration

**Ambassador Tibor P. Nagy, Jr.**

Declaration

**Ndifon Robert**

Declaration regarding Translations

**29 March 2005 "Funding Agreement"**

Contract
Translation

**DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**AND**

**SUPPLEMENTAL DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| Defendants. | : | |

**DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

PROFESSOR EPHRAIM NGWAFOR declares pursuant to 28 U.S.C. § 1746:

1.    I am a citizen of the Republic of Cameroon and resident of Yaoundé, Cameroon. The Republic of Cameroon is a sovereign state located in Africa.

2.    I was recruited as a don at the University of Yaoundé (today the University of Yaoundé II) in 1979 and rose to the rank of Professor of Law, a position I have held since 1998.

3.    I hold the following academic and professional qualifications:

        Licence en Droit (Yaoundé -- Cameroon)

        LL.M. (Dalhousie Law School -- Canada)

        Ph.D. (University of London -- England, UK)

I have occupied the following positions:

- Appointed Head of the Administrative and Personnel Division of the University of Yaoundé (1991).

- Dean of Studies, the University of Yaoundé II (1993).

- Rector of the University of Yaoundé II (1995-1998).

- Appointed member of government by the Head of State of Cameroon, as Minister in charge of special duties at the Presidency of the Republic of Cameroon (2004).

- Since 2004, I have held the position of co-ordinator of the Doctoral Programme in Common Law in the University of Yaoundé II.

- Head of the Department of Common Law in the University of Yaoundé II (November 2005 to the present).

- Admitted as a member of the Cameroon Academy of Sciences in 2007.

- Admitted as a member of the Users' Council of the London Court of International Arbitration.

4.   I was called to the Bar of the Republic of Cameroon in January 2002.

5.   At various times in the University of Yaoundé II, I have taught the Law of Contract, Evidence, Commercial Law, Family law, Social Security Law, Motor Accident Compensation Law and also participated in several seminars on our Constitutional evolution.

Cameroon Constitution and Government.

6.   By Presidential Decree N° 93/34 of 17 May 1993, I was appointed member of the Technical Committee for the revision of the Cameroon Constitution of 2nd June, 1972.  This exercise led to the eventual adoption by Parliament and promulgation

- 2 -

into law of a new constitution, the 1996 Constitution, namely Law N° 96-06 of 18th January, 1996.

7.    Cameroon is a bilingual and bi-jural country.  The Common Law applies in the two English-speaking Provinces (in the North West and South West) formerly administered by Great Britain, while the Civil Law system applies in the eight French-speaking Provinces of the Republic, formerly administered by France. Also, local legislation and various bodies of customary law (including Islamic Law) apply in special circumstances.

8.    Consistent with the 1996 Constitution, Cameroon operates under a Presidential system of government.  The President of the Republic is the Head of State. There is a Prime Minister, the Head of Government, who is appointed by the President of the Republic.  On the proposal of the Prime Minister, the President of the Republic appoints members of the Government.  The country is composed of ten Provinces headed by their respective Governors who are appointed by the President of the Republic.  The 1996 Constitution also provides for clear-cut separation of powers among the Executive, the Legislative and the Judiciary branches of the Government.  These powers are respectively spelled out in Part II (Section 5-13), Part III, (Sections 14 - 24), and Part V (Section 37 - 45). However, Part IV (Sections 25 - 36), defines the relationship that exists between the Executive and the Legislative bodies.

Ownership of Plaintiff Atlantic Group, SCI.

9.      I am familiar with the Complaint filed April 4, 2007, by MBI Group, Inc. ("MBI"),

        and Atlantic Group, SCI ("Atlantic Group") (jointly "Plaintiffs") in this proceeding,

        the allegations made therein, and the exhibits attached to the Complaint.

10.     Attached hereto as Exhibit EN-1 is a true copy of the Articles of The Falls PLC

        ("The Falls"), a public limited company formed under the laws of Cameroon.

        Exhibit EN-1 was prepared by Pierre Francois-Xavier Menye Ondo, a Notary

        Public and , as such, a public official under Cameroon law. Under Cameroon

        Law, a Notary Public who prepares such a document is required to maintain it on

        file and to produce it when required by law to do so. EN-1 was produced by

        Pierre Francois-Xavier Menye Ondo, for purposes of use in this proceeding

        pursuant to the order of the President of the Court of First Instance, Yaounde,

        Administrative Centre.   Under the law of Cameroon, the Articles of a public

        limited company must identify the owners of the stock of the company and the

        amount of capital contributed.  Also, the Articles must be amended to show any

        change in ownership of the shares or any additional capital contributed, and

        there are no amendments recorded to the Articles of The Falls.  Exhibit EN-1

        states that the sole shareholder of The Falls is Ateba Minkoulou Gabriel and the

        amount of capital is 25,000,000 CFA Francs (equivalent to about US$50,000).

11.     Attached hereto as Exhibit EN-2 is a true copy of the 24 July 2003 record of the

        ordinary decision of the single shareholder of The Falls to delegate power.

        Exhibit EN-2 was prepared Pierre Francois-Xavier Menye Ondo, a Notary Public

- 4 -

and, as such, a public official under Cameroon law. Under Cameroon Law, a Notary Public who prepares such a document is required to maintain it on file and to produce it when required by law to do so. EN-2 was produced by Pierre Francois-Xavier Menye Ondo, for purposes of use in this proceedings pursuant to the order of the President of the Court of First Instance, Yaounde, Administrative Centre. Exhibit EN-2 reflects that Ateba Minkoulou Gabriel (sole shareholder of The Falls) conferred full power to act on behalf of The Falls upon one Koh Koh.

12.    Attached hereto as Exhibit EN-3 is a true copy of the Articles of Atlantic Group. Exhibit EN-3 was prepared by Pascal Enpe, a Notary Public and, as such, a public official under Cameroon law. Under Cameroon Law, a Notary Public who prepares such a document is required to maintain it on file and to produce it when required by law to do so. EN-3 was produced by Pascal Enpe, for purposes of use in this proceedings pursuant to the order of the President of the Court of First Instance, Bonanjo, Douala. Under Cameroon law, the articles of a company such as Atlantic Group must set forth the names of its share owners, the total capital of the company and the contributions of capital by each of the owners. If there is a change in the ownership, or if additional capital is contributed, it must be reflected in an amendment to the articles. There are no amendments recorded to the Articles of Atlantic Group.

13.    Exhibit EN-3 reflects that Atlantic Group was created on March 24, 2004. MBI was represented by Roger Tchoufa and The Falls was represented by Koh Koh. The owners of the stock of Atlantic Group are: (a) The Falls, owning 45% of the

- 5 -

stock; (b) MBI, owning 35% of the stock; and (c) Roger Tchoufa owning the remaining 20% of the stock.  Exhibit EN-3, § 7.  The Articles of Atlantic Group also show that Atlantic Group's total capital is 2,000,000 CFA Francs (approximately US$4,000).

14.    Thus, Atlantic Group, one of the Plaintiffs in this action and a company that stood to profit from the proposed Cameroon housing projects, is owned 45% by The Falls.  The sole shareholder of The Falls, Ateba Minkoulou Gabriel, is the brother-in-law of Joseph Edou, who was at that time the General Manager of Crédit Foncier du Cameroun ("CFC").  Moreover, the owners of Atlantic Group obtained their interests for contributions of capital that were disproportionately small in relation to the proposed business undertakings of the company.  The Falls contributed only 900,000 (Nine Hundred Thousand)CFA Francs (about US$1,800 - One Thousand Eight Hundred U.S Dollars) and the MBI Group contributed only 700,000 (Seven Hundred Thousand)  CFA Francs (approximately US$1,400 - One Thousand Four Hundred U.S. Dollars).  Roger Tchoufa received a 20% interest in the Atlantic Group for a contribution of 400,000 (Four Hundred Thousand) CFA Francs (about US$800 - Eight Hundred U.S. Dollars).

Atlantic Group's Purchase of Residential Property for The Falls.

15.    Attached hereto as Exhibit EN-4 is a true copy of the August 4, 2005 deed of certain residential property from one Sandji Ndongo to The Falls.  Exhibit EN-4 was produced by Beatrice Rufine Assena, a Notary Public and, as such, a public

official under Cameroon law. Under Cameroon Law, a Notary Public who prepares such a document is required to maintain it on file and to produce it when required by law to do so. EN-4 was produced by Beatrice Rufine Assena, for purposes of use in this proceedings pursuant to the order of the President of the Court of First Instance, Yaounde, Administrative Centre. The residential property that is the subject of the deed has no relation to the alleged Cameroon housing projects that are the subject of the purported contracts among MBI, Atlantic Group and CFC.

16.     As a result of his dealings with MBI and Atlantic Group, as well as other activities he allegedly engaged in while General Manager of CFC, Joseph Edou is under criminal indictment charged with misappropriation and embezzlement of Public Funds, and conspiring with others to misappropriate funds for fictitious services purportedly rendered.  Joseph Edou is at present on trial in Yaoundé, Cameroon, on these charges,

17.     As a result of certain alleged activities on behalf of Atlantic Group and MBI and his dealings with Joseph Edou, Roger Tchoufa is under criminal indictment in Cameroon charged with embezzlement and misappropriation of public funds, Roger Tchoufa fled Cameroon, and is the subject of a fugitive warrant outstanding for his arrest.

"Memorandums of Agreements" attached to Plaintiffs' Complaint.

18.     I have examined the purported "Memorandums of Agreements" that are attached as Exhibits A, B and C to Plaintiffs' April 4, 2007 Complaint.  I have also

examined the declaration of Henri Mekongo Mbala and the Articles of CFC that are attached thereto as Exhibit HMM1. It is apparent that Joseph Edou as General Manager of CFC did not have the authority to execute any of the three purported "Memorandums of Agreements" on behalf of CFC because such acts fall within the powers of the CFC Board of Directors, and the Board did not delegate Joseph Edou such authority.

19. Any project such as the housing projects Plaintiffs have alleged in their Complaint that involves a Government-owned company such as CFC must be submitted for public bids in accordance with Presidential Decrees Numbers 95/101 and 95/102 of 9 June 1995. None of the projects that are the subject of any of the three purported "Memorandums of Agreements" attached to Plaintiffs' Complaint could lawfully be undertaken by CFC without first being put out for public bids.

20. The "Memorandum of Agreement" that is Exhibit A to Plaintiffs' Complaint purports to obligate CFC, among other things, to "provide all construction and project development financing of approximately US$49 million for the housing project as well as the necessary financial guarantees." Section 3(b). I am aware of no government-owned corporation in Cameroon or elsewhere whose general manager ("directeur general") is empowered by his sole signature to create an obligation on the part of the enterprise of as much as US$49 million. The General Manager of CFC is authorized to do so only for contracts which involve less than 10,000,000 FCFA (about US$20,000). Nor do I know of any situation in which a government-owned corporation is permitted to undertake a project of the

- 8 -

magnitude of that contemplated by the purported May 18, 2004 "Memorandum of Agreement" without an evaluation report, done with due diligence and after thoroughly exploring other alternatives.

Plaintiffs' rights in the courts of Cameroon.

21.    MBI and Atlantic Group may bring the claims in their Complaint in the Courts of Cameroon, which would have jurisdiction over such a lawsuit.  Cameroon has by its Constitution and by practice a Judiciary that is independent of the executive branch of the government.   Lawsuits against the government and against government-owned corporations are decided on the merits of the claims, and the executive branch of the government cannot direct the courts' decisions.

22.    The purported contracts attached as Exhibits A, B and C to Plaintiffs' Complaint concern alleged projects in Yaounde and Douala, both of which are in Francophone Cameroon.  Generally, any action which tends on contract law or tort law in Francophone Cameroon is dealt with under the Civil Code as amended, a code which for historic reasons draws its inspiration from the Napoleonic code or the French Civil Code 1807.

Under this law, Plaintiffs may recover damages on claims such as those that are alleged in Plaintiffs' Complaint, *i.e.*, the alleged claims are covered in the Civil Code as modified and applied in Cameroon. Hence an action for breach of contract is covered by Articles 1147 and 1184. As to deceit and fraudulent misrepresentation an action will lie under Article 1116, while article 1383 covers negligent misrepresentation. Intentional interference with contracts is covered by

Article 1165 while intentional interference with prospective advantage can be dealt with by the very elaborate Article 1382.

As to actions based on misappropriation of trade secrets that is those which turn on Intellectual property, Cameroon ratified the Paris Convention of 1967, and the Bangui Agreement of 1979 revised in 1999. Also, Cameroon and all others who signed the Paris Agreement also signed the Trade Related Aspects of Intellectual Property (TRIPS Agreement 1995). Cameroon is also a signatory of the World Intellectual Property Organization (WIPO). All these agreements protect trade secrets and proprietary information. Under Article 1382 of the Cameroon Civil Code, the plaintiff can sue for damages for misappropriation of intellectual property.

The Government of Cameroon and CFC are required to pay any damages awarded against them by the courts of Cameroon. Under Article 1 of the OHADA Uniform Acts relating to Companies and Economic Interest Groups, CFC is subject to the ordinary commercial law relating to attachment of property, and its property would be subject to attachment to enforce a judgment against it by the courts of Cameroon.

Translation requirements.

23.    Cameroon has two official languages, French and English. Yaoundé, the capital of Cameroon and Douala, the Commercial Center of Cameroon, are found in French speaking Cameroon and the dominant language in these two cities is French. Similarly, most of the witnesses, including Government witnesses

- 10 -

whose testimony would be pertinent to Plaintiffs' claims, speak and understand French as their principal language.  Most such witnesses would not be able to testify in English, but would require a translator for purpose of any testimony given if this case were tried in a court in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 17, 2007, at Yaoundé, Cameroon.

Professor Ephraim Ngwafor

- 11 -

Exhibits:

Exhibit EN-1        Copy of the Articles of The Falls PLC, and translation.

Exhibit EN-2        Copy of the Ordinary Decision of the Single Shareholder of The Falls PLC to Delegate Power, and translation.

Exhibit EN-3        Copy of the Articles of Atlantic Group SCI, and translation.

Exhibit EN-4        Copy of the deed of certain residential property to The Falls PLC, and translation.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| Defendants. | : | |

**SUPPLEMENTAL DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

PROFESSOR EPHRAIM NGWAFOR declares pursuant to 28 U.S.C. § 1746:

1.   On 17 September 2007, I executed a Declaration for submission in this proceeding.  This Declaration is a supplement thereto.

2.   In Paragraph 21 of my 17 September 2007 Declaration, I state that MBI and Atlantic Group may bring the claims in their Complaint in the Courts of Cameroon, which would have jurisdiction over such lawsuit.   Neither the Government of Cameroon nor CFC would be entitled to sovereign immunity in such a lawsuit.  Also, such a lawsuit would not be barred by limitations or lapse of time.   The statute of limitations on such a lawsuit in Cameroon is that applicable in civil matters which is thirty years.

3.    If MBI and Atlantic Group bring the claims in their Complaint in the Courts of Cameroon, proceedings will be those applicable in a civil law jurisdiction. In such proceedings counsel for plaintiff fully represents the plaintiff and the proceedings are in writing. Plaintiffs are not required to appear in person and their testimony can be incorporated in counsels submission and any evidence annexed thereto Roger Tchoufa would not be disqualified as a witness because of the charges pending against him (described in Paragraph 17 of my 17 September 2007 Declaration).

4.    I have reviewed the purported "Convention de Financement," or "Funding Agreement" between CFC and Atlantic dated 29 March 2005. This document contains the following Article 21:

> ARTICLE 21:  ATTRIBUTION DE COMPETENCE
>
> Les parties conviennent expressément qu'à défaut d'un règlement à l'amiable, tous litiges pouvant naître de l'interprétation ou de l'exécution de la présente convention ressortiront de la compétence du Tribunal de Grande Instance de YAOUNDE.

The English translation is:

> ARTICLE 21 :  JURISDICTION
>
> The parties expressly agree that in the event of failure to reach an amicable settlement, any disputes that may arise from the interpretation or execution of this agreement shall fall within the jurisdiction of the High Court of Yaounde.

The provision as it appears in the purported 29 March 2005 Convention de Financement is the form in French legal construction for exclusive jurisdiction and would be interpreted under Cameroonian law as an exclusive jurisdiction

- 2 -

provision.  Thus any lawsuit with respect to the interpretation or execution of the

purported agreement can be brought only before the High Court of Yaounde.

Executed on September 26, 2007, at Yaoundé, Cameroon.


Professor Ephraim Ngwafor

- 3 -

**EXHIBIT EN-1**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**ARTICLES OF THE FALLS**



## EXPEDITION

Rep N° 4283,4284,4285  Taxe N°
Date : 21 Juillet  2003

### Actes Constitutifs
### de la Société THE FALLS SA

**Pierre  François-Xavier  MENYE ONDO**
Notaire au Siège de la Cour d'Appel de Yaoundé

### OFFICE NOTARIAL

Boulevard du 20 Mai - Face Hôtel Hilton - Immeuble  Crédit Foncier - 3ème Etage - Porte 308
Boîte Postale 6650 - Téléphone (237) 223.53.76 -  Té lécopie (237) 222.55.66
Site web : www.etudemaitremenye.com - e-mail : etudenotaire63@yahoo.fr
REPUBLIQUE DU CAMEROUN  - YAOUNDE - REPUBLIC OF CAMEROON



REPERTOIRE N° 4283
DU 21 Juillet 2003

**PARDEVANT Maître Pierre François Xavier MENYE ONDO**, Notaire au siège de la Cour d'Appel de YAOUNDE (République du Cameroun) y demeurant, soussigné. ----------------------------------------------------------------------------

------------------------------------ **A COMPARU** --------------------------------------

--- **Monsieur ATEBA MINKOULOU Gabriel,** Camerounais né en 1940 à ESSAZIK, de feu MINKOULOU Gabriel et de feue AKABA Véronique, Planteur, domicilié à YAOUNDE – BASTOS, titulaire du récépissé demande de la carte nationale d'identité numéro 1030895381 à lui délivré le 14 Janvier 2002 à YAOUNDE. ----------------------------------------------------------------------------------

LEQUEL a établi, ainsi qu'il suit, les statuts d'une Société Anonyme avec Administrateur Général qu'il se propose de fonder : ---------------------------------

## TITRE I : FORME - OBJET - DENOMINATION - SIEGE - DUREE

ARTICLE UN :**FORME**

Il est formé par le propriétaire des actions ci-après créées et de celles qui pourront l'être ultérieurement, une Société Anonyme qui sera régie par les textes actuellement en vigueur au CAMEROUN, par les présents statuts, et le droit uniforme des sociétés commerciales et du groupement d'intérêt économique intervenant suite au traité de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires (OHADA), applicable à compter du premier Janvier mil neuf cent quatre vingt dix huit.----------------------------------------------------------------

ARTICLE DEUX : **OBJET**

La Société a pour objet, directement ou indirectement en tous pays et plus particulièrement en République du CAMEROUN :---------------------------------------

---- La promotion immobilière, le tourisme, l'hôtellerie, la prestation de services, la représentation, le commerce général: l'Import-Export ----------------------------------

--- Et généralement toutes activités annexes, toutes opérations financières, industrielles, mobilières ou immobilières pouvant se rattacher directement ou indirectement à l'objet social, ou à tous objets similaires ou connexes.-----------



PREMIER ROLE

### ARTICLE TROIS : **DENOMINATION**

La société prend la dénomination de : **THE FALLS**-------------------------------------

Dans tous les actes, factures, annonces publicitaires et autres documents, la société sera désignée par la dénomination sociale qui doit être immédiatement précédée ou suivie en caractères lisibles des mots "société anonyme (ou S.A) avec Administrateur Général".-------------------------------------------------------------------

### ARTICLE QUATRE : **SIEGE SOCIAL**

Le siège social est fixé à YAOUNDE BP 11 236 (Centre commercial)-----------------

Il pourra être transféré en tout autre lieu de la même ville, par décision de l'Administrateur Général, et partout ailleurs en vertu d'une décision de l'Assemblée Générale Extraordinaire des actionnaires.---------------------------------

L'Administrateur Général peut décider de la création, du transfert, de la suppression de tous bureaux, dépôts, succursales, agences ou filiales, partout où il le jugera utile.-------------------------------------------------------------------------

### ARTICLE CINQ : **DUREE**

La durée de la société est fixée à 99 (quatre vingt dix neuf) ans à compter de sa constitution définitive, sauf le cas de dissolution anticipée ou de prorogation.------

### **TITRE II : APPORTS - CAPITAL SOCIAL - ACTIONS**

### ARTICLE SIX : **APPORT-CAPITAL SOCIAL-ACTIONS**

Le capital social est fixé à la somme de FCFA 25 000 000 (vingt cinq millions de francs).--------------------------------------------------------------------------------------
Il est divisé en 2500 (deux mille cinq cents) actions de FCFA 10 000 (dix mille francs) chacune, intégralement souscrit et numérotées de 1 à 2 500 ----------------

### ARTICLE SEPT : **AUGMENTATION DU CAPITAL SOCIAL**

Le capital social est augmenté, soit par émission d'actions nouvelles, soit par majoration du montant nominal des actions existantes.---------------------------------



Les actions nouvelles sont libérées soit :--------------------------------------

- en espèces,----------------------------------------------------------------

- par compensation avec des créances certaines, liquides et exigibles sur la société.----------------------------------------------------------------------

- par incorporation de réserves, bénéfices ou primes d'émission, --------------------

- par apports en nature.-----------------------------------------------------

L'augmentation de capital par majoration du montant nominal des actions n'est décidée qu'avec le consentement unanime des actionnaires, à moins qu'elle ne soit réalisée par incorporation de réserves, bénéfices ou primes d'émission.--------

Les actions nouvelles sont émises, soit à leur montant nominal, soit à ce montant majoré d'une prime d'émission.------------------------------------------------

L'Assemblée Générales Extraordinaire est seule compétente pour décider ou, le cas échéant, autoriser une augmentation de capital, sur le rapport de l'Administrateur Général et sur le rapport du Commissaire aux comptes.-----------

Lorsque l'augmentation de capital est réalisée par incorporation de réserves, bénéfices ou primes d'émission, l'Assemblée Générale statue aux conditions de quorum et de majorité prévues à l'article 44 des présents statuts pour les Assemblées Générales Ordinaires.------------------------------------------------

Le droit à l'attribution d'actions gratuites, comme les droits formant rompus qui peuvent résulter pour les actionnaires de l'augmentation de capital par incorporation de réserves, de bénéfices ou de primes d'émission, sont négociables et cessibles.------------------------------------------------------------------

Toutefois, l'Assemblée Générale Extraordinaire peut, dans les conditions de quorum et de majorité prévues à l'article 46 des présents statuts, décider de manière expresse que les droits formant rompu ne seront pas négociables et que les actions correspondants seront vendues.----------------------------------------

Les sommes provenant de la vente seront allouées aux titulaires des rompus au plus tard trente (30) jours après la date d'inscription à leur compte du nombre entier d'action attribuées.--------------------------------------------------------

DEUXIEME ROLE--

L'Assemblée Générale peut autoriser le L'Administrateur Général à fixer les modalités de la vente des droits formant rompus.----------------------------------------

L'Assemblée Générale peut déléguer à l'Administrateur Général les pouvoirs nécessaires à l'effet de réaliser l'augmentation de capital en une ou plusieurs fois, d'en fixer tout ou partie des modalités, d'en constater la réalisation et de procéder à la modification corrélative des statuts.----------------------------------------

Le rapport de l'Administrateur Général contient toutes informations utiles sur les motifs de l'augmentation du capital proposée ainsi que sur la marche des affaires sociales depuis le début de l'exercice en cours et, si l'Assemblée Générale Ordinaire appelée à statuer sur les comptes n'a pas encore été tenue, pendant l'exercice précédent.----------------------------------------

L'Augmentation du capital doit être réalisée dans le délai de trois (03) ans à compter de l'Assemblée Générale qui l'a décidée ou autorisée.----------------------------

L'augmentation du capital est réputée réalisée à compter du jour de l'établissement de la déclaration de souscription et de versement.--------------------

Le capital doit être intégralement libéré avant toute émission d'actions nouvelles à libérer en numéraire, à peine de nullité de l'opération.----------------------------------

## ARTICLE HUIT : DISPOSITIONS PARTICULIERES AUX AUGMENTATIONS DE CAPITAL PAR APPORT EN NATURE ET/OU STIPULATIONS D'AVANTAGES PARTICULIERS

Les apports en nature et/ou avantages particuliers doivent être évalués par un commissaires aux apports désigné, à la requête de l'Administrateur Général, par le président de la juridiction compétente du lieu du siège social.----------------------

Le commissaire aux apports peut être le commissaire aux comptes de la société.--

Le commissaire aux apports apprécie, sous sa responsabilité, la valeur des apports en nature et des avantages particuliers.----------------------------------------

Le rapport du commissaire aux apports est déposé huit (8) jours au moins avant la tenue de l'Assemblée Générale Extraordinaire au siège social, et tenu à la disposition des actionnaires qui peuvent en prendre connaissance et en obtenir, à leur frais, copie intégrale ou partielle.----------------------------------------



**EXPEDITION**

Il est également déposé, dans le même délai, au greffe du tribunal chargé des affaires commerciales du lieu du siège social.------------------------------------------------------

Lorsque l'Assemblée Générale Extraordinaire statue sur l'approbation d'un rapport en nature ou l'octroi d'un avantage particulier, les actions de l'apporteur ou du bénéficiaire ne sont pas prises en compte pour le calcul du quorum et de la majorité.--------------------------------------------------------------------------

L'apporteur ou le bénéficiaire n'a voix délibérative ni pour lui même, ni comme mandataire.-------------------------------------------------------------------------------

Si l'Assemblée approuve l'évaluation des apports et l'octroi d'avantages particuliers, elle constate la réalisation de l'augmentation de capital.----------------

Si l'Assemblée réduit l'évaluation des apports ou la rémunération d'avantages particuliers, l'approbation expresse des modifications par les apporteurs, les bénéficiaires ou leurs mandataires dûment autorisés à cet effet, est requise.-------

A défaut, l'augmentation de capital n'est pas réalisée. --------------------------------

Les actions d'apports sont intégralement libérées dès leur émission.-----------------

## ARTICLE NEUF : REDUCTION DU CAPITAL SOCIAL

Le capital social est réduit, soit par diminution de la valeur nominale des actions, soit par la diminution du nombres des actions.------------------------------------------

La réduction du capital est autorisée ou décidée par l'Assemblée Générales Extraordinaire, qui peut déléguer l'Administrateur Général tous pouvoirs pour la réaliser.---------------------------------------------------------------------------------

En aucun cas elle ne peut porter atteinte à l'égalité des actionnaires sauf consentement exprès des actionnaires défavorisées.--------------------------------------

Le projet de réduction du capital est communiqué au commissaire aux comptes quarante cinq (45) jours au moins avant la réunion de l'Assemblé Générale Extraordinaire qui décide ou autorise la réduction de capital.------------------------

Le commissaires aux comptes présente à l'Assemblée Générale Extraordinaire un rapport dans lequel il fait connaître son appréciation sur les causes et les conditions de la réduction de capital.-------------------------------------------------------

TROISIÈME RÔLE

Lorsque L'Administrateur Général réalise la réduction de capital sur délégation de l'Assemblée Générale, il doit en dresser un procès-verbal soumis à publicité et procéder à la modification corrélative des statuts.----------------------------------------

Les créanciers de la société ne peuvent pas s'opposer à la réduction de capital lorsque celle-ci est motivée par des pertes.--------------------------------------------

Les créanciers de la société, dont la créance est antérieure au dépôt au greffe du tribunal chargé des affaires commerciales du procès-verbal de la délibération de l'Assemblée Générale qui a décidé ou autorisée la réduction du capital, de même que les obligataires, peuvent s'opposer à la réduction du capital de la société lorsque celle-ci n'est pas motivée par des pertes.--------------------------------------

Le délai d'opposition des créanciers à la réduction de capital est de trente (30) jours à compter de la date de dépôt du procès-verbal de la délibération de l'Assemblée Générale qui a décidé ou autorisé la réduction de capital.---------------

L'opposition est formée par acte extrajudiciaire et portée devant la juridiction compétente statuant à bref délai.-----------------------------------------------------

Les opérations de réduction de capital ne peuvent commencer pendant le délai d'opposition ni, le cas échéant, avant qu'il ait été statué en première instance sur cette opposition;--------------------------------------------------------------------------

Lorsque l'opposition est accueillie, la procédure de réduction de capital est interrompue jusqu'au remboursement des créances ou jusqu'à la constitution de garanties pour les créanciers si la société en offre et si elles sont jugées suffisantes.---------------------------------------------------------------------------------

La réduction du capital fait l'objet de formalités de publicité.--------------------------

## ARTICLE DIX : DROIT PREFERENTIEL DE SOUSCRIPTION - GENERALITES

Les actions comportent un droit préférentiel de souscription aux augmentations de capital.-------------------------------------------------------------------------------

Les actionnaires ont proportionnellement au montant de leurs actions, un droit de préférence à la souscription des actions de numéraire émises pour réaliser une augmentation de capital. Ce droit est irréductible.--------------------------------------

Pendant la durée de la souscription, le droit préférentiel de souscription est négociable lorsqu'il est détaché d'actions elles-mêmes négociables.-------------------



Dans le cas contraire, ce droit est cessible dans les mêmes conditions que l'action elle-même.------------------------------------------------------------------------------------

Si l'Assemblée Générale le décide expressément, les actionnaires ont également un droit préférentiel de souscription à titre réductible des actions nouvelles qui n'auraient pas été souscrites à titre irréductibles.-----------------------------------------

Les actions sont attribuées à titre réductible aux actionnaires qui ont souscrit un nombre d'actions supérieur à celui qu'ils pouvaient souscrire à titre irréductible et, en tout état de cause, dans la limite de leur demande.------------------------------

Le délai accordé aux actionnaires, pour l'exercice de leur droit préférentiel de souscription ne peut être inférieur à vingt (20) jours. Ce délai court à compter de la date de l'ouverture de la souscription.-------------------------------------------------

Ce délai se trouve clos par anticipation dès que tous les droits de souscription à titre irréductible et, le cas échéant, à titre réductible ont été exercés, ou que l'augmentation de capital a été intégralement souscrite après renonciation individuelle à leur droit de souscription, par les actionnaires qui n'ont pas souscrit.------------------------------------------------------------------------------------------

Si les souscriptions à titre irréductibles et, le cas échéant, à titre réductible n'ont pas absorbé la totalité de l'augmentation de capital : -------------------------------

1/ le montant de l'augmentation de capital peut être limité au montant des souscriptions réalisées sous la double condition que ce montant atteigne les trois quarts (3/4) au moins de l'augmentation prévue par l'assemblée générale qui a décidé ou autorisé l'augmentation de capital et que cette faculté ait été prévue expressément par l'Assemblée lors de l'émission.--------------------------------------

2/ Les actions non souscrites peuvent être librement réparties, totalement ou partiellement, à moins que l'Assemblée en ait décidé autrement.---------------------

3/ Les actions non souscrites peuvent être offertes au public totalement ou partiellement lorsque l'Assemblée a expressément admis cette possibilité.----------

L'Administrateur Général peut utiliser, dans l'ordre qu'il détermine, les facultés prévues ci-dessus ou certaines d'entre elles seulement.---------------------------------



QUATRIEME ROLE

L'augmentation de capital n'est pas réalisée lorsque, après l'exercice de ces facultés, le montant des souscriptions reçues n'atteint pas la totalité de l'augmentation de capital, ou, dans le cas prévu au paragraphe 1 ci-dessus, les trois quart (3/4) de cette augmentation.----------------------------------------------------

Toutefois, L'Administrateur Général peut d'office et dans tous les cas, limiter l'augmentation de capital au montant atteint, lorsque les actions souscrites représentent quatre vingt dix sept pour cent (97%) de l'augmentation de capital.--

Toute décision contraire de L'Administrateur Général est réputée non écrite.-------

## ARTICLE ONZE : SUPPRESSION DU DROIT PREFERENTIEL

L'Assemblée Générale qui décide ou autorise une augmentation de capital peut, en faveur d'un ou de plusieurs bénéficiaires nommément désignés, supprimer le droit préférentiel de souscription pour la totalité de l'augmentation de capital ou pour une ou plusieurs tranches de cette augmentation.-------------------------------

Les bénéficiaires, lorsqu'ils sont actionnaires, ne prennent pas part au vote ni pour eux-mêmes, ni comme mandataires et leurs actions ne sont pas prises en compte pour le calcul du quorum et de la majorité.-------------------------------------

## ARTICLE DOUZE: RENONCIATION INDIVIDUELLE AU DROIT PREFERENTIEL DE SOUSCRIPTION

Les actionnaires peuvent renoncer, à titre individuel, à leur droit préférentiel de souscription au profit de personnes dénommées. Ils peuvent également renoncer à ce droit sans indication de bénéficiaires.-------------------------------------------

L'actionnaire qui renonce à son droit préférentiel de souscription doit en aviser la société, par lettre au porteur contre récépissé ou par lettre recommandée avec demande d'avis de réception, avant l'expiration du délai d'ouverture de la souscription.---------------------------------------------------------------------

La renonciation sans indication de bénéficiaire doit être accompagnée pour les actions au porteur, des coupons correspondants ou de l'attestation du dépositaire des titres constatant la renonciation de l'actionnaire.---------------------------------

La renonciation faite au profit de bénéficiaires dénommés doit être accompagnée de l'acceptation de ces derniers.--------------------------------------------------------



Les actions nouvelles auxquelles l'actionnaire a renoncé sans indication de bénéficiaires peuvent être souscrites à titre réductible ou, le cas échéant, réparties entre les actionnaires ou offertes au public, ceci dans les conditions fixées à l'article 10 des présents statuts.-------------------------------------

Toutefois, lorsque cette renonciation a été notifiée à la société au plus tard à la date de la décision de réalisation de l'augmentation de capital, les actions correspondantes sont mises à la disposition des autres actionnaires pour l'exercice de leur droit préférentiel de souscription à titre irréductible et, le cas échéant, à titre réductible.-----------------------------------------------------

Lorsque l'actionnaire renonce à souscrire à l'augmentation de capital au profit de personnes dénommées, ses droits sont transmis à ceux-ci, à titre irréductible et, le cas échéant, à titre réductible.----------------------------------------------

## ARTICLE TREIZE : USUFRUIT

Lorsque les actions anciennes sont grevées d'un usufruit, l'usufruitier et le nu-propriétaire peuvent régler comme ils l'entendent les conditions d'exercice du droit préférentiel et l'attribution des actions nouvelles.------------------------------

A défaut d'accord entre les parties, les dispositions du présent article sont applicables.-------------------------------------------------------------------

Ces dispositions s'appliquent également, dans le silence des parties, en cas d'attribution d'actions gratuites.-------------------------------------------------

Le droit préférentiel de souscription attaché aux actions anciennes appartiennent au nu-propriétaire.--------------------------------------------------------------

Si le nu-propriétaire vend ses droits de souscription, l'usufruitier peut se substituer à lui pour souscrire aux actions nouvelles ou pour vendre le droit de souscription.---------------------------------------------------------------------

Si l'usufruitier vend le droit de souscription, le nu-propriétaire peut exiger le remploi des sommes provenant de la cession. Les biens ainsi acquis sont soumis à l'usufruit.----------------------------------------------------------------------

Le nu-propriétaire d'actions est réputé, à l'égard de l'usufruitier, avoir négligé d'exercer le droit préférentiel de souscription aux actions nouvelles émises par la

### CINQUIEME ROLE

société lorsqu'il n'a ni souscrit d'actions nouvelles, ni vendu le droit de souscription huit (08) jours au moins avant l'expiration du délai de souscription accordé aux actionnaires.------------------------------------------------------------

Les actions nouvelles appartiennent au nu-propriétaire pour la nu-propriété et à l'usufruitier pour l'usufruit. Toutefois, en cas de versement de fonds effectué par le nu-propriétaire ou par l'usufruitier pour parfaire une souscription, les actions nouvelles appartiennent au nu-propriétaire et à l'usufruitier qu'à concurrence des droits de souscription : le surplus des actions nouvelles appartient en pleine propriété à celui qui a versé les fonds.--------------------------------------------------

## ARTICLE QUATORZE : PRIX D'EMISSION ET RAPPORT

Les prix d'émission des actions nouvelles ou les conditions de fixation de ce prix doivent être déterminés par l'Assemblée Générale Extraordinaire sur le rapport de L'Administrateur Général et sur celui du Commissaire aux comptes.-----------------

Le rapport de L'Administrateur Général indique :-------------------------------------

1) le montant maximal et les motifs de l'augmentation de capital proposé,----------

2) les motifs de la proposition de suppression du droit préférentiel de souscription ;--------------------------------------------------------------------------

3) le nom des attributaires des actions nouvelles, le nombre de titres attribués à chacun d'eux et, avec sa justification, le prix d'émission.------------------------------

Lorsque l'Assemblée fixe elle-même toutes les modalités de l'augmentation de capital, le rapport mentionné ci-dessus indique également l'incidence sur la situation des actionnaires, de l'émission proposée, en particulier en ce qui concerne sa quote-part des capitaux propre à la clôture du dernier exercice.-------

Si la clôture est antérieure de plus de six (06) mois à l'opération envisagée, cette incidence est appréciée au vue d'une situation financière intermédiaire établie sur les six (06) derniers mois selon les mêmes méthodes et suivant la même présentation que le dernier bilan annuel.-----------------------------------------------------

Le Commissaire aux comptes donne son avis sur la proposition de suppression du droit préférentiel, sur le choix des éléments de calcul du prix d'émission et sur son montant, ainsi que sur l'incidence de l'émission sur la situation des actionnaires appréciée par rapport aux capitaux.------------------------------------------



EXPEDITION

Il vérifie et certifie la sincérité des informations tirées des comptes de la société sur lesquels il donne cet avis.------------------------------------------------------------

Lorsque l'Assemblée Générale a délégué ses pouvoirs dans les conditions prévues à l'article 7 alinéa 11, L'Administrateur Général établi, au moment où il fait usage de son autorisation, un rapport complémentaire décrivant les conditions définitives de l'opération établie conformément à l'autorisation donnée par l'Assemblée. Le rapport en outre des informations prévues à l'alinéa 2 du présent article.------------------------------------------------------------

Le Commissaire aux comptes vérifie notamment la conformité des modalités de l'opération au regard de l'autorisation donnée par l'Assemblée et des indications fournies à celle-ci. Il donne également son avis sur le choix des éléments de calcul du prix d'émission et sur son montant définitif, ainsi que sur l'incidence de l'émission sur la situation financière de l'actionnaire, notamment en ce qui concerne sa quote-part des capitaux propres à la clôture du dernier exercice.------

Ces rapports complémentaires sont immédiatement mis à la disposition des actionnaires au siège social, au plus tard dans les quinze (15) jours suivant la réunion de L'Administrateur Général, et portés à leur connaissance à la plus prochaine Assemblée.------------------------------------------------------------

**ARTICLE QUINZE: FORME DES ACTIONS.**

Les actions de numéraires sont celles dont le montant est libéré en espèces ou par compensation des créances certaines, liquides et exigibles sur la société, celles qui sont émises par suite d'une incorporation au capital des réserves, bénéfices, ou prime d'émission et celles dont le montant résulte pour partie d'une incorporation des réserves, de bénéfices ou de primes d'émission et pour partie d'une libération en espèce. Ces dernières doivent être intégralement libérées lors de la souscription.------------------------------------------------------------

Toutes les autres actions sont les actions d'apports:------------------------------------

L'action de numéraire est nominative jusqu'à son entière libération.----------------

L'action d'apport n'est convertible en titre au porteur qu'après deux (02) ans.------

Le montant nominal des actions ou coupures d'actions ne peut être inférieur à FCFA 10 000 (dix mille francs).------------------------------------------------------------

SIXIEME ROLE

## ARTICLE SEIZE : DROIT DE VOTE ATTACHE A L'ACTION

A chaque action, est attaché un droit de vote proportionnel à la quotité du capital qu'elle représente et chaque action donne droit à une (01) voix au moins.-----------

### * Vote double

Un droit de vote double de celui conféré aux autres actions eu égard à la quotité du capital qu'elles représentent, peut être conféré par l'Assemblée Générale Extraordinaire aux actions nominatives entièrement libérées pour lesquelles il est justifié une inscription nominative depuis au moins deux ans au nom du même actionnaire.----------------------------------------------------------------------------

De même, en cas d'augmentation de capital par incorporation de réserves, de bénéfices ou de primes d'émission, le droit de vote double peut être conféré dès leur émission aux actions nominatives attribuées gratuitement à un actionnaire à raison des actions anciennes pour lesquelles il bénéficie déjà de ce droit.-----------

Toute action convertie au porteur perd le droit de vote double.-----------------------

## ARTICLE DIX SEPT : DROIT DE DIVIDENDE ATTACHE A L'ACTION

A chaque action est attaché un droit aux dividendes proportionnel à la quotité du capital qu'elle représente.-------------------------------------------------------------------

Nonobstant les dispositions du premier alinéa du présent article, lors de la constitution de la société ou au cours de son existence, il peut être créés des actions de priorité jouissant d'avantages par rapport à toutes les autres actions. Ces avantages peuvent notamment être une part supérieure dans le bénéfice ou le boni de liquidation, un droit de priorité dans les bénéfices, des dividendes cumulatif.-------------------------------------------------------------------------------------

L'ensemble des intérêts, dividendes ou autres produits périodiques revenant aux actions pour un exercice social déterminé devra être payé en une (01) seule fois.--

La date de paiement unique sera fixée par l'Assemblée Générale des actionnaires. Cette dernière pourra toutefois charger L'Administrateur Général de procéder à cette fixation. -------------------------------------------------------------------------------

## ARTICLE DIX HUIT : NEGOCIABILITE DES ACTIONS

Les actions ne sont négociables qu'après immatriculation de la société au registre du commerce et du crédit immobilier ou de l'inscription de la mention modificative à la suite d'une augmentation de capital.------------------------------

**EXPEDITION**

Les actions de numéraire ne sont négociables qu'après avoir été entièrement libérées.-----------------------------------------------------------------------

Les actions demeurent négociables après la dissolution de la société et jusqu'à la clôture de liquidation.-------------------------------------------------------------

L'annulation de la société ou d'une émission d'actions n'entraîne la pas nullité des négociations intervenues antérieurement à la décision d'annulation si les titres sont réguliers en la forme. Toutefois, l'acquéreur peut exercer un recours en garantie contre son vendeur.--------------------------------------------------------

## ARTICLE DIX NEUF : TRANSMISSION DES ACTIONS

La transmission des actions, si la société ne fait pas appel public à l'épargne, s'opère selon les modalités suivantes :--------------------------------------------

    1) Par transfert sur les registres de la société pour les actions nominatives, les droits du titulaire résultant de la seule inscription sur les registres de la société ;------------------------------------------------------------------------

    2) Par simple tradition pour les actions au porteur. Le porteur du titre est réputé en être propriétaire.------------------------------------------------------------

## ARTICLE VINGT : LIMITATION A LA TRANSMISSION DES ACTIONS

Si les actions sont nominatives, la transmission d'actions à un tiers étranger à la société, soit à titre gratuit, soit à titre onéreux, sera soumise à l'agrément de L'Assemblée Générale ;----------------------------------------------------------------

Les limitations à la transmission des actions ne peuvent s'opérer en cas de succession, de liquidation de communauté des biens entre époux, ou de cession soit à un conjoint, soit à un ascendant ou un descendant.----------------------------

Le Cédant ne prend pas part au vote et sa participation ou ses voix sont déduites pour le calcul du quorum et de la majorité.--------------------------------------

Le cédant joint à sa demande d'agrément adressée à la société par lettre au porteur contre récépissé ou par lettre recommandée avec demande d'avis de réception, par télex ou par télécopie les nom, prénoms, qualité et adresse du cessionnaire proposé, le nombre d'actions dont la transmission est envisagée et le prix offert.-----------------------------------------------------------------------

SEPTIEME ROLE

L'agrément résulte soit d'une notification, soit du défaut de réponse dans le délai de trois (03) mois à compter de la demande.------------------------------------------------

Si la société n'agrée pas le cessionnaire proposé, l'Administrateur Général est tenu dans le délai de trois (03) mois à compter de la notification de refus, de faire acquérir les actions soit par un actionnaire, soit par un tiers, soit avec le consentement du cédant, par la société en vue d'une réduction du capital.---------

A défaut d'accord entre les parties, le prix des cessions est déterminé à dire d'Expert désigné par le président de la juridiction compétente à la demande de la partie la plus diligente.-------------------------------------------------------

Si à l'expiration du délai de trois mois, l'achat n'est pas réalisé, l'agrément est considéré comme donné. Toutefois, au cas où un Expert aurait été désigné par le Président de la juridiction compétente pour fixer les prix, le délai peut être prorogé pour une période qui ne peut excéder trois mois par le président de la juridiction qui a désigné l'expert.-------------------------------------------

## ARTICLE VINGT ET UN : NANTISSEMENT DES ACTIONS

Si la société a donné son consentement à un projet de nantissement d'actions, ce consentement emporte agrément du cessionnaire en cas de réalisation forcée des actions nanties, à moins que la société ne préfère racheter ces actions sans délai en vue de réduire son capital.-----------------------------------------------

Le projet de nantissement d'action n'est opposable à la société que s'il a été agréé par l'Administrateur Général.-----------------------------------------------

Le projet de nantissement doit avoir été préalablement adressé à la société par lettre au porteur contre récépissé ou par lettre recommandé avec demande d'avis de réception par télex ou par télécopie, indiquant les nom, prénoms, et le nombre d'actions devant être nanties.-------------------------------------------

L'action résulte soit d'une acceptation du nantissement communiqué dans les mêmes formes que la demande d'agrément de nantissement, soit du défaut de réponse dans le délai de trois mois à compter de la demande.-------------------------

## ARTICLE VINGT DEUX : DEFAUT DE LIBERATION DES ACTIONS

Les actions doivent être libérées au moins du quart de leurs valeurs à la souscription, le solde étant versé au fur et à mesure des appels de L'Administrateur Général dans un délai maximum de trois ans à compter de la date de souscription.---------------------------------------------

EXPEDITION



Au cas de non paiement des sommes restants à verser sur les actions non libérées aux époques fixées par l'Administrateur Général, la société adresse à l'actionnaire défaillant une mise en demeure par lettre au porteur contre récépissé ou par lettre recommandée avec demande d'avis de réception.-------------

Un mois après cette mise en demeure restée sans effet, la société poursuit de sa propre initiative la vente de ces actions. A compter du même délai, les actions pour lesquelles les versements exigibles n'ont pas été effectués cessent de donner droit à l'admission aux votes dans les assemblées d'actionnaires et elles sont déduites pour le calcul du quorum et des majorités ; -----------------------------------

A l'expiration de ce même délai d'un mois, le droit au dividende et le droit préférentiel de souscription aux augmentations de capital attachées à ces actions sont suspendus jusqu'au paiement des sommes dues.----------------------------------

La vente des actions cotées s'effectue en bourse, celle des actions non cotées est effectuée aux enchères publiques par un agent de change ou un Notaire.-----------

Avant de procéder à la vente prévue à l'alinéa précédent, la société publie dans un journal habilité à recevoir les annonces légales, trente jours après la mise en demeure, les numéros des actions mises en vente. Elle avise le débiteur et le cas échéant, ses codébiteurs de la mise en vente par lettre au porteur contre récépissé ou par lettre recommandée avec accusé de réception contenant l'indication de la date et du numéro du journal dans lequel la publication a été effectuée. Il ne peut être procédé à la mise en vente des actions moins de quinze jours après l'envoi de la lettre au porteur contre récépissé ou de la lettre recommandée avec accusé de réception.-----------------------------------------------

L'actionnaire défaillant reste débiteur ou profite de la différence. Les frais engagés par la société pour parvenir à la vente sont à la charge de l'actionnaire défaillant.

L'actionnaire défaillant, les cessionnaires successifs et les souscripteurs sont tenus solidairement du montant libéré de l'action.-----------------------------------------

La société peut agir contre eux soit avant ou après la vente, soit en même temps pour obtenir tant la somme due que le remboursement des frais exposés.----------

Celui qui a désintéressé la société dispose d'un recours pour le tout contre les titulaires successifs de l'action. La charge définitive de la dette incombe au dernier d'entre eux.----------------------------------------------------------------

HUITIÈME RÔLE

**ARTICLE VINGT TROIS : REMBOURSEMENT DES ACTIONS**

L'amortissement des actions par voie de tirage au sort est interdit nonobstant toutes dispositions législatives, réglementaires ou contractuelles contraires.-------

**TITRE III : ADMINISTRATION ET DIRECTION DE LA SOCIETE**

**ARTICLE VINGT QUATRE : MODE D'ADMINISTRATION**

La présente société anonyme sera administrée par un Administrateur Général.----

La société peut, en cours de vie sociale, changer à tout moment son mode d'administration et de direction.-----------------------------------------------------

La décision est prise par l'Assemblée Générale Extraordinaire qui modifie les statuts en conséquence.-------------------------------------------------------------

**ARTICLE VINGT CINQ : DESIGNATION DE L'ADMINISTRATEUR GENERAL**

Le premier Administrateur Général est désigné par l'Assemblée Générale Constitutive.-----------------------------------------------------------------------------

En cours de vie sociale, l'Administrateur Général est nommé par l'Assemblée Générale Ordinaire.------------------------------------------------------------------

--- L'Administrateur Général est choisi parmi les actionnaires ou en dehors d'eux.------------------------------------------------------------------------------------

**ARTICLE VINGT SIX : CONTRAT DE TRAVAIL**

L'Administrateur Général peut être lié à la société par un contrat de travail à la condition que celui-ci corresponde à un emploi effectif..------------------------------

Le contrat de travail est soumis à l'autorisation préalable de l'assemblée générale Ordinaire.------------------------------------------------------------------------------

**ARTICLE VINGT SEPT : DUREE DU MANDAT DE L'ADMINISTRATEUR GENERAL**

La durée du mandat de l'Administrateur Général est de deux (02) ans en cas de nomination par l'Assemblée Générale constitutive et de six (06) ans, en cas de nomination en cours de vie sociale. Ce mandat est renouvelable.--------------------

EXPEDITION

## ARTICLE VINGT HUIT : EMPECHEMENT ET REVOCATION DE L'ADMINISTRATEUR GENERAL

### *EMPECHEMENT

En cas d'empêchement temporaire de l'Administrateur Général, ses fonctions sont provisoirement exercées par l'Administrateur Général Adjoint lorsqu'il en a été nommé un. A défaut, les fonctions d'Administrateur général sont provisoirement exercés par toute personne que l'assemblée générale ordinaire des actionnaires jugera bon de désigner.-------------------------------------------------------

### *DECES OU DEMISSION

En cas de décès ou de démission de l'Administrateur général, ses fonctions sont exercées par l'Administrateur Général adjoint jusqu'à la nomination, par la plus prochaine assemblée générale ordinaire, d'un nouvel Administrateur Général.-----

### *REVOCATION

L'Administrateur Général peut être révoqué à tout moment par l'assemblée générale, toute clause contraire étant réputée non écrite.-------------------------------

## ARTICLE VINGT ET NEUF : REMUNERATION

Hors les sommes perçues dans le cadre d'un contrat de travail, l'Administrateur Général ne peut recevoir, au titre de ses fonctions, aucune autre rémunération, permanente ou non, que celles visées au paragraphe ci-après.----------------------

L'Assemblée Générale Ordinaire peut allouer à l'Administrateur général, en rémunération de ses activités, une somme fixe annuelle à titre d'indemnité de fonction.------------------------------------------------------------------------------

L'assemblée peut également allouer à l'Administrateur général, des rémunérations exceptionnelles pour les missions et mandats qui lui sont confiées ou autoriser le remboursement des frais de voyage, déplacements et dépenses engagés dans l'intérêt de la société.-------------------------------------------------

Le cas échéant, les avantages en nature qui lui sont attribués sont fixés de la même manière que sa rémunération.----------------------------------------------------

Les dispositions ci-dessus mentionnées ne visent pas les dividendes qui sont régulièrement répartis entre les actionnaires.-----------------------------------------

NEUVIEME ROLE

**ARTICLE TRENTE : ATTRIBUTION DU L'ADMINISTRATEUR GENERAL**

L'Administrateur Général est investi des pouvoirs les plus étendus pour agir en toutes circonstances au nom de la société.--------------------------------------------------

- Il les exerce dans la limite de l'objet social et sous réserve de ceux attribués aux Assemblées d'actionnaires et, le cas échéant par les statuts.--------------------------

L'Administrateur Général dispose notamment des pouvoirs suivants qui sont énonciatifs et non limitatifs : --------------------------------------------------------------

- Il précise les objectifs de la société et l'orientation qui doit être donnée à son administration, --------------------------------------------------------------------------------

Il assure la gestion de la société.---------------------------------------------------------

Il arrête les comptes de chaque exercice.-------------------------------------------------

Il arrête les états financiers de synthèse et le rapport de gestion sur l'activité de la société, qui sont soumis à l'approbation de l'Assemblée Générale Ordinaire.--------

Il convoque et préside les assemblées générales d'actionnaires.-----------------------

Dans ses rapports avec les tiers, la société est engagée par les actes de l'Administrateur Général qui ne relèvent pas de l'objet social dans les conditions et limites fixées par l'Acte Uniforme.--------------------------------------------------

Les stipulations des statuts ou les résolutions de l'assemblée générale des actionnaires limitant les pouvoirs de l'administrateur général ne sont pas opposables aux tiers de bonne foi.--------------------------------------------------

**ARTICLE TRENTE ET UN : CONVENTIONS REGLEMENTEES**

L'Administrateur Général présente à l'Assemblée Générale ordinaire statuant sur les états financiers de synthèses de l'exercice écoulé, un rapport sur les conventions qu'il a conclues avec la société, directement ou indirectement, ou par personne interposée et sur les conventions passées avec une personne morale dont il est propriétaire, associé indéfiniment responsable ou, d'une manière générale, dirigeant social.--------------------------------------------------

EXPEDITION

Les dispositions du présent article ne sont pas applicables aux conventions portant sur des opérations courantes conclues à des conditions normales telles que décrites à l'article 34 du présent statut.------------------------------------------------

L'Administrateur Général avise le Commissaire aux comptes dans le délai d'un mois à compter de la conclusion de la convention et, en tout état de cause, quinze jours au moins avant la tenue de l'assemblée générale ordinaire annuelle.----------

Le commissaire aux comptes présente à l'assemblée générale ordinaire un rapport sur ces conventions.--------------------------------------------------------------------------

Ce rapport énumère les conventions soumises à l'appréciation de l'assemblée, en précise la nature, mentionne les produits ou les services faisant l'objet de ces conventions, leurs modalités essentielles notamment l'indication des prix ou des tarifs pratiqués, des ristournes ou commissions consenties, des sûretés conférées et, le cas échéant, toutes autres indications permettant aux actionnaires d'apprécier l'intérêt qui s'attache à la conclusion de ces conventions.----------------

Les conventions approuvées ou désapprouvées par l'assemblée générale produisent tous leurs effets à l'égard des cocontractants et des tiers.----------------

Toutefois, les conséquences dommageables pour la société des conventions désapprouvées par l'assemblée générale peuvent être mises à la charge de l'administrateur général.------------------------------------------------------------------------

Les dispositions des 1er, 2ème et 3ème paragraphes du présent article ne s'appliquent pas lorsque l'administrateur général est l'actionnaire unique de la société anonyme. ------------------------------------------------------------------------------

Par contre les dispositions des 1er 6ème et 7ème paragraphes du présent articles sont applicables à l'administrateur général et l'administrateur général adjoint.----

## ARTICLE TRENTE DEUX : CAUTIONS, AVALS ET GARANTIES

Les cautions, avals, garantie à première demande donnés par l'administrateur général ou par l'Administrateur Général Adjoint ne sont opposables à la société que s'ils ont été autorisés préalablement par l'assemblée générale ordinaire, soit d'une manière générale, soit d'une manière spéciale.------------------------------------

Toutefois, cette limite ne s'applique pas aux avals, cautions et garanties donnés par l'Administrateur Général ou par l'Administrateur Général Adjoint agissant au nom de la société, aux administrations douanières et fiscales.------------------------

DIXIEME ROLE

**ARTICLE TRENTE TROIS : CONVENTIONS INTERDITES**

A peine de nullité du contrat, il est interdit à l'Administrateur général ou à l'Administrateur général adjoint lorsqu'il en est nommé, ainsi qu'à leurs conjoints, ascendant, descendants et aux personnes interposées, de contracter, sous quelque forme que ce soit, des emprunts auprès de la société, de se faire consentir par elle un découvert en compte courant ou autrement, ainsi que de faire cautionner ou avaliser, par elle leurs engagements envers les tiers-------------

Toutefois, lorsque la société est un établissement bancaire ou financier, elle peut consentir à son Administrateur Général ou à son Administrateur Général adjoint, sous quelque forme que ce soit, un prêt, un découvert en compte-courant ou autrement, un aval, un cautionnement ou toute autre garantie, si ces conventions portent sur des opérations courantes conclues à des conditions normales.---------------------------------------------------------------------------

**ARTICLE TRENTE QUATRE :L'ADMINISTRATEUR GENERAL ADJOINT**

Sur la proposition de l'Administrateur général, l'assemblée générale des actionnaires peut donner mandat à une ou plusieurs personnes physiques d'assister l'administrateur à titre d'Administrateur Général Adjoint-----------------

L'Assemblée fixe librement la durée des fonctions de l'Administrateur Général Adjoint----------------------------------------------------------------------------------

Le mandat de l'administrateur général adjoint est renouvelable----------------------

En accord avec l'administrateur général, l'assemblée générale détermine les pouvoirs qui sont délégués à l'administrateur général adjoint.-------------------------

Les clauses statutaires ou les décisions de l'assemblée générale limitant ses pouvoirs ne sont pas opposables aux tiers-----------------------------------------------

L'Administrateur Général adjoint peut être lié à la société par un contrat de travail à la condition que celui-ci soit effectif.------------------------------------------

Le contrat de travail est soumis à l'autorisation préalable de l'assemblée générale Ordinaire-------------------------------------------------------------------------------------



Les modalités et le montant de la rémunération de l'administrateur général adjoint sont fixés par l'Assemblée Générale Ordinaire ainsi que le cas échéant, les avantages en nature qui lui sont accordés----------------------------------------------------

Sur proposition de l'Administrateur Général, l'assemblée générale ordinaire peut révoquer à tout moment l'administrateur général adjoint---------------------------

**TITRE IV : ASSEMBLEES GENERALES.**

**CHAPITRE I: REGLES COMMUNES A TOUTES ASSEMBLEES D'ACTIONNAIRES.**

**ARTICLE TRENTE CINQ CONVOCATION DE L'ASSEMBLEE**

L'assemblée des actionnaires est convoquée par l'Administrateur Général.----------

A défaut elle peut être convoquée:-------------------------------------------------------

    1/ Par le commissaire aux comptes, après que celui-ci ait vainement requis la convocation l'Administrateur Général,  par lettre au porteur contre récépissé ou par lettre recommandée avec demande d'avis de réception .-----------------------

Lorsque  le commissaire aux comptes procède à cette convocation, il fixe l'ordre du jour et peut, pour des motifs déterminants , choisir un lieu de réunion autre que celui du siège social.  Il expose les motifs de la convocation dans un rapport lu à l'Assemblée . -------------------------------------------------------------------------

    2/ Par un mandataire désigné par le président de la juridiction compétente, statuant à bref délai, à la demande soit de tout intéressé en cas d'urgence, soit d'un ou plusieurs actionnaires représentant au moins le dixième (1/10ème) du capital social s'il s'agit d'une Assemblée générale ou le  dixième (1/10ème) des actions de la catégorie intéressée s'il s'agit d'une assemblée spéciale.---------------

    3/ Par le liquidateur--------------------------------------------------------------------

Les Assemblées d'actionnaires sont réunies au siège social ou en tout autre lieu du territoire d'un des pays signataires du traité de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires (OHADA) où se situe le siège social-----------------------------------------------------------------------------------------------

La convocation des Assemblées est faite par avis de convocation qui est inséré dans un journal habilité à recevoir les annonces légales-----------------------------

ONZIEME ROLE

Les actions étant nominatives, la convocation est faite aux frais de la société par lettre au porteur contre récépissé ou par lettre recommandée avec demande d'avis de réception, portant mention de l'ordre du jour----------------------------------------

## * Délai de convocation

L'avis de convocation doit parvenir ou être porté à la connaissance des actionnaires quinze (15) jours au moins avant la date de l'assemblée sur première convocation, le cas échéant, six (6) jours au moins pour les convocations suivantes-----------------------------------------------------------------------------

Lorsque l'assemblée est convoquée par un mandataire de justice, le juge peut fixer un délai différent.--------------------------------------------------------------------

## * Contenu de la convocation

L'avis de convocation indique la dénomination de la société, suivi le cas échéant, de son sigle, la forme de la société, le montant du capital social, l'adresse du siège social, le numéro d'immatriculation au registre de Commerce et du Crédit Mobilier, les jour, heure et lieu de l'assemblée, ainsi que sa nature ordinaire, extraordinaire ou spéciale et son ordre du jour----------------------------------------

Le cas échéant, l'avis indique où doivent être déposées les actions au porteur ou le certificat de dépôt de ces actions, pour ouvrir droit de participer à l'assemblée ainsi que la date à laquelle ce dépôt doit être fait.----------------------------------------

Les copropriétaires d'actions indivises, les nu-propriétaires et les usufruitiers d'actions sont convoqués suivant les formes ci-dessus mentionnées-----------------

Toute Assemblée irrégulièrement convoquée peut être annulée. Toutefois, l'action en nullité n'est pas recevable lorsque les actionnaires étaient présents ou représentés. ---------------------------------------------------------------------------------

## ARTICLE TRENTE SIX : ORDRE DU JOUR DE L'ASSEMBLEE

L'ordre du jour de l'Assemblée est arrêté par l'auteur de la convocation-------------

Toutefois, lorsque l'Assemblée est convoquée par un mandataire de justice, l'ordre du jour est fixé par le Président de la juridiction compétente qui l'a désigné--------





De même, un ou plusieurs actionnaires ont la faculté de requérir l'inscription, à l'ordre du jour de l'Assemblée Générale, d'un projet de résolutions lorsqu'ils représentent :----------------------------------------------------------------------

      1) Cinq pour cent (5%) du capital, si le capital de la société est inférieur à un milliard (1.000.000.000) de francs cfa.---------------------------------------------

      2) Trois pour cent (3%) du capital, si le capital de la société est compris entre un milliard (1.000.000.000) et deux milliards (2.000.000.000) de francs cfa.

      3) Zéro cinquante pour cent (0.5%) du capital, si celui-ci est supérieur à deux milliards (2.000.000.000) de francs cfa.-------------------------------------------

La demande est accompagnée :--------------------------------------------------------

      1) Du projet de résolution auquel il est joint un bref exposé des motifs-------

      2) De la justification de la possession ou de la représentation de la fraction de capital exigée au présent article.--------------------------------------------------

Ces projets sont adressés au siège social par lettre au porteur contre récépissé par lettre recommandée avec demande d'avis de réception, par télex ou par télécopie, dix (10) jours au moins avant la tenue de l'Assemblée Générale pour pouvoir être soumis au vote de l'Assemblée.-------------------------------------------

Les délibérations de l'Assemblée Générale sont nulles si les projets de résolution envoyés conformément aux dispositions du présent article ne sont pas soumis au vote de l'Assemblée.-------------------------------------------------------------------

L'Assemblée ne peut délibérer sur une question qui n'est pas inscrite à son ordre du jour----------------------------------------------------------------------------------

Néanmoins, elle peut, lorsqu'elle est réunie ordinairement, révoquer l'Administrateur Général ou l'Administrateur général Adjoint, et peut procéder à leur remplacement.------------------------------------------------------------------------

Lorsque l'ordre du jour de l'Assemblée Générale porte sur la présentation de candidats au poste d'Administrateur Général, il doit être fait mention de leur identité, de leurs références professionnelles et de leurs activités professionnelles au cours des cinq dernières années.-------------------------------------------------

DOUZIEME ROLE

L'ordre du jour de l'Assemblée ne peut être modifié sur deuxième convocation ou, les cas échéant, pour les Assemblées Générales Extraordinaires, sur troisième convocation.---------------------------------------------------------------------------------------

### ARTICLE TRENTE SEPT: COMMUNICATION DE DOCUMENTS

En ce qui concerne l'Assemblée Générale Ordinaire annuelle, tout actionnaire a le droit, pour lui-même ou par le mandataire qu'il a nommément désigné pour le représenter à l'Assemblée Générale, de prendre connaissance au siège social :-----

1/ De l'inventaire, des états financiers de synthèse et de la liste des Administrateurs lorsqu'un L'Administrateur Général a été constitué.----------------

2/ Des rapports du commissaire aux comptes et de L'Administrateur Général qui sont soumis à l'Assemblée.---------------------------------------------------

3/ Le cas échéant, du texte de l'exposé des motifs, des résolutions proposées, ainsi que des renseignements concernant les candidats au poste d'Administrateur Général.-----------------------------------------------------------

4/ De la liste des Actionnaires.--------------------------------------------------

5/ Du montant global certifié par les commissaires aux comptes des rémunérations versée aux dix (10) ou cinq (5) dirigeants sociaux et salariés les mieux rémunérés selon que l'effectif de la société excède ou non deux cent (200) salariés.------------------------------------------------------------------------------

Sauf en ce qui concerne l'inventaire, le droit pour l'actionnaire de prendre connaissance emporte celui de prendre copie à ses frais. Le droit de prendre connaissance s'exerce durant les quinze (15) jours qui précèdent la tenue de l'Assemblée Générale.----------------------------------------------------------------------

En ce qui concerne les Assemblées autres que l'Assemblée Générale Ordinaire annuelle, le droit de prendre connaissance porte sur le texte des résolutions proposées, le rapport de l'Administrateur Général et, le cas échéant, le rapport du commissaire aux comptes ou du liquidateur.------------------------------------------

Tout actionnaire peut, en outre, à toute époque prendre connaissance et copie----



**EXPEDITION**

   1/ Des documents sociaux visés ci-dessus concernant les trois (3) derniers exercices----------------------------------------------------------------------------------------------

   2/ Des procès-verbaux et des feuilles de présence des Assemblées tenues au cours de ces trois (3) derniers exercices.--------------------------------------------

   3/ De tous autres documents, si les statuts le prévoient.----------------------

De même, tout actionnaire peut, deux (2) fois par exercice, poser des questions écrites au Directeur Général sur tous faits de nature à compromettre la continuité de l'exploitation.------------------------------------------------------------------

La réponse est communiquée au commissaire aux comptes.----------------------------

Le droit de communication ci-dessus prévu appartient également à chacun des copropriétaires d'actions indivises, au nu-propriétaire et à l'usufruitier d'actions.

Si la société refuse de communiquer tout ou partie des documents visés ci-dessus, il est statué sur ce refus, à la demande de l'actionnaire, par le président de la juridiction compétente statuant à bref délai.----------------------------------------

Le président de la juridiction compétente peut ordonner à la société, sous astreinte, de communiquer les documents à l'actionnaire.---------------------------------

**ARTICLE TRENTE HUIT : BUREAU DE L'ASSEMBLEE**

L'Assemblée est présidée par l'Administrateur Général ou en cas d'empêchement de celui-ci et sauf disposition statutaire contraire, par l'actionnaire ayant ou représentant le plus grand nombre d'actions ou, en cas d'égalité, par le doyen d'âge.--------------------------------------------------------------------------------------------------

Les deux (2) actionnaires représentant le plus grand nombre d'actions par eux-mêmes ou comme mandataires sont nommés scrutateurs, sous réserve de leur acceptation.-------------------------------------------------------------------------------------------

Un secrétaire est nommé par l'Assemblée pour établir le procès-verbal des débats. Il peut être choisi en dehors des actionnaires------------------------------------------------

**ARTICLE TRENTE NEUF : FEUILLE DE PRESENCE**

A chaque Assemblée, il est tenu une feuille de présence contenant les indications suivantes :----------------------------------------------------------------------------------------------

TREIZIEME ROLE

1/ L'indication de chaque actionnaire présent ou représenté, le nombre d'actions dont il est titulaire ainsi que le nombre de voix attachées à ces actions.

2/ Les nom, prénom et domicile de chaque mandataire, le nombre d'actions qu'il représente ainsi que le nombre de voix attachées à ces actions.----------------

La feuille de présence est émargée par les actionnaires présents et par les mandataires, au moment de l'entrée en séance.-------------------------------------------

Les procurations sont annexées à la feuille de présence, à la fin de l'Assemblée.

La feuille de présence est certifiée sincère et véritable, sous leur responsabilité, par les scrutateurs.-----------------------------------------------------------------------

## ARTICLE QUARANTE :PROCES VERBAUX

Le procès-verbal des délibérations de l'Assemblée indique la date et le lieu de la réunion, la nature de l'Assemblée, le mode de convocation, l'ordre du jour, la composition du bureau, le quorum, le texte des résolutions soumises au vote de l'Assemblée et le résultat des votes pour chaque résolution, les documents et rapports présentés à l'Assemblée et un résumé des débats----------------------------

Il est signé par les membres du bureau et archivé au siège social avec la feuille de présence et ses annexes conformément aux dispositions de l'article 38 des présents statuts----------------------------------------------------------------------------

Les copies ou extraits des procès-verbaux des Assemblée sont valablement certifiés, par l'Administrateur Général ou par toute autre personne mandatée à cet effet.------------------------------------------------------------------------------------

En cas de liquidation, ils sont certifiés par un seul liquidateur.----------------------

## ARTICLE QUARANTE ET UN :CONDITIONS D'ADMISSION AUX ASSEMBLEES

Peuvent participer aux Assemblées Générales -------------------------------------------

♦ Les actionnaires ou leur représentant dans les conditions définies par la loi ou par les stipulations des statuts.--------------------------------------------

♦ Toute personne habilitée à cet effet par une disposition légale ou par une stipulation des présents statuts de la société.------------------------------------

EXPEDITION

Il en est de même des personnes étrangères à la société lorsqu'elles y ont été autorisée soit par le président de la juridiction compétente, soit par décision du bureau de l'Assemblée, soit par l'Assemblée elle-même.----------------------------------

**ARTICLE QUARANTE DEUX :REPRESENTATION DES ACTIONNAIRES ET DROIT DE VOTE**

Tout actionnaire peut se faire représenter par un mandataire de son choix.--------

Tout actionnaire peut recevoir les pouvoirs émis par d'autres actionnaires en vue d'être représenté à une assemblée, sans autre limite que celle résultant des dispositions légales ou statutaires fixant le nombre de voix dont peut disposer une même personne, tant en son nom personnel que comme mandataire.--------
La procuration doit comporter : -----------------------------------------------------------

     1/ Les nom, prénoms et le domicile ainsi que le nombre d'actions et de droit de votre du mandat ;-----------------------------------------------------------------

     2/ L'indication de la nature de l'assemblée pour laquelle la procuration est donnée ;-----------------------------------------------------------------------------------

     3/ La signature du mandant précédée de la mention « bon pour pouvoir » et la date du mandat-------------------------------------------------------------------------

Le mandat est donné pour une (1) assemblée, il peut cependant être donné pour deux (2) assemblées, l'une ordinaire, l'autre extraordinaire tenues le même jour ou dans un délai de sept (7) jours.-------------------------------------------------

Le mandat donné pour une assemblée vaut pour les assemblées successives convoquées avec le même ordre du jour.--------------------------------------------

Les clauses contraires aux dispositions des alinéas qui précèdent sont réputées non écrites.-------------------------------------------------------------------------

Le droit de vote attaché à l'action nantie appartient au propriétaire. Le créancier gagiste, à la demande de son débiteur et aux frais de celui-ci, les actions qu'il détient en gage lorsque celles-ci sont au porteur.-----------------------------------

Le dépôt se fait dans les conditions suivantes :----------------------------------------

QUATORZIEME ROLE



--- Le droit de participer aux assemblées peut être subordonné à l'inscription préalable des actionnaires sur le registre des actions nominatives de la société, au dépôt des actions au porteur en un lieu précisé par l'avis de convocation ou la production d'un certificat de dépôt des actions au porteur, délivré par l'établissement bancaire ou financier dépositaire de ces actions.----------------------

--- L'inscription, le dépôt ou la production du certificat de dépôt doit être effectué au plus tard cinq jours avant la tenue de l'assemblée.---------------------------------

Les actions rachetées par la société sont dépourvues de droit de vote. Il ne peut en être tenu compte pour le calcul du quorum.---------------------------------------------

Le droit de vote attaché aux actions de capital ou jouissance est proportionnel à la quotité du capital qu'elles représentent et chaque action donne droit à une voix.--------------------------------------------------------------------------------------

Toutefois, les statuts peuvent limiter le nombre de voix dont chaque actionnaire dispose dans les assemblées, à condition que cette limitation soit imposée à toutes les actions sans distinction de catégorie.--------------------------------------------

Un droit de vote double de celui conféré aux autres actions, eu égard à la quotité du capital social qu'elles représentent, peut être attribué, par les statuts ou par une assemblée ultérieure, à toutes les actions entièrement libérées pour lesquelles il sera justifié d'une inscription nominative depuis deux ans au moins, au nom d'un actionnaire.------------------------------------------------------------------

En outre, en cas d'augmentation de capital par incorporation de réserves, bénéfices ou prime d'émission, le droit de vote double peut être conféré dès leur émission, aux actions nominatives attribuées gratuitement à un actionnaire à raison d'actions anciennes pour lesquelles il bénéficie de ce droit.--------------------

Toute action convertie au porteur ou transféré en propriété perd le droit de vote double qui peut lui être attaché.-------------------------------------------------------------

Toutefois, le transfert par suite de succession, de liquidation de communauté de biens entre époux ou de donation entre vifs au profit d'un conjoint ou d'un parent au degré successif, ne fait pas perdre le droit acquis.-----------------------------------

La fusion de la société est sans effet sur le droit de vote double qui peut être exercé au sein de la société absorbante si les statuts de celle-ci le prévoient.-------

EXPEDITION

**CHAPITRE II :ASSEMBLEE GENERALE ORDINAIRE**

**ARTICLE QUARANTE TROIS :ATTRIBUTION DE L'ASSEMBLEE GENERALE ORDINAIRE**

L'assemblée générale ordinaire prend toutes les décisions autres que celles qui sont expressément réservées par l'article 45 des présents statuts pour les Assemblées Générales Extraordinaires, et par l'article 47 pour les Assemblées Spéciales.---------------------------------------------------------------------------------------

Elle est notamment compétente pour :---------------------------------------------------------

    1/ Statuer sur les états financiers de synthèse de l'exercice ;-------------------

    2/ Décider de l'affectation du résultat ; à peine de nullité de toute délibération contraire, il est pratiqué sur le bénéfice de l'exercice diminué, le cas échéant, des pertes antérieures, une dotation égale à un dixième au moins affectée à la formation d'un fonds de réserve dit « réserve légale ». Cette dotation cesse d'être obligatoire lorsque la réserve atteint le cinquième du montant du capital social ;--------------------------------------------------------------------------------

    3/ Nommer l'Administrateur Général, le cas échéant l'Administrateur Général Adjoint ainsi que le commissaire aux comptes ;------------------------------

    4/ Approuver ou refuser d'approuver les conventions conclues entre les dirigeants sociaux et la société ;-----------------------------------------------------------------

    5/ Emettre des obligations ;-------------------------------------------------------------

    6/ Approuver le rapport du commissaire aux comptes.--------------------------

Lorsque la société, dans les deux (2) ans suivant son immatriculation, acquiert un bien appartenant à un actionnaire et dont la valeur est au moins égale à cinq millions (5 000 000) de francs CFA, le commissaire aux comptes, à la demande de l'Administrateur Général établit sous sa responsabilité un rapport sur la valeur de ce bien. Ce rapport est soumis à l'approbation de la plus proche Assemblée Générale Ordinaire.---------------------------------------------------------------------------

Ce rapport décrit le bien à acquérir, indique les critères retenus pour la fixation du prix et apprécie la pertinence de ces critères.---------------------------------------

QUINZIEME ROLE

Le commissaire aux comptes doit établir et déposer au siège social ledit rapport quinze (15) jours au moins avant la réunion de l'Assemblée Générale Ordinaire.

L'assemblée générale statue sur l'évaluation du bien à peine de nullité de la vente. Le vendeur ne prend pas part au vote, ni pour lui-même, ni comme mandataire, de la résolution relative à la vente, et ses actions ne sont pas prises en compte pour le calcul du quorum et de la majorité.------------------------

## ARTICLE QUARANTE QUATRE : REUNION, QUORUM ET MAJORITE DE L'ASSEMBLEE GENERALE ORDINAIRE

L'assemblée générale ordinaire est réunie au moins une fois par an, dans les six mois de la clôture de l'exercice, sous réserve de la prorogation de ce délai par décision de justice.------------------------------------------------------------

Chaque action donne droit à une voix lors des votes en assemblée générale ordinaire------------------------------------------------------------------------

L'assemblée générale ordinaire ne délibère valablement, sur première convocation, que si les actionnaires présents ou représentés possèdent au moins le quart des actions ayant le droit de vote.----------------------------------------------

Sur deuxième convocation, aucun quorum n'est requis.--------------------------------

L'assemblée générale ordinaire statue à la majorité des voix exprimées. Dans les cas où il est procédé à un scrutin, il n'est pas tenu compte des bulletins blancs dont disposent les actionnaires présentes ou représentés------------------------------

## CHAPITRE III : ASSEMBLEE GENERALE EXTRAORDINAIRE

## ARTICLE QUARANTE CINQ : ATTRIBUTION DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE

L'Assemblée générale extraordinaire est seule habilitée à modifier les statuts dans toutes leurs dispositions-----------------------------------------------------------

Toute clause contraire est réputée non écrite.--------------------------------------------

L'assemblée générale extraordinaire est également compétente pour :----------------







1°) autoriser les fusions, scissions, transformation et apports partiels d'actif ;------

2°) transférer le siège social en toute autre ville de la République du Cameroun, ou sur le territoire d'un autre Etat.-------------------------------------------------------

3) dissoudre par anticipation la société ou en proroger la durée.---------------------

Toutefois, l'Assemblée générale Extraordinaire ne peut augmenter les engagements des actionnaires au delà de leurs apports qu'avec l'accord de chaque actionnaire.----------------------------------------------------------------------------

## ARTICLE QUARANTE SIX : REUNION, QUORUM ET MAJORITE DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE

Tout actionnaire peut participer aux assemblées générales extraordinaire sans qu'une limitation de voix puisse lui être opposée.-----------------------------------------

Toute clause contraire est réputée non écrite.------------------------------------------

L'assemblée générale extraordinaire ne délibère valablement que si les actionnaires présents ou représentés possèdent au moins la moitié des actions, sur la première convocation, et le quart des actions, sur deuxième convocation.

Lorsque le quorum n'est pas réuni, l'assemblée peut être une troisième fois convoquée dans un délai qui ne peut excéder deux mois à compter de la date fixée par la deuxième convocation, le quorum restant fixé au quart des actions.

L'assemblée générale extraordinaire statue à la majorité des deux tiers des voix exprimées.-----------------------------------------------------------------------------------

Lorsqu'il est procédé à un scrutin, il n'est pas tenu compte des bulletins blancs.--
Dans le cas transfert du siège de la société sur le territoire d'un autre Etat signataire du traité de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires (OHADA), la décision est prise à l'unanimité des membres présents ou représentés.-----------------------------------------------------------------------------

## CHAPITRE IV : ASSEMBLEE SPECIALE

## ARTICLE QUARANTE SEPT: ATTRIBUTIONS DE L'ASSEMBLEE SPECIALE

L'assemblée spéciale réunit les titulaires d'actions d'une catégorie déterminée.----

SEIZIEME ROLE

L'assemblée spéciale approuve ou désapprouve les décisions des assemblées générales lorsque ces décisions modifient les droits de ses membres.----------------

La décision d'une assemblée générale de modifier les droits relatifs à une catégorie d'actions, n'est définitive qu'après approbation par l'assemblée spéciale des actionnaires de cette catégorie.----------------------------------------------------------

### ARTICLE QUARANTE HUIT: REUNION, QUORUM ET MAJORITE DE L'ASSEMBLEE SPECIALE

L'assemblée spéciale ne délibère valablement que si les actionnaires présents ou représentés possèdent au moins la moitié des actions, sur première convocation, et le quart des actions, sur deuxième convocation.--------------------------------------

A défaut de ce dernier quorum, l'assemblée doit se tenir dans un délai de deux mois à compter de la date fixée par la deuxième convocation. Le quorum est fixé au quart des actionnaires présents ou représentés possédant au moins le quart des actions.------------------------------------------------------------------------------

L'assemblée spéciale statue à la majorité des deux tiers des voix exprimées il n'est pas tenu compte des bulletins blancs.-----------------------------------------------------

### TITRE IV : CONTROLE DE LA SOCIETE

### CHAPITRE I: CHOIX DU COMMISSAIRE AUX COMPTES ET DE SON SUPPLEANT

### ARTICLE QUARANTE NEUF : COMMISSAIRES AUX COMPTES

Le contrôle est exercé par un ou plusieurs commissaires aux comptes.--------------

Les fonctions de commissaires aux comptes sont exercées par des personnes physiques ou par des sociétés constituées par ces personnes physiques.------------

Seuls les experts comptables agréés par l'ordre des experts comptables peuvent exercer les fonctions de commissaires aux comptes.-------------------------------------





EXPEDITION

## CHAPITRE II : NOMINATION DU COMMISSAIRE AUX COMPTES ET DE SON SUPPLEANT

### * Nomination

La société est tenue de désigner un commissaire aux comptes et un suppléant.---

Le premier commissaire aux comptes et son suppléant seront nommés par l'assemblée générale constitutive de la société. ---------------------------------------------

En cours de vie sociale, le commissaire aux comptes et son suppléant sont désignés par l'Assemblée Générale Ordinaire.---------------------------------------------

### * Durée

La durée des fonctions du commissaire aux comptes désigné dans les statuts ou par l'Assemblée Générale Constitutive est de deux (2) exercices sociaux. Ses fonctions expirent à l'issue de l'Assemblée Générale qui statue sur les comptes du deuxième exercice.---------------------------------------------------------------------

Lorsqu'il est désigné par l'Assemblée Générale Ordinaire, le commissaire aux comptes exerce ses fonctions durant six (6) exercices sociaux. Ses fonctions expirent à l'issue de l'Assemblée Générale  qui statue sur les comptes du sixième exercice.--------------------------------------------------------------------------------

Si l'Assemblée omet de renouveler le mandat d'un commissaire aux comptes ou de le remplacer à l'expiration de son mandat et, sauf refus exprès du commissaire, sa mission est prorogée jusqu'à la plus prochaine Assemblée Générale Ordinaire annuelle.-------------------------------------------------------------

## CHAPITRE III :DEMISSION DU COMMISSAIRE AUX COMPTES

## ARTICLE CINQUANTE :OBLIGATIONS DU COMMISSAIRE AUX COMPTES

Le commissaire aux comptes : --------------------------------------------------------------

- Certifie que les états financiers de synthèse sont réguliers et sincères et donnent une image fidèle du résultat des opérations de l'exercice écoulé ainsi que de la situation financière et du patrimoine de la société à la fin de cet exercice.----------

- Vérifie les valeurs et les documents comptables de la société.----------------------

DIX SEPTIEME ROLE

- Contrôle la conformité de la comptabilité de la société par rapport aux règles en vigueur.----------------------------------------------------------------------------------------

- Ils peuvent à toute époque de l'année, opérer les vérifications et contrôles qu'ils jugent opportuns ; ils peuvent toujours convoquer l'assemblée générale des actionnaires en cas d'urgence.------------------------------------------------------------------

A défaut de nomination des Commissaires par l'assemblée générale, ou en cas d'empêchement ou de refus de tous les commissaires nommés, il est procédé à leur nomination ou à leur remplacement par ordonnance du Président du Tribunal de Commerce du siège de la société, à la requête de l'Administrateur Général ou de tout intéressé. --------------------------------------------------------------

Le Commissaire nommé par l'Assemblée en remplacement d'un autre ne demeure en fonction que pendant le temps qui reste à courir du mandat de son prédécesseur.------------------------------------------------------------------------------

Les Commissaires sont rééligibles, les Commissaires reçoivent une rémunération, dont l'importance, fixée par l'Assemblée Générale, est maintenue jusqu'à décision nouvelle.-----------------------------------------------------------------------------------

## TITREVI : ANNEE SOCIALE – INVENTAIRE - FONDS DE RESERVES REPARTITION DES BENEFICES

## ARTICLE CINQUANTE ET UN : ANNEE SOCIALE

L'année sociale commence le premier Janvier et finit le trente et un Décembre de chaque année.--------------------------------------------------------------------------------

En outre, les actes accomplis pour son compte pendant la période de constitution et repris par la Société seront rattachés à cet exercice.--------------------------------

## ARTICLE CINQUANTE DEUX : INVENTAIRE

A la clôture de chaque exercice, l'Administrateur Général établit conformément à la loi, un inventaire contenant l'indication de l'actif et du passif de la société. Dans cet inventaire, les divers éléments de l'actif social subissent les amortissements qui sont décidés par l'Administrateur Général.----------------------



EXPEDITION

L'Administrateur Général établit en outre, en se conformant aux prescriptions légales en vigueur, un bilan et un compte de profits et pertes et il présente aux actionnaires un rapport sur la marche de la société pendant l'exercice écoulé.-----

L'inventaire, le bilan et le compte de profits et pertes mis à la disposition des Commissaires quarante jours au moins avant l'assemblée générale, sont présentés à ces Assemblée.------------------------------------------------------------

Tout actionnaire a le droit d'exercer dans les conditions déterminées par l'article 43 des présents statuts, le droit de communication qui lui est réservé par cet article.-------------------------------------------------------------------------

**ARTICLE-CINQUANTE-TROIS:  AFFECTATION-ET-REPARTITION-DES BENEFICES**

Les bénéfices nets sont constitués par les produits de la société, tels que ceux-ci sont constatés par l'inventaire annuel, déduction faite des frais généraux et des charges sociales, y compris notamment les rémunérations fixes ou proportionnelles de l'Administrateur Général, ainsi que toutes rémunérations fixes ou proportionnelles allouées à l'Administrateur Général Adjoint ou aux employés, tous amortissements, provisions, réserves et autres charges jugées utiles par l'Administrateur Général, pour quelque cause que ce soit.-----------------

Sur les bénéfices nets, il est prélevé d'abord au moins cinq pour cent (5%) pour constituer le fonds de réserve légale prescrit par la loi. Ce versement cesse d'être obligatoire lorsque le fonds de réserve a atteint une somme égale au dixième du capital social. Il reprend son cours si cette somme vient à être entamée.-----------

**ARTICLE CINQUANTE QUATRE: PAIEMENT DES DIVIDENDES**

Le paiement des dividendes a lieu en numéraire.----------------------------------------

Il est effectué aux époques et aux caisses désignées par l'Administrateur Général.

Lorsqu'un bilan établi au cours ou à la fin de l'exercice et certifié par un Commissaire aux comptes fait apparaître que la Société, depuis la clôture de l'exercice précédent, après constitution des amortissements et provisions nécessaires, déduction faite s'il y a lieu des pertes antérieures, ainsi que des bénéfices, il peut être distribué des acomptes sur dividendes avant l'approbation des comptes de l'exercice. Le montant de ces acomptes ne peut excéder le montant du bénéfice ainsi défini.----------------------------------------------------------

DIX-HUITIEME ROLE

Toutefois, la répartition des tantièmes revenant à l'Administrateur Général ne peut lui être faite que si le premier dividende statutaire revenant aux actions est mis en distribution.------------------------------------------------------------------------

Les dividendes non réclamés dans les cinq ans de leur exigibilité sont prescrits conformément à la loi.------------------------------------------------------------------------

Tous dividendes régulièrement perçus ne peuvent être l'objet de rapport ou de restitution, à moins qu'ils n'aient été distribués en violation des dispositions légales et si la société que les bénéficiaires avait connaissance du caractère irrégulier de cette distribution au moment de celle-ci ou ne pouvaient l'ignorer compte tenu des circonstances.------------------------------------------------------------------------

## TITRE VII :FUSION-SCISSION-TRANSFORMATION

## ARTICLE CINQUANTE CINQ: FUSION

La fusion est décidée par l'Assemblée Générale Extraordinaire de chacune des sociétés qui participent à l'opération.------------------------------------------------------------------------

La fusion est soumise, le cas échéant, dans chacune des sociétés qui participent à l'opération, à la ratification des assemblées spéciales d'actionnaires visées à l'article 47 des présents statuts.------------------------------------------------------------------------

L'Administrateur Général de chacune de sociétés participant à l'opération établit un rapport qui est mis à la disposition des actionnaires.------------------------------

Ce rapport explique et justifie le projet, de manière détaillée, du point de vue juridique et économique, notamment en ce qui concerne le rapport d'échange des actions et les méthodes d'évaluation utilisées, qui doivent être concordantes pour les sociétés concernées ainsi que, le cas échéant, les difficultés particulières d'évaluation.------------------------------------------------------------------------

Un ou plusieurs commissaires à la fusion, désignés par le président de la juridiction compétente, établissent, sous leur responsabilité, un rapport écrit sur les modalités de la fusion.------------------------------------------------------------------------

Ils peuvent obtenir auprès de chaque société, communication de tous documents utiles et procéder à toutes vérifications nécessaires. Ils sont soumis, à l'égard des sociétés participantes, aux incompatibilités prévues par la loi.------------------------

EXPEDITION

Le ou les commissaires à la fusion vérifient que les valeurs relatives attribuées aux actions des sociétés participant à l'opération sont pertinentes et que le rapport d'échange est équitable. Le ou les rapports des commissaires à la fusion sont mis à la disposition des actionnaires et indiquent.-----------------------------

1°) La ou les méthodes suivies pour la détermination du rapport d'échange proposé ;-----------------------------------------------------------------------

2°) Si cette ou ces méthodes sont adéquates en l'espèce et les valeurs auxquelles chacune de ces méthodes conduit, un avis étant donné sur l'importance relative donnée à cette ou ces méthodes dans la détermination de la valeur retenue ;-------

3°) Les difficultés particulières d'évaluation, s'il en existe.----------------------------
Le ou les commissaires à la scission sont désignés et accomplissent leur mission dans les conditions prévues à l'article 8 des présents statuts.------------------------

S'il n'est établi qu'un seul rapport pour l'ensemble de l'opération, la désignation a lieu sur requête conjointe de toute les sociétés participantes.------------------------

Toute société anonyme participant à une opération de fusion ou de scission doit mettre à la disposition de ses actionnaires, au siège social, quinze jours au moins avant la date de l'assemblée générale appelée à se prononcer sur le projet, les documents suivants:-----------------------------------------------------------------

1°) Le projet de fusion ou de scission ;-----------------------------------------------

2°) Les rapports mentionnés ci-dessus ;-----------------------------------------------

3°) Les états financiers de synthèse approuvés par les assemblées générales ainsi que les rapports de gestion des trois derniers exercices des sociétés participant à l'opération ;-------------------------------------------------------------------------

4°) Un état comptable établi selon les mêmes méthodes et suivant la même présentation que le dernier bilan annuel, arrêté à une date qui, si les derniers états financiers de synthèse se rapportent à un exercice dont la fin est antérieure de plus de six mois à la date du projet de fusion ou de scission doit être antérieur de moins de trois mois à la date de ce projet.----------------------------------------------

Tout actionnaire peut obtenir, à ses frais, sur simple demande, copie intégrale ou partiels des documents susvisés.-----------------------------------------------------

DIX NEUVIEME ROLE

L'assemblée générale extraordinaire de la société absorbante statue sur l'approbation des apports en nature, conformément aux dispositions de l'article 8 des statuts.---------------------------------------------------------------------------------

Lorsque depuis le dépôt au greffe du tribunal chargé des affaires commerciales du projet de fusion et jusqu'à la réalisation de l'opération, la société absorbante détient en permanence la totalité du capital de la ou des sociétés absorbées, il n'y a lieu ni à approbation de la fusion par l'assemblée générale extraordinaire des sociétés absorbées, ni à l'établissement des rapports mentionnés dans les alinéas 1 à 7 du présent article.---------------------------------------------------------------------

Lorsque la fusion est réalisée par voie de création d'une société nouvelle, celle-ci peut être constituée sans autres apports que ceux des sociétés qui fusionnent.----

Dans tous les cas, le projet de statuts de la société nouvelle est approuvé par l'assemblée générale extraordinaire de chacune des sociétés qui disparaissent. Il n'y a pas lieu à approbation de l'opération par l'assemblée générale de la société nouvelle.------------------------------------------------------------------------------------

Le projet de fusion est soumis aux assemblées d'obligataires des sociétés absorbées, à moins que le remboursement des titres sur simple demande de leur part ne soit offert audits obligataires.----------------------------------------------------

Lorsqu'il y a lieu à remboursement sur simple demande, la société absorbante devient débitrice des obligataires de la société absorbée.-------------------------------

L'offre de remboursement des titres sur simple demande des obligataires prévue ci-dessus est publiée dans un journal habilité à recevoir les annonces légales de l'état dépendant du traité de l'Organisation pour l'Harmonisation en Afrique du Droit des Affaires (OHADA). --------------------------------------------------------------

Tout obligataire qui n'a pas demandé le remboursement dans le délai fixé conserve sa qualité dans la société absorbante aux conditions fixées par le contrat de fusion.-------------------------------------------------------------------------

La société absorbante est débitrice des créanciers non obligataires de la société absorbées aux lieu et place de celle-ci, sans que cette substitution emporte novation à leur égard.----------------------------------------------------------------------

Les créanciers non obligataires des sociétés participant à l'opération de fusion, y compris les bailleurs de locaux loués aux sociétés apportées, et dont la créance est antérieure à la publicité donné au projet de fusion peuvent former opposition à celui-ci dans un délai de trente jours à compter de cette publicité devant la juridiction compétente.------------------------------------------------------------------

Le président de la juridiction compétente rejette l'opposition ou ordonne, soit le remboursement des créances, soit la constitution de garanties si la société en offre et si elles sont jugées suffisantes.-----------------------------------------------------

A défaut de remboursement des créances ou de la constitution des garanties ordonnées, la fusion est inopposable à ce créancier.-----------------------------------

L'opposition formée par un créancier ne peut avoir pour effet d'interdire la poursuite de l'opération de fusion.-------------------------------------------------------

Les dispositions du présent article ne mettent pas obstacle à l'application des conventions autorisant le créancier à exiger le remboursement immédiat de sa créance en cas de fusion de la société débitrice avec une autre société.--------------

Le projet de fusion n'est pas soumis aux assemblées d'obligataires de la société absorbante.--------------------------------------------------------------------------------

Toutefois, l'assemblée générale des obligataires peut donner mandat aux représentants de la masse de former opposition à la fusion dans les conditions et sous les effets prévus au présent article.-------------------------------------------------

L'opposition d'un créancier à la fusion ou à la scission dans les conditions prévues au présent article doit être formée dans le délai de trente (30) jours à compter de l'insertion prescrite par le présent article.-----------------------------------

L'opposition des représentants de la masse des obligataires à la fusion ou à scission prévue au présent article doit être formée dans le même délai.--------------

## ARTICLE CINQUANTE SIX : SCISSION

Les dispositions de l'article 55 relatif à la fusion sont applicables à la scission.----

Lorsque la scission doit être réalisée par apport à des sociétés anonymes nouvelles, chacune des sociétés nouvelles peut être constituée sans autre apport que celui de la société scindée.----------------------------------------------------------------

VINGTIÈME ROLE

En ce cas et si les actions de chacune des sociétés nouvelles sont attribuées aux actionnaires de la société scindée proportionnellement à leurs droits dans le capital de cette société, il n'y a pas lieu à l'établissement du rapport mentionné à l'article 55-------------------------------------------------------------------------

Dans tous les cas, les projets des statuts des sociétés nouvelles sont approuvés par l'assemblée générale extraordinaire de la société scindée.------------------------

Il n'y a pas lieu à approbation de l'opération par l'assemblée générale de chacune des sociétés nouvelles.-------------------------------------------------------------------

Le projet de scission est soumis aux assemblées d'obligataires de la société scindée, à moins que le remboursement des titres sur simple demande de leur part ne leur soit offert.-------------------------------------------------------------------

Lorsqu'il y a lieu à remboursement sur simple demande, les sociétés bénéficiaires des apports résultant de la scission sont débitrices solidaires des obligataires qui demandent le remboursement.-----------------------------------------------------------

Le projet de scission n'est pas soumis aux assemblées d'obligataires des sociétés auxquelles le patrimoine est transmis. Toutefois, l'assemblée des obligataires peut donner mandat aux représentants de la masse de former opposition à la scission, dans les conditions et sous les effets prévus à l'article 61.----------------------------

Les sociétés bénéficiaires des apports résultant de la scission sont débitrices solidaires des obligataires et des créanciers non obligataires de la société scindée, aux lieu et place de celle-ci sans que cette substitution emporte novation à leur égard. Par dérogation, il peut être stipulé que les sociétés bénéficiaires de la scission ne seront tenues que de la partie du passif de la société scindée mis à la charge respective et sans solidarité entre elles.--------------------------------------------

Par dérogation au principe que le prix d'émission des actions nouvelles ou les conditions de fixation de ce prix doivent être déterminés par l'assemblée générale extraordinaire sur le rapport de l'Administrateur Général et sur celui du commissaire aux comptes, il peut être stipulé que les sociétés bénéficiaires de la scission ne seront tenues que de la partie du passif de la société scindée mis à leur charge respective et sans solidarité entre elles.------------------------------------

En ce cas, les créanciers non obligataires des sociétés participantes peuvent former opposition à la scission dans les conditions et sous les effets prévus à l'article 55.-------------------------------------------------------------------------------

**EXPEDITION**

## ARTICLE CINQUANTE SEPT: TRANSFORMATION

La société peut se transformer en société d'une autre forme si, au moment de sa transformation, elle a été constituée depuis deux ans au moins et si elle a établi et fait approuver par les actionnaires le bilan de ses deux premiers exercices------

La décision de transformation est prise par rapport du commissaire aux comptes de la société.--------------------------------------------------------------------------

Le rapport atteste que l'actif net est au moins égal au capital social.----------------

La transformation est soumise, le cas échéant à l'approbation de l'assemblée des obligataires.------------------------------------------------------------------------

La décision de transformation est soumise à publicité dans les conditions prévues par la loi.---------------------------------------------------------------------------

La transformation de la société en société en nom collectif est décidée à l'unanimité des actionnaires. Il n'est pas fait, dans ce cas, application des alinéas 1 à 5 du présent article.-------------------------------------------------------------

La transformation d'une société anonyme en société à responsabilité limitée est décidée dans les conditions prévues pour la modification des statuts des sociétés de cette forme.-----------------------------------------------------------------------

## TITRE VIII : DISSOLUTION-LIQUIDATION

## ARTICLE CINQUANTE HUIT :DISSOLUTION ANTICIPEE

L'Administrateur Général peut, à toute époque et pour quelque cause que ce soit, proposer à une assemblée générale extraordinaire, la dissolution anticipée de la société.-------------------------------------------------------------------------

En cas de perte de plus de la moitié du capital social, l'Administrateur Général est tenu de provoquer la réunion de l'assemblée générale de tous les actionnaires à l'effet de statuer sur la question de savoir s'il y a lieu de continuer la société ou de prononcer sa dissolution.------------------------------------------------------------

A cette Assemblée seront convoqués tous les actionnaires, quel que soit le nombre des actions dont ils sont propriétaires ; l'Assemblée devra réunir le quorum prévu ci-dessus pour les Assemblées extraordinaire ne délibérant pas sur une question touchant à l'objet ou à la forme de la société.---------------------------

<u>VINGT ET UNIEME ROLE</u>

Si la dissolution n'est pas prononcée, le capital doit être, sous réserve des dispositions légales, réduit d'un montant égal à celui des pertes qui n'ont pu être imputées sur les réserves, si les capitaux propres n'ont pas été reconstitués à concurrence d'une valeur au moins égale à la moitié du capital social.---------------

La résolution de l'Assemblée Générale dans tous les cas rendue publique.----------

**ARTICLE CINQUANTE NEUF :CONDITION DE LA LIQUIDATION REPARTITION DES BENEFICES DE LA LIQUIDATION**

A l'expiration du terme fixé par les statuts, ou en cas de dissolution anticipée, l'assemblée générale règle, sur la proposition de l'Administrateur Général, le mode de liquidation et nomme un ou plusieurs liquidateurs ou un conseil de liquidation, dont elle détermine les pouvoirs et attributions.--------------------------

Cette nomination mettra fin aux pouvoirs de l'Administrateur Général et des commissaires. Les liquidateurs peuvent, en vertu d'une délibération de l'Assemblée générale, faire apport de cession à une autre société ou à toute personne, de la totalité des biens, droits et obligations de la société dissoute, et accepter, en représentation de ces apports ou cession pour la totalité ou pour partie, des espèces, des actions libérées, des titres et valeurs.------------------------

L'assemblée générale régulièrement constituée, conserve, pendant la liquidation, les mêmes attributions que pendant le cours de la société ; elle a notamment le pouvoir de donner quitus à l'ancien Administrateur Général, de révoquer le ou les liquidateurs, d'en nommer d'autres, de modifier, restreindre ou augmenter leurs pouvoirs, de discuter, approuver, redresser ou rejeter les comptes de la liquidation et de donner quitus aux liquidateurs.-----------------------------------------

Pendant le cours de la liquidation, tous les biens et droits mobiliers et immobiliers de la société continueront à appartenir à l'être moral ; les actionnaires ne posséderont sur les biens aucun droit individuel.--------------------

L'assemblée générale est présidée par un des liquidateurs ou , à défaut, par une personne désignée par l'Assemblée.-------------------------------------------------

L'actif net social, après extinction du passif, sera employé d'abord au remboursement au pair du montant libéré et non amorti des actions, ainsi qu'au remboursement aux actionnaires du montant des réserves qui pourraient leur appartenir exclusivement, et le solde sera réparti entre toutes les actions.----------

EXPEDITION



### TITRE VIII : DISPOSITIONS DIVERSES

### ARTICLE SOIXANTE: CONTESTATIONS

Toutes contestations qui peuvent s'élever, pendant le cours de la société ou de sa liquidation, soit entre les actionnaires et la société, soit entre les actionnaires eux-mêmes, au sujet des affaires sociales, sont jugées conformément à la loi et soumises à la juridiction des tribunaux du siège social.--------------------------------

A cet effet en cas de contestation, tout actionnaire devra faire élection de domicile dans l'arrondissement du siège social, et toutes assignations ou significations sont régulièrement données à ce domicile.--------------------------------------------

A défaut d'élection de domicile, les assignations ou significations sont valablement faites au parquet de Monsieur le Procureur de la République près le tribunal du siège social.-------------------------------------------------------------

### ARTICLE SOIXANTE ET UN: FRAIS DE CONSTITUTION

Les frais et honoraires des présents statuts des actes et des assemblées ayant trait à la constitution comme ceux de leur dépôt et publication et, très généralement, toutes les autres dépenses que le fondateur aurait pu être amené à engager en vue de la constitution et de l'organisation de la société, seront supportés par elle et portés comme frais de premier établissement pour être amortis comme il en sera décidé ultérieurement par l'Administrateur Général.-----

### ARTICLE SOIXANTE DEUX : DEPOTS ET PUBLICATION

Pour faire déposer et publier les présents statuts et tous actes et procès-verbaux relatifs à la constitution de la société, tous pouvoirs sont donnés au porteur d'un original, d'une expédition, d'une copie ou d'un extrait de ces documents.-----------

-------------------- DONT ACTE SUR QUARANTE TROIS PAGES -----------------------

En minute fait et passé en l'Etude Maître Pierre François Xavier MENYE ONDO, Notaire soussigné. ----------------------------------------------------------------

L'AN MIL DEUX MILLE TROIS. ------------------------------------------------------
ET LE VINGT ET UN DU MOIS DE JUILLET. ----------------------------------------

Après lecture et traduction faites, le comparant a signé avec le Notaire en approuvant.---------------------------------------------------------------------------

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : ---------------------------------------------------------------------------

Enregistré à YAOUNDE CDI 7(ACTES CIVILS) --------------------------------------
Le 21 Juillet 2003 ------------------------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293 ------------------------------------------------------------------
Reçu  dix  mille  francs  ------------------------------------------------------------------
Quittance n° 0822955 du 21 Juillet 2003 -------------------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M.Jean Marie ONANA
EBODE, « IMPOTS ». --------------------------------------------------------------------------

Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur quarante quatre pages, sans rature,
ni renvoi en marge, ni mot rayé comme nul
par NOUS,Maître Pierre François Xavier
MENYE ONDO, Notaire soussigné. ----------

Yaoundé, le 21 Juillet 2003



**EXPEDITION**

**SOCIETE : THE FALLS**
**SOCIETE ANONYME EN FORMATION**
**CAPITAL SOCIAL : FCFA 25 000 000**
**SIEGE SOCIAL : YAOUNDE BP 11 236 (Centre Commercial)**

**PROCES - VERBAL DE L'ASSEMBLEE GENERALE CONSTITUTIVE**

REPERTOIRE N° 4284
DU 21 juillet 2003

L'AN MIL DEUX MILLE TROIS.------------------------------------------------------
ET LE

PARDEVANT Maître Pierre François Xavier MENYE ONDO, Notaire au siège de
la cour d'Appel de YAOUNDE (République du Cameroun), y demeurant,
soussigné.------------------------------------------------------------------------------

S'est tenue au futur Siège Social, sur la convocation faite par le fondateur,
l'Assemblée Générale Constitutive Unique de la Société Anonyme dénommée
THE FALLS SA, au capital social de FCFA 25 000 000 (vingt cinq millions de
francs), dont le siège est fixé à YAOUNDE BP 11 236 (Centre Commercial) .-----

Il a été dressé une feuille de présence émargée par chaque membre entrant en
séance. L'Assemblée procède alors à la composition de son bureau.---------------

La présidence de la séance est confiée à Monsieur ATEBA MINKOULOU
Gabriel; actionnaire unique de la société. -------------------------------------------

Et Maître Pierre François Xavier MENYE ONDO, Notaire, assure le secrétariat.-

Et compte tenu du caractère unipersonnel de la Société, il n'a été désigné de
Scrutateurs.------------------------------------------------------------------------------

La feuille de présence certifiée sincère et véritable par les membres du bureau
ainsi constitué, permet de constater que l'unique Souscripteur, représentant
les 2500 (deux mille cinq cents) actions est présent. -------------------------------

L'Assemblée réunissant ainsi plus de la moitié du capital social est déclarée
régulièrement constituée et peut valablement délibérer.----------------------------

**PREMIER ROLE**

Monsieur le Président dépose ensuite sur le bureau de l'Assemblée et met à la disposition des membres ;-----------------------------------------------------------------

1) La feuille de présence ;-----------------------------------------------------------------

2) Le certificat délivré par le Greffier en Chef constatant le dépôt à son Greffe du projet des Statuts de la Société.-----------------------------------------------------------

3) Un exemplaire des statuts de la Société.--------------------------------------------

4) Un exemplaire de l'acte de déclaration de libération du capital reçu par Maître Pierre François Xavier MENYE ONDO, Notaire à YAOUNDE. --------------

5) Le bulletin de souscription du souscripteur unique d'actions ;-----------------

7) Le reçu attestant du versement des fonds ;-----------------------------------------

8) Et le texte des résolutions proposées à l'Assemblée.------------------------------

Monsieur le Président déclare que le texte des résolutions ci-dessus a été tenu à la disposition des membres de l'Assemblée pour un temps largement suffisant.------------------------------------------------------------------------------------------

L'Assemblée donne acte à Monsieur le Président de cette déclaration dont elle reconnaît l'exactitude.--------------------------------------------------------------------------

Monsieur le Président rappelle que l'Assemblée est appelée à délibérer sur l'ordre du jour suivant : --------------------------------------------------------------------------

### ORDRE DU JOUR :

**1) VERIFICATION DE LA SINCERITE DE LA DECLARATION NOTARIEE DE SOUSCRIPTION ET DE VERSEMENT ;**

**2) DESIGNATION D'UN ADMINISTRATEUR GENERAL ;**

**3) NOMINATION D'UN COMMISSAIRE AUX COMPTES TITULAIRE;**

**4) NOMINATION D'UN COMMISSAIRE AUX COMPTES SUPPLEANT ;**

**5) APPROBATION DES STATUTS ET CONSTATATION DE LA CONSTITUTION DEFINITIVE DE LA SOCIETE.**

**6) QUESTIONS DIVERSES**

EXPEDITION



Puis Monsieur le Président donne lecture de l'acte des statuts, de la déclaration notariée de souscription et de versement et de la liste des souscripteurs contenant également l'état des versements effectués par le Souscripteur unique, annexés à cette déclaration.-----------------------------------------------

Cette lecture terminée, Monsieur le Président déclare la discussion ouverte.-----

Diverses observations sont échangées, puis personne ne demandant plus la parole, Monsieur le Président met successivement aux voix les résolutions suivantes, toutes à l'ordre du jour :-------------------------------------------------

Cette résolution est adoptée à l'unanimité

PREMIERE RESOLUTION : **Vérification de la sincérité de la déclaration de souscription et de versement du capital social**

L'Assemblée Générale, après vérification, reconnaît sincère et véritable la déclaration de souscription et de versement faite par le fondateur de la Société suivant acte reçu par Maître Pierre François-Xavier MENYE ONDO, Notaire à YAOUNDE. -------------------------------------------------------------------

Cette résolution est adoptée à l'unanimité

DEUXIEME RESOLUTION: **Nomination d'un Administrateur Général**

L'Assemblée Générale, après avoir délibéré, décide de nommer Monsieur ATEBA MINKOULOU Gabriel aux fonctions d'Administrateur Général de la Société THE FALLS SA ------------------------------------------------------------

Cette résolution est adoptée à l'unanimité

Monsieur ATEBA MINKOULOU Gabriel, présent à l'assemblée après avoir accepté les fonctions qui lui ont été conférées, déclare n'exercer aucune fonction et n'être frappé d'aucune mesure, susceptible de lui interdire l'exercice des fonctions d'Administrateur Général.-------------------------------------------------

TROISIEME RESOLUTION: **Nomination d'un Commissaire aux comptes titulaire.**

L'Assemblée Générale agissant en vertu des dispositions des statuts sociaux, nomme pour les deux premiers exercices sociaux en qualité de commissaire au comptes titulaire de la Société: THE FALLS SA, ---------------------------------------

DEUXIEME ROLE

Monsieur MOUENDE Thomas, Expert comptable demeurant à YAOUNDE B.P 2713, inscrit à l'ordre des Experts comptables du Cameroun sous le numéro 48 E.C.P-------------------------------------------------------------------------------

---- Dit que sa rémunération sera fixée ultérieurement.-----------------------------

Il est donné lecture d'une lettre par laquelle, Monsieur MOUENDE Thomas déclare qu'il ne tombe sous le coup d'aucune des dispositions légales instituant des incompatibilités ou des interdictions de fonctions et qu'en conséquence, il accepte les fonctions qui lui ont été conférées dans les statuts.--------------------

Cette résolution est adoptée à l'unanimité.

QUATRIEME RESOLUTION : **Nomination d'un Commissaire aux comptes suppléant.**

L'Assemblée Générale décide agissant en vertu des dispositions des statuts sociaux, décide de nommer pour les deux premiers exercices sociaux en qualité de commissaire aux comptes suppléant de la Société THE FALLS SA :---------

----- Monsieur MBOUKEM Célestin, Expert comptable demeurant à DOUALA B.P 5662, inscrit à l'ordre des expert comptable du Cameroun sous le numéro 38 E.C P.------------------------------------------------------------------------------

---- Dit que sa rémunération sera fixée ultérieurement.-----------------------------

Il est donné lecture d'une lettre par laquelle, Monsieur Célestin MBOUKEM déclare qu'il ne tombe sous le coup d'aucune des dispositions légales instituant des incompatibilités ou des interdictions de fonctions et qu'en conséquence, il accepte les fonctions qui lui ont été conférées dans les statuts.--------------------

Cette résolution est adoptée à l'unanimité.

CINQUIEME RESOLUTION: **constatation de la constitution définitive de la Société THE FALLS.**

L'Assemblée Générale constate la constitution définitive de la Société et donne quitus au fondateur. Elle donne en outre, tous pouvoirs au porteur d'un extrait ou d'une copie du présent procès-verbal constatant ses délibérations en vue de l'accomplissement de toute formalité légale de publicité.-------------------- -------

Cette résolution est adoptée à l'unanimité

Aucune résolution n'a été adoptée au titre de divers.----------------------------------

# EXPEDITION

L'ordre du jour étant épuisé et personne ne demandant plus la parole, Monsieur le Président déclare la séance levée à 18 h 30.----------------------------------------

De tout ce que dessus, il a été dressé le présent procès-verbal qui a été signé par les membres du Bureau après lecture .----------------------------------------

----------------------- DONT ACTE SUR CINQ PAGES -----------------------

En Minute fait et passé en l'Etude Maître Pierre François Xavier MENYE ONDO, Notaire soussigné.----------------------------------------------------------------

Le Président                                             Le Secrétaire

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : ----------------------------------------------------------------

Enregistré à YAOUNDE CDI 7(ACTES CIVILS) ----------------------------------
Le 21 Juillet 2003 ------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293 --------------------------------------------------
Reçu dix mille francs ------------------------------------------------------
Quittance n° 0822955 du 21 Juillet 2003 --------------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M.Jean Marie ONANA EBODE, « IMPOTS ». ---------------------------------------------------------

Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur cinq pages, sans rature, ni renvoi en
Marge, ni mot rayé comme nul par NOUS,
Maître Pierre François Xavier MENYE ONDO,
Notaire soussigné. -----------------------------

Yaoundé, le 21 Juillet 2003

# EXPÉDITION



## Annexe à l'acte n° 4284 du 21 juillet 2003

**FEUILLE DE PRESENCE A L'ASSEMBLEE
CONSTITUTIVE UNIQUE DE LA SOCIETE DENOMMEE :
THE FALLS SA
EN DATE DU 11 JUILLET 2003**

| Nos ordre | Noms et domicile des Actionnaires | Nombre d'Actions | Nombre de voix | Emargement |
|---|---|---|---|---|
| 1 | Monsieur ATEBA MINKOULOU Gabriel | 2500 | 25000 | |

------- La présente feuille de présence est certifiée sincère et exacte par les membres du Bureau.

Yaoundé, le 11 Juillet 2003.

Le Président                                                                 Le Secrétaire

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : --------------------------------------------------------------

Enregistré à YAOUNDE CDI 7(ACTES CIVILS) ----------------------------------
Le 21 Juillet 2003 --------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293 --------------------------------------------------
Reçu quatre mille francs ----------------------------------------------------
Quittance n° 0822955 du 21 Juillet 2003 --------------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M.Jean Marie ONANA
EBODE, « IMPOTS ». -------------------------------------------------------------

Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur une page, sans rature, ni renvoi en
Marge, ni mot rayé comme nul par NOUS,
Maître Pierre François Xavier MENYE ONDO,
Notaire soussigné. -------------------------------

Yaoundé, le 21 Juillet 2003

*Me Pierre François Xavier Menye Ondo*
*Notaire*

EXPEDITION

RÉPERTOIRE N° 4285
DU 21 Juillet 2003

------- PARDEVANT Maître Pierre François Xavier MENYE ONDO, Notaire au Siège de la Cour d'Appel de YAOUNDE (République du Cameroun), y demeurant soussigné,------------------------------------------------------------

------------------------------- A COMPARU ----------------------------- -------

--- **Monsieur ATEBA MINKOULOU Gabriel**, Camerounais né en 1940 à ESSAZIK, de feu MINKOULOU Gabriel et de feue AKABA Véronique, Planteur, domicilié à YAOUNDE, titulaire du récépissé de demande de Carte nationale d'identité numéro 1030895381 à lui délivrée le 14 Janvier 2002 à YAOUNDE. ---

---- Lequel, a exposé ce qui suit :------------------------------------------------

------------------------------- EXPOSE ---------------------------------

--- QUE par actes du Ministère du Notaire soussigné dont l'enregistrement est requis, il a été constitué une société anonyme dénommée THE FALLS SA, au capital social de FCFA 25 000 000 (vingt cinq millions de francs), divisé en 2500 (deux mille cinq cents) actions de FCFA 10 000 (dix mille francs) chacune de numéraire, dont le siège est fixé à YAOUNDE BP 11 236 (centre commercial).----

----- L'objet de ladite société est : La promotion immobilière, le tourisme, l'hôtellerie, la prestation de services divers, la représentation, le Commerce général, l'Import-Export. --------------------------------------------------

--- Et généralement toutes activités annexes, toutes opérations financières, industrielles, mobilières ou immobilières pouvant se rattacher directement ou indirectement à l'objet social, ou à tous objets similaires ou connexes.-------------

Cet exposé terminé, le Comparants a fait la déclaration suivante :------------------

DÉCLARATION DES SOUSCRIPTIONS ET VERSEMENTS DU CAPITAL

- Conformément à l'article 394 de l'acte uniforme relatif au Droit des Sociétés Commerciales et du Groupement d'intérêt économique régissant les Sociétés

PREMIER ROLE



anonymes dans le territoire du Cameroun, le comparant déclare au Notaire soussigné que les 2500 (deux mille cinq cents) actions composant le capital social de FCFA 25 000 000 (vingt cinq millions de francs) sont intégralement souscrites, et libérées en totalité en numéraire, par le souscripteur unique.------

--- A l'appui de la déclaration qui précède, le comparant a présenté au Notaire soussigné un état dressé sur une feuille de papier libre certifié sincère et véritable par le comparant contenant les prénoms et nom du souscripteur unique et le montant des versements effectués par ce dernier.----------------------

--- Une attestation en date du 11 Juillet 2003 délivrée par la Banque Internationale du Cameroun pour L'Epargne et le Crédit en abrégé B.I.C.E.C, certifiant de la libération de la somme de FCFA 25 000 000 (vingt cinq millions de francs) représentant le montant du capital social. ---------------------------------

--- En outre le comparant a présenté au Notaire soussigné le bulletin constatant la souscription susvisée, lequel a été remis au comparant après que le Notaire en ait pris connaissance.------------------------------------------------------------

----------------------------------------- ANNEXE -----------------------------------------

--- Aux présentes est demeurée annexée après avoir été revêtue d'une mention de cette annexe par le Notaire soussigné, la liste de souscription et de la libération de capital à l'appui des déclarations qui précèdent, signée sincère et véritable par le Fondateur.------------------------------------------------------------

------------------------- DONT ACTE SUR DEUX PAGES -------------------------

En Minute fait et passé en l'Étude Maître Pierre François Xavier, Notaire soussigné.------------------------------------------------------------------------------

L'AN DEUX MILLE TROIS.-----------------------------------  -----------------------------

ET LE VINGT ET UN DU MOIS DE JUILLET. --------------------------------------------

Après lecture et traduction faites, le comparant a signé avec le Notaire en approuvant. ------------------------------------------------------------------------

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : ------------------------------------------------------------------------



# EXPÉDITION



Enregistré à YAOUNDE CDI 7(ACTES CIVILS) ------------------------------
Le 21 Juillet 2003 --------------------------------------------------------
Vol 4 Folio 34 Case/BD 293 ------------------------------------------------
Reçu cinq cent mille francs ------------------------------------------------
Quittance n° 0822955 du 21 Juillet 2003 -----------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M.Jean Marie ONANA
EBODE, « IMPOTS ». -----------------------------------------------------

Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur trois pages, sans rature, ni renvoi en
Marge, ni mot rayé comme nul par NOUS,
Maître Pierre François Xavier MENYE ONDO,
Notaire soussigné. -------------------------------

Yaoundé, le 21 Juillet 2003

Me Pierre François Xavier Menye Ondo

Notaire

EXPEDITION

Annexe à l'acte n° 4285 du 21 juillet 2003

SOCIETE: THE FALLS SA
SIEGE SOCIAL: YAOUNDE BP 11236
CAPITAL SOCIAL: FCFA 25 000 000 (vingt cinq millions de francs)

**ÉTAT DE VERSEMENT ET DE SOUSCRIPTION :**

---- Société anonyme en formation au capital de FCFA 25 000 000 (vingt cinq millions de francs), divisés en 2500 (deux mille cinq cents) actions de FCFA 10 000 (dix millions de francs) à souscrire entièrement et à libérer moins du quart en numéraire. -----------------------------------------------------------------

------- Liste des actionnaire, souscripteurs des Actions en numéraire et état des versements effectués par chacun d'eux. --------------------------------------------

| Nos | NOMS ET DOMICILES DES FUTURS ACTIONNAIRES | NOMBRE D'ACTIONS | MONTANT DES ACTIONS | MONTANT DES VERSEMENTS | % |
|-----|------|------|------|------|------|
| 1 | M. ATEBA MINKOULOU | 2500 | 25 000 000 | 25 000 000 | 100 |

TOTAL DES ACTIONS ----------2500
MONTANT DES ACTIONS -------------------- 25 000 000
MONTANT DES VERSEMENTS EFFECTUES --------------- 25 000 000
POURCENTAGE DES VERSEMENTS------------------------------------------- 100

------- La présente liste est certifiée sincère et exacte par Monsieur ATEBA MINKOULOU Gabriel, Fondateur, signataire de la présente déclaration notariée de versement prescrite.-----------------------------------------------------------------

Yaoundé, le 11 Juillet 2003.

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : ----------------------------------------------------------------------

Enregistré à YAOUNDE CDI 7(ACTES CIVILS) ------------------------------------
Le 21 Juillet 2003 ------------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293 --------------------------------------------------------
Reçu quatre mille francs ------------------------------------------------------------
Quittance n° 0822955 du 21 Juillet 2003 ------------------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M.Jean Marie ONANA
EBODE, « IMPOTS ». ----------------------------------------------------------------

Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur trois pages, sans rature, ni renvoi en
Marge, ni mot rayé comme nul par NOUS,
Maître Pierre François Xavier MENYE ONDO,
Notaire soussigné. --------------------------------

Yaoundé, le 21 Juillet 2003

**TRANSLATION OF EXHIBIT EN-1**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**ARTICLES OF THE FALLS**



AUTHENTIC COPY

DEEDS BOOK Nᵒˢ 4283, 4284, 4285
of 21 July 2003                    Fax n°

**THE FALLS Plc**
**ARTICLES**

Pierre François-Xavier MENYE ONDO
Notary at the Yaounde Court of Appeal Headquarters

**ADDRESS**
======
20th May Blvd – Opposite Hilton Hotel – Crédit Foncier Building – 3rd Floor – Door 308
Post Office Box 6650 – Telephone (237) 223.53.66 – Fax (237) 222.55.66
Website: www.etudemaitremenye.com – e-mail: me.menye@iccnet.cm
REPUBLIQUE DU CAMEROUN – YAOUNDE – REPUBLIC OF CAMEROON

*DEEDS BOOK n°4283*

## APPEARING

**BEFORE** *Pierre François Xavier MENYE ONDO*, Notary Public at the Yaoundé Court of Appeal (Republic of Cameroon) where he is resident.................

Mr. ATEBA MINKOULOU Gabriel, a Cameroonian born in 1940 in ESSAZIK, son of late MINKOULOU Gabriel and late AKABA Véronique, farmer resident in YAOUNDE-BASTOS, holder of National Identity Card (application receipt n°1030895381 issued on 14 January 2002 in YAOUNDE.

**WHO** has drawn up, as presented below, the memorandum of association of a Limited Liability Company with a General Manager which he intends to form.

## PART I : FORM-OBJECTIVE-NAME-HEADQUARTERS-DURATION

## ARTICLE ONE : FORM

A limited liability company to be governed by the laws currently in force in Cameroon, its memorandum of association and the Uniform Act of Commercial Companies and Economic Interest Groups intervening as a result of the Organisation for the Harmonisation of Business law in Africa (OHADA) Treaty which will come into force in nineteen ninety-eight, is hereby formed by the owner of the shares constituted below and others which will be constituted later on :

## ARTICLE TWO : OBJECTIVE

The company shall seek, directly, or indirectly, throughout all countries and particularly the Republic of Cameroon, to :

- Promote the real estate industry, tourism, the hotel industry, service delivery, representation, general import-export trade etc;
- Generally, offer all related services, all financial, industrial, real estate operations directly or indirectly related to the business or similar objectives of the Company.

## ARTICLE THREE : NAME

The company shall be named: THE FALLS

In all acts, invoices, advertisements and other documents, the Company shall be designated by the business name which shall immediately be preceded or followed by the words "société anonyme (or S.A.) with a General Manager" written in legible characters.

## ARTICLE FOUR : HEADQUARTERS

The headquarters of the Company shall be in YAOUNDE, P.O. BOX 11236 (Downtown).

It may be transferred to any other place in the same city by decision of the General Manager, or to any other part of the country by decision of the Extraordinary General Assembly of shareholders.

The General Manager may decide to setup, transfer, or close any office, depot, branch office, agency or subsidiary wherever he deems it necessary.

## ARTICLE FIVE : DURATION

The duration of the Company shall be ninety-nine (99) years starting from the date of the definitive constitutive act, except for cases of anticipated dissolution, or of extension.

## PART II : EQUITY CONTRIBUTION-CAPITAL-SHARES

## Article SIX : EQUITY CONTRIBUTION-REGISTERED CAPITAL-SHARES

The registered capital shall be twenty-five million (25,000,000) CFA francs.

It shall be broken down into two thousand five hundred (2,500) shares of ten thousand (10,000) CFA francs each, completely subscribed and numbered from 1 to 2,5000.

## ARTICLE SEVEN : CAPITAL INCREASE

The registered capital shall be increased either by issuing new shares or by increasing the face value of existing shares.

New shares shall be paid up either :

- in cash.
- by set-offs with certain accounts receivable, due and payable on the Company;
- by incorporating reserves, profits or share premiums ;
- by assets in kind;

Capital increase by increasing the face value of shares shall be effected only if shareholders unanimously agree thereto, unless such capital increase is by incorporating reserves, profits and share premiums.

New shares shall be issued either for their par value or for that amount increased by a share premium.

Only the Extraordinary General Assembly shall be competent to decide on or, where need be, authorize the increase of capital upon the report of the General Manager and that of the auditor.

Where capital increase is by means of incorporating reserves, profits or share premiums, the General Assembly shall decide on the conditions for forming the quorum and the majority provided for under section 44 herein for Extraordinary General Assemblies;

The right to the allocation of bonus shares, just as the right to fractional shares which may derive from capital increase by the incorporation of reserves, profits and share premiums, shall be negotiable and transferable.

However, the Extraordinary General Assembly may, under the conditions for determining the quorum and the majority provided for by section 46 herein, expressly decide that the right to fractional shares shall not be negotiable and that the corresponding shares shall be sold.

The proceeds from such sale shall be allotted to the holders of such fractional shares latest thirty (30) days from the date of entering the whole number of shares allotted in their account.

The General Assembly may authorize the General Manager to determine the modalities of selling the rights to fractional shares.

The General Assembly may delegate to the General Manager the powers it would take to effect capital increase in one or two times, determine one or part of the modalities therefor, note that the said increase has been effected and to amend the articles of association accordingly.

The report of the General Manager should contain all useful information on the reasons for the proposed capital increase as well as on the state of affairs right from the beginning of the current business year and, where the General Assembly that should examine the accounts has not yet held, such report should cover the preceding company year.

The said capital increase should be carried out within three (3) years starting from the day it was decided or authorized that the capital be increased.

The capital of the Company shall be considered as having been increased from the day it is proven that shares have been subscribed for and paid up.

Under pain of nullity of the operation, capital increase shares shall be completely paid up before new cash shares are issued.

**SECTION EIGHT** : **SPECIAL PROVISIONS FOR CAPITAL INCREASE THROUGH CONTRIBUTIONS IN KIND AND/OR SPECIAL PERQUISITES**

Contributions in kind and/or special advantages must be evaluated by a commissioner for contributions appointed at the suit of the General Manager, by the President of the Court having jurisdiction over the headquarters.

The commissioner for contributions may be the company's auditor.

The commissioner for contributions shall, on his own responsibility, estimate the value of the contributions in kind or special perquisites.

The report of the commissioner for contributions shall be deposited at headquarters at least eight (8) days before the Extraordinary General Assembly is held, and it shall be placed at the disposal of shareholders who may want to acquaint themselves with its contents and obtain, at their own expenses, a copy of the whole or part thereof.

It shall also be forwarded, within the same time limit, to the registrar of Companies.

When the Extraordinary General Assembly meets to approve a report on contributions in kind or the granting of special perquisites, the shares of the contributor or beneficiary shall not be taken into account in working out the quorum and the majority.

The contributor or beneficiary shall have no right to participate in the discussions nor to vote neither for himself nor as a representative.

Should the General Assembly approve the estimated value of the contributions or the grant of special perquisites, it shall note the increase of capital.

Should the General Assembly reduce the estimated value of the contributions in kind or the remuneration of special perquisites, the express approval of such modifications by the contributors, beneficiaries or their duly authorised representatives to that end shall be sought.

Failing that, there shall be no capital increase.

Shares issued for property shall be completely paid up as soon as they are issued.

## SECTION NINE : REDUCTION OF REGISTERED CAPITAL

The registered capital shall be reduced either by reducing the face value of shares or by reducing the number of shares.

The reduction of capital shall be authorized or decided on by the Extraordinary General Assembly which may delegate all powers to the General Manager to carry it out.

In no way may capital reduction prejudice the equality of shareholders, except with the express agreement of the disfavoured shareholders.

The plan to reduce capital shall be communicated to the auditor at least fort-five (45) days prior to the Extraordinary General Assembly authorizing or deciding on said capital reduction.

The auditor shall present a report to the Extraordinary General Assembly in which he shall give his appraisal of the causes of and the conditions for such capital reduction.

Where the General Manager has effected the capital reduction as delegated by the General Assembly, he shall write a report thereon which shall be published, and shall accordingly go on to amend the corresponding sections of the memorandum of association.

The creditors of the company may not object to capital reduction where such reduction is as a result of losses incurred.

The Company's creditors whose claims were received before the minutes of the proceedings of the General Assembly deciding on or authorizing capital reduction were filed at the commercial court registry, as well as bondholders, may object to the company's capital reduction where such capital reduction as a result of losses incurred.

The time limit for creditors to object to capital reduction shall be thirty (30) days starting from the day the minutes of the proceedings of the General Assembly deciding on or authorizing capital reduction were filed in.

Such objection shall be formulated through an extrajudicial document and shall be brought before the competent jurisdiction sitting at short notice.

The capital reduction operation may not start within the time limit allowed for objection nor, where necessary, before a ruling has been given on such objection in the first instance.

When the objection is granted, the capital reduction procedure shall be interrupted until the claims are paid or until guarantees thereof are constituted, where the company offers any guarantees and where such guarantees are deemed sufficient.  Capital reduction shall be subject to formalities of publicity.

## SECTION TEN : PRE-EMPTAVE SUBSCRIPTION RIGHTS – GENERALITIES

Shares shall encompass a pre-emptive subscription right to capital increase.

Shareholders shall have, in proportion to the amount of their shares, a pre-emptive right to subscribe for the cash shares issued to increase the capital of the company. Such right shall be irreducible.

During the subscription period, the pre-emptive right to subscription shall be negotiable where it is separated from shares which are themselves negotiable.

Or otherwise, this right shall be transferable under the same conditions as the share itself. --------------------------------------------------------------------

Should the General Assembly expressly decide, the shareholders shall also have a pre-emptive right on shares that were not irreducibly subscribed.----------- -----------------------------------------------------------------------

Shares shall be subject to allocation for shareholders who have subscribed more shares than they could have subscribed irreducibly and, whatever the circumstances, within the limit of their request.-------------------------------------- ---------------------------

The deadline granted for shareholders to exercise their pre-emptive right may not be less than twenty (20) days starting from the opening date of subscriptions.----- ---------------------------------------------

The time allowed shall be closed by anticipation as soon as every irreducible and, where need be, reducible subscription right has been exercised or as soon as capital increase has been completely subscribed for after the shareholders who did not subscribe have individually renounced their subscription rights.------------ -----

Where the irreducible and, if necessary, reducible subscriptions have not completely absorbed the capital increase:-------------------------------------------- --------------

1/ The amount set for capital increase may be limited to the amount of subscriptions done under the double condition that this amount should reach at least three quarters (3/4) of the amount previously set by the General Assembly which decided or authorised the capital increase and that this option had been expressly provided for by the General Assembly when it was issued.----------------- ------------

2/ The shares unsubscribed for may be freely distributed, completely or partially, except otherwise decided by the Assembly.--------------------------------------------

3/ The shares unsubscribed for may be offered to the public, completely or partially, when the Assembly expressly agrees to this option.------------------------- ------------

The General Manager may use, in any order determined by himself, all or only some of the options provided for above.--------------------------------------------

There shall be no capital increase in the case where, after exercising these options, the amount of subscriptions received does not reach the required amount for capital increase, or, three quarters (3/4) thereof as provided for under subsection 1 above.--------------------------------------------------------------------

However, the General Manager may, as of right, and in any case, limit capital increase to the amount reached, where the shares subscribed for represent ninety-seven (97%) of capital increase.------------------------------------------

Any other decision of the General Manager repugnant hereto shall be considered undocumented.--------------------------------------------------------------------------------

### SECTION ELEVEN:

### SUPPRESSION OF PREFERENTIAL RIGHT

The General Assembly which decides or authorises capital increase may deprive one or several beneficiaries, so designated by name, of their; pre-empture right to subscribe for the totality of the capital increase, or for one or several portions thereof.

Where the beneficiaries are shareholders, they may neither take part in voting for themselves nor as representatives, and their shares shall not be taken into account in calculating the quorum or the majority.--------------------------------------
-------------

### SECTION TWELVE:

### INDIVIDUAL RENUNCIATION OF PRE-EMPTIVE RIGHTS

Shareholders may individually renounce their pre-emptive rights to subscribe for the benefit of designated persons. They may also renounce the said right without designating any beneficiary.------------------------------------------

Any shareholder who renounces his pre-emptive rights to subscription shall accordingly notify the company thereof, either by way of letter to bearer with acknowledgement of receipt or by a registered letter with a request for acknowledgement of receipt thereof, before the expiry of the subscription deadline.-----------------------------------------------------------------------

For bearer stocks, renunciation without designation of beneficiary shall be accompanied by corresponding coupons or an attestation by the holder of the securities stating the shareholder's renunciation.--------------------

Renunciation with designation of beneficiaries shall be accompanied by the acceptance of the latter.-------------------------------------------------------------------------
--------

New shares to which the shareholder has renounced his rights without designating any beneficiary may be subscribed for reducibly or, where necessary, distributed among shareholders, or offered to the public under the conditions stipulated by Section 10 herein.--------------------------------------------------------------
----

However, when the company is notified of such renunciation latest on the date set for the said capital increase, the corresponding shares shall be made available to the other shareholders for them to exercise their irreducible and, where need be, reducible subscription pre-emptive rights.-------------------------------

Where the shareholder renounces to subscribe to capital increase for the benefit of designated persons, his rights shall be transferred to them on an irreducible or reducible basis where necessary.----------------------

### SECTION THIRTEEN:

### USUFRUCT

When old shares are held in usufruct, the usufructuary and the bare owner shall agree on the conditions for exercising the pre-emptive rights and attributing new shares.--------------------------------------------------------------------------------

Failing agreement between both parties, the provisions of this Section shall be applicable.--------

These provisions shall also be applicable should both parties remain silent as regards the allocation of free shares.------------------------------------------------------ ------------------

The pre-emptive subscription rights attached to the old shares shall be exercised by the bare owner.----------------------------------------------------------------------- ---------

Should the bare owner sell his subscription rights, the usufructuary may substitute for him in order to subscribe for new shares or to sell the subscription right.------------------------------------------------------------------------

Should the usufructuary sell the subscription rights, the bare owner may demand the re-use of the proceeds of such transfer. The property thus acquired shall be submitted to usufruct.----------------------------------------------------

The bare shareholder shall be considered, with regard to the usufructuary, to have neglected exercising his pre-emptive rights to subscribe for new shares issued by the company when he has neither subscribed for new shares, nor sold the subscription rights at least eight (08) days before the expiry of the subscription deadline granted to shareholders.--------------------------------------------- ---------------------------

The shares shall belong to the bare owner for bare property and to the usufructuary for usufruct. However, in case of payment by the bare owner or usufructuary in order to perfect the subscription, the new shares shall belong to the bare owner and the usufructuary only up to the amount of shares each subscribed for: surplus new shares shall be the full property of whoever pases for them.-------------------------------------------------------------------------

## SECTION FOURTEEN:

### ISSUING PRICE AND REPORT

The issuing price of new shares or the terms and conditions for determing such price shall be laid down by the Extraordinary General Assembly on recommendation made therefor in the General Manager's report and that of the auditor.------------------------------------------

The General Manager's report shall indicate:----------------------------------------

1) the maximum amount and the reasons for the proposed capital increase,-----------

2) the reasons for withdrawing the pre-emptive subscription rights;---------------

3) the names of the allotees of the new shares, the number of shares allotted to each of them and, with proof, the issuing price.------------------------------------------

Where the Assembly itself lays down all the conditions for increasing capital, the report mentioned above shall also indicate the impact of the proposed issuance on the shareholders' situation, especially concerning their own share on of the capital at the close of the preceding financial year.------------------------------------------

If the closing occurred over six (06) months before the envisaged transaction, such impact shall be evaluated following an intermediary financial situation established on the preceding six (06) months according to the same methods and following the same presentation as that of the previous annual statement of accounts.--------------------------

The auditor shall give his opinion on the withdrawal of the pre-emptive right, on the choice of elements considered in the calculation of the issuing price, and on the amount thereof, as well as on the impact of the issuance on the shareholders' situation in relation to their share of capital.------------------------------------------

He shall verify and certify as true the information taken from the company's accounts, and on the basis of which he is giving his opinion.--------------------------

When the General Assembly has delegated its powers as provided for under Section 7(11) above, the General Manager shall, when exercising these powers, establish a complementary report defining the definitive conditions for the operation established in conformity with the authorisation given by the Assembly. The report shall be provided in addition to the information provided for under subsection 2 above.-----------------------------------------------------------------

The auditor shall verify, among others, the conformity of the terms and conditions from the viewpoint of the authorisation given by the Assembly and of the information submitted to it. He shall also give his opinion on the elements chosen in calculating the issuing price and on its final amount, as well as on the incidence thereof on the financial situation of the shareholder, especially concerning his share of own capital at the close of the previous financial year.-

These complementary reports shall immediately be made available to shareholders at the headquarters at most fifteen (15) days following the General Manager's meeting, and shall be brought to their knowledge during the next Assembly.-------------------------------------------------------------------------------------

SECTION FIFTEEN:

**FORM OF SHARES**

Cash shares shall be those which have been paid for in cash or by compensation of certain receivable accounts, and cash loans and debts due on the company, those which are issued following the incorporation of reserves, profits or premium shares into the capital, and those whose amount stems partly from the incorporation of reserves, profits or premium shares and partly from cash payments. They have to be paid up in full upon subscription.----------------------------------------------------------------------

Any other shares shall be  shares issued for property:--------------------------------------------

Until complete payment, cash shares shall be nominal shares.------------------

Shares issued for property shall be convertible into bearer securities only after two (02) years.-----------------------------------------------------------------------------------

The nominal amount of shares or fractions shares thereof may not be inferior to ten thousand (10 000) CFA francs.----------------------------------------------------------

SECTION SIXTEEN:

**VOTING RIGHTS ATTACHED TO A SHARE**

Each share shall have attached to it a voting right proportionate to the quota of the capital it represents; and each share shall give entitlement to one (01) vote at least.--------------------------------------------------------------------------------------

**\* Double Vote**

The right to vote that is double that conferred upon other shares considering the quota of the capital they represent may be conferred, by  the Extraordinary General Assembly, upon completely paid up nominal shares for which the

shareholder shall provide proof of registration, in his name, for at least two years.----------------------------------------------------------------------------

Similarly, in case of capital increase by incorporating reserves, profits or premium shares, the right to double vote may be conferred from the moment of their issuance to the nominal shares granted freely to a shareholder on the basis of the old shares which already entitle him to this right.-----------------------------------

Any share converted into a bearer security shall lose the right to a double vote.------------------------

## SECTION SEVENTEEN:

### RIGHT TO DIVIDEND ATTACHED TO THE SHARE

Every share shall be entitled to dividends proportionate to the quota of the capital it represents.---------------------------------------------------

The provisions of sub-paragraph 1 above notwithstanding, at the inception of the company and throughout its existence, preferred shares, which will have advantages over all other shares may be established. Among such other advantages, they may constitute a bigger part in the profits or in the liquidation dividends, have priority on profits, or cumulative dividends.--------

All interest, dividends or other periodic products due to shares for a specific company year shall be paid at one (01) go.-----------------

The single payment date shall be determined by the General Assembly of shareholders. The Assembly may however entrust the General Manager with the task of determining the said date.--------------------------------------------------------------------------

## SECTION EIGHTEEN:

### SHARE NEGOTIABILITY

Shares shall be negotiable only after the company has been registered in the Trade Register or after the modification text following capital increase has been registered.----------------------------------------------------------------------

Cash shares shall be negotiable only after they have been completely paid up.--------------------------------------------------------------------------------------

The shares shall remain negotiable after the winding up of the company and until the end of the liquidation process.-------------------------------------------------------

Dissolution of the company or the stoppage of the issuance of shares shall not entail nullity the of negotiations carried out before the decision to wind up if the

form of the certificates thereof is regular. However, the buyer may petition against the seller for guarantees.------------------------------------------------

## SECTION NINETEEN:

### TRANSMISSION OF SHARES

The transmission of shares, if the company does not call on the public for savings, shall be carried out under the following conditions:--------------------------

1) by transferring the rights of the holder in the company's registers, for nominal shares, by simple registration in the company's register;---------
2) by simple tradition for bearer securities. The bearer of the certificate shall be considered to be its owner.-----------------------------------------------------

## SECTION TWENTY:

### RESTRICTING SHARE TRANSMISSION

Though shares are nominative, the transmission thereof to third parties who are strangers to the company, either for free or against payment shall be subject to the approval of the General Assembly.--------------------------------------------------
--------------------

Share transmission shall not be restricted in the case of succession, liquidation of joint property between spouses, or the transfer of such to a spouse, an ascendant or a descendant.------------------------------------------------------------------------------
-----

The transferor shall not take part in voting and his participation or votes shall not count in the calculation of the quorum and the majority.-------------------------
-----------------------

The transferor shall attach to his application for approval, the full names, profession and address of the proposed transferee, the number of shares envisaged for transmission and the price proposed. The application shall be forwarded to the company via a bearer against receipt or by registered mail with a request for acknowledgement of receipt.---------------------------

The approval shall be given by notification, or by failure to respond within three (03) months from the submission date.------------------------------------------------------

Should the company not approve the proposed transferee, the General Manager shall, within three (03) months from the refusal notification, be bound to have the said shares bought by a shareholder, a third party or, if agreed thereto by the transferor, by the company in view of capital reduction.-------------------------------

If both parties cannot agree, the transfer price shall be determined by an Expert designated by a judge of the competent court at the request of the more diligent party.---------------------------------------------------------------------------------------------

If at the end of the three-month period the shares have not been bought, it shall be considered that the company has given its approval. However, where an Expert might have been designated by the President of the court having jurisdiction to determine the prices, the deadline may be extended for a period not exceeding three months by the President of the court having jurisdiction.----------------------

SECTION TWENTY-ONE: **GUARANTEEING SHARES**

Should the company approve a project to guarantee shares, such approval shall imply the transferee's approval in the case of forced guaranteeing of shares, unless the company prefers to immediately redeem the shares in view of reducing its capital.----------

The guaranteeing of shares shall be demurrable to the company only if it was approved by the General Manager.-----------------------------------------------------------

The guaranteeing project shall have to be forwarded beforehand to the company through a bearer of a covering letter against acknowledgement of receipt or by a registered letter with a request for acknowledgement of receipt, or  through telex or fax, indicating the full names, and the number of shares to be guaranteed.-----

The share shall result from the guarantee approval communicated in the same form as the application for guarantee, or from failure to reply within three months from the application date.------------------------------------------------------------------

SECTION TWENTY-TWO:

**NON-PAYMENT OF SHARES**

Shares shall be fully paid up for to at least a quarter of their value upon subscription, while the balance thereof shall be paid up for as and when, the General Manager's shall so demand, but within a maximum period of three years from the subscription date.-----------

In case of non payment of the balance on shares within the periods laid down by the General Manager, the company shall send a notice thereof to the defaulting shareholders against a receipt or by registered letter with a request for acknowledgement of receipt.---------------------------------------------------------------

If one month later this formal notice is not heeded, the company shall proceed, on its own initiative, with the sale of the shares. As from the same deadline, shares

which have not been paid up shall cease to entitle the holders thereof to the vote during meetings of shareholders; and they shall be deducted for purposes of calculating the quorum and the majority;----------------------------------------

At the end of this same one-month deadline, the dividend and pre-emptive subscription rights for capital increase attached to these shares shall be suspended until the amounts owed are paid up.----------------------------------------

Listed shares shall be sold on the stock exchange while unlisted shares shall be sold in a public auction by a stockbroker or a Notary Public.--------------------------

Prior to the sale provided for in the preceding paragraph, the company shall, thirty days after formal notification, publish the numbers of the shares put up for sale in a journal authorised to receive legal announcements. It shall notify the debtor and, where need be, the co-debtors, of the sale by hand mail against receipt or by registered letter with acknowledgement of receipt, indicating the date and number of the journal in which the publication was made. The sale may not be carried out within less than fifteen days from the date of dispatch of the notification of the correspondence to the debtor.----------------------------------------
---------------

The defaulting shareholder shall either remain a debtor or benefit from the balance. The expenses incurred by the company during the sale shall be charged to the defaulting shareholder.----------------------------------------------------------

The defaulting shareholder, the successive transferees and the subscribers shall be jointly responsibly for the share-paid amount.---------------------------------------

The company may take action against them either before or after the sale, or simultaneously to obtain both the money owed and reimbursement for expenses.-
----------------------------------------------------------------

Whoever pays off the company shall claim the successive holders of the share. The definitive debt burden shall be borne by the last of them.-------------------------
--------------------------------------------------------------------

## SECTION TWENTY-THREE:

### REDEMPTION OF SHARES

The redemption of shares by drawing lots shall be forbidden, notwithstanding contrary legal, regulatory or contractual provisions.----------------------------------------

### PART III:

### COMPANY ADMINISTRATION AND MANAGEMENT

## SECTION TWENTY-FOUR:

## METHOD OF ADMINISTRATION

This limited liability company shall be administered by a General Manager.--------
--

The company may, during its existence, change its mode of administration and management.------------------------------------------------------------------------

Such decision shall be taken by the Extraordinary General Assembly which shall amend the memorandum of association to that end.------------------------------------
------------------------

### SECTION TWENTY-FIVE:

## APPOINTING THE GENERAL MANAGER

The first General Manager shall be appointed by the Constitutive General Assembly.--------------------------------------------------------------------------------

During the existence of the company, the General Manager shall be appointed by the Ordinary General Assembly.-----------------------------------------------------------
----

The General Manager shall be appointed either from among the shareholders or from among non-shareholders.----

### SECTION TWENTY-SIX:

## LABOUR CONTRACT

The General Manager may be bound to the company by a labour contract, on condition that such contract means effective employment.-----------------------------
------

The labour contract shall be subject to the prior authorisation of the Ordinary General Assembly.--------------------------------------------------------------------------
-----------

### SECTION TWENTY-SEVEN:

## TERM OF OFFICE OF THE GENERAL MANAGER

The term of office of the General Manager shall be two (02) years where he is appointed by the Constitutive General Assembly and six (06) years where he is appointed in the course of the company's existence. The term of office shall be renewable.-

### SECTION TWENTY-EIGHT:

## UNAVOIDABLE ABSENCE AND DISMISSAL OF GENERAL MANAGER

IN the event of the General Manager being temporarily absent, his functions shall be performed provisionally by the Deputy General Manager, where one has been appointed. In the absence of one, the General Manager's functions shall be performed provisionally by any person deemed good appointed by the Ordinary General Assembly.-----

### *DEATH OR RESIGNATION

In case of death or resignation of General Manager, his functions shall be performed by the Deputy General Manager until a new General Manager is appointed during the next Ordinary General Assembly.

### *DISMISSAL

The General Assembly may dismiss the General Manager at any moment, any contrary provision being considered undocumented.------------------------------------------

## SECTION TWENTY-NINE:

### REMUNARATION

Apart from the money paid by the terms of the labour contract, the General Manager may not receive any other remuneration for his services, be it permanent or not, except the one stated herebelow.--------------------------------------

The Ordinary General Assembly may allot to the General Manager in remuneration for his activities, a fixed annual amount as duty allowance.------------------------

The General Assembly may also allocate to the General Manager exceptional allowances for the missions and duties entrusted to him, or authorise the reimbursement of his travelling expenses, and any other expenditure incurred in the interest of the company.----------------------------------------------------------------------

Where need be, other perquisites granted in kind that are given to him shall be determined in the same manner as the remuneration.-----------------------------------------------------------

The above provisions shall not cover the dividends which are regularly shared among shareholders.-----------------------------------------------------------------------

## SECTION THIRTY:

### FUNCTIONS OF THE GENERAL MANAGER

The General Manager shall be vested with wide-ranging powers to act on behalf of the company under any circumstance.------------------------------------------------------------

He shall exercise such rights within the limits of the company's objectives and subject to powers attributed to the assembly of shareholders and, where need be, those conferred by the articles of association.------------------------------------------------------------

The General Manager shall, in particular, have the following powers which are rather enunciative than limitative:------------------------------------------------------------

He shall keep the objectives of the company in focus and determine the orientation is to be given to its administration,------------------------------------------------------------

He shall keep the objectives of the company in focus. ---------------------------------

He shall manage the company.------------------------------------------------------------

He shall close the books for every financial year.-----------------------------------

He shall close he company's financial statements and approve management reports, which shall be submitted to the Ordinary General Assembly for approval.------------------------------------------------------------

He shall convene and chair General Assemblies of shareholders.-------------------

In his dealings with third parties, the acts of the General Manager which do not fall within the company's goals under the conditions and limits laid down by the Uniform Act, shall commit the company.-----------------------------------------

The provisions of the memorandum of association or the resolutions of the General Assembly of shareholders limiting the General Manager's powers shall not be demurrable to third parties of good faith.------------------------------------------------------------

## SECTION THIRTY-ONE:

### CONTROLLED AGREEMENTS

The General Manager shall submit, to the Ordinary General Assembly deciding on the analytical financial statements of the year just ended, a report on the agreements he signed with the company, directly or indirectly, or through an intermediary, and on agreements signed with a moral entity of which he is the owner, indefinitely responsible associate or, in a general manner, company manager.-------------------

The provisions of this Section shall not be applicable to agreements on running transactions concluded under normal conditions as described under Section 34 herein.------------------------------------------------------------------

The General Manager shall notify the auditor within one month from the date of concluding the agreement and, in any case, at least fifteen days before the annual Ordinary General Assembly holds.------------------------------------------------

The auditor shall present a report on these agreements to the General Assembly.-

The report shall list the agreements submitted to the General Assembly's appreciation, state their nature, mention the goods or services concerned by the convention, their essential modalities, particularly the price or rates, discounts or commissions agreed upon, the securities conferred and, where need be, any indication facilitating the shareholders' appreciation of the benefits attached to these agreements.------------------------------------------------------------

The agreements approved or disapproved by the General Assembly shall be effective on the contracting and third parties.---------------------------------------------

However, any tort to the company that is consequent upon the agreement disapproved by the General Assembly may be imputed to the General Manager.---
------------------------------------------------------------------------------------

The provisions of paragraphs 1, 2 and 3 above shall not apply where the General Manager is the sole shareholder of the limited liability company.---------------------
------------------------------------------------------------------

On the other hand, the provisions of paragraphs 1, 6 and 7 above shall be applicable to the General Manager and the Deputy General Manager.----------------
------------------------------------------------------------------------

## SECTION THIRTY-TWO:

### CAUTIONS, AND GUARANTEES

The cautions, and guarantees given by the General Manager or Deputy General Manager on first application shall be opposable against the company only if they were given after prior authorisation by the Ordinary General Assembly, either generally or specially.------------------------------------------------------------

However, this limitation shall not be applicable to cautions and guarantees granted to the customs and taxation authorities by the General Manager or Deputy General Manager acting in the name of the company.-------------------

## SECTION THRITY-THREE:

### FORBIDDEN AGREEMENTS

Under penalty of nullity of the contract, it shall be forbidden for the General Manager or the Deputy General Manager (where one is appointed) as well as for their spouses, ascendants, descendants and intermediaries, to contract in any form whatsoever, loans from the company, to have the company grant them an overdraft on a current account or otherwise, or to caution or endorse through the company their commitments to third parties.----------------------------------------

However, if the company is a bank or financial establishment, it may grant to its General Manager or Deputy General Manager, under any form whatsoever, a loan, an overdraft for a current account or otherwise, a caution or an endorsement or any other guarantee, if these agreements concern current transactions concluded under normal conditions.---------------------------------------

## SECTION THIRTY-FOUR:

### THE DEPUTY GENERAL MANAGER

Upon the proposal of the General Manager, the General Assembly of shareholders may appoint one or several individuals to assist the General Manager as Deputy General Manager.----------------------------------------------------------------------

The Assembly shall be free to determine the duration of the tenure of the Deputy General Manager.-------------------------------------------------------------------------------------------

The Deputy General Manager's tenure shall be renewable.-----------------------------------

The General Assembly shall, in agreement with the General Manager, determine the powers to be delegated to the Deputy General Manager.--------------------

The statutory clauses or decisions of the General Assembly limiting his powers shall not be opposable to third parties.-----------------------------------------------------------

The Deputy General Manager may be bound to the company by a labour contract on condition that the employment be effective.---------------------------------------------

The labour contract shall be subject to the prior authorisation of the Ordinary General Assembly.-------------------------------------------------------------------------------------------

The modalities and amount of the General Manager's remuneration and, where need be, the perquisites granted him shall be fixed by the Ordinary General Assembly.

Upon the proposal of the General Manager, the Ordinary General Assembly may dismiss the Deputy General Manager at any moment.------------

## PART IV:

**GENERAL ASSEMBLIES**

**CHAPTER I:**

**RULES COMMON TO ASSEMBLIES OF SHAREHOLDERS**

SECTION THIRTY-FIVE:

**CONVENING THE ASSEMBLY**

The General Assembly of shareholders shall be convened by the General Manager.--

Failing which, it may be convened:-------------------------------------------------------

1/ by the auditor, after he has, through a letter sent to the General Manager by hand mail against receipt or by registered letter with a request for acknowledgement of receipt, tried in vain to have him convene the Assembly.----------------------------------------------------------------

Where the auditor convenes the General Assembly, he shall draw the agenda thereof and may, for specified reasons, choose a venue other than the headquarters. He shall present the reasons therefor the General Assembly in this report to the Assembly.---------------------

2/ by an attorney appointed by the President of the competent court, for a brief period, on the request of any party concerned in case of an emergency, or of one or several shareholders representing at least one tenth (1/10) of the share capital, if it is a General Assembly or one tenth (1/10) of the shares in the category concerned, in case of a special assembly.-----------------------------------

3/ by the liquidator------------------------------------------------------------------

Meetings of shareholders shall be held at the headquarters or at any other venue in the territory of one of the signatory countries to the OHADA Treaty where the headquarters are located (OHADA: Organization for the Harmonization of Business Laws in Africa).-----------------------------------------------------------------------------------

General Assembly meetings shall be convened by a notice published in a journal authorised to receive legal announcements---------------------------------

Since shares are nominal, the convening notice shall be sent at the expense of the company either by hand mail against receipt or by registered letter with a request for acknowledgement of receipt, and shall state the agenda.-----------------------------------------

**\* Deadline for convening General Assembly**

The convening notice shall reach or be made known to shareholders at least fifteen (15) days before the meeting date, for the first notice, and where need be, at least six (6) days for subsequent notices.-------------------------------------------------

Where the Assembly is convened by an attorney of the judiciary, the judge may fix a different deadline.--------------------------------------------------------------------------------------------

### * Contents of the Convening notice

The convening notice shall indicate the company name, followed, where applicable, by its acronym, company's form, the share capital, the address of the headquarters, the registration number, the day and date, time and place of the meeting, as well as its nature (ordinary, extraordinary or special) and its agenda.----------------

Where applicable, the notice shall indicate where the bearer bonds or the deposit certificate of these shares have to be deposited, in order to open the way to participate in the meeting as well as the date by which the bearer bonds should be deposited.-----------------

Joint owners of undivided shares, the bare owners and the usufructuaries of shares shall be convened following the procedures given hereabove-----------------------------------------------------------------------------------------------------

Any General Assembly irregularly convened may be annul and void. However, nullity shall not be admissible if the shareholders were present or represented.-------------------------------------------------------------------------------------------

## SECTION THIRTY-SIX:

## AGENDA

The agenda of the meeting shall be drawn up shall be by the convener.---------------------------------------------

However, when the General Assembly is convened by an attorney, the agenda shall be drawn up by the judge of the competent court who appointed him.-----------------------------------------

Likewise, one or several shareholders shall have the capacity to request that draft resolutions be inserted on the agenda where they represent:-----------------------

    1) five percent (5%) of the capital, if the share capital is less than one billion (1,000,000,000) CFA Francs.---------------------------------------------------------

    2) three percent (3%) of the capital, if the share capital is between one billion (1,000,000,000) and two billion (2,000,000,000) CFA Francs.-----------------

3) zero point five percent (0.5%) of the capital if it is more than two billion (2,000,000,000) CFA Francs.--------------------------------------------------------------

The following shall be attached to the request:----------------------------------------

1) the draft resolutions with a brief explanatory statement.---------------

2) proof of ownership or of representation of the required fraction of the capital as stipulated herein.

These draft resolutions shall be forwarded to the headquarters by hand mail against a receipt, by registered letter with a request for acknowledgement of receipt, by telex or by fax, at least ten (10) days before the General Assembly meets for them to be put to the vote.---------------------------------------------------------

The deliberations of the General Assembly shall be null and void if the draft resolutions forwarded, in conformity with the provisions of this section, are not put to the vote.------------

The General Assembly may not deliberate on an issue that does not feature on the agenda.--------------------------------------------------------------------------------

Nevertheless, when meeting in ordinary session, it may dismiss or replace the General Manager or the Deputy General Manager.----------------------------------------

Where the agenda of the General Assembly concerns the presentation of candidatures for the post of General Manager, it shall give their identities, their professional profiles over the last five years.----------------------------------------

The agenda of the General Assembly may not be modified during the second meeting convened or, where need be,  during the third time the meeting is convened in the case of meetings of Extraordinary General Assembly.--------

<u>SECTION THIRTY-SEVEN:</u>

**COMMUNICATING DOCUMENTS**

For the Annual Ordinary General Assembly, every shareholder shall have the right to inform himself at the headquarters, either in person or through the representative he has designated by name to represent him at the meeting, of:----

1/ the inventory, summary financial statements and the list of managers where a General Manager has been associated.----------------------------------------

2/ the reports of the auditor and General Manager which are submitted to the General Assembly.------------------------------------------------------------------

3/ where need be, the explanatory statements of the proposed resolutions, and information on the candidates for the post of General Manager.------

4/ the list of shareholders.-----------------------------------------------------------

5/ The global amount of remunerations duly certified by auditors of the company paid to the ten (10) or five (5) highest paid managers and employees of the company depending on whether or not the company's staff exceeds two hundred (200) employees.--------------------

Except for the inventory, the right of the shareholder to inform himself shall imply that of procuring a copy of a document for himself at his own expense. The right to information shall be exercised during the fifteen (15) days that precede the General Assembly meeting.-----------------------------------------------------

For General Assembly meetings other than the annual Ordinary General Assembly, the right to information shall concern proposed resolutions, the General Manager's report and, where need be, the report of the auditor or liquidator.-----------

Furthermore, any shareholder may, at anytime, consult and procure for himself a copy of the following:------------------------------------------------------------------------------------

1/ the company's documents mentioned above for the three most recent years.-------------------------------------------------------------------------------------

2/ the minutes and attendance sheets of the General Assemblies held within the last three years.--------------------------------------------------------------

3/ any other document, where provided for by the memorandum of association.--------------------

Similarly, any shareholder may submit written questions two (2) times per year to the General Manager on any issue that could be prejudicial to the future of the company.-------------------------------------------------------------------------------

The answer shall be communicated to the auditor.--------------------------------------

All joint owners of undivided shares, and usufructuaries shall also be entitled to the right to communication provided for above.--------------------------

Should the company refuse to communicate all or part of the documents mentioned above, the President of the competent court shall, at the request of the

shareholder, rule on the refusal.----------------------------------------------------------
--

The President of the competent court may compel the company to communicate the said documents to the shareholder.----------------------------------------------------
---------

## SECTION THIRTY-EIGHT:

### BUREAU OF THE GENERAL ASSEMBLY

The General Assembly shall be chaired by the General Manager or if he is unavoidably absent and unless otherwise provided by law, by the shareholder having or representing the highest number of shares, or in case of equality, the eldest shareholder.--------------------------------------------------------------------------
--------

The two (2) shareholders representing the highest number of shares in person or as representatives shall be appointed tellers, subject to their acceptance.-----------

A secretary shall be appointed by the General Assembly to take the minutes. He may or may not be a shareholder.-------------------------------------

## SECTION THIRTY-NINE:

### ATTENDANCE SHEET

During each General Assembly, an attendance sheet shall be drawn up indicating the following:------------------------------------------------------------------------------------
----------

     1/ the name of every shareholder present or represented, the number of shares he owns and the number of votes attached thereto:--------------------

     2/ the full names and place of residence of each representative, the number of shares he owns and the number of votes attached thereto.-------------------

The attendance sheet shall be signed by the shareholders present and by the representatives, at the beginning of the session.------------------------------------------

Proxies shall be attached to the attendance sheet at the end of the meeting.--------
------------------------------------------------------------------------------

The attendance sheet shall be certified as true, under their responsibility, by the tellers.-----------------------------------------------------------------------------------------

The attendance sheet shall be certified genuine and true under their responsibility, by the tellers.

**SECTION FORTY** : **MINUTES**

Minutes of the proceedings of the Assembly shall indicate the date and place of meeting, the nature of the Assembly, the mode of convening it, the agenda, the composition of the Bureau, the quorum, the text of resolutions put to the vote and the results of the votes for each resolution, the documents and reports presented to the Assembly meeting and a summary of the debates.

They shall be signed by members of the Bureau and, together with the attendance sheet and other documents attached thereto, kept in the archives at the headquarters of the Company pursuant to the provisions of section 38 herein.

Copies or extracts of minutes of General Assemblies shall be validly certified by the General Manager or any other person authorised to do so.

In the event of liquidation, such minutes shall be certified by only one liquidator.

**SECTION FORTY-ONE** : **CONDITIONS OF ADMISSION INTO GENERAL ASSEMBLY MEETING**

The following persons may participate in General Assembly meetings :

- shareholders, or their representatives under the conditions laid down by the laws or the memorandum of association ;
- all other persons authorised to do so by some legal provision or by the provisions of the company's memorandum of association.

It shall be same for non shareholders, where they have been duly authorised either by the President of the Court having jurisdiction, by decision of the Bureau of the General Assembly, or by the General Assembly itself.

**SECTION FORTY TWO** : **REPRESENTING SHAREHOLDERS AND THE RIGHT TO VOTE**

Any shareholder may have himself represented by any person of his choice.

Any shareholder may receive the power of attorney from other shareholders to represent them at a meeting without any restriction other than that resulting from the legal or statutory provisions laying down the number of votes any one person may cast both for himself and as a legal representative.
Such power of attorney shall comprise:

1) the full names and place of residence of the representative as swell as the number of shares and times he has to vote ;
2) an indication of the nature of the Assembly for which the power of attorney is given ;
3) the signature of the principal preceded by the words "*valid for proxy*" and the date of the power of attorney.

The power of attorney shall be given for one (1) Assembly; however, it may be given for two (2) assemblies, one ordinary and one extraordinary both held on the same day or within a time limit of seven (7) days.

The power of attorney given for one Assembly meeting shall be valid for successive assembly meetings convened with the same agenda;

All other clauses repugnant to the provisions of the preceding subsections shall be presumed to be undocumented.

The voting right attached to a pledged share shall go to the owner. The pledge shall, at the suit of his debtor and at the expense of the latter pledge the shares he has if such shares are bearer shares.

They shall be deposited under the following conditions :

- the right to participate in General Assembly meetings may be subject to the prior registration of shareholders in the Company's nominal share register, the depositing of bearer shares at a place specified in the notice convening the meeting, or on attestation issued by the depositary bank or financial institution showing that the bearer shares have been handed in there.

The registration, the attestation of deposit should be done latest five (5) days prior to the date of the meeting.

Shares redeemed by the company shall be deprived of the right to vote. They shall not be taken into account in working out the quorum.

The voting right which goes with share stock or jouissance shares shall be proportional to the quota of the capital they represent, and each share shall be entitled to one vote.

However, the articles of association may limit the number of votes to which each shareholder shall be entitled during general assembly meetings; provided that such restriction is imposed on all shares irrespective of category.

A double voting right conferred on other shares, given the quota of the registered capital they represent, may be allotted, by the articles of association or a later general assembly, to all fully paid up shares which show proof of nominal registration in the name of the shareholder dating at least two years back.

Besides, in case of capital increase by incorporating reserves, profits or issue premiums, the double voting right may be conferred as soon as such premiums are issued to nominal shares allotted free of charge to a shareholder on account of old shares for which he is entitled to this right.

Any share converted into a bearer share or transferred as property shall lose the double voting right that could be attached thereto.

However, transfer as a result of succession, liquidation of community of property between spouses, or the donation to husband or wife or a relative by living persons, shall not entail the loss of an acquired right.

The fusion of the company with another shall have no effect on the double voting right which can be exercised within the absorbing company, if the memorandum of association of the latter provide for it.

**CHAPTER II** :

**SECTION FORTY-THREE : ORDINARY GENERAL ASSEMBLY**

The ordinary general assembly shall take all decisions other than those expressly reserved for Extraordinary General Assemblies by the provisions of section 45 herein, and for Special Assemblies by section 47 herein.

It shall be competent, especially, to :

1- examine the financial statements for the company year ;
2- decide on the allocation of results ; under pain or nullity of all contrary indications, losses form past years shall, if necessary, be off-set from the profits made during the year just ended, and an endowment equal to at least one tenth of the said profits shall be allocated to the formation of a reserve fund known as "*legal reserves*". The said endowment shall cease to be compulsory when the reserves shall have reached one fifth of the registered capital.
3- appoint the General Manager and, where necessary, the Deputy General Manager and the Auditor ;
4- approve or disapprove the agreements signed between the corporate executive and the company ;
5- issue bonds ;
6- approve the auditor's report.

When, within two (2) years following its registration, the company acquires property belonging to a shareholder and the value of which is at least five million (5,000,000) CFA francs, the auditor shall, at the request of the General Manager, make a report on the said property under his own responsibility. The said report shall be presented to the nearest ordinary General Assembly for approval.

The report shall describe the property to be acquired, indicate the criteria retained for determining the price thereof, and give an appraisal of such criteria.

The auditor must write and hand in the said report at the headquarters at least fifteen (15) days before the meeting of the ordinary general assembly.

The General Assembly shall decide on the evaluation of the property under pain of nullity of the sale. The seller shall not take part in the vote, neither for himself nor as a representative, on the resolution pertaining to the sale ; and his

shares shall not be taken into account in working out the quorum and the majority.

**SECTION FORTY-FOUR** : **MEETINGS OF THE ORDINARY GENERAL ASSEMBLY : QUORUM AND MAJORITY**

The ordinary General Assembly shall meet at least once a year within six (6) months of the close of the company year, subject to the extension of this time limit by decision of the Court.

Each share shall entitle the holder thereof to one vote during meetings of the ordinary General Assembly.

The Ordinary General Assembly may deliberate validly on first notice only if the shareholders present or represented own at least one quarter of the shares entitling holders to vote.

On the second notice, no quorum shall be required.

The ordinary general assembly shall take decisions by a majority of the votes cast. In cases where balloting takes place, the blank ballot papers made available to shareholders present or represented shall not be taken into account.

**CHAPTER III : EXTRAORDINARY GENERAL ASSEMBLY**

**SECTION FORTY-FIVE** : **FUNCTIONS OF THE EXTRAORDINARY GENERAL ASSEMBLY**

The extraordinary general assembly shall alone be empowered to amend the memorandum of association in its entirety.

Any clause repugnant hereto shall be presumed to be undocumented.

The extraordinary general assembly shall also be competent to :

1) authorise mergers, split-ups, transformation and spin-offs ;
2) transfer the headquarters to any other town in the Republic of Cameroon ;
3) dissolve the company by anticipation or extend the duration thereof.

However, the extraordinary general assembly may increase the commitments of shareholders above their contributions only when each shareholder approves thereof.

**SECTION FORTY-SIX** : **EXTRAORDINARY GENERAL ASSEMBLY : MEETINGS, QUORUM AND MAJORITY**

Any shareholder may participate in the extraordinary general assembly unconditionally.

Any clause repugnant hereto shall be presumed to be undocumented.

The extraordinary general assembly can deliberate validly only if the shareholders present or represented on the first notice own at least half of the shares and one quarter of the shares on second notice.

Where the quorum is not formed, the assembly may be convened for a third time within a time limit not exceeding two (2) months starting from the date of the second meeting and with the quorum maintained at one quarter of shares.

The extraordinary general assembly shall take decisions by a two-thirds majority of the votes cast.

Where balloting takes place, blank ballot papers shall not be taken into account. In case of the transfer of the headquarters of the Company to another country signatory to the organisation for the Harmonisation of Business Law in Africa (OHADA) treaty, the members present or represented shall unanimously agree.

## CHAPTER IV : SPECIAL ASSEMBLY

## SECTIONS FORTY-SEVEN : FUNCTIONS OF THE SPECIAL ASSEMBLY

The special assembly shall bring together owners of shares of a given category.

The special assembly shall approve or disapprove the decisions of general assemblies where such decisions modify the rights of its members.

The decision of a general assembly to modify the rights pertaining to a category of shares can be final only after approval by thereof the special assembly of shareholders of the said category.

## SECTION FORTY-EIGHT : SPECIAL ASSEMBLY :
## MEETINGS, QUORUM AND MAJORITY

The special assembly can deliberate validly only if the shareholders present or represented on first notice own at least half (1/2) of the shares, and one quarter (1/4) of the shares on second notice.

Failing this last quorum, the assembly has to hold within a time limit of two (2) months starting from the date of the second notice. The quorum shall be one quarter (1/4) of the shareholders present or represented and owning at least a quarter (1/4 of the shares.

The special assembly shall take its decision by a two-thirds majority of the votes cast, with blank ballot papers not being taken into consideration.

## PART IV : CONTROL OF THE COMPANY

## CHAPTER I : CHOICE OF AUDITOR AND HIS ASSISTANT

**SECTION FORTY-NINE** : **AUDITORS**

Control shall be carried out by one or several auditors.

The functions of auditors shall be performed by natural persons or companies comprising the said natural persons.

Only chartered accountants approved by the order of chartered accounts may perform the functions of auditor.

## CHAPTER II : APPOINTMENT OF AUDITOR AND DEPUTY AUDITOR

**\* APPOINTMENT**

The company shall be bound to appoint an auditor and a deputy auditor.

The first auditor and his deputy shall be appointed by the constitutive general assembly of the company.

In the course of its activities, the auditor and his deputy shall be designated by the extraordinary general assembly.

**\* DURATION**

The auditor designated by the constitutive general assembly shall hold office for two (2) company years. His functions shall expire by the end of the General Assembly examining the accounts of the second company year.

Where the auditor is designated by the Ordinary General Assembly, he shall hold office for six (6) company years. His functions shall expire by the end of the general assembly examining the accounts of the sixth company year.

Should the assembly fail to renew the mandate of an auditor or to replace him on the expiry of his mandate and, barring the express refusal of the auditor, his mission shall be extended till the nearest annual general assembly.

## CHAPTER III : RESIGNATION OF AUDITOR

**SECTION FIFTY** : **DUTIES OF THE AUDITOR**

The auditor shall :

- certify that the analytical statements of account are regular, sincere and reflect a faithful result of the operations of the company for the year just ended as well as of the company's financial situation and heritage as one of the end of the said company year.

- control the securities and documents of the company.
- monitor the conformity of the company's accounting system with the rules in force;
- they may audit the company at anytime of the year; they may call a general assembly of shareholders in case of emergency.

Failing the appointment of auditors by the general assembly, or in case of the unavoidable absence or refusal of all the auditors appointed, the President of the Court having jurisdiction over headquarters shall, at the request of the General Manager or the person concerned, order that new auditor(s) be appointed in replacement of the other(s).

The auditor appointed by the assembly in replacement of another shall hold office only for the rest of the tenure of his predecessor.

Auditors shall be re-eligible; and shall be entitled to remuneration the amount of which shall be determined by the general assembly and maintained until further notice.

## PART VI : COMPANY YEAR – INVENTORY – RESERVE FUND – SHARING OF PROFITS

### SECTION FIFTY-ONE

The Company year shall begin on the first of January and end on the thirty-first of December of each year.

Besides, the transactions carried out for the Company during the constitutive period and taken up by the company shall be incorporated into that company year.

### SECTION FIFTY-TWO : INVENTORY

At the close of each company year, the General Manager shall, pursuant to the law, draw up an inventory indicating the assets and liabilities of the company. In the said inventory, the amortization of the various elements of the corporate assets of the company as decided by the General Manager, shall be highlighted.

Furthermore, the General Manager shall, pursuant to the legal prescriptions in force, draw up a balance sheet, and a profit and loss statement, and shall present a report on the functioning of the company during the year just ended to the shareholders.

The inventory, the balance sheet and the profit and loss statement which should be made available to the auditors forty (40) days at least prior to the general assembly, shall be presented to the said assembly.

Any shareholder may, subject to the conditions laid down under section 43 herein, avail himself of the right to communicate.

## SECTION FIFTY-THREE:  ALLOCATION AND SHARING OF PROFITS

Net profits shall comprise the company's products as can be seen from the annual inventory, less overheads, fringe benefits and payroll taxes, including especially the steady and proportional remuneration of the General Manager as well as any steady or proportional remuneration allocated to the Deputy General Manager or other employees, all amortizations, allowances, reserves and other charges deemed necessary by the General Manager for any reason whatsoever.

Five percent (5%) of net profits shall first of all be deducted and paid into the legal reserve fund as prescribed by law.  This payment shall cease to be mandatory when the reserve fund shall have reached an amount equal to one tenth (1/10) of the registered capital.  It shall be recommenced whenever the abovementioned amount is found to have been tampered with.

## SECTION FIFTY-FOUR:  PAYMENT OF DIVIDENDS

Dividends shall be paid in cash.  Dividends shall be paid at periods and at places designated by the General Manager.

When it emerges from a balance sheet drawn up during or at the end of the year and certified by an auditor that, after amortization expenses and provision for necessary reserves had been made and, where need be, deductions for past losses the company has, right from the close of the preceding company year, realized profits, interim dividends may be paid before the year's accounts are passed.  The amount of valid interim dividends may not exceed the amount of the profits thus described.

However, the director's percentage of profit that falls to the General Manager may only be paid if the first statutory dividend that falls to shares is being paid.

Dividends that are not claimed within five years of their being due shall be prescribed pursuant to the law.

No report may need to be written on any dividends paid out regularly, unless such payment was in violation of legal provisions and unless the company discovers that at the time of such payment the beneficiaries were aware of the irregular nature of the payment or that, given the circumstances, they could not have been unaware.

## PART VII:  MERGERS–SPLIT-UPS–TRANSFORMATION

## SECTION FIFTY-FIVE:  MERGERS

The decision to merge shall be taken by the extraordinary General Assembly of each company participating in the operation.

The merger shall, where necessary, be subject to ratification within each of the companies participating in the operation, by the special assemblies of shareholders referred to under section 47 herein.

The General Manager of each of the participating companies shall write a report thereon which shall be circulated to shareholders.

The report shall clarify and provide detail information in support of the merger.

The report shall clarify and provide detail legal and economic reasons in support of the merger, especially as concerns the ratio in which shares have to be exchanged and the methods used which should be concordant for all the companies concerned, and, where need be, the special difficulties of evaluation.

One or several commissioners for the merger so designated by the President of the court having jurisdiction shall, under their own responsibility, write a report on the modalities of the merger.

They may, to that end, procure all useful documents from each of the companies and proceed to make necessary verifications. Within the participating companies, the commissioners shall be subject to the incompatibilities provided for by the law.

The commissioner(s) in charge of the merger shall check to see that the relevative value attributed to the shares of the companies participating in the merger are appreciate and that the exchange ratio is equitable. The reports of the commissioners in charge of the merger shall be circulated to shareholders and shall indicate:

1- the method(s) followed in determining the proposed exchange ratio;
2- whether such methods and the values to which each of them leads are appropriate, matched with an opinion expressed as to the relative importance given to the said methods in determining the value retained;
3- the special evaluation difficulties, if any.

The commissioners in charge of the split-ups shall be designated and shall accomplish their mission under the conditions provided for under section 8 herein.

If only one report was drawn up for the whole operation, the designation shall take place at the joint request of all the participating companies.

Each Limited Liability company involved in the merger or split-up operation must, at least fifteen days prior to the date of the general assembly that has to decide on the merger or split-up, make the following documents available to its shareholders at its headquarters; viz

1- the blueprint of the merger or split-up;

2- the abovementioned reports;
3- the analytical financial statements approved by the general assemblies, as
   well as the management reports of the last company years of the
   participating companies.
4- an accounting statement drawn up according to the same method and
   following the same lay-out as that of the annual balance sheet signed on a
   date which, if the last analytical financial statements are relating to a year
   which ended more than six months as of the date of the merger or split-up
   plan, it should be anterior to the date of the plan by less than three
   months.

Any shareholder may procure, at his own expense and on simple application, an
integral or partial copy of the above-mentioned documents.

The extraordinary general assembly of the absorbing company shall pursuant to
the provisions of section 8 herein, decide whether or not to approve the
contributions in kind.

Where the absorbing company permanently holds the whole capital of the
company or companies absorbed right form the date of filing in the merger
blueprint at the commercial court registry up till the end of the operation, there
shall be neither reason for the extraordinary general assembly of the absorbed
companies to approve the merger, nor for the reports referred to in sub-sections 1
to 7 above to be written.

Where the merger results in the establishment of a new company, such new
company may be constituted with no other contributions than those of the
merging companies.

In any case, the draft memorandum of association of the new company shall be
approved by the extraordinary general assembly of each of the companies
disappearing.  There shall be no ground for the general assembly of the new
company to approve the operation.

The blueprint of the merger shall be presented to the meetings of bondholders of
the absorbed companies for approval, unless they are offered the possibility of
reducing their securities on simple demand.

Where there is ground to redeem securities on call the absorbing company shall
be debtor to the bondholders of the absorbed company.

The offer of the possibility to redeem securities on simple demand by bondholders
provided for above shall be published in a newspaper authorized to receive legal
announcements from the state and depending on the Organization for the
Harmonization of Business Law in Africa (OHADA) Treaty.

Any bondholder who has not applied for the redemption of his securities within
the time lime laid down shall maintain his status in the absorbing company
under the conditions laid down by the merger contract.

The absorbing company shall, in the stead of the absorbed company, be debtor to the non-bondholding creditors of the said absorbed company,  but without this substitution implying novation.

The non-bondholding creditors of the companies participating in the merger including lessors of the companies brought in and whose claims are anterior to the publicizing of the merger may object to the said merger before a competent court within a time limit of thirty (30) days starting from the date of publicity.

The President of the court having jurisdiction may overrule the objection or order either payment of the claims or the constitution of guarantees if the company offers any and if such guarantees are seen to be sufficient.

Failing payment of debts due or the constitution of guarantees, the merger shall be incontestable.

The objection raised by a creditor may not stop the merger operation from being pursued.

The provisions of this section shall not hinder the implementation of the conventions authorizing the creditor to ask for the immediate repayment of his debt in case of a merger of the debtor company with another one.

However, the general assembly of bondholders may mandate the representatives of the bulk of creditors to object to the merger under the conditions and consequences provided for in this section.

The objection by any creditor to the merger or split-up under the conditions provided for in the section most be formulated within a time limit of thirty (30) days as prescribed in this section.

The objection to the merger or split-up by representatives of the general body of bondholders provided for in this section must be formulated within the same time limit.

## SECTION FIFTY-SIX:  SPLIT-UPS

The provisions of section 55 relating to mergers shall be applicable to split-ups.

When a split-up has to be realized through contributing to new limited liability companies, each of the new companies may be constituted without any other contribution than that from the split company,

Should the shares of each of the new companies be allocated to shareholders of the split-up company in proportion to their rights in the capital of the said company, there shall be no gr0ound for writing the report referred in section 55 above.

In any case, the draft articles of association of the new companies shall be approved by the extraordinary general assembly of the split-up company.

There shall be no ground for submitting the operation to the general assembly of each of the new companies for approval.

The blueprint of the split-up shall be submitted to the meetings of bondholders of the split-up company for approval unless they are offered the possibility of redeeming their securities on simple demand.

Where there is ground for the redemption of securities on simple demand, the companies benefiting from the contributions resulting from the split-up shall be joint debtors of the bondholders asking for repayment.

The blueprint of the split-up shall not be submitted to the meetings of bondholders of the companies to which the heritage has been handed down. However, the meeting of bondholders may mandate the representatives of the bulk of bondholders to formulate an objection to the split-up under the conditions and consequences provided for in section 61 herein.

The companies benefiting by the contributions resulting form the split-up shall, in the stead of the split company be joint debtors of the bondholders and non-bondholding creditors of the said split company but without this substitution implying novation.  This nothwithstanding, it may be stipulated that the companies benefiting by the split-up shall be responsible only for the part of the liabilities of the split company charged to them respectively rather than jointly.

Notwithstanding the principle that the issue price of new shares or that the said price should be determined by the extraordinary general assembly upon the reports of both the General Manager and the Auditor, it may be stipulated that the companies benefiting from the split-up shall be responsible only for the part of the liabilities of the split company charged to them respectively rather than jointly.

In such a case, the non-bondholding creditors of the participating companies may raise an objection to the split-up under the conditions and the consequences provided for in section 55 herein.

**SECTION FIFTY-SEVEN:  TRANSFORMATION**

The company may be transformed into another type of company if, at the moment of such transformation, it had been so constituted for at least two years, and if it had drawn up a balance sheet for the two years, and it had had such balance sheet approved by the shareholders.

The decision to transform the company shall be made by report of the company's auditor.

The report shall attest that the net assets are at least equal to the registered capital. ------------------------------------------------------------------------------------

The transformation shall, where necessary, be subject to approval of the meeting of bondholders. ---------------------------------------------------------------------

The decision to transform the company shall be subject to publicity under the conditions provided for by law.

The decision to transform the company into one with a collective name shall be unanimously taken by the shareholders.  In that case the provisions of sub-section 5 above shall not be applicable.

The decision to transform a company into a Limited Liability Company shall be subject to the conditions laid down for modifying the status of companies of that nature.

## PART VIII: DISSOLUTION – LIQUIDATION

### SECTION FIFTY-EIGHT:  ANTICIPATED DISSOLUTION

The General Manager may, at anytime and for whatever reason deemed necessary, propose to an extraordinary general assembly to anticipate the dissolution of the company.

Where more than half of the capital of the company has been lost, the General Manager shall be bound to provoke a session of the General Assembly of all shareholders to decide on whether there are grounds to continue with the company or to declare it dissolved.

All shareholders, irrespective of the number of shares owned by each of them, shall be invited to attend this meeting.  The assembly shall have to form the quorum provided for above for extraordinary assemblies not deliberating on a question having to do with the objectives and the form of the company.

Should the company not be declared dissolved, the capital shall, subject to legal provisions, be reduced by an amount equal to the losses which could not be deducted from reserves, if own capital could not be reconstituted to an amount at least equal to half of the registered capital.

Resolutions of the General Assembly shall, in any case, always be made public.

### SECTION FIFTY-NINE:  CONDITIONS OF LIQUIDATION – SHARING OF PROCEEDS FROM LIQUIDATION

Upon the expiry of the term laid down by the memorandum of association, or in case of anticipated dissolution, the general assembly shall, on the proposal of the General Manager, decide on the mode of liquidation, appoint one or several liquidators or a board of liquidators, and define their functions.

Such appointment shall put an end to the powers of both the General Manager and the auditors. The liquidators may, by virtue of the deliberations of the General assembly, contribute by ceding to another company or any other person, all of the property, rights and liabilities of the defunct company, and accept in return for all or part of these contributions or transfers, cash, paid-up shares, securities etc.

The regularly constituted general assembly shall, during the liquidation, maintain the same functions as during the existence of the company; it shall have, especially, the power to give quitus to the former General Manager, dismiss the liquidator(s), appoint other liquidators, modify, restrict or increase their powers, discuss, approve, correct or reject the liquidation accounts, and give the liquidators quitus.

During the liquidation, all the moveable effects and real property of the company shall continue to belong to the legal entity; shareholders shall not have any individual rights over the property of the company.

The general assembly shall be chaired by a liquidator or, failing this, by a person designated by the said assembly.

The net assets shall, after paying off debts, be used first of all in the refund of the par value of paid-up but non amortized shares as well as for refunding part of the reserves eventually due to shareholders exclusively, and the balance thereof shall be shared among all shares.

## PART VIII:  MISCELLANEOUS

### SECTION SIXTY: DISPUTES

All disputes relating to business matters that may arise either between the shareholders and the company or between shareholders themselves during the existence of the company or its liquidation shall be adjudicated in accordance with the law and referred to the court having jurisdiction over the headquarters.

To that end, all shareholders shall, in case of a dispute, elect domicile in the sub-division of the headquarters, and all writs of summons and notifications shall be served at home.

Failing the election of domicile, the writs of summons or notifications shall be validly served at the office of the District Attorney.

### SECTION SIXTY-ONE

The expenses incurred in producing these articles and organizing meetings relating to their constitution as well as those relating to depositing and publishing them and very generally, all other expenditures which the founder must have incurred in constituting and organizing the company shall be borne by

it and recorded as start-up costs to be amortized as shall be decided later on by the General Manager.

**SECTION SIXTY-TWO:  DEPOSITING AND PUBLISHING**

For purposes of depositing and publishing this memorandum of association and all instruments and minutes relating to the establishment of the company, all powers have been granted to the bearer of the original, official copy, copy or extract thereof.

**RECORDED ON FORTY-THREE PAGES**

In the Chambers of  Pierre François Xavier MENYE ONDO, the undersigned Notary Public

IN THE YEAR TWO THOUSAND AND THREE AND ON THE TWENTY-FIRST DAY OF JULY

After reading and translating, the appearer with the Notary Public signed in approval.

Then the signatures followed and the original Deed bears the following registration marks:

Registered in YAOUNDE CDI 7 (Civil Deed)
On 21 Jult 2003
Vol. 4 Folio 34 case / BD 293
Received ten thousand francs
Receipt n° 0822955 of 21 July 2003
The Head of the Divisional Taxation Centre and by Order M. Jean Marie ONANA EBODE

*Certified true copy duly collated*
*And issued on forty-three pages*
*Without erasures, nor marginal*
*alterations, nor words crossed*
*out as nul and void by US*
*Pierre François Xavier MENYE ONDO*
*The undersigned Notary Public ......................*

*Yaounde, 21 July 2003*

**COMPANY: THE FALLS**
**PUBLIC LIMITED COMPANY UNDER CONSTRUCTION**
**CAPITAL STOCK: CFAF 25 000 000**
**HEADQUARTERS: YAOUNDE P.O. BOX 11 236 (Commercial Centre)**

**REPORT OF THE CONSTITUTING GENERAL ASSEMBLY**

DIRECTORY No. 4284
OF 21 July 2003

THE YEAR TWO THOUSAND AND THREE-------------------------------------------------
THE

IN THE PRESENCE OF the undersigned Maître Pierre François Xavier MENYE ONDO, Notary at the YAOUNDE Court of Appeal (Republic of Cameroon),-----------

The Unique General Assembly to constitute the public limited company known as THE FALLS SA, with capital stock CFAF 25 000 000 (twenty-five million francs), with headquarters at YAOUNDE P.O. BOX 11 236 (Commercial Centre), was held at the future headquarters, following convocation by the founder.--------------------

An attendance sheet was drawn and signed by every member attending the meeting. The Assembly then elected its bureau.--------------------------------------------

The session was chaired by Mr ATEBA MINKOULOU Gabriel; single shareholder of the company.--------------------------------------------------------------------------------

And Maître Pierre François Xavier MENYE ONDO, Notary, was at the secretariat.-

And given the impersonal quality of the company, no teller was appointed.---------

The attendance sheet certified as sincere and true by the members of the bureau thus constituted, attests that the unique subscriber, representing 2500 (two thousand five hundred) shares, is present.--------------------------------------------------

The Assembly thus representing more than half of the capital is declared normally constituted and may validly deliberate.-------------------------------------------

The chairman then presented and made available to the members of the bureau;-

1) The attendance sheet;-------------------------------------------------------------------

2) The certificate delivered by the Chief Court Clerk stating that the company's draft Statutes were deposited at his desk.-------------------------------------------------

3) A copy of the company's statutes.-------------------------------------------------------

4) A copy of the declaration of capital payment received by Maître Pierre François Xavier MENYE ONDO, Notary at YAOUNDE.------------------------------------------------

5) The subscription form of the single share subscriber;--------------------------------

7) The receipt certifying payment of funds;--------------------------------------------------

8) And the resolutions document proposed to the Assembly.---------------------------

The chairperson declared that the resolutions document below was made available to the members of the Assembly within a largely sufficient period.--------

The Assembly gave notice to the Chairman of this declaration and formally acknowledged its accuracy.------------------------------------------------------------------------

The Chairman reiterated that the Assembly is required to deliberate on the following agenda:---------------------------------------------------------------------------------------

## AGENDA

1) **VERIFYING THE GENUINENESS OF THE NOTARISED DECLARATION OF SUBSCRIPTION AND PAYMENT;**

2) **APPOINTING A GENERAL MANAGER;**

3) **APPOINTING A SENIOR AUDITOR;**

4) **APPOINTING A DEPUTY AUDITOR;**

5) **APPROVING THE STATUTES AND CERTIFYING THE FINAL CONSTITUTION OF THE COMPANY.**

6) **OTHER ISSUES**

Then the Chairman read the statutes, the notarised declaration of subscription and payment and the list of subscribers equally containing the statement of payments made by the unique subscriber, appended to this declaration.------------

After reading, the Chairman declared the discussions open.---------------------------

Several observations were made, and when nobody else asked for the floor, the Chairman submitted successively for voting, the following resolutions, all in the agenda:----------------------------------------------------------------------------------------------------

This resolution was unanimously passed

FIRST RESOLUTION: **Verifying the genuineness of the notarised declaration of subscription and payment**

The General Assembly, after verification, acknowledged as genuine and true the notarised declaration of subscription and payment made by the founder of the company following receipt by Maître François Xavier MENYE ONDO, Notary at Yaoude.----------------------------------------------------------------------------------------

This resolution was unanimously passed

SECOND RESOLUTION: **Appointing a General Manager**

The General Assembly, after deliberations, decided to appoint Mr ATEBA MINKOULOU Gabriel to the post of General Manager of THE FALLS Plc-------------

This resolution was unanimously passed

Mr ATEBA MINKOULOU Gabriel, present at the assembly after accepting the functions conferred to him, declared that he exercises no other function and that he is not subject to any measure that may prohibit him from carrying out his functions as General Manager.----------------------------------------------------------------

THIRD RESOLUTION: **Appointing a senior auditor**

The General Assembly, acting in pursuance of the provisions of the company's statutes, appointed for the first two years as senior auditor for THE FALLS Plc:----

Mr MOUENDE Thomas, Chartered Accountant residing at YAOUNDE P.O. BOX 2713, registered at the Order of Chartered Accountants of Cameroon under the number 48 E.C.P---------------------------------------------------------------------------

---- Mention that his remuneration shall be fixed at an ulterior date.-----------------

A letter was read, through which MOUENDE Thomas declared that he was not subjected to any legal provision instituting incompatibilities or banning him from the function and that he consequently accepts the functions conferred to him in the statutes.---------------------------------------------------------------------------------------

This resolution was passed unanimously

FOURTH RESOLUTION: **Appointing a deputy auditor**

The General Assembly, acting in pursuance of the provisions of the company's statutes, appointed for the first two years as deputy auditor for THE FALLS Plc:---

---- Mr MBOUKEM Célestin, Chartered Accountant residing at DOUALA P.O. BOX 5662, registered at the Order of Chartered Accountants of Cameroon under the number 38 E.C.P.----------------------------------------------------------------------------

---- Mention that his remuneration shall be fixed at an ulterior date.-----------------

A letter was read, through which Célestin MBOUKEM declared that he was not subjected to any legal provision instituting incompatibilities or banning him from the function and that he consequently accepts the funds conferred to him in the statutes.--------------------------------------------------------------------------------------

This resolution was unanimously passed

No resolution was passed for other issues.-------------------------------------------------

With the agenda completely exploited and with no one else requesting the floor, the Chairman declared the session ended at 6:30 p.m.----------------------------------

This report is written for everything mentioned above and, after reading, the members of the Bureau signed the document.----------------------------------------------

----------------CONSTITUTING LEGAL PUBLICATION ON FIVE PAGES----------------

Drafted and passed at the chambers of Maître Pierre François Xavier MENYE ONDO, undersigned notary.--------------------------------------------------------------------

The Chairman                                    The Secretary

--- Following the signatures, the report makes mention of the following registrations: -------------------------------------------------------------------------------

Registered in YAOUNDE CDI 7 (CIVIL ACTS) ----------------------------------------------
21 July 2003 ---------------------------------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293-----------------------------------------------------------------------
Received ten thousand francs ------------------------------------------------------------------
Receipt No. 0822955 of 21 July 2003 -------------------------------------------------------
For the Head of the Divisional Tax Department, Jean Marie ONANA EBODE, Tax Inspector. -----------------------------------------------------------------------------

> For a Certified True Copy of the minutes duly collated and delivered on five pages, without deletion, alteration or word deleted as null by us, Maître Pierre François Xavier MENYE ONDO Undersigned notary. --------------------
>
> Yaounde, 21 July 2003

Maître Pierre François Xavier MENYE ONDO

**Appendix to Deed no. 4284 of 21 July 2003**

| | | | | |
|---|---|---|---|---|
| **ATTENDANCE SHEET FOR THE ONLY STATUTORY MEETING OF THE FALLS COMPANY LTD ON 11 JULY 2003** | | | | |
| No. | Names and residence of shareholders | Number of shares | Number of votes | Signature |
| 1 | Mr ATEBA MINKOULOU Gabriel | 2,500 | 25,000 | |

-----------This attendance sheet is certified genuine and true by the members of the Bureau.

Yaounde, 11 July 2003.

The Chairman                                                          The Secretary

--- Then followed the signatures, after which the report bears the following registration marks appended to the minutes: --------------------------------------------------------- --------------------------

Registered in YAOUNDE CDI 7 (CIVIL DEEDS) ----------------------------------------------
On 21 July 2003 -------------------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293-----------------------------------------------------------------
Received ten thousand francs -----------------------------------------------------------
Receipt No. 0822955 of 21 July 2003 ----------------------------------------------------
Signed for the Divisional Head of the Taxation Department, and by order Jean Marie ONANA EBODE, Tax Inspector. -------------------------------------------------------------- --------

Certified True Copy of the minutes duly collated and delivered on one page, without deletion, erasures or marginal alterations or word crossed out as null by us, Maître Pierre François Xavier MENYE ONDO the undersigned notary. --------------------

Yaounde, 21 July 2003

Barrister Pierre François Xavier MENYE ONDO

DEEDS No. 4285
OF 21 JULY 2003

BEFORE the undersigned Barrister Pierre François Xavier MENYE ONDO, Notary at the YAOUNDE Court of Appeal (Republic of Cameroon)------------

--------------------------------APPEARING-------------------------------------------------------

--- **Mr ATEBA MINKOULOU Gabriel**, Cameroonian born in 1940 at ESSAZIK, son of the late MINKOULOU Gabriel and of the late AKABA Véronique, Farmer, residing in YAOUNDE, holder of National Identity Card application receipt number 1030895381 issued on 14 January 2002 in YAOUNDE.----------------------

---- Stated as follows:----------------------------------------------------------------

------------------------------------STATEMENT---------------------------------------------

---- THAT by instruments of the undersigned Notary the registration of which is still being sought, a limited liability company named THE FALLS SA was constituted, with a registered capital of twenty-five million (25,000.000) frs CFA, broken down into 2,500 shares of ten thousand (10,000) francs CFA each registered, with headquarters in YAOUNDE, P.O. BOX 11 236 (Commercial Centre).------------------------
----------

---- The objective of the said company is to: Promote the real estate industry, tourism, the hotel and catering industry and provide various services like, representation, and do general, Import-Export trading.----------------------------------------------
-------------------------------

---- And, generally, any other ancillary activity, financial, industrial, personal or real estate transactions that may be directly or indirectly related to the company's objectives, or to any similar or closely related objective.---------------------------------------------
---------

At the end of his statement, the appear made the following declarations:-----------------
------------------------------------------------------------------

## DECLARATION OF SUBSCRIPTIONS AND PAYMENT OF CAPITAL

- Pursuant to 394 of the Uniform Act relating to the rights of Commercial Companies and Economic Interest Groups in particular and governing public limited companies in Cameroon in general, the appearer, declared before the undersigned Notary that the two thousand five hundreds (2,500) shares constituting the registered capital, i.e. twenty-five million (25,000,000) francs are completely subscribed and fully paid up and registered by the sole suscriber.--------------------------
-----------

---- In support of the above declaration, the appearer presented to the undersigned Notary a statement written on an unstamped paper bearing the surname and

names of the single subscriber and the sum of payments made by him and certified as genuine and true by the appearer.------------------------

---- An attestation dated 11 July 2003 issued by the "Banque Internationale du Cameroun pour l'Epargne et le Crédit (B.I.C.E.C), showing payment of the sum of twenty-five million(25,000,000) CFA Francs being registered capital.--------

Moreover, the appearer presented to the undersigned Notary, the form showing evidence of the over mentioned subscription, and the Notary after examining the document, handed it back to him.-----------------------------------------------------------

-----------------------------------APPENDIX-------------------------------------------------

---- After the undersigned Notary mentioned the apposition of an appendix, the subscription and capital stock payment list, in support of the preceding declarations, were appended to this document and certified as genuine and true by the Founder.---------------------------------------------------------------------------

---------------WHEREOF THIS INSTRUMENT IS EXECUTED ON FIVE PAGES----------------

At the chambers of Barrister Pierre François Xavier MENYE ONDO, the undersigned notary.----------------------------------------------------------------

IN THE YEAR TWO THOUSAND AND THREE------------------------------------------------

AND ON THE TWENTY-FIRST DAY OF THE MONTH OF JULY.----------------------------

After reading and translating, the appearer party approved and signed with the notary.--------------------------------------------------------------------------------------

--- Then came the signatures, after which the report bears the following registration marks appended to the minutes: ---------------------------------------------------------------------

Registered in YAOUNDE CDI 7 (CIVIL DEEDS) ---------------------------------------------
On 21 July 2003 --------------------------------------------------------------------------
Vol 4 Folio 34 Case/BD 293-----------------------------------------------------------
Received ten thousand francs ------------------------------------------------------------
Receipt No. 0822955 of 21 July 2003 -----------------------------------------------------
For the Divisional Head of the Taxation Department, Jean Marie ONANA EBODE, Tax Inspector. -------------------------------------------------------------------------

Certified True Copy of the minutes duly collated and delivered on three pages, without alterations, marginal alterations or words crossed out as null and void by us, Barrister Pierre François Xavier MENYE ONDO, the undersigned Notary. -----------

*Yaounde, 21 July 2003*

*Barrister Pierre François Xavier MENYE ONDO*

*Appendix to Deed No. 4285 of 21 July 2003*

<u>*COMPANY*</u>: *THE FALLS SA*
<u>*HEADQUARTERS*</u>: *YAOUNDE P.O. BOX 11236*
<u>*REGISTERED CAPITAL*</u>: *twenty-five million (25,000.000) francs CFA*

**<u>STATEMENT OF PAYMENT AND SUBSCRIPTION:</u>**

---- *Limited Liability Company being constituted with a capital of twenty five million (25,000,000) CFA Francs, divided into shares of two thousand five hundred (2,500) CFA francs of ten thousand (10,000) CFA Francs to be fully subscribed with less than a quarter of them to be paid up each.*----

---- *List of shareholders, cash subscribers and statement of payments by each of them.*------------------------------------------------------------

| No. | FUTURE SHAREHOLDERS' NAMES AND RESIDENCES | NUMBER OF SHARES | VALUE OF SHARES | PAYMENTS DONE | % |
|-----|--------------------------------------------|------------------|------------------|----------------|-----|
| 1 | ATEBA MINKOULOU | 2,500 | 25,000,000 | 25,000,000 | 100 |

*TOTAL SHARES*--------------*2,500*
*VALUE OF SHARES*----------------------*25,000,000*
*TOTAL SUM OF PAYMENTS* ----------------------------------*25,000,000*
*PAYMENT PERCENTAGE*------------------------------------------------------*100*

---- *This list is certified genuine and true by Mr ATEBA MINKOULOU Gabriel, Founder, signatory to this notarized declaration of obligatory payment.*-------------

*Yaounde, 11 July 2003.*

--- *Then followed the signatures, after which the report bears the following registration marks appeared to the minutes:* ---------------------------------------------------------------------------------

*Registered in YAOUNDE CDI 7 (CIVIL ACTS)* ---------------------------------------------
*On 21 July 2003* ----------------------------------------------------------------------
*Vol 4 Folio 34 Case/BD 293*------------------------------------------------------------
*Received ten thousand francs* ----------------------------------------------------------
*Receipt No. 0822955 of 21 July 2003* ----------------------------------------------------
*For the Diviaional Head of the Taxation Department, Jean Marie ONANA EBODE, Tax Inspector.* -------------------------------------------------------------------------

*Certified True Copy of the minutes duly collated and delivered on three pages, without alterations, marginal alterations or words crossed out as null and void by us, Barrister Pierre François Xavier MENYE ONDO, the undersigned Notary. -----------*

*Yaounde, 21 July 2003*

*Barrister Pierre François Xavier MENYE ONDO*

I the undersigned **NDIFON ROBERT**, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

**Ndifon Robert**
**B.A. (Hons) University of Yaounde**
**M.A. (Translation) University of Montreal (Canada)**

EXHIBIT EN-2

TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR

THE FALLS: DELEGATION OF POWER OF SINGLE SHAREHOLDER



**EXPEDITION**

Rep N° 4300 Taxe N°
Date: 24 Juillet 2003

**Procès - verbal de la décision ordinaire de
l'actionnaire unique de la société THE FALLS SA
contenant délégation de pouvoirs**

Pierre François-Xavier MENYE ONDO

Notaire au Siège de la Cour d'Appel de Yaoundé

**OFFICE NOTARIAL**

Boulevard du 20 Mai - Face Hôtel Hilton - Immeuble Crédit Foncier - 3ème Etage - Porte 308
Boîte Postale 6650 - Téléphone (237) 22 . 23.53.76 - Té lécopie (237) 22. 22.55.66
Site web : www.etudemaitremenye.com - e-mail : etudenotaire63@yahoo.fr
REPUBLIQUE DU CAMEROUN - YAOUNDE - REPUBLIC OF CAMEROON

# EXPEDITION

**SOCIETE: THE FALLS SA**
**CAPITAL SOCIAL : FCFA 25 000 000**
**SIEGE SOCIAL: YAOUNDE**
**BP 11 236 (Centre commercial)**
**PROCES - VERBAL DE LA DECISION ORDINAIRE**
**DE l'ACTIONNAIRE UNIQUE**

REPERTOIRE N° 4300
DU 24 juillet 2003

L'AN DEUX MILLE TROIS.---------------------------------------------------------------
ET LE VINGT QUATRE DU MOIS DE JUILLET. --------------------------------------

------- **PARDEVANT Maître Pierre François Xavier MENYE ONDO,** Notaire au
siège de la cour d'Appel de YAOUNDE (République du Cameroun), y
demeurant, soussigné.----------------------------------------------------------------

---- A comparu, M. ATEBA MINKOULOU Gabriel, Actionnaire unique de la
Société Anonyme dénommée: THE FALLS, au capital social de FCFA 25 000
000 (vingt cinq millions de francs) dont le siège social est fixé à YAOUNDE BP
11 236. ------------------------------------------------------------------------------------

---- La présidence de la séance est confiée à M. ATEBA MINKOULOU Gabriel et
Maître Pierre François Xavier MENYE ONDO, Notaire soussigné assure le
secrétariat.--------------------------------------------------------------------------------

--- Monsieur le Président dépose sur la table: -----------------------------------

- Une expédition des statuts de la Société ;--------------------------------------

- le texte des résolutions à prendre. ---------------------------------------------

---- Monsieur le Président donne ensuite lecture des points suivants, inscrits à
l'ordre du jour :-------------------------------------------------------------------------

## ORDRE DU JOUR:

1)DELEGATION DE POUVOIRS;---------------------------------------------------
2) POUVOIRS POUR FORMALITES; -----------------------------------------------
3) QUESTIONS DIVERSES. --------------------------------------------------------

<u>PREMIER ROLE ET UNIQUE</u>



Cette lecture terminée, Monsieur le Président déclare qu'en sa qualité d'Actionnaire unique, et conformément aux dispositions statutaires, il a décidé de déléguer les pouvoirs d'administration et de direction générale de la société à un tiers. ------------------------------------------------------------------------

Le Président prend ensuite les résolutions, suivantes toutes à l'ordre du jour :--

<u>PREMIERE RESOLUTION</u>: **DELEGATION DE POUVOIRS.**

-- Monsieur ATEBA MINKOULOU Gabriel, agissant en sa qualité d'Actionnaire unique de la société et conformément aux dispositions de l'article 28 des statuts sociaux, décide de déléguer pour une durée de cinq (05) ans renouvelable par tacite reconduction, les pouvoirs d'Administration Générale et de Direction Générale de la société THE FALLS SA à : -----------------------------

-- Monsieur KOH KOH, Camerounais né le 10 Août 1954 à LENOUK, de feu KOSOH NDZONGO et de MEDOUA EBENE, Cadre contractuel, domicilié à NKOLBISSON (YAOUNDE), titulaire de la Carte nationale d'identité numéro 101313309 à lui délivrée le 03 Novembre 2000 à YAOUNDE. ----------------------

--- En conséquence, Monsieur ATEBA MINKOULOU Gabriel confère à M. KOH KOH, ici présent et qui accepte, tous les pouvoirs les plus étendus pour agir en toutes circonstances au nom de la société THE FALLS SA, tels que prévus à l'article 30 des statuts sociaux et les dispositions légales en la matière. ----------

<u>DEUXIEME RESOLUTION</u>: **POUVOIRS POUR FORMALITES**

Pour l'exécution des présentes, tous pouvoirs sont donnés au porteur d'un extrait ou d'une expédition des présentes, en vue de l'accomplissement de toutes les formalités légales requises. -----------------------------------------------

Aucune disposition particulière n'a été retenue au titre de divers. -----------------

L'ordre du jour étant épuisé, M. le Président déclare la séance levée à 17 h 30.-

De tout ce que dessus, il a été dressé le présent procès-verbal qui a été signé par l'Actionnaire unique et le Notaire après lecture.----------------------------------

--------------------------- DONT ACTE SUR DEUX PAGES ----------------------------

En Minute fait et passé en l'Etude de Maître Pierre François-Xavier MENYE ONDO, Notaire soussigné.--------------------------------------------------------------

LE PRESIDENT                               LE SECRETAIRE

---- Suivent les signatures, la minute porte les mentions d'enregistrement suivantes : -------------------------------------------------------------------------------



# EXPEDITION

Enregistré à YAOUNDE CDI 7 (ACTES CIVILS) --------------------------------
Le 28 juillet 2002 --------------------------------------------------------
Vol 4 Folio 35 Case/BD 304 ------------------------------------------------
Reçu  dix  mille  francs --------------------------------------------------
Quittance n° 825399 du 25 juillet  2003 ----------------------------------
Le Chef de Centre Divisionnaire des impôts (è) P.O M. Jean Marie ONANA
EBODE, Inspecteur des impôts « IMPOTS ». --------------------------------
-

> Pour Expédition certifiée conforme à la
> Minute dûment collationnée et délivrée
> Sur trois pages, sans rature, ni renvoi en
> Marge, ni mot rayé comme nul par NOUS,
> Maître Pierre François Xavier MENYE ONDO,
> Notaire soussigné. --------------------------------
>
> Yaoundé, le 25 juillet  2003

TRANSLATION OF EXHIBIT EN-2

TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR

THE FALLS: DELEGATION OF POWER OF SINGLE SHAREHOLDER



AUTHENTIC COPY

No. 4300
Of 24 July 2003, Tax No.

**Report of the ordinary decision of single shareholder of THE FALLS Plc to grant power of attorney**

Pierre François-Xavier MENYE ONDO
Notary at the Yaounde Court of Appeal Headquarters

**ADDRESS**
======
20th May Blvd – Opposite Hilton Hotel – Crédit Foncier Building – 3rd Floor – Door 308
Post Office Box 6650 – Telephone (237) 223.53.66 – Fax (237) 222.55.66
Website: www.etudemaitremenye.com – e-mail: me.menye@iccnet.cm
REPUBLIQUE DU CAMEROUN – YAOUNDE – REPUBLIC OF CAMEROON

**COMPANY: THE FALLS PLC**
**CAPITAL STOCK: CFAF 25 000 000**
**HEADQUARTERS: YAOUNDE**
**P.O. BOX 11 236 (Commercial Centre)**
**REPORT OF THE ORDINARY DECISION**
**OF THE SINGLE SHAREHOLDER**

DIRECTORY No. 4300
OF 24 July 2003

THE YEAR TWO THOUSAND AND THREE.------------------------------------------------
AND THE TWENTY FOURTH OF THE MONTH OF JULY.------------------------------

-------**IN THE PRESENCE OF the undersigned Maître Pierre François Xavier MENYE ONDO,** Notary at the YAOUNDE Courts of Appeal (Republic of Cameroon), --------------------------------------------------------------------------------

------Appeared, Mr ATEBA MINKOULOU Gabriel, Single shareholder of Public Limited Company: THE FALLS, with capital stock of 25 000 000 (twenty-five million Francs) and headquarters in YAOUNDE, P.O. Box 11 236.--------------------

------The session was chaired by Mr ATEBA MINKOULOU Gabriel, and Maître Pierre François Xavier MENYE ONDO, undersigned notary handled the secretariat. -----------------------------------------------------------------------------

---The chairman laid on the table: ---------------------------------------------------------

-An authentic copy of the company's statutes; ----------------------------------------

-A copy of the resolutions to be made. --------------------------------------------------

----The chairman then read out the following points on the agenda: -----------------

AGENDA:

    1) POWER OF ATTORNEY; ----------------------------------------------------------
    2) PROCEDURAL POWER; ------------------------------------------------------------
    3) OTHER ISSUES. ----------------------------------------------------------------------

## LEADING AND UNIQUE ROLE

After reading out the points, the chairman declared that in his capacity as Single Shareholder, and in conformity with the provisions of the statutes, he has decided to delegate administrative powers and general management of the company of a third party.-------------------------------------------------------------------

The chairman then made the following resolutions:---------------------------------------

### RESOLUTION ONE: **POWER OF ATTORNEY**

--Mr ATEBA MINKOULOU Gabriel, in his capacity as Single Shareholder and in conformity with the provisions under Section 28 of the company statutes, grants power of attorney for the general administration and general management of THE FALLS PLC, for a period of five years renewable by tacit agreement, to:--------------

-- Mr KOH KOH, Cameroonian born on 10 August 1954 at LENOUK, son of the late KOSOH NDZONGO and of MEDOUA EBENE, executive on contract, residing at NKOLBISSON (YAOUNDE), holder of National Identity Card No. 101313309 delivered on 03 November 2000 at Yaounde. ------------------------------------------------

--- Consequently, Mr ATEBA MINKOULOU Gabriel confers to Mr KOH KOH, here present and who accepts, full power of attorney to act in every circumstance in the name of THE FALLS PLC, as provided for under Section 30 of the company's statutes and by any related provision of the Law. ---------------------------------------

### RESOLUTION TWO: **PROCEDURAL POWER**

For the implementation of the decisions herein, power shall be delegated to a bearer of an extract or an authentic copy of this document, in view of meeting any legal requirements. ---------------------------------------------------------------------

No specific decision was taken on other issues. ----------------------------------------

The above report was read and signed by the Single Shareholder and the Notary.-

---------------CONSTITUTING LEGAL PUBLICATION ON TWO PAGES---------------

Drafted and passed at the chambers of Maître Pierre François Xavier MENYE ONDO, undersigned notary. ---------------------------------------------------------------

THE CHAIRMAN                                THE SECRETARY

--- Following the signatures, the report makes mention of the following registrations: ---------------------------------------------------------------------------

Registered in YAOUNDE CDI 7 (CIVIL ACTS) -----------------------------------------------
28 July 2002 ----------------------------------------------------------------------------------
Vol 4 Folio 35 Case/BD 304----------------------------------------------------------------

Received ten thousand francs ----------------------------------------------------------------
Receipt No. 825399 of 25 July 2003 -----------------------------------------------------------
For the Head of the Tax Divisional Department, Jean Marie ONANA EBODE, Tax
Inspector. ------------------------------------------------------------------------------------

> For a Certified True Copy of the minutes duly collated and delivered on three pages, without deletion, alteration or word deleted as null by us, Maître Pierre François Xavier MENYE ONDO Undersigned notary. -------------------------

> Yaounde, 25 July 2003

Maître Pierre François Xavier MENYE ONDO

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

Ndifon Robert
B.A. (Hons) University of Yaounde
M.A. (Translation) University of Montreal (Canada)

B.A. (Yaounde); M.A. (Montréal)
Senior Translator
NATIONAL ASSEMBLY OF CAMEROON

**EXHIBIT EN-3**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**ARTICLES OF ATLANTIC GROUP**

NOTAIRE

N° ..3503........................ DU REP.

LE...24 MARS 2004.........................................



STATUTS DE LA SOCIETE CIVILE IMMOBILIERE ATLANTIC GROUP

EN ABREGE "ATLANTIC GROUP S.C.I", SOCIETE CIVILE IMMOBILIER

AU CAPITAL DE 2.000.000 DE FRANCS CFA DONT LE SIEGE EST A

DOUALA B.P. 12560.

# ETUDE DE MAITRE Pascal ENPE
## NOTAIRE A DOUALA (Cameroun)
*ETUDE SISE 737, RUE BOUE DE LAPEYRERE (Rue Mermoz) AKWA*
*B.P. 30 DOUALA TEL. : (237) 33.43.14.49 - Fax : (237) 33.43.14.49*



NJ
N° 3503  DU REP.

— 1 —

Pardevant Me **Pascal ENPE**, Notaire au siège de la
Cour d'Appel de Douala, 737 Rue Boué de Lapeyrère, soussigné,

### ONT COMPARU

1ent — La société **MBI GROUP Inc**, Corporate SEAL 2001
DELAWARE (USA),

Représentée par Monsieur John M. KAMYA, lui même
représenté par Monsieur TCHOUFA Roger, en vertu des pouvoirs à
eux délivrés à l'effet des présentes et qui demeureront ci-
annexés après mentions

2ent. — La société **THE FALLS SA**, Société Anonyme au
capital de FCFA 25.000.000 dont le siège est à Yaoundé
B.P. 11236 (Centre commercial),

Représentée par Monsieur KOH KOH, en vertu des
pouvoirs à lui conférés suivant procès verbal de la décision
ordinaire de la l'actionaire unique de ladite société reçu par
Me Pierre François MENYE ONDO, Notaire à Yaoundé, le vingt
quatre juillet deux mille trois, enregistré à Yaoundé CDI 7
(ACTES CIVILS) le vingt cinq juillet deux mille trois Vol 4,
Folio 35 Case/BD304, quittance N° 825399 du 25 juillet 2003 et
dont une copie demeurera ci-annexée après mentions.

3ent. — Et Monsieur **TCHOUFA Roger**, Consultant
Financier demeurant à Washington (USA), aujourd'hui de passage
à Douala,

Né le vingt sept novembre mil neuf cent soixante un
à Mélong,

Fils de NJONFANG Alfred et de NGUENTCHAM Marguerite,
Titulaire du passeport N° 0298/ACW/2002/569398
délivrée à Washington D.C. le seize septembre deux mille deux.
De nationalité camerounaise.

LESQUELS ONT, par ces présentes, établi ainsi qu'il
suit les statuts d'une Société Civile Immobilière qu'ils ont
convenu de constituer entre eux.

### S T A T U T S

#### TITRE PREMIER
#### FORME — DENOMINATION — DUREE — SIEGE — OBJET —

ARTICLE 1er. — FORME
Il est formé entre les comparants ci-dessus nommés,
une Société Civile Immobilière qui sera régie par les articles
1832 et suivants du code civil et par les présents statuts.

ARTICLE 2. — DENOMINATION SOCIALE
La Société a pour dénomination : SOCIETE CIVILE
IMMOBILIERE ATLANTIC GROUP en abrégé "ATLANTIC GROUP SCI".

ARTICLE 3.  - DUREE
La Société est constituée pour une durée de quatre vingt dix-neuf (99) années à compter de ce jour.

ARTICLE 4.  - SIEGE SOCIAL
Le siège social est fixé à Douala, B.P. 12560. Il peut être transféré dans tout endroit de la même ville par simple décision du gérant et en tout autre lieu en vertu d'une décision extraordinaire des associés.

ARTICLE 5.  - OBJET
La société a pour objet directement ou indirectement en tous pays et particulièrement en République du Cameroun :
- l'achat, la vente, la gestion et la mise en valeur d'immeubles bâtis ou non bâtis ;
- l'administration, la gestion, l'exploitation par bail ou autrement de tous immeubles bâtis ou à bâtir que la société pourrait acquérir ou prendre à bail, ainsi que l'édification de toutes constructions à usage commercial, professionnel, d'habitation ou en vue de revente ;
- La prise de participation directe ou indirecte, sous quelque forme que ce soit dans toutes sociétés et dans toutes les opérations financières, industrielles, mobilières et immobilières se rattachant directement ou indirectement à l'objet social par voie de création de sociétés nouvelles, d'apports, de souscription ou d'achat de titres ou droits sociaux, fusion, association ou participation ;
Et généralement, toutes opérations quelconques se rattachant directement ou indirectement de cet objet.

## TITRE II
## APPORTS - CAPITAL SOCIAL - PARTS SOCIALES

ARTICLE 6. - APPORTS
Les comparants font apport à la société d'une somme de DEUX MILLIONS DE FRANCS (2.000.000 F.) CFA dont la souscription a été assurée par chacun d'eux dans les proportions suivantes :
- La société THE FALLS SA, la somme de NEUF CENT MILLE FRANCS CFA
ci.......................................................... 900.000
- La société MBI GROUP Inc, la somme de SEPT CENT MILLE FRANCS CFA,
ci.......................................................... 700.000
- Et Monsieur TCHOUFA Roger, la somme de QUATRE CENT MILLE FRANCS CFA,
ci.......................................................... 400.000
TOTAL : DEUX MILLIONS DE FRANCS CFA,
ci.......................................................... 2.000.000

Laquelle somme de DEUX MILLIONS DE FRANCS (2.000.000 F.) CFA a été déposée dans un compte ouvert au nom de la société en constitution à la UNION BANK OF CAMEROON - DOUALA, ainsi qu'il ressort de l'attestation délivrée par ladite banque qui demeurera ci-annexée après mentions.

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
TIMBRE FISCAL-FISCAL STAMP
FCFA 0001000
PERCEPTION-AKWA
09H57      9085      0113
montant1208.07apports 0£9059

ARTICLE 7. - CAPITAL SOCIAL - PARTS D'INTERET

Le capital de la société est fixé à la somme de DEUX
MILLIONS DE FRANCS (2.000.000 F.) CFA, montant des apports ci-
dessus constatés.

Il est divisé en deux cent (200) parts de DIX MILLE
FRANCS (10 000 F.) CFA chacune, entièrement libérées et
attribuées aux associés en proportion de leurs apports,
savoir :

- A la société THE FALLS SA, quatre vingt dix
parts numérotées de 1 à 90,
ci............ ......... ....................      90

- A la société MBI GROUP Inc, soixante dix
parts numérotées de 91 à 160,
ci............ ......... ....................      70

- Et à Monsieur TCHOUFA Roger, quarante parts
numérotées de 161 à 200,
ci............ ......... ....................      40

Soit au total deux cent parts d'intérêts,
ci................................. ................      200



4

## ARTICLE 8. AUGMENTATION ET REDUCTION DE CAPITAL SOCIAL

### 1. - Augmentation de capital

Le capital social peut, en vertu d'une décision extraordinaire de la collectivité des associés, être augmenté en une ou plusieurs fois, par la création de parts nouvelles attribuées en représentation d'apports en nature ou en espèces, mais les attributaires s'ils n'ont pas déjà la qualité d'associés devront être agréés, par les associés anciens représentant les trois quarts au moins du capital ancien.

Il peut aussi en vertu d'une décision extraordinaire de ladite collectivité, être augmenté en une ou plusieurs fois par incorporation au capital de tout ou partie des réserves ou de bénéfices, par voie d'élévation de la valeur nominale des parts existantes.

En cas d'augmentation de capital par voie d'apports en numéraire et par application du principe de l'égalité entre les associés, chacun des associés a, proportionnellement au nombre de parts qu'il possède, un droit de préférence à la souscription des parts nouvelles représentatives de l'augmentation de capital.

Le droit de souscription attaché aux parts anciennes peut être cédé par les voies civiles, conformément à l'article 1690 du Code Civil, sous réserve de l'agrément du cessionnaire dans les conditions indiquées ci-dessus, s'il n'a déjà la qualité d'associé.

L'augmentation de capital est réalisée nonobstant l'existence de «rompus» et les associés disposant d'un nombre insuffisant de droits de souscription pour obtenir un nombre entier de parts d'intérêts nouvelles doivent faire leur affaire personnelle de toute acquisition ou cession de droits. A défaut d'utilisation de tous les droits de souscription, les parts nouvelles correspondant aux droits non utilisés peuvent être souscrites à un plus grand nombre de parts, et ce, proportionnellement au nombre de leurs parts anciennes et dans la limite de leur demande.

Si toutes les parts ne sont pas souscrites, les parts restantes peuvent être souscrites par des tiers étrangers à la société à condition que chacun d'eux soit agréé dans les conditions fixées ci-dessus.

Le droit préférentiel de souscription est exercé dans les formes et délais fixés par le gérant de la société, sans toutefois que le délai imparti aux associés pour souscrire ou proposer un cessionnaire de leurs droits de souscription puisse être inférieur à un mois.

La collectivité des associés par la décision extraordinaire afférente à l'augmentation de capital pourra renoncer, en tout ou partie, au droit préférentiel de souscription des associés.

Cette décision devra être précédée d'un rapport du gérant de la société indiquant les nom, prénom, profession, domicile et nationalité des bénéficiaires de la renonciation ainsi que le taux d'émission des parts nouvelles et les bases sur lesquelles ce taux a été déterminé.

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
TIMBRE FISCAL-FISCAL STAMP
FCFA 00011000
0113
069060

Une copie de ce rapport sera alors adressé à chaque associé si la décision est prise par voie de correspondance. En cas de réunion d'une assemblée, ledit rapport sera tenu à la disposition des associés, au siège social, à compter de l'envoi des lettres de convocation à cette assemblée.

Toute renonciation au droit préférentiel de souscription des associés par une décision collective sera nulle en cas d'infraction aux dispositions ci-dessus.

En cas de renonciation au droit préférentiel de souscription au profit de tiers étrangers à la société, ces tiers seront agréés comme nouveaux associés, dans la décision de renonciation, à la majorité fixée ci-dessus.

## 2. Réduction du capital

Le capital social peut aussi, en vertu d'une décision extraordinaire de la collectivité des associés être réduit, pour quelque cause que ce soit, notamment par voie de remboursement ou de rachat de parts, de réduction de leur montant ou de leur nombre, avec obligation, s'il y a lieu, de cession ou d'achat de parts anciennes pour permettre l'opération.

## ARTICLE 9. - TITRE DES ASSOCIES

Le titre de chaque associé résultera seulement des présentes, des actes modificatifs ultérieurs et des cessions qui seraient régulièrement consenties.

Une copie ou un extrait de ces actes, certifié par un gérant, pourra être délivré à chacun des associés, sur sa demande et à ses frais.

## ARTICLE 10. CESSION DES PARTS

La cession des parts d'intérêts s'opère par acte notarié ou sous seing privés qui devra être signifié à la société ou accepté par elle dans un acte notarié conformément à l'article 1690 du Code Civil.

Les parts sont librement cessibles entre associés mais elles ne peuvent être cédées à des tiers étrangers sans l'autorisation de l'Assemblée Générale Extraordinaire.

Les associés ont, en cas de cession à des tiers étrangers, un droit de préemption qui s'exercera selon les modalités ci-après fixées.

En cas de cession projetée, le cédant doit en faire la déclaration à la gérance, par lettre recommandée, en indiquant les noms, prénoms, profession et domicile du cessionnaire ainsi que le prix de la cession.

Dans la quinzaine de la réception de cette lettre recommandée, la gérance devra soumettre aux autres associés les termes de cette demande et leur proposer l'acquisition des parts aux conditions précisées dans ladite demande. Les associés pourront, dans un délai de quinze jours de l'envoi de la lettre recommandée à eux adressée par la gérance, faire connaître à celle-ci qu'ils entendent se porter acquéreurs des parts à céder aux conditions indiquées ; passé ce délai sans

-6-

manifestation de leur volonté à ce sujet, ils seront censés avoir renoncé à l'acquisition desdites parts pour leur compte. Dans le cas où plusieurs associés déclareraient vouloir exercer leur droit de préemption dont il vient d'être parlé, les parts à céder seraient réparties entre eux dans la limite de leur demande et proportionnellement au nombre des parts déjà possédées par eux.

Dans le cas où aucun associé ne désirerait se rendre cessionnaire des parts à céder, comme dans le cas où les associés n'exerceraient pas leur droit de préemption pour la totalité desdites parts, la gérance devra, dans la quinzaine qui suivra l'expiration du délai d'option, convoquer l'Assemblée générale Extraordinaire à l'effet de statuer sur l'acceptation ou le refus comme nouvel associé du cessionnaire proposé, lequel, au cas d'acceptation ne pourra devenir cessionnaire que des parts non préemptées. Si le cessionnaire proposé n'est pas agréé, la cession ne pourra être régularisée.

La décision de l'Assemblée Générale n'est pas motivée et, en cas de refus, ne peut donner lieu à aucune réclamation contre la société ou contre ses membres pris individuellement.

Les dispositions qui précèdent s'appliquent à toutes les cessions même à celles qui auraient lieu par adjudication en vertu d'ordonnance de justice ou autrement ; elles s'appliquent également aux mutations entre vifs et par décès au profit d'héritiers, donataires ou légataires autres que le conjoint survivant et les héritiers en ligne directe d'un associé, lesquels sur la seule justification de leurs qualités prennent, dans la société, les lieux et place de leur auteur.

Les adjudicataires, héritiers, donataires ou légataires autres que le conjoint survivant et les héritiers en ligne directe d'un associé sont tenus de se faire agréer dans les trois mois de l'adjudication, de la donation ou du décès.

S'ils ne sont pas agréés, ils doivent, dans les deux mois de la notification à eux faite de la décision de l'Assemblée générale Extraordinaire ayant statué sur leur demande d'agrément, céder leurs parts soit à des associés, soit à des personnes désignée par l'Assemblée Générale moyennant un prix qui, sauf entente entre les intéressés, sera égal à la valeur des parts cédées d'après le dernier état de situation établi par la société au moment de la transmission.

ARTICLE 11. - DROIT DES PARTS

Chaque part donne droit dans la propriété de l'actif social et dans la répartition des bénéfices à une fraction proportionnelle au nombre de parts existantes.

ARTICLE 12. - ENGAGEMENT DES ASSOCIÉS

Dans leurs rapports respectifs, les associés sont tenus des dettes et engagements de la société dans la proportion du nombre de parts qu'ils possèdent. Vis-à-vis des

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
FCFA 0001000
TIMBRE FISCAL/FISCAL STAMP
0113
0061

créanciers de la société, les associés que ce qu'ils prévoient
à l'article 1863 du Code Civil. Mais dans tous ceux qui
contiendront des engagements au nom de la société et notamment
dans ceux relatifs aux emprunts et aux traités d'entrepre-
neurs, le gérant devra faire renoncer les créanciers au droit
d'exercer une action personnelle contre les associés de telle
sorte que lesdits créanciers de cette renonciation ne puissent
exercer des actions et des poursuites que contre la présente
société et sur les biens lui appartenant.

## ARTICLE 13. - CAS DE DECES D'UN ASSOCIE

La société ne sera pas dissoute par le décès de l'un
des associés, son interdiction, sa faillite ou sa déconfiture.
En cas de décès de l'un d'eux, la société continuera avec ses
héritiers et représentants sauf l'effet des stipulations de
l'article 10 ci-dessus.

Chaque part est indivisible à l'égard de la société.
Les co-propriétaires indivis sont tenus, pour l'exercice de
leurs droits, de se faire représenter auprès de la société par
un seul d'entre eux ou par un mandataire commun pris parmi les
autres associés.

Les droits et obligations attachés à chaque part la
suivent dans quelques mains qu'elles passent. La propriété
d'une part emporte de plein droit adhésion aux statuts et aux
résolutions prises par l'Assemblée Générale.

Les héritiers, représentants et créanciers d'un
associé décédé ne peuvent, sous aucun prétexte, provoquer
l'apposition des scellés sur les biens et papiers de la
société, en demander la licitation ou le partage ni s'immiscer
en aucune manière dans son administration ; ils doivent, pour
l'exercice de leurs droits, s'en rapporter exclusivement aux
états de situation annuels et aux décisions de l'Assemblée
Générale.

## TITRE III
## ADMINISTRATION DE LA SOCIETE

## ARTICLE 14. - GERANTS

La société est administrée par un ou plusieurs
gérants, pris parmi les associés ou en dehors d'eux et nommés
par l'Assemblée Générale Ordinaire.

Dès à présent, Monsieur **TCHOUFA Roger** est nommé
Gérant de la société pour une durée indéterminée.

La gérance a droit, à titre de rémunération pour ses
peines et soins à des appointements ainsi qu'à une participa-
tion dans les bénéfices, le tout à fixer annuellement par
l'Assemblée Générale Ordinaire et à porter au compte des frais
généraux.

## ARTICLE 15. - OBLIGATIONS DES GERANTS

Le ou les gérants ne contractent, à raison de leur
aucune obligation personnelle ou solidaire avec la

8

société. Ils doivent consacrer tout le temps et tous les soins nécessaires à la bonne marche de la société.

ARTICLE 16.   - POUVOIRS DES GERANTS

Le ou les gérants sont investis des pouvoirs les plus étendus dont ils peuvent faire usage ensemble ou séparément pour agir au nom de la société et faire ou autoriser tous les actes et opérations relatifs à son objet. Ils ont notamment les pouvoirs suivants, lesquels sont énonciatifs et non limitatifs :

- Ils administrent les biens de la société et ils la représentent vis-à-vis des tiers ou de toutes administrations;

- Ils consentent ou acceptent et résilient tous baux et locations pour le temps et aux prix, charges et conditions qu'ils jugeront convenables ;

- Ils touchent les sommes dues à la société à quelque titre et pour quelque cause que ce soit ; ils paient toutes celles qu'elle peut devoir ;

- Ils arrêtent et règlent tous comptes avec tous créanciers et débiteurs ;

- Ils décident toutes constructions et font exécuter tous travaux, réparations et installations ; à cet effet, ils arrêtent tous devis et passent tous marchés.

- Ils exercent toutes actions judiciaires tant en demandant qu'en défendant ;

- Ils signent ou autorisent tous traités, transac- tions, compromis, tous acquiescements et désistements, ils consentent toutes subrogations et toutes mainlevées d'inscriptions, saisies, oppositions et autres droits avec ou sans constatation de paiements ;

- Ils arrêtent les états de situation et les comptes qui doivent être soumis à l'Assemblée Générale ; ils statuent sur toutes les propositions à lui soumettre et arrêtent l'ordre du jour ;

- Ils peuvent sous leur responsabilité, déléguer tout ou partie de leurs pouvoirs à un mandataire pour un ou plusieurs objets déterminés ;

- Ils signent tous les actes et engagements concer- nant la société.

- Ils procèdent à toutes acquisitions, échanges et aliénations de biens meubles et immeubles ;

- Ils contractent tous emprunts quelconques, sans limitation de somme de la manière et aux conditions qu'ils jugent convenables ;

- Ils consentent toutes hypothèques, tous nantisse- ments, délégations, cautionnements, avals et autres garanties mobilières et immobilières sur les biens de la société.

- Ils prennent toutes participations directes ou indirectes, sous quelque forme que ce soit dans toutes sociétés et dans toutes les opérations financières, industrielles, mobilières et immobilières, par voie de création de société nouvelles, d'apports, de souscription ou d'achat de titres ou droits sociaux, fusion association ou participation.



**TITRE IV**
**ASSEMBLEES GENERALES**

ARTICLE 17.    - CONVOCATIONS

Les associés sont réunis en Assemblée Générale
Annuelle Ordinaire dans le premier semestre de chaque année
aux jour, heure et lieu indiqués dans l'avis de convocation.
Des Assemblées Générales peuvent être convoquées extraordi-
nairement soit par la gérance, soit sur demande d'un ou
plusieurs associés représentant la moitié au moins de toutes
les parts.

Les convocations aux Assemblées Générales Ordinaires
ou Extraordinaires sont faites par lettre recommandée adressée
par la gérance aux associés cinq jours au moins à l'avance et
qui doivent indiquer sommairement l'objet de la réunion.
L'Assemblée peut même se réunir sur convocation verbale et
sans délai si tous les associés sont présents ou représentés.

ARTICLE 18.    - COMPOSITION

Tous les associés ont le droit d'assister à
l'Assemblée Générale et chacun d'eux peut s'y faire
représenter par un autre associé.

Lorsque l'Assemblée est appelée à délibérer dans les
cas autres que ceux prévus à l'article 22 ci-après, elle doit
être composée d'associés représentant au moins la moitié de
toutes les parts.

Si cette condition n'est pas remplie, l'Assemblée
Générale est convoquée à nouveau et elle délibère valablement
quel que soit le nombre des parts représentées mais seulement
sur les questions à l'ordre du jour de la première réunion.

ARTICLE 19.    - TENUE DES ASSEMBLEES

L'Assemblée est présidée par le gérant le plus
ancien ou, à son défaut, par un autre gérant ou par toute
autre personne désignée par elle.

Le Président est assisté d'un secrétaire nommé par
l'Assemblée. Il est tenu une feuille de présence indiquant les
noms, prénoms et domiciles des associés présents ou
représentés et le nombre des parts possédées par chacun
d'eux ; cette feuille est signée par tous les associés lors de
leur entrée en séance.

L'ordre du jour est arrêté par la gérance. Il ne
peut être mis en délibération aucun autre objet que ceux
portés à l'ordre du jour.

ARTICLE 20    DELIBERATIONS

Les délibérations sont prises à la majorité des voix
associés présents sauf ce qui va être dit à l'article 22
ci-après. Chaque membre de l'Assemblée a autant de voix qu'il
possède ou représente de parts sans limitation.
L'Assemblée Générale régulièrement constituée
représente l'universalité des associés.

10

Les délibérations prises conformément aux statuts obligent tous les associés, même les dissidents, les absents et les incapables.

## ARTICLE 21.    POUVOIRS DE L'ASSEMBLEE GENERALE ORDINAIRE

L'Assemblée Générale Ordinaire entend le rapport de la gérance sur les affaires sociales ; elle discute, approuve ou redresse les comptes et fixe les bénéfices à répartir ; Elle nomme ou remplace les gérants, fixe la durée de leurs fonctions, les révoque le tout s'il y a lieu ;

Elle autorise tous actes excédant les pouvoirs de la gérance, et elle délibère sur toutes les questions portées à l'ordre du jour qui ne sont pas de la compétence exclusive de l'Assemblée Générale Extraordinaire.

## ARTICLE 22.    — POUVOIRS DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE

L'Assemblée Générale Extraordinaire peut, sur l'initiative de la gérance ou à la demande d'un ou plusieurs associés représentant la moitié au moins des parts apporter toutes modifications aux statuts. Elle peut décider notamment :

l'augmentation ou la réduction du capital social, sa division en parts d'un taux autre que celui actuel de la société ;

Sa fusion ou alliance avec d'autres sociétés par parts d'intérêts ou par actions constituées ou à constituer ;

La transformation de la société en société de toute autre forme ou étrangère notamment en Société à Responsabilité Limitée ou en Société Anonyme ;

L'extension ou la restriction de l'objet social et toutes modifications à la répartition des bénéfices et de l'actif social.

Elle peut, en outre, décider exceptionnellement la vente d'immeubles sociaux ; les opérations de cette nature ne pouvant constituer un acte normal d'exploitation et, de ce fait, prenant obligatoirement le caractère d'un acte de liquidation de la compétence exclusive de l'Assemblée Générale Extraordinaire. Mais dans les cas prévus ci-dessus, l'Assemblée Générale ne peut valablement délibérer que si elle réunit des associés représentant les deux tiers au moins de toutes les parts et ses délibérations doivent être prises à la majorité des deux tiers des voix des associés présents ou représentés.

## ARTICLE 23. - PROCES - VERBAUX

Les délibérations des Assemblées Générales sont constatées par des procès-verbaux inscrits sur un registre spécial et signés par le Président et le Secrétaire.

Les copies de ces procès-verbaux à produire en justice ou ailleurs sont signés par l'un des gérants.

ARTICLE 24. - COMPTES - COURANTS

Les associés auront le droit de verser des fonds en
compte courant dans le cas où une mise de fonds serait
nécessaire pour les opérations sociales.

Les intérêts en seront fixés annuellement par
l'Assemblée Générale Ordinaire et portés en compte des frais
généraux.

Les retraits ne pourront être effectués que d'un
commun accord avec la gérance.

**TITRE V**
**ETATS DE SITUATION - REPARTITION DES BENEFICES**

ARTICLE 25. - ETATS DE SITUATION

La gérance tiendra une comptabilité régulière des
opérations sociales. Elle établit chaque année au trente un
décembre un état de situation contenant l'indication de
l'actif et du passif de la société.

ARTICLE 26. - REPARTITION DES BENEFICES

Les produits nets de la société constatés par l'état de
situation annuel, déduction faite des frais généraux, des
charges sociales et de tous amortissements, constituent les
bénéfices.

Ces bénéfices, sauf la partie qui serait mise en
réserve par l'Assemblée Générale Ordinaire et la partie
attribuée à la gérance, seront distribués, par les soins de la
gérance et aux époques fixées par elle, entre les associés,
proportionnellement au nombre de parts possédées par chacun
d'eux.

**TITRE VI**
**DISSOLUTION - LIQUIDATION - CONTESTATIONS**

ARTICLE 27. - CAS DE DISSOLUTION ANTICIPEE

En cas de perte des trois quarts du capital social,
l'Assemblée Générale doit être convoquée à l'effet de statuer
sur la question de savoir s'il y a lieu de continuer la
société ou de prononcer sa dissolution.

ARTICLE 28. - LIQUIDATION

A l'expiration ou en cas de dissolution anticipée de
la société, l'Assemblée Générale règle, sur la proposition de
la gérance, le mode de liquidation et nomme un ou plusieurs
liquidateurs, pris parmi les associés ou en dehors d'eux dont
elle détermine les pouvoirs.

L'Assemblée Générale régulièrement constituée
conserve, pendant la liquidation, les mêmes attributions que
durant le cours de la société ; elle a notamment le pouvoir
d'approuver les comptes de liquidation et de donner quitus aux
liquidateurs, de modifier, d'étendre ou de restreindre les

12 .

pouvoirs des liquidateurs, de leur conférer tous pouvoirs
spéciaux, notamment ceux nécessaires pour faire apport à une
société civile ou commerciale, camerounaise ou étrangère, de
la totalité d'une partie des biens, droits et obligations de
la société dissoute ou la cession à toutes personnes ou
sociétés de ces mêmes biens, droits et obligations. Le produit
de la liquidation après le règlement des engagements sociaux
est réparti entre les associés proportionnellement au nombre
dè parts possédées par chacun d'eux.

ARTICLE 29.  — CONTESTATIONS

        Toutes contestations qui peuvent s'élever entre
associés au sujet des affaires sociales pendant le cours de la
société ou de sa liquidation, seront jugées conformément à la
loi et soumises à la juridiction du Tribunal du lieu du siège
social.
        A cet effet, en cas de contestations, tout associé
doit faire élection de domicile dans l'arrondissement du lieu
du siège social et toutes assignations et significations sont
valablement faites au Parquet de monsieur le Procureur de la
République près le Tribunal Civil du lieu du siège social.

ARTICLE 30.  — FRAIS DE CONSTITUTION

        Tous les frais, droits et honoraires des présentes
et de tous dépôts et publications s'il y a lieu, seront portés
au compte de frais généraux de la société.
                    DONT ACTE sur douze pages
        Fait et passé à Douala, 737 Rue Boué de Lapeyrère,
En l'Etude de Me Pascal ENPE, Notaire soussigné
        L'AN DEUX MILLE QUATRE
        LE VINGT QUATRE MARS
        Après lecture, les comparants, Messieurs KOH KOH et
TCHOUFA Roger ès-qualités, ont signé le présent acte avec le
Notaire.
        La minute est signée par :--------------------------
        Messieurs TCHOUFA Roger, KOH KOH et Me Pascal ENPE,
ce dernier Notaire.----------- ------------------------------
        Ensuite vient la mention d'enregistrement-----------
        E = 2 % x 2.000.000  40.000 francs-----------------
        Enregistré au Centre Provincial des Impôts du
Littoral 1 (Actes Civils) le sept avril deux mille quatre,
volume 21, folio 188, N° 1362, perçu quarante mille francs,
quittance N° 1643220 LT du 07 Avril 2004.-------------------
Pour le Chef de Centre Provincial des Impôts--------------
Par Ordre---------------------------- --------------------
Signé illisible---------------------- --------------------
GNOWE Justin------------------------- --------------------
Inspecteur des Impôts---------------- --------------------
        Suit la teneur de l'annexe 1, annexée à la minute--------



REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
FCFA 0001000
TIMBRE FISCAL-FISCAL STAMP
PERCEPTION-NKWA         09H58         7743         0113
DOUALA LITTORAL 1     11/09/07         2         069064

## SOCIETE: THE FALLS SA
## CAPITAL SOCIAL : FCFA 25 000 000
## SIEGE SOCIAL: YAOUNDE
## BP 11 236 (Centre commercial)
## PROCES - VERBAL DE LA DECISION ORDINAIRE
## DE l'ACTIONNAIRE UNIQUE

REPERTOIRE N° 4300
DU 24 juillet 2003

L'AN DEUX MILLE TROIS.------- ------ -------- ------ ------
ET LE VINGT QUATRE DU MOIS DE JUILLET. -------------------

------ **PARDEVANT Maître Pierre François Xavier MENYE ONDO,** Notaire au siège de la cour d'Appel de YAOUNDE (République du Cameroun), y demeurant, soussigné.-------------------------------------------

---- A comparu, M. ATEBA MINKOLULOU Gabriel, Actionnaire unique de la Société Anonyme dénommée: THE FALLS, au capital social de FCFA 25 000 000 (vingt cinq millions de francs) dont le siège social est fixé à YAOUNDE BP 11 236. --------------------------------------------------------------

---- La présidence de la séance est confiée à M. ATEBA MINKOULOU Gabriel et Maître Pierre François Xavier MENYE ONDO, Notaire soussigné assure le secrétariat.--- ----------------------------------------------

--- Monsieur le Président dépose sur la table: ----- -------------------------

- Une expédition des statuts de la Société ;----------------------------------

- le texte des résolutions à prendre. ------------------------------------

---- Monsieur le Président donne ensuite lecture des points suivants, inscrits à l'ordre du jour :-------------------------------------------------------

ORDRE DU JOUR:

1)DELEGATION DE POUVOIRS;---------------------------------------
2) POUVOIRS POUR FORMALITES; ----------------------------------
3) QUESTIONS DIVERSES. -------------------------------------

PREMIER ROLE ET UNIQUE

Cette lecture terminée, Monsieur le Président déclare qu'en sa qualité d'Actionnaire unique, et conformément aux dispositions statutaires, il a décidé de déléguer les pouvoirs d'administration et de direction générale de la société à un tiers. ------------------ --------------------------------------------------

Le Président prend ensuite le résolutions, suivantes toutes à l'ordre du jour :--

PREMIERE RESOLUTION: DELEGATION DE POUVOIRS.

-- Monsieur ATEBA MINKOULOU Gabriel, agissant en sa qualité d'Actionnaire unique de la société et conformément aux dispositions de l'article 28 des statuts sociaux, décide de déléguer pour une durée de cinq (05) ans renouvelable par tacite reconduction, les pouvoirs d'Administration Générale et de Direction Générale de la société THE FALLS SA à : -------------------------

-- Monsieur KOH KOH, Camerounais né le 10 Août 1954 à LENOUK, de feu KOSOH NDZONGO et de MEDOUA EBENE, Cadre contractuel, domicilié à NKOLBISSON (YAOUNDE), titulaire de la Carte nationale d'identité numéro 101313309 à lui délivrée le 03 Novembre 2000 à YAOUNDE. --------------------

--- En conséquence, Monsieur ATEBA MINKOULOU Gabriel confère à M. KOH KOH, ici présent et qui accepte, tous les pouvoirs les plus étendus pour agir en toutes circonstances au nom de la société THE FALLS SA, tels que prévus à l'article 30 des statuts sociaux et les dispositions légales en la matière. ----------

DEUXIEME RESOLUTION: POUVOIRS POUR FORMALITES

Pour l'exécution des présentes, tous pouvoirs sont donnés au porteur d'un extrait ou d'une expédition des présentes, en vue de l'accomplissement de toutes les formalités légales requises. ---------------------------------------

Aucune disposition particulière n'a été retenue au titre de divers. ----------------

L'ordre du jour étant épuisé, M. le Président déclare la séance levée à 17 h 30.-

De tout ce que dessus, il a été dressé le présent procès-verbal qui a été signé par l'Actionnaire unique et le Notaire après lecture.-----------------------------

----------------------------- DONT ACTE SUR DEUX PAGES -----------------------

En Minute fait et passé en l'Etude de Maître Pierre François-Xavier MENYE ONDO, Notaire soussigné.------------- --------------------------------------

LE PRESIDENT                                         LE SECRETAIRE

---- Suivent les signatures, la minute et les mentions d'enregistrement suivantes : ----------------------------------------------------------------

EXPEDITION

Enregistré à YAOUNDE CDI 7 (ACTES CIVILS)
Le 28 juillet 2002 ----------------------------------
Vol 4 Folio 35 Case/BD 304 ---------------------------------
Reçu dix mille francs -----------------------------
Quittance n° 825399 du 25 juillet 2003 ---------------------------
Le Chef de Centre Divisionnaire des impôts (c) P.O M. Jean Marie ONANA
EBODE, Inspecteur des impôts « IMPOTS ». ------------------------------



Pour Expédition certifiée conforme à la
Minute dûment collationnée et délivrée
Sur trois pages, sans rature, ni renvoi en
Marge, ni mot rayé comme nul par NOUS,
Maître Pierre François Xavier MENYE ONDO,
Notaire soussigné. -------------------------------

Yaoundé, le 25 juillet 2003



**ANNEXE 1**

       Annexée à la minute d'un acte reçu par Me Pascal
ENPE le 24 Mars 2004.————————————————————————————————
       E = DF = 4.000 francs——————————————————————
       Enregistré au Centre Provincial des Impôts du
Littoral 1 (Actes Civils) le sept avril deux mille quatre,
volume 21, folio 188, N° 1362, perçu quatre mille francs,
quittance N° 1643220 LT du 07 Avril 2004.——————————————
Pour le Chef de Centre Provincial des Impôts——————————
Par Ordre——————————————————————————————————————————————
Signé illisible————————————————————————————————————————
GNOWE Justin——————————————————————————————————————————
Inspecteur des Impôts——————————————————————————————————
       Suit la teneur de l'annexe 2, annexée à la minute————



REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
FCFA **0001000**
TIMBRE FISCAL-FISCAL STAMP
PERCEPTION-NKWA    09H59    DECO    0113
DOUALA-LITTORAL 1    11/09/07    2    069066

### MBI GROUP, INC.
### CORPORATE RESOLUTION

## ESTABLISHMENT AND INCOPORATION
## OF
## ATLANTIC GROUP (CAMEROUN) SA
## AND APPOINTMENT OF ROGER TCHOUFA, EXECUTIVE VICE PRESIDENT
## OF MBI GROUP, INC. TO UNDERTAKE THE MATTERS RESOLVED BELOW

It is hereby resolved on this 10th day of March 2004, in Bethesda, Maryland, USA, by the Members of the Board of Directors of MBI Group, Inc. that:

(a)    MBI Group, Inc. is to organize and incorporate a company (to be called Atlantic Group (Cameroun) SA), in Cameroun to undertake various construction / housing and mortgage industry related projects;

(b)    MBI Group, Inc. is to carry out all the necessary business activities to start the projects contemplated in (a) above, including arranging for contractors, engineers, architects, urban planners, etc to start work, as may be considered prudent, in light of the identified projects' timelines.

(c)    MBI Group, Inc. hereby appoints Roger Tchoufa, Executive Vice President, to negotiate on MBI Group, Inc's behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroun.

(d)    MBI Group, Inc. empowers John M. Kamya, President of MBI Group, Inc., to issue a Notarized Power of Attorney to Roger Tchoufa, to enable Mr. Tchoufa to undertake the matters resolved in (a), (b) and (c), for and on behalf of the company.

Signed: _____          Signed: _____

By:    John M. Kamya, President          By:    Miranda Amarquaye
       MBI Group, Inc.                           Corporation Secretary



ANNEXE 1

Annexée à la minute d'un acte reçu par Me Pascal ENPE le 24 Mars 2004.------------------------------------
E = DF = 4.000 francs----------------------------
Enregistré au Centre Provincial des Impôts du Littoral 1 (Actes Civils) le sept avril deux mille quatre, volume 21, folio 188, N° 1362, perçu quatre mille francs, quittance N° 1643220 LT du 07 Avril 2004.----------------
Pour le Chef de Centre Provincial des Impôts---------------
Par Ordre-----------------------------------------------
Signé illisible---------------------------------------------
GNOWE Justin------------------------------------------
Inspecteur des Impôts-----------------------------------
Suit la teneur de l'annexe 2, annexée à la minute----

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
FCFA 0001000
TIMBRE FISCAL-FISCAL STAMP
09H59    93B0    0113
11/09/07    2    069067

## POWER OF ATTORNEY OF MBI GROUP, INC.
## TO
## ROGER TCHOUFA, Executive Vice President of MBI GROUP, INC.

This is to confirm that the Board of Directors of MBI Group, Inc., has given a Power of Attorney to Roger Tchoufa, Executive Vice President of MBI Group, Inc. (MBIG), to negotiate on MBIG's behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroon. MBI Group, Inc. shall become a shareholder in Atlantic Group (Cameroun) SA, and the company's Directors shall include Roger Tchoufa and John M. Kamya, in addition to others who shall be appointed.

Signed this 10th day of March, 2004 in Bethesda, Maryland, USA.

John M. Kamya, President
MBI Group, Inc.

ANNMARIE WILKINSON
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires September 1, 2006

**NOTARY:**



ANNEXE 2

Annexée à la minute d'un acte reçu par Me Pascal
EÑPE le 24 Mars 2004.-------------------------------------
E = DF = 4.000 francs-------------------------
Enregistré au Centre Provincial des Impôts du
Littoral 1 (Actes Civils) le sept avril deux mille quatre,
volume 21, folio 188, N° 1362, perçu quatre mille francs,
quittance N° 1643220 LT du 07 Avril 2004.----------------
Pour le Chef de Centre Provincial des Impôts-------------
Par Ordre------------------------------------------------
Signé illisible------------------------------------------
GNOWE Justin---------------------------------------------
Inspecteur des Impôts------------------------------------
Suit la teneur de l'annexe 3, annexée à la minute----

# UBC  Union Bank of Cameroon Plc

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES

TIMBRE FISCAL-FISCAL STAMP

Head Office :
2nd Floor,
NWCA Ltd Building, Commercial Avenue
P.O. Box 110, Bamenda
North West Province

Facsmile :  (237) 336 23 10
Email : ubc.bamenda@iccnet2000.com

Stat. N° 710-828-005 B    Licence N°00319/MINEFI/DCE/DMF/EC  CNPS N° 9430001 - S    Reg. N° 000034

**BAMENDA BRANCH**
Ground Floor
NWCA Building
Commercial Avenue
Mankon - Bamenda
Tel. : 336 23 14
Fax : 336 23 10
Email : ubc.bamenda
@iccnet2000.com

**DOUALA BRANCH**
Blvd de la Liberté
B.P. 15569
Akwa Douala
Tél. : 343 64 03
Fax : 342 24 51
Telex : UBC 55555KN
Email : ubc.douala
@iccnet2000.com

**LIMBE BRANCH**
Befunde Centre
Opposite Botanic Garden
P.O. Box 257 Limbe
Tel. : 333 20 10
      333 20 11
      333 20 12
      333 20 13
Fax : 333 20 14
Email : ubc limbe
@iccnet2000.com

YAOUNDE BRANCH
Immeuble Mercure Hôtel
Av. El Hadj Ahmadou
Ahidjo
P.O. Box 13698 Yaoundé
Tel. : 222 28 04
Fax : 222 67 90
Email : ubc.yaounde
@iccnet2000.cm

# ATTESTATION DE DEPOT

## N°. UBC/BM/ARM/04/03/097

**A QUI DE DROIT :**

Nous soussignés **UNION BANK OF CAMEROON (UBC) Plc,** société anonyme au capital de FCFA 5.000.000.000 (Cinq milliards) agréée pour exercer l'activité bancaire au Cameroun au terme de l'ordonnance N°0319/MINEFI/DCE/DMF/EC; N°. Stat 710-828-005 B; CNPS N° 943001; Reg. N°000034 du 08 Septembre 1999, ayant notre siège social à Bamenda, attestons que :

**SOCIETE CIVILE IMMOBILIERE ATLANTIC GROUP, B.P. 12560 Douala,** une société immobilière en création, donc le siège est à Douala, est titulaire du compte numéro **2004200048** ouvert dans nos livres. Le dépôt initial de **FCFA 2.000.000 (deux millions)** correspond à l'intégralité du capital social.

Le retrait de la dite somme ne pourra être effectué qu'après présentation de l'attestation d'immatriculation de la société au registre de commerce et de crédit mobilier.

**LA PRESENTE ATTESTATION LUI EST DELIVREE POUR SERVIR ET VALOIR CE QUE DE DROIT.**

Fait à Douala, le 19 Mars 2004

**GEMANDZE Sabuless Johnson**
Account Relations Manager

**NANA Philip TIBEME**
Branch Manager

ANNEXE 3

Annexée à la minute d'un acte reçu par Me Pascal ENPE le 24 Mars 2004.----------------------------------------
E = DF = 4.000 francs-----------------------------------
Enregistré au Centre Provincial des Impôts du Littoral 1 (Actes Civils) le sept avril deux mille quatre, volume 21, folio 188, N° 1362, perçu quatre mille francs, quittance N° 1643220 LT du 07 Avril 2004.-----------------
Pour le Chef de Centre Provincial des Impôts-------------
Par Ordre-----------------------------------------------------
Signé illisible---------------------------------------------------
GNOWE Justin-------------------------------------------------
Inspecteur des Impôts--------------------------------------
        POUR EXPEDITION DELIVREE ET CERTIFIEE CONFORME A L'ORIGINAL PAR LE NOTAIRE SOUSSIGNE.-----------------------
                                    POUR EXPEDITION--------

EXPEDITION sur vingt
deux pages, contenant
quatre blancs bâtonnés,
sans renvoi ni mot
rayé comme nul

ETUDE Mc PASCAL ENPE
NOTAIRE
B.P. 30
DOUALA

*Extrait des minutes du Greffe du Tribunal de Première Instance de Douala-Bonanjo*

---

DECLARATION DE ☐ **CONSTITUTION DE PERSONNE MORALE**

OU ☐ D'OUVERTURE D'UN ETABLISSEMENT SECONDAIRE

OU ☐ D'OUVERTURE D'UNE SUCCURSALE D'UNE PERSONNE MORALE ETRANGERE

---

RENSEIGNEMENTS RELATIFS A LA PERSONNE MORALE

1 DENOMINATION : **SOCIETE CIVILE IMMOBILIERE ATLANTIC GROUP "ATLANTIC GROUP SCI"**

NOM COMMERCIAL :                    ENSEIGNE :          SIGLE : **ATLANTIC GROUP SCI**

2 ADRESSE DU SIEGE : **Douala B.P. 12560**

3 ADRESSE DE L'ETABLISSEMENT CREE :

FORME JURIDIQUE : **S.C.I.**          N° R.C.C.M :

4 CAPITAL SOCIAL : **2.000.000 F.CFA**       DONT NUMERAIRES :          DONT EN NATURE :

5 DUREE : illimitée

DUREE : **99 années**          FAIT EN QUATRE EXEMPLAIRES
                              DOUALA, LE 16 Décembre 2004

*EXPEDITION*

---

RENSEIGNEMENTS RELATIVES A L'ACTIVITE AUX ETABLISSEMENTS

6 ACTIVITES :   ACTIVITE PRINCIPAL : (préciser) : **l'achat, la vente, la gestion et la mise en valeur d'immeubles bâtis ou non bâtis ; l'administration, la gestion, l'exploitation par bail ou autrement de tous immeubles bâtis ou à bâtir.**

7 DATE DE DEBUT : **Dès immatriculation au R.C.C.M.**          Nbre de salariés prévues :

8 PRINCIPAL ETABLISSEMENT OU SUCCURSALE :

9      Adresse :
10     Origine : Création, Achat, Apport, Prise en location gérance,          Autre (préciser) :
11     Précédent exploitant : Nom :          , Prénoms :
12     Adresse :          , N° R.C.C.M :
13          Loueur de fonds (nom/dénomination, adresse) :

ETABLISSEMENT SECONDAIRE : (autre que celui crée)          Nom,          ou (préciser)
14          Adresse :

          Activité :

ASSOCIES TENUS INDEFINIMENT ET PERSONNELLEMENT (*)

\* La totalité des renseignements relatifs à ces associés doit IMPERATIVEMENT figurer sur le formulaire complémentaire M.O Bis annexé

15   RESUMER DES INFORMATIONS :

| NOM | PRENOM | DATE ET LIEU DE NAISSANCE | ADRESSE |
|-----|--------|---------------------------|---------|
|     |        |                           |         |

## RENSEIGNEMENTS RELATIFS AUX DIRIGEANTS (*) (**)

(*)  Concerne les Gérants, Administrateurs ou associés ayant le pouvoir d'engager la personne morale

(**) Les renseignements ne pouvant figurer ci-dessus doivent IMPERATIVEMENT être reportés sur le formulaire M.o. Bis annexé

16

| NOM | PRENOM | DATE ET LIEU DE NAISSANCE | ADRESSE | FONCTION (***) |
|-----|--------|---------------------------|---------|----------------|
| TCHOUFA | Roger | 27/11/1961 à Mélong | B.P. 12560 Douala | Gérant |

(***) Préciser : Gérant, PDG, Administrateur, Associé

## COMMISSAIRES AUX COMPTES

17

| NOM | PRENOM | DATE ET LIEU DE NAISSANCE | ADRESSE | FONCTIONS |
|-----|--------|---------------------------|---------|-----------|
|     |        |                           |         |           |

LE SOUSSIGNE (préciser si mandataire) : **Maître Pascal ENPE**
Demande à ce que la présence constitue
18                     DEMANDE D'IMMATRICULATION AU R.C.C.M.

**La conformité de la déclaration avec les pièces justificatives produites en application de l'Acte Uniforme OHADA sur le Droit commercial général a été vérifiée par le Greffier en Chef soussigné qui a procédé à**

l'inscription le..........1.7..DEC..2004.............., sous le NUMERO 
                    DOUALA-BONANJO, LE 1 7 DEC 2004

LE GREFFIER EN CHEF :



Me Abbo Amadou
Administrateur des Greffes

**TRANSLATION OF EXHIBIT EN-3**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**ARTICLES OF ATLANTIC GROUP**

3503

24 MARCH 2004

## OFFICIAL COPY

## ARTICLES OF ASSOCIATION OF SOCIETE CIVILE IMMOBILIERE ATLANTIC GROUP

## IN SHORT « ATLANTIC GROUP SCI » , SHARE CAPITAL CFAF

## 2.000.000, HEAD OFFICE, DOUALA P.O BOX 12560

**PASCAL ENPE CHAMBERS**

NOTARY, DOUALA (CAMEROON)
37, RUE BOUE DE LAPEYRERE (Rue Mermoz) AKWAP.O BOX 30
Tel/Fax (237) 343 14 49

No. 3503 OF REP

**APPEARING BEFORE  Pascal ENPE,** Notary at the Douala Court of Appeal, 737 Rué Boué de Lapeyrere, the undersigned,

1st Party:  MBI GROUP Inc, Corporate SEAL 2001 DELAWARE (USA)

Represented by Mr. John M. KAMYA, himself represented by Mr. TCHOUFA Roger, by virtue of the power of attorney given them and appended hereto;

2nd Party: THE FALLS SA, share capital CFA F 25,OOO,OOO, Head office, Yaoundé, P.O Box 11236 (Centre Commercial), Represented by Mr. KOH KOH, by virtue of the power of attorney given him as per the report of the decision of the sole shareholder of the company received by Pierre Menye ONDO, Notary in Yaoundé, on 24 July 2003, registered at the Yaoundé Inland Revenue Office 7 (CIVIL MATTER) on 25 July 2003 Vol. 4, File 35 CDase/BD304, Receipt No. 825399 of 25 July 2003, copy appended hereto;

3rd Party: Mr. TCHOUFA Roger, Financial Consultant based in Washington (USA), currently in Douala on business,
Born on 2nd November 1960 at Melong,
Son of NJONFANG Alfred and NGUENTCHAM Marguerite, holder of Passport No; O298/ACW/2002/569398 issued in Washington D.C. on 16 September 2002, of Cameroonian nationality.

By this deed the parties agree to draw up the articles of association of a real estate company they intend to set up.

# ARTICLES OF ASSOCIATION

## PART ONE
## FORMATION – NAME – DURATION – HEAD OFFICE – PURPOSE

Article 1      FORMATION

A real Estate Company, to be governed by Articles 1832 and following articles of the Civil Code and by these articles of associations, is hereby formed by the abovementioned parties.

Article 2:        NAME

The company shall be called: **SOCIETE IMMOBILIERE ATLANTIC GROUP** in short "**ATLANTIC GROUP SIC**".

Article 3:        DURATION
The company shall have a life span of 99 (ninety-nine) years as from the date of signing of this deed.

Article 4: HEADQUARTERS
The headquarters shall be in Douala, P.O Box 12560. It may be transferred to any other part of the town by simple decision of the manager and to any other place by extraordinary decision of the partners.

Article 5: PURPOSE

The objective of the company is to, directly or indirectly, in all countries, especially in the Republic of Cameroon, undertake:
- the purchase, sale, management and development of built and non-built real estate;
- the administration, management, operating by lease or otherwise of all the built or to be built real estates which the company could acquire or take on lease, as well as the building of houses for commercial, professional and residential purposes or to be resold;
- the direct or indirect or otherwise incorporation in any company in all financial, industrial and real estate transactions, directly or indirectly related to the corporate objective through the setting up of new companies, capital , subscription or purchase of bonds , merger, association or partnership.
And in general, any transaction directly or indirectly related to this corporate objective.

## PART II
## CAPITAL CONTRIBUTION – CORPORATE CAPITAL – PARTNERSHIP SHARE

Article 6:    **CAPITAL CONTRIBUTION**

- The parties contribute the sum of CFA F 2 000 000 (two million) as follows:
- THE FALLS SA,CFA F nine hundred thousand ………………900 000
- MBI GROUP Inc, CFA F seven hundred thousand……………700 000
- Mr. TCHOUFA Roger, CFA F four hundred thousand ………...400 000

TOTAL: CFA F TWO MILLION………………………………...2 000 000

This sum of CFA F 2 000 000(two million) has been deposited in an account opened on behalf of the company at UNION BANK OF CAMEROON, DOUALA, as ascertained by the statement issued by the bank and appended hereto.

## ARTICLE 7: **CORPORATE CAPITAL – INTEREST COMPONENT**

The corporate capital is set at CFAF 2 000 000(two million), aggregate of the above contributions paid in.

It is divided into 200(two hundred) shares of CFA F10 000(ten thousand) each, fully discharged and allotted to the partners proportionately to their contribution:

- 
- 
- THE FALLS SA, ninety shares, numbered 1 to 90…………………90

MBI GROUP Inc, seventy shares, numbered 91 to 160…………………70
-Mr. THOUFA Roger, forty shares, numbered, 161 to 200………………40

TOTAL number of shares..................................................200

## Article 8 – **INCREASE AND REDUCTION OF CORPORATE CAPITAL**

### 1. **CAPITAL INCREASE**

By an extraordinary decision of all the partners, the corporate capital may be increased one or more times, by creating new shares paid for by contributions in cash or kind; but if the persons to whom the shares are sold are not yet partners, they shall first of all have to be approved by the existing partners representing at least three quarters of the existing capital.

Capital can also, by an extraordinary decision of the partners, be increased one or more times through the incorporation into the capital of all or part of the reserves or profits, by increasing the face value of the existing shares.

In the case of capital increase through cash contributions and in compliance with the principle of equality among partners, each partner shall purchase shares proportionately to the number be holds and shall have a right of first refusal to subscribe new shares representing the capital increase.

The subscription right on existing shares may be transferred by civil methods pursuant to Article 1690 of the Civil Code, subject to the approval of the transferee under the above conditions, if he is not yet a partner.

Capital increase shall be carried out notwithstanding the existence of assorted shares and the partners who lack the required number of subscription rights to obtain a full number of shares must conduct their private transactions to acquire or transfer shares; where all the subscription rights are not used, the new shares corresponding to the unused rights may be subscribed to a greater number of shares and, this proportionately, to the number of existing shares and in respect of their request.

If all the shares are not subscribed, the remaining shares may be subscribed by persons outside the company provided that each of the buyers is approved as per the above conditions.

The subscription preferential right shall be exercised under conditions and deadline defined by the company manager. The time limit prescribed for

partners to subscribe or propose a transferee of their subscription rights should not however be less than one month.

By an extraordinary decision relating to capital increase, the partners could waive all or part, of the subscription preferential rights of partners.

Such decision should be preceded by a report of the company manager specifying the full names, profession, place of residence and nationality of the beneficiaries of the waiver as well as the release rate of the new rates and the basis on which the rate is fixed.

A copy of the report shall be attached to the ballot paper sent to each partner if the decision is taken by mail. In the case of a meeting of the assembly, the report shall be made available to all the partners, at the head quarters, from the date of dispatch of the letters of invitation to the assembly meeting.

Any waiver of the subscription preferential right of partners by a collective decision shall be null and void if the above provisions are contravened.

In case of waiver of the subscription preferential right for persons outside the company, these persons shall be approved as new partners, in the waiver decision, by a majority as stipulated above.

2. Capital Reduction

By extraordinary decision of the partners, the corporate capital may also be reduced, for any reason, especially through the reimbursement or repurchase of shares, the reduction of their amount or number, if necessary, the transfer or purchase of existing shares to enable the exercise.

PARTNERSHIP

Article 9:

Partnership shall be exclusively in compliance with these articles of association, and with subsequent amendments thereto and in respect of transfers duly agreed upon.

A copy or detached copy of these deeds, certified by a manager, could be issued to each of the partners, at his request and expense.

## TRANSFER OF SHARES

Article 10:

The transfer of shares shall be by notary act or under private seal which should be notified to the company or accepted by it in a notary act in accordance with Article 1690 of the Civil Code.

Shares shall be transferred freely among partners but may not be transferred to third parties without the approval of the Extraordinary General Assembly.

In case of transfer to third parties, the partners may exercise a pre-emptive right as per the above defined terms.

In case of an intended transfer, the transferee must notify the manager by registered letter, mentioning the full names, occupation and place of residence of the transferee as well as the price of the transfer.

Within fifteen days of receipt of the registered letter, management should inform the other partners of the terms of the request and propose to them the acquisition of the shares under the conditions specified in the request. The partners could, within fifteen days, inform management of their intention to acquire the shares to be transferred under the specified conditions; beyond this time limit and if their intention is not made known, they shall be considered as having given up the acquisition of the shares. If partners decide to exercise their pre-emptive right, the shares to be transferred shall be shared among them in respect of their request and proportionately to the number of shares they already hold.

Where no partner is willing to take over the transferable shares, like in the case where the associates do not exercise their pre-emptive right over all the shares, management should, within fifteen days from the expiry of the option period, convene the Extraordinary General Assembly to decide whether to accept or refuse as new partner the proposed transferee who, if accepted, could only become transferee of the non-pre-empted shares. If the proposed transferee is not approved, the transfer shall not be normalized.

The decision of the General Assembly shall not be reasoned and, in case of refusal, no claim may be made against the company or against the members severally.

## ARTICLE 13: **CASE OF DEATH OF A PARTNER**

The company shall not be dissolved as a result of the death, ban, bankruptcy or insolvency of one of the partners. In the event of the death of a partner, the company shall continue with the heirs and representatives, save and except the stipulations of Article 10 above.

The company shall consider each share as indivisible. In the exercise of their rights, undivided co-owners shall be required to be represented in the company by only one of them or a representative mutually designated from among the other partners.

The rights and duties related to each share shall continue irrespective of the holder. Ownership of a share shall give full right of adherence to the articles of association and the resolutions taken by the General Assembly.

The heirs, representatives and creditors of a deceased partner may not, for any reason, ask for the sealing of the property and documents of the company, n neither request their licitation or partition nor, in any way, interfere in the management of the property. In the exercise of their rights, they must refer solely to the annual reports and the decisions of the General Assembly.

### PART III
### MANAGEMENT OF THE COMPANY

### MANAGERS

Article 14:

The company shall be managed by one or more managers, taken from among the partners or from outside the partnership who shall be appointed by the Ordinary General Assembly.

For now, Mr. TCHOUFA Roger, has been appointed manager of the company for an unspecified period.

The manager shall receive a salary as well as benefits and a share of the profits.

.

.

## 2. Capital Reduction

By extraordinary decision of the partners, the corporate capital may also be reduced, for any reason, especially through the reimbursement or repurchase of shares, the reduction of their amount or number, with need, if possible, to transfer or purchase existing shares to enable the exercise.

## PARTNERSHIP

Article 9:

Partnership shall be exclusively in compliance with these articles of association, subsequent amendments and the transfers accordingly agued upon.

A copy or detached copy of these deeds, certified by a manager, could be issued to each of the partners, at his request and his expense.

## TRANSFER OF SHARES

Article 10:

The transfer of shares shall be by notary act or under private seal which should be notified to the company or accepted by it in a notary act in accordance with Article 1690 of the Civil Code.

Shares shall be transferred freely among partners but may not transfer to third parties without the approval of the Extraordinary General Assembly.

In case of transfer to third parties, the partners may exercise a pre-emptive right according to above defined terms.

In case of an intended transfer, the transferee must notify the manager by registered letter, mentioning the full names, occupation and place of residence of the transferee as well as the price of the transfer.

Within fifteen days of receipt of the registered letter, management should inform the other partners of the terms of the request and propose to them the acquisition of the shares under the conditions specified in the request. The partners could, within fifteen days management, inform management of their intention to acquire the shares to be transferred under the specified conditions; beyond this time limit and if their intention is not made known, they shall be considered as having given up the acquisition of the shares partners decide to exercise their pre-emptive right just mentioned, the shares to be transferred shall be shared among them in respect of their request and proportionately to the number of shares they already possess.

Where no partner is willing to take over the transferable shares, like in the case where the associates do not exercise their pre-emptive right over all the shares, management should, within fifteen days from the expiry of the option period, convene the Extraordinary General Assembly to decide whiter to accept or refuse as new associate the proposed transferee who, if accepted, could only become transferee of the non-pre-empted shares. If the proposed transferee is not approved, the transfer shall not be normalized.

The decision of the General Assembly shall not be reasoned and, in case of refusal, no claim may be made against the company or against the members severally.

The foregoing provisions shall apply to all transfers even to those e tender following a court order or otherwise; they shall also apply to transfers inter vivo or by death to heirs, donees or devisees other than the surviving spouse and the direct heirs of a partner, who by virtue of their blood relation ship replace their parent I the company.

Bidder, heirs, donees or devisees other than the surviving spouse and direct heirs of a partner shall be required to be approved within three months from the tender, donation or death.

If not approved, they must, within two months of the notification to them by the Extraordinary general Assembly which decided on their request for approval, transfer their shares either to partners, or to persons designated by the General Assembly at a price which, save and except agreement on the part of the parties concerned, shall be equal to the value of the shares transferred according to be situation established by the company at the time of dispatch.

## SHARE RIGHT

**Article 11:**
        Each share gives right to corporate asset and to the sharing of profits proportionately to the number of existing shares.

## PARTNER UNDERTAKING

**Article 12:**

        By their respective understating, the partners are bound by the debts and commitments of the company proportionately to the number of shares under Article 1863 of the Civil Code; they shall be also bound by the debts of the company. However in all deeds which contain commitment on behalf of the company and especially those pertaining to borrowing and to contractor agreements, the manager shall guard the creditors not to taking any individual action against the partners such that the creditors of the waiver can not enter into a law suit against the company or for the corporate property.

## DEATH OF A PARTNER

**Article 13:**

        The company shall not dissolve as a result of the death ban, bankruptcy or insolvency of one of the partners. In the event of the death of a partner, the company shall continue with the heirs and representatives save and except the stipulations of Article 10 above.

        The company shall consider each share as indivisible. In the exercise of their rights, undivided co-owners shall be required to be represented in the company by only one of them or representative mutually designated from among the other partners.

        The rights and duties related to each share continue irrespective of the holder. Ownership of a share shall give full right of adherence to the articles of association and the resolutions taken by the General Assembly.

        The heirs, representatives and creditors of a deceased partner may not, for any reason, ask for the sealing of the property and documents of the company, neither request their licitation or partition nor, in any way, interfere in the management of the property. In the exercise of their rights, they must refer solely to the annual reports and the decisions of the General Assembly.

PART III
MANAGEMENT OF THE COMPANY

MANAGERS

Article 14:

The company shall be managed by one or more managers, taken from among the partners or from outside the partnership who shall be appointed by the Ordinary General Assembly.

For now, Mr. TCHOUFA Roger, has been appointed the Manager of the company for an indefinite period.

The Manager shall receive a salary for his work, benefits as well as a share of the profits. The pay package shall be determined each by the Ordinary General Assembly and charged to overhead.

DUTIES OF MANAGERS

Article 15:

In the exercise of their duties, the manager(s) shall not jointly or severally commit the company. They must commit themselves fully to the smooth running of the company.

POWERS OF THE MANAGERS

Article 16:

The Manager(s) shall be entrusted with full powers which they may exercise jointly or severally on behalf of the company and shall perform or authorize all acts and transactions within the scope of their powers. They shall notably have the following powers, which are declaratory and not limited; they shall manage the property of the company which they represent before third parties or other services:

- agree or accept and terminate all leases and rentals the time, price, charges and terms they deem convenient;
- receive sums owed the company for what ever transactions, they shall pay the sums owed by the company;
- close and settle all accounts with all the creditors and debtors;
- decide on all constructions and commission works, repairs and installations, in this respect, decide on all work estimated and award contracts;
- take all legal actions as plaintiff and defendant;
- sign or authorize all agreements, transaction, negotiations, all acquiescence and discontinuance, agree on subrogation and release of registration, seizures, oppositions and other rights with or without proof of payment;
- close statement of accounts which they must submit to the General Assembly, decide on all the recommendations to be submitted to the General Assembly and draw up the agenda;
- in the discharge of their duties, transfer all or part of their powers to delegate for one or more defined purposes;
- sign all deeds and undertaking concerning the company;
- carry out all acquisitions, exchanges and transfer of real estate property;
- contract all kinds of borrowing with no limited amount in a way and terms they deem;
- undertake all mortgages, collaterals transfers, guarantees, backings and other real estate guarantees on corporate property;
- subscribe all kinds of directs or indirect shares in all companies and in all financial, industrial, real estate transactions, by opening new companies, contributions, subscription or purchase of shares, merger association or shareholding.

## PART IV
## GENERAL ASSEMBLIES

### INVITATION

Article 17:

Partners shall meet in Ordinary Annual General Assembly within the first half of each year at the date, time and venue indicated in the invitation letter Extraordinary General Assemblies may be convened either by management or by one or more partners representing at least half of all the shares.

Invitations to Ordinary or Extraordinary General Assemblies shall be by registered letters sent by management to the partners at least five days before and which must succinctly specify the purpose of the meeting. The Assembly may also meet by verbal invitation and without delay of all the partners are present or represented.

## COMPOSITION

Article 18:

All partners have the right to attend the General Assembly and each of them can be represented by another partner.

Where the Assembly is called upon to discuss matters other than those defined in Article 22 below, it must comprise of partners representing at least half of all the shares.

If this condition is not met, the General Assembly shall be convened again and shall conduct valid business what ever the number of shares represented but only on the items features on the agenda of the first meeting.

## HOLDING OF MEETINGS

Article 19:

The Assembly meeting shall be chaired by the longest serving manager or, if absent, by another manager or any other person designated by the assembly.

The chairman shall be assisted by a secretary appointed by the Assembly. There shall be an attendance sheet indicating the full names and places of residence of the partners present or represented and the number of shares held by each of them; this sheet shall be signed by all the partners on entering the meeting.

The agenda shall be drawn up by management only items featuring on the agenda shall be discussed.

## PROCEEDINGS

Article 20:

Decisions shall be taken by a majority of the votes of the partners present except for the stipulation of Article 22 below. Each member of the Assembly shall have as many votes as the number of shares he holds or represents without limit.

The General Assembly represents all the partners when meeting in full session.

Decisions taken in accordance with the articles of association shall be binding on all partners, even the dissenting absent and invalid partners.

## POWERS OF THE ORDINARY GENERAL ASSEMBLY

Article 21:

The Ordinary General Assembly shall listens to management report on social matters, it discourse, approve or adjust the accounts and decide on the profits to be shared. It shall appoint or replace managers, set the duration of their duties, dismiss them, if possible.

It shall authorize all acts that go beyond the powers of management, and shall discuss all items on the agenda which do not fall under the preserve of the Extraordinary General Assembly.

## POWERS OF THE EXTRAORDINARY GENERAL ASSEMBLY

Article 22:

At the behest of management or at the request of one or more partners representing at least half of the shares, the Extraordinary General Assembly may make any amendment to the Articles of Association. It may decide, notably to:

- increase or reduce the corporate capital, divide it in shares at a rate other than the current corporate rate;
- merge or associate with other companies by shares or shares incorporated or to be built up;
- transform the company into any other of company or foreign especially into a limited company or into a business corporation;
- extend or restrict the scope of the company and make all changes in the sharing of profits and corporate assets.

In addition, it may exceptionally decide to sell partnership lands, such transactions can not be considered as an normal operating exercise and, as such,

are duly considered as an act of liquidation which falls under the exclusive powers of the extraordinary General Assembly may only conduct valid business if partners representing at least two thirds of all the shares are present and, decisions must be taken by a two thirds majority of the votes of the partners present or represented.

## REPORTS

Article 23:

The proceedings of General Assembly meetings shall be in a report written in a special log book and signed by the Chairman and Secretary.

Copies of these reports to be presented in court or else where shall be signed by one of the managers.

## CURRENT ACCOUNTS

Article 24:

Partners shall reserve the right to pay monies into a current account in the case where an investment should be needed for corporate transactions.

The interests shall be fixed yearly by the Ordinary General Assembly and transferred into the overheads account.

Withdraws shall only be made by mutual agreement with management.

## PART V

## PROGRESS REPORT – SHARING OF PROFITS

## PROGRESS  REPORT

Article 25:

Management shall keep an up to date record of corporate transactions. It shall each year at 31 December present a progress report sharing the assets and liabilities of the company.

## SHARING OF PROFITS

Article 26:

      The net proceeds of the company ascertained after the annual progress report, after deducting overheads, corporate charges and all depreciation, shall be considered as profit.

      These profits, but for the share to be considered as reserve by the Ordinary General Assembly and the part allotted to management, shall be shared by management at a time it deems appropriate to partners proportionately to the number of shares each partner holds.

## PART VI
## DISSOLUTION – LIQUIDATION – DISPUTES

## CASE OF FORESEEN DISSOLUTION

Article 27:

      In case of loss of three quarters of the corporate capital, the General Assembly must be convened to decide on whether to continue the company or to dissolve it.

## LIQUIDATION

Article 28:

      At expiry or in case of foreseen dissolution of the company, the General Assembly shall,

is to be determined yearly by the Ordinary General Assembly and charged to overhead.

## DUTIES OF MANAGERS

Article 15:

In the exercise of their duties, the manager(s) shall not jointly or severally commit the company. They must commit themselves fully to the smooth running of the company.

## POWERS OF THE MANAGERS

Article 16:

The Manager(s) shall be entrusted with full powers which they may exercise jointly or severally on behalf of the company and shall perform or authorize all acts and transactions within the scope of their powers. They shall notably have the following powers, which are declaratory and not limited; they shall manage the property of the company which they represent before third parties or other services:

-   agree or accept and terminate all leases and rentals the time, price, charges and terms they deem convenient;
-   receive sums owed the company for what ever transactions, they shall pay the sums owed by the company;
-   close and settle all accounts with all the creditors and debtors;
-   decide on all constructions and commission works, repairs and installations, in this respect, decide on all work estimated and award contracts;
-   take all legal actions as plaintiff and defendant;
-   sign or authorize all agreements, transaction, negotiations, all acquiescence and discontinuance, agree on subrogation and release of registration, seizures, oppositions and other rights with or without proof of payment;
-   close statement of accounts which they must submit to the General Assembly, decide on all the recommendations to be submitted to the General Assembly and draw up the agenda;
-   in the discharge of their duties, transfer all or part of their powers to delegate for one or more defined purposes;
-   sign all deeds and undertaking concerning the company;

- carry out all acquisitions, exchanges and transfer of real estate property;
- contract all kinds of borrowing with no limited amount in a way and terms they deem;
- undertake all mortgages, collaterals transfers, guarantees, backings and other real estate guarantees on corporate property;
- subscribe all kinds of directs or indirect shares in all companies and in all financial, industrial, real estate transactions, by opening new companies, contributions, subscription or purchase of shares, merger association or shareholding.

PART IV
GENERAL ASSEMBLIES

INVITATION

Article 17:

Partners shall meet in Ordinary Annual General Assembly within the first half of each year at the date, time and venue indicated in the invitation letter Extraordinary General Assemblies may be convened either by management or by one or more partners representing at least half of all the shares.

Invitations to Ordinary or Extraordinary General Assemblies shall be by registered letters sent by management to the partners at least five days before and which must succinctly specify the purpose of the meeting. The Assembly may also meet by verbal invitation and without delay of all the partners are present or represented.

COMPOSITION

Article 18:

All partners have the right to attend the General Assembly and each of them can be represented by another partner.

Where the Assembly is called upon to discuss matters other than those defined in Article 22 below, it must comprise of partners representing at least half of all the shares.

If this condition is not met, the General Assembly shall be convened again and shall conduct valid business what ever the number of shares represented but only on the items features on the agenda of the first meeting.

## HOLDING OF MEETINGS

Article 19:

The Assembly meeting shall be chaired by the longest serving manager or, if absent, by another manager or any other person designated by the assembly.

The chairman shall be assisted by a secretary appointed by the Assembly. There shall be an attendance sheet indicating the full names and places of residence of the partners present or represented and the number of shares held by each of them; this sheet shall be signed by all the partners on entering the meeting.

The agenda shall be drawn up by management only items featuring on the agenda shall be discussed.

## PROCEEDINGS

Article 20:

Decisions shall be taken by a majority of the votes of the partners present except for the stipulation of Article 22 below. Each member of the Assembly shall have as many votes as the number of shares he holds or represents without limit.

The General Assembly represents all the partners when meeting in full session.

Decisions taken in accordance with the articles of association shall be binding on all partners, even the dissenting absent and invalid partners.

## POWERS OF THE ORDINARY GENERAL ASSEMBLY

Article 21:

The Ordinary General Assembly shall listens to management report on social matters, it discourse, approve or adjust the accounts and decide on the profits to be shared. It shall appoint or replace managers, set the duration of their duties, dismiss them, if possible.

It shall authorize all acts that go beyond the powers of management, and shall discuss all items on the agenda which do not fall under the preserve of the Extraordinary General Assembly.

## POWERS OF THE EXTRAORDINARY GENERAL ASSEMBLY

Article 22:

At the behest of management or at the request of one or more partners representing at least half of the shares, the Extraordinary General Assembly may make any amendment to the Articles of Association. It may decide, notably to:

- increase or reduce the corporate capital, divide it in shares at a rate other than the current corporate rate;
- merge or associate with other companies by shares or shares incorporated or to be built up;
- transform the company into any other of company or foreign especially into a limited company or into a business corporation;
- extend or restrict the scope of the company and make all changes in the sharing of profits and corporate assets.

In addition, it may exceptionally decide to sell partnership lands, such transactions can not be considered as an normal operating exercise and, as such, are duly considered as an act of liquidation which falls under the exclusive powers of the extraordinary General Assembly may only conduct valid business if partners representing at least two thirds of all the shares are present and, decisions must be taken by a two thirds majority of the votes of the partners present or represented.

## REPORTS

Article 23:

The proceedings of General Assembly meetings shall be in a report written in a special log book and signed by the Chairman and Secretary.

Copies of these reports to be presented in court or else where shall be signed by one of the managers.

## CURRENT ACCOUNTS

Article 24:

Partners shall reserve the right to pay monies into a current account in the case where an investment should be needed for corporate transactions.

The interests shall be fixed yearly by the Ordinary General Assembly and transferred into the overheads account.

Withdraws shall only be made by mutual agreement with management.

## PART V

## PROGRESS REPORT – SHARING OF PROFITS

## PROGRESS   REPORT

Article 25:

Management shall keep an up to date record of corporate transactions. It shall each year at 31 December present a progress report sharing the assets and liabilities of the company.

## SHARING OF PROFITS

Article 26:

The net proceeds of the company ascertained after the annual progress report, after deducting overheads, corporate charges and all depreciation, shall be considered as profit.

These profits, but for the share to be considered as reserve by the Ordinary General Assembly and the part allotted to management, shall be shared by management at a time it deems appropriate to partners proportionately to the number of shares each partner holds.

## PART VI
## DISSOLUTION – LIQUIDATION – DISPUTES

## CASE OF FORESEEN DISSOLUTION

Article 27:

In case of loss of three quarters of the corporate capital, the General Assembly must be convened to decide on whether to continue the company or to dissolve it.

## LIQUIDATION

Article 28:

At expiry or in case of foreseen dissolution of the company, the General Assembly shall, on the recommendation of management, decide on the method of liquidation and shall appoint one or more liquidators from among the partners or from outside whose powers it shall determine.

During the liquidation, the General shall continue to perform the same duties like during the life of the company. It shall in particular approve the liquidation accounts and shall discharge the liquidators, modify, extend or curtail the powers of the liquidators, give them all the powers needed as especially as concerns the transfer to a Cameroonian or foreign civil or commercial company all or part of the property, rights and duties of the dissolved company or the transfer of this property, rights and duties to any persons or company. The proceeds of the liquidation, after the settlement of corporate commitments, shall be shared to partners proportionately to the respective number of shares they hold.

## ARTICLE 29   DISPUTES

All disputes that may arise between partners concerning corporate matters during the life of the company or during its liquidation shall be tried in respect of the law and referred to the court where the headquarters is located.
In this respect, in case of dispute, any partner must elect domicile in the subdivision of the headquarters and all subpoenas and notifications shall only be valid if issued by the Legal department of the State Counsel of the civil court of the place of the headquarters.

## ARTICLE 30 - FORMATION EXPENSES

All the charges, taxes and fees of this deed, as well as the deposit and publications thereof, if necessary, shall be borne by the overhead expenses of the company.

## DEED IN TWELVE PAGES

Drafted in Douala, 737 Rue Boué de Lapeyrère,

In the Chambers of Pascal ENPE, the undersigned notary
24 March 2004

After reading, the appearers, Messrs KOH KOH and TCHOUFA Roger, as manager, signed the deed with the notary

The draft is signed by: …………………………………………………..
Messrs TCHOUFA Roger, KOH KOH and Pascal ENPE, notary……………..
Thereafter, the deed was registered……………………………………………
R = 2% x 2.000.000 = 40.000 …………………………………………………..
Registered at the Littoral I Provincial Taxation Office (Civil Matter) on 7 April 2004, Volume 21, folio 188, No. 1362, received CFA F forty- thousand, receipt No. 1643220 LT of 7 April 2004 …………………………………………
For the Head of the Provincial Taxation Office …………………………….
By delegation …………………………………………………………..
Signed …………………………………………………………………
GNOWE Justin ……………………………………………………..
Tax Inspector ……………………………………………………..

Wording of Appendix I, appended to the draft ………………………………

APPENDIX I

Appended to a deed received by Pascal ENPE, notary on 24 March 2004.....
R = DF = 4.000 francs ……………………………………………….
Registered at the Littoral I Provincial Taxation Office (Civil Matter) on 7 April
2004, Volume 21, Folio 188, No. 1362, received the sum of four thousand
francs, receipt No. 1643220 LT of 7 April 2004 ………………………..
For the Head of the Provincial taxation Office ………………………………
By delegation ……………………………………………………………….
Signed ……………………………………………………………………...
GNOWE Justin ……………………………………………………………...
Tax Inspector ………………………………………………………………
Wording of Appendix 2, appended to the draft ………………………………

OFFICIAL COPY

Registered in CDI 7 YAOUNDE (CIVIL MATTER) ……….....................
On 28 July 2002 …………………………………………………………….
Vol. 4 Folio 35 Case/BD 301 ………………………………………………
Received ten thousand francs …………………………………………….
Receipt No. 825399 of 25 July 2003 ………………………………….
Head of the Provincial Taxation Office (sgd)
P.O.M Jean Marie ONANA EBODE, Tax Inspector ……………………….

Dispatch, certified consonant with the draft duly called and
checked and issued in three pages, no erasure, marginal alteration,
Nor word deleted by US, Pierre François Xavier MENYE ONDO,
Undersigned Notary …………………………………………………..
Yaoundé, this 25th day of March 2003

APPENDIX 2

Appended to the draft of a deed received by Pascal ENPE
On 24 March 2004 ……………………………………………….
   R = DF = 4.000 francs …………………………………………..
   Registered at the Littoral I Provincial Taxation Office
(Civil Matter) on 7 April 2004, Volume 21, Folio 188, No. 1362, received: four
thousand francs, Receipt No. 1643220 Lt of 7 April 2004 ……………………..
For the Head of the Taxation Office ………………………………………….
By delegation ………………………………………………………………..
Signed …………………………………………………………………………
GNOWE Justin ……………………………………………………………….
Tax Inspector ………………………………………………………………….
Wording of Appendix 3, appended to the draft …………………………………..

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

      Ndifon Robert
      B.A. (Hons) University of Yaounde
      M.A. (Translation) University of Montreal (Canada)

B.A. (Yaounde); M.A. (Montréal)
Senior Translator
NATIONAL ASSEMBLY OF CAMEROON

**EXHIBIT EN-4**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**DEED**

# EXPEDITION

**REPERTOIRE N°** : 5112          **TAXE N°** : 5215

**DATE :** 04 août 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Vente par Monsieur SANDJI NDONGO François à la Société ''THE FALLS'' SA d'une parcelle de terrain bâtie sise à YAOUNDE (BASTOS), à morceler du titre foncier numéro 1504 du Mfoundi**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Etude de Me Béatrice Rufine ASSENA**
**Notaire**

**BP 6184  YAOUNDE**
**Téléphone  : 22 22 44 76**
**Mobile        : 96 41 54 06**
**City phone : 22 00.88.69**
**Télécopie  : 22 23 17 96**
**E-Mail : assena@iccnet.cm ou assenaoffice@yahoo.fr**
**République du CAMEROUN**

**EXPEDITION**

Vente immobilière



REPERTOIRE N° 5112
DU 04.08.2005

PARDEVANT Maître Béatrice Rufine ASSENA, Notaire à YAOUNDE (République du CAMEROUN), y demeurant, BP 6184, soussignée.

## ONT COMPARU

**1/- Monsieur SANDJI NDONGO François**, Pharmacien, demeurant à YAOUNDE BP 276, né le dix neuf décembre mil neuf cent trente à NYAMANGA II, fils de NDONGO Paul et de feue AMBATINDA Elisa, camerounais, titulaire de la carte nationale d'identité numéro 102601515 délivrée le deux avril deux mille deux à YAOUNDE.

Ci-après désigné "LE VENDEUR"

D'une part,

**2/- La société THE FALLS SA**, société anonyme avec administrateur général au capital de 25.000.000 FCFA (vingt cinq millions) dont le siège social est à YAOUNDE BP 30870 au lieudit Centre Commercial, immatriculée au Registre de Commerce et du Crédit Mobilier de YAOUNDE sous le numéro 2003.B.330 du 18 juillet 2003.

Représentée aux présentes par Monsieur KOH KOH, demeurant à YAOUNDE BP 30870, né le dix août mil neuf cent cinquante quatre à LENOUK, fils de feu KOSOH NDZONGO et de MEDOUA EBENE, camerounais, titulaire de la carte nationale d'identité numéro 101313309 délivrée le trois novembre deux mille à YAOUNDE.

En vertu des pouvoirs spéciaux à lui conférés par Monsieur ATEBA MINKOULOU Gabriel, Administrateur Général de la société THE FALLS SA, suivant acte numéro 4300 reçu le 24 juillet 2003 par Maître MENYE ONDO Pierre François Xavier, Notaire à YAOUNDE, enregistré à YAOUNDE CDI 7 (actes civils) le 28 juillet 2003 volume 4 folio 35 case et bordereau 304 aux droits de 10.000 FCFA (dix mille) quittance numéro 825399 du 25 juillet 2003.

Ci-après désignée «L'ACQUEREUR»

D'autre part.

Lesquels ont requis Maître Béatrice Rufine ASSENA, Notaire soussigné, en vue de rédiger ainsi qu'il suit la vente immobilière intervenue entre eux :

Etude Me Béatrice ASSENA

Vente immobilière SANDJI NDONGO François/
Société THE FALLS SA

- 2 -

## VENTE IMMOBILIERE

Monsieur SANDJI NDONGO François a, par ces présentes, vendu en s'obligeant à toutes les garanties ordinaires de fait et de droit en pareille matière, à la société THE FALLS SA, ainsi que son Représentant l'accepte, l'immeuble dont la désignation suit :

### Désignation

Une parcelle de terrain urbain bâtie sise à YAOUNDE I au lieudit Bastos, d'une superficie de 920 m2 (neuf cent vingt mètres carrés), à morceler du titre foncier numéro 1504 du Mfoundi volume 8 folio 151 ;

Limitée : au Nord par une route non dénommée ; au Sud par le titre foncier numéro 1296 ; à l'Est par la partie restante du titre foncier numéro 1504 ; à l'Ouest par le terrain de Monsieur ESSOMBA Sébastien.

Tel que ledit immeuble existe, s'étend et se poursuit, avec tous immeubles par destinations et tous droits y attachés, sans aucune exception ni réserve.

### Origine de propriété

L'immeuble objet du titre foncier numéro 1504 du Mfoundi appartient en toute propriété à Monsieur SANDJI NDONGO François pour l'avoir acquis à titre onéreux de la Collectivité MVOG NKILI MBASSI ZOBO suivant acte reçu le 04 mai 1962 par Maître Philippe MONGO MBOCK, Notaire à YAOUNDE, dûment enregistré, ainsi qu'il ressort des énonciations contenues dans les bordereaux analytiques dudit titre foncier.

### Propriété et Jouissance

La société THE FALLS SA, ACQUEREUR, aura à compter de ce jour l'entière propriété et la jouissance de l'immeuble vendu par la simple prise de possession réelle.

### Charges et conditions

La présente vente a lieu sous les charges et conditions ordinaires de fait et de droit, notamment :

- L'ACQUEREUR prendra l'immeuble présentement vendu dans l'état où il se trouvera ce jour, sans pouvoir exercer aucun recours ni répétition contre le VENDEUR pour raison soit de mitoyenneté, soit de défaut d'alignement, soit de mauvais état des bâtiments, du sol ou du sous-sol, soit de vices, même cachés, soit enfin d'erreur dans la désignation ou dans la contenance, toute différence entre cette contenance et celle réelle devant faire le profit ou la perte de l'ACQUEREUR.

Etude Me Béatrice ASSENA

Vente immobilière RÉPUBLIQUE DU CAMEROON - REPUBLIC OF CAMEROON
MINISTÈRE DES FINANCES - MINISTRY OF FINANCES
DIRECTION GENERALE DES IMPOTS
FCFA **0000 1000**
TIMBRE FISCAL-FISCAL STAMP
CENTRE D'IVISIONNAIRE 13H15      0C67      0073
DES IMPOTS-VDE 3   17/09/07       2      059462

- 3 -

- L'ACQUEREUR souffrira les servitudes passives, apparentes ou occultes, continues ou discontinues qui peuvent grever l'immeuble vendu, sauf à s'en défendre et à profiter en retour de celles actives, s'il en existe, le tout à ses risques et périls, sans recours contre le VENDEUR, et sans que la présente clause puisse donner à qui que ce soit plus de droits qu'il n'en aurait en vertu de titres réguliers non prescrits ou de la Loi.

- Le VENDEUR déclare que l'immeuble présentement vendu n'est à sa connaissance grevé d'aucune autre servitude que celles pouvant être énoncées aux présentes ou résulter soit de titres de propriété antérieurs soit de la situation actuelle des lieux et que personnellement, il n'en a créé ou conféré aucune autre.

- L'ACQUEREUR fera son affaire personnelle de manière que le VENDEUR ne soit jamais inquiété ni recherché à ce sujet de l'exécution ou de la résiliation de tous abonnements ou traités qui ont pu être contractés ou passés par le VENDEUR ou les précédents propriétaires notamment par le service des eaux, du gaz et de l'électricité, et il en paiera les redevances à partir de ce jour.

- L'ACQUEREUR acquittera à compter de ce jour tous impôts, taxes et charges de toute nature assis ou à asseoir sur l'immeuble présentement vendu.

- L'ACQUEREUR fera son affaire personnelle à compter de ce jour de manière que le VENDEUR ne soit jamais inquiété ni recherché à ce sujet des baux et locations pouvant exister sur l'immeuble vendu et ce, bien entendu, dans les cas seulement où il ne résulterait pas des présentes que ledit immeuble est vendu libre de toute location ou occupation.

- Enfin, l'ACQUEREUR paiera tous les frais, droits, honoraires et émoluments des présentes et ceux qui en seront la suite ou la conséquence, y compris le coût de toute grosse à délivrer éventuellement au VENDEUR, ainsi que les frais et honoraires de renouvellement, le cas échéant, de toute inscription de privilège de vendeur ou de prêteur de deniers à prendre en vertu du présent acte, et ceux occasionnés par la levée, la demande et l'obtention de tous états hypothécaires, hors ou sur formalité, ou autres états, ainsi que par la demande et l'obtention de tous certificats d'urbanisme, de voirie ou autres, et notamment ceux éventuellement annexés aux présentes.

## P R I X

En outre, la présente vente est consentie et acceptée moyennant le prix principal de 80.000.000 FCFA (quatre vingt millions de francs) payé comptant, hors la vue du Notaire soussigné, par la société THE FALLS SA à Monsieur SANDJI NDONGO François qui le reconnaît et lui en donne bonne et valable quittance.

**Dont quittance**

Etude Me Béatrice ASSENA

- 4 -

### Déclarations

Monsieur SANDJI NDONGO François fait les déclarations suivantes :

- il confirme expressément les énonciations qui figurent au présent acte concernant son état civil et sa capacité ;

- il n'existe de son chef aucun obstacle ni aucune restriction d'ordre légal ou contractuel à la libre disposition de l'immeuble présentement vendu ;

- Il n'est pas actuellement et n'a jamais été avant ce jour en état de faillite, de liquidation de biens, de règlement judiciaire ni de cessation de paiement ;

- l'immeuble présentement vendu n'a fait l'objet à son encontre d'aucune mesure de confiscation et personnellement, il ne fait l'objet d'aucune poursuite pouvant aboutir à sa confiscation ;

- il n'a reçu aucune notification tendant à l'expropriation de l'immeuble présentement vendu et celui-ci n'est pas compris dans une zone à urbaniser en priorité ni dans une zone d'aménagement différé ;

- l'immeuble vendu n'est grevé, à ce jour, d'aucune inscription de privilège ou autres.

### Publicité Foncière

Une expédition des présentes sera publiée par les soins du Notaire soussigné au Bureau de la Conservation Foncière du Centre à YAOUNDE. Si l'état levé par suite de l'accomplissement de cette formalité révèle l'existence d'inscriptions grevant l'immeuble vendu, le VENDEUR sera tenu ainsi qu'il s'y oblige, à en faire rapporter à ses frais, les mainlevées et certificats de radiation dans le mois de la dénonciation amiable qui lui sera faite au domicile ci-après élu, de l'état contenant lesdites inscriptions.

### Remise de titres

D'un commun accord entre les parties, l'ACQUEREUR sera subrogé dans les droits du VENDEUR pour se faire délivrer, à ses frais, tous titres de propriété ou pièces relatifs à l'immeuble vendu.

Etude Me Béatrice ASSENA

Vente immobilière

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
TIMBRE FISCAL-FISCAL STAMP
CENTRE DIVISIONNAIRE
DES IMPOTS-YDE 3
13H15        0EA5        0073
17/09/07       2        059463

- 5 -

### Lecture des Lois - Affirmation de sincérité

Maître Béatrice Rufine ASSENA, Notaire soussigné, a donné aux parties lecture des articles 295 et 371 et suivants du Code Général des Impôts et des peines édictées par le Code Pénal.

Chacune des parties a affirmé sous les sanctions légales, que le présent acte exprime l'intégralité du prix convenu.

Et le Notaire soussigné affirme qu'à sa connaissance, le présent acte n'est modifié par aucune contre lettre contenant augmentation du prix ci-dessus fixé.

### Domicile

Pour l'exécution des présentes, les parties font élection de domicile en leur siège social et demeure ci-dessus indiqués.

### DONT ACTE SUR CINQ PAGES

Fait et passé en minute à YAOUNDE
En l'Etude de Maître Béatrice R. ASSENA
L'an deux mille cinq
Le quatre du mois d'août

Et après lecture entière, les comparants ont signé le présent acte avec Maître Béatrice Rufine ASSENA, Notaire.-

SANDJI Ndofo François

KOH KOH

Etude Me Béatrice ASSENA

Suivent les signatures de SANDJI NDONGO François, KOH KOH et Maître Béatrice Rufine ASSENA, cette dernière Notaire.

La minute porte les mentions d'enregistrement suivantes :

Enregistré à YAOUNDE CPIC 1 (Actes Civils)
Le trente août deux mille cinq
Volume 09 Folio 02 Case et Bd 1307/1
Reçu : douze millions de francs
Quittance numéro 1329623 du 30 août 2005
Le Chef de Centre Provincial
Le Chef de Centre Principal I et P.O
(é) Justin KAMMI
Inspecteur des Impôts

Pour expédition certifiée conforme à la Minute dûment collationnée et délivrée sur six pages, sans renvoi en marge ni mot rayé nul par Maître Béatrice Rufine ASSENA, Notaire soussigné.

Yaoundé, le 17 septembre 2007

Me Béatrice Rufine ASSENA



Département du MFOUNDI

Cabinet MOTASS

République du Cameroun

Paix – Travail – Patrie

YAOUNDE

T.F. N° ...................

Arrondissement de Ydé I

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
TIMBRE FISCAL-POSTAL STAMP (BASTOS)
FCFA 000 1000

CENTRE-DIVISIONNAIRE
DES IMPOTS-YDE I    13H16    76    0073
17/09/07    2    059464

Plan joint au P.V. de bornage de morcellement
du T.F. n° 1504/MF, établi le 09 Août 2005 à la
demande de M. SANDJI NDONGO François
au profit de la société THE FALLS SARL

Superficie:...920.......m²

PLAN DE SITUATION ECHELLE 1/15000°

Emplacement

ROUTE    EXISTANTE

(B1)

27.98    B1

(B4) B4

| S | X | Y |
|----|----|----|
| B1 | 1113168.44 | 1420011.17 |
| B2 | 20.29 | 571.94 |
| B3 | 184.62 | 868.13 |
| B4 | 1113168.59 | 1420008.49 |

Terrain de M. ESSOMBA Sébastien

Partie restante du T.F. 1504/MF

43.43

39.65

Piscine

(B3)

B3    17.10    B2

(B2)

T.F.    1296

Béatrice RUFINE ASSENA
REPUBLIQUE DU CAMEROUN
B.P. 618
NOTAIRE à YAOUNDE

G motass t
Géomètre-expert
B.P. 11453 Ydé Tél: 220 16 17
cabinettopo.motass@yahoo.fr
O.G.E.C. A. 039

Echelle: 1/500°

Mappe de repérage
Feuille au 1/15000°
C.S.... N° 1921 M1

L'annexe porte les mentions d'enregistrement suivantes :

Enregistré à YAOUNDE CPIC 1 (Actes Civils)
Le trente août deux mille cinq
Volume 09 Folio 02 Case et Bd 1307/2
Reçu : quatre mille francs
Quittance numéro : 1329623 du 30 août 2005
Le Chef de Centre Provincial
Le Chef de Centre Prinvincial I et P.O
(é) Justin KAMMI
Inspecteur des Impôts


Pour expédition certifiée conforme à la Minute dûment collationnée et délivrée sur deux pages, sans renvoi en marge ni mot rayé nul par Maître Béatrice Rufine ASSENA, Notaire soussigné.



Yaoundé, le 13 Septembre 2007

Me Béatrice Rufine ASSENA

**TRANSLATION OF  EXHIBIT EN-4**

**TO DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**DEED**

# AUTHENTIC COPY

**REGISTRQTION No.: 5112**                                      **TAX No.: 5215**

**DATE: 04 August 2005**

...............................................

**Sale by SANDJI NDONGO François to Sté "THE FALLS" of a plot located at YAOUNDE-BASTOS, to be parcelled out from land title No. 1504 of Mfoundi**

...............................................

**Chambers of Maître Béatrice Rufine ASSENA
Notary**

**P.O. Box 6184 YAOUNDE
Telephone: 222 44 76
Fax: 223 17 96
Email: assena@iccnet.cm, etude_assena@yahoo.fr
Republic of CAMEROON**

DIRECTORY No. 5112
OF 04.08.2005

BEFORE the undersigned Maître Béatrice Rufine ASSENA, Notary in YAOUNDE (Republic of Cameroon), residing in the same town, P.O. Box 6184.

## APPEARING

1/- **Mr SANDJI NDONGO François,** pharmacist residing in YAOUNDE P.O. Box 276, born on the nineteenth day of December nineteen-thirty at NYAMANGA II, son of NDONGO Paul and of the late AMBATINDA Elisa, Cameroonian, holder of national identity card No. 102601515 issued on the second day of April two thousand and two at YAOUNDE.

Hereinafter referred to as "THE SELLER"

And

2/- **THE FALLS Plc**, public limited company with a general manager and a capital of twenty-five million (25 000 000) CFA Francs with headquarters in Down Town YAOUNDE, P.O. Box 30870 registered at the YAOUNDE Commercial and Property Registry under No. 2003.B.330 of 30 July 2003.

Represented herein by Mr KOH KOH, residing in YAOUNDE P.O. Box 30870, son of the late KOSOH NDZONGO and of MEDOUA EBENE, born on the tenth of August nineteen fifty-four at LENOUK, Cameroonian, holder of national identity card No. 101313309 issued on the third of November two thousand at YAOUNDE.

By virtue of the special powers conferred on him by Mr ATEBA MINKOULOU Gabriel, General Manager of, Sté THE FALLS, following Deed No. 4300 received on 24 July 2003 by Maître MENYE ONDO Pierre François Xavier, Notary at YAOUNDE, registered at YAOUNDE CDI 7 (civil acts) 28 July 2003 volume 4 folio 35 note 304 on payment of a fee of ten thousand (10 000) CFA Francs receipt No. 825399 of 25 July 2003.

Hereinafter referred to as "THE BUYER"

Who requisitioned the undersigned Notary, Maître Béatrice Rufine ASSENA, draws this conveyance deed between them:

## PROPERTY SALE

Mr SANDJI NDONGO François has hereby sold to Sté :THE FALLS" giving every ordinary de facto and de jure guarantee, the property described herebelow as accepted by the company's representative:

DESCRIPTION

A parcel of developed urban land measuring nine hundred and twenty square metres (920 m2), situated in YAOUNDE I, in the BASTOS parcelled out from Land Title No. 1504 of Mfoundi volume 8 folio 51;

It is bounded on the North by an unnamed road; on the South by Land Title No. 1296; on the East by the remaining part of Land Title No. 1504, on the West by land owned by Mr ESSOMBA Sébastien.

As the said property is and stands, including the Landlord's fixtures with all attendant rights, without any exception or reservation.

### Origin

The plot referred to in Land Title No. 1504 of Mfoundi belongs exclusively to Mr SANDJI NDONGO François who acquired it against payment from the MVOG NKILI MBASSI ZOBO family, following the Deed received on 04 May 1962 by Barrister Philippe MVOGO MBOCK, Notary at Yaounde, and duly registered, as seen from the analytical notes of the said Land Title.

### Ownership

By simply taking actual possession of the property, the BUYER, THE FALLS, shall as from this day have complete ownership of the plot sold.

### Expenses and conditions

This sale is legitimately and effectively subject to the ordinary expenses and conditions, particularly:

- The BUYER shall take the property now sold in the state in which he finds it today, without any claim against the SELLER because of common ownership of party wall, redge, ditch etc or failure to align, deteriorated building, floor or basement, or defects even hidden, or, finally, an error in description or in its size, with any difference between the given and the real size being to the profit or the loss of the BUYER.

- The BUYER shall bear any easements or charges, be they passive, apparent or hidden, continued or discontinued, which may weigh down on the plot sold, except he refrains from using them but may at his own risk enjoy the benefits of the active ones, if there exist any. Without lodging any claim against the SELLER and without this clause giving whosoever more rights than he/she would have by virtue of any regular titles not prescribed or the law.

- The SELLER hereby declares that the property now being sold is, to the best of his knowledge, not saddled with any mortgage other than those that may be mentioned herein, or stem from previous land titles, or from the present location of the property, and that personally he has not set up any other easements involving the property.

- The BUYER shall as from this day, ensure that the SELLER should never be bothered or distained upon for this deed or for the cancellation of subscription or contract that may have been signed by the SELLER or previous owners, particularly the water, gas and power supply authority, and he shall pay the dues thereof.

- The BUYER shall pay all taxes that will be levied on the property now sold.

- The BUYER shall, as from this day, ensure that the SELLER is never bothered or distrained upon because of any eventual leases or rents on the property sold, and this, of course, only if this were not to result from this Deed that the property as it is sold is rent- or unoccupied.

- Finally, the BUYER shall bear all the charges and fees consequent upon this Deed and any other document relating thereto, or resulting there from, including the cost of any copies thereof to be delivered to the SELLER, as well as renewal costs, and as the case may be the costs of any registration of the seller's or moneylender's privileges under the terms of this Deed, and any expenses resulting from the lifting, claiming or obtention of any mortgage documents, formally or informally, or any other account, as well as any application and obtention of town planning, road building or other certificates, particularly those appended hereto.

## PRICE

Furthermore, this sale is authorized and accepted for a main cash price of eighty million (80,000,000) frs CFA cash, not in the presence of the undersigned Notary, by Sté "THE FALLS" to Mr SANDJI NDONGO François who has acknowledged it and issued a valid receipt to that effect to the BUYER.

## Declarations

Mr SANDJI NDONGO François hereby declares:

- he expressly confirms the statements made herein about his civil status and capacity;

- personally, he knows there is no legal or contractual obstacle or restriction on the free disposal of the property now sold;

- he is presently not, and has never been bankrupt, nor gone into liquidation, nor been ruled by the court to be insolvent;

- the property being sold has never been object of any distraint, and he, personally is not being prosecuted for any matter likely to result in its being distrained upon;

- he has received no expropriation notification for the property now being sold and the property is not located in a priority town planning zone, neither is it located in any other development area;

- the property sold is not to this day, burdened with any registered or other preferential right.

## Publicity

A copy of this Deed shall be by the undersigned Notary at the Registry of Deeds for the Centre Province in YAOUNDE. Should it be subsequently discovered that the property sold is saddled with a mortgage, the SELLER shall, as he has undertaken be forced to bear the costs replevin within the month he is notified of the said at the residence herein elected subscriptions.

## Granting of Titles

By mutual agreement the BUYER shall subrogate the SELLER in all rights and will be delivered, at his expense, only title deed or other documents relating to the property sold.

## Reading of the Law – Confirmation of Validity

The undersigned notary, Maître Béatrice Rufine ASSENA, Sections 295 and 371 for the General Tax Code and the sanctions provided for by the Penal Code.

Each party confirmed, under penalty of legal sanctions, that this deed clearly spells out the whole agreed price.

And the undersigned Notary confirmed that to the best of her knowledge, this Deed has not been modified by any counter letter containing an increase in the price as fixed above.

## Residence

For the execution of this Deed, the parties elect domicile in, their headquarters as written hereabove.

Deed in five pages
Done in YAOUNDE
At the Chambers of Maître Béatrice R. ASSENA
In the year two thousand and five
And on the fourth day of the month of August

And after thoroughly reading through, the parties signed the Deed with Barrister Béatrice R. ASSENA, Notary.-

*SANDJI Ndongo François*                                    *KOH KOH*

Then Messrs SANDJI NDONGO François, KOH KOH and Barrister Béatrice Rufine ASSENA, Notary appended their signatures.

The Deed mentions the following as regards the registration:

Registered at YAOUNDE CPIC 1 (Civil Acts)
On the thirtieth day of August two thousand and five
Volume 9 Folio 2 Case and Bd 1307/1
Received: twelve million
Receipt no. 1329623 of 30 August 2003
The Head of the Provincial Centre
For the Senior Head of Centre Number I
Justin KAMMI

Certified true copy of the deed duly collated and written out on six pages, without marginal alterations or words crossed out considered null by the undersigned Notary, Maître Béatrice Rufine ASSENA, undersigned Notary.-

Yaounde, 24 March 2006

Maître Béatrice Rufine ASSENA

The Appendix mentions the following registrations:

Registered at YAOUNDE CPIC 1 (Civil Acts)
On the thirtieth of August two thousand and five
Volume 9 Folio 2 Case and Bd 1307/2
Received: four thousand francs
Receipt no. 1329623 of 30 August 2003
The Head of the Provincial Centre
For the Senior Head of Centre Number I
Justin KAMMI

Certified true copy of the deed duly collated and written out on six pages, without marginal, alterations or words crossed out considered null by the undersigned Notary, Béatrice Rufine ASSENA, undersigned Notary.-

Yaounde, 24 March 2006

Barrister Béatrice Rufine ASSENA

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

     Ndifon Robert
     B.A. (Hons) University of Yaounde
     M.A. (Translation) University of Montreal (Canada)

**DECLARATION OF HENRI MEKONGO MBALA**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MBI Group, Inc., *et al.,*                          :
                                                    :
    *Plaintiffs,*                :
                                                    :
    v.                           :      1:07-cv-00637-JDB
                                                    :
Crédit Foncier du Cameroun                          :
                                                    :
    and                          :
                                                    :
The Government of the Republic of Cameroon,         :
                                                    :
    *Defendants.*                :

---

## <u>DECLARATION DE HENRI MEKONGO MBALA</u>

HENRI MEKONGO MBALA conformément a l'article 28 U.S.C. § 1746:

1.      Je suis Inspecteur Général de Crédit Foncier du Cameroun ("CFC"), le Défendeur a cette cause.   En tant qu'Inspecteur General, je supervise les services juridiques du CFC. Je suis aussi le conseiller juridique du Directeur Général et du Conseil d'Administration. Mes responsabilités et mes fonctions comprennent la représentation du CFC devant les Cours et Tribunaux a l'intérieur ou a l'extérieur du pays. Je m'occupe aussi  de toutes autres activités qui peuvent m'être déléguées. J'assure les fonctions d'inspecteur Général depuis le 19 janvier 2000.

Dans le cadre de mes attributions, je suis familier des lois, décrets et règlements qui régissent le CFC et ses opérations.

2.      J'ai lu l'assignation en date du 4 avril 2007 des Groupe MBI Inc ('MBI') et Atlantic Group SCI (tous les deux demandeurs dans cette procédure), leurs prétentions et j'ai pris connaissance des pièces jointes a l'assignation.

Crédit Foncier du Cameroun.

3.      Le CFC est une entreprise régie par les lois de la République du Cameroun. Un exemplaire des Statuts est joint a cette déclaration. (Pièce HMM 1). Le CFC est propriété  a 75 %  de L'Etat du Cameroun, 20% de  la Caisse Nationale de Prévoyance Sociale et 5% de la Caisse D'Epargne Postale.  (Pièce HMM-1, Article 7).

La Caisse Nationale de Prévoyance Sociale et la Caisse d'Epargne Postale appartiennent en totalité a l'Etat du Cameroun.

4.      L'organe dirigeant du Crédit Foncier du Cameroun est le Conseil D'Administration. Il comprend 12 Administrateurs, dont 8 sont nommes par l'Etat, 2 par la Caisse Nationale de Prévoyance Sociale et 1 par la Caisse Epargne. Le dernier membre est le représentant du personnel, lequel est désigné par voix de vote (Pièce HMM-1 Articles 31.1 et 31.2).

5.      Le CFC est un établissement financier a caractère bancaire dont la principale mission est de promouvoir la construction et l'accès a la propriété de logements sociaux par octroi de prêts.

La ressource principale est un impôt prélevé sur tous les salaires de plus de 50.000 FCFA (1 % au titre de la contribution salariale et 0'25% au titre de la contribution patronale).

6.     Le Conseil d'Administration élit son Président.  (Pièce HMM-1 Article 32). M. Booto a Ngon était Président du Conseil jusqu'au 13 Septembre 2005, date a la quelle il a été remplace par M. Jules Doret Ndongo.

Il  convient de relever que M. Ndongo est le Secrétaire Général des Services du Premier Ministre.  Mais en temps que tel il n'a pas de responsabilité particulière  au CFC.

7.     Le CFC est une personne morale distincte de l'Etat du Cameroun. Son Conseil d'Administration, bien que compose de membres désignés en partie par l'Etat et ses démembrements, dirige l'entreprise comme une entité a part en vue de réaliser les missions définies par les statuts.   Le Ministre des Finances assure la supervision technique et financière (Pièce HMM 1 Article 6), mais ni le Ministre ni un autre membre du Gouvernement du Cameroun, n'intervient de manière directe dans la conduite des opérations du CFC.

8.     le Directeur Général du CFC est nommé par le Conseil d'Administration dont il n'est cependant pas membre.  Il est chargé de mettre en application la politique générale de l'entreprise sous la supervision du Conseil d'Administration auquel il rend compte. (Pièce HMM-1  Article 40)

De janvier 1999 au 13 septembre 2005 M. Joseph Edou était Directeur Général. Il a été remplacé par M. Camille Ekindi, actuel Directeur Général,

9.     Le CFC n'a pas reçu l'autorisation d'entreprendre des affaires aux Etats Unis ou dans un quelconque Etat, des Etats Unis. Le CFC n'a ni bureau ni salariés, ni

propriété aux Etats Unis. Le CFC n'a jamais mené d'activité commerciale aux Etats Unis. Le CFC n,a jamais saisi une juridiction Américaine dans le cadre d'un procès.

10.    Selon les statuts de CFC, le pouvoir d'approuver des conventions ayant une incidence sur le budget appartient au Conseils d'Administrations. (Piece HMM-1 Article 33.1.h).  Ceci veut dire que toute dépense ou engagement doit être approuvé par le Conseil d'Administration.

11.    Le Conseil d'Administration a délégué au Directeur General, Joseph Edou, le pouvoir d'accorder des prêts dont le montant n'excède pas 10.000.000 FCFA, (environ 20.000 Dollars).

Des exemples de prêts accordés par M. Joseph Edou dans la limite des pouvoirs a lui délégués sont joints a la présente. (Pièce HMM-2).  De la même manière, le Conseil d'Administration a délégué au Comite de Direction le pouvoir d'accorder des prêts d'un montant supérieur a 10.000.000 de FCFA mais inferieur a 200.000.000 FCFA.  Des exemples de prêts accordés pas le Conseil de Direction dans la limite de ses pouvoirs sont joints a la présente. (Pièce HMM-3).

12.    Tout prêt d'un montant supérieur a 200,000,000 CFA Francs demande l'approbation spécifique du Conseil d'Administration. Des exemples des prêts accordé par le Conseil d'Administration sont joints a la présente. (Pièce HMM-4).  Voici deux exemples des prêts proposé par Joseph Edou agissant en qualité de Directeur Général pour des montants de US$860,000 et US$668,000 respectivement, montants de loin inferieurs a $49millions, mais qui ont quand même nécessité l'approbation du Conseil d'Administration.

13.    Le Conseil n'a donné aucune délégation a Joseph Edou d'engager le CFC dans un quelconque projet engageant le CFC pour plus de 10.000.000 FCFC (environ $20,000) et encore moins pour un montant aussi important que US$49 millions.

14.    Joseph Edou n'avait pas le pouvoir de signer le "Memorandum of Agreement" du 18, mai 2004, joint comme Pièce A de l'assignation du 4, avril 2007. Joseph Edou n'avais aucun pouvoir d'exécuter un tel contrat au nom du CFC.    M, Joseph Edou n'avait pas non plus le pouvoir d'exécuter le contrat tel que celui présenté a la pièce B et C de l'assignation.

15.    Ni le prétendu "Memorandum of Agreement" (Pièces A, B, et C jointes dans l'assignation), ni  aucun des autres supposés contrats relatifs au projet impliquant MBI Group, Inc. ("MBI"), ou Atlantic Group SCI ("Atlantic Group") n'ont été  soumis a l'approbation  du Conseil D'administration.

16.    Tout projet tel que Olembé II, doit  fait l'objet d'un appel d'offres. La loi portant réglementation des Marchés Publics est présentée dans le paragraphe 19, de la déclaration de Pr. Ephraim Ngwafor. Aucun appel d'offres n'a été faire avant le 18 Mai 2004. Naturellement aucun appel d'offres n'a été fait a un quelconque moment en relation avec le projet Olembe II ou tout autre projet impliquant les Sociétés MBI et Atlantic Group.

17.    Le Conseil d'Administrations du CFC n'a pas autorisé  Joseph Edou, relativement a son voyage de mai 2004 a Washington, D.C., a contracté ou a négocier un quelconque contrat avec qui que se soit y compris MBI ou Atlantic Group.

18.     Le 4, aout 2005, Atlantic Group a payé  80,000,000 FCFA (environ US$160,000) comme prix d'achat et 15,954,855 CFCF (environ US$31,910) comme frais annexes pour l'acquisition d'un immeuble résidentiel pour la Société '' The Falls'' dont le seul actionnaire était le beau-frère de Joseph Edou ainsi que l'atteste la déclaration de Beatrice Rufine Assena (Notaire). La preuve de la vente est jointe (Pièce EN-4), de la déclaration de Pr. Ephraim Ngwafor . L'immeuble acheté n'a aucun rapport d'aucune sorte avec le projet Olembe II.

19.     Ateba Minkoulou Gabriel est le mari de la sœur ainée de Joseph Edou, Ateba Minkoulou Gabriel est donc le beau frère de Joseph Edou.  Je le sais parce que j'ai été un collaborateur de Joseph Edou, pendant plus de 5 ans.

Je sais aussi que la nièce de Joseph Edou c'est a dire la fille de Ateba Minkoulou Gabriel, Akaba Ateba Leonie, était employée a la représentation du CFC a Paris, France, et mes fonctions d'Inspecteur Général m'ont permis de la rencontrer assez souvent. La relation de famille  entre Joseph Edou et Akaba Ateba Leonie, la fille de Ateba Minkoulou Gabriel, était bien connue parmi les collaborateurs de Joseph Edou au CFC.

Je déclare sous peine de poursuites selon les lois en vigueur aux Etats Unis d'Amérique que les déclarations ci-dessus sont vraies.

Fait le 14  septembre 2007

Henri Mekongo Mbala

- 6 -

**PIECES JOINTES**

| | |
|---|---|
| **HMM-1** | **Statuts du CFC** |
| **HMM-2** | **Exemples de prêts accordes pas le Directeur General** |
| **HMM-3** | **Exemples des prêts accordés par le Comite de Direction** |
| **HMM-4** | **Exemples des prêts accordés par le Conseil d'Administration et résolutions dudit conseil en sa session extraordinaire du 12 juin 2004** |

**TRANSLATION OF**
**DECLARATION OF HENRI MEKONGO MBALA**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| MBI Group, Inc., *et al.,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| Defendants. | : | |

---

## DECLARATION OF HENRI MEKONGO MBALA

HENRI MEKONGO MBALA declares pursuant to 28 U.S.C. § 1746:

1.     I am Inspector General of Crédit Foncier du Cameroun ("CFC"), a Defendant in this lawsuit.  As Inspector General, I am head and supervisor of the legal service of CFC, and legal advisor to the General Manager and to the Board of Directors.  My authorities and duties include representing CFC before the courts in and out of Cameroon, and also performing such activities as the General Manager or the Board of Directors may delegate to me.  I have held the position of Inspector General since December 19, 2000.

In connection with my duties as Inspector General, I am familiar with the laws, decrees, Articles, internal regulations and other measures that govern CFC and its operations.

2.    I have read the Complaint filed April 4, 2007, by MBI Group, Inc. ("MBI"), and Atlantic Group, SCI ("Atlantic Group") (jointly "Plaintiffs") in this proceeding, the allegations made therein, and the exhibits attached to the Complaint.

Crédit Foncier du Cameroun.

3.    CFC is a corporation organized under the laws of the Republic of Cameroon.  A copy of the Articles of CFC (i.e., its corporate charter) is attached to this Declaration as Exhibit HMM-1.  CFC is owned 75% directly by the Republic of Cameroon, 20% by the Social Insurance Board of Cameroon and 5% by the Post Office Savings Bank of Cameroon.  Ex. HMM-1 (CFC Articles, Section 7).

Both the Social Insurance Board and the Post Office Savings Bank are wholly owned by the Republic of Cameroon.

4.    The governing body of CFC is its Board of Directors.  Ex. HMM-1 (CFC Articles, Sections 31.1 and 33.1).  The Board consists of 12 Directors of whom 8 are appointed by the State of Cameroon, 2 by the Social Insurance Board and 1 by the Post Office Savings Bank.  The remaining member of the Board is a person from the Staff of CFC who is chosen by the Staff by way of election.  Ex. HMM-1 (CFC Articles, Sections 31.1 and 31.2).

- 2 -

5.    CFC is a Financial Institution functioning like a bank whose principal purpose is to facilitate the development and ownership of affordable housing in Cameroon by the granting of loans.

One major source of funding for CFC is a tax of 1% on all employees' salaries in Cameroon in excess of 50,000 CFA Francs per month* and 0.25% on total payroll for employers.  The proceeds from this tax are intended to be used to encourage and facilitate the ownership of residences by citizens of Cameroon.

6.    The Chairman of the Board of CFC is elected by the Board.  Ex. HMM-1 (CFC Articles, Section 32).  The Chairman during the period relevant to Plaintiffs' Complaint in this proceeding up until September 13, 2005 was Booto a Ngon.  On September 13, 2005, Jules Doret Ndongo replaced Booto a Ngon as Board member and as Chairman of the Board and has continued as Chairman to the present.  Mr. Ndongo was appointed to the Board by the Government of Cameroon.

Mr. Ndongo is also Secretary General to the Prime Minister of Cameroon. However, the two offices are separate and distinct.

7.    CFC is a corporate entity separate from the Government of Cameroon.  Its Board of Directors, although appointed for the most part by the Government or Government-owned bodies, directs the activities of CFC as a separate entity to accomplish the purposes stated in CFC's Articles.  The Ministry of Finance provides

_____

*    Since 1999, the Cameroon currency has been pegged to the Euro at the rate of 655.96 CFA Francs to €1.  At current exchange rates, US$1 is equivalent to approximately 500 CFA Francs.

technical and financial supervision (see Section 6 of CFC's Articles), but neither the Ministry nor any other part of the Government of Cameroon directs the manner in which CFC operates or in which it pursues the objectives stated in its Articles.

8.     The General Manager ("Directeur Général") of CFC is appointed by the Board of Directors, but is not a member of the Board.  The General Manager is in charge of managing and implementing the company's general policy under the supervision of the Board of Directors, to which he is answerable.  Ex. HMM-1 (CFC Articles, Section 40).

The General Manager of CFC from January 1999 until September 13, 2005, was Joseph Edou.  On September 13, 2005, Camille Ekindi replaced Mr. Edou as General Manager, and Mr. Ekindi has continued as General Manager of CFC to the present.

9.     CFC is not authorized to conduct business in the United States or in any State or other jurisdiction within the United States.  CFC has no office, employee or property in the United States.  CFC has never carried on a commercial activity in the United States.  CFC has never brought a legal action in any court in the United States.

10.     Under CFC's Articles, the authority to approve any agreement of CFC that affects its budget is vested in CFC's Board of Directors.  Ex HMM-1 (CFC Articles, Section 33.1.h).  This means that any expenditure, or commitment for an expenditure, by CFC must be approved by its Board.

- 4 -

11.    The Board of Directors delegated to the General Manager, Joseph Edou, the authority to commit to loans by CFC up to but not exceeding 10,000,000 CFA Francs (equivalent to approximately US$20,000).

Examples of loans made by Joseph Edou within the limits of his authority are attached hereto as Exhibit HMM-2.   Similarly, the Board delegated to CFC's Management Committee, which consists of six CFC officials, the authority to approve loans exceeding 10,000,000 CFA Francs but not exceeding 200,000,000 CFA Francs (equivalent to approximately US$400,000).   Examples of loans approved by the Management Committee within the limits of its authority are attached hereto as Exhibit HMM-3.

12.    Any loan by CFC in excess of 200,000,000 CFA Francs required the specific approval of the Board of Directors. Attached hereto as Exhibit HMM-4 are examples of approvals by CFC's Board of Directors.  These are two loan proposals recommended by Joseph Edou as CFC General Manager which involved amounts (equivalent to approximately US$860,000 and US$668,000 respectively) that were very substantially less than US$49million, but which required the approval of CFC's Board.

13.    There was no delegation by the Board to Joseph Edou to commit CFC to any project requiring a CFC expenditure in excess of 10,000,000 CFA Francs (approximately $20,000) and certainly not to commit CFC for an amount as large as US$49 million.

14.    Joseph Edou did not have the authority to enter into the purported "Memorandum of Agreement" dated May 18, 2004, that is attached as Exhibit A to

- 5 -

Plaintiffs' April 4, 2007 Complaint in this proceeding.  Joseph Edou had no power to execute such a purported contract on behalf of CFC.  Also, Joseph Edou did not have the authority to execute a purported contract such as Exhibit B or Exhibit C attached to Plaintiffs' April 4, 2007 Complaint in this proceeding.

15.    None of the purported "Memorandums of Agreements" that are Exhibits A, B, and C to Plaintiff's Complaint nor any of the other purported contracts relating to any of the projects in which MBI Group, Inc. ("MBI"), or Atlantic Group SCI ("Atlantic Group") was involved was submitted to CFC's Board of Directors for approval.

16.    Any project of CFC such as the alleged Olembé II project must be put out for public bids before CFC is authorized to enter into a binding contract to carry out the project.  The law requiring such a public tender is described in Paragraph 19 of the Declaration of Professor Ephrain Ngwafor.   No public tender was made for the purported Olembé II project prior to May 18, 2004.  Indeed, no public tender was made at any time with respect to the purported Olembé II project or with respect to any other alleged project in which either MBI or Atlantic Group was involved.

17.    CFC's Board of Directors did not authorize Joseph Edou in connection with his May 2004 trip to Washington, D.C., to enter into any contract with, or to negotiate any contract with, any party, including MBI or Atlantic Group.

18.    On August 4, 2005, Atlantic Group paid 80,000,000 FCFA (approximately US$160,000) as the purchase price and 15,954,855 CFCF (approximately US$31,910) in transaction expenses to purchase a residential property for The Falls, whose sole stockholder was Joseph Edou's brother-in-law, as described in the Declaration of

- 6 -

Béatrice R. Assena.  The deed to this property is attached as Exhibit EN-4 to the Declaration of Professor Ephrain Ngwafor.  The property so purchased is not in any way related to the purported Olembé II project.

19.    Ateba Minkoulou Gabriel is married to the elder sister of Joseph Edou, so that Ateba Minkoulou Gabriel is the brother-in-law of Joseph Edou.  I know of this relationship because I was a colleague of Joseph Edou at CFC for almost five years.

Also, Joseph Edou's niece, Akaba Ateba Leónie, i.e., the daughter of Ateba Minkoulou Gabriel, was also an employee of CFC, in the office in Paris, France, and my duties as Inspector General brought me in frequent contact with her.  The family relationship between Joseph Edou and Akaba Ateba Leónie, the daughter of Ateba Minkoulou Gabriel, was well known among Joseph Edou's colleagues at CFC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 25, 2007.

Henri Mekongo Mbala

- 7 -

<u>Exhibits:</u>

Exhibit HMM-1      Copy of the Articles ("Statuts") of Crédit Foncier du Cameroun, and
                   translation.

Exhibit HMM-2      Examples of loans approved by Joseph Edou within the scope of
                   his authority (up to 10,000,000 CFA Francs).

Exhibit HMM-3      Examples of loans approved by the CFC Credit Committee within
                   the scope of its authority (up to 200,000,000 CFA Francs).

Exhibit HMM-4      Examples of loans approved by the Board of Directors (in excess of
                   200,000,000 CFA Francs), a copy of the Crédit Foncier du
                   Cameroun Board of Directors Resolution No. 2 in Special Session
                   of June 14, 2005, showing approval of two loans recommended by
                   Joseph Edou.

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

      Ndifon Robert
      B.A. (Hons) University of Yaounde
      M.A. (Translation) University of Montreal (Canada)

Ndifon Robert Ikainyui
B.A. (Yaounde); M.A.(Montréal)
Senior Translator
NATIONAL ASSEMBLY OF CAMEROON

**EXHIBIT HMM-1**

**TO DECLARATION OF HENRI MEKONGO MBALA**

**ARTICLES OF CFC**

# CREDIT FONCIER DU CAMEROUN
## S T A T U T S

## TITRE PREMIER : FORME - DENOMINATION - OBJET - RESSOURCES SIEGE - DUREE - TUTELLE

### Article 1 - FORME - DENOMINATION

Le **CREDIT FONCIER DU CAMEROUN**, en abrégé CFC, établissement public à caractère commercial créé par le décret n° 77/140 du 13 mai 1977 modifié et complété par le décret n° 81/236 du 17 juin 1981 est, pour compter de la date 31 août 2001, transformé sous la même dénomination, en société à capital public, suivant la résolution N° AGE/01/2001 de l'Assemblée Générale Extraordinaire des Associés tenue à Douala le 31 août 2001.

Le Crédit Foncier du Cameroun est régi par les lois, règlements et usage applicables aux sociétés anonymes ; par la réglementation bancaire en vigueur en Afrique Centrale ainsi que par les présents statuts, sous réserve des dispositions de la loi N° 99/016 du 22 décembre 1999 portant statut général des établissements publics et des entreprises du secteur public et parapublic.

Les actes et documents émanant de la société et destinés aux tiers, notamment les lettres, factures, annonces et publications diverses, doivent indiquer la dénomination sociale précédée ou suivie immédiatement et lisiblement des mots "société à capital public" ou des initiales "SCP" avec Conseil d'Administration et de l'énonciation du montant du capital social ainsi que le lieu et le numéro d'immatriculation au registre de commerce et du crédit mobilier.

### Article 2 - OBJET SOCIAL

Le Crédit Foncier du Cameroun a pour objet social d'apporter son concours financier et son expertise à la réalisation de tout projet destiné à promouvoir l'habitat et l'immobilier en général.

A ce titre, il est notamment habilité à :

- financer les travaux d'équipement des terrains destinés à la construction des logements économiques ;

- financer l'aménagement et la construction des équipements communaux et régionaux générateurs de recettes ;

- rechercher et mettre en place les financements destinés aux

tourisme, ainsi qu'aux structures scolaires pour ce qui concerne en particulier le segment immobilier de l'hôtellerie et de l'enseignement ;

- financer tout projet social jugé rentable pour le CFC, après avis conforme du Conseil d'Administration ;

- collecter, recevoir en vue de faciliter l'accès à la propriété immobilière, l'épargne des personnes physiques ou morales. A cet effet, le Crédit Foncier du Cameroun peut consentir des prêts à moyen et à long termes par engagements, avals ou escomptes ;

- accomplir toutes opérations bancaires, financières, commerciales, mobilières et immobilières se rattachant directement ou indirectement à l'objet ci-dessus.

## Article 3 -  LES RESSOURCES

Les ressources du Crédit Foncier du Cameroun sont constituées :
- de son capital social ;
- de la contribution au Crédit Foncier du Cameroun et de toutes autres recettes fiscales affectées ;
- des dotations, dons et legs ;
- des dépôts des épargnants ou des organismes publics ou privés ;
- des emprunts ;
- du produit de ses activités et services.

## Article 4 - SIEGE SOCIAL

Le Siège Social est fixé à YAOUNDE, République du Cameroun, boîte postale numéro 1531, au numéro 484 Boulevard du 20 mai 1972.

Il peut être transféré en tout autre lieu  par décision de l'Assemblée Générale Extraordinaire des actionnaires.

Le Conseil d'Administration peut créer en tant que de besoin sur l'ensemble du territoire national des succursales, agences et bureaux de la Société et des représentations à l'extérieur du territoire, sans qu'il puisse en résulter une dérogation aux règles de compétence édictées par les présents statuts.

## Article 5 - DUREE

La durée de la Société est fixée à quatre vingt dix neuf (99) années à compter du 10 mars 1978, date de son immatriculation au Registre de Commerce et du Crédit Mobilier sous le numéro 231, sauf cas de dissolution anticipée ou de prorogation prévus aux présents statuts.

**Article 6 - TUTELLE**

Le Ministère chargé des Finances exerce la Tutelle technique et financière de la Société.

## TITRE DEUXIEME     : CAPITAL SOCIAL - ACTIONS

### Article 7 - CAPITAL SOCIAL - ACTIONS

1) Le capital social est de six milliards (6 000 000 000) de francs CFA répartis de la manière suivante :

| | |
|---|---|
| Etat Camerounais | 75 % |
| Caisse Nationale de Prévoyance Sociale | 20 % |
| Caisse d'Epargne Postale | 5 % |

2) Ce capital social est divisé en soixante mille (60 000) actions de cent mille (100 000) francs CFA de valeur nominale chacune numérotées de 1 à 60 000 inclus.

3) Les actions sont exclusivement nominatives.

4) Toutes les actions sont entièrement libérées.

5) Les actions appartenant à l'Etat sont détenues en son nom par le Ministre chargé des Finances.

### Article 8- AUGMENTATION ET REDUCTION DU CAPITAL

- Le capital social peut être augmenté en une ou plusieurs fois, par la création d'actions nouvelles exclusivement en espèces, ou par la transformation des réserves en vertu d'une décision de l'Assemblée Générale Extraordinaire des Actionnaires.

- Cette Assemblée fixe les conditions de création et d'émission de nouvelles actions. Elle peut déléguer ses pouvoirs au Conseil d'Administration dans ce domaine y compris celui d'apporter aux statuts les modifications liées à l'augmentation du capital.

4

- L'Assemblée Générale Extraordinaire des Actionnaires peut, à l'occasion de l'augmentation de capital, créer des actions de priorité, jouissant de certains avantages sur les autres actions ou conférant des droits d'antériorité sur les bénéfices ou sur l'actif social ou sur les deux.

- Les propriétaires des actions existantes, libérés des versements exigibles, ont droit de préférence à la souscription des actions nouvelles. Toutefois, l'Assemblée Générale des Actionnaires peut écarter l'exercice de ce droit de préférence en se conformant aux dispositions légales à ce sujet.

- Le droit de préférence à la souscription des actions nouvelles est négociable dans les mêmes conditions que l'action elle-même.

- L'Assemblée Générale Extraordinaire des Actionnaires peut décider que l'augmentation du capital social aura lieu par émission d'actions avec prime, et dans ce cas, elle fixe librement le montant de la prime et ses attributions ou son affectation.

- De même, elle peut décider de la réduction du capital social pour quelque cause et de quelque manière que ce soit, notamment au moyen d'un remboursement aux actionnaires, d'un rachat d'actions de la société, d'une réduction de leur valeur nominale, d'un échange d'anciens titres d'actions contre de nouveaux titres d'un nombre équivalent ou moindre, ayant ou non le même montant nominal et les mêmes numéros et, s'il y a lieu, avec obligations de cession ou d'achat d'actions anciennes pour permettre l'échange ou encore avec paiement d'une soulte.

## Article 9 - LIBERATION DU CAPITAL

- Les actions à souscrire exclusivement en numéraire doivent être libérées des trois quarts au moins de leur montant nominal lors de la souscription et, le cas échéant, de la totalité de la prime d'émission.

- La libération du surplus a lieu en une fois sur appel du Conseil d'Administration, aux périodes par lui fixées. Dans tous les cas, elle doit être achevée dans un délai maximum de trois ans à compter du jour de la création juridique des actions.

- Le Conseil d'Administration peut en toute période autoriser les actionnaires à libérer par anticipation leurs actions aux conditions qu'il juge convenables.

- Les appels de fonds sont portés à la connaissance des souscripteurs quinze jours au moins avant la date fixée pour chaque versement, par un avis inséré dans un journal d'annonces légales du lieu du siège social ou par une lettre recommandée à eux envoyée par le Conseil d'Administration, à l'adresse qu'ils auront indiquée lors de la souscription des actions.

- Les actions souscrites en augmentation du capital peuvent être libérées par voie de compensation avec une créance certaine, liquide et exigible sur la société.

## Article 10 - DEFAUT DE LIBERATION

- Tout versement en retard sur le montant des actions porte intérêt de plein droit en faveur de la société au taux de dix (10) % l'an, à compter de l'expiration du mois qui suit le jour de l'exigibilité, sans qu'il soit besoin d'une demande en justice ou d'une mise en demeure.

- Si, dans le délai fixé lors de l'appel de fonds, certaines actions n'ont pas été libérées des sommes exigibles, le Conseil d'Administration, sur délégation de l'Assemblée Générale des Actionnaires peut, trente jours après une mise en demeure spéciale et individuelle notifiée au défaillant par acte extra-judiciaire, procéder à la vente desdites actions, sous réserve en cas de cession au secteur privé des dispositions de la législation applicable en matière de privatisation.

- A cet effet les numéros de ces actions sont publiés dans des journaux d'annonces légales du lieu du siège social. Quinze jours après cette publication, sans besoin d'aucune autorisation ni de l'observation d'aucun délai de distance, le Conseil d'Administration peut faire vendre les actions non libérées des versements exigibles.

- Cette vente a lieu, en bloc ou séparément, même plusieurs fois, au besoin sur duplicata, aux requêtes et diligences du Conseil d'Administration, par le ministère d'un Notaire, aux enchères, sur une mise à prix pouvant être indéfiniment baissée.

- La vente est faite aux risques et périls de l'actionnaire défaillant.

- Les titres des actions vendues deviennent nuls de plein droit et il est délivré aux acquéreurs de nouveaux titres, portant ou non les mêmes numéros d'actions et libérés des versements dont le défaut a motivé l'exécution.

- Le produit net de la vente s'impute sur ce qui est dû à la Société en principal et intérêts par l'actionnaire défaillant, lequel reste débiteur de la différence s'il y a déficit, ou profite de l'excédent s'il en existe.

- La Société peut également exercer toutes actions personnelles et de droit commun contre l'actionnaire et ses garants soit avant, soit après la vente des actions, soit en même temps que celle-ci.

- Toute action sur laquelle les versements exigibles n'ont pas été effectués cesse d'être négociable, aucun dividende ne lui est payé ; les actionnaires en défaut de paiement ne peuvent assister ni se faire représenter aux Assemblées Générales, ni exercer leur droit de préférence à la souscription d'actions

6

nouvelles en cas d'augmentation de capital ; enfin dans le cas où un actionnaire en défaut de paiement fait partie du Conseil d'Administration, il est considéré de plein droit comme démissionnaire trois jours francs après la mise en demeure spéciale qui lui est faite par le Conseil d'Administration, par acte extra-judiciaire.

## Article 11- RESPONSABILITE DES CESSIONNAIRES D'ACTIONS

- Les titulaires, les cessionnaires intermédiaires et les souscripteurs sont tenus solidairement du montant de l'action.

- Tout souscripteur ou actionnaire qui cède son titre cesse, deux ans après la cession, d'être responsable des versements non encore appelés.

## Article 12 - TRANSMISSION DES ACTIONS

Sous réserve des textes législatifs et réglementaires en matière de privatisation, la transmission des actions s'effectue ainsi qu'il suit :

1°)   La cession des actions nominatives, qui sont négociables ou de celles dont la création matérielle n'aurait pas encore eu lieu, ne peut s'opérer que par une déclaration de transfert signée du cédant ou de son mandataire, laquelle déclaration est mentionnée sur un registre de la Société. Toutefois, s'il s'agit d'actions non entièrement libérées, la signature du cessionnaire ou de son mandataire est nécessaire.

2°)   En tenant compte des exceptions résultant des dispositions légales en vigueur, le Conseil d'Administration peut exiger que la signature des parties soit certifiée par un Notaire, un Agent de change ou le Maire du domicile du requérant.

3°)   Les actions sur lesquelles les versements échus ont été effectués sont seules admises au transfert.

4°)   Les actions sont librement cessibles entre les actionnaires. Elles ne peuvent être cédées à des personnes étrangères à la société que dans les conditions prévues aux alinéas suivants.

5°)   En cas de cession projetée ou de mutation à une personne étrangère à la société, le cédant doit en faire la déclaration à la société par lettre recommandée en indiquant les dénomination, raison sociale, domaine d'activité, adresse et s'il y a lieu, l'immatriculation au Registre du Commerce du cessionnaire ainsi que le prix et les conditions de la cession ou de la mutation.

Cette notification, pour être valable, doit être accompagnée du certificat d'inscription des actions à muter, de toutes justifications et du bordereau du transfert.

**6°)** Dans le mois qui suit cette déclaration, le Conseil d'Administration statue à la majorité des deux tiers de ses membres présents ou représentés, sur l'acceptation ou le refus du cessionnaire proposé. Sa décision n'est pas motivée et ne peut donner lieu à aucune réclamation contre ses membres ni contre la Société. Il est donné connaissance au cédant par lettre recommandée avec accusé de réception dans la semaine suivant la décision.

**7°)** Dans le cas où le Conseil d'Administration a décidé de ne pas agréer le cessionnaire proposé, il dispose d'un délai de deux (2) mois à compter de la date de la lettre recommandée faisant connaître sa décision au cédant pour désigner à la majorité des deux tiers de ses membres présents ou représentés un ou plusieurs nouveaux cessionnaires, actionnaires ou non. Cette décision sera portée à la connaissance du cédant par lettre recommandée au plus tard huit jours après l'expiration des deux mois ci-dessus fixés. Le ou les cessionnaires ainsi désignés acquerront sans délai les actions.

Dans le cas où le Conseil d'Administration dans le délai sus-indiqué n'aurait désigné personne pour être substitué au cessionnaire proposé, celui-ci se trouvera agréé par le fait même.

**8°)** Le prix de cession, s'il ne peut être fixé d'un commun accord entre le cédant et le Conseil d'Administration, est déterminé par deux experts respectivement choisis par les intéressés.

Les deux experts ont la faculté de s'adjoindre un troisième expert avec lequel ils statueront à la majorité. En cas de refus par l'une des parties de désigner un expert, il sera procédé aux nominations nécessaires sur simple requête de la partie ou de l'expert le plus diligent par le Président du Tribunal du lieu du siège social.

**9°)** Les dispositions qui précèdent sont applicables à tous les cas de cessions qui auraient lieu à l'amiable ou par adjudication publique en vertu d'Ordonnance de Justice.

**10°)** Les actions dont l'existence des propriétaires au sein de la Société serait jugée préjudiciable à son fonctionnement pourront être rachetées.

Dans cette hypothèse, l'évaluation des actions mises en vente sera faite conformément aux clauses du paragraphe 8 du présent article.

8

## Article 13 - DROITS ET OBLIGATIONS ATTACHES AUX ACTIONS

- Chaque action de même catégorie donne droit, dans la propriété de l'actif social, à une vocation proportionnelle à la fraction du capital qu'elle représente.

- Elle donne droit en outre, à une part proportionnelle égale dans les bénéfices sociaux. A égalité de valeur nominale, toutes les actions de même catégorie sont entièrement assimilables entre elles, à la seule exception du point de départ de leur jouissance.

- Les droits et obligations attachés à l'action suivent le titre dans quelque main qu'il passe.

- La propriété d'une action emporte de plein droit adhésion aux statuts de la société et aux décisions de l'Assemblée Générale.

## Article 14 - PERTE D'UN TITRE

- En cas de perte d'un titre, le titulaire doit en faire notification par acte extrajudiciaire à la société, à son siège social, et le Conseil d'Administration la rend publique par un avis inséré dans les huit jours dans un des journaux d'annonces légales du lieu du siège social. Cette notification vaut opposition.

- Pendant six mois à compter de l'inscription, le titulaire ne peut demander le paiement d'aucun intérêt ni d'aucun dividende.

- Ces six mois expirés sans que le titre ait été retrouvé, il est délivré au réclamant un nouveau titre portant la mention « duplicata », dont il donne récépissé et qui annule l'ancien.

- Les intérêts et dividendes arriérés lui sont payés et mention est faite sur le nouveau titre.

- Le Conseil d'Administration peut, avant délivrance du nouveau titre et avant paiement des intérêts ou des dividendes arriérés, exiger une caution.

- La notification de perte à la société, l'insertion et tous autres frais sont à la charge du titulaire.

9

# TITRE TROISIEME : OBLIGATIONS

## Article 15 - EMISSION DES OBLIGATIONS

- La société peut contracter des emprunts par voie d'émission d'obligations, avec ou sans garantie ou nantissement sur les biens mobiliers dépendant de l'actif social. L'émission de ces obligations est décidée par le Conseil d'Administration. L'émission a lieu dans les conditions et selon les modalités prévues par la réglementation en vigueur.

# TITRE QUATRIEME : GESTION DE LA SOCIETE

## CHAPITRE 1 : DE L'ASSEMBLEE GENERALE DES ACTIONNAIRES

## Article 16 - COMPOSITION

L'Assemblée Générale est composée des représentants des actionnaires.

## Article 17 - ATTRIBUTIONS ET POUVOIRS DE L'ASSEMBLEE GENERALE ORDINAIRE

L'Assemblée Générale Ordinaire :

- reçoit le rapport du conseil d'administration sur la marche de la société et les opérations sociales et reçoit reddition des comptes de sa gestion ;

- approuve le rapport des commissaires aux comptes ;

- approuve les comptes annuels et les bilans et statue sur l'affectation des résultats et la répartition des bénéfices ;

- statue sur toute convention entre la société et ses administrateurs ou assimilés, approuve ou désapprouve ces conventions ;
- donne quitus aux administrateurs ;

- nomme et révoque les administrateurs et fixe le montant de leurs jetons de présence ou indemnités de session ainsi que l'allocation mensuelle du Président du Conseil d'Administration, conformément à la réglementation en vigueur ;

- nomme et révoque les commissaires aux comptes et fixe leur rémunération.

### Article 18 - ATTRIBUTIONS ET POUVOIRS DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE

-    L'Assemblée Générale Extraordinaire peut, sur proposition du Conseil d'Administration, modifier les statuts en toutes leurs dispositions ;

-    L'Assemblée Générale Extraordinaire peut notamment décider  de :

    . l'augmentation ou la réduction du capital social ;
    . la création ou l'attribution de parts bénéficiaires et de tous avantages particuliers ;
    . la prorogation ou la dissolution anticipée de la société et généralement toute modification dans la durée de celle-ci ;
    . la modification directe ou indirecte de l'objet social ;
    . le transfert du siège social ;
    . la modification de la dénomination sociale ;
    . la division ou le regroupement, la modification de la valeur nominale des actions ;
    . la modification de la forme des actions ou des conditions de leur cession ou transmission.

S'il existe des actions de plusieurs catégories, aucune cession ne peut être faite, ni porter atteinte aux droits des actions d'une de ces catégories, que par la double délibération conforme d'une Assemblée Générale Extraordinaire de tous les actionnaires de la ou des catégories intéressées, celle-ci convoquée et délibérant dans les mêmes conditions, transposées en son sein, que l'Assemblée Générale Extraordinaire plénière de tous les actionnaires.

### Article19 - CONVOCATION DE L'ASSEMBLEE GENERALE

L'Assemblée Générale est l'organe d'expression directe de la volonté collective des actionnaires de la société.

L'initiative de la convocation des assemblées générales appartient :

-    au Président du Conseil d'Administration

-    aux Commissaires aux Comptes en cas d'urgence,

-    aux liquidateurs, pendant la période suivant la dissolution de la société,

-    à l'autorité judiciaire, sur saisine d'actionnaires justifiant d'un intérêt légitime, de l'urgence et de la carence des autorités statutaires à qui appartient normalement la convocation.

## Article 20 - PERIODICITE DES REUNIONS DE L'ASSEMBLEE GENERALE

- L'Assemblée Générale Ordinaire se réunit au moins une fois par an dans les six mois suivant la clôture du précédent exercice pour statuer sur la gestion et les comptes de cet exercice.

- L'Assemblée Générale Extraordinaire se réunit toutes les fois qu'il apparaît utile pour l'intérêt de la société, sur convocation du Président du Conseil d'Administration ou à la demande du 1/5 des administrateurs. Tout actionnaire peut participer aux Assemblées Générales Extraordinaires sans qu'une limitation des voix puisse lui être opposée.

## Article 21 - MODE DE CONVOCATION DE L'ASSEMBLEE - LIEU DE REUNION

La fixation de l'ordre du jour et la préparation du projet des résolutions à soumettre à l'Assemblée Générale appartiennent à l'autorité convocatrice.

- Les convocations des assemblées générales ordinaires et extraordinaires se font par télex, télégramme ou télécopie ou par tous moyens laissant traces, confirmés par lettres recommandées adressées aux représentants des actionnaires au moins quinze (15) jours avant la date prévue pour la réunion. Les convocations indiquent l'ordre du jour et le lieu de réunion ;

- La convocation peut également être faite par un avis inséré dans un journal d'annonces légales ou, par lettre recommandée adressée à tous les actionnaires.

- Les avis et lettre de convocation doivent mentionner le jour, l'heure et le lieu de la réunion, ainsi que l'ordre du jour de la délibération.

- Lorsque l'Assemblée, n'ayant pu valablement délibérer sur première convocation est réunie sur nouvelle convocation, les avis ou lettre de convocation reproduisent l'ordre du jour et mentionnent les résultats de la ou des précédentes Assemblées.

- La convocation autre que la première de l'Assemblée Générale Extraordinaire doit être faite dans les formes spéciales prescrites par la loi.

- La réunion de l'Assemblée Générale a lieu au siège social, ou en tout autre endroit, au choix de l'autorité convocatrice.

12

## Article 22 - DELAIS DE CONVOCATION

- L'Assemblée Générale Ordinaire se réunit extraordinairement sur première convocation quinze jours francs au moins à l'avance et sur deuxième convocation huit jours francs au moins à l'avance.

- L'Assemblée Générale Extraordinaire se réunit sur première convocation quinze jours francs au moins à l'avance et sur convocation autres que la première, dans les délais impartis par la loi.

- L'Assemblée Générale est réputée réunie sur simple convocation verbale et sans délai si tous les actionnaires y sont présents ou représentés et si ce mode de convocation est, suivant la nature de l'assemblée, compatible avec les prescriptions de la loi.

## Article 23 - QUORUM DE L'ASSEMBLEE GENERALE

- Dans toutes les assemblées, le quorum est calculé sur l'ensemble des actions composant le capital social, déduction faite de celles qui seraient privées de droit de vote en vertu de la loi ou des présents statuts.

- Pour délibérer valablement, l'Assemblée Générale Ordinaire ou Extraordinaire doit réunir au moins la moitié du capital social.

## Article 24 - MAJORITE - POTENTIEL DE VOTE

- Les délibérations de l'Assemblée Générale Ordinaire sont prises à la majorité simple des voix dans le cas où il est procédé à un scrutin ; il n'est pas tenu compte des bulletins blancs.

- Les délibérations de l'Assemblée Générale Extraordinaire doivent, pour être valables, réunir les deux tiers au moins des voix des actionnaires présents ou représentés.

- Tout actionnaire a droit à autant de voix qu'il possède ou représente d'actions, à égalité de valeur nominale.

- Toutefois, pour le vote des résolutions nécessitant la forme constitutive de l'Assemblée Générale Extraordinaire, le nombre de voix appartenant à un actionnaire ne peut être supérieur à dix quel que soit le nombre de ses actions.

15

## Article 25 - ACCES A L'ASSEMBLEE GENERALE - REPRESENTATION DES ACTIONNAIRES

Pour assister ou se faire représenter à l'Assemblée Générale :

- les titulaires d'actions doivent être inscrits sur le registre de la société trois jours au moins avant la réunion ;

- l'autorité convocatrice peut toutefois, par voie de mesure générale, abréger ou supprimer les délais ci-dessus ;

- les actionnaires peuvent se faire représenter par un mandataire, à condition que celui-ci soit lui-même actionnaire ;

- la forme des pouvoirs est déterminée par le Conseil d'Administration ;

- l'accès à l'Assemblée Générale est ouvert à ses membres sur simple justification de leur qualité ;

- le Conseil d'Administration peut toutefois, s'il le juge utile, remettre aux actionnaires des cartes d'admission nominatives et personnelles, et exiger la production de ces cartes.

## Article 26 - FEUILLE DE PRESENCE

- Il est, avant l'ouverture de l'Assemblée Générale, dressé une feuille de présence, indiquant les noms et adresses des actionnaires présents ou représentés et le nombre d'actions, ainsi que, s'il y a lieu, le nombre de voix appartenant à chacun d'eux.

- Cette feuille de présence est émargée ou signée par les actionnaires présents ou leurs représentants avant d'entrer en séance et certifiée exacte par les membres du Bureau de l'Assemblée.

- Elle est déposée au siège social et doit être communiquée à tout requérant.

## Article 27 - BUREAU DE L'ASSEMBLEE GENERALE

- Le Bureau de l'Assemblée Générale est constitué d'un Président et de deux scrutateurs. La Présidence est assurée par le Président du Conseil d'Administration ou, à défaut, par un Administrateur délégué pour le suppléer.

- Les fonctions de scrutateurs sont remplies par les deux actionnaires, présents et acceptant, représentant tant par eux-mêmes que comme mandataires, le plus grand nombre d'actions.

14

- Le Secrétariat de l'Assemblée Générale est assuré par le Directeur Général. Toutefois l'assemblée peut, en tant que de besoin, mettre en place un secrétariat ad hoc.

- Les membres du Bureau ont pour mission de vérifier, certifier et signer la feuille de présence, de veiller à la bonne tenue des débats, de régler les incidents de séance, de veiller à l'établissement du procès-verbal.

- Leurs décisions peuvent à la demande de tout actionnaire être soumises au vote souverain de l'Assemblée.

## Article 28 - EXPRESSION DES SUFFRAGES

Le vote a lieu et les suffrages sont exprimés, au choix de l'Assemblée Générale :

- à main levée ou,
- par assis et levés ou,
- par appel nominal.

## Article 29 - PROCES-VERBAL DE DELIBERATION DE L'ASSEMBLEE GENERALE

- Il est dressé de la délibération de l'Assemblée Générale un procès-verbal qui est couché ou enliassé dans un registre spécial.

- Ce procès-verbal est signé par les membres, ou tout au moins la majorité des membres du Bureau, sans que l'omission de cette formalité puisse entraîner nullité de la délibération.

- Les copies ou extraits des procès-verbaux des délibérations de l'Assemblée Générale à produire en justice ou ailleurs, font foi s'ils sont signés par le Président du Conseil d'Administration, l'administrateur délégué temporairement pour suppléer le Président empêché, ou l'un des scrutateurs.

## Article 30 - DROIT DE COMMUNICATION DES ACTIONNAIRES

- L'inventaire, le bilan et le compte de profits et pertes, et généralement tous les documents qui, d'après la loi, doivent être communiqués à l'Assemblée Générale, sont tenus à la disposition des actionnaires au siège social, quinze jours au moins avant la date de l'Assemblée Générale.

- A tout moment de l'année, tout actionnaire peut prendre connaissance ou copie au siège social, par lui-même ou par un mandataire, de tous les documents qui ont été soumis aux Assemblées Générales durant les trois dernières années et des procès-verbaux de ces assemblées. Il peut, quinze jours au moins avant

réunion de toute Assemblée Générale, prendre au siège social, connaissance de la liste des actionnaires.

– Le texte des résolutions proposées à l'Assemblée Générale Extraordinaire doit, conformément aux prescriptions légales, être tenu à la disposition des actionnaires quinze jours au moins avant la date de la réunion de l'Assemblée Générale sur première convocation.

# CHAPITRE 2 : DU CONSEIL D'ADMINISTRATION

## Article 31 - COMPOSITION - NOMINATION - DUREE DES FONCTIONS DES ADMINISTRATEURS

**1°)** Le CREDIT FONCIER DU CAMEROUN est administré par un Conseil d'Administration de douze (12) membres dont un représentant élu du personnel.

**2°)** La répartition des onze (11) sièges du Conseil entre les personnes morales composant la société s'établit ainsi qu'il suit :

- huit (8) pour l'Etat Camerounais
- deux (2) pour la Caisse Nationale de Prévoyance Sociale
- un (1) pour la Caisse d'Epargne Postale

**3°)** Les administrateurs sont nommés par l'Assemblée Générale Ordinaire des actionnaires pour un mandat de trois (3) ans renouvelable une (1) fois.

**4°)** Le mandat de tout administrateur prévu pour prendre fin au dernier jour de l'exercice est de plein droit prorogé jusqu'à celui de l'Assemblée Générale appelée à statuer sur les comptes de cet exercice.

**5°)** Sauf l'effet des dispositions du paragraphe 3 du présent article, les administrateurs sortants sont toujours rééligibles.

**6°)** Les dispositions légales relatives au dépôt par les administrateurs d'actions en garantie de la bonne exécution de leur mandat ne sont pas applicables.

**7°)** Le mandat d'administrateur prend fin à l'expiration normale de sa durée, par décès ou par démission. Il prend également fin à la suite de la perte de la qualité qui avait motivé la nomination, ou encore par révocation à la suite d'une faute grave ou des agissements incompatibles avec la fonction d'administrateur. De même la dissolution de la société met fin aux fonctions d'administrateur.

La fin du mandat intervient dans les mêmes formes que celles applicables à la prise du mandat. Toutefois, tout administrateur dont la dette vis-à-vis de la société ou du système bancaire est déclarée douteuse par les commissaires aux comptes ou la Commission Bancaire encourt la déchéance de plein droit de ces fonctions.

8°) En cas de décès en cours de mandat ou dans toutes les hypothèses où un administrateur n'est plus en mesure d'exercer son mandat, l'organe qui l'a nommé désigne un autre administrateur pour la durée restante du mandat.

9°) Nommés à titre personnel, en raison de leur qualité et de leur compétence, les administrateurs représentant l'Etat ou les Collectivités Publiques décentralisées, ne peuvent déléguer leurs fonctions. En outre, ils ne peuvent exercer plus de deux (2) mandats consécutifs.

Le Conseil d'Administration peut appeler à siéger à titre consultatif toute personne ayant une compétence particulière pour l'examen d'une ou plusieurs questions inscrites à l'ordre du jour d'une session du Conseil. Les personnes ainsi consultées ne participent ni aux délibérations, ni aux votes.

## Article 32 - BUREAU DU CONSEIL D'ADMINISTRATION

- Le Conseil d'Administration, après consultation de l'actionnaire majoritaire, élit son Président parmi ses membres, en dehors des représentants du personnel et du Ministère assurant la tutelle technique, à la majorité des deux tiers des membres présents.

- Le Président doit être une personne physique.

- Le Secrétariat du Conseil d'Administration est assuré par le Directeur Général.

- Sous réserve des dispositions du paragraphe 3 de l'article 31 ci-dessus, le Président sortant est rééligible.

## Article 33 - POUVOIRS DU CONSEIL D'ADMINISTRATION

1°) Le Conseil d'Administration a les pouvoirs les plus étendus pour agir au nom de l'entreprise, définir et orienter sa politique générale et évaluer sa gestion dans les limites fixées par son objet social. En particulier, et sans que cette énumération soit limitative, le Conseil d'Administration :

a) fixe les objectifs et approuve les activités de la société ;

b) approuve le budget et arrête, de manière définitive, les comptes et états financiers annuels ;

c) adopte l'organigramme, le règlement intérieur, la grille de rémunérations et des avantages qui seront préparés par le Directeur Général ;

17

   d)  recrute et licencie le personnel d'encadrement, sur proposition du Directeur Général ;

   e)  nomme, sur propositions du Directeur Général, aux postes de responsabilité à partir du rang de Directeurs adjoints et assimilés ;

   f)  nomme ou démet de leurs fonctions, sur proposition du Directeur Général, les représentants de leur entreprise aux Assemblées Générales et aux Conseils d'Administration d'autres entreprises ;

   g)  accepte tous dons, legs et subventions ;

   h)  approuve toutes conventions, y compris les emprunts préparés par le Directeur Général et ayant une incidence sur le budget ;

   i)  autorise les participations dans des associations, groupements ou autres organismes, ainsi que les créations de filiales dont l'activité est liée à l'objet social ;

   j)  crée en tant de besoin, des comités techniques spécialisés notamment un comité de gestion.

**2°)** Le Conseil d'Administration peut déléguer certains de ses pouvoirs.

## Article 34 - DELIBERATIONS DU CONSEIL D'ADMINISTRATION

Le Conseil d'Administration se réunit aussi souvent que l'intérêt de la société l'exige, soit au siège social soit à tout autre endroit indiqué dans la lettre de convocation.

Sur convocation de son Président, le Conseil d'Administration se réunit au moins deux (2) fois par an en session ordinaire dont une fois pour le vote du budget et une fois pour arrêter les états financiers annuels et examiner la marche des activités de l'entreprise. Il examine toute question inscrite à l'ordre du jour soit par le Président, soit à la demande de 2/3 des administrateurs.

Toutefois, à la demande d'un tiers (1/3) au moins des membres du Conseil d'Administration, le Président est tenu de convoquer le Conseil en séance extraordinaire. En cas de refus ou de silence du Président, les membres concernés adressent leur demande au Ministre chargé des finances, qui procédera à la convocation du Conseil d'Administration selon les mêmes règles de forme et de délai.

Le président du Conseil d'Administration est défaillant lorsqu'il ne convoque pas au moins deux séances du conseil par an. Dans ce cas le tiers au moins de ses membres ou le Ministre chargé des finances peut prendre l'initiative de convoquer le Conseil d'Administration en proposant un ordre du jour.

- Les convocations sont faites par telex, télégramme ou télécopie, confirmées par lettres recommandées ou par tous moyens laissant traces, adressées aux membres, quinze jours au moins avant la date prévue pour la réunion. Les convocations contiennent l'ordre du jour et le lieu de réunion. Les dossiers soumis à l'examen du Conseil d'Administration doivent être, dans les mêmes délais, mis à la disposition des Administrateurs.

- Tout membre empêché peut se faire représenter aux réunions par un autre membre du Conseil d'Administration. Toutefois aucun administrateur ne peut au cours d'une session représenter plus d'un administrateur.

- Tout membre présent ou représenté à une séance du Conseil d'Administration sera considéré comme ayant été dûment convoqué.

- En cas d'empêchement du Président, le Conseil élit en son sein un Président de séance à la majorité simple des membres présents et représentés.

- Le Conseil d'Administration ne peut valablement délibérer sur toute question inscrite à son ordre du jour que si les deux tiers (2/3) au moins de ses membres sont présents ou représentés. Si le quorum n'est pas atteint lors de la première convocation, il est ramené à la moitié des membres du Conseil d'Administration ou représentés pour les convocations suivantes.

- Chaque membre dispose d'une voix. Les décisions sont prises à la majorité simple des voix des membres présents ou représentés sous réserve d'une majorité renforcée prévue par les statuts. En cas de partage de voix, celle du Président du Conseil d'Administration est prépondérante.

## Article 35 - PROCES-VERBAUX DU CONSEIL D'ADMINISTRATION

- Les procès-verbaux des séances sont consignés dans un registre spécial tenu au siège social et sont signés par le président et par le secrétaire de séance. Ils font mention des membres présents ou représentés. Ils sont lus et approuvés par le Conseil d'Administration lors de sa session suivante.

- Les copies ou extraits à produire en justice ou ailleurs sont certifiés par le Président ou par deux administrateurs.

## Article 36 - COMITE DE GESTION

Le Conseil d'Administration crée en son sein un Comité de Gestion chargé de statuer sur certains emprunts et certaines demandes de prêts dont le niveau est fixé par le Conseil et de donner son avis pour les questions mobilières et immobilières.

Le Comité peut être chargé de l'examen de toute autre question à lui soumise par le Conseil d'Administration pour avis.

19

Il se réunit aussi souvent que l'intérêt de la société l'exige, sur convocation du Président du Conseil d'Administration.

Sa composition est arrêtée par le Conseil d'Administration. Les membres du Comité de Gestion perçoivent des jetons de présence dont le montant est égal à celui alloué aux Administrateurs pendant les sessions du Conseil d'Administration.

## Article 37 - REMUNERATION DES ADMINISTRATEURS

Le mandat d'administrateur est gratuit ; cependant les administrateurs peuvent bénéficier de jetons de présence ou indemnités de session dans les limites fixées par les textes en vigueur et du remboursement des dépenses occasionnées par les sessions du Conseil d'Administration sur présentation de pièces justificatives. Le président du Conseil d'Administration peut bénéficier d'une allocation mensuelle.

## Article 38 - RESPONSABILITE DES ADMINISTRATEURS

Les administrateurs ne contractent, en raison de leur gestion, aucune obligation personnelle ou solidaire, relativement aux engagements de la société ; ils ne sont responsables que de l'exécution du mandat qu'ils ont reçu.

## Article 39 - CONVENTION ENTRE LA SOCIETE ET L'UN DES ADMINISTRATEURS

-   A l'exception du contrat de travail de l'administrateur représentant le personnel, toute convention entre la société et l'un de ses administrateurs, soit directement soit indirectement, soit par personne interposée, doit être soumise à l'autorisation préalable du Conseil d'Administration ; avis en est donné aux commissaires aux comptes.

-   Pour le cas spécifique des prêts susceptibles d'être accordés, la quotité est fixée conformément aux normes prévues par la réglementation bancaire.

# CHAPITRE 3 : DIRECTION GENERALE

<u>Article 40</u> - NOMINATION - POUVOIRS - RESPONSABILITE - CESSATION
DE FONCTIONS

- La Direction Générale de la société est assumée par un Directeur Général assisté d'un Directeur Général Adjoint nommés à la majorité des deux tiers par le Conseil d'Administration pour une durée de trois (3) ans renouvelable deux fois. Tous deux sont agréés en cette qualité par l'autorité monétaire après avis conforme de la Commission Bancaire pour l'Afrique Centrale (COBAC).

- Les fonctions de membre du Gouvernement ou assimilé et de parlementaire sont incompatibles avec les fonctions de Directeur Général ou de Directeur Général Adjoint de la société ou toute autre fonction en tenant lieu.

Le Directeur Général est chargé de la gestion et de l'application de la politique générale de l'entreprise sous le contrôle du Conseil d'Administration à qui il rend compte.

A ce titre, et sans que cette énumération soit limitative le Directeur Général :

1°) prépare le budget, les états financiers annuels, les rapports d'activité ;

2°) prépare les délibérations du Conseil d'Administration, assiste avec voix consultative à ses réunions et exécute ses décisions ;

3°) assure la Direction technique, financière et administrative de l'entreprise ;

4°) recrute, nomme, note et licencie, sous réserve des dispositions prévues à l'article 33 ci-dessus, les membres du personnel et fixe leurs rémunérations et avantages dans le respect de la réglementation en vigueur, du règlement intérieur, des prévisions budgétaires et des décisions du Conseil d'Administration ;

5°) prend dans les cas d'urgence toute mesure conservatoire nécessaire à la bonne marche de l'entreprise à charge pour lui, d'en rendre compte au Conseil d'Administration ;

6°) représente l'entreprise dans tous les actes de la vie civile et en justice.

Le Conseil d'Administration peut, en outre, lui déléguer certaines de ses attributions. Le Directeur Général peut aussi déléguer une partie de ses pouvoirs.

Les fonctions du Directeur Général prennent fin par révocation, par non renouvellement du mandat, par décès ou démission ou encore du fait de la dissolution de l'entreprise.

21

Le Directeur Général est responsable devant le Conseil d'Administration qui peut le sanctionner en cas de faute grave de gestion ou de comportement susceptible de nuire à la bonne marche ou à l'image de l'entreprise.

A cet effet, le Président du Conseil d'Administration est tenu de convoquer une session extraordinaire au cours de laquelle le Directeur Général est entendu. Le Conseil d'Administration peut prononcer à son encontre l'une des sanctions suivantes après saisine de la COBAC :

-    la suspension de certains de ses pouvoirs ;

-    la suspension de ses fonctions, avec effet immédiat pour une durée limitée ;

-    la révocation.

La session extraordinaire chargée d'entendre le Directeur Général ne peut valablement siéger qu'en présence de deux tiers au moins des membres du Conseil d'Administration. La représentation n'est pas admise dans ce cas.

Les décisions sont prises :

-    à l'unanimité des membres présents en cas de révocation ;

-    à la majorité des deux tiers pour les autres sanctions.

En cas de suspension du Directeur Général de ses fonctions, le Conseil d'Administration prend les dispositions nécessaires pour assurer la bonne marche de l'entreprise.

Les décisions sont transmises pour information au Ministre de tutelle par le Président du Conseil d'Administration.

En cas de vacance de la Direction Générale pour cause de décès, de démission ou d'empêchement définitif, et en attendant la nomination d'un nouveau responsable dudit organe par l'autorité compétente, le Conseil d'Administration prend toutes les dispositions nécessaires pour assurer la bonne marche de la société.

Lorsque la situation du Crédit Foncier du Cameroun le justifie, il peut être désigné conformément à la réglementation sur les Etablissements de Crédit, un administrateur provisoire auquel sont transférés les pouvoirs nécessaires à l'administration et à la direction de la société.

## Article 41 - REMUNERATION DES DIRECTEURS GENERAUX

-    La rémunération et les avantages du Directeur Général et du Directeur Général Adjoint sont fixés à la majorité des deux tiers par le Conseil d'Administration, sous réserve des plafonds fixés par la réglementation en vigueur.

- En outre le Directeur Général et le Directeur Général Adjoint ainsi que les travailleurs du CFC peuvent, selon les modalités prévues par voies réglementaires, être intéressés aux performances de l'entreprise sur la base d'une quotité de dix pour cent (10 %) au plus du bénéfice net réalisé au cours de chaque exercice.

## TITRE SIXIEME - ORGANES DE CONTROLE

### Article 42 - COMMISSAIRES AUX COMPTES

- La Société dispose de deux Commissaires aux comptes dont l'un est désigné par l'Assemblée Générale des Actionnaires et l'autre par le Ministre chargé des Finances, tous deux agréés en cette qualité par l'Autorité Monétaire après avis conforme de la Commission Bancaire de l'Afrique Centrale (COBAC).

- Les Commissaires aux Comptes nommés pour une durée de trois ans renouvelable ont mandat de réviser les comptes, d'en vérifier les valeurs, afin de certifier la régularité et la sincérité des états financiers ainsi que des informations contenues dans les rapports des organes statutaires.

- Les Commissaires aux comptes adressent aux organes statutaires et au Ministre chargé des Finances au moins une fois l'an un rapport général sur les comptes et un rapport spécial sur la conformité des actes de gestion aux dispositions légales. Ils sont invités à présenter leurs conclusions aux réunions du Conseil d'Administration et de l'Assemblée Générale qui arrêtent les comptes de l'exercice clos.

- A toute période de l'exercice, les Commissaires aux comptes peuvent demander des explications au Président du Conseil d'Administration sur toute négligence, toute irrégularité et, en général, tout fait de nature à compromettre la solvabilité et la continuité de la société qu'ils ont relevé à l'occasion de l'exercice de leur mandat. A défaut de réponse dans le délai de deux mois ou si celle-ci n'est pas suffisante, ils informent sans délai, par un rapport spécial, les organes statutaires et le Ministre chargé des Finances.

- Le Commissaire aux comptes nommé par l'Assemblée Générale en remplacement d'un autre ne demeure en fonction que pendant le temps qui reste à courir du mandat de son prédécesseur.

- Tout Commissaire aux comptes sortant est rééligible sous réserve des dispositions de l'alinéa 1er du présent article.

23

- Les Commissaires aux comptes ont droit à une rémunération fixée par l'Assemblée Générale. Cette rémunération est maintenue jusqu'à nouvelle décision de l'Assemblée Générale et son montant mis au compte des frais généraux.

- Les fonctions des Commissaires aux comptes sont incompatibles :

  avec toute activité ou tout acte de nature à porter atteinte à son indépendance ;

  avec toute autre fonction un emploi rémunéré, même ponctuel, au sein de la société.

- Le Commissaire aux comptes ne peut être nommé administrateur, Directeur Général ou Directeur Général Adjoint moins de cinq (05) années après la cessation de sa fonction auprès de la société.

## Article 43 - CONTROLE GENERAL

Le Contrôle Général est la structure interne prescrite par la réglementation de la Commission Bancaire de l'Afrique Centrale. Il est chargé des trois missions principales suivantes :

- l'audit et l'inspection générale des services ;
- le contrôle de gestion ;
- l'organisation et méthodes.

Le Contrôle Général est hiérarchiquement et fonctionnellement rattaché au Directeur Général. Toutefois il peut rendre directement compte, s'il en est saisi, au Conseil d'Administration.


## TITRE SEPTIEME - ANNEE SOCIALE - BUDGET - COMPTES - ANNUELS - BENEFICES - SECRET - PROFESSIONNEL

## Article 44 - ANNEE SOCIALE - BUDGET - COMPTES ANNUELS

- La société est gérée selon les règles de la comptabilité privée.

- L'année sociale commence le premier Juillet de chaque année et finit le trente Juin de l'année suivante.

24

- Chaque année, le Directeur Général prépare en même temps que le budget, pour approbation par le Conseil d'Administration, avant le début de l'exercice, un programme d'activité spécifiant les objectifs et les résultats à atteindre au cours de l'exercice. Ces documents sont transmis pour information au Ministre chargé des Finances.

- Un rapport d'activité de l'exercice écoulé est également confectionné chaque année et transmis dans les mêmes conditions.

- Il est établi chaque année, conformément à la loi, un inventaire contenant l'indication de l'actif et du passif de la société et dans lequel les divers éléments de l'actif social subissent les amortissements qui sont déterminés par le Conseil d'Administration, un bilan de la situation active et passive de la société et un compte de pertes et profits faisant apparaître les résultats de chaque exercice social.

- Les comptes et bilans annuels sont arrêtés par le Conseil d'Administration, vérifiés par les Commissaires aux comptes et approuvés par l'Assemblée Générale dans les six mois de la clôture de l'exercice. Ils sont transmis pour information au Ministre chargé des Finances avec le rapport de gestion du Conseil d'Administration à l'Assemblée Générale et les rapports des Commissaires aux comptes.

## Article 45 - FIXATION ET REPARTITION DES BENEFICES

- Le Conseil d'Administration soumet pour approbation à l'Assemblée Générale des actionnaires la répartition du bénéfice distribuable.

- Le bénéfice distribuable est constitué par le bénéfice de l'exercice diminué des pertes antérieures ainsi que des sommes à porter en réserve en application du paragraphe visé ci-après et augmenté du report bénéficiaire.

- A peine de nullité de toute délibération contraire, il est fait sur le bénéfice net de l'exercice, un prélèvement de dix pour cent (10 %) au moins affecté à la formation d'un fonds de réserve légale. Ce prélèvement cesse d'être opéré lorsque la réserve atteint les quinze pour cent (15 %) du capital social.

Les travailleurs de la société peuvent être intéressés aux performances de celle-ci sur la base d'une quotité de dix pour cent (10 %) au plus du bénéfice net réalisé au cours de chaque exercice selon les modalités prévues par le Conseil d'Administration.

Toutes les réserves, sauf la réserve légale sont à la disposition du Conseil d'Administration pour tous les besoins sociaux, y compris l'exécution des décisions de l'Assemblée Générale ayant fixé la répartition du dividende et du tantième, le remboursement ou l'amortissement du capital.

25

## Article 46 - PAIEMENT DES DIVIDENDES

Le paiement des dividendes se fait annuellement aux périodes et dans les conditions fixées par le Conseil d'Administration.

## Article 47 - SECRET PROFESSIONNEL

Tous les titulaires des fonctions d'administration, de direction, de gestion et de contrôle sont tenus au secret professionnel.

Le secret professionnel n'est toutefois pas opposable à la Commission Bancaire de l'Afrique Centrale, au Comité Monétaire et Financier National, à la Banque des Etats de l'Afrique Centrale, au Ministère chargé des Finances, au Juge et à la Commission des Marchés Financiers.

# TITRE HUITIEME - DISSOLUTION - LIQUIDATION - PROROGATION

## Article 48 - DISSOLUTION ANTICIPEE

- Le Conseil d'Administration peut, à tout moment, proposer à l'Assemblée Générale Extraordinaire la dissolution anticipée de la société.

- A ce titre, il doit, lorsque du fait des pertes constatées dans les documents comptables, les capitaux propres de l'entreprise sont inférieurs à la moitié du capital social, provoquer la tenue d'une Assemblée Générale Extraordinaire au plus tard dans les six mois suivant le constat des pertes à l'effet de statuer sur des mesures de régularisation à prendre ou à défaut sur la dissolution anticipée.

- Dans tous les cas, la dissolution anticipée est prononcée à la clôture du deuxième exercice suivant celui au cours duquel la constatation des pertes est intervenue à défaut de régularisation. Le ou les Commissaires aux comptes sont tenus d'avertir le Ministre chargé de Finances dès la clôture du premier exercice constatant les pertes

- A défaut pour les Administrateurs de réunir l'assemblée ci-dessus prévue, comme dans le cas où elle n'aurait pu se constituer régulièrement, tout intéressé peut demander la dissolution de la société devant la juridiction compétente.

**Article 49** - CONSULTATION DES ACTIONNAIRES PREALABLE AU TERME DE LA DUREE STATUTAIRE

– Un an au moins avant la date d'expiration de la société, le Conseil d'Administration devra convoquer une réunion de l'Assemblée Générale Extraordinaire des actionnaires pour décider si la société doit être prorogée ou non.

– Faute par lui d'avoir provoqué cette décision, tout actionnaire pourra, trente jours après une mise en demeure par lettre recommandée avec avis de réception restée infructueuse, demander au Président du Tribunal du siège social statuant en référé la désignation d'un mandataire de justice chargé de convoquer et présider ladite Assemblée Générale Extraordinaire.

**Article 50** - PROROGATION - LIQUIDATION DE LA SOCIETE

La prorogation et la liquidation de la société sont soumises aux lois et règlements en vigueur applicables aux établissements de crédit.

## TITRE NEUVIEME - LITIGES

**Article 51** - TRIBUNAUX COMPETENTS - ELECTION DE DOMICILE - DROIT D'AGIR EN JUSTICE - PRESCRIPTIONS

– Tout litige qui pourrait s'élever pendant le cours de la société ou de sa liquidation, soit entre les actionnaires, soit entre la société et les actionnaires eux-mêmes, concernant l'interprétation et l'exécution des présents statuts, ou généralement au sujet des affaires sociales, sont soumises à la juridiction des tribunaux compétents du siège social.

– A cet effet, en cas de contestation, tout actionnaire doit faire élection de domicile dans le ressort du Siège Social et toutes assignations et significations seront régulièrement délivrées à domicile. A défaut d'élection de domicile, les assignations et significations seront valablement faites au Parquet de Monsieur le Procureur de la République près le Tribunal de Grande Instance de Yaoundé.

– Des actionnaires, représentant le vingtième au moins du capital social peuvent, dans un intérêt commun charger à leurs frais un ou plusieurs mandataires de soutenir, tant en demandant qu'en défendant, une action contre les administrateurs ou les commissaires et de les représenter, en ce cas, en justice, sans préjudice de l'action que chaque actionnaire peut intenter individuellement en son nom personnel.

27

- Aucune décision de l'Assemblée Générale ne peut avoir pour effet d'éteindre une action en responsabilité contre les administrateurs ou les commissaires pour faute commise dans l'accomplissement de leur mandat.

- Les actions en responsabilité contre les administrateurs ou les commissaires aux comptes sont prescrites par trois années, à compter de la date à laquelle se sont produits les faits pouvant donner ouverture aux dites actions, alors même que ceux-ci ne seraient pas constitutifs d'infractions à la loi pénale. Toutefois, si ces faits sont qualifiés de crimes, la prescription demeure celle fixée par la loi pénale.

# TITRE X - DISPOSITIONS FINALES

## Article 52 - FRAIS

Tous les frais, droits et honoraires des présents statuts et leurs suites, notamment les frais de mise en conformité, ceux des dépôt et publication ainsi que toutes autres dépenses que la société pourrait être amenée à engager, les frais d'études et consultations auxquelles cette mise en conformité aura donné lieu, seront supportées par la société et portées selon le cas comme frais d'établissement ou de transformation pour être amortis comme il sera décidé ultérieurement par le Conseil d'Administration.

## Article 53 - REGIME FISCAL ET DOUANIER

Le régime fiscal et douanier du Crédit Foncier du Cameroun est fixé par le code général des impôts, le code des douanes et le code de l'enregistrement, du timbre et de la curatelle.

## Article 54 - REGIME DES MARCHES

Les marchés du Crédit Foncier du Cameroun sont soumis à la réglementation régissant les marchés publics.

## Article 55 - ENREGISTREMENT ET PUBLICATION

Pour faire enregistrer et publier les présents statuts, tous actes et procès verbaux relatifs à la mise en conformité avec la législation en vigueur, tous pouvoirs sont donnés au Président du Conseil d'Administration et au Directeur Général ou à son mandataire pour accomplir les formalités requises.

**TRANSLATION OF EXHIBIT HMM-1**

**TO DECLARATION OF HENRI MEKONGO MBALA**

**ARTICLES OF CFC**

CREDIT FONCIER DU CAMEROUN

ARTICLES

PART I: FORM – NAME – PURPOSES – RESOURCES – HEADQUARTERS

– DURATION – GOVERNANCE

## Section 1 – FORM – NAME

**CREDIT FONCIER DU CAMEROUN**, abbreviated CFC, is state owned corporation engaged in commercial activity, created under Decree No. 77/140 of 13 May 1977, modified and completed by Decree No. 81/236 of 17 July 1981 shall, from the 30th day of August 2001, be converted, under the same name, into a company capitalised by state funds, pursuant to Resolution No. AGE/01/2001 of the shareholders ' Extraordinary General Assembly held in Douala on 31 August 2001.

Crédit Foncier du Cameroun shall be governed by the laws, regulations and practices applicable to public limited companies; by the Banking Laws in force in Central Africa and by the present Articles, without prejudice of Law No. 99/016 of 22 December 1999 on the general statutes of state-owned companies and companies in the public and para-statal sector.

Legal instruments and documents coming from the company and destined for third parties, including various letters, bills, announcements and publications shall carry the company name immediately and legibly preceded or followed by the words "company capitalised by state funds" or the initials "SCP" with a Board of Directors and mention of the company capital as well as the location and the registration number from the company registry.

## Section 2 – OBJECT

The object of Crédit Foncier du Cameroun shall be to contribute financially and through its expertise to the realization of any project aimed at promoting housing and real estate in general.

To this it will have the capacity especially to:

- finance works to prepare land destined for the building of affordable housing units

- finance the development and construction of community and regional facilities aimed at generating revenues

- seek and set up finance destined for tourism and for schools, especially in the domains of hotel management and teaching;

- finance every social project deemed profitable for CFC, after approval by the Board of Directors;

1

- collect and receive, with a view to facilitating access to ownership of real estate and savings by individuals other legal entities. To this effect, Crédit Foncier du Cameroun may grant medium and long term loans by commitments, gurantees or discounts;

- carry out every banking, financial, commercial, real estate and personal transaction directly or indirectly related to the stated objects

## Section 3 – RESOURCES

CFC resources shall comprise:

- the company's capital;
- contributions to CFC and any other allotted fiscal revenue;
- endowments and donations;
- savings deposits from individuals or private/public organisations;
- loans;
- revenue from its activities and services.

## Section 4 – HEADQUARTERS

The headquarters shall be set up in YAOUNDE, Republic of Cameroon, post office box number 1531, at 434 20th May 1972 Blvd.

It may be moved to any other location by decision of the Extraordinary General Assembly of the shareholders.

The Board of Directors shall have the power to create whenever necessary on the national territory, the company's branches, agencies and offices and representation outside of the country. This action shall not constitute a departure from the jurisdiction of regulations provided for in these Articles.

## Section 5 – DURATION

The duration of the company shall be fixed at ninety-nine (99) years as from the 10th day of March 1978, date of its registration into the Commercial Registry under number 231, except in the case of premature winding up or extension as provided for by these Articles.

## Section 6 – SUPERVISION

The Ministry in charge of Finance shall ensure the technical and financial supervision of the company.

2

## PART TWO: CAPITAL – SHARES

### Section 7 – CAPITAL AND SHARES

1) The company's capital shall be six billion (6,000,000,000) CFA Francs divided as follows:

| | |
|---|---|
| The State of Cameroon | 75% |
| Caisse Nationale de Prévoyance Sociale (National Social Welfare Office) | 20% |
| Post Office Savings Bank | 5% |

2) The company's capital shall be divided into sixty thousand (60,000) shares of one hundred thousand (100,000) CFA Francs, each numbered from 1 to 60,000.

3) The shares shall be exclusively registered

4) All shares shall be fully paid-up.

5) The shares owned by the State shall be held in its name by the Minister in charge of Finance.

### Section 8 – INCREASE AND REDUCTION OF CAPITAL

- The company's capital may be increased once or several times by the creation of new shares exclusively in cash, or through the transformation of reserves by virtue of shareholders' decision during an Extraordinary General Assembly.

- This Assembly shall set the conditions for the creation and the distribution of new shares. It may delegate its powers in this domain to the Board of Directors as well as power to modify the provisions of the Articles relating to the increase of capital.

- When there is af capital increase, the shareholders' Extraordinary General Assembly may create priority shares, benefiting from some advantages over the other shares or conferring priority rights on the company's profits or assets or on both.

- The owners of the existing shares, who have paid fully for shares subscribed to and for which payment is due, shall have preferential rights to the new shares. However, the shareholders' General Assembly may set aside the exercise of this preferential right by acting in accordance with applicable laws.

- The preferential right to the subscription of the new shares is negotiable under the same condition as the shall be subject to negotiations under the same conditions as the share itself.

3

- The Shareholders' Extraordinary General Assembly may decide that the increase in the company's share capital be effected by the issuing of premium shares, in such a case, it shall be free to fix the premium amount, its allocation or distribution.

- In the same manner,it may reduce the company's share capital for any reason and in any manner whatsoever. More especially it may proceed by making a refund to shareholders, buying back company shares, reducing their face value, exchanging old shares for an equal or lesser number of new shares,with or without the same face value, with or without the same number , and, as the case may be, under the obligation to cede or buy old shares so as to permit the exchange of old shares if necessary, even by the payment of the balance.

## Section 9 – PAYING UP THE CAPITAL

- Shares subscribed to shall be paid up exclusively in cash of which three-quarters at least of their nominal value must be covered on subscription and as the case may be, of the entire issuing fee.

- The paying up of the balance shall be effected by a single payment at the request of the Board of Directors, at periods that it shall determine. In any case the shares must be fully paid up within three years of the date they were legally created.

- The board of Directors may at any time authorise the shareholders to pay for their shares in advance, under conditions that it shall deem convenient.

- Calls for sharees to be paid up shall be made known to the subscribers thereto at least fifteen days before the date set for each payment, by the publication of legal notice in a newspaper located at the headquarters of the company or by registered letter sent by the Board of Directors, to the address indicated at the time of the subscription for the shares.

- Shares subscribed to on the increase of the capital may be paid up by way of set off with a debt certain, liquid and due for payment by the company.

## Section 10 – FAILURE TO PAY

- Any late payment for shares shall attract a yearly interest of 10% as of right, from the end of the month following the day on which payment was due without recourse to the law courts or notice.

- If, within the deadline set for the call up of payment, the amount due for certain shares have not been paid up, the Board of Directors, duly empowered by the Shareholders' General Assembly, may within thirty days after formal and personal notice on the defaulter by an extra-judicial act, put up the shares for sale: in case of sales to the private sector the provisions of the law on privatisation will be applicable

- In this case legal notice of the numbers of the shares will be published in a newspaper at the headquarters of the company. Fifteen days after the legal notice the Board of Directors may sell the shares that have not been paid up without prior authorisation or extension of time by reason of distance.

4

- The shares shall be sold in bulk separately or even several times, and where the use of duplicates is necessary, as requested and directed by the Board of Directors. The shares shall be auctioned by a notary with no predetermined starting price.

- The sale shall be done at the defaulting shareholder's risk.

- The certificates of shares sold shall automatically become void and new share certificates shall be delivered to the new shareholders and this may or may not bear the same shares numbers and be free of all incumberances that had prompted their sale..

- The net proceeds of the sale shall be attributed to the company in payment of the principal and interest owed by the defaulting shareholder.  The latter who at all times remained a debtor to the company is liable for any balance in case of a sale under the amount of the debt: where the proceeds of the sales are in excess of the debt owed the balance is paid to the defaulting shareholder .

- The company may avail itself of any course of action or legal recourse against any shareholders, his guarantors before,  during or after the sale of the shares.

- Any share that has not been duly paid for shall cease to be negotiable, no dividend shall be paid to the shareholder; the defaulting shareholder shall not attend General Assemblies neither in person or by proxy; he shall not exercise his preferential right to the subscription of new shares in case of capital increase; finally, in the case where the defaulting shareholder is a member of the Board of Directors, he shall automatically be considered to have resigned three days after a special extra-judicial notification by the Board of Directors.

## Section 11 – OBLIGATIONS OF TRANSFEREE

- Shareholders, intermediate transferees and subscribers shall all be jointly liable for the costs of the shares.
- Any subscriber or shareholder who transfers his shares ceases, two years after the transfer, to be responsible for any payment not yet called up.

## Section 12 – TRANSFER OF SHARES

Except otherwise provided for by legislation or rules and regulations governing privatisation, shares may be transferred as follows:

1) Registered shares which are negotiable or which are yet to be issued may only be transferred by a signed declaration of transfer executed by the transferor or his assignee.  The declaration is entered in the register of the company. However, if the shares are not completely paid up, the transferee's or his assignee's signature shall be necessary.

2) Considering the exception resulting from the provisions of applicable laws in force, the Board of Directors may require that the signatures of both parties be certified by a Notary, a stock broker or the mayor of the applicant's residence.

5

3) Only shares that are fully paid up may be transferred.

4) Shares are freely transferable between shareholders. They may only be transferred to persons outside the company under the conditions provided for in the following subsections.

5) Should a transfer or change of ownership to a person outside the company be envisaged, the transferor shall notify the company thereof by registered letter stating the name, profession, area of work, address and, as the case may be, the transferee's company's registration number in the register of commerce as well as the price or terms and conditions for the transfer or change.

   For the notice to be valid, a registration certificate for the shares to be transferred and any other supporting document as well as the transfer slip thereof must be attached thereto.

6) Within a month following the said notice, the Board of Directors shall rule by a two-thirds majority of the members present or represented, whether to accept or reject the proposed transferee. The Board shall not give any reason for its decision, and no complaint against any Board member or the company in general because of the said decision shall be entertained. Within one week of the ruling, the transferor shall be notified of the decision by an official letter with acknowledgement of receipt.

7) Should the Board of Directors decide to reject the proposed transferee, it shall, within two months from the date the transferor was informed of its decision, designate, by a two-thirds majority of members present or represented, one or several new transferees, be they shareholders or not.

   Should the Board of Directors fail to designate a substitute to the proposed transferee within the two-month period allowed above, the proposed transferee shall ipso facto consider himself accepted.

8) If the transfer price cannot be agreed upon by the transferor and the Board of Directors, the said transfer price shall be determined by two experts chosen respectively by the parties concerned.

   The two experts shall have the option of taking on a third expert with whom they shall rule on the matter by a majority vote. Should one of the parties refuse to designate an expert, the more diligent party shall simply petition the President of the court having jurisdiction who shall then take the necessary decision.

9) The above provisions shall be applicable to any other transfer that shall be carried out by mutual agreement or by public hearing pursuant to a Court Order.

10) Shares belonging to persons whose presence is prejudicial to the company shall be bought back.

   In such a case, shares to be bought back shall be evaluated following the provisions of subsection 8 above.

## Section 13 – RIGHTS AND OBLIGATIONS ATTACHED TO SHARES

-   Considering company capital, each share of the same category shall give the right to a fraction of the shares that it represents.

-   It shall also entitle the holder thereof to an equal fraction of company profits. Where shares are of equal face value, every share of the same category shall be completely assimilable with the only exception being the starting point of their rights.

-   The rights and obligations attached to the share shall remain unchanged regardless of change of ownership.

-   Ownership of a share shall as of right signify complete acceptance of the company's Articles and the decisions of the General Assembly.

## Section 14 – LOSS OF A CERTIFICATE

-   Should a certificate be lost, the holder shall notify the company thereof extra judicially, at its headquarters, and the Board of Directors shall, within eight days, make an announcement about such loss in a legal journal of the town where the headquarters is located.

-   Within the six months following the date of such announcement, the holder may not be entitled to any profit or dividend.

-   If the certificate is not recovered at the end of this period, a new certificate marked "duplicate" shall be delivered to the claimant who shall duly acknowledge receipt thereof; and which duplicate shall cancel the former certificate.

-   Outstanding interest and dividends shall be paid with mention thereof being made on the new certificate.

-   Before issuing the new certificate and before payment of overdue interests and dividends, the Board of Directors may demand a surety.

-   The expenses incurred is giving out a notice to the company, making the announcement and any other thing shall be borne by the holder.

### PART THREE: OBLIGATIONS

## Section 15 – ISSUING OF OBLIGATIONS

-   The company may contract debts by issuing bonds, with or without guarantee or hypothecation on movables that depend on the company's capital. The issuance of such bonds shall be decided upon by the Board of Directors. The issuance shall be done following the terms and conditions provided for by the law in force.

7

## PART FOUR: MANAGEMENT

### CHAPTER 1: THE GENERAL ASSEMBLY OF SHAREHOLDERS

### Section 16 – COMPOSITION

The General Assembly shall be made up of representatives of shareholders.

### Section 17 – FUNCTIONS AND POWERS OF THE ORDINARY GENERAL ASSEMBLY

The Ordinary General Assembly shall:

- receive the management report of the Board of Directors as well as its statement of accounts;

- approve the auditors' reports

- approve annual accounts and balance sheets and decide on the allotment of results and the sharing of profits;

- decide upon any agreement between the company and its administrators and equivalent employees, and approve or disapprove these agreements;

- nominate and dismiss administrators, determine the amount of their attendance fees or session allowances, as well as the monthly allowance of the chairperson of the Board of Directors, in accordance with the regulations in force;

- appoint and dismiss auditors and determine their remuneration.

### Section 18 – FUNCTIONS AND POWERS OF THE EXTRAORDINARY GENERAL ASSEMBLY

- The Extraordinary General Assembly man, on the proposal of the Board of Directors, amend the Articles of the company;

- More especially, the Extraordinary General Assembly may to decide to:

  - increase or reduce the company's capital;
  - establish or attribute share balance and any special advantage;
  - extend continuing or close down the company in advance and, in  general, carryout any other modification relating to the duration of the company;
  - directly or indirectly modify the company's objectives;
  - transfer the headquarters;
  - modify the name of the shareholders';
  - split the company, merge it with another, modify the face value of the shares;
  - modify the form of shares or the conditions for their sale or transfer.

Should there be several categories of shares, then the transfer or change of share category shall only be possible through a separate decision of an Extraordinary General Assembly of all shareholders in the category or categories concerned which shall be convened to decide

8

thereupon under the same conditions governing an Extraordinary General Assembly of shareholders in all the categories.

## Section 19 – CONVENING THE GENERAL ASSEMBLY

The General Assembly shall be the organ directly expressing the collective will of the company's shareholders.

General assemblies shall be convened on the initiative of:

- the Chairperson of the Board of Directors
- the auditors, in case of an emergency
- the liquidators during the period following the liquidation of the company,
- an authority of the judiciary, where shareholders refer a matter to the court with proof that they have a legitimate interest therein, that the said matter is urgent, or that the statutory authorities who should normally convene the said meeting are absent.

## Section 20 – FREQUENCY OF GENERAL ASSEMBLY MEETINGS

- The Ordinary General Assembly shall meet at least once yearly within six months following the end of the previous fiscal year to review the results of management and the accounts of that fiscal year.

- The Extraordinary General Assembly shall meet at any time deemed necessary for the good of the company. It shall be convened by the Chairperson of the Board of Directors, or at the request of 1/3 of the Directors. Any shareholder may take part in the Extraordinary General Assembly without any restriction on their vote.

## Section 21 – METHODS OF CONVENING – MEETING PLACE

The agenda and the preparation of the resolutions proposed to be submitted to the General Assembly shall be done by the convening authority.

- Ordinary and Extraordinary General Assemblies shall be convened by telex, telegram or facsimile, or by any other written method, which will be confirmed by registered letters sent to the shareholders' representatives at least fifteen (15) days before the meeting date. The letter convening the meeting shall state the agenda and the meeting place;

- Meetings may also be convened through an announcement in an approved newspaper or through a registered letter sent to every shareholder.

- The said announcements and letters shall state the date, time and place of meeting, as well as the agenda to be discussed.

- When the Assembly does not validly deliberate during a first duly convened meeting, the announcements or letters convening a second meeting shall reproduce the agenda, stating the results of the previous meeting or meetings.

- Any meeting other than the first Extraordinary General Assembly shall be convened following the special formalities provided for by the law.

9

- The General Assembly shall meet at the headquarters, or at any other venue chosen by the convening authority.

## Section 22 – CONVENING PERIOD

- The Ordinary General Assembly shall be extraordinarily convened for a first meeting at least fifteen clear days in advance and for a second meeting, at least eight clear days in advance.

- The Extraordinary General Assembly shall be convened for a first meeting at least fifteen clear days in advance and for meetings other than the first one, within the time allowed by Law.

- The General Assembly shall be considered to have met on verbal notice and without delay if all shareholders are present or represented and if this method of convening it is, depending on the type of assembly, in accordance with the provisions of the Law.

## Section 23 – QUORUM FOR THE GENERAL ASSEMBLY

- The quorum for all meetings shall be calculated on the basis of all the shares that make up the company's share capital, less those that are deprived of voting rights in accordance with the law or these Articles.

- For both ordinary and extraordinary General Assemblies, members representing at least half of the company's share capital must be present for the deliberations thereof to be valid.

## Section 24 –   POTENTIAL VOTING MAJORITY

- Decisions of the Ordinary General Assembly shall be taken by a simple majority; where a matter is put into vote, blank voting papers shall not be considered.

- For the decisions of an Extraordinary General Assembly to be valid, a two-thirds majority vote of the shareholders present or represented shall be required.

- Every shareholder shall have as many votes as he has, or represents, shares where there is equality of face value.

- However, with regard to voting resolutions to determine the form of the Extraordinary General Assembly, a shareholder shall not have more than ten votes regardless of the number of shares he owns.

## Section 25 – ACCESS TO THE GENERAL ASSEMBLY – REPRESENTATION OF SHAREHOLDER

To attend, or to be represented at, the General Assembly:

- the shareholders must have subscribed for shares at least three days prior to the meeting;

- however, the authority convening the meeting may, through a general measure, shorten or annul the deadline referred to above;

- a shareholder may have himself represented, provided that the representative is a shareholder himself;

- the form of powers of attorney shall be determined by the Board of Directors;

- access to the General Assembly shall be open to its members upon proof of their membership;

- however, the Board of Directors may, if it so deems it necessary, give non-transferable and personal admission cards to shareholders and make the presentation thereof mandatory at the entrance into meeting precincts.

## Section 26 – ATTENDANCE SHEET

- Before the General Assembly is called to order, an attendance sheet shall be drawn up, indicating the names and addresses of the shareholders present or represented and the number of shares as well as, where necessary, the number of votes each of them has.

- The said attendance sheet shall be signed by the shareholders present or represented before the start of the session, and certified true by the Bureau members of the Assembly.

- It shall be deposited at the headquarters and must be communicated to anyone who so requests.

## Section 27 – BUREAU OF THE GENERAL ASSEMBLY

- The Bureau of the General Assembly shall be made up of a chairperson and scrutineers. The meeting shall be chaired by the Chairperson of the Board of Directors or, if he is not available, by a Board Member appointed to act in his place.

- The scrutineers shall be two present and consenting members representing, both as shareholders themselves and as representatives of other shareholders, the largest number of shares.

- The Secretariat of the General Assembly shall be manned by the General Manager. However, the General Assembly may, where need be, set up an ad hoc secretariat.

- It shall be the responsibility of Board Members to verify, certify and sign the attendance sheet, ensure that the discussions take place properly, resolve any incidents occurring during sessions, and ensure the writing of reports.

- Any shareholder may demand that their decisions be subjected to the sovereign vote of the Assembly.

11

## Section 28 – METHOD OF VOTING

The General Assembly shall decide the method of voting from among the following:

- by show of hand or,
- by sitting versus standing or,
- by roll call.

## Section 29 – REPORT OF THE GENERAL ASSEMBLY

- Minutes of the General Assembly shall be filed or kept in a special register.

- The report shall be signed by the members, or at least a majority of the Bureau members. However, failure to do this shall not nullify the proceedings.

- Copies or extracts of minutes of the General Assembly proceedings to be sent to court or elsewhere shall be authentic if they were signed by the Chairperson of the Board of Directors, the Board member appointed to act in the place of the absent chairperson, or one of the scrutineers.

## Section 30 – SHAREHOLDERS' RIGHTS TO INFORMATION

- The inventory, balance sheet, profit and loss account or in general, every document which, according to the Law, must be transmitted to the General Assembly, shall be made available to shareholders at the headquarters, at least fifteen days before the General Assembly meeting.

- At any period of the year, any shareholder may either in person or through a representative acquaint himself with or ask for a copy of any document that was submitted to the General Assembly during the three previous years, as well as the minutes of the General Assemblies for those years. At least fifteen days before any General Assembly meeting, he may acquaint himself with the list of shareholders.

- Draft resolutions for an Extraordinary General Assembly shall, in accordance with the prescriptions of the Law, be made available to shareholders at least fifteen days before the initial date for which the General Assembly meeting was convened.

## CHAPTER 2: THE BOARD OF DIRECTORS

## Section 31 – COMPOSITION – APPOINTMENTS – DURATION OF TENURE

1) The Cameroon Housing Loans' Fund shall be administered by a 12-member Board of Directors whom shall be a member elected from the personnel.

2) The distribution of the eleven seats between the legal entities making up the company shall be as follows:

- eight (8) for the State of Cameroon

12

- two (2) for the National Social Insurance Fund
- one (1) for the Post Office Savings Bank

3) The directors shall be appointed by an Ordinary General Assembly of Shareholders for a three-(3)-year term of office, renewable once (1).

4) The term of office of the Board Member due to expire on the last day of the fiscal year shall automatically be extended to the date of the General Assembly convened to consider the year's accounts.

5) Except as provided for under subsection 3 above, the outgoing Board member shall be re-eligible.

6) The legal provisions relating to the need for directors to deposit shares as a guarantee for the proper execution of their term of office shall not be applicable.

7) The mandate of a Board member shall end upon the normal expiration of the period, death or by resignation. It shall also end following loss of the quality which motivated his/her nomination, or by dismissal due to gross misconduct or conduct that is incompatible with the functions of a Board member. Similarly, the dissolution of the corporation shall put an end to the duties of Board members.

   The term of office shall and under the same conditions applicable to the start thereof. However, any Board member whose debt vis-à-vis the corporation or the banking system is declared by the auditors or the banking commission to be dubious shall be automatically relieved of his duties.

8) In case of death during the term of office, or any situation where the Board member is no longer capable of carrying out his functions, the authority that appointed him shall designate another Board member to complete the rest of his term.

9) Due to the fact that they are appointed because of their personal qualities, Board members representing the State or decentralised state structures may not delegate their duties to another person. Moreover, they may not have more than two (2) consecutive terms of office.

The Board of Directors may, for purposes of consultancy, invite any person having specialist skills to attend a Board meeting and to examine one or more issues on the agenda. The consultants shall not take part in decision making or in voting.

## Section 32 – EXECUTIVE OF THE BOARD OF DIRECTORS

- The Board of Directors shall, after consulting with the majority shareholder, elect its chairperson from among its members – excluding members representing the staff and the supervisory Ministry by a two-thirds majority vote of those present.

- The chairperson shall be an individual.

- The Secretariat of the Board of Directors shall be handled by the General Manager.

13

- Subject to the provisions of Section 31(3), above, the outgoing chairperson shall be re-eligible.

## Section 33 – POWERS OF THE BOARD OF DIRECTORS

1) The Board of Directors shall have full powers to act on behalf of the company, define and orientate its general policy, and evaluate its management within the limits set by the objectives of the company.  Without being limitative, the Board of Directors shall, in particulars:

   a. set the objectives of the corporation and approve its activities;

   b. approve the budget and definitively close the annual accounts and financial statements;

   c. adopt the corporation's organisation chart, its internal rules and regulations, the staff emoluments scales prepared by the General Manager;

   d. recruit or dismiss staff members, on the proposal of the General Manager;

   e. appoint, on the proposal of the General Manager, assistant directors and those ranking as such;

   f. appoint or relief of their duties, on the proposal of the General Manager, representatives of the corporation to the General Assemblies and Boards of Directors of other corporations;

   g. accept all gifts, legacies and grants;

   h. approve all agreements, including loans impacting on the budget prepared by the General Manager;

   i. authorise participation in associations, groups and other bodies , and the setting up of subsidiaries whose activities are related to the business objectives of the company;

   j. set up necessary, specialised technical committees, especially a management committee.

2) The Board of Directors may delegate some of its powers.

## Section 34 – PROCEEDINGS OF THE BOARD OF DIRECTORS

- The Board of Directors shall meet as often as warranted by the company's interests, either at the headquarters or at any other venue indicated in the letter convening it.

- The Board of Directors shall meet in ordinary session at least two (2) times yearly when convened by the chairperson; once to approve the budget and once to close the annual accounts and examine the progress report on the company's activities. It shall examine

every issue entered on the agenda either by the chairperson, or at the request of 2/3 of the Board members.

- However, when so requested by at least one third (1/3) of Board members, the Chairperson shall be expected to convene the Board of Directors in extraordinary session. Should the chairperson refuse to act, the members concerned shall refer their request to the Minister in charge of Finance, who shall convene the Board of Directors in accordance with the same regulations and deadlines.

- The chairperson of the Board of Directors shall be defaulting if he does not convene Board meetings at least twice yearly. In that case, at least one third of its members or the Minister in charge of Finance may take the initiative to convene the Board meeting and propose the agenda.

- Notice of meetings shall be sent by telex, telegram or fax and confirmed by registered letter, or by any other means that leaves a written record, to the members at least fifteen days before the meeting date. The notice shall indicate the agenda and venue of the meeting.  The files submitted to the Board of Directors for examination shall be made available to Board members within the same time allowed.

- Any member who is unavoidably absent may be represented at the meetings by another member of the Board of Directors. However, no Board member may represent more than one other member during a meeting.

- Any member present or represented at a Board meeting shall be considered to have consented to the meeting as duly convened.

- If the chairperson is unavoidably absent, the Board of Directors shall elect, by simple majority vote, a chairperson for the meeting from among the members present or represented.

- The Board of Directors may validly deliberate on any matter on the agenda only if at least two thirds (2/3) of the members thereof are present or represented. If the quorum is not reached, the first time a meeting is convened, the said quorum shall be reduced to half of the Board members for subsequent meetings convened.

- Each member shall have one vote. Decisions shall be made by a simple majority vote of the members present or represented, subject to a re-enforced majority as provided for by the Articles of Association.  Should there be a tie, the chairperson of the Board of Directors shall have the casting vote.

## Section 35 – MINUTES OF BOARD MEETINGS

- Minutes of meetings shall be recorded in a special register kept at the headquarters and shall be signed by the chairperson and secretary of the meeting. They shall state the members present or represented. They shall be read and approved by the Board of Directors during the following meeting.

- Copies or extracts to be sent to court or elsewhere shall be certified by the chairperson of the Board of Directors or by two Board Members.

## Section 36 – THE MANAGEMENT COMMITTEE

The Board of Directors shall setup from among its members a Management Committee which shall make decisions on loans and loan applications the level of which shall be fixed by the Board of Directors. It shall also give its opinion on movable and immovable property.

The Committee may be in charge of examining any other issue referred to it by the Board of Directors.

It shall meet as often as warranted by the interests of the company, and when convened by the chairperson.

Its composition shall be determined by the Board of Directors. The members of the Management Committee shall be paid a sitting allowance equal to that paid to Board members during Board meetings.

## Section 37 – REMUNERATION OF BOARD MEMBERS

The services of a Board member shall be free; however, Board members may receive a sitting or session allowance within the limits set by the regulations in force, and be reimbursed all expenditures incurred as a result of attending a meeting of the Board of Directors, upon presentation of proof thereof. The chairperson of the Board of Directors shall be paid a monthly allowance.

## Section 38 – DIRECTORS' DUTIES

Because of their administration, Board members shall not contract any personal or joint obligation relating to the corporation's commitments; they shall only be responsible for the execution of their term of office.

## Section 39 – AGREEMENT BETWEEN THE CORPORATION AND ONE OF THE BOARD MEMBERS

- Apart from the labour contract of the Board members representing the personnel, every agreement between the corporation and any of its Board members signed directly, indirectly or through an intermediary, shall be subject to prior authorisation by the Board of Directors; notice thereof shall be submitted to the auditors.

- For the specific case of loans likely to be granted, quotas shall be set in accordance with the provisions of the banking regulations.

## CHAPTER THREE: GENERAL MANAGEMENT

## Section 40 – APPOINTMENT – POWERS – DUTIES – CESSATION OF FUNCTIONS

- The General Management of the company shall be carried out by a General Manager assisted by a Deputy General Manager, appointed by two-thirds majority of the Board of Directors for a three-year period renewable twice. Both managers shall be approved in

this capacity by the monetary authority endorse by the Banking Commission for Central Africa (COBAC).

- The functions of member of government or those ranking as such and those of member of Parliament shall be incompatible with the functions of General Manager or Deputy General Manager of the corporation or any other similar function.

The General Manager shall be in charge of managing the corporation and implementing its general policy under the supervision of the Board of Directors to which he shall be answerable.

In that capacity, and without being limitative, the General Manager shall:

1) prepare the budget, the yearly financial records, the progress report;

2) prepare the meetings of the Board of Directors, attend the meetings as a consultant and execute its decisions;

3) run the company's technical, financial and administrative departments;

4) hire, appoint, assess and dismiss staff members, subject to the provisions of Section 33 above, and determine their remuneration and benefits in accordance with the law in force, the rules and regulations of the company, the budget and the decisions of the Board of Directors;

5) take in cases of emergency, take any protective measures conducive to the smooth running of the company placed in his care; provided that he shall report to the Board of Directors;

6) represent the company in all civil and legal matters.

Moreover, the Board of Directors may delegate some of its functions to the General Manager, who may also delegate some of his powers.

The functions of General Manager shall cease by revocation, failure to renew the term of office, death, resignation or as a result of the company being liquidated.

The General Manager shall be responsible to the Board of Directors which may take disciplinary action against him in case of gross mismanagement or misconduct likely to be detrimental to the smooth running or good image of the company.

To this effect, the chairperson of the Board of Directors shall convene an extraordinary meeting during which the General Manager shall explain himself. After reporting the case to COBAC, the Board of Directors may decide to:

- suspend some of his powers;

- suspend his duties, with immediate effect for a fixed period;

- dismiss him.

17

The extraordinary session to hear the General Manager shall be valid only if at least two-thirds of the Board members are present. Representation shall not be allowed in this case.

Decisions shall be made as follows:

- unanimously agreement of those present for revocation;

- two-thirds majority of those present for the other sanctions.

If the General Manager is relieved of his functions, the Board of Directors shall take necessary measures to ensure the smooth running of the company.

These decisions shall be forwarded to the supervisory Minister by the chairperson of the Board of Directors.

If the General Manager dies, resigns or is permanently impaired, the Board of Directors shall, while waiting for the appointment of a new official by the competent authorities, take all necessary measures to ensure the smooth running of the company.

Where the situation of the Cameroon Housing Loans Fund so warrants it, a pro tem administrator shall be appointed in accordance with the regulations governing banks, with all powers necessary for the proper management of the company transferred to him.

## Section 41 – REMUNERATION OF GENERAL MANAGERS

- The remuneration of the General Manager and Deputy General Manager shall be fixed by a two-thirds majority vote of the Board of Directors, and shall be subject to the limits fixed by the regulations in force.

- Moreover, the General Manager and the Deputy General Manager as well as CHLF staff members may, in accordance with the modalities laid down in the regulations, also receive the company performance bonus which is based on a ten percent (10%) quota at most of the net profits made during each fiscal year.

## PART SIX – MONITORING ORGANS

## Section 42 – AUDITORS

- The company shall have two auditors: one of them shall be chosen by the General Assembly of Shareholders and the other by the Minister in charge of finance. Both shall be approved of in this capacity by the Monetary Authority after consultation with the Banking Commission for Central Africa (COBAC).

- The auditors, appointed for a three-year term renewable, shall be mandated to examine accounts, verify values thereof, so as to certify that the financial records and information found in the reports of statutory organs are regular and genuine.

- At least once a year, the auditors shall forward to the statutory organs and the Minister in charge of Finance, a general report on the accounts and a special report on the

compliance of management with the provisions of the Law. They shall be invited to present their conclusions to the Board of Directors and the General Assembly which shall close the accounts of the financial year just ended.

- The auditors may at any time during the financial year, demand explanations from the Chairperson of the Board of Directors on any negligence, irregularity and, in general, any issue that could compromise the company's creditworthiness or continuity which they may have noticed during their term of office. Upon failure to respond within two months or should his response be unsatisfactory, the auditors shall immediately inform, through a special report, the statutory organs and the Minister in charge of Finance.

- The auditor appointed by the General Assembly to replace another shall hold the office only for the rest of his predecessor's term.

- Any outgoing auditor shall be re-eligible, as provided for by subsection one above.

- The auditors shall be entitled to a remuneration determined by the General Assembly. The amount shall be maintained until otherwise decided by the General Assembly and it shall be charged to overhead expenses.

- The function of auditor shall be incompatible with:

     any activity or act that could jeopardise the independence of the auditor;

     any other remunerated function, even if it is a single project, within the company.

- An auditor may not be appointed director, General Manager or Deputy General Manager within five years after the end of his functions with the company.

## Section 43 – GENERAL AUDIT OFFICE

The General Audit Office shall be the internal office provided for by the regulations of the Banking Commission of Central Africa. It shall be in charge of the following three major missions:

- general auditing and inspection service;
- management supervision;
- organisation and methods.

The General Audit Office shall, in matters of hierarchy and functions attached to the General Manager. However, it shall report directly to the Board of Directors if required to do so.


## PART SEVEN – BUSINESS YEAR – BUDGET – ANNUAL ACCOUNTS – PROFITS – PROFESSIONAL SECRECY

## Section 44 – BUSINESS YEAR – BUDGET – ANNUAL ACCOUNTS

- The corporation shall be managed according to the rules of private accounting.

19

- The financial year shall begin on the first day of July of each year and end on the thirtieth day of June of the following year.

- Before the beginning of every financial year, the General Manager shall prepare simultaneously with the budget to be approved by the Board of Directors a programme of activities stating the objectives and results to be obtained during the year. These documents shall be forwarded to the Minister in charge of Finance.

- A progress report on the just-ended financial year shall also be prepared every year and submitted in like manner.

- Each year an inventory indicating the corporation's assets and liabilities shall, pursuant to the law be drawn up highlighting the appropriate elements of the corporation's assets shall being amortized as determined by the Board of Directors, a record of the company's assets and liabilities and a profit and loss account showing the company's yearly results.

- Annual accounts and balance sheets shall be drawn up by the Board of Directors, verified by the auditors and approved by the General Assembly at most six months after the end of the financial year. They shall be forwarded to the Minister in charge of Finance together with the management report of the Board of Directors and the auditors' reports.

## Section 45 – DETERMINING AND SHARING PROFITS

- The Board of Directors shall submit the apportionment of distributable profits to the Shareholders' General Assembly for approval.

- Distributable profits shall be the profits made during the year minus previous losses and money to be carried over as reserves, pursuant to the subsection herebelow, and added to the carried-over profit.

- Under penalty of rendering any contrary decision null and void, at least ten percent (10%) of the net profits for the financial year shall be allocated for the legal reserve fund. This allocation shall stop when the reserve fund reaches fifteen percent (15%) of the corporation's capital.

The Corporation's employees may be associated with the performance of the said fund for a maximum ten percent (10%) quota of the net profit of each financial year, in accordance with the terms and conditions laid down by the Board of Directors.

Except for the legal reserve fund, all reserve shall be made available to the Board of Directors for the Corporation's business, including the execution of General Assembly decisions, dividends, and the General Manager's percentage of profits, reimbursements or capital amortization.

## Section 46 – PAYMENT OF DIVIDENDS

Dividends shall be paid on a yearly basis at periods and under conditions laid down by the Board of Directors.

## Section 47 – PROFESSIONAL SECRECY

Every administrator, director, manager and supervisor shall be bound to professional secrecy.

However, professional secrecy shall not be demurrable to the Banking Commission for Central Africa, the National Financial and Monetary Committee, the Bank of Central African States, the Minister in charge of Finance, the Judge and Commission of Financial Markets.

### PART EIGHT – WINDING UP – LIQUIDATION – PROROGATION

## Section 48 – ANTICIPATED DISSOLUTION

- The Board of Directors may at any time propose the premature winding up of the corporation to the Extraordinary General Assembly,.

- In that regard, when it is seen from the accounting reports that losses incurred have reduced the corporation's own capital to less than half of the original share capital, the Board of Directors shall convene an Extraordinary General Assembly within at most six months following the report with a view to deciding on the measures to be taken to regularise the situation or, failing that, the anticipated dissolution of the corporation.

- In any case, the anticipated shall be announced at the end of the second year following the one during which the losses were recorded, should the bid to regularize the situation fail. The auditor or auditors shall notify the Minister in charge of Finance thereof as from the end of the first year of recording the losses.

- If the administrators fail to convene the Assembly as provided for above, for example if it was unable to form itself properly, every party concerned shall have the right to demand before the competent court that the corporation be dissolve.

## Section 49 –    CONSULTATION OF SHAREHOLDERS PRIOR TO THE END OF THE STATUTORY DURATION

- At least one year before the company's expiry date, the Board of Directors shall convene an Extraordinary General Assembly of Shareholders to decide on whether to extend or end the corporation.

- In case of failure to invoke this decision, any shareholder shall, thirty days after notifying by an official letter without receiving an acknowledgement of receipt, refer to the presiding judge in the headquarters' jurisdiction and request that an authorised agent be designated to convene and chair the said Extraordinary General Assembly.

21

## Section 50 – COMPANY EXTENSION – LIQUIDATION

The extension and liquidation of the company shall be subject to the regulations and laws in force applicable to banks.

## PART NINE – DISPUTES

## Section 51 – COMPETENT COURTS – ELECTION OF RESIDENCE – THE RIGHT TO TAKE COURT ACTION – PROVISIONS

-   Every dispute that may arise during the normal running of the corporation or during the liquidation thereof either among shareholders or between the corporation and shareholders themselves relating to the interpretation and execution of these Articles, or generally to business issues, shall be referred to the courts having jurisdiction where the headquarters is located.

-   To this effect, if a dispute arises, every shareholder shall elect domicile in the area where the headquarters are located and every summons, subpoena and notification shall be delivered at home. Should a shareholder fail to elect domicile, the summons, subpoena and notifications shall be validly done at the Public Prosecutor's office at the Yaounde High Court.

-   Shareholders representing at least twenty percent of the corporation's share capital shall, in their common interest and at their expense, elect one or several proxies, as claimants or defendants, to sue the administrators or auditors and to represent them, in court, without prejudice to individual suits that each shareholder may file in his name.

-   No decision of the General Assembly shall cancel an accountability action against administrators or auditors for a fault committed during their term of office.

-   The accountability action against the administrators or auditors shall be statute-barred three years from the date of the events that could have given rise to the said action, even these deeds might not have constituted a breach of criminal law. However, if these deeds are considered criminal, they shall be subject to provisions of criminal law.

## PART TEN – FINAL PROVISIONS

## Section 52 – EXPENSES

Any expenses incurred and fee paid in preparing these Articles and their modifications, particularly fees to conform, deposit and publication fees and every other expense that the company may have incur examination and consultation fees resulting from the conforming process, shall be borne by the corporation and shall be charged as the case may be, investment or conversion costs of transformation to be paid as shall be later decided by the Board of Directors.

22

**Section 53 – TAX AND CUSTOM SYSTEM**

The tax and custom regime of CHLF shall be determined by the general tax code, the customs code and the registration, stamp duty and trusteeship code.

**Section 54 – MARKET SYSTEM**

Contracts of the Cameroon Housing Loans Fund shall be subject to the law governing public contracts.

**Section 55 – REGISTRATION AND PUBLICATION**

To register and publish the present Articles and every deed and report relating to its conforming with the laws in force, the Chairperson of the Board of Directors and the General Manager or his representatives shall be given full powers to fulfil the required formalities.

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

Ndifon Robert
B.A. (Hons) University of Yaounde
M.A. (Translation) University of Montreal (Canada)

Ndifon Robert Ikainyui
B.A. ( Yaounde); M.A.(Montréal )
Senior  Translator
NATIONAL ASSEMBLY OF CAMEROON

**EXHIBIT HMM-2**

**TO DECLARATION OF HENRI MEKONGO MBALA**

**EXAMPLES OF LOANS APPROVED BY JOSEPH EDOU**

Yaoundé, le 9 juin 2005

FEUILLE DE DECISION

Prêt n° 194765
TETANG THOMAS
CONSTRUCTION RESIDENCE PRINCIPALE

| PRET: Fonciers classique autres... | 9.706.000 CFA sur 10 ans |
| | Taux          :    7,00 % |
| | Différé total: 6 MOIS |

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$PC = 9.706.000$ a 10ans

$D = 6$  $i = 7\%$

PROPOSITION DU DIRECTEUR GENERAL:                    10/6/05

Accn⌐ 1781

CREDIT FONCIER DU CAMEROUN
Le Directeur
Général
★

J. EDOU

DECISION DU COMITE:

RESERVES:

CREDIT FONCIER — CAMEROUN
INSPECTION GENERALE
Inspecteur Général
Chargé des Affaires
Juridiques et du
Recouvrement
★

Henri Mekongo Abala

NB: Dossier comité

Yaoundé, le 20 juillet 2005

FEUILLE DE DECISION

Prêt n° 194746
DJELANI ABDOULAYE
CONSTRUCTION RESIDENCE PRINCIPALE

PRET: Fonciers classique autres...        6.544.000 CFA sur 9 ans
                                          Taux       :    7.00 %
                                          Différé total: 6 MOIS

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$PC = 6.544.000$ en 9 ans

$D = 6$ i = 7%

AAAJ

PROPOSITION DU DIRECTEUR GENERAL:

Accord 26 JUIL

J. EDOU

CREDIT FONCIER DU CAMEROUN
Le Directeur
Général
★

DECISION DU COMITE:

RESERVES:

CREDIT FONCIER DU CAMEROUN
INSPECTION GENERALE
Inspecteur Général
Chargé des Affaires
Juridiques et du
Recouvrement
IG/AR
★

Henri Mekongo Akhala

NB: Dossier comité

Yaoundé, le 18 juillet 2005

**FEUILLE DE DECISION**

Prêt n° 196435
**AISSATOU EP ABDOULAYE**
AMELIORATION RESIDENCE DE RETRAITE

---

PRET: Fonciers classique autres...          5.697.000 CFA sur 6 ans
                                             Taux        :    7,00 %
                                             Différé total: 3 MOIS

---

AVIS DU DIRECTEUR DE L'EXPLOITATION:

PC = 5.697.000 en 6ans

D=3    i=7%

201705

PROPOSITION DU DIRECTEUR GENERAL:



J. EDOU

DECISION DU COMITE:

RESERVES:

Henri Mekongo Mbala

NB: Dossier comité

Yaoundé, le 15 février 2005

**FEUILLE DE DECISION**

Prêt n° 190129
**HAMADOU (20/12/1966)**
FINITIONS RESIDENCE PRINCIPALE  A

---

PRET: Fonciers classique autres...          4.476.000 CFA sur 20 ans
                                           Taux         :     7.00 %
                                           Différé total: 3 MOIS

---

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$Pc = 4.476.000$ en 20ans

$D = 3$    $i = 7\%$

16/2/05

PROPOSITION DU DIRECTEUR GENERAL:

Accord 135 ₣

J. EDOU

CREDIT FONCIER DU CAMEROUN
Le Directeur
Général
★

DECISION DU COMITE:

RESERVES:



NB: Dossier comité

Yaoundé, le 15 mars 2005

FEUILLE DE DECISION

Prêt n° 188514
**YONKEU EPSE KOLONTCHANG CLAUDINE**
CONSTRUCTION RESIDENCE PRINCIPALE

| PRET: Fonciers classique autres... | 5.130.000 CFA sur 13 ans |
| | Taux          :     6.50 % |
| | Différé total: 6 MOIS |

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$Pc = 5130.000$ sur 13 ans

$D = 6$   $c = 6.50\%$

7/4/05

PROPOSITION DU DIRECTEUR GENERAL:

*Bon* 11 45

**J. EDOU**

CREDIT FONCIER DU CAMEROUN
Le Directeur
Général

DECISION DU COMITE:

RESERVES:

CREDIT FONCIER DU CAMEROUN
INSPECTION GENERALE
Inspecteur Général
Chargé des Affaires
Juridiques et du
Recouvrement
IG/AR

*Henri Mekongo Mbala*

NB: Dossier comité

Yaoundé, le 21 juin 2005

FEUILLE DE DECISION

Prêt n° 195241
**YAZID AMINOU**
FINITION RESIDENCE PRINCIPALE

| PRET: Fonciers classique autres... | 5.860.000 CFA sur 10 ans |
| | Taux : 7,00 % |
| | Différé total: 3 MOIS |

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$PC = 5.860.000$ en 10 ans

$D = 3$ $i = 7\%$

PROPOSITION DU DIRECTEUR GENERAL:

DECISION DU COMITE:

RESERVES:

NB: Dossier comité

**EXHIBIT HMM-3**

**TO DECLARATION OF HENRI MEKONGO MBALA**

**EXAMPLES OF LOANS APPROVED BY THE CFC MANAGEMENT COMMITTEE**

Yaoundé, le 17 août 2005

FEUILLE DE DECISION

Prêt n° 197384
GWET JEAN HENRI
CONSTRUCTION RESIDENCE PRINCIPALE

---

PRET: Fonciers classique autres...          16.016.000 CFA sur 18 ans
                                              Taux        :    7.00 %
                                              Différé total: 9 MOIS

---

AVIS DU DIRECTEUR DE L'EXPLOITATION:

Pc = 16 016 000 en 18ans

D= 9  i = 7%

PROPOSITION DU DIRECTEUR GENERAL:          18/8/05

Avis partagé  26.8.15

J. EDOU

DECISION DU COMITE:   ACCORD du COMITE du 10-11-05.

RESERVES: — Hypotheque ferme sur le TF morcelé au
profit du client a'lui mise en place du prêt
— Assurance vie + Incendie
— AUI (Brice) + OVP des mensualités au
profit du Cfc.
— Signature acte de prêt.

NB: Dossier comité

Michel FOUEDJIO

Yaoundé, le 15 décembre 2004

FEUILLE DE DECISION

Prêt n° 188225
**AHMADOU AHIDJO**
CONSTRUCTION RESIDENCE PRINCIPALE

PRET: Fonciers classique autres...        39.249.000 CFA sur 7 ans
Taux        :    7.00 %
Différé total: 6 MOIS

AVIS DU DIRECTEUR DE L'EXPLOITATION:

*Prêt classique de 39 249 000 F en 7 ans; Différé: 6 mois, Taux: 7,00 %*
*15/12/04*

PROPOSITION DU DIRECTEUR GENERAL:

*Sans    objection   22 12 04*

J. EDOU

DECISION DU COMITE:

*ACCORD du 27. 12. 2004*

RESERVES: *— Hypothèque ferme sur le T.F 32320/ Mfoundi*
*à la mise en place du prêt.*
*— permis de bâtir avant le dernier déblocage*
*— AVI (SGBC) + OVP des mensualités du prêt au*
*profit du cfc.*
*— Assurance vie sur 2 têtes + Ass. Incendie + Ass. pet*
*revenus.*

NB: Dossier comité *— Signature conjointe de l'acte de prêt*



Yaoundé, le 14 février 2005

FEUILLE DE DECISION

Prêt n° 190179
**BELLA EPSE ABANDA KPAMA MARIE**

FINITIONS RESIDENCE PRINCIPALE

EDWIGE

| PRET: Fonciers classique autres... | 22.491.000 CFA sur 10 ans |
| | Taux        :    7,00 % |
| | Différé total: 3 MOIS |

AVIS DU DIRECTEUR DE L'EXPLOITATION:

Pℓ : 22.491.000 en 10 ans

D = 3        i = 7%

13745

PROPOSITION DU DIRECTEUR GENERAL:

Sans objection

J. EDOU



DECISION DU COMITE:

ACCORD AU 03-03-05

RESERVES: — HYPOTHEQUE FERME SUR TF N° 21845/WOURI A
LA MISE EN PLACE DU PRET, APRES RADIATION
D'HYPOTHEQUE INSCRITE EN FAVEUR C.L.C.
— SIGNATURE CONJOINTE DE L'ACTE DE PRET.
— ASSURANCE VIE SUR DEUX TETES + INCENDIE + ASSURAN
— PERMIS DE BATIR AVANT LE DERNIER DEBLOCAGE DU
PRET.
— AVI (CLC) + OVP DES MENSUALITES DU PRET
DU CFC.

J. EDOU

Yaoundé, le 13 juillet 2005

**FEUILLE DE DECISION**

Prêt n° 196148
**BELA JEAN MARIE**
CONSTRUCTION RESIDENCE PRINCIPALE

---

PRET: Fonciers classique autres...    15.208.000 CFA sur 13 ans
Taux        :    7,00 %
Différé total: 6 MOIS

---

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$$P_C = 15.208.000 \text{ en } 13 \text{ ans}$$

$$D = 6 \quad i = 7\%$$

14/7/05

PROPOSITION DU DIRECTEUR GENERAL:

Même avis 21/05

*Le Directeur Général*

DECISION DU COMITE:

RESERVES:    ACCORD DU 04-08-05
- Hypothèse ferme sur TF N° 30682/Yaoundi à la mise en
place du prêt.
- Permis de bâtir à produire avant dernier déblo-
cage de prêt
- AVI (CLC) + OVP des mensualités du prêt au profit a
CFC
- Assurance vie + incendie (....)

*Le Directeur Général*

J. EDOU

NB: Dossier comité

Yaoundé, le 19 octobre 2004

FEUILLE DE DECISION

Prêt n° 186538
**HELE PIERRE**
FINITIONS RESIDENCE DE RETRAITE

| PRET: Fonciers classique autres... | 25.000.000 CFA sur 8 ans |
|---|---|
| | Taux          :    7,00 % |
| | Différé total: 6 MOIS |

AVIS DU DIRECTEUR DE L'EXPLOITATION:

$$Pt = 25.000.000 \text{ en } 8 \text{ ans}$$

$$D = 6 \quad i = 7\%$$

19/10/04

PROPOSITION DU DIRECTEUR GENERAL:

Même avis 22/00u

J. EDOU

DECISION DU COMITE:

ACCORd du 27.12.2004

RESERVES: — procuration
— Hypotheque ferme sur le TF 371/BEMOUE a la mise en place du prêt.
— permis de bâtir avant le dernier déblocage
— Assurance vie + Incendie + perte revenus
— nantissement des loyers au profit du crédit financier + OUP des mensualités au profit du cfc

NB: Dossier comité

**EXHIBIT HMM-4**

**TO DECLARATION OF HENRI MEKONGO MBALA**

**EXAMPLES OF LOANS APPROVED BY THE CFC BOARD OF DIRECTORS**

# Crédit Foncier
# du Cameroun

**B P 1531 - YAOUNDE - Téléphone : 23 52 16 / 23 52 17 - Télécopie : 23 52 21**

## CONSEIL D'ADMINISTRATION
## EXTRAORDINAIRE N° 2
## DU 14 JUIN 2005

## RESOLUTION

**Le Conseil a délibéré de l'ordre du jour suivant :**

Examen des dossiers de prêts des programmes immobiliers ROC à Yaoundé et Santa Helena à Limbé.

**05-07     PROGRAMME IMMOBILIER ROC A YAOUNDE**

Le Conseil d'Administration autorise la Direction Générale à mettre en place le financement du Programme Immobilier ROC pour un montant de F CFA 430 000 000.

**05-08     PROGRAMME IMMOBILIER SANTA HELENA A LIMBE**

Le Conseil d'Administration autorise la Direction Générale à mettre en place le financement du Programme Immobilier SANTA HELENA pour un montant de F CFA 334 000 000 sous réserve de la cession du terrain d'assiette au projet par l'initiateur dudit projet.

A. BOOTO A NGON

**DECLARATION OF BÉATRICE R. ASSENA**

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MBI Group, Inc., *et al.,*

      Plaintiffs,

    v.

Crédit Foncier du Cameroun,

  and

The Government of the Republic of Cameroon,

      *Defendants.*

1:07-cv-00637-JDB

## DECLARATION OF BÉATRICE R. ASSENA

BÉATRICE R. ASSENA declares pursuant to 28 U.S.C. § 1746:

    1.    I am a citizen of Cameroon and a resident of Yaoundé.   I am a Notary Public in Cameroon.  My office address is at 900, Avenue Winston Churchill, B.P. 6184, Yaoundé, Cameroon.

    2.    In Cameroon, any conveyance of real property must be drawn by a notary public, who records and registers the deed, and carries out all legal formalities prescribed by law.

    3.    On 4 August 2005, as Notary, I drew up a deed whereby land subject of Land Title Number 1504 of Mfoundi, Division, was conveyed by Sandji Ndongo François to The Falls SA., represented by Koh Koh.  Attached hereto as Exhibit BA-1 is a copy of the official record of the transaction.

4.    Attached hereto as Exhibit BA-2 is a copy of a certified check dated 05 August 2005, drawn by Atlantic Group SCI on its account in the Union Bank of Cameroon in the amount of 80,000,000 FCFA in payment of the purchase price of the property.  The CFA is tied to the EURO at a fixed rate of EUROS 655.84 Accordingly, the 80,000,000 FCFA purchase price of the property is equivalent to    EUROS 121,980.9.

5.    Attached hereto as Exhibit BA-3 is a copy of a certified check n0: 0009108, dated 5 August 2005, drawn by Atlantic Group SCI on its account in the Union Bank of Cameroon in the amount of 15,954,855 FCFA in payment of cost in connection with the transaction.

6.    Attached hereto as Exhibit BA-4 is a copy of my letter No: 20892 dated 6 October 2005 to the 'Conservation Foncière du Mfoundi' (Land Registry of Mfoundi) to have the property duly registered in the name of The Falls SA.

7.    Attached hereto as Exhibit BA-5 is a copy of the 'Ordre de Versement des Redevances Foncieres' (Order for the Payment of Real Estate Tax) issued by the Land Registry of Mfoundi, a copy of my check no: 0451751, in favour of the Land Registry of Mfoundi and a copy of a treasury receipt no: 0142729 dated 15/11/2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 31, 2007, at Yaoundé, Cameroon.

Béatrice R. Assena

Béatrice R. Asséna

## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| *Plaintiffs*, | : | |
| v. | : | 1:07-cv-00637-JDB |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| The Government of the Republic of Cameroon, | : | |
| *Defendants*. | : | |

---

## DECLARATION OF EVANS M. MUNA

EVANS M. MUNA declares pursuant to 28 U.S.C. § 1746:

I am a Barrister-at-Law in the Republic of Cameroon, with offices at 728-742 Rue de Narvick, BP. 307, Yaounde, Cameroon.  I am fluent both in English and in French.

I prepared the text of the attached declaration of Beatrice R. Assena from information she provided to me.  I translated the declaration fully and accurately into French for her, as she is Francophone.  She acknowledged that she fully understood the assertions in the declaration, and she executed the declaration as her own.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 26, 2007.

_____

Evans M. Muna

**EXHIBIT BA-1**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**DEED**

# EXPEDITION

**REPERTOIRE N°** : 5112                **TAXE N°** : 5215

**DATE :** 04 août 2005

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Vente par Monsieur SANDJI NDONGO François à la Société ''THE FALLS'' SA d'une parcelle de terrain bâtie sise à YAOUNDE (BASTOS), à morceler du titre foncier numéro 1504 du Mfoundi**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Etude de Me Béatrice Rufine ASSENA**
**Notaire**

**BP 6184  YAOUNDE**
**Téléphone  : 22 22 44 76**
**Mobile       : 96 41 54 06**
**City phone : 22 00.88.69**
**Télécopie   : 22 23 17 96**
**E-Mail : assena@iccnet.cm ou assenaoffice@yahoo.fr**
**République du CAMEROUN**

# EXPEDITION

Vente immobilière



**REPERTOIRE N° 5112**
**DU 04.08.2005**

PARDEVANT Maître Béatrice Rufine ASSENA, Notaire à YAOUNDE (République du CAMEROUN), y demeurant, BP 6184, soussignée.

## ONT COMPARU

**1/- Monsieur SANDJI NDONGO François,** Pharmacien, demeurant à YAOUNDE BP 276, né le dix neuf décembre mil neuf cent trente à NYAMANGA II, fils de NDONGO Paul et de feue AMBATINDA Elisa, camerounais, titulaire de la carte nationale d'identité numéro 102601515 délivrée le deux avril deux mille deux à YAOUNDE.

Ci-après désigné "LE VENDEUR"

D'une part,

**2/- La société THE FALLS SA,** société anonyme avec administrateur général au capital de 25.000.000 FCFA (vingt cinq millions) dont le siège social est à YAOUNDE BP 30870 au lieudit Centre Commercial, immatriculée au Registre de Commerce et du Crédit Mobilier de YAOUNDE sous le numéro 2003.B.330 du 30 juillet 2003.

Représentée aux présentes par Monsieur KOH KOH, demeurant à YAOUNDE BP 30870, né le dix août mil neuf cent cinquante quatre à LENOUK, fils de feu KOSOH NDZONGO et de MEDOUA EBENE, camerounais, titulaire de la carte nationale d'identité numéro 101313309 délivrée le trois novembre deux mille à YAOUNDE.
En vertu des pouvoirs spéciaux à lui conférés par Monsieur ATEBA MINKOULOU Gabriel, Administrateur Général de la société THE FALLS SA, suivant acte numéro 4300 reçu le 24 juillet 2003 par Maître MENYE ONDO Pierre François Xavier, Notaire à YAOUNDE, enregistré à YAOUNDE CDI 7 (actes civils) le 28 juillet 2003 volume 4 folio 35 case et bordereau 304 aux droits de 10.000 FCFA (dix mille) quittance numéro 825399 du 25 juillet 2003.

Ci-après désignée «L'ACQUEREUR»

D'autre part.

Lesquels ont requis Maître Béatrice Rufine ASSENA, Notaire soussignée, en vue de rédiger ainsi qu'il suit la vente immobilière intervenue entre eux :

Etude Me Béatrice ASSENA

- 2 -

## VENTE IMMOBILIERE

Monsieur SANDJI NDONGO François a, par ces présentes, vendu en s'obligeant à toutes les garanties ordinaires de fait et de droit en pareille matière, à la société THE FALLS SA, ainsi que son Représentant l'accepte, l'immeuble dont la désignation suit :

### Désignation

Une parcelle de terrain urbain bâtie sise à YAOUNDE I au lieudit Bastos, d'une superficie de 920 m2 (neuf cent vingt mètres carrés), à morceler du titre foncier numéro 1504 du Mfoundi volume 8 folio 151 ;

Limitée : au Nord par une route non dénommée ; au Sud par le titre foncier numéro 1296 ; à l'Est par la partie restante du titre foncier numéro 1504 ; à l'Ouest par le terrain de Monsieur ESSOMBA Sébastien.

Tel que ledit immeuble existe, s'étend et se poursuit, avec tous immeubles par destinations et tous droits y attachés, sans aucune exception ni réserve.

### Origine de propriété

L'immeuble objet du titre foncier numéro 1504 du Mfoundi appartient en toute propriété à Monsieur SANDJI NDONGO François pour l'avoir acquis à titre onéreux de la Collectivité MVOG NKILI MBASSI ZOBO suivant acte reçu le 04 mai 1962 par Maître Philippe MONGO MBOCK, Notaire à YAOUNDE, dûment enregistré, ainsi qu'il ressort des énonciations contenues dans les bordereaux analytiques dudit titre foncier.

### Propriété et Jouissance

La société THE FALLS SA, ACQUEREUR, aura à compter de ce jour l'entière propriété et la jouissance de l'immeuble vendu par la simple prise de possession réelle.

### Charges et conditions

La présente vente a lieu sous les charges et conditions ordinaires de fait et de droit, notamment :

- L'ACQUEREUR prendra l'immeuble présentement vendu dans l'état où il se trouvera ce jour, sans pouvoir exercer aucun recours ni répétition contre le VENDEUR pour raison soit de mitoyenneté, soit de défaut d'alignement, soit de mauvais état des bâtiments, du sol ou du sous-sol, soit de vices, même cachés, soit enfin d'erreur dans la désignation ou dans la contenance, toute différence entre cette contenance et celle réelle devant faire le profit ou la perte de l'ACQUEREUR.

Etude Me Béatrice ASSENA

Vente immobilière

RÉPUBLIQUE DU CAMEROUN REPUBLIC OF CAMEROON
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS

FCFA **0001000**

TIMBRE FISCAL-FISCAL STAMP
13H15        0C67        0073
17/09/07        2        059462

CENTRE DIVISIONNAIRE
DES IMPOTS-YDE 3

- 3 -

- L'ACQUEREUR souffrira les servitudes passives, apparentes ou occultes, continues ou discontinues qui peuvent grever l'immeuble vendu, sauf à s'en défendre et à profiter en retour de celles actives, s'il en existe, le tout à ses risques et périls, sans recours contre le VENDEUR, et sans que la présente clause puisse donner à qui que ce soit plus de droits qu'il n'en aurait en vertu de titres réguliers non prescrits ou de la Loi.

- Le VENDEUR déclare que l'immeuble présentement vendu n'est à sa connaissance grevé d'aucune autre servitude que celles pouvant être énoncées aux présentes ou résulter soit de titres de propriété antérieurs soit de la situation actuelle des lieux et que personnellement, il n'en a créé ou conféré aucune autre.

- L'ACQUEREUR fera son affaire personnelle de manière que le VENDEUR ne soit jamais inquiété ni recherché à ce sujet de l'exécution ou de la résiliation de tous abonnements ou traités qui ont pu être contractés ou passés par le VENDEUR ou les précédents propriétaires notamment par le service des eaux, du gaz et de l'électricité, et il en paiera les redevances à partir de ce jour.

- L'ACQUEREUR acquittera à compter de ce jour tous impôts, taxes et charges de toute nature assis ou à asseoir sur l'immeuble présentement vendu.

- L'ACQUEREUR fera son affaire personnelle à compter de ce jour de manière que le VENDEUR ne soit jamais inquiété ni recherché à ce sujet des baux et locations pouvant exister sur l'immeuble vendu et ce, bien entendu, dans les cas seulement où il ne résulterait pas des présentes que ledit immeuble est vendu libre de toute location ou occupation.

- Enfin, l'ACQUEREUR paiera tous les frais, droits, honoraires et émoluments des présentes et ceux qui en seront la suite ou la conséquence, y compris le coût de toute grosse à délivrer éventuellement au VENDEUR, ainsi que les frais et honoraires de renouvellement, le cas échéant, de toute inscription de privilège de vendeur ou de prêteur de deniers à prendre en vertu du présent acte, et ceux occasionnés par la levée, la demande et l'obtention de tous états hypothécaires, hors ou sur formalité, ou autres états, ainsi que par la demande et l'obtention de tous certificats d'urbanisme, de voirie ou autres, et notamment ceux éventuellement annexés aux présentes.

## P R I X

En outre, la présente vente est consentie et acceptée moyennant le prix principal de 80.000.000 FCFA (quatre vingt millions de francs) payé comptant, hors la vue du Notaire soussigné, par la société THE FALLS SA à Monsieur SANDJI NDONGO François qui le reconnaît et lui en donne bonne et valable quittance.

**Dont quittance**

Etude Me Béatrice ASSENA

- 4 -

## Déclarations

Monsieur SANDJI NDONGO François fait les déclarations suivantes :

- il confirme expressément les énonciations qui figurent au présent acte concernant son état civil et sa capacité ;

- il n'existe de son chef aucun obstacle ni aucune restriction d'ordre légal ou contractuel à la libre disposition de l'immeuble présentement vendu ;

- Il n'est pas actuellement et n'a jamais été avant ce jour en état de faillite, de liquidation de biens, de règlement judiciaire ni de cessation de paiement ;

- l'immeuble présentement vendu n'a fait l'objet à son encontre d'aucune mesure de confiscation et personnellement, il ne fait l'objet d'aucune poursuite pouvant aboutir à sa confiscation ;

- il n'a reçu aucune notification tendant à l'expropriation de l'immeuble présentement vendu et celui-ci n'est pas compris dans une zone à urbaniser en priorité ni dans une zone d'aménagement différé ;

- l'immeuble vendu n'est grevé, à ce jour, d'aucune inscription de privilège ou autres.

## Publicité Foncière

Une expédition des présentes sera publiée par les soins du Notaire soussigné au Bureau de la Conservation Foncière du Centre à YAOUNDE. Si l'état levé par suite de l'accomplissement de cette formalité révèle l'existence d'inscriptions grevant l'immeuble vendu, le VENDEUR sera tenu ainsi qu'il s'y oblige, à en faire rapporter à ses frais, les mainlevées et certificats de radiation dans le mois de la dénonciation amiable qui lui sera faite au domicile ci-après élu, de l'état contenant lesdites inscriptions.

## Remise de titres

D'un commun accord entre les parties, l'ACQUEREUR sera subrogé dans les droits du VENDEUR pour se faire délivrer, à ses frais, tous titres de propriété ou pièces relatifs à l'immeuble vendu.

Etude Me Béatrice ASSENA



Vente immobilière

- 5 -

### Lecture des Lois - Affirmation de sincérité

Maître Béatrice Rufine ASSENA, Notaire soussigné, a donné aux parties lecture des articles 295 et 371 et suivants du Code Général des Impôts et des peines édictées par le Code Pénal.

Chacune des parties a affirmé sous les sanctions légales, que le présent acte exprime l'intégralité du prix convenu.

Et le Notaire soussigné affirme qu'à sa connaissance, le présent acte n'est modifié par aucune contre lettre contenant augmentation du prix ci-dessus fixé.

### Domicile

Pour l'exécution des présentes, les parties font élection de domicile en leur siège social et demeure ci-dessus indiqués.

### DONT ACTE SUR CINQ PAGES

Fait et passé en minute à YAOUNDE
En l'Etude de Maître Béatrice R. ASSENA
L'an deux mille cinq
Le quatre du mois d'août

Et après lecture entière, les comparants ont signé le présent acte avec Maître Béatrice Rufine ASSENA, Notaire.-

KOH KOH

SANDJI Ndongo François

Etude Me Béatrice ASSENA

Suivent les signatures de SANDJI NDONGO François, KOH KOH et Maître Béatrice Rufine ASSENA, cette dernière Notaire.

La minute porte les mentions d'enregistrement suivantes :

Enregistré à YAOUNDE CPIC 1 (Actes Civils)
Le trente août deux mille cinq
Volume 09 Folio 02 Case et Bd 1307/1
Reçu : douze millions de francs
Quittance numéro 1329623 du 30 août 2005
Le Chef de Centre Provincial
Le Chef de Centre Principal I et P.O
(é) Justin KAMMI
Inspecteur des Impôts

Pour expédition certifiée conforme à la Minute dûment collationnée et délivrée sur six pages, sans renvoi en marge ni mot rayé nul par Maître Béatrice Rufine ASSENA, Notaire soussigné.

Yaoundé, le    septembre 2007

Me Béatrice Rufine ASSENA



Département du MFOUNDI

Cabinet MOTASS

République du Cameroun

Paix – Travail – Patrie

**YAOUNDE**

T.F. N° ........................

Arrondissement de Ydé I

REPUBLIQUE DU CAMEROUN-REPUBLIC OF CAMEROUN
MINISTERE DE L'ECONOMIE ET DES FINANCES
DIRECTION GENERALE DES IMPOTS
(...) II (BASTOS)

FCFA **000 000**

TIMBRE FISCAL-FISCAL STAMP

CENTRE DIVISIONNAIRE
DES IMPOTS-YDE 3

13H16    7(...)    0073
17/09/07    2    059464

Plan joint au P.V. de bornage de morcellement
du T.F. n° 1504/MF, établi le 09 Août 2005 à la
demande de M. SANDJI NDONGO François
au profit de la société THE FALLS SARL

Emplacement

**Superficie:...920.......m²**

PLAN DE SITUATION ECHELLE 1/15000ᵉ

ROUTE EXISTANTE

(B1)

27.96    B1

(B1) B4    Terrain de M. ESSOMBA Sébastien

43.43

Piscine

B3

17.10    B2    (B3)

(B4)    T.F. 1296

Partie restante du T.F. 1504/MF

| S | X | Y |
|----|----------|------------|
| B1 | 1113166.14 | 1429911.17 |
| B2 | 20.29 | 871.94 |
| B3 | 184.62 | 868.13 |
| B4 | 1113168.59 | 1429908.49 |

Béatrice RUFINE ESSENA
REPUBLIQUE DU CAMEROUN
B.P. 6184
NOTAIRE A YAOUNDE

**Gmotass**
Géomètre-expert
B.P. 11452 Ydé Tél: 220 16 17
cabinettop...motass@yahoo.fr
O.G.E.C. A. 039

Echelle: 1/500ᵉ

Mappe de repérage
Feuille    au 1/15000ᵉ
C.C.    N° 1921 Mᵗ

L'annexe porte les mentions d'enregistrement suivantes :


Enregistré à YAOUNDE CPIC 1 (Actes Civils)
Le trente août deux mille cinq
Volume 09 Folio 02 Case et Bd 1307/2
Reçu : quatre mille francs
Quittance numéro : 1329623 du 30 août 2005
Le Chef de Centre Provincial
Le Chef de Centre Principal I et P.O
(é) Justin KAMMI
Inspecteur des Impôts


Pour expédition certifiée conforme à la Minute dûment collationnée et délivrée sur deux pages, sans renvoi en marge ni mot rayé nul par Maître Béatrice Rufine ASSENA, Notaire soussigné.



Yaoundé, le 17 septembre 2007

Me Béatrice Rufine ASSENA

**TRANSLATION OF EXHIBIT BA-1**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**DEED**

# AUTHENTIC COPY

**REGISTRQTION No.: 5112**                                    **TAX No.: 5215**

**DATE: 04 August 2005**

....................................................

**Sale by SANDJI NDONGO François to Sté "THE FALLS" of a plot located at YAOUNDE-BASTOS, to be parcelled out from land title No. 1504 of Mfoundi**

....................................................

**Chambers of Maître Béatrice Rufine ASSENA**
**Notary**

**P.O. Box 6184 YAOUNDE**
**Telephone: 222 44 76**
**Fax: 223 17 96**
**Email: assena@iccnet.cm, etude_assena@yahoo.fr**
**Republic of CAMEROON**

DIRECTORY No. 5112
OF 04.08.2005

BEFORE the undersigned Maître Béatrice Rufine ASSENA, Notary in YAOUNDE (Republic of Cameroon), residing in the same town, P.O. Box 6184.

<u>APPEARING</u>

1/- **Mr SANDJI NDONGO François,** pharmacist residing in YAOUNDE P.O. Box 276, born on the nineteenth day of December nineteen-thirty at NYAMANGA II, son of NDONGO Paul and of the late AMBATINDA Elisa, Cameroonian, holder of national identity card No. 102601515 issued on the second day of April two thousand and two at YAOUNDE.

Hereinafter referred to as "THE SELLER"

And

2/- **THE FALLS Plc,** public limited company with a general manager and a capital of twenty-five million (25 000 000) CFA Francs  with headquarters in Down Town YAOUNDE, P.O. Box 30870 registered at the YAOUNDE Commercial and Property Registry under No. 2003.B.330 of 30 July 2003.

Represented herein by Mr KOH KOH, residing in YAOUNDE P.O. Box 30870, son of the late KOSOH NDZONGO and of MEDOUA EBENE, born on the tenth of August nineteen fifty-four at LENOUK, Cameroonian, holder of national identity card No. 101313309 issued on the third of November two thousand at YAOUNDE.

By virtue of the special powers conferred on him by Mr ATEBA MINKOULOU Gabriel, General Manager of, Sté THE FALLS, following Deed No. 4300 received on 24 July 2003 by Maître MENYE ONDO Pierre François Xavier, Notary at YAOUNDE, registered at YAOUNDE CDI 7 (civil acts) 28 July 2003 volume 4 folio 35 note 304 on payment of a fee of ten thousand (10 000) CFA Francs receipt No. 825399 of 25 July 2003.

Hereinafter referred to as "THE BUYER"

Who requisitioned the undersigned Notary, Maître Béatrice Rufine ASSENA, draws this conveyance deed between them:

## PROPERTY SALE

Mr SANDJI NDONGO François has hereby sold to Sté :THE FALLS" giving every ordinary de facto and de jure guarantee, the property described herebelow as accepted by the company's representative:

DESCRIPTION

A parcel of developed urban land measuring nine hundred and twenty square metres (920 m2), situated in YAOUNDE I, in the BASTOS parcelled out from Land Title No. 1504 of Mfoundi volume 8 folio 51;

It is bounded on the North by an unnamed road; on the South by Land Title No. 1296; on the East by the remaining part of Land Title No. 1504, on the West by land owned by Mr ESSOMBA Sébastien.

As the said property is and stands, including the Landlord's fixtures with all attendant rights, without any exception or reservation.

### Origin

The plot referred to in Land Title No. 1504 of Mfoundi belongs exclusively to Mr SANDJI NDONGO François who acquired it against payment from the MVOG NKILI MBASSI ZOBO family, following the Deed received on 04 May 1962 by Barrister Philippe MVOGO MBOCK, Notary at Yaounde, and duly registered, as seen from the analytical notes of the said Land Title.

### Ownership

By simply taking actual possession of the property, the BUYER, THE FALLS, shall as from this day have complete ownership of the plot sold.

### Expenses and conditions

This sale is legitimately and effectively subject to the ordinary expenses and conditions, particularly:

- The BUYER shall take the property now sold in the state in which he finds it today, without any claim against the SELLER because of common ownership of party wall, redge, ditch etc or failure to align, deteriorated building, floor or basement, or defects even hidden, or, finally, an error in description or in its size, with any difference between the given and the real size being to the profit or the loss of the BUYER.

- The BUYER shall bear any easements or charges, be they passive, apparent or hidden, continued or discontinued, which may weigh down on the plot sold, except he refrains from using them but may at his own risk enjoy the benefits of the active ones, if there exist any. Without lodging any claim against the SELLER and without this clause giving whosoever more rights than he/she would have by virtue of any regular titles not prescribed or the law.

- The SELLER hereby declares that the property now being sold is, to the best of his knowledge, not saddled with any mortgage other than those that may be mentioned herein, or stem from previous land titles, or from the present location of the property, and that personally he has not set up any other easements involving the property.

- The BUYER shall as from this day, ensure that the SELLER should never be bothered or distained upon for this deed or for the cancellation of subscription or contract that may have been signed by the SELLER or previous owners, particularly the water, gas and power supply authority, and he shall pay the dues thereof.

- The BUYER shall pay all taxes that will be levied on the property now sold.

- The BUYER shall, as from this day, ensure that the SELLER is never bothered or distrained upon because of any eventual leases or rents on the property sold, and this, of course, only if this were not to result from this Deed that the property as it is sold is rent- or unoccupied.

- Finally, the BUYER shall bear all the charges and fees consequent upon this Deed and any other document relating thereto, or resulting there from, including the cost of any copies thereof to be delivered to the SELLER, as well as renewal costs, and as the case may be the costs of any registration of the seller's or moneylender's privileges under the terms of this Deed, and any expenses resulting from the lifting, claiming or obtention of any mortgage documents, formally or informally, or any other account, as well as any application and obtention of town planning, road building or other certificates, particularly those appended hereto.

## PRICE

Furthermore, this sale is authorized and accepted for a main cash price of eighty million (80,000,000) frs CFA cash, not in the presence of the undersigned Notary, by Sté "THE FALLS" to Mr SANDJI NDONGO François who has acknowledged it and issued a valid receipt to that effect to the BUYER.

## Declarations

Mr SANDJI NDONGO François hereby declares:

- he expressly confirms the statements made herein about his civil status and capacity;

- personally, he knows there is no legal or contractual obstacle or restriction on the free disposal of the property now sold;

- he is presently not, and has never been bankrupt, nor gone into liquidation, nor been ruled by the court to be insolvent;

- the property being sold has never been object of any distraint, and he, personally is not being prosecuted for any matter likely to result in its being distrained upon;

- he has received no expropriation notification for the property now being sold and the property is not located in a priority town planning zone, neither is it located in any other development area;

- the property sold is not to this day, burdened with any registered or other preferential right.

## Publicity

A copy of this Deed shall be by the undersigned Notary at the Registry of Deeds for the Centre Province in YAOUNDE. Should it be subsequently discovered that the property sold is saddled with a mortgage, the SELLER shall, as he has undertaken be forced to bear the costs replevin within the month he is notified of the said at the residence herein elected subscriptions.

## Granting of Titles

By mutual agreement the BUYER shall subrogate the SELLER in all rights and will be delivered, at his expense, only title deed or other documents relating to the property sold.

## Reading of the Law – Confirmation of Validity

The undersigned notary, Maître Béatrice Rufine ASSENA, Sections 295 and 371 for the General Tax Code and the sanctions provided for by the Penal Code.

Each party confirmed, under penalty of legal sanctions, that this deed clearly spells out the whole agreed price.

And the undersigned Notary confirmed that to the best of her knowledge, this Deed has not been modified by any counter letter containing an increase in the price as fixed above.

## Residence

For the execution of this Deed, the parties elect domicile in, their headquarters as written hereabove.

Deed in five pages
Done in YAOUNDE
At the Chambers of Maître Béatrice R. ASSENA
In the year two thousand and five
And on the fourth day of the month of August

And after thoroughly reading through, the parties signed the Deed with Barrister Béatrice R. ASSENA, Notary.-

*SANDJI Ndongo François*                                    *KOH KOH*

Then Messrs SANDJI NDONGO François, KOH KOH and Barrister Béatrice Rufine ASSENA, Notary appended their signatures.

The Deed mentions the following as regards the registration:

Registered at YAOUNDE CPIC 1 (Civil Acts)
On the thirtieth day of August two thousand and five
Volume 9 Folio 2 Case and Bd 1307/1
Received: twelve million
Receipt no. 1329623 of 30 August 2003
The Head of the Provincial Centre
For the Senior Head of Centre Number I
Justin KAMMI

Certified true copy of the deed duly collated and written out on six pages, without marginal alterations or words crossed out considered null by the undersigned Notary, Maître Béatrice Rufine ASSENA, undersigned Notary.-

Yaounde, 24 March 2006

<u>Maître Béatrice Rufine ASSENA</u>

The Appendix mentions the following registrations:

Registered at YAOUNDE CPIC 1 (Civil Acts)
On the thirtieth of August two thousand and five
Volume 9 Folio 2 Case and Bd 1307/2
Received: four thousand francs
Receipt no. 1329623 of 30 August 2003
The Head of the Provincial Centre
For the Senior Head of Centre Number I
Justin KAMMI

Certified true copy of the deed duly collated and written out on six pages, without marginal, alterations or words crossed out considered null by the undersigned Notary, Béatrice Rufine ASSENA, undersigned Notary.-

Yaounde, 24 March 2006

Barrister Béatrice Rufine ASSENA

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

Ndifon Robert
B.A. (Hons) University of Yaounde
M.A. (Translation) University of Montreal (Canada)

Ndifon Robert Nuinyui
B.A. (Yaounde); M.A. (Montréal)
Senior Translator
NATIONAL ASSEMBLY OF CAMEROON

**EXHIBIT BA-2**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**ATLANTIC GROUP CHEQUE FOR 80,000,000 CFAF**

AMOUNT CFA FRS XXXX80,000,000 000XXXX

CAF80,000,000-0

B.P.F CFA

èque certifié
e A

Bank of Cameroon

Reçu chèf de CFA quatre vingt millio

le 5 Août 2005

**EXHIBIT BA-3**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**ATLANTIC GROUP CHEQUE FOR 15,954,855 CFAF**



**EXHIBIT BA-4**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**COPY OF 6 OCTOBER 2005 LETTER TO LAND REGISTRY**

NE

# Béatrice R. ASSENA
## Notaire

900, avenue Winston Churchill
BP 6184 Yaoundé
Téléphone : 222 44 76 - Télécopie : 223 17 96
**E-Mail : assena@iccnet.cm**
       etude_assena@yahoo.fr

Yaoundé, le  06 octobre 2005

**Monsieur le Délégué Provincial**
**des Domaines et des Affaires Foncières**
**du Centre**
<u>**YAOUNDE**</u>

V/Réf :
N/Réf : 10692 /BRA/N/YDE
N° Dossier :  A/838

Objet : Morcellement du titre foncier numéro
       1504  du Mfoundi

Monsieur le Délégue Provincial,

Je vous prie de trouver ci-joint aux fins de droit :

   - une expédition de l'acte de mon ministère numéro 5112 du 04 août 2005 portant vente par Monsieur SANDJI NDONGO François à la société "THE FALLS" SA, d'une parcelle de terrain urbain bâtie sise à YAOUNDE-BASTOS, morceler du titre foncier numéro 1504 du Mfoundi ;

   - la copie du titre foncier numéro 1504 du Mfoundi ;
   - un procès-verbal de bornage ;
   - un certificat d'urbanisme ;
   - un certificat d'accessibilité ;
   - cinq plans de morcellement.

**Je vous remercie de procéder au morcellement dudit titre foncier au profit de la société "THE  FALLS" SA.**

Vous en souhaitant bonne réception et dans cette attente,

Veuillez croire Monsieur le Chef de Service, en ma parfaite considération.

Me Béatrice Rufine ASSENA

**TRANSLATION OF EXHIBIT BA-4**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**COPY OF 6 OCTOBER 2005 LETTER TO LAND REGISTRY**

**Beatrice R. ASSENA**

**NOTARY PUBLIC**

900, Winston Churchill Avenue

P.O.Box 6184, Youandé

Tel.: 22 22 44 76 Fax.: 22 23 17 96

E-mail: assena@iccnet.com

etude_asseba@yahoo.fr

CAMEROON

Yaounde, 06 October 2005

To The Provincial Delegate,

Lands and State Property

Centre Province

YAOUNDE

Your Ref:

Our Ref:         20892/BRA/N/YDE

File: No. A/838

Subject:         **Parcelling out of land title**

**Number 1504 of Mfoundi Division**

Mr. Provincial Delegate,

Kindly find attached hereto for legal purposes the following documents:

- an official copy of deed No. 5112 of my Ministry dated 4 August 2005 relating to a developed urban plot located in Bastos, Yaoundé, parcelled out from land titile No. 1504 of Mfoundi Division and sold to "THE FALLS" Company by SANDJI NDONGO François;

- a copy of land title No. 1504 of Mfoundi Division;

- a certificate of survey;

- a zoning certificate;

- an attestation of accessibility;

- 5 site plans.

Thank you for parcelling out this plot from the said land title for "THE FALLS" Company Ltd.

While hoping you would receive it soon, I am, Sir,

Yours with high regards,

**Barrister Beatrice Rufine ASSENA**

I the undersigned NDIFON ROBERT, Senior Translator at the National Assembly of the Republic of Cameroon do hereby attest under penalty of perjury that the above document is a true translation of the original.

Dated at Yaounde this 17th day of September 2007

Ndifon Robert
B.A. (Hons) University of Yaounde
M.A. (Translation) University of Montreal (Canada)

**EXHIBIT BA-5**

**TO DECLARATION OF BÉATRICE R. ASSENA**

**COPY OF PAPERS FROM LAND REGISTRY**

MINISTÈRE DES DOMAINES
ET DES AFFAIRES FONCIÈRES

RÉPUBLIQUE DU CAMEROUN
Paix – Travail – Patrie

DÉLÉGATION DÉPARTEMENTALE
DU MFOUNDI

CONSERVATION FONCIÈRE

*Qce n° 0142728*
*du 15-11-2005*

ORDRE DE VERSEMENT DES REDEVANCES FONCIÈRES

N° _160_ / OVRVF / DDM / CF / Ydé

Le Receveur des Domaines du Mfoundi à Yaoundé est autorisé à percevoir au titre de l'exercice 200 / 2005
Chapitre _____ Article _7.195_ Paragraphe _____
La somme de __₣ 1.605.000 ₣__
Assise sur la valeur : Superficie __₣ 80.000.000 ₣__
Correspondant aux droits de _morcellement + diminution_
Sur le titre foncier N° _1504_ du département _du MFOUNDI_
Au nom de M. _SOCIÉTÉ THE FALLS_

2 NOV 2005

Yaoundé, le _____

ASSERMENTÉES P/O _____

---

MINISTÈRE DES FINANCES ET DU BUDGET
*MINISTRY OF FINANCE AND BUDGET*

DIRECTION DU TRÉSOR
*TREASURY DEPARTMENT*

N° 0142729

Trésorerie Générale de : _Yaoundé 100_
Poste comptable : _RFD Ydé_ _0810_
*Treasury station*

## DÉCLARATION DE RECETTE
### *DECLARATION OF RECEIPT*

Je soussigné,
*I, the undersigned*

~~Trésorier Payeur Général~~
*Treasurer - General*
Receveur des ~~Finances~~ de _Yaoundé_ déclare m'être chargé en recette
*Divisional Treasurer of* *acknowledge receipt*
~~Percepteur~~
*Sub - Treasurer*
de la somme de _Un million six cent cinq mille_ (en toutes lettres) **1.605.000 F**
*of the sum of (in words)*
remise par M. _La Société THE FALLS_
*paid by*
demeurant à _Yaoundé_ B.P. _____ Contribuable : _____
*resident at* *Taxpayer's N°*

en règlement de l'opération suivante _Morcellement & diminution_ _1504/MFOUNDI_
*in settlement of the following transaction*
par Chèque bancaire *(bank cheque)* n° _0009 SGBC_ du _10-11-2005_ de _1.605.000 ₣_ F
Mandat postal *(money order)* n° _____ du _____ de _____ F
Autre titre *(other means of settlement)* _____ de _____ F

En foi de quoi la présente déclaration de recette a été délivrée pour servir et valoir ce que de droit.
*This declaration of receipt therefore is issued to serve the purpose it deserves where and even necessary.*
La présente déclaration vaut quittance.

Fait à _Yaoundé_, le _15-11-2005_
*Done at* *the*

FRANÇOIS MBONGO Le Comptable
CONTRACTUEL D'ADMINISTRATION *The Accountant*

FRANÇOIS-CHARLES OBEBTHUR FIDUCIAIRE

P026

Cheque   09/03/04
0451751

AMOUNT CFA FRS
B.P.F CFA

= 1.605.000 =

## UBC   Union Bank of Cameroon PLC

PAY AGAINST THIS CHEQUE   Un million six cent mille francs CFA
PAYER CONTRE CE CHÈQUE   (not endorsable except for the benefit of a bank or an organization authorized by law) ABOUT IN LETTERS - SOMME EN TOUTE LETTRE

TO THE ORDER OF   Receveur Departemental des Domaines du
A L'ORDRE DE

PAYABLE AT   Depuis   AT/A   THE/LE   10. 11. 2005

Yaounde Branch
Immeuble Mercure Hotel
P.O Box 13698  Yaounde

ETUDE Me ASSENA
BEATRICE
40042J0411
BP 6184  YAOUNDE

Cheque
0451751

"0451751" "000000010"

**DECLARATION OF KOH KOH**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MBI Group, Inc., et al.,
          *Plaintiffs,*

     v

                            1:07-cv-00637-JDB

Credit Foncier du Cameroun

     and

The Government of the Republic of Cameroon
          *Defendants*

---

## DECLARATION OF KOH KOH

KOH KOH declares pursuant to 28 U.S.C. § 1746:

    1.    I am a citizen of Cameroon and a resident of Yaounde.   I am working with the Institute of Public Management, Yaounde.

    2.    On 24 July 2003, Ateba Minkoulou Gabriel, the sole shareholder of The Falls, a Cameroonian corporation, executed a power of attorney for me to act in all circumstances in the name of The Falls.

3.    That on going to the Notary Public I knew that it was for the finalizing of the creation of a company, it is only in the Notary Publics Office that I was informed that Ateba Minkoulou Gabriel is executing a Power of Attorney for me.

4.    Prior to 24 July 2003, I was not acquainted with Ateba Minkoulou Gabriel, and after 24 July 2003, I did not have any further contact with him.

5.    That it was during the preliminary inquiries that I learnt that the wife of Ateba Minkoulou Gabriel is a relative to Joseph Edou.

6.    I accepted the power of attorney at the request of Joseph Edou, with whom I was previously acquainted, and it is my understanding that in appointing me Ateba Minkoulou Gabriel acted at the direction of Joseph Edou.

7.    Prior to my appointment on 24 July 2003, I had little experience in business affairs and no experience in acting on behalf of a company such as The Falls. In my actions on behalf of The Falls, I followed the instructions of Joseph Edou and made no decisions independent of his instructions.

8.    On 24 March 2004, I executed the Articles of Atlantic Group SCI on behalf of The Falls, which was one of the shareholders of Atlantic Group SCI. I know little of the details of this transaction. In this matter, I acted solely on the instructions of Joseph Edou.

9.    On 4 August 2005, I acted on behalf of The Falls in connection with the sale of a parcel of land in Yaoundé-Bastos to The Falls. My understanding was that Atlantic Group purchased the property for The Falls, but I know little of the details of the transaction. In this matter also, I acted solely on the instructions of Joseph Edou.

- 2 -

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 27, 2007, at Yaoundé, Cameroon.

Koh Koh

I, DJAPA Theodore, Barrister at Law, of the Cameroon Bar Association, Counsel for Koh Koh, do hereby attest under penalty of perjury, that this document was duly signed by my client and in my presence, this 27th day of August 2007.

**DJAPA Theodore**

**Barrister at Law**

- 3 -

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| *Plaintiffs*, | : | |
| v. | : | 1:07-cv-00637-JDB |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| The Government of the Republic of Cameroon, | : | |
| *Defendants*. | : | |

## DECLARATION OF DJAPA THEODORE

DJAPA THEODORE declares pursuant to 28 U.S.C. § 1746:

I am a Barrister-at-Law in the Republic of Cameroon, with offices at BP. 13099, Yaounde, Cameroon. I am fluent both in English and in French.

I prepared the text of the attached declaration of Koh Koh from information he provided to me. I translated the declaration fully and accurately into French for him, as he is Francophone. He acknowledged that he fully understood the assertions in the declaration, and he executed the declaration as his own.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 26, 2007.

DJAPA THEODORE

**DECLARATION OF BOSCOLO ANDREA**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun, | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| Defendants. | : | |

### DECLARATION OF BOSCOLO ANDREA

BOSCOLO ANDREA declares pursuant to 28 U.S.C. § 1746:

    1.    I am a resident of Yaoundé-Bastos, Republic of Cameroon.   I am General Manager of the company Patrice Bois.

    2.    I reside in an apartment in the property in Yaoundé-Bastos, subject of Land Title Number 1504, of Mfoundi, that was formerly owned by Mr. Sandji Ndongo François and sold by him on 4 August 2005.  In the course of the sale I was introduced to Tchoufa Roger by Sandji Ndongo François as the person rents had to be paid to.

    3.    However, the person who after wards collected the rents from me was Joseph Edou, who acted in all aspects as the owner of the property.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 4, 2007, at Yaoundé, Cameroon.

_____
Boscolo Andrea

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.,* | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants.* | : | |

## DECLARATION OF BIYICK THOMAS

BIYICK THOMAS declares pursuant to 28 U.S.C. § 1746:

I am a Bailiff in the Republic of Cameroon, with offices at BP.11277, Yaounde, Cameroon.  I am fluent both in English and in French.

I prepared the text of the attached declaration of Boscolo Andrea from information he provided to me.  I translated the declaration fully and accurately into English for him, as his native language is French.  He acknowledged that he fully understood the assertions in the declaration, and he executed the declaration as his own.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 26, 2007.

BIYICK THOMAS

**DECLARATION OF AMBASSADOR TIBOR P. NAGY, JR.**

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.,* | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| The Government of the Republic of Cameroon, | : | |
| *Defendants.* | : | |

## DECLARATION OF AMBASSADOR TIBOR P. NAGY, Jr.

AMBASSADOR TIBOR P. NAGY, Jr., declares pursuant to 28 U.S.C. § 1746:

1. I am currently Associate Vice Provost for International Affairs at Texas Tech University in Lubbock, Texas.

2. From 1978 through 2002, I served in the US Foreign Service. I spent twenty years in Sub-Saharan Africa as a United States diplomat at eight postings, including the west, southern, eastern, and central regions of the continent, with my assignments covering the full range of professional duties. I served in Lusaka, Zambia, as General Services Officer from 1979-81; in Victoria, Seychelles, for two years as the second ranking officer at the post; and in Addis Ababa, Ethiopia, as Management Officer from 1983-84. During the next eight years,

I served as the Deputy Chief of Mission in the US embassies in Lome, Togo (1987-90), in Yaounde, Cameroon (1990-93), and in Lagos, Nigeria (1993-95). From 1996 to 1999 I served as US Ambassador to Guinea, and from 1999 to 2002, I served as US Ambassador to Ethiopia.

3. During my extensive time in Africa, I gained expertise in the politics, economics, cultures, and languages of the regions where I served. Because my postings – with the exception of Nigeria – did not include a US Department of Commerce Foreign Commercial Service (FCS) presence, I spent considerable time promoting and supporting US businesses in the countries where I was serving. Prior to my first Deputy Chief of Mission assignment (1987), I completed the Department of State's specialized six month economic/commercial course of study – normally restricted to economic specialists – in preparation for performing economic and commercial responsibilities as part of my deputy portfolio. At all of my postings I met frequently with US business representatives and potential US investors to brief them and discuss the local economic/commercial environment, including local opportunities and practices, local Government regulations and impediments, cultural considerations, economic factors and constraints, political realities, the effect of US policies on business operations, etc.

4. During my twenty years in Africa, I was called on to assist US businesses with numerous major and minor issues. In doing so, I investigated and became familiar with, among other issues, the requirements set by various governments, government agencies and government-owned companies for entering into contracts with or securing commitments from such entities. I advised and worked closely with US businesses seeking to obtain such contracts and commitments in the various African countries in which I served,

including Cameroon. This experience has provided me with a wide acquaintance with the requirements for obtaining approvals for such contracts and commitments in these countries.

5.    African Governments such as Cameroon's tend to be centralized to the extent that decisions on all important matters – most especially involving large sums of money (e.g., above $100,000 in my experience); awarding of major contracts; sale, purchase, or lease of strategic real estate; employment for key positions; etc. – involving either government or quasi-government entities (such as Crédit Foncier du Cameroun), would routinely require reviews and approvals beyond and above the General Manager level. Depending on the value of the contract or importance of the matter at hand, such reviews could involve the governing board, officials of the appropriate ministry (including the Minister), officials of the Presidency, and perhaps even the President.

6.    I have read the Complaint filed April 4, 2007, by MBI Group, Inc., and Atlantic Group, SCI (jointly "Plaintiffs") in this proceeding, the allegations therein and the "Memorandums of Agreement" attached as Exhibits A, B and C to the Complaint. Each of the documents purports to be executed by Joseph Edou, with the following legend below his signature line: "Duly authorized for and on behalf of CREDIT FONCIER DU CAMEROUN." Exhibit A also identifies Joseph Edou as "Director General."

7.    Of course, the specific requirements for approval of contracts and other commitments with state-owned companies differ among African countries and often among different state-owned companies within the same country. However, I know of no state-owned company whose procedures would permit an individual, of whatever official capacity with the company, to make on the company's behalf a binding contract or commitment such as

those purportedly undertaken by Crédit Foncier du Cameroun ("CFC") in Exhibit A, B, or C.

8. Exhibit A contains the following Paragraph 3.b: "CFC will provide all construction and project development financing of approximately US$49 million, and shall provide the necessary financial guarantees." Exhibits B contains the following Paragraph 3.e: "CFC will provide mortgage loans for the approved buyers of the estimated 1,200 housing units to be constructed by Atlantic Group SCI." Exhibits C contains the following Paragraph 3.e: "CFC will provide mortgage loans for the approved buyers of the estimated 2,000 housing units to be constructed by Atlantic Group SCI."

9. Based on my experience, it is inconceivable that the General Manager (or "Director General") of CFC would have the sole authority to sign a contract with the scope and value of that contained in Exhibit A, B or C. Such a contract or commitment typically requires multiple due-diligence reviews, eventual approval by the company's Board of Directors, and often approval by higher government officials.

10. In my experience the above conditions are common knowledge among companies doing business in West/Central Africa, and a company participating in a high value contract would make sure that it had necessary formal approvals, as well as acquiescence at the technical and/or professional managerial levels. Even a company unfamiliar with doing business in Cameroon could learn immediately from more knowledgeable local business contacts, or by consulting with the US Embassy, of the due diligence required before entering into such a contract – and of the absolute necessity of assuring that any potential agreement had the approval of the appropriate Cameroonian Government officials.

Executed on September 8 , 2007, at _LUBBOCK TX_.

Ambassador Tibor P. Nagy, Jr.

**DECLARATION OF NDIFON ROBERT**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.,* | : | |
| *Plaintiffs,* | : | |
| v. | : | 1:07-cv-00637-JDB |
| Crédit Foncier du Cameroun | : | |
| and | : | |
| The Government of the Republic of Cameroon, | : | |
| *Defendants.* | : | |

## DECLARATION OF NDIFON ROBERT

NDIFON ROBERT declares pursuant to 28 U.S.C. § 1746:

I am Senior Translator at the National Assembly of the Republic of Cameroon, qualified to translate French documents into English.

The following documents prepared for submission by the Defendants in this proceeding and listed below are correct and complete translations of the original French versions.

Exhibits to the Declaration of Professor Ephraim Ngwafor:

EN-1    Translation of the Articles of The Falls PLC.

EN-2    Translation of the Delegation of Power by the Single Shareholder of The Falls PLC.

EN-3    Translation of the Articles of Atlantic Group, SCI.

EN-4    Translation of Deed of property from Sandji Ndongo to The Falls PLC.

Exhibit to the Declaration of Henri Mekongo Mbala:

HMM-1   Translation of the Articles of CFC.

Exhibits to the Declaration of Béatrice R. Assena

BA-1   Translation of Deed of property from Sandji Ndongo to The Falls PLC.

BA-4   Translation of 6 October 2005 letter to land registry.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated at Yaounde this 25th day of September  2007.


Ndifon Robert
B.A. (Hons) University of Yaounde
M.A. (Translation) University of Montreal (Canada)

- 2 -

**29 MARCH 2005 CONTRACT**

## CONVENTION DE FINANCEMENT
## CFC / SCI ATLANTIC GROUP

## PROGRAMME D'HABITAT SOCIAL A
## YAOUNDÉ OLEMBE II

Entre le **Crédit Foncier du CAMEROUN**, Société à capital public avec Conseil d'Administration, au capital de 6 000 000 000 Fcfa, registre de commerce n°1–046 dont le siège social est à Yaoundé BP 1531 au Boulevard du 20 mai 1972, représenté par Monsieur Joseph EDOU, son Directeur Général,

Ci- après désigné en abrégé le **CFC**, d'une part,


Et la **Société Civile Immobilière ATLANTIC GROUP** au capital de 2 000 000 Fcfa, registre de commerce n° RC/DLA/2004/B/034159 dont le siège social est à Douala BP 12560, représentée par Monsieur Roger TCHOUFA, son Gérant,

Ci- après dénommée **le Promoteur** d'autre part.


<u>EXPOSE</u>

Suite à la réalisation d'un programme test de financement de 112 logements sociaux à OLEMBE I et en vue d'amplifier ce mouvement et de participer activement à la politique gouvernementale de lutte contre la pauvreté, notamment par la mise à la disposition des Camerounais de logements économiques décents, le CFC a entrepris auprès du Gouvernement des démarches tendant au financement de la réalisation de programmes d'habitat social de grande envergure à Yaoundé et Douala.

A cet effet, le Gouvernement a prescrit le 12 juillet 2001 au Ministre de l'Urbanisme et de l'Habitat d'engager la procédure de mise à la disposition du CFC d'un terrain dans la ville de Yaoundé.

Y faisant suite, le Ministre de l'Urbanisme et de l'Habitat, par lettre n°1733 du 14 novembre 2003, a instruit la MAETUR de rétrocéder au CFC une parcelle de 70 hectares à prélever sur le titre foncier n° 23105/MFOUNDI au lieu-dit OLEMBE.

Attendu que par une convention à venir entre le CFC et la MAETUR, les parties vont convenir et arrêter les modalités de mise à disposition du terrain sus-visé,

Attendu que par une convention d'aménagement à venir le CFC et la MAETUR vont convenir et arrêter les modalités de réalisation des voiries primaires du terrain ci-dessus évoqué,

Attendu que pour la construction des logements, un protocole d'accord a été signé le 2 septembre 2004 entre le CFC, la SCI ATLANTIC GROUP et l'entreprise GROUP FIVE INTERNATIONAL,

Attendu qu'à cet effet, la SCI ATLANTIC GROUP a présenté le 8 décembre 2004, en association avec des spécialistes en bâtiment dont l'entreprise GROUP FIVE INTERNATIONAL, une offre pour la construction de 1034 logements dont le coût toutes dépenses confondues est estimé à **15,554,772,403** (quinze milliards cinq cent cinquante quatre millions sept cent soixante douze mille quatre cent trois) Fcfa TTC selon l'annexe 1,

Vu la lettre n° 005/CF/PCA du 21 mars 2005 du Conseil d'Administration du Crédit Foncier autorisant la Direction Générale à poursuivre la mise en œuvre du programme ci-dessus ;

Les parties conviennent et arrêtent ce qui suit :

- 2 -

## ARTICLE 1 : OBJET DE LA CONVENTION

La présente convention a pour objet de préciser les modalités de collaboration entre le CFC et la SCI ATLANTIC GROUP pour la réalisation du programme de construction de 1034 logements sociaux à YAOUNDE, au lieu-dit OLEMBE II.

## ARTICLE 2 : PROGRAMME

### 2.1- Composition

L'opération consiste en la construction et la vente en état futur d'achèvement par la SCI ATLANTIC GROUP de 1034 logements dont :

- 500 logements T4 de 120 m² bâtis,
- 300 logements T5 de 136 m² bâtis,
- 234 logements T6 de 148 m² bâtis.

### 2.2- Prix de vente

Les prix de vente prévisionnels TTC de ces logements sont les suivants :

- Pour les logements T4 :     **9 891 200** Fcfa TTC,
- Pour les logements T5 :   **16 229 234** Fcfa TTC
- Pour les logements T6    **17 280 717** Fcfa TTC.

### 2.3- Structure des prix de vente

Les prix de vente ci-dessus ne comprennent pas les coûts relatifs à l'acquisition du foncier et aux travaux d'aménagement : terrassements généraux, voiries, électrification, adduction d'eau et drainage des eaux pluviales. Ces dépenses seront prises en charge comme suit :

- Foncier : mise à disposition gratuite par la MAETUR à la demande de l'Etat ;
- Voiries et réseaux divers primaires : MAETUR
- Voiries et réseaux divers secondaires et tertiaires : CFC.

### 2.4- Site de l'opération

L'opération se réalisera sur une parcelle de 70 hectares rétrocédés au CFC par la MAETUR à la demande du Gouvernement.

### 2.5- Phase pilote

L'opération débutera par une phase pilote de 172 logements, dont l'objet est de permettre d'apprécier d'une part l'adéquation des techniques et des coûts de construction prévus dans l'offre du promoteur et, d'autre part la réceptivité du produit par la clientèle cible.

La réussite de cette phase conditionnera la poursuite du programme.

## ARTICLE 3 : QUALITE DES PARTIES

Les parties concourant à la réalisation de l'opération sont :

- MAETUR :                       Pourvoyeur du foncier
- SCI ATLANTIC GROUP :    Maître d'Ouvrage et Promoteur
- CFC :                            Bailleur de fonds.

## ARTICLE 4: MODALITES DE LA COLLABORATION

La collaboration entre le CFC et la SCI ATLANTIC GROUP se fera par :

1. La mise à disposition gratuite par le CFC du terrain d'assiette du programme, suivant la convention de rétrocession CFC / MAETUR.

2. La production par le CFC, pour le compte de la SCI ATLANTIC GROUP, d'une lettre de caution délivrée par une banque de premier ordre garantissant le paiement des prestations de l'entreprise de construction à hauteur de **15,554,772,403** (quinze milliards cinq cent cinquante quatre millions sept cent soixante douze mille quatre cent trois) Fcfa TTC.

3. Le préfinancement par le CFC de la totalité des dépenses de la phase pilote telles qu'indiquées à l'article 2.5 ci-dessus par ouverture de crédit d'un montant équivalant à 15% des dépenses prévues à l'article 5 ci-dessous.

4. La mise à disposition par le CFC, en cas de succès de la phase pilote, des ressources provenant des prêts accordés aux acquéreurs des logements pour la couverture des dépenses restantes de l'opération.

5. La conduite par le promoteur des opérations de construction des logements conformément au dossier technique de son offre de partenariat versé en annexe de la présente convention ;

6. L'apport par le CFC de son expertise au promoteur pour la conduite des opérations de commercialisation ;

## ARTICLE 5 : DEPENSES DE L'OPERATION

Le coût total de l'opération toutes dépenses confondues, sans le coût d'acquisition et d'aménagement du foncier, est estimé à **15,554,772,403** (quinze milliards cinq cent cinquante quatre millions sept cent soixante douze mille quatre cent trois) Fcfa TTC suivant l'annexe 1, et concerne notamment :

- honoraires d'études et de contrôle technique des travaux ;
- travaux de construction des logements ;
- frais administratifs (arrêté approuvant le lotissement, permis de bâtir...)
- frais de commercialisation ;
- frais de supervision des travaux
- honoraires de notaire, de géomètre et les frais liés aux morcellements en faveur des acquéreurs.

- 4 -

## ARTICLE 6 : MONTANT ET CONDITIONS DU PREFINANCEMENT

Le montant du préfinancement pour la couverture des dépenses de la phase pilote est fixé à **2,446,250,000** (deux milliards quatre cent quarante six millions deux cent cinquante mille) FCFA. Il sera représenté par les tirages effectués sur le compte d'opération prévu à l'article 7.

Le préfinancement couvrira plus généralement les impasses de trésorerie qu'enregistrerait l'opération en raison des décalages liés aux délais de mise en place des prêts acquéreurs.

La somme totale des tirages ci-dessus ne doit en aucun cas dépasser le montant du préfinancement.

Le préfinancement est consenti au taux de 10% pour une durée de 36 mois et un différé d'amortissement de 18 mois à compter de la date du premier décaissement des fonds.

## ARTICLE 7 : FONCTIONNEMENT DU COMPTE D'OPERATION

Il sera ouvert par le promoteur dans les livres du CFC un compte dénommé Compte d'Opération destiné à centraliser l'ensemble des flux financiers relatifs à l'opération.

Les flux en entrée sont constitués :

- des acomptes de réservation des acquéreurs de logements ;
- des financements nets des prêts aux acquéreurs de logements ;
- des produits des ventes au comptant.

Les flux en sortie sont constitués :

- des dépenses liées à l'opération ;
- des remboursements éventuels aux réservataires s'étant désistés ;
- de la rémunération du promoteur ;
- éventuellement des commissions bancaires, intérêts et autres frais et accessoires.

Les recettes de commercialisation sont impérativement logées au Compte d'Opération et sont indisponibles sauf pour les dépenses prévues à l'article 5 ci-dessus.

Les mouvements en débit du compte d'opération sont prohibés, sauf pour les dépenses spécifiquement liées à l'opération.

## ARTICLE 8 : ENGAGEMENTS DES PARTIES

### 8.1- Le promoteur s'engage sous peine de suspension des décaissements à :

a- Produire l'arrêté préfectoral approuvant le lotissement et le permis de construire délivré par le Délégué du Gouvernement auprès de la Communauté Urbaine de YAOUNDÉ ;

b- S'abstenir de toutes transactions avec des tiers sur le site du programme ;

c- Faire réaliser les travaux par une entreprise de compétence avérée suivant la convention signée avec cette dernière et conformément aux plans, coupes, devis

descriptifs et estimatifs remis à l'appui de la demande de ~~……~~ modification devra être soumise à l'approbation préalable du CFC ;

d- Faire utiliser par l'entreprise la main d'œuvre et les matériaux locaux ;

e- Assurer sur les lieux une publicité suffisante de l'opération, en faisant ressortir que l'opération est financée par le CFC ;

f- Utiliser des techniques de construction permettant de dégager des économies substantielles des coûts ;

g- Informer le CFC de tout fait susceptible de rompre l'équilibre financier prévisionnel de l'opération ;

h- Ouvrir au guichet financier du CFC à YAOUNDE, un Compte d'Opération intitulé COP OLEMBE II ;

i- Respecter les lois et règlements de la République du Cameroun ;

j- Ne percevoir directement aucune recette de commercialisation de la part des acquéreurs avant la mise en exécution de la présente convention ;

k- Déposer impérativement dans le Compte d'Opération toutes les recettes de commercialisation comme stipulé à l'article 7 ci-dessus ;

l- Utiliser la totalité des fonds de l'accord de financement au seul programme tel qu'il est défini à l'Article 2 de la présente convention. S'il s'avérait que ceux-ci ont été utilisés, même partiellement à une autre fin, le CFC serait en droit de suspendre tout nouveau décaissement tant que les fonds n'auraient pas retrouvé leur affectation initiale.

m- Informer le CFC de tous faits ou décisions affectant la gérance ou d'une manière générale la vie de la SCI ATLANTIC GROUP, et susceptibles de compromettre le bon dénouement du programme immobilier ou de mettre en péril les fonds du CFC.

n- Tenir une comptabilité propre au programme et fournir au CFC mensuellement un état de commercialisation et des dépenses ainsi que les justificatifs y afférents.

o- Informer le CFC de tout retard par rapport à l'échéancier initialement communiqué.

p- Rembourser au CFC toutes les sommes qu'il aura décaissées pour son compte au titre de l'opération.

8.2 - Le CFC s'engage à :

    a- Mettre à la disposition du promoteur le terrain à aménager, assiette de l'opération ;

    b- Procéder avec célérité aux règlements des appels de fonds ;

    c- Octroyer des crédits en faveur des acquéreurs des logements remplissant les conditions ;

    d- Tenir mensuellement au promoteur un relevé de compte d'opération faisant ressortir tous les flux en entrée et en sortie ;

    e- Tenir trimestriellement au promoteur la liste des prêts acquéreurs accordés.

## ARTICLE 9 : CONDITIONS PREALABLES AU DECAISSEMENT DES FONDS

Préalablement au décaissement des fonds, le promoteur devra :

1- Ouvrir au Guichet du Crédit Foncier du Cameroun un compte d'opération dénommé COP OLEMBE II dont le fonctionnement est décrit à l'article 7 ci-dessus.

2- Communiquer au CFC pour approbation les plans, devis, cahiers des charges, rapports, documents de consultation d'entreprises, plannings des travaux et les contrats s'y rapportant ; Toutefois, certains documents peuvent être communiqués ultérieurement à condition qu'ils ne soient pas indispensables au démarrage du programme.

3- Déposer au CFC les originaux du cautionnement de bonne fin fixé à 5% du montant des marchés et de remboursement des avances de démarrage des travaux à consentir aux entreprises, ainsi que les polices d'assurance Responsabilité Civile et Tous Risques Chantier ; Les cautionnements et polices ci-dessus doivent être délivrées respectivement par des banques et des compagnies d'assurances de premier ordre, agréées par le Ministre chargé des finances.

4- Réaliser éventuellement l'apport personnel nécessaire à l'équilibre du projet. A cet égard, un état des dépenses réalisées sera adressé au CFC avec les justificatifs correspondants.

5- Présenter l'état de commercialisation du lotissement au jour de la demande de décaissement indiquant :

- le nombre total des logements et le chiffre d'affaires attendu,
- le nombre de logements réservés et le chiffre d'affaires correspondant,
- le nombre de logements vendus et le chiffre d'affaires réalisé,
- le montant total des acomptes perçus,
- les recettes restant à encaisser.

ARTICLE 10 : MODALITES DE DECAISSEMENT DES FONDS

Les décaissements s'opèrent par débit du Compte d'Opération comme suit :

a- A titre d'avance de démarrage, un pourcentage du montant des dépenses égal au pourcentage d'avance convenu entre le promoteur et ses partenaires. Toutefois aucun pourcentage ne doit excéder 20% du montant de chaque marché.

b- Chaque appel de fonds est accompagné d'un état des prestations réglées ou à régler auquel seront annexés les justificatifs correspondants. Par justificatifs on entend les documents suivants vérifiés par le Maître d'œuvre, visés par le promoteur et confirmés par les services techniques du CFC :

- les notes d'honoraires,
- les décomptes d'entreprise ou l'état des dépenses du promoteur en cas de prestations effectuées en régie.

c- Les décaissements ne sont pas autorisés au-delà de l'expiration de la durée des travaux stipulée par le promoteur.

d- Le CFC préalablement à chaque décaissement effectuera une visite du chantier afin de constater l'état d'avancement des travaux ; à cet effet, le promoteur s'oblige à permettre aux représentants du CFC de pénétrer sur le chantier s'ils le requièrent, et s'engage à leur faciliter ces visites, soit par lui-même, soit par des instructions données aux personnes chargées de l'exécution des travaux.

e- Le CFC se réserve le droit de surseoir à un décaissement si l'état d'avancement des travaux constaté est jugé insatisfaisant, défectueux ou non conforme aux plans, coupes, devis descriptifs et estimatifs produits à l'appui de la demande de financement.

f- Les décaissements de fonds sont effectués dans la limite du montant logé dans le Compte d'Opération et seront suspendus dès constat de l'achèvement des travaux y afférents.

g- Tout décaissement pour des prestations autres que celles prévues à l'article 5 ci-dessus est prohibé.

h- Les décaissements s'effectuent au fur et à mesure de l'avancement des travaux et suivant les clauses des contrats y relatifs, conformément aux alinéas a, b, c, d, e et g du présent article.

i- Les décaissements au titre des retenues de garantie s'effectueront un an après la réception provisoire des travaux et conformément aux clauses des contrats d'entreprise déposés au CFC et visés à l'article 9 ci-dessus.

ARTICLE 11 : EXECUTION DU PROGRAMME

Le Promoteur s'engage à exécuter les travaux du programme défini à l'article 2 ci-dessus avec la diligence et l'efficacité voulues et selon les méthodes techniques, financières et de gestion adéquates.

Il s'engage, en outre à affecter exclusivement audit programme la totalité des fonds à provenir du Compte d'Opération ainsi que le cas échéant, toute avance à valoir sur sa réalisation.

## ARTICLE 12 : COMMERCIALISATION DES LOGEMENTS

Le promoteur adresse au CFC mensuellement un état des réservations et des ventes en précisant les noms des acquéreurs, les numéros des logements vendus, le prix de vente, ainsi que les reçus des versements dans le Compte d'Opération prévu à l'article 7 ci-dessus.

Les actes de vente donneront droit au morcellement du titre foncier n°23105/MFOUNDI au profit des acquéreurs. Les morcellements en faveur des tiers autres que les acquéreurs sont prohibés et de nul effet s'ils n'ont pas obtenu l'assentiment préalable du CFC.

Les logements invendus et la partie restante du terrain d'assiette feront l'objet d'une mutation au profit du CFC

## ARTICLE 13 : SUSPENSION DES DECAISSEMENTS DES FONDS

Au cas où l'exécution des travaux s'avérerait défectueuse ou non conforme aux dossiers technique, financier et commercial produits à l'appui de la demande de financement, le CFC peut, par voie de notification écrite, signifier au promoteur la suspension en tout ou en partie du décaissement des fonds.

## ARTICLE 14 : EXIGIBILITE

Les sommes tirées et non justifiées par le promoteur deviennent exigibles dans les cas suivants :

a. défaut de réalisation des travaux correspondant à toute somme avancée par le CFC, après un mois de la mise en demeure par exploit d'huissier ou tout autre mode de signification équivalente ;

b. règlement ou liquidation judiciaire, faillite, cessation de paiement ou déconfiture du promoteur ;

c. inexactitude de l'une des déclarations faites dans la présente convention, dissimulation ou fausse déclaration ayant permis l'octroi du financement alors qu'elles auraient motivé un rejet de la demande ;

d. modification unilatérale du projet par le promoteur;

e. défaut de domiciliation des recettes de commercialisation au Compte d'Opération visé à l'article 7 ci-dessus.

## ARTICLE 15 : SUBROGATION

En sa qualité de prêteur de deniers, le CFC est subrogé au promoteur dans tous ses droits, actions et privilège du vendeur.



ARTICLE 16 : DECLARATIONS

Le promoteur fait les déclarations suivantes :

- o Il n'a jamais été en état de règlement judiciaire, liquidation des biens, faillite personnelle ou déconfiture ;

- o Il s'engage à tenir informé le CFC dans un délai de quinzaine, de tous faits susceptibles d'augmenter sensiblement le budget du programme.

## ARTICLE 17 : PUBLICITE

Le promoteur se charge d'assurer sur les lieux une publicité suffisante par panneaux faisant ressortir en position privilégiée et avec les caractères les plus frappants que l'opération est financée par le CFC, nommé pour la circonstance sans aucune abréviation.

## ARTICLE 18 : DUREE DE LA CONVENTION

La présente convention demeure en vigueur jusqu'à l'extinction de la dette.

## ARTICLE 19 : RESILIATION DE LA CONVENTION

La résiliation de la présente convention peut survenir à tout moment à l'initiative de l'une ou de l'autre partie en cas de manquement grave à une de ses prescriptions, à charge pour celle qui demande la résiliation d'en informer l'autre par exploit d'huissier.

La résiliation emporte automatiquement résolution de la cession du terrain d'assiette et mutation du titre foncier ou de sa partie restante au CFC.

## ARTICLE 20 : ELECTION DE DOMICILE

Pour l'exécution des présentes, les parties font élection de domicile à leur siège social.

## ARTICLE 21 : ATTRIBUTION DE COMPETENCE

Les parties conviennent expressément qu'à défaut d'un règlement à l'amiable, tous litiges pouvant naître de l'interprétation ou de l'exécution de la présente convention ressortiront de la compétence du Tribunal de Grande Instance de YAOUNDE.

## ARTICLE 22 : ENTREE EN VIGUEUR

La présente convention entre en vigueur à la date de sa signature. Elle ne sera exécutoire et ses clauses ne seront opposables aux parties qu'après réalisation des conditionnalités ci-dessous :

1. Signature de la convention de rétrocession du terrain d'assiette du programme entre le CFC et la MAETUR;

2. Signatures des conventions d'aménagement et de financement des travaux des VRD primaires, secondaires et tertiaires ;

3. Approbation définitive par le CFC des composantes technique, financière et commerciale du programme de construction des logements ;

4. Production par le promoteur des projets des marchés avec les entreprises intervenant dans l'exécution du programme ;

5. Approbation par le CFC des entreprises visées à l'alinéa 4 ci-dessus ;

6. Production par le CFC de la lettre de caution en faveur de l'entreprise de construction des logements ;

## ARTICLE 23 : DISPOSITIONS DIVERSES

Tous les frais et droits des présentes et leurs suites sont à la charge du promoteur qui s'y oblige.

Fait à Yaoundé, le    2 9 MAR 2005

Pour
**ATLANTIC GROUP SCI**

**Roger TCHOUFA**
**Directeur Général**

Pour
**LE CREDIT FONCIER DU CAMEROUN**

**Joseph EDOU**
**Directeur Général**

**TRANSLATION OF 29 MARCH 2005 CONTRACT**

# FUNDING AGREEMENT
## BETWEEN
## CFC & SCI ATLANTIC GROUP

### YAOUNDE LOW-COST HOUSING PROGRAM
### OLEMBE II

Between **Crédit Foncier du Cameroun**, a State-owned corporation with Board of Directors, share capital of 6 000 000 000 CFAF, company registration No 1-046, registered office at Yaounde, P.O. Box 1531, May 20 1972 Boulevard, represented by Mr. Joseph Edou, its General Manager,

Hereinafter referred to by its acronym CFC, of the one part,

And the **ATLANTIC GROUP** real estate corporation, with a share capital of 2 000 000 CFAF, company registration No. RC/DLA/2004/B/034159, whose registered office is at Doulala, P.O. Box 12560, represented by Mr. Roger TCHOUFA, its Chief Executive Officer,

Hereinafter referred to as the promoter, of the other part.

### PREAMBLE

Following the rolling out of a test program involving the funding of 112 housing units at Olembe I and with a view to replicating the program and contributing actively to Government's poverty reduction policy, *inter alia,* by providing decent, low-cost housing units to Cameroonians, CFC approached Government for the funding of large-scale, low-cost housing programs in Yaounde and Douala.

To that effect, Government, on July 12 2001, instructed the Ministry of Town Planning and Housing to make available to CFC a plot of land in the city of Yaounde.

Accordingly, the Ministry of Town Planning and Housing, by Letter No. 1733 of November 14 2003, instructed MAETUR to make available to CFC a 70-hectare parcel of land to be obtained from Land Certificate No. 23105/MFOUNDI in the Olembe neighborhood.

Whereas by virtue of an agreement to be signed between CFC and MAETUR, the parties are going to agree on, and determine the modalities for the provision of the above-mentioned plot of land;

Whereas by a development agreement to be signed CFC and MAETUR will agree on, and determine the modalities for the construction of primary roads on the above-mentioned plot of land;

Whereas for the purpose of construction of the housing units a protocol agreement was signed on September 2 2004 between CFC, SCI ATLANTIC GROUP and GROUP FIVE INTERNATIONAL;

Whereas to this effect SCI ATLANTIC GROUP presented on December 8 2004, in conjunction with building construction specialists including GROUP FIVE INTERNATIONAL, a proposal for the construction of 1034 housing units for an estimated total cost of 15 554 772 403 (fifteen billion five hundred and fifty-four million

seven hundred and seventy-two thousand four hundred and three) CFAF inclusive of tax, as per Appendix I;

Mindful of Letter No. 005/CF/PCA of March 21 2005 whereby the Board of Directors of Credit Foncier du Cameroun authorizes General Management to proceed with the implementation of the above program;

The contracting parties hereby agree as follows:

## ARTICLE 1: SUBJECT OF AGREEMENT
This agreement sets out the terms and conditions of collaboration between CFC and SCI ATLANTIC GROUP for the implementation of the construction program for 1034 low-cost housing units in Yaounde in the Olembe II neighborhood.

## ARTICLE 2: PROGRAM

### 2.1. Description

The project involves the construction and selling upon completion, by SCI ATLANTIC GROUP of 1034 housing units broken down as follows:

- 500 T4 housing units of 120 m built,
- 300 T5 housing units of 136 m built,
- 234 T6 housing units of 148 m built.

### 2.2. Selling Price

The projected selling prices inclusive of tax for the housing units will be as follows:

- T4 housing units: 9 891 200 CFAF inclusive of tax,
- T5 housing units: 16 229 234 CFAF inclusive of tax,
- T6 housing units: 17 280 717 CFAF inclusive of tax.

### 2.3. Pricing Structure:

The above selling prices do not include costs relating to the acquisition of the land and land development works such as general earthworks, roads, electrification, water supply and drainage. These costs will be defrayed as follows:
- Land : Provided free of charge by MAETUR at the request of the State,
- Primary roads and other networks: MAETUR,
- Various secondary and tertiary roads and networks: CFC

### 2.4. Project Site.

The project will be implemented on a 70-hectare parcel of land made available to CFC by MAETUR at the request of the Government.

2.5. <u>Pilot Phase</u>

The project will begin with a pilot phase of 172 housing units aimed at assessing the suitability of the construction techniques and costs contained in the proposal of the promoter, on the one hand, and testing the responsiveness of the target population to the product, on the other hand.

The success of this phase will be the determining factor for continuation.

## ARTICLE 3: ROLES OF THE CONTRACTING PARTIES

The parties involved in the implementation of the project are as follows:
- MAETUR: Land provider,
- SCI ATLANTIC GROUP: Project manager and Promoter,
- CFC: Funding body

## ARTICLE 4: COLLABORATION MODALITIES

The basis for collaboration between CFC and SCI ATLANTIC GROUP shall be as follows:

1. CFC shall provide the land to be used for the program free of charge as per the disposal agreement between CFC and MAETUR;
2. CFC shall furnish SCI ATLANTIC GROUP with a bank guarantee issued by a first-class bank to secure payment for the services of the construction company to the tune of 15 554 772 403 (fifteen billion five hundred and fifty-four million seven hundred and seventy-two thousand four hundred and three) CFAF inclusive of tax.
3. CFC shall pre-finance the total expenditure for the pilot phase as provided for under Article 2.5. above by opening a line of credit amounting to 15% of the expenditure provided for under article 5 below.
4. In the event that the pilot phase succeeds, CFC shall provide resources from loans granted to persons acquiring the housing units to cover the remaining expenses for the project.
5. The promoter shall carry out the construction work for the housing units in accordance with the technical specifications of his partnership proposal annexed to the present agreement.
6. CFC shall support the promoter with its expertise in the marketing aspect of the project.

## ARTICLE 5: PROJECT EXPENSES

The total cost of the project, all expenses put together, excluding cost of land acquisition and development, is estimated at 15 554 772 403 (fifteen billion five hundred and fifty-four million seven hundred and seventy-two thousand four hundred and three) CFAF inclusive of tax as per Appendix 1. This cost pertains to the following items:

- consultants' fees for studies and technical supervision of work;
- housing construction works;
- administrative expenses (order approving division of land, building permit, etc.);
- marketing expenses;
- works supervision expenses;
- Notary and surveyor fees, expenses for parcelling out the property for buyers.

## ARTICLE 6: AMOUNT AND TERMS OF PRE-FINANCING

Pre-financing required to cover expenses for the pilot phase of the project shall amount to 2 446 250 000 (two billion four hundred and forty-six million two hundred and fifty thousand) CFAF. It shall come in the form of drawdowns from the operating account provided for under Article 7.

Pre-financing shall cover, in broader terms, liquidity shortfalls that the project will encounter as a result of leads and lags in funding arising from delays in the putting in place of buyer loans.

In no case shall the total amount of the above drawdowns exceed the pre-financing amount.
Pre-financing is granted at the rate of 10% over a 36-month period with a redeemable grace period of 18 months effective form the date of first disbursement of funds.

## ARTICLE7 : FUNCTIONING OF OPERATING ACCOUNT

The promoter shall open an account in the books of CFC called operating account intended to record all cash flow operations relating to the project.

Payments into the account shall come from:
- down payments made by persons acquiring the property;
- net proceeds from loans granted to persons buying the houses;
- proceeds from cash sales.

Withdrawals from the account shall pertain to:
- project-related expenses;
- refunds in cases where some buyers withdraw from the scheme;
- remuneration payable to the promoter;
- where applicable, bank charges, interest and other miscellaneous expenses.

Proceeds from sales must be paid into the operating account. They shall not be used for any purpose other than for the expenses provided for under Article 5 above.

Debit transactions on the operating account shall be prohibited, except for expenses specifically related to the project.

## ARTICLE 8: COMMITMENTS OF PARTIES

8.1. The promoter hereby undertakes, under pain of suspension of disbursements, to:

a- produce the prefectoral order approving the land division and the building permit issued by the Government Delegate to the Yaounde City Council;

b- abstain from any transactions with third parties on the project site;

c- entrust the construction works to a firm with a proven track record on the basis of an agreement signed with such firm in accordance with the plans, designs and the bill of quantities and estimates submitted in support of the funding application; any modifications thereto shall obtain the prior approval of CFC;

d- ensure that the construction firm uses local labor and materials;

e- provide adequate publicity on the project at the site, indicating that the project is funded by CFC;

f- use construction techniques likely to cut cost significantly;

g- inform CFC of any developments that could upset the projected financial stability of the project;

h- open an operating account with the CFC branch in Yaounde entitled COP Olembe II;

i- respect the laws and regulations of the Republic of Cameroon;

j- abstain from receiving any proceeds from sales directly from buyers before the execution of this agreement;

k- pay all proceeds from sales into the operating account as stipulated under article 7 above;

l- use all the funds from the financing agreement for the sole purpose of the project as defined under Article 2 of this agreement; where it is established that these proceeds are used – even in part – for another purpose, CFC reserves the right to suspend further disbursements until the funds so used are returned to their initial destination;

m- inform CFC of any facts or decisions affecting the management of SCI ATLANTIC GROUP or its life in general, where such facts or decisions are likely to undermine the successful implementation of the real estate program or place in jeopardy the funds of CFC;

n- keep separate accounts for the program and submit to CFC on a monthly basis a sales and expenditure statement along with the relevant supporting documents;

o- inform CFC of any delays as per the timeframe initially presented;

p- repay to CFC any funds they may have paid out on his behalf under this project.

8.2. CFC undertakes to:

a- make available to the promoter the land to be developed to harbor the project;

b- respond swiftly to all funding requests;

c- grant loans to potential buyers who fulfill the requirements;

d- provide the promoter on a monthly basis with a bank statement showing all payments into the account and withdrawals therefrom;

e- provide the promoter on a quarterly basis with the list of buyer loans granted.

## ARTICLE 9: PREREQUISITES FOR DISBURSEMENT OF FUNDS

Before any funds are disbursed, the promoter shall:

a- open an operating account with Credit Foncier du Cameroun entitled COP OLEMBE II which shall function in accordance with the provisions of Article 7 above;

b- submit to CFC for approval, plans, estimates, specifications, firm consultation documents, timeframes for works and the relevant contracts pertaining thereto; however, some documents may be submitted later provided they are not indispensable for the commencement of the program;

c- submit to CFC the originals of the performance bond amounting to 5% of contract amounts and guarantees for repayment of mobilization advances made to companies, as well as civil liability and contractor risks insurance policies. The above guarantees and insurance policies shall be issued by first-class banks and insurance companies approved by the ministry in charge of finance;

d- provide, where applicable, the personal contribution needed for the stability of the project. To this effect, a statement of expenditure incurred shall be sent to CFC along with the relevant supporting documents;

e- submit a sales report as of the day on which the funding request is made indicating:

- the total number of housing units and the expected turnover,
- the number of reserved housing units and the corresponding turnover,
- the number of housing units sold and the turnover made,
- the total amount received as down payments,
- amount of accounts receivable.

## ARTICLE 10: MODALITIES FOR DISBURSEMENT OF FUNDS

Drawdowns shall be debited to the Operating Account as follows:

a- As mobilization advance, a percentage of expenditure agreed upon as advance between the promoter and his partners. This percentage may not exceed 20% of the total amount of each contract.

b- Each funding request shall be accompanied by a statement of services paid for or to be paid for along with the relevant supporting documents. Supporting documents here refers to the following documents verified by the Project Owner, initialed by the promoter and confirmed by the technical services of CFC:

- bills and invoices,
- advances to companies or statement of expenditure incurred by the promoter in the case of services provided on a concessionary basis.

c- Disbursements shall not be allowed after expiry of the timeframe for the works as stipulated by the promoter.

d- Before each disbursement, CFC shall visit the site to assess progress made; in this regard, the promoter undertakes to give the agents of CFC free access into the site where they so request; he further undertakes to provide them any necessary help for such site inspections, either in person or through instructions to the persons carrying out the works.

e- CFC reserves the right to withhold a disbursement where progress on the site is deemed unsatisfactory, sub-standard or at variance with the plans, designs, bills of quantities and estimates submitted in support of the funding request.

f- Disbursements shall be made within the limits of the amount allocated to the Operating Account and shall be suspended once the works for which the funds are earmarked are completed.

g- Any disbursement of funds for services other than those provided for under Article 5 above shall be prohibited.

h- Disbursements shall be made in line with progress on the site and in accordance with the provisions of the relevant contracts, pursuant to paragraphs a,b,c,d,e and g of this Article.

i- Disbursements pertaining to security deposits shall be made one year after provisional acceptance of the works and in accordance with the provisions of the company contracts submitted to CFC as provided for under Article 9 above.

## ARTICLE 11: PROGRAM IMPLEMENTATION

The promoter undertakes to implement the program as defined under Article 2 above with the requisite diligence and efficiency while maintaining adequate technical, financial and management standards. He further undertakes to allocate solely to the said program all funds disbursed from the operating account as well as any advances chargeable to the program, where applicable.

## ARTICLE 12: SALE OF HOUSING UNITS

The promoter shall present to CFC on a monthly basis a statement of reservations and sales stating the names of the buyers, the numbers of the housing units sold, the selling price as well as receipts for cash deposits on the operating account provided for under Article 7 above.

The bill of sale shall give the right to subdivision of Land Certificate No. 23105/MFOUNDI in favor of the buyers. Subdivision in favor of third parties other than the buyers is prohibited and shall be null and void where it is carried out without the prior approval of CFC.

Ownership over unsold housing units and the remaining portion of the assigned land shall revert to CFC.

## ARTICLE 13: SUSPENSION OF FUNDS DISBURSEMENT

Where the execution of the works is deemed sub-standard or at variance with the technical, financial and commercial proposals submitted in support of the funding application, CFC may, by means of written notice, inform the promoter of its decision to suspend disbursements in part or in whole.

## ARTICLE 14: PAYABILITY

Sums drawn down by the promoter without justification shall become due and payable in the following cases:

1. failure to carry out the works pertaining to any sums advanced by CFC, one month after formal notice is given through a process server or any equivalent form of notice;
2. placement under receivership or liquidation, bankruptcy, insolvency or collapse of promoter;
3. inaccuracy in any of the statements made in this agreement, misrepresentation or false representation resulting in the granting of funding whereas the application should have been rejected;
4. unilateral modification of the project by the promoter;
5. failure to deposit sales proceeds on the Operating Account provided for under Article 7 above.

## ARTICLE 15: SUBROGATION

In its capacity as lender, CFC shall subrogate the promoter in all his rights, actions and privilege as seller.

## ARTICLE 16: STATEMENTS

The promoter states as follows:
- that he has never been in a state of receivership, liquidation, personal bankruptcy of collapse;
- He undertakes to inform CFC within a fortnight of any developments likely to increase the budget of the program significantly.

## ARTICLE 17: PUBLICITY

The promoter undertakes to ensure proper publicity on the site by way of billboard so as to inform the public, in a prime location and through the most striking characters, that the project is funded by CFC, which in this particular instance, shall be stated in full without abbreviation.

## ARTICLE 18: DURATION OF AGREEMENT

This agreement shall remain in force until the debt if fully redeemed.

**ARTICLE 19: CANCELLATION OF THE AGREEMENT**

This agreement may be cancelled at any moment at the initiative of either party in the event gross violation of any of its clauses; the party taking the initiative for cancellation shall inform the other party through a process server.

Cancellation shall automatically puts an end to the disposal of the land harboring the project and transfers the land title or the remaining portion thereof to CFC.

**ARTICLE 20: DOMICILE**

For the purposes of this agreement, the contracting parties elect domicile at their registered office.

**ARTICLE 21: JURISDICTION**

The parties expressly agree that in the event of failure to reach an amicable settlement, any disputes that may arise from the interpretation or execution of this agreement shall fall within the jurisdiction of the High Court of Yaounde.

**ARTICLE 22: ENTRY INTO FORCE**

This agreement shall enter into force on the date of signature thereof. It shall only become enforceable and its clauses binding on the parties after the following conditionalities are met:

1. signing of the disposal agreement on the project land between CFC and MAETUR;
2. signing of the agreements for development and funding of primary, secondary and tertiary roads and networks;
3. final approval by CFC of the technical, financial and commercial components of the housing units construction program;
4. production by the promoter of draft contracts to be signed with the firms involved in the execution of the program;
5. approval by CFC of the companies referred to in paragraph 4 above;
6. production by CFC of the letter of guarantee in favor of the housing construction company.

**ARTICLE 23: SUNDRY PROVISIONS**

All the charges and taxes pertaining to this agreement and subsequent instruments thereto shall be borne by the promoter, who so undertakes.

Done at Yaounde, March 29 2005.

For and on Behalf of ATLANTIC GROUP
 Roger Tchoufa
Chief Executive Officer


For and on Behalf of Credit Foncier du Cameroun
Joseph Edou
General Manager

*THIS DOCUMENT WAS TRANSLATED FROM THE FRENCH ORIGINAL BY PETER TERENCE AWA, CERTIFIED TRANSLATOR/CONFERENCE INTERPRETER, MEMBER OF THE ASSOCIATION OF PROFESSIONAL TRANSLATORS AND INTERPRETERS OF CAMEROON (APTIC).*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MBI Group, Inc.,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **1:07-cv-00637-JDB** |
| | : | |
| **Crédit Foncier du Cameroun,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **The Government of the Republic of Cameroon,** | : | |
| | : | |
| ***Defendants.*** | : | |

## <u>ORDER</u>

On consideration of the Defendants' motion to dismiss, Defendants' memorandum in support of the motion and Plaintiffs' opposition thereto, it is

ORDERED that Defendants' motion to dismiss is granted and that the Plaintiffs' Complaint is dismissed with prejudice.

So Ordered.

_____
Judge John D. Bates
United States District Court
for the District of Columbia