## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MBI GROUP, INC., et al.** | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **CRÉDIT FONCIER DU CAMEROUN** | : | **1:07-cv-00637-JDB** |
| | : | |
| **and** | : | |
| | : | |
| **THE GOVERNMENT OF THE REPUBLIC** | : | |
| **OF CAMEROON** | : | |

### PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANTS CRÉDIT FONCIER DU CAMEROUN AND THE GOVERNMENT OF THE REPUBLIC OF CAMEROON TO DISMISS THE COMPLAINT

COME NOW plaintiffs MBI Group Inc and Atlantic Group, SCI (hereinafter "Plaintiffs"), by and through undersigned counsel, and pursuant to this court's order entered November 2, 2007, and pursuant to Fed.R.Civ.P. 12 and LCvR. 7 opposes the Motion of defendants Crédit Foncier Du Cameroun and the Government of The Republic of Cameroon ("Defendants") to Dismiss the Complaint (the "Motion to Dismiss"), and in opposition thereto respectfully refers this Honorable Court to the annexed memorandum of points and authorities and exhibits.

WHEREFORE, by all these presents, counsel for plaintiffs pray that the instant motion be denied.

Respectfully Submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*:  pmusolino@musolinoanddessel.com

Sylvia J. Rolinski # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*:  srolinski@rolinski.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MBI GROUP, INC., et al.                          :
                                                 :
          v.                                     :
                                                 :
                                                 :
CRÉDIT FONCIER DU CAMEROUN                       :        1:07-cv-00637-JDB
                                                 :
          and                                    :
                                                 :
THE GOVERNMENT OF THE REPUBLIC                   :
     OF CAMEROON                                 :

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION OF
DEFENDANTS CRÉDIT FONCIER DU CAMEROUN AND THE GOVERNMENT OF
THE REPUBLIC OF CAMEROON TO DISMISS THE COMPLAINT**

Defendants Crédit Foncier Du Cameroun ("CFC") and the Government of the Republic

Of Cameroon ("Cameroon," collectively with CFC "Defendants") move to dismiss the instant

complaint pursuant to Fed.R.Civ.P.12. For the reasons set forth below, the instant motion must

be denied.

## I.  THE PROCEEDINGS, PROCEDURES AND APPLICABLE STANDARDS

### A.  The Proceedings In This Case

Plaintiffs MBl Group Inc. ("MBI") and Atlantic Group S.C.I. ("Atlantic," collectively

with MBI "Plaintiffs") filed the instant complaint ("Compl.") on April 4, 2007. The Complaint

arises out of the wrongful and deliberate breach by defendants – after plaintiffs refused to pay

bribes -- of their agreements to provide land, financing and other support for an affordable

housing project in Cameroon. The Complaint asserts causes of action sounding in breach of

contract (Count One), fraud, deceit and misrepresentation (Count Two), negligent

misrepresentation (Count Three), intentional interference with contract (Count Four), intentional

interference with prospective advantage (Count Five), and misappropriation of trade secrets

(Count Six).

Defendants filed their motion to dismiss on September 26, 2007. The Motion to Dismiss contends that: subject matter jurisdiction does not exist under the commercial activities exception to the Foreign Sovereign Immunities Act ("FSIA"), at 10-18; CFC is not subject to the personal jurisdiction of this court, id., at 18-20, and the doctrine of *forum non conveniens* requires dismissal of the case in favor of the courts of the Cameroon. *Id.*, at 20-29.

The motion purports to rely on the declarations of Professor Ephraim Ngwafor, (the "Ngwafor Decl.,"), Henri Mekongo Mbala (the "Mbala Decl.,"), Beatrice R Assena (the "Assena Decl.,"), Koh Koh (the "Koh Koh Decl.,"), Boscola Andrea (the "Andrea Decl.,"), and Ambassador Tibor P. Nagy, Jr. (the "Nagy Decl.,"), and it further relies on 14 exhibits.[1]

### B.   Procedures, Standards, And Burdens of Proof Applicable to the Motion

#### 1.   The Sequencing of Non-Merits Motions and Jurisdictional Motions

The Supreme Court has recently clarified the leeway accorded to a trial court in its sequencing of non-merits motions to deny consideration of a complaint. In *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S.Ct. 1184, 1186-87 (2007), the Supreme Court ruled that:

> Although a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the cause (subject-matter jurisdiction) and the parties (personal jurisdiction) ... there is no mandatory sequencing of nonmerits issues ... A court has leeway to choose among threshold grounds for denying audience to a case on the merits....
> *Forum non conveniens* is a nonmerits ground for dismissal.... A district court therefore may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant. *Forum non conveniens*, like other threshold issues, may involve a brush with factual and legal issues of the underlying dispute.... But the critical point, rendering a *forum non conveniens* determination a nonmerits issue that can be determined before taking up jurisdictional inquiries is this: Resolving a *forum non conveniens* motion does not entail any assumption by the court of substantive law-declaring power (internal citations, quotation marks omitted).

Thus, this court has the discretion to dispose of the transfer argument prior to disposing

---

[1] As is more fully discussed below, defendants' reliance on those declarations and those exhibits warrants the grant of jurisdictional discovery to aid the court in its assessment of its jurisdiction.

of the challenge to subject matter jurisdiction.

> The Supreme Court has made clear that a federal court must resolve all "threshold" issues, such as subject matter jurisdiction and personal jurisdiction,[2] before reaching the merits of a case..... The high court has acknowledged, however, that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits. A venue challenge need not take precedence over a disentitlement inquiry, then, because both are threshold issues (internal citations, brackets, quotation marks omitted).

*U.S. v. $6,976,934.65 Plus Interest,* 486 F.Supp.2d 37, 38 (D.D.C.2007). "Jurisdiction to resolve

cases on the merits requires both authority over the category of claim in suit (subject-matter

jurisdiction) and authority over the parties (personal jurisdiction), so that the court's decision will

bind them." *Fasolyak v. The Cradle Society, Inc.,* 2007 WL 2071644*3 (D.D.C.2007).[3]

### 2.  Challenges to Subject Matter Jurisdiction Under Fed.R.Civ.P. 12(b)(1)

There are two procedures for challenging the subject matter of the court under Fed.R.Civ.P.

12(b)(1) – a facial challenge, and a factual challenge.

> By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception, and how the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge.
>
> If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff.

*Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40, 342 U.S.App.D.C. 145, 149 (D.C. Cir. 2000).

Applying *Phoenix,* the District of Columbia Circuit in *Nemariam v. Federal Democratic*

*Republic of Ethiopia* 491 F.3d 470, 475 (D.C.Cir. 2007) wrote that:

> In their motion to dismiss, the CBE and Ethiopia did not dispute the appellants' factual allegations....Grounds for dismissal are based upon issues of law, and *underlying facts sufficient to support dismissal are not in dispute.* Accordingly,

---

[2]  In "appropriate circumstances," the trial court may also dispose of challenges to personal jurisdiction prior to disposing of challenges to subject matter jurisdiction, *Int'l Mfg. & Eng'g Servs. Co. v. Semiconductor Energy Lab. Co.*, 2007 WL 2059768*1, n.1 (D.D.C. 2007)

[3]  As the District of Columbia Circuit noted after *Sinochem,* a *forum non conveniens* motion is not a jurisdictional motion.  *Public Citizen v. U.S. Dist. Court for Dist. of Columbia,* 486 F.3d 1342, 1348 (D.C. Cir. 2007).

we must "take the appellants' factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the appellants (internal brackets,    With respect to claims by Defendant that it is immune pursuant to the FSIA, the allegations of the complaint should be more carefully examined. As the court in *Burnett v. Al Baraka Inv. and Development Corp.,* 274 F.Supp.2d 86 (D.D.C. 2003) observed:

"Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." However, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." The district court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."

*Burnett v. Al Baraka Inv. and Development Corp.,* 292 F.Supp.2d 9, 14 (D.D.C. 2003) (citations omitted).

In the case at bar, defendants do not challenge the legal sufficiency of the plaintiff's

jurisdictional allegations. Instead, they rely on extrinsic testimony from multiple declarants, as

well as on extrinsic documentary evidence. Defendants have thus made a factual challenge to this

court's subject matter jurisdiction.

In *Price v. Socialist People's Libyan Arab Jamahiriya,* 389 F.3d 192, 197 (D.C.Cir.2004),

the District of Columbia Circuit reconciled the tension between early resolution of a sovereign's

immunity defense and the need for fact-finding in a non-facial challenge.  As the *Price* court

explained:

On the one hand, because a foreign sovereign "has immunity from trial and the attendant burdens of litigation," its claim of immunity from suit should be resolved as early in the litigation as possible... lest the purpose to be served by sovereign immunity be unduly compromised. On the other hand, a court is poorly equipped to resolve factual disputes at an early stage in a litigation - as reflected in the ordinary rules of procedure.

In *Phoenix Consulting* we explained how we reconcile these propositions: When a foreign sovereign disputes the fact(s) upon which the district court's subject matter jurisdiction depend(s), the court "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." 216 F.3d at 40. This resolution, of course, is not a conclusive determination but is instead subject to change in light of further development of the facts..... And, as we later observed, the district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction (internal citations omitted, quotation marks omitted).

Because the court's subject matter determination turns on resolution of facts, the court must devise procedures to "ferret out" those facts. Those procedures should include limited jurisdictional discovery. With respect to factual challenges under the FSIA, the court in *Phoenix* observed that the district court "must give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.... In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited.... (internal citations, brackets and quotation marks omitted)." At 149.

In applying the facts to commercial activities exception to sovereign immunity, the court must impose on defendants the burden of proof. It is beyond dispute that "... the foreign sovereign has the burden of proof." *El-Hadad v. United Arab Emirates,* 496 F.3d 658, 665 (D.C.Cir. 2007). And *see Princz v. F.R.G.,* 26 F.3d 1166, 1171 (D.C.Cir.1994), cited with approval in *El-Hadad, supra,* ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable"); and *see Transamerican S.S. Corp. v. Somali Democratic Republic,* 767 F.2d 998, (1985), cited with approval in *Princz, supra* ("In accordance with the restrictive view of sovereign immunity reflected in the FSIA, the burden of proof in establishing the inapplicability of these exceptions is upon the party claiming immunity....").

### 3.  Motions to Dismiss for Lack of Personal Jurisdiction

The plaintiff bears the burden of establishing a factual basis for exercising personal jurisdiction over the non-resident defendant. *Mwani v. Bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. New York Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990). "In determining whether such a basis exists, factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane,* 894 F.2d at 456. In the absence of an evidentiary hearing, the plaintiff may carry his burden by making a *prima facie* showing that personal jurisdiction exists. *Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C .Cir.1991); *Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir .1984). This *prima facie* showing must be premised on

specific facts, however, and cannot be based on mere conclusory allegations. *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000).

"[P]recisely focused discovery[4] aimed at addressing matters related to personal jurisdiction..." is a prerequisite to disposition of the issue of personal jurisdiction. GTE *News Media Services, Inc. v. Bell South Corp.,* 199 F.3d 1343, 1352 (D.C. Cir.2000). Plaintiffs are entitled to "... a fair opportunity to inquire ..." into contacts which would support the exercise of personal jurisdiction. *Crane v. Carr,* 259 U.S. App. DC 229, 235, 814 F.2d 758, 764 (D.C. Cir.1987). A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery..." *El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C. Cir. 1996).

### 4.  Motions to Dismiss for *Forum Non Conveniens*

Defendants bear "the burden of persuasion on all elements of the *forum non conveniens* analysis." *El-Fadl, supra,* at 676-677.

> At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is "amenable to process" in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute....[5]

> Only if there is an adequate alternative forum must the court then weigh the relative conveniences to the parties against the presumption of the plaintiff's forum selection....Availability of adequate alternative fora is a threshold test ... in the sense that a *forum non conveniens* motion cannot be granted unless the test is fulfilled.... The defendant bears the burden of proving that there is an adequate alternative forum (internal citations, quotation marks omitted). *Id.*

---

[4] Plaintiff will shortly file a motion for leave to conduct discovery on subject matter jurisdiction, personal jurisdiction, and *forum non conveniens.*

[5] "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1, and *see* Proposed Amendment of Rule 44.1, effective December 1, 2007.

Discovery on *forum non conveniens* motions is appropriate. *See BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz,* 828 F.Supp. 92 (D.D.C.1993) ("the parties were allowed to take discovery on the issues raised in the motions to dismiss, including those relating to *forum non conveniens.*")

## II.  THE FACTS APPLICABLE TO THE MOTION TO DISMISS

### A.  MBI and U.S. Government Supported Housing Projects for Africa

Plaintiff MBI had designed and developed a business plan for affordable housing in regions of the world with limited or undeveloped housing infrastructure (the "MBI Affordable Housing Program."). Compl., at ¶ 9.

In 2002, the United States announced the creation of the Millennium Challenge Corporation ("MCC"). MCC determines a nation's eligibility for U.S. aid based on its record of fighting corruption and fostering entrepreneurship. Compl., at ¶ 10.

In July 2003, the United States announced the Africa Mortgage Market Initiative (the "US Initiative"). The US Initiative was designed to assist in overcoming the lack of access in Africa to capital for business and for home purchases. Compl., at ¶ 11.

The United States Overseas Private Investment Corporation ("OPIC") was the agency designated to work through the MCC and the US Initiative with Africans to develop "robust housing markets" through construction of affordable homes in developing nations with the goal of bolstering retail banking and fueling local capital markets as "engines of entrepreneurship." Compl., at ¶ 12.

Financial participation by OPIC in the development of programs in Africa and elsewhere required financial participation by American investors or entities. Compl., at ¶ 13.

### B.  Defendants' Initial Solicitations to MBI, MBI's Preliminary Response, and the Preliminary Agreement to Proceed

In November 2003, CFC approached MBI and solicited MBI's participation in the development and the implementation of an affordable housing program in the Cameroon. That

approach and solicitation was made by Joseph Edou ("Edou"), who was at that time CFC's

Managing Director. Compl., at ¶ 14. [6]

CFC, through Edou, affirmatively and explicitly represented to MBI in December 2003 in

Yaounde, Cameroon that:

a.  Cameroon had a shortage of over 600,000 housing units;

b.  CFC had, held, owned and had control over funds sufficient to provide mortgage lending for more than 5000 purchasers;

c.  CFC was aware of many eligible buyers ready to purchase homes.

d.  there was little or no supply of new affordable housing in the Cameroon.

e.  CFC desired to enter into an agreement with an entity that would serve as a developer which would undertake, on its own initiative, the feasibility studies necessary to financially and economically justify an affordable housing project, and then implement an affordable housing program which would be rolled out in various cities in Cameroon.

f.  CFC desired to attract financing and support for an affordable housing program from agencies such as OPIC and the International Finance Corporation ("IFC").

g.  CFC understood that financial support from OPIC required substantial financial participation from an American entity.

h.  CFC understood that to attract financial support from organizations such as OPIC and the IFC, CFC would be required to have successfully commenced an affordable housing project, and that organizations such as OPIC and IFC would provide financing for expansion of such projects.

---

[6] Mr. Edou now languishes in a Cameroon jail after he refused to pay a bribe to Cameroon officials. Compl., at ¶¶ 60-63, 67-68,79, 89. "Scholars have documented that a typical reaction of employers to retaliation suits by whistleblowers is to attack the whistleblowers' behavior." Moberley, RE, *Unfulfilled Expectations: An Empirical Analysis Of Why Sarbanes-Oxley Whistleblowers Rarely Win* 49 Wm. & Mary L. Rev. 65, 127 (October 2007). And *see El-Hadad, supra* (accountant who uncovered embezzlement at UAE embassy wrongly accused of financial improprieties, improperly terminated and defamed).

In the Motion to Dismiss, Defendants base their attack on Mr. Edou on the suggestion that he hid a secret interest in the Project behind a corporation allegedly owned by his "brother-in-law." Motion to Dismiss, at 4-5, 26. But CFC's own Inspector General admits that the daughter of the "brother-in-law" worked at CFC, and was in frequent contact with the Inspector General himself, and that the Inspector General himself knew of the alleged family relationship between Edou and his "brother-in-law," and that the "family relationship...was well-known among Joseph Edou's colleagues at CFC." Declaration of Henri Mekongo Mbala, Document 9-3, page 16 of 86, at ¶ 19. Because the "brother-in-law's" interest in the corporation participating in the Project was a matter of public record and public knowledge, the secrecy at the core of defendants' retaliatory allegations evaporates.

The transaction upon which defendants' rely is discussed in the declaration of plaintiffs' Roger Tchoufa, **Plaintiff's Exhibit ("PX")** 1, at ¶ 34. Plaintiffs have been denied access to Mr. Edou by the Cameroon government. **PX 8E.**

i. CFC understood that, in order for the project to succeed, the parties would have to treat the project as a commercial undertaking for profit, controlled by industry standards and norms. Compl., at ¶ 15.

Officers of MBI in January and February of 2004 traveled to the Cameroon to investigate and assess the potential of the proposed affordable housing project in Cameroon (the "Cameroon Housing Project"). Compl., at ¶ 16. In February 2004, MBI's Roger Tchoufa met in Yaounde with Mr. Andre Booto A Ngon ("Booto") who was the chairman of CFC's board of directors. Declaration of Roger Tchoufa ("Tchoufa Decl."), at ¶ 10.

On February 27, 2004, pursuant to CFC's request, MBI delivered to CFC a formal expression of interest, setting out in detail the anticipated terms, conditions and participants of the Cameroon Housing Project. The proposal included the construction of between 1000 to 1200 homes in the capital city of Yaounde in the Cameroon Housing Project's initial phase (the Yaounde Phase I Project"), and contemplated contribution of land and financing by CFC. Compl., at ¶ 17.

On February 27, 2004, CFC reviewed the proposal and advised MBI that the proposal conformed with CFC's requirements. CFC thereupon authorized MBI to commence master planning, project costing and architectural design work. Compl., at ¶ 18.

On March 24, 2004, Atlantic was incorporated in Cameroon specifically for the development and implementation of the Cameroon Housing Project and the Yaounde Phase I Project. Compl., at ¶ 20. Commencing in March 2004, Plaintiffs retained firms to commence work on the Project. Compl., at ¶ 22.

**C. The Negotiation and Ratification of Agreements for the First Project**

By letter dated May 11, 2004 to Plaintiffs from Edou, CFC advised Plaintiffs as follows: CFC had available "more than 50 million US dollars" for construction of 2000 houses, and was "prepared to provide additional funding" for 10,000 houses. CFC then requested that Plaintiffs

11

confirm "as soon as possible, your intention to carry out this test program of 2,000 units within the price range you provided to me." CFC also asked for confirmation a follows:

> (i)n order to ensure the success of this program, that your Group, as Credit Foncier's promoter and sole representative, has selected and signed contracts with the builder, and project manager, and/or any other consultant, in compliance with the pertinent regulations, along with the compensation modalities defined and agreed to by the parties.

Compl., at ¶ 24.

For approximately two weeks, commencing approximately May 9, 2004, Edou traveled to and remained in the United States for the purpose of facilitating the Cameroon Housing Project, including the Yaounde Phase I Project and extensions thereof. During that trip, MBI arranged for and conducted inspections with Edou and other CFC officials of several housing developments in the Washington DC metropolitan area. During that trip, MBI introduced Edou and other CFC officials to officials of OPIC and officials of the United States Department of Housing and Urban Development, and the United States Department of the Treasury, International Division, and participated in meetings with those officials. Compl., at ¶ 25. CFC Chairman Booto was among the CFC officials on the trip and the inspections. Tchoufa Decl., at ¶ 11.

On May 18, 2004, a Memorandum of Agreement was signed in Bethesda Maryland among CFC, Atlantic and MBI the ("May 2004 Agreement"). A true and accurate copy of the May 2004 Agreement is annexed as Exhibit A to the Complaint. Compl., at ¶ 26. CFC Chairman Booto, in the presence of Tchoufa, MBI's John Kamya, and at least one other person, instructed Edou to sign the May 2004 Agreement, and advised Edou that he – Booto – would report the signing to the CFC Board. Tchoufa Decl. at ¶ 12.

The May 2004 Agreement, *inter alia*, required CFC to provide to Plaintiffs for the Yaounde Phase I Project and, in part, extensions thereof: (a) project development and construction financing of approximately forty nine million dollars (US$49,000,000.00) and all

necessary financial guarantees for the Yaounde Phase I Project; (b) land on which approximately 1,100 affordable housing units would be constructed by Plaintiffs for the Yaounde Phase I Project; (c) mortgage financing for the "buyers of the 1100 units" for the Yaounde Phase I Project; and (d) the identity of over 50,000 potential home buyers. CFC also confirmed "the availability of mortgage funds for at least 5,000 to 6,000" houses "over the next four years." Compl., at ¶ 27.

Commencing no later than May 2004, Plaintiffs entered into discussions with Group Five International, as agent for Group Five Construction (Pty) Ltd. ("Group Five"). Group Five is and was at all times pertinent to the averments herein a publicly-traded South African construction company with annual revenues of approximately five hundred million dollars ($500,000,000.00). Shortly after ratification of the May 2004 Agreement, and in conformity therewith, Plaintiffs retained Group Five to carry out pre-construction studies of the Project and to prepare detailed cost estimates. Compl., at ¶ 31.

On November 17, 2004, Atlantic hand-delivered to CFC, in conformity with the May 2004 Agreement, documents constituting a feasibility study (the November 2004 Plan Documents.") Compl., at ¶ 33. CFC requested certain changes to the November 2004 Plan Documents. Compl., at ¶ 34. Atlantic and MBI promptly and timely made changes to the November 2004 Plan Documents. Compl., at ¶ 35. On December 8, 2004, Atlantic hand-delivered to CFC, in conformity with the May 2004 Agreement and the changes requested by CFC to the November 2004 Plan Documents, documents constituting a feasibility study (the "December 2004 Plan Documents"). Compl., at ¶ 36.

The December 2004 Plan Documents provided for the construction of 1034 houses on 102 hectares of land, including roads and common areas. Compl., at ¶ 3. In December 2004, CFC approved the December 2004 Plan Documents. Compl., at ¶ 38.

In December 2004, after submission of the December 2004 Plan Documents, Tchoufa met with CFC Chairman Booto at Chairman Booto's CFC office in Yaounde. Also present at the meeting was Edou. Booto told Tchoufa that he had been briefed, and that the May 2004 Agreement was going forward, and that the details on performance would be handled through Mr. Edou. Tchoufa Decl., at ¶ 13.

On or about January 28, 2005, Atlantic and Group Five ratified a Federation Internationale des Ingeneurs-Conseils ("FIDIC") Contract for Construction and Building of Engineering Works contract for the construction of one thousand thirty four (1,034) units at Olembe II, a suburb of Yaoundé in the amount of twenty one million four hundred forty thousand two hundred twenty three dollars ($21,440,223.00) (the "Yaounde Phase I FIDIC Contract"). A representative of CFC witnessed the Yaounde Phase I FIDIC Contract, which provided, *inter alia*, that:

> CFC ... in agreement with appropriate partners will operate as the Employer's Financial Partner. The Employer's Financier will provide a financial facility directly to the Contractor and a Payment Guarantee from an international first class bank acceptable by Group Five and will incur the liability to make payments directly to the Contractor in terms of this Agreement for all amounts as detailed in the drawdown schedule attached...

Compl., at ¶ 39.

The Yaounde Phase I FIDIC Contract was ratified at the CFC offices in Yaounde. The CFC Board was meeting at the CFC offices at the same time. CFC Chairman Booto was aware that the FIDIC contract was being signed that date at CFC's offices, and met with Tchoufa, Edou and Group 5 representatives and discussed in detail the Yaounde Phase I FIDIC Contract and its signing. Tchoufa Decl., at ¶ 14.

The Yaounde Phase I FIDIC Contract provided, *inter alia*, that: Group Five would be paid an advance payment (the "Group Five Advance Payment") of 20% of the total contract value; Group Five would deliver to CFC, as "financier" an advance payment guarantee; and, Group Five would deliver to CFC a Parent Company Guarantee. Compl., at ¶ 40.

On January 26, 2005 Group Five, in conformity with the Yaounde Phase I FIDIC Contract, issued an Advance Payment Guarantee in the amount of four million seven hundred and fifty thousand dollars ($4,750,000.00) to CFC. Compl., at ¶ 41.

In April, 2005, pursuant to the May 2004 Agreement and the Yaounde Phase I FIDIC Contract, CFC delivered funds for the Advance Payment. Compl., at ¶ 40.

The check was drawn on April 1, 2005 on the account of CFC, and made payable to Atlantic Group in the amount of $4,007,083.00. Tchoufa Decl., at ¶15. Atlantic Group wired that sum in its entirety to Group Five pursuant to the May 2004 Agreement and the Yaounde Phase I FIDIC Contract. Tchoufa Decl., at ¶ 16.

On May 11, 2005, pursuant to the Yaounde Phase I FIDIC Contract, and following its receipt of the Advance Payment, Group Five delivered to CFC a Parent Company Financial Guarantee for the total contract value. Compl., at ¶ 41.

On June 16, 2005, pursuant to the May 2004 Agreement and to reimburse plaintiffs for costs and expenses, CFC delivered to Atlantic the sum of $254,708.97. Tchoufa decl., at ¶ 17.

In June 2005, MBI arranged meetings for CFC in Washington and Bethesda, Maryland, with senior executives of OPIC, IFC, the Government National Mortgage Association ("GNMA") of HUD, and the International Division of the U.S. Department of the Treasury, to secure U.S. Government funding and support for the expansion of the Cameroon Project. Compl., at ¶ 42.

On July 23, 2005, at a public ceremony, CFC handed over to Plaintiffs and to Group Five 102 hectares of land for the construction and the completion of the Yaounde Phase I Project. Compl., at ¶ 45. The ceremony was attended by virtually the entire CFC staff. CFC Chairman Booto was a speaker at the ceremony, along with Edou. Also speaking at the ceremony was the First Consul to the South African Ambassador to Cameroon. Tchoufa decl., at ¶ 18.

In his speech, Booto stated that the site was selected for an affordable housing project, and he presented MBI, as the American developer, Atlantic as the local developer, and Group

Five as the South African contractor which together partnered with CFC to build local affordable housing on the site. Tchoufa decl. at ¶ 18.

### D.  The Negotiation and Ratification of Expansion Agreements

On July 15, 2005, Plaintiffs and CFC signed a Memorandum of Agreement which expanded the Cameroon Project (the "July 2005 Agreement"). A true and accurate copy of the July 2005 Agreement is attached as Exhibit B to the Complaint. Compl., at ¶ 47.

CFC's Chairman Booto and Tchoufa spoke in detail about the July 2005 Agreement, both before and after its ratification. Booto assured Tchoufa that CFC had the funds to provide financing for the purchasers, and was well aware that the July 2005 Agreement was signed by Edou on behalf of CFC. Tchoufa Decl. at ¶¶ 25, 26.

The July 2005 Agreement provided, *inter alia*, that CFC would be the Mortgage Financier for the construction and sale of 1,200 houses in Yaounde as an expansion of the Yaounde Phase I Project (the "Yaounde Phase II Project"). A Memorandum of Understanding was signed on July 11, 2005, among Group Five and Plaintiffs pursuant to which Group Five would undertake the construction of the Yaounde Phase II Project. Compl., at ¶ 49.

On July 28, 2005, in conformity with the July 2005 Agreement, Plaintiffs submitted to OPIC in Washington a 250-page application for construction financing for the Yaounde Phase II Project. That application correctly projected as a result of the Yaounde Phase II Project a significant increase in employment in the United States and a significant inflow of capital annually from Cameroon to the United States. Compl., at ¶ 50.

Tchoufa advised Edou and CFC Chairman Booto of the OPIC application at the time of its submission to OPIC. Tchoufa decl., at ¶ 20.

On August 10, 2005, the Minister of Finance and Economy delivered to CFC his approval of a special importation regime for the importation of construction equipment to be used by Group Five for construction pursuant to the May 2004 Agreement. **PX 5**, Tchoufa decl., at ¶

22. On that day, Chairman Booto told Tchoufa that the Minister of Finance and Economy told Chairman Booto that people in the Cameroon government would "chop the head" of the Chairman and Edou because those government personnel were not receiving bribes. Tchoufa decl., at ¶ 22.

On August 11, 2005, Plaintiffs and CFC signed a Memorandum of Agreement which further expanded the Cameroon Project (the "August 2005 Agreement"). A true and accurate copy of the July 2005 Agreement is annexed to the Complaint as Exhibit C. Compl., at ¶ 51. Tchoufa spoke with CFC Chairman Booto about the August 2005 Agreement. Chairman Booto was well aware of the Agreement, and expressed his approval of the agreement to Tchoufa. Tchoufa decl., at ¶ 21. The August 2005 Agreement provided, *inter alia*, that CFC would be the Mortgage Financier for the construction and sale of 2,000 houses in Douala (the "Douala Phase III Project"). A Memorandum of Understanding was signed on August 11, 2005 among Group Five, Atlantic Group and MBI Group, pursuant to which Group Five would undertake the construction of the Douala Phase III Project. Compl., at ¶ 53.

In mid-August 2005, Tchoufa spoke with Chairman Booto about the need for additional payments from CFC under the May 2004 Agreement. Chairman Booto advised Tchoufa that he should wait until the CFC Board approved an upcoming resolution approving the May 2004 Agreement and its extensions. Tchoufa decl., at ¶ 23.

### E.  The CFC Board Approves the Agreement

On August 18, 2005, CFC issued a resolution which provided as follows:

**05-09 Olembe Extension Project:**     The Board of Directors approved, with absolute majority of the administrators present, the continuation of the Olembe 1 extension project and recommended the presentation of the works at every board meeting. [7]

---

[7] There is no doubt that the "Olembe Extension Project," or "Olembe II," refers to the May 2004 Agreement to construct 1034 houses. **PX 7.**
The Agreement was at least "provisionally" approved in March 2005, **PX 7**, or as early as the approval of Olembe I. *Id.*

PX 6. Tchoufa decl., at ¶ 24.

On the day that the Resolution was approved, prior to its approval, Tchoufa met with Edou and CFC Chairman Booto and CFC's offices. Booto advised Tchoufa that the CFC Board was going to vote that day on the approval of the May 2004 Agreement as extended by the July 2005 Agreement and the August 2005 Agreement. Tchoufa decl., at ¶ 25.

On the day that the Resolution was approved, after its approval, Tchoufa met with Edou and CFC Chairman Booto and CFC's offices. Booto advised Tchoufa that the CFC Board had voted that day and approved the May 2004 Agreement. Tchoufa decl., at ¶ 26.

### F. Plaintiffs' Performance and Defendants' Breaches

On or about August 29, 2007, CFC delivered to Atlantic Group $1,637,738.45 pursuant to the May 2004 Agreement. The Financial Director at CFC – Essama Jerveis -- called the branch manager at Union Bank of Cameroon PLC and asked the branch manager to pick up the check. Tchoufa decl., at ¶ 27.

On September 22, 2005, pursuant to the August 2005 Agreement, Plaintiffs submitted to the Multilateral Investment Guarantee Agency ("MIGA") of the World Bank a Preliminary Application for Guarantee for the Douala Phase III Project. Compl., at ¶ 54.

On September 23, 2005, MIGA responded that "your investment appears to be eligible for MIGA's guarantee. I am therefore pleased to issue this Notice of Registration" for the Douala Phase III Project. Compl., at ¶ 55.

No later than May 2004, Plaintiffs diligently and timely commenced and performed all work required of Plaintiffs under the May 2004 Agreement. Compl., at ¶ 54. No later than July 2005, Plaintiffs diligently and timely commenced and performed all work required of Plaintiffs under the July 2005 Agreement. Compl., at ¶ 55. No later than August 2005, Plaintiffs diligently

and timely commenced and performed all work required of Plaintiffs under the August 2005 Agreement. Compl., at ¶ 56.

For the Yaounde Phase I Project, Plaintiffs, *inter alia*, timely: entered into construction-related contracts with several local companies; arranged for the importation of special-purpose construction equipment; arranged for the relocation to Cameroon of construction engineers; and, assembled over 200 construction workers. Compl., at ¶ 57. Mr. Kemayou Robinson ("Kemayou"), CFC's director of project performance, sent his assistant to the site to observe on and report on the construction progress. Tchoufa decl., at ¶ 28. Tchoufa spoke with Kemayou and the director of CFC's legal department about the construction progress. Tchoufa decl., at ¶ 28.

In August or September 2005, officials of Cameroon demanded a bribe in connection with the Cameroon Project. The solicitation and the demand was made of, and communicated through CFC's Edou. Compl., at ¶ 60. Plaintiffs refused to pay any bribe. Compl., at ¶ 61. Edou refused to participate in any bribery. Compl., at ¶ 62.

In September 2005, after refusing to participate in any bribery, Edou was removed from his position at CFC. On September 13, 2005, Mr. Camille Ekindi ("Ekindi") was named the Managing Director of CFC. Compl., at ¶ 63.

On September 29, 2005, Ekindi informed Tchoufa that Ekindi had been "instructed" that he was not to take any action to assist the Yaounde Phase I Project without specific approval from those in the Cameroon government who gave him the instructions. Ekindi declined to identify the source of those instructions. Compl., at ¶ 65.

On or about October 3, 2005, Tchoufa called Ekindi to arrange for the processing of customs material and documents. Ekindi responded that he had the documents but needed to inform others in the Cameroon government before he could take any action. Compl., at ¶ 66.

On October 11, 2005, Tchoufa again met with Ekindi and discussed in particular the Yaounde Phase I Project and the actions that needed to be taken, including the schedule for draw of the CFC funds. Ekindi responded that he would not take any action unless instructed to do so by others in the Cameroon government. Compl., at ¶ 67.

Tchoufa pointed out that CFC was bound by its contractual agreements. Ekindi responded that the Cameroon Housing Project and, in particular, the Yaounde Phase I Project were good projects, but that in Cameroon private parties needed to take into account the "interests" of others, and that the failure to do so was Edou's downfall. Ekindi added that every project must have a "godfather." *Id.*

Plaintiffs declined and refused to offer or pay any bribe, or to participate in any bribery. Compl., at ¶ 68.

On October 21, 2005, Ekindi informed Plaintiffs that Defendants were unilaterally reducing the available land for the Yaounde Phase I Project from 102 hectares to 70 hectares and were demanding major changes in the plans. Compl., at ¶ 70. Plaintiffs undertook to respond to the demanded changes. Compl., at ¶ 74.

On October 26, 2005, Plaintiffs received from OPIC preliminary approval of the Yaounde Phase II Project and received OPIC's Preliminary Terms of Reference for a $10 million revolving construction financing loan. Compl., at ¶ 75.

On November 3, 2005, Tchoufa met with Ekindi at Ekindi's office. Ekindi stated that the changes CFC demanded should be made. Compl., at ¶ 77.

On or about November 20, 2005, Tchoufa advised Ekindi that the failure to act on customs requests made it impossible for construction equipment to be delivered to the construction site. Ekindi responded: "you know what to do to help me help you continue the project." Compl., at ¶ 79.

On December 7, 2005, Plaintiffs arranged a meeting with officials from OPIC's Washington office, an official from the American Embassy in Cameroon, officials from Plaintiffs, and Ekindi. The meeting took place in CFC's office. In that meeting, Ekindi explicitly represented, *inter alia*, that:

a. Defendants recognized their agreements with Plaintiffs, and were committed to performing pursuant to the terms of those Agreements

b. Ekindi held the mandate for the Cameroon Housing Project;

c. Ekindi and the Defendants would support any initiative which conformed to the Cameroon Housing Project;

d. the Yaounde Phase I Project was still proceeding smoothly;

e. the changes demanded by CFC were being completed by Plaintiffs to CFC's complete satisfaction;

f. CFC would comply with all its Agreements with Plaintiffs;

g. Defendants were honored and excited by OPIC's agreement to provide construction financing to the Plaintiffs for the Yaounde Phase II Project.

By letter dated December 12, 2005, CFC, without explanation or justification, instructed Plaintiffs to cease all work on the Yaounde Phase I Project. Compl., at ¶ 81.

On December 20, 2005, Tchoufa met with Ekindi at Ekindi's office. Ekindi informed Tchoufa that Ekindi had been instructed to identify a pretext[8] for the termination of the Cameroon Housing Project and in particular the Yaounde Phase I Project. Compl., at ¶ 82. Ekindi identified the person who gave him that instruction, and that person was a high official in the Cameroon government. Tchoufa decl., at ¶ 29.

In December 2005, Group Five, pursuant to the explicit instructions of Defendants, discontinued all work, terminated its existing agreements and commenced the repatriation of its employees. Compl., at ¶ 84.

---

[8] At no time did anyone from either defendant assert that the agreements between plaintiffs and CFC were not authorized or approved. In fact, the first time that plaintiffs had ever heard that claim was in the Motion to Dismiss. Tchoufa Decl., at ¶35.

On February 7, 2006, Plaintiffs delivered to CFC over five bankers boxes of documents containing the changes and the demands CFC made to the Yaounde Phase I Project. Compl., at ¶ 86. On February 15, 2006, Tchoufa met with Ekindi at CFC's office. Ekindi admitted that Defendants had no basis for objection to the revised plans, and that those plans had been approved by the relevant Cameroon land development agency, as had the previous plans. Ekindi informed Tchoufa that there was no hope that the Cameroon Housing Project, and in particular the Yaounde Phase I Project would go forward. Ekindi informed Tchoufa that he was following instructions from Cameroon government officials. Tchoufa reiterated that he would not authorize any payments of any bribes. Compl., at ¶ 87.

On or about March 23, 2006, Plaintiffs, through counsel, demanded compensation for the damages caused by Defendants, and wrote, *inter alia*, that:

> MBI declines to speculate here regarding the motivations behind CFC's inexplicable and unjustified behavior, except to note that a new CFC Director General and Board had been appointed prior to the October 21 breaches described above, and to note further that conduct of the sort now in issue is conventionally associated with allegations of graft and corruption.

Compl., at ¶ 89.

In August 2006, Cameroon improperly caused the arrest of the secretary of Tchoufa's wife, and imprisoned her without charges for one week, and wrongfully seized property of Tchoufa and his wife, and wrongfully threatened the arrest of other relatives, including a minor. Compl., at ¶ 90.

In September 2006, Cameroon improperly caused the arrest of a Tchoufa relative, and demanded a bribe in the amount of two hundred thousand dollars ($200,000.00) from the relative to dispose of the case, and threatened the lives of Tchoufa and his wife if either returned to Cameroon. Compl., at ¶ 91.

## III. ARGUMENT

### A. This Court Has Subject Matter Jurisdiction Over Both Defendants

#### 1. The Acts Alleged In the Complaint Satisfy the Commercial Activity Test of the FSIA

The FSIA"…provides generally that a foreign state is immune from the jurisdiction of the United States courts unless one of the exceptions listed in 28 U.S.C. § 1605(a) applies." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, (D.C. Cir. 2003). "When one of these exceptions applies, the foreign sovereign is stripped of immunity, and, pursuant to 28 U.S.C. § 1330(a), subject matter jurisdiction exists in the district court." *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 148 (2nd Cir. 1991), *aff'd Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, (1992). As is set forth above, defendants bear the burden of proof on the inapplicability of the exceptions.

28 U.S.C. §1605(a)(2) provides that a sovereign state is not immune from suit in any of three circumstances:

> in which the action is based upon a commercial activity [9]carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The facts in this case satisfy all three exceptions.

> *a. The Action Is Based Upon A Commercial Activity Carried On In The United States By The Foreign State; And Upon An Act Performed In The United States In Connection With A Commercial Activity Of The Foreign State Elsewhere*

Defendants appear to concede that this action is "based upon" the May 2004 Agreement, [10] and that the ratification of the May 2004 Agreement in Maryland constitutes "commercial

---

[9] Defendants do deny that the conduct alleged in the complaint constitutes "commercial activity."

[10] Defendants' contention that the only conduct on which the action is "based" is the ratification of the May 2004 Agreement is discussed below.

23

activity carried on in the United States,[11] and was also "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." Defendants contend, however, that the May 2004 Agreement was signed by CFC General Manager without authority, and therefore cannot be attributed to CFC for jurisdictional purposes.

Even assuming *arguendo* that the conduct pertinent to the first two prongs of 1605(a)(2) is limited to the ratification of the May 2004 Agreement, defendants ignore both the dispositively explicit language of CFC's own resolution approving the Agreement, and Cameroon's own indictment alleging that the May 2004 Agreement was approved by CFC.

On August 18, 2005, the CFC "Board of Directors approved, with absolute majority of the administrators present, the continuation of the Olembe 1 extension project and recommended the presentation of the report of the works at every board meeting." **PX 6**. If there was any room for the slightest doubt about the meaning of that Resolution, and Cameroon's awareness of it, Cameroon's own indictment language is conclusive. Cameroon alleged in December 2006:

> In 2004, without drawing consequences from the ruinous real estate program Olembe I, Edou, Joseph et Booto A. Ngon [12] launched a new real estate program under the name OLEMBE II through which they misappropriated funds, through fictive shell companies SCI ATLANTIC GROUP and GROUP FIVE [13]....
>
> ...Booto A Ngon, Andre claimed that the project was a response from (CFC) to a government need for social housing construction;
>
> In order to respond to this need, he contacted an American promoter, ATLANTIC GROUP, which called upon GROUP FIVE....
>
> When presented before the Board of Trustees, the project was unanimously approved...
>
> ... Resolution no. 05-09 [14] from the Board of Trustees of (CFC) held on August 18, 2005 took place long after the disbursement of 2.4 Billion by Edou, Joseph, following the instructions given by the President of the Board of Trustees...

---

[11] Cameroon's contention that the acts of CFC cannot be attributed to it, and that, therefore, neither of the first two prongs of section 1605(a)(2) applies to Cameroon is discussed below.

[12] The then CFC Chairman of the Board of Directors.

[13] Group Five is a publicly-traded South African construction company with annual revenues of approximately $500,000,000.00. Compl., at ¶ 31. Cameroon's characterization of Group Five as a "fictive shell" company is illustrative of the baselessness of the charges brought in the indictment.

[14] **PX6**

According to witnesses attending the Board meeting during which the project was approved, the President of the Board took the General Director's defense, arguing that the latter had received a verbal agreement from his financial trusteeship, the Ministry of Finances and Budget, which argument was confirmed by his special guest at the meeting: the Director General of the Treasury.

It is established that the president of the Board of Trustees has personally endorsed the project from his correspondence dated March 21, 2005;...

...Edou, Joseph claimed that the project Olembe II is formed of 1034 social housing units,[15] all built by developer ATLANTIC GROUP on a 70 hectares lot ...

According to him, the government agreed to Olembe II because the project was only an extension of Olembe I, which was granted by the Board of Trustees....

...CFC launched a program for the construction of 1034 social housing units under the name Olembe I Extension on 70 hectares of land [16] ... CFC had two partners in this program; namely, ATLANTIC GROUP and GROUP FIVE ....

**PX 7.** There is thus, simply no factual basis for contending, as the defendants do, that neither the May 2004 Agreement, "nor any other purported contract relating to any of the projects in which MBI or Atlantic was involved was submitted to CFC's Board of Directors for approval." Motion to Dismiss, at 8, and *see* Motion to Dismiss at 13-14, 16-17. Both CFC, in its resolution, and Cameroon, in its indictment, have memorialized, asserted and conceded that the May 2004 Agreement was approved by the CFC Board of Directors.

Moreover, the circumstances surrounding the approval of the project preclude a determination that Edou acted alone.

In July and August 2001, the government of Cameroon and CFC pursued the resumption of the housing project on 70 hectares of land. **PX 3** (Minutes of Interministerial Meeting Related to the Financing by the CFC of a Social Housing Programme); **PX 4A, 4B, 4C** (letters from the Prime Minister's Office directing the commencement of actions in support of the project).

---

[15] By December 2004, the number of units to be built under the may 2004 Agreement was fixed at 1034. Compl., at ¶ 37.

[16] In October 2005, CFC reduced the size of the May 2004 Agreement construction to 70 hectares. Compl., at ¶ 70.

The Agreement with plaintiffs was signed in Maryland in the presence of and at the direction of the Chairman of CFC's Board. Plaintiffs immediately commenced work on the project, delivering documents to CFC in November 2004, and responding to CFC's requests for changes in December 2004. That month, CFC's Chairman reiterated to plaintiffs that the project was going forward, and directed that the details be handled by Edou.

In January 2005, plaintiffs entered into a construction contract, at CFC's headquarters, and witnessed by CFC. In April 2005, CFC issued to Atlantic pursuant to the May 2004 Agreement its check in the amount of $4,007,083.00. [17] An additional check was issued in June and, that month, CFC officials traveled again to the United States for meetings with US government officials, including officials at OPIC.

A related Agreement was signed in July 2005, and was discussed in detail by CFC's Chairman and plaintiffs. That month, at a public ceremony, in the presence of virtually the entire CFC staff, the Chairman of the CFC Board turned over the project land to plaintiffs, and described the partnership among CFC, plaintiffs, and Group Five.

On August 10, 2005, The Minister of Finance and Economy approved special importation provisions for Group Five's construction equipment. And on the day of board approval that month, both before and after the Board meeting, the Chairman confirmed to plaintiffs that the project was to be approved, and was in fact approved, by the Board.

On August 29, 2005, The Financial Director at CFC directed the branch manager at plaintiffs' bank to pick up a check for $1,637,738.45 pursuant to the May 2004 Agreement.

Throughout the entire process, in the presence of plaintiffs, CFC's officials repeatedly sought the approval for the project and for the steps taken to perform under the May 2004 Agreement from officials of the Cameroon government. Tchoufa decl,, at ¶ 30. At no time

---

[17] CFC's declarant Henri Mekongo Mbala was the Inspector General at the time, but appears to have been silent about the issuance of a check in an amount which he now claims greatly exceeded the General Manager's authority.

during the process, and up to the filing of the Motion to Dismiss, did defendants ever contend that the May 2004 Agreement was unauthorized. Tchoufa decl,, at ¶ 35.

Even under defendants' markedly cramped *sub silencio* contention that the "commercial activity" to which the first prong refers can only be the ratification of the May 2004 Agreement, Motion to Dismiss, at 13, n.5 and accompanying text, the Board's approval in August 2005, of the actions in the United States in May 2004, of Edou and the Chairman precludes any determination that those acts were not the acts of CFC.[18]

But defendants' cramped construction of section 1605(a)(2) is wrong. In *Saudi Arabia v. Nelson,* 507 U.S. 349 (1993), the Supreme Court addressed the commercial activities exception, and added its analysis of the phrase "based upon."

The *Nelson* Court concluded that "the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case. At 357. In *Nelson*, however, only the first of 1605(a)(2)'s three clauses was in issue. *Id.* Thus, as the court further explained,

> Distinctions among descriptions juxtaposed against each other are naturally understood to be significant ..., and Congress manifestly understood there to be a difference between a suit "based upon" commercial activity and one "based upon" acts performed "in connection with" such activity. The only reasonable reading of the former term calls for something more than a mere connection with, or relation to, commercial activity. *Id.*, at 357-358.

The 'in connection with" language is utilized in both the second and the third prongs of 1605(a)(2). Thus, because the two trips to the United States were "in connection with" the housing project, the second prong of 1605(a)(2) is satisfied.

> *b.  This Action Is Based Upon An Act Outside The Territory Of The United States In Connection With A Commercial Activity Of The Foreign State Elsewhere And That Act Causes A Direct Effect In The United States.*

---

[18] And *see Reiss v. Societe Centrale du Groupe des Assurances Nationales,* 246 F.Supp.2d 273, 283 (S.D.N.Y.2003) ( in suit against foreign state for actions of an alleged agent the court ruled that ratifying conduct by the foreign state "cures any defect in actual authority at the time of the engagement.")

The third prong of 1605(a)(2) adds two compensating elements: the act occurs outside the United States, but it causes a "direct effect" in the United States. Defendants contend that the third prong is not applicable because of the absence of a direct effect. That argument is groundless.

Courts have consistently applied a broad and unrestrictive meaning to "direct effect." In *Weltover*, an FSIA breach of contract action arising out of Argentina's unilateral extension of time to pay bonds, the Supreme Court explained:"...we reject the suggestion that §1605(a)(2) contains an unexpressed requirement of 'substantiality' or 'foreseeability....' (A)n effect is 'direct' if it follows as an immediate consequence of the defendant's activity (internal ellipses omitted)."

Further, "(n)othing in the commercial activity exception expressly limits the cognizable effects to those felt solely by plaintiff." *Morris v. People's Republic of China,* 478 F.Supp.2d 561, 568 (S.D.N.Y. 2007). And *see Commercial Bank of Kuwait v. Rafidain Bank and Central Bank of Iraq,* 15 F.3d 238 (2nd Cir. 1994) (rejecting defense "because the United States is not the place of performance of any contractual obligations owed to this plaintiff, there is no 'direct effect." At 241). *See also United World Trade Inc. v. Mangyshlakneft Oil Prod. Assoc.,* 33 F.3d 1232, 1236-38 (10th Cir.1994), *see also IDAS Resources, N.V. v. Empresa National de Diamantes de Angola E.P.,* 2006 WL 3060017*7 (D.D.C. 2006), and *see Maritime International Nominees Establishment v. The Republic of Guinea,* 693 F.2d 1094, 1110, 1111 (D.C.Cir. 1983) (applies pre-*Weltover* foreseeability test to reject immunity exception, but recognizes that injury to non-party could constitute direct effect.)

In addition, as Judge Wald stressed in her concurrence in *Goodman Holdings v. Rafidain Bank,* 26 F.3d 1143 (D.C.Cir. 1994): "for an act to have a 'direct effect' in the United States, there is no prerequisite that that the United States be contractually designated as the place of performance." *Id,* at 1147 (Wald, concurring).

28

An examination of the direct effect test necessarily begins with a determination of the "acts" in issue. The Complaint sets out in detail the events in Cameroon attendant to three separate agreements, as well as the misrepresentations made by various CFC officials.[19] The effect of those acts was the collapse of housing projects supported by an American company, and by American government agencies including OPIC.

Defendants' do not argue that the acts had no effect on plaintiff MBI in the United States.[20] Instead, they contend only that "the financial loss of a U.S. corporation is not a direct effect." Motion to Dismiss, at 18, and *see* Motion to Dismiss at 11, n.3.

In *Rong v. Liaoning Province Government,* 452 F.3d 883 (D.C. Cir. 2006), Judge Henderson, in her concurring opinion, addressed the direct effect test, stating:

> Unlike the allegations of direct effect in *Foremost-McKesson* [21]-not merely nonpayment but also cessation of the "flow of capital, management personnel, [22] engineering data, machinery, equipment, materials and packaging" between Iran and the United States, *see Foremost-McKesson,* 905 F.2d at 451-here the direct effect involves only the monetary loss of a Chinese national resident in the U.S. In addition, Broadsino's status as a foreign corporation does alter the no "direct effect" determination." At 891.

Thus, contrary to defendants' suggestion, the fact that the effect was sustained by an American corporation, rather than a foreign corporation, is critical to an assessment of a direct effect including financial loss. As Judge Henderson further explained:

> MacKesson, however, was an American corporation while Broadsino is incorporated under the laws of Hong Kong...*so Int'l Hous. Ltd. v. Rafidain Bank*

---

[19] The role of the government of the Cameroon is discussed in the following subsection.

[20] Defendants are silent on the effect on OPIC, notwithstanding that, as described above, a direct effect is not limited to the effect on plaintiff. The complaint is replete with averments of OPIC's involvement in the project. Compl., at ¶¶ 9-13, 15f-h, 25, 42, 48e, 50, 52e and 80. The complaint specifically averred that Plaintiffs' OPIC application "correctly projected as a result of the Yaounde Phase II project a significant increase in employment in the United States and a significant inflow of capital annually from Cameroon to the United States." Compl., at ¶ 50. The collapse of housing projects supported by OPIC constitutes a direct effect in the United States, and is unaddressed by defendants. On that basis alone, the Motion to Dismiss must be denied.

[21] *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990). It is not inconsequential that *Foremost-McKesson* was decided before *Weltover,* and that the *Foremost-McKesson* court applied the materiality and substantiality tests, at 451, later rejected by the Supreme Court in *Weltover.*

[22] As noted above, plaintiffs assert the loss of capital inflow to, and employment in the United States. Compl., at ¶ 50.

> *Iraq*, 893 F.2d 8, 11 (2nd Cir.1989) ("The fact that some or all of IHL's principals or officers may be United States citizens does not outweigh the facts that they organized the company outside the United States and that its losses in the instant transaction thus occurred elsewhere.") *Weltover* is not to the contrary.... (U.S. was "place of performance for Argentina's ultimate contractual obligations"; rescheduling of obligations therefore had direct effect in U.S. because " [m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming").... In the Second Circuit's *Weltover* decision ...the court declared that courts "often look to the place where legally significant acts giving rise to the claim occurred" to determine the location of a "direct effect.";... *cf. I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1190 (D.C.Cir.2003) (Pakistan's failure to meet payment obligation under contract providing for payment in Virginia had direct effect in U.S. because "the involvement of a U.S. bank was immediate and unavoidable") (internal citations omitted).

*Rong, supra*, at 891-892. Financial loss is not a direct effect only if it is "fortuitous," or "eventual."[23] There was nothing fortuitous or eventual about the losses sustained by MBI. The resources it devoted to the project were lost as a result of defendants' misconduct. As the 11th Circuit observed in *Honduras Aircraft Registry, Ltd. v. The Gov't of Honduras*, 129 F.3d 543, 559 (11th Cir. 1997):

> the district court found that jurisdiction was satisfied under § 1605(a)(2) of the FSIA, based an act outside the territory of the United States in connection with commercial activity of Honduras which caused a direct effect in the United States. Those effects can be easily seen; as the district court noted, the offices and registry database were to be established and maintained in Florida, computers and other equipment were to be purchased in the United States, plaintiffs had DARs in Florida and had established a network of aircraft inspectors in the United States.).

### 2.  Cameroon's Relationship With CFC and Cameroon's Own Conduct Subject It to This Court's Subject Matter Jurisdiction

Cameroon seeks to escape liability by asserting that CFC is a separate entity whose conduct cannot be attributed to the government of the Cameroon.  That argument fails because Cameroon exercises control over CFC sufficient to subject Cameroon to liability for CFC's

---

[23] In  *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511 (D.C.Cir.1988), upon which Judge Henderson relies for those terms, plaintiff argued only that he suffered financial hardship in the United States after Saudi Arabia breached a contract negotiated, signed and performed in Saudi Arabia because he eventually chose to return to the United States after the breach. At 1514-1515.

actions and because the government of the Cameroon directly engaged in the wrongful conduct alleged in the complaint.

*Foremost-McKesson, supra,* sets out the fundamental standard for attribution to a foreign sovereign of the actions of an agency or instrumentality: "sufficient control …to create a relationship of principal to agent. At 447. "…(A) sovereign need not exercise complete dominion over an instrumentality to the point of stripping it of any meaningful separate identity in order to establish a relationship of principal and agent." *Transamerica Leasing Inc. v. La Republica de Venezuela,* 200 F.3d 843, 849 (D.C.Cir. 2000).

CFC was created by Decree of the president in 1977. **PX 2A.** In June 1981, CFC was, again by decree of the president, placed under the supervision of both the Ministry of Town Planning and Housing, and the Ministry of Finance. **PX 2B.** CFC's Articles describe it as "a state owned corporation engaged in commercial activity," Motion to Dismiss, Document 9-3, page 48 of 86, under the "supervision" of "the ministry in charge of Finance." *Id.,* at 49. The meaning and the extent of that supervision is not explained in the Articles. Though CFC Inspector General Henri Mekongo Mbala claims that neither the Ministry nor the government "directs the manner in which CFC operates or in which it pursues the objectives stated in its Articles,"[24] Document 9-3, pages 12-13 of 86 at para. 7, he offers no testimony on the extent of the Ministry's "supervision."

Ample evidence of control has already been adduced in this case. As Mr. Tchoufa declares:

> Throughout my communications with CFC officials on the Cameroon Housing Project, I was continuously advised by those CFC officials that they were in constant contact with various Cameroon government officials, and that CFC sought the guidance, supervision and approval of those Cameroon government officials on virtually every aspect of the Cameroon Housing Project. In particular, I was informed by the CFC officials that such guidance, supervision

---

[24] Particularly in light of the Inspector General's testimony on the absence of any Resolution by the Board, the court should discount Henri Mekongo Mbala's declaration, or permit meaningful discovery related to his testimony.

and approval was regularly and repeatedly sought from the Minister of Finance and the Secretary General of the Office of the Presidency.

For example, during the May 2004 visit to Washington, Mr. Edou made repeated calls to the Minister of Finance and  the Secretary General of the Office of the Presidency.

PX 1, at ¶ 30.

Mr. Tchoufa also declares that:

On December 20, 2005, I met with Ekindi at Ekindi's office.  Ekindi informed me that Ekindi *had been instructed* to identify a pretext for the termination of the Cameroon Housing Project and in particular the Yaounde Phase I Project.  *Ekindi identified the person who gave him that instruction, and that person was a high official in the Cameroon government*(emphasis added). *Id.,* at ¶ 29.

Mr Tchoufa also declares that:

On August 10, 2005, the Minister of Economy and Finance delivered to CFC his approval of a special importation regime for the importation of construction equipment …. On that day, Chairman Booto told me that the Minister of Economy and Finance told Chairman Booto that people in the Cameroon government would "chop the head" of the Chairman and Edou because those government personnel "were not in the equation." *Id.,* at ¶ 22. [25]

As the complaint alleges: CFC's "Ekindi informed Tchoufa that there was no hope that the Cameroon Housing Project … would go forward.  Ekindi informed Tchoufa that he was following instructions from Cameroon government officials." Compl., at ¶ 87 and see ¶¶ 65-67 (identify CFC admissions that it required instructions and approval of Cameroon government).  By CFC's own admission, thus, the Cameroon Housing Project was subject to the control of the government of the Cameroon, which repeatedly issued "instructions" to CFC.

Moreover, in the words of the government of the Cameroon, in its indictment, the CFC approved the Project in August 2005 when the Board was advised that the government approved of the project.  The indictment claims that:

According to witnesses attending the Board meeting during which the project was approved, the President of the Board took the General Director's defense, arguing that the latter had received a verbal agreement from his financial

---

[25] In fulfillment of that threat, the Project has been stopped, and both the Chairman and Edou have been indicted by the government of Cameroon.

32

trusteeship, the Ministry of Finances and Budget, which (argument)t was confirmed by his special guest at the meeting: the Director General of the Treasury. **PX 7.**

Simply stated, when the government of the Cameroon wanted the project to proceed, it proceeded. When it wanted the project stopped, it stopped. That control is the essence of a principal-agency relationship triggering attribution of the agent's conduct to the principal.

It is certainly true that "(t)he question defies resolution by mechanical formulae, for the inquiry is inherently fact-specific (internal quotation marks, brackets omitted)." *Transamerica, supra,* at 849. Particularly because "internationally recognized equitable principles mandate attribution in order to avoid injustice," *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 633-34 (1983), cited in *Foremost-McKesson* at 446, the government of the Cameroon should not escape liability for the breaches it demanded on the basis of a curt declaration from its Inspector General. At a minimum, the extent of Cameroon's control over CFC generally, and with respect to the plaintiffs' claims in this case, should be accorded the fact-finding scrutiny required for resolution of the claim.

## B. This Court Has Personal Jurisdiction Over Defendant CFC

Subject matter jurisdiction in this case lies exclusively under the FSIA. The FSIA contains its own long-arm statute for obtaining personal jurisdiction over foreign states. Under 28 U.S.C. § 1330(b), "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction ... where service has been made under [28 U.S.C. § 1608]." Neither compliance with the forum state's long-arm statute nor minimum contacts between the defendant and the forum state is required. *See, e.g., Weltover* at 619-620 (1992) (holding that "Argentina ' "purposefully avail[ed] itself of the privilege of conducting activities within the [*United States* ]" ' ") quoting *Burger King v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958) (emphasis added).

33

Defendants make no contention that service was not effected pursuant to section 1608. On its face, section 1330(b) suggests no further analysis is required. Indeed, the D.C. Circuit has made clear that an agency or instrumentality of a foreign state does not enjoy due process protections, as the foreign state itself does not, when the foreign state exerts sufficient control over the agency or instrumentality as to make it an agent of the sovereign. *TMR Energy Ltd. v. State Property Fund of Ukraine,* 411 F.3d 296, 301 (D.C. Cir. 2005). For the reasons set forth in section III.A, *supra,* CFC is not a "person" for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the Court. *Accord, TMR,* 411 F.3d at 302.

Furthermore, even if this Court held that CFC was a person for due process purposes, as a foreign person with no substantial connections to the United States it still should not be entitled to due process protections. *Id.,* fn*, quoting, *U.S. v. Verdugo-Urquidez,* 494 U.S. 259, 271 (1990) ("aliens receive constitutional protections [only] when they have come within the territory of the United States and developed substantial connections with this country")[26]; (brackets in original) and *Jifry v. FAA,* 370 F.3d 1174, 1182 (D.C. Cir. 2004) ("non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections"). This principle has been extended to foreign entities with no substantial ties to the U.S. *See People's Mojahedin Org. of Iran v. Dep't of State,* 327 F.3d 1238, 1241 (D.C.Cir.2003) ("[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."). Since CFC is not authorized to conduct business in the U.S. and maintains no office, employee or property in the U.S., Motion to Dismiss at 18, it can hardly contend that it has "substantial connections" with the U.S., along with the due process protections those connections may bring. *See Am. Immigration Lawyers Ass'n v. Reno,* 18 F.Supp.2d 38, 60

---

[26]  The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections. *See Johnson v. Eisentrager,* 339 U.S. 763, 771 (1950); *Yamataya v. Fisher,* 189 U.S. 86, 101 (1903); *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886). *See also United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 318; *Pauling v. McElroy,* 278 F.2d 252, 253 n. 3 (D.C.Cir.1960). *Cf. Verdugo-Urquidez,* 494 U.S. at 261.

& n. 17 (D.D.C.1998) (holding that regular visits to family members do not qualify as "substantial connections."); *Verdugo-Urquidez,* 494 U.S. at 273 (aliens with substantial connections are those who are in this country "voluntarily and presumably [have] accepted some societal obligations.").

Nevertheless, CFC still has sufficient contacts with the United States to not offend due process[27]. A defendant is constitutionally amenable to a forum's specific jurisdiction if it possesses sufficient minimum contacts with the forum to satisfy due process requirements, and if the forum's exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). A defendant must have "fair warning" that a particular activity may subject it to the jurisdiction of a foreign sovereign. *Burger King Corp.,* 471 U.S. at 472. Because a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction," a court must evaluate the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendant "purposefully established minimum contacts within the forum." *Burger King Corp.* 471 U.S. at 479 (1985).

CFC solicited, negotiated and entered into a contract with MBI in the United States[28]. *See Compl.* at 24, 25, 26, 35, 42, 43, 50, 80, 81. *See also,* Tchoufa Dec. at 11, 12, 30, 36. Even though the contract called for housing projects to be completed in the Cameroon, the solicitation of U.S. entities, MBI and OPIC, occurred in and were directed at the United States. The contract

---

[27]    Sharply distinct from state long arm statutes is the recognition that contacts for FSIA purposes be nationwide, instead of state forum specific. *Ruiz v. Transportes Aereos Militares Ecuadorianos,* 103 F.R.D. 458, 460 (D.D.C. 1984) (holding that relevant forum for due process analysis in claims brought under FSIA is United States, not particular forum state). This analysis is akin to the analysis under Fed. R. Civ. P. 4(k).

[28]    The issue of Mr. Edou's authority to take these actions in the United States is discussed in Section III.A, *supra.*

itself was executed in Bethesda, Maryland and subsequent actions by CFC occurred within and were directed at the U.S. Furthermore, under the contract itself, all notices were to be delivered to MBI at its Bethesda address and presumably, at least some of MBI's obligations under the contract were to be performed at its offices in Maryland. Because the contract was formed in the U.S., the corpus of the contract involved the participation of two U.S. residents, both with a U.S. address, and the parties contemplated future repeated contacts with the U.S. as a condition of performance, the contract had a substantial connection with the District of Columbia and CFC "purposefully avail[ed] [itself] of the ... benefits and protections of [U.S.] laws," *Burger King,* 471 U.S. at 475; *See also, Helmer v. Doletskaya,* 393 F.3d 201, 206 (D.C. Cir. 2004)

### C. The Case Should Not Be Dismissed On *Forum Non Conveniens* Grounds

As is set forth in subsection I.B.4 supra, defendants bear the burden of proof on all elements of *forum non conveniens.* The threshold inquiry is the availability of an alternate forum, *id.*[29] If the court determines that an alternative forum is available,

> the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice. If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum. If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 717 F.2d 602, 606 (D.C. Cir.1983).

---

[29] Defendants refer to, but do not rely on, a purported forum selection clause in two documents which are not a part of the facts asserted in the Complaint. Motion to Dismiss, at n.27 and accompanying text. In all events"(e)ven if a forum selection clause is mandatory on its face, it will not be enforced if there is a "compelling and countervailing reason." *McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 345 (8th Cir. 1985). Moreover, "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause. *Latihn America Finance Group, Inc. v. Pareja,* 2006 WL 2032627*7 (S.D.N.Y.2006), and *see Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.* 414 F.3d 325, 334,-335 (2nd Cir.2005) (applying New York law).

"The district court need not weigh any factors favoring dismissal, however, if no other forum to which the plaintiff may repair can grant the relief it may obtain in the forum it chose."

*TMR Energy Ltd. v. State Property Fund of Ukraine,* 411 F.3d 296, 303 (D.C.Cir.2005).

Discussing transfer under 28 U.S.C. § 1404, the court set out in *FC Investment Group LC v. Lichtenstein,* 441 F.Supp. 2d 3, 12-13 (D.D.C.2006) the applicable standards stating:

> Section 1404(a) is rooted in the earlier doctrine of *forum non conveniens....* Although courts have "more discretion to transfer under § 1404(a) than they ha[ve] to dismiss on grounds of *forum non conveniens,"* ..., they are guided by similar factors in both contexts-namely, the private and public interests at stake....

> The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses ..., but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home....

### 1. Cameroon Is Not An Available Alternative Forum

Defendants have failed to meet their burden of proof that plaintiffs "will be treated fairly," *Abiola v. Abubakar,* 267 F.Supp.2d 907, 918 (N.D.Ill.,2003), in Cameroon courts.  In its most recent report on the state of the judiciary in the Cameroon, the United States Department of State has reported that:

> The constitution and law provide for an independent judiciary; however, *the judiciary remained highly subject to executive influence, and corruption and inefficiency remained serious problems.* The court system was subordinate to the Ministry of Justice, which was part of the presidency. A constitutional anomaly names the president as "first magistrate," thus "chief" of the judiciary and the theoretical arbiter of any sanctions against the judiciary, which could influence judicial action. In practice, however, the president has not filled this role. The constitution specifies that the president is the guarantor of the legal system's independence. He also appoints all judges with the advice of the Supreme Council of the Magistrature. Some politically sensitive cases were never heard by the courts (emphasis added).

*Country Reports on Human Rights Practices (Cameroon - 2006),* United States Department of State, Bureau of Democracy, Human Rights, and Labor (Released March 6, 2007).  **PX 8A.**

Support can be found in judicial decisions for the view that where the local courts have proved to be notoriously lacking in independence, a complainant can be excused from seeking redress in that court system. ...BLCC explained that the legal and political context in which justice is administered in Cameroon allows the President to wield extraordinary powers at the expense of the judiciary. This subordination of the judicial branch to the will of the presidency goes back to the origins of the origin of the Republic. In stitching together the basic law of the land, the constitutional draftsman set out to create an *imperial presidency*" by making this institution the font of a vast array of judicial and non-judicial powers. As a result of this deliberate constitutional engineering, appointment to and removal from high office under this scheme is by Presidential decree....

BLCC submitted that the lack of an independent or impartial judiciary severely compromises the competence of any domestic court in handling the case at bar. Pointing out that the one striking feature about Cameroon's judiciary is its total lack of independence, since it is under the firm control of the President of the Republic. ... Judicial officers owe their appointments to the President ...and serve at his pleasure. This power of appointment and removal is like a sword of Damocles dangling over the heads of judges, ready to descend the moment one of them steps out of line. In theory though, the President is assisted by a Higher Judicial Council in the appointment of members of the bench and officials of the legal department. It is this body, sitting-in-council, that decides the fate of all judicial officers from judges, magistrates, procureurs of the Republic, down to senior court registrars. However, this organ, which is responsible for all appointments, promotions and dismissals in the judiciary, is completely under the control of the President, who appoints the majority of its members and presides over all its meetings.

Kofele-Kale, *Ndiva Asserting Permanent Sovereignty Over Ancestral Lands: The Bakweri Land Litigation Against Cameroon* 13 Ann. Surv. Int'l & Comp. L. 103, 140 (Spring 2007).

Cameroon avocat Nkana Jules opines as follows:

In our professional opinion, specifically based on the current legal environment in Cameroon, as well as the significance and sensitivities of the underlying issues regarding CFC's motives for the illegal stoppage of the housing projects, as well as additional sensitive matters that may be (and probably will be) raised in the litigation, it is our opinion that Atlantic Group SCI and MBI, Group Inc. would not and will not have a fair hearing in the Cameroonian court/legal system. This is evidenced by CFC's and the Cameroonian Government's treatment of Atlantic Group SCI and MBI Group, Inc. (and their principals) so far. **PX 8C**. [30]

The treatment of Mr. Tchoufa by Cameroon leaves no room for the conclusion that

Cameroon is a viable alternative or that "plaintiffs can reinstate their suit in the alternative forum

without undue inconvenience or prejudice." *Friends for All Children, Inc., supra.*

---

[30] *See also* the December 21, 2006 letter from Rebecca Enonchong of Apps Tech Group to Ambassador Neils Marquardt. **PX 8B**. Ms. Enonchong discusses the "evidence of judicial corruption" in Cameroon courts.

Characterized by defendants as "subject to a fugitive warrant for his arrest," Mr. Tchoufa has lived in the United States for 20 years, has been a permanent resident alien for 15 years, has lived at the same address in Bethesda for 10 years, and has worked at the same office in Bethesda for 10 years. The bogus "charges" brought against Mr. Tchoufa by Cameroon came only after Mr. Tchoufa disclosed the demands by the Cameroon government for bribes. Complaint, at ¶ 89, Tchoufa Decl., at ¶¶ 2-7 Indictment, **PX 7**, and after the filing of this lawsuit.

The merit of the Cameroon's arrest warrant was tested in the Ivory Coast and Cameroon failed to make any effort to support it. As Yao Emmanuel – Mr. Tchoufa's attorney in the Ivory Coast -- explains:

> (T)he police at Abidjan International Airport, Ivory Coast detained Mr. Roger Tchoufa as we was waiting to board his plane bound to the United States of America. Police officers who detained him told him they were executing an arrest warrant issued by the Cameroonian authority....
>
> ...(T)he Cameroonian authority suggested to the police in Ivory Coast that Mr. Tchoufa be sneaked to Cameroon Embassy in Abidjan, Ivory Coast and they will do the rest. That request was turned down....
>
> ...After three weeks of detention the court decided that because the Cameroonian Government did not file for an extradition request or a claim of some kind for them to even look at the case ... Mr. Tchoufa was released. **PX 8D.**

Yao Emmanuel concludes, the "claim that Mr. Tchoufa is a fugitive would never stand in any court outside Cameroon." *Id.*[31]   Those courts – "highly subject to executive influence," and

---

[31] As the Complaint avers, Cameroon further retaliated against Tchoufa's disclosure of the bribe demands by improperly arresting and imprisoning Mr. Tchoufa's wife's secretary, seizing Mr. Tchoufa's and his wife's property, threatening the arrest of other relatives, including a minor, improperly arresting a relative and demanding a bribe for his release, and threatening the lives of Mr. Tchoufa and his wife if either returned to the Cameroon. Compl., at ¶¶ 89, 90, 91. *See Iragorri v. Int'l Elevator, Inc.,* 203 F.3d 8, 14 (1st Cir.2000) (considering the plaintiffs' safety "relevant to the suitability of the proposed alternative forum"); *Aldana v. Fresh Del Monte Produce, et al.,* No. 01-3399, slip op. at 4 (S.D.Fla. Jun. 5, 2003) (finding that "a credible threat of retaliatory violence against Plaintiffs renders the Guatemalan forum insufficient as an adequate alternative forum"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 336 (S.D.N.Y.2003) (finding the alternative forum to be inadequate because, in part, "the victim would be endangered by merely returning" to his home country); *Cabiri v. Assasie-Gyimah,* 921 F.Supp. 1189, 1199 (S.D.N.Y.1996) (finding the alternative forum to be inadequate because the plaintiff "would be putting himself in grave danger were he to return to Ghana to prosecute this action"); *see also Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 221 (5th Cir.2000) ("A foreign forum is available when the entire case and *all parties* can come within the jurisdiction of the forum.") (emphasis added). *Cf. Estate of Rodriquez v. Drummond Co., Inc.,* 256 F.Supp.2d 1250, 1267-68 (N.D.Ala.2003) (finding that the plaintiffs had

permeated by "corruption and inefficiency," cannot and will not provide a fair hearing on plaintiffs' corruption-based complaint, and do not provide an alternative forum for plaintiffs' claims against CFC and Cameroon.[32]

2.  The <em>Forum Non Conveniens</em> Private Factors Weigh Against Dismissal

<em>a.  The Plaintiffs' Choice Of Forum</em>

In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) the Supreme Court concluded that plaintiff's choice of forum is entitled to deference. The "normal deference," as characterized by *Piper*, is a "a strong presumption in favor of the plaintiff's choice of forum," at 265-66, and where plaintiff is a non-resident of the forum, "the presumption applies with less force." *Id.*, at 266. And *see Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 609 (3d Cir.1991) (holding that in cases involving foreign plaintiffs, defendants must establish a "strong preponderance" in favor of dismissal).

> As the Second Circuit explained in an FSIA action:

> A domestic petitioner's choice of its home forum receives great deference, while a foreign petitioner's choice of a United States forum receives less deference. We measure    the    degree    of    deference    on    a    sliding    scale,...and the more it appears that the [petitioner's] choice of a U.S. forum was motivated by forum-shopping reasons-such as ... the inconvenience and expense to the [respondent] resulting from litigation in that forum-the less deference the [petitioner's] choice commands, and, consequently, the easier it becomes for the [respondent] to succeed on a forum non conveniens motion by showing that convenience would better be served by litigating in another country's courts.

> On the other hand, "the greater the [petitioner's] or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the [respondent] to gain dismissal for forum non conveniens." *Id.* (footnote omitted).

---

adequately alleged the unavailability of remedies, for TVPA exhaustion purposes, because they would have been at risk of retaliation).

[32] Defendants' extended discussion on the availability of assets to enforce a judgment, Motion to Dismiss, at 22, n.7 is irrelevant to a *forum non conveniens* analysis. As the D.C. Circuit explained in *TMR Energy, supra*: "Even if the SPF currently has no attachable property in the United States, however, it may own property here in the future, and TMR's having a judgment in hand will expedite the process of attachment. In any event, the possibility that the judgment of the district court may go unenforced does not bear upon whether that court is an inconvenient forum in which to defend." At 303.

*In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz Of Ukraine And State Of Ukraine,* 311 F.3d 488, 498 (2nd Cir. 2002).

Defendants make no claim that plaintiffs engaged in forum shopping. Accordingly, plaintiff's selection should be accorded greater deference.

Defendants seek to minimize the presumption because plaintiff Atlantic is a resident of Cameroon and plaintiff MBI is a resident of Maryland. But – with respect to MBI's choice of forum – defendant incorrectly urges a state-based, rather than national-based identification of plaintiffs' residence. As the court in *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 244 F.Supp.2d 289, 338-339 (S.D.N.Y.2003) explained:

> The Court notes that NCDS is incorporated in Minnesota, that Garbang is an Illinois resident, and that Cluol is an Iowa resident. In short, while several plaintiffs are United States residents, none is a New York resident. Similarly, in *Wiwa[33]* none of the plaintiffs was a resident of New York. The district court in that case had weighed that fact against plaintiffs. As the Second Circuit has made clear, that was reversible error:

> In this case, the district court weighed against the plaintiffs that none of them were [sic] residents of the Southern District of New York but did not count in favor of their choice of a U.S. forum that two of them were residents of the United States. This was error.

> *Wiwa,* 226 F.3d at 103. For purposes of a *forum non conveniens* determination, the home forum of any United States resident is any United States Court. *See id.* at 103. Thus, the fact that none of the plaintiffs in the instant case is a resident of the Southern District is irrelevant. The fact that none of the individual plaintiffs is a United States citizen is similarly irrelevant: "We have never accorded less deference to a foreign plaintiff's choice of a United States forum where that plaintiff was a U.S. resident." *Wiwa,* 226 F.3d at 103.

### b. The Defendants' Choice Of Forum

No court suggests that defendants' choice of forums is entitled to the same weight as plaintiff's choice.

### c. Whether The Claim Arose Elsewhere

The Complaint asserts and relies on critical facts arising in the United States. *See* Compl., at¶¶ 4 (residence of MBI), 9-13 (American programs), 15f-h (American participation), 25 (CFC

---

[33] *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 100 (2nd Cir.2000).

41

visit for two weeks to the United States), 26-30 (signing of May 2004 Agreement in Maryland, 42 (CFC meetings in Washington), 50 (filing with OPIC), 54 (filing with World Bank), 80 (OPIC's Washington officials travel to Cameroon), 88 (Tchofa returns to United States), and 89 (plaintiffs send demand letter referring to "graft and corruption").

### d. The Convenience Of The Parties

As this court observed in *FC Investment Group, supra*:

> When analyzing the convenience of parties and witnesses, a defendant must show that witnesses would be unwilling to testify in the District of Columbia..... Otherwise, it is assumed that the witnesses will voluntarily appear... and mere inconvenience to the witnesses alone is not enough to warrant transfer ... In addition, to support its request for transfer under section 1404(a), a moving party must demonstrate ... what a non-resident witness will testify to, the importance of the testimony to the issues in the case, and whether that witness is willing to travel to a foreign jurisdiction.... At 14.

Defendants have not contended that its officials or employees would refuse to appear in the United States to defend the claim. Moreover, defendants have already retained in Washington highly competent counsel who are now well-familiarized with the case. *See Presbyterian Church, supra,* at 341 (discussing significance of availability of counsel).

### e. The Convenience Of The Witnesses

As with the convenience of parties, defendants are required to show that witnesses would be unwilling to testify in the United States. *FC Investment Group, supra*, at 14. Defendants have not made that showing. Moreover, plaintiff will rely on many witnesses living and working in the United States, including officials and employees at OPIC, HUD, and the World Bank.

It is also relevant that there is no jury demand in this case. The trial court will thus have significant flexibility in its consideration of trial testimony logistics, including "contemporaneous transmission from a different location," Fed.R.Civ.P. 43(a), and *see El-Hadad, supra,* at 668-669 (affirming trial court's use of "testimony from Egypt by Internet video"), and the use of depositions *de bene esse, see U.S. v. Microsoft Corp.,* 165 F.3d 952, 956 (D.C. Cir. 1999) (noting long history of depositions taken in "order to preserve the testimony of a witness who was

expected to be unavailable at trial because he was aged, infirm, or lived beyond the subpoena power of the court.")

*f.   The Ease Of Access To Sources Of Proof.*

In *FC Investment Group, supra,* the court wrote that "in the context of a motion for a transfer of forum, the location of documents, given modern technology, is less important in determining the convenience of the parties." At 14. "(T)he need to photocopy and ship documents is hardly unprecedented in American litigation." *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 66 (2d Cir.2000).

Defendants' detailed motion –accompanied by numerous exhibits and declarations – underscores its access to sources of proof. Both parties will have access to material through the liberal discovery available in American courts. Defendants' declarant Professor Ephraim Ngwafor makes no mention in either of his declarations of the availability of discovery in Cameroon's courts.[34]

By contrast, plaintiffs have already been denied by Cameroon access to Mr. Edou for purposes of either an interview or a declaration. Minutes of Observation, Ngoufack Samuel, **PX 8E.**[35] Indeed, defendants assert that in Cameroon "the proceedings are in writing," Motion to Dismiss, at 28, foreclosing any cross-examination of witnesses – including those under government control and government employees – who have not been subjected to any civil discovery.

3.   The *Forum Non Conveniens* Public Factors Weigh Against Dismissal

*a.   The Transferee's Familiarity With The Governing Laws*

Defendant complains that this court would be required to determine the applicable law of

---

[34]   "There were no laws providing citizens with access to government information, and in practice such access was difficult to obtain. Most government documents, such as statistics, letters exchanged between various administrations, draft legislation and investigation reports, were not available to the public or the media." Department of State Report, **PX 8A,** at Section 3.

[35]   Presumably, plaintiffs will also be denied access to defendants' declarant Koh Koh, who is also incarcerated. Tchoufa decl.

Cameroon." Motion to Dismiss, at 27. Even assuming *arguendo* that every claim in this case is subject to a Cameroon choice of law provision, Fed.R.Civ.P. 44.1 provides a ready mechanism for the determination of that law. Defendants appear to have had no difficulty to date asserting and interpreting Cameroonian law. *See* declarations of Professor Ephraim Ngwafor.

To the extent that broader legal issues are involved, familiarity of the District of Columbia courts with issues of international consequence[36] is unsurpassed.

> ### b. The Relative Congestion Of The Calendars Of The Potential Transferee And Transferor Courts

According to the 2006 Judicial Business of the United States: Annual Report of the Director, available at http:/www.uscourts.gov/cgi-bin/cmsd-006.pl, there are 274 pending cases per judgeship in the District of Columbia. Defendants have provided no statistics with respect to the Cameroon courts, but the Department of State's 2007 report, **PX 8A**, emphasizes the corruption and the inefficiency of those courts.

> ### c. The Local Interest In Deciding Local Controversies At Home

This case began with an American company pursuing a housing project urged and supported by American government programs. It ended because of Cameroonian government corruption. Fair disposition of those issues is of vital importance to the courts of the United States and of the District of Columbia.

Defendants cannot dispute that American courts have an interest in ensuring that the rights of American citizens are protected. *See Shaw v. Marriott Intern., Inc.*, 474 F.Supp.2d 141, 147 (D.D.C.2007).[37]

Equally important, the United States and its courts have an undeniable interest in fighting corruption. Access to United States MCC monies is based in part on a foreign state's "...record

---

[36] Congress certainly recognized the utility of directing cases against foreign states and their political subdivisions to the District of Columbia in 28 U.S.C.§ 1391(f)(4)(providing alternate venue in the District of Columbia for any such claim).

[37] As noted above, "(f)or purposes of a *forum non conveniens* determination, the home forum of any United States resident is any United States Court." *Presbyterian Church, supra,* at 338-339.

of fighting corruption." Compl., at 10. And *see* the Foreign Corrupt Practices Act, 15 U.S.C.§§ 78dd-1, 78dd-2 (prohibiting the use of the mails or any instrumentality of interstate commerce to offer or pay bribes to foreign officials in order to obtain or retain business).

This court, thus, has a strong local interest in the fair disposition of plaintiffs' claims.

Respectfully Submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*: (202) 466-3883
*Fax*:    (202) 775-7477
*Email*: pmusolino@musolinoanddessel.com

Sylvia J. Rolinski, Esq. # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*: srolinski@rolinski.com

45

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served electronically on November 5, 2007 on:

Knox Bemis
Dewey & LeBoeuf LLP
1101 New York Avenue NW, Suite 1100
Washington, DC  20005

John Jay Range
B. Donovan Picard
Edward B. Rowe
HUNTON & WILLIAMS
1900 K Street, N.W., Suite 1200
Washington, D.C 20006

Philip M. Musolino

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI GROUP, INC., et al. | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CRÉDIT FONCIER DU CAMEROUN | : | 1:07-cv-00637-JDB |
| | : | |
| and | : | |
| | : | |
| THE GOVERNMENT OF THE REPUBLIC | : | |
| OF CAMEROON | : | |

## ORDER

This matter having come before this Court on the Motion of Defendants Crédit Foncier Du Cameroun and the Government of The Republic of Cameroon ("Defendants") to Dismiss the Complaint ( the "Motion to Dismiss"), and opposition thereto, and good cause having been shown, it is, this _____ day of _____, 200_:

ORDERED, that the Motion to Dismiss be and is hereby DENIED, and it is

FURTHER ORDERED, defendants shall file an answer to the Complaint within __ days of the date of entry f this order.

SO ORDERED.

_____
Judge John D. Bates
United States District Court
for the District of Columbia

cc:

Philip M. Musolino
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036

Sylvia J. Rolinski
Danielle M. Espinet
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854

Knox Bemis
Dewey & LeBoeuf LLP
1101 New York Avenue NW, Suite 1100
Washington, DC  20005

John Jay Range
B. Donovan Picard
Edward B. Rowe
HUNTON & WILLIAMS
1900 K Street, N.W., Suite 1200
Washington, D.C 20006

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI GROUP, INC., et al. | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| CRÉDIT FONCIER DU CAMEROUN | : | 1:07-cv-00637-JDB |
| | : | |
| **and** | : | |
| | : | |
| THE GOVERNMENT OF THE REPUBLIC | : | |
| OF CAMEROON | : | |

## PLAINTIFFS' EXHIBITS IN OPPOSITION TO MOTION OF DEFENDANTS CRÉDIT FONCIER DU CAMEROUN AND THE GOVERNMENT OF THE REPUBLIC OF CAMEROON TO DISMISS THE COMPLAINT

| Plaintiffs' Exhibit Number | Description |
|---|---|
| 1 | Declaration of Roger Tchoufa |
| 2A | Excerpts from Decree 77/140 May 13, 1977 (Entire Decree in French attached) |
| 2B | Excerpts from Decree 81/236 June 17, 1981 (Entire Decree in French attached) |
| 2C | Excerpts from Decree 2002/251 October 31, 2002 (Entire Decree in French attached) |
| 3 | Minutes of Meeting held on July 12, 2001 (Entire Document in French attached) |
| 4A | Letter August 29, 2001 Secretariat General to CFC General Manager (Entire Document in French attached) |

| **4B** | Letter August 29, 2001 Secretariat General to Minister of Urban Affairs (Entire Document in French attached) |
| **4C** | Letter August 29, 2001 Secretariat General to Minister of Town Planning and Housing (Entire Document in French attached) |
| **5** | Letter August 10, 2005 Minister of Economy and Finance to CFC General Manager |
| **6** | CFC Board Resolution August 18, 2005 |
| **7** | Excerpts Indictment December 22, 2006 (Excerpts in French attached) |
| **8A** | Report United States Department of State March 6, 2007 |
| **8B** | Letter Rebecca Enonchong to Ambassador Marquardt December 2, 2006 |
| **8C** | Letter Nkana J. Jules November 2006 |
| **8D** | Declaration Yao Emmanuel |
| **8E** | Minutes of Observation October 25, 2007 |

Respectfully Submitted,

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883

Sylvia J. Rolinski, Esq. # 430573
Danielle M. Espinet # 478553
*Rolinsko & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
(240) 632-0903

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MBI GROUP, INC., et al.**                    :
                                               :
      **v.**                                       :
                                               :
                                               :
**CRÉDIT FONCIER DU CAMEROUN**                 :          **1:07-cv-00637-JDB**
                                               :
      **and**                                     :
                                               :
**THE GOVERNMENT OF THE REPUBLIC** :
  **OF CAMEROON**                              :

## DECLARATION OF ROGER TCHOUFA

I, Roger Tchoufa, being duly sworn and under oath and under penalty of perjury under

the laws of the United States, de hereby declare, swear and affirm that the statements in

this declaration are true and accurate and are based on my personal information.

1.  I was born in Melong Cameroon in 1961.

2.  I first arrived in the United States in 1988 on a student visa.

3.  I earned an M.B.A. in Finance from Lincoln University, Missouri in 1991.

4.  I became a permanent resident of the United States in 1993.

5.  I have lived in the United States with the exception of business and personal travel
since 1988.

6.  I have lived at the same address in Bethesda Maryland since 1997.

7.  I formed MBI and have worked for and with MBI since 1997.  MBI's offices have
always been in Bethesda, Maryland.

8.  I am very familiar with the complaint in this case.  The statements of fact contained in
paragraphs four through 96 of the complaint are true and accurate.

9.  The agreements upon which the law suit is based were approved by the Board of
Directors of CFC.

1



**PLAINTIFF'S EXHIBIT**

_1_

10.  In February 2004, I met in Yaounde with Mr. Andre Booto A Ngon ("Booto") who was the chairman of CFC's board of directors.

11.  In May 2004, Chairman Booto was among the CFC officials who traveled to Washington for meetings and inspections, as described in the Complaint.

12.  On May 18, 2004, in Bethesda, CFC Chairman Booto, in my presence, and in the presence of MBI's John Kamya, and at least one other person, instructed Edou to sign the May 2004 Agreement, and advised Edou that he – Booto – would report the signing to the CFC Board.

13.  In December 2004, after submission of the December 2004 Plan Documents, I met with CFC Chairman Booto at Chairman Booto's CFC headquarters in Yaounde. Also present at the meeting was Edou. Booto told me that he had been briefed on the May 2004 Agreement and its progress, and that the May 2004 Agreement was going forward, and that the details on performance would be handled through Mr. Edou.

14.  The Yaounde Phase I FIDIC Contract was ratified at the CFC headquarters in Yaounde. The CFC Board was meeting at the CFC offices at the same time. CFC Chairman Booto was aware that the FIDIC contract was being signed that date at CFC's headquarters, and met with me, Edou and Group 5 representatives and discussed in detail the Yaounde Phase I FIDIC Contract and its signing.

15.  On April 1, 2004 a check drawn on CFC's account, and made payable to Atlantic Group in the equivalent amount of $4,007,083.00, was delivered to Atlantic pursuant to the May 24, 2004 Agreement.

16.  Pursuant to the Yaounde Phase I FIDIC Contract, Atlantic Group wired that sum in its entirety to Group 5.

17.  On June 16, 2005, pursuant to the May 2004 Agreement and to reimburse plaintiffs for costs and expenses, CFC delivered to Atlantic the equivalent sum of $254,708.97.

18.  On July 23, 2005, at a public ceremony, CFC handed over to Plaintiffs and to Group Five 102 hectares of land for the construction and the completion of the Yaounde Phase I Project. Compl., at ¶ 45. The ceremony was attended by virtually the entire CFC staff. CFC Chairman Booto was a speaker at the ceremony, along with Edou. Also speaking at the ceremony was the First Consul to the South African Ambassador to Cameroon.

In his speech, Booto stated that the site was selected for an affordable housing project, and he presented MBI, as the American developer, Atlantic as the local developer, and Group Five as the South African contractor which together partnered with CFC to build local affordable housing on the site.

2

19.  CFC's Chairman Booto and I spoke in detail about the July 2005 Agreement, both before and after its ratification. Booto assured me that CFC had the funds to provide financing for the purchasers, and was well aware that the July 2005 Agreement was signed by Edou on behalf of CFC.

20.  I advised Edou and CFC Chairman Booto of the OPIC application at the time of its submission to OPIC in July 2005 on the Yaounde Phase II project.

21.  I spoke with CFC Chairman Booto about the August 2005 Agreement. Chairman Booto was well aware of the Agreement, and expressed his approval of the agreement to me.

22.  On August 10, 2005, the Minister of Economy and Finance delivered to CFC his approval of a special importation regime for the importation of construction equipment to be used by Group Five for construction pursuant to the May 2004 Agreement. A copy of that letter, and its translation, are appended hereto as Plaintiff's Exhibit ("PX") 5. On that day, Chairman Booto told me that the Minister of Economy and Finance told Chairman Booto that people in the Cameroon government would "chop the head" of the Chairman and Edou because those government personnel "were not in the equation."

23.  In mid-August 2005, I spoke with Chairman Booto about the need for additional payments from CFC under the May 2004 Agreement. Chairman Booto advised me that I should wait until the CFC Board approved an upcoming resolution..

24.  On August 18, 2005, CFC issued a resolution which provided as follows:

> **05-09 Olembe Extension Project:** The Board of Directors approved, with absolute majority of the administrators present, the continuation of the Olembe 1 extension project and recommended the presentation of the works at every board meeting.

A copy of that Resolution, and its translation, are appended hereto as PX 7. The Olembe I extension project refers to the May 2004 Agreement.

25.  On the day that the Resolution was approved, prior to its approval, I met with Edou and CFC Chairman Booto and CFC's headquarters. Booto advised me that the CFC Board was going to vote that day on the approval of the May 2004 Agreement. Tchoufa decl.

26.  On the day that the Resolution was approved, after its approval, I met with Edou and CFC Chairman Booto and CFC's offices. Booto advised me that the CFC Board had voted that day and approved the May 2004 Agreement. Tchoufa decl.

3

27. On or about August 29, 2007, CFC delivered to Atlantic Group $1,637,738.45 pursuant to the May 2004 Agreement. The Financial Director at CFC – Essama Jerveis -- called the branch manager at Union Bank of Cameroon PLC and asked the branch manager to pick up the check.

28. Mr. Kemayou Robinson ("Kemayou"), CFC's director of project performance, sent his assistant to the site to observe on and report on the construction progress. I spoke with Kemayou and the director of CFC's legal department about the construction progress.

29. On December 20, 2005, I met with Ekindi at Ekindi's office. Ekindi informed me that Ekindi had been instructed to identify a pretext for the termination of the Cameroon Housing Project and in particular the Yaounde Phase I Project. Ekindi identified the person who gave him that instruction, and that person was a high official in the Cameroon government.

30. Throughout my communications with CFC officials on the Cameroon Housing Project, I was continuously advised by those CFC officials that they were in constant contact with various Cameroon government officials, and that CFC sought the guidance, supervision and approval of those Cameroon government officials on virtually every aspect of the Cameroon Housing Project. In particular, I was informed by the CFC officials that such guidance, supervision and approval was regularly and repeatedly sought from the Minister of Finance and the Secretary General of the Office of the Presidency.

For example, during the May 2004 visit to Washington, Mr. Edou made repeated calls to the Minister of Finance and the Secretary General of the Office of the Presidency.

31. I have read the defendants' motion in this case. It accuses me of being a fugitive, and claims that I have been indicted in Cameroon. I am not a fugitive. I continue to reside at my home in Bethesda with my wife and daughter. I continue to work at my office in Bethesda.

32. The indictment is a totally trumped up claim by the Cameroon government in retaliation for my allegations of bribery against the government. In one instance, I was traveling in the Ivory Coast. I was arrested by Ivory Coast officials because the Cameroon Government had issued a phony arrest warrant through Interpol. The Cameroon government demanded that I be transferred from the custody of the Ivory Coast government to the custody of the Cameroon government. The Ivory Coast authorities refused, and scheduled the matter for a hearing, at which time the Cameroon government was required to present the basis for its arrest warrant. The Cameroon

4

government never appeared at the hearing, and never provided any evidence to the Ivory Coast court. I was thereupon released with no charges remaining.

Yao Emmanuel is my attorney in the Ivory Coast. I have read his November 2, 2007 declaration and it is accurate.

33.    I have also read the allegations directed at Joseph Edou with regard to the property in Bastos. First, Mr. Edou was not employed by plaintiffs for any purpose during his tenure at CFC. After he was removed from CFC, we discussed his participation in the OPIC projects in Cameroon. Well after his removal, he assisted us in acquiring some property for the projects. Neither plaintiff ever conspired with Mr. Edou to give him any secret interest in any asset of plaintiffs or of the Housing Project.

34.    I was the Atlantic officer who instructed Koh Koh to take the steps necessary to acquire the property about which he speaks in his declaration. Atlantic agreed with Group Five to acquire the property so that it could be used as housing for Group Five construction workers. Atlantic was already paying rent on four other properties for those workers, and I decided that it was more prudent to acquire a rental property for use by Group Five workers. The property could provide housing for as many as seven (7) workers.

That transaction was structured as it was for bookkeeping and tax reasons. Mr. Edou was asked by me to pick up a single rent check, well after his removal from CFC, because I was unavailable and because the property was near his family home. He never picked up any other checks for that property.

I understand that Koh Koh is currently in jail in Cameroon.

35.    At no time prior to this litigation did anyone from either defendant assert that the agreements between plaintiffs and CFC were not authorized or approved. In fact, the first time that I or plaintiffs had ever heard that claim was in the Motion to Dismiss.

36.    I and plaintiffs continue to work with OPIC on the housing projects in Cameroon, even though CFC is not participating.

37.    I and MBI have received from OPIC approval and a commitment letter for the construction of affordable housing in Uganda.

November 2, 2007

_____
Roger Tchoufa

5

REPUBLIC OF CAMEROON                 PEACE-WORK-FATHERLAND

DECREE Nº 77/140 OF MAY 13, 1977
bearing on the creation and organisation of the
Credit Foncier du Cameroun

THE PRESIDENT OF THE REPUBLIC

MINDFUL of the June 2, 1972 constitution, amended by the law nº 75/1 of May 9, 1975

MINDFUL of decree nº 75/467 of June 1975 bearing on government reshuffle;

DECREES

SECTION I-          FORM –HEADQUARTERS –SUBJECT

**Article 1**: A public business establishment with legal status and financial autonomy has been created called "Credit Foncier du Cameroun" (CFC).

The Credit Foncier du Cameroun is placed under the tutelage of Ministry of Finance

**Article 13**: Placed under the authority of a General Manager appointed by decree of the President of the Republic assisted by a deputy General Manager appointed likewise, the General Directorate of the Credit Foncier du Cameroun is charged with executing the decisions of the Board of Directors and specialised organs.

TRANSLATION SERVICE DE TRADUC
PILOT LINGUISTIC CENTRE LINGUISTIQUE
P.O. BOX /BP.7239 YAOUNDE CAMEROON
TEL. (237) 222.13.74/58

PLAINTIFF'S
EXHIBIT
2A

REPUBLIQUE UNIE DU CAMEROUN                    PAIX - TRAVAIL - PATRIE
------------                                        ---

DECRET N° 77/140  DU 13 MAI 1977
portant création et organisation du
Crédit Foncier du Cameroun.-

----------

LE PRESIDENT DE LA REPUBLIQUE,

VU la Constitution du 2 juin 1972, modifiée et complétée par la loi n° 75/1
du 9 mai 1975 ;

VU le Décret n° 75/467 du 28 juin 1975 portant réorganisation du Gouver-
nement ;

D E C R E T E :

TITRE I - FORME - SIEGE - OBJET

ARTICLE 1er.- Il est créé un établissement public à caractère commercial do-
té de la personnalité juridique et de l'autonomie financière, dénommé :
"Crédit Foncier du Cameroun" (CFC).

Le Crédit Foncier est placé sous la tutelle du Ministère des Fi-
nances.

ARTICLE 2.- Le siège social du Crédit Foncier est à Yaoundé. Il ne peut être
transféré en tout autre lieu que sur décision du Conseil d'Administration.
Celui-ci peut également décider de la création d'agences dans d'autres villes
du Cameroun.

ARTICLE 3.- Le Crédit Foncier a pour objet d'apporter son concours financier
à la réalisation de tout projet destiné à promouvoir l'habitat.

A ce titre, il est habilité à :

1° Financer les travaux d'équipement des terrains destinés à la
construction de logements économiques ;

2° Rechercher et mettre en place les financements nécessaires aux
sociétés immobilières et de promotion, ainsi qu'à la réalisation de tous pro-
grammes de logements économiques entrant dans les objectifs du Plan et dont
les caractéristiques techniques répondent aux normes définis par arrêté du
Premier Ministre ;

3° Collecter, recevoir, en vue de faciliter l'accès à la propriété
immobilière, les dépôts d'épargne des personnes physiques ou morales. A cet
effet, le Crédit Foncier peut consentir des prêts à moyen et à long termes
par engagements, avals ou escomptes ;

4° Accomplir toutes opérations financières, commerciales mobilières
et immobilières se rattachant directement ou indirectement à l'objet ci-dessus

TITRE II - RESSOURCES

ARTICLE 4.- (1) Pour réaliser son objet, le Crédit Foncier est autorisé à
recevoir :

    - des recettes fiscales affectées ;
    - des dotations, subventions, dons et legs ;
    - des dépôts d'épargnants ou d'organismes publics ou privés.

   (2) En outre, il est autorisé à créer des obligations et émettre
sur tout marché financier ou à contracter tous emprunts.

   (3) Il bénéficie également des facilités de réescompte qui lui
sont consenties par la Banque des Etats de l'Afrique Centrale dans les condi-
tions fixées par les statuts de cet établissement.

ARTICLE 5.- Le capital du Crédit Foncier du Cameroun est fixé initialement
à 1 500 millions de francs CFA, réparti comme suit :

    - Etat Camerounais.......................................... 70 %
    - Caisse Nationale de Prévoyance Sociale............... 20 %
    - Caisse d'Epargne Postale............................. 5 %
    - Caisse Nationale de Réassurance....................... 5 %

ARTICLE 6.- Les dépôts publics affectés aux ressources permanentes du Crédit
Foncier du Cameroun proviennent des comptes à terme ouverts au nom des orga-
nismes d'Etat, selon les modalités fixées par arrêté du Ministre des Finances.

ARTICLE 7.- Toutes les ressources financières du Crédit Foncier du Cameroun
doivent être exclusivement affectées à des opérations dont l'objet répond aux
buts définis à l'article 3 du présent décret.

TITRE III - ORGANISATION

ARTICLE 8.- Le Crédit Foncier du Cameroun est doté des organes suivants :

    - un Conseil d'Administration ;
    - des Comités spécialisés dont l'organisation et le fonctionne-
      ment sont fixés par le règlement intérieur ;
    - une Direction Générale.

ARTICLE 9.- Le Crédit Foncier du Cameroun est administré par un Conseil
d'Administration composé d'un Président nommé par décret présidentiel et de
onze membres ainsi qu'il suit :

    - un Représentant de la Présidence de la République,
    - un Représentant des Services du Premier Ministre,
    - un Représentant du Ministère des Finances,
    - un Représentant du Ministère de l'Equipement et de l'Habitat,

- un Représentant du Ministère de l'Economie et du Plan ;

- le Directeur National de la Banque des Etats de l'Afrique Centrale ou son représentant ;

- le Directeur Général de la Caisse Nationale de Réassurance ou son représentant ;

- le Directeur Général de la Caisse Nationale de Prévoyance Sociale ou son représentant ;

- le Directeur de la Caisse d'Epargne Postale ou son représentant ;

- deux personnalités désignées par le Chef de l'Etat.

Les membres du Conseil d'Administration sont nommés pour quatre ans, par décret présidentiel, leur mandat est renouvelable.

Lorsque au cours de son mandat, un administrateur perd la qualité qui avait motivé sa nomination, il est pourvu à son remplacement. Le mandat du nouvel administrateur ainsi désigné prend fin à la date à laquelle devait expirer celui de son prédécesseur.

Les fonctions d'administrateur sont gratuites. Toutefois, le Conseil d'Administration peut allouer à ses membres une indemnité de session, et procéder au remboursement de leurs frais de transport et de séjour à l'occasion de ses réunions.

Le Conseil peut appeler à siéger à titre consultatif pour une ou plusieurs questions inscrites à l'ordre du jour, toute personne ayant une compétence particulière pour l'étude de ces questions. Les personnes ainsi consultées n'assistent ni aux délibérations, ni aux votes.

ARTICLE 10.- Le Conseil d'Administration a les pouvoirs les plus étendus pour la gestion et l'administration du Crédit Foncier du Cameroun. Il peut notamment :

- élaborer son règlement intérieur qui est approuvé par décret ;

- fixer la structure interne et l'organisation générale des services de la caisse ;

- arrêter les plans et programmes d'activité ;

- approuver le budget prévisionnel, décider de la répartition des bénéfices, approuver les comptes annuels ;

- procéder à tous emprunts ;

- constituer toutes garanties hypothécaires et autres, à l'exception de celles garantissant les emprunts obligatoires ;

- proposer l'extension des opérations du Crédit Foncier ;

- conférer à un ou plusieurs de ses membres ou à des tiers tous mandats spéciaux pour un ou plusieurs objets déterminés ;

- fixer le barème des rémunérations du personnel cadre ;

- fixer l'étendue des pouvoirs délégués au Directeur Général ;

- nommer et révoquer les cadres de Direction sur proposition du Directeur Général ;

- approuver les statuts du personnel ;

- proposer l'augmentation ou la réduction du capital.

ARTICLE 11.- Le Conseil d'Administration peut en vertu des dispositions su règlement intérieur, se réunir aussi souvent que l'intérêt du Crédit Foncier l'exige et au moins doux fois par an.

ARTICLE 12.- Le Conseil d'Administration ne peut valablement délibérer que si les 2/3 de ses membres sont présents. Chaque membre dispose d'une voix.

Les décisions sont prises à la majorité des voix des membres présents ; en cas de partage, la voix du Président est prépondérante.

ARTICLE 13.- Placée sous l'autorité d'un Directeur Général nommé par décret du Président de la République, assisté d'un Directeur Général-Adjoint nommé dans les mômes conditions, la Direction Générale du Crédit Foncier du Cameroun est chargée de l'exécution des décisions du Conseil d'Adminis-tration et des Comités Spécialisés.

ARTICLE 14.- Le Directeur Général-Adjoint remplit les fonctions qui lui sont déléguées par le Directeur Général et le remplace en cas d'absence ou d'empêchement.

ARTICLE 15.- Le Directeur Général reçoit du Conseil D'Administration les pouvoirs nécessaires pour assurer la gestion du Crédit Foncier.

A ce titre :

- il assure l'application du règlement intérieur et des textes législatifs et réglementaires relatifs au Crédit Foncier ;

- il représente le Crédit Foncier dans les sociétés où celui-ci détient des actions ;

- il organise et dirige tous les services du Crédit Foncier ;

- il représente le Crédit Foncier dans les actes de la vie civile et en justice ;

- il prend toutes mesures d'exécution et toutes mesures conser-vatoires qu'il juge utiles ;

- sous réserve des dispositions de l'article 10 ci-dessus, il re-crute, nomme et révoque le personnel et en fixe la rémunération.

ARTICLE 16.- Les comptes du Crédit Foncier sont vérifiés annuellement par deux Censeurs nommés pour trois ans par l'Autorité de tutelle. Les Censeurs ont mandat de vérifier les livres, la caisse, le portefeuille et les valeurs de la société, de contrôler la régularité et la sincérité des inventaires et des bilans ainsi que l'exactitude des informations données dans les comptes de la société et dans le rapport adressé au Conseil d'Administration par le Directeur Général.

Ils peuvent à toute époque de l'année, opérer les vérifications ou contrôles qu'ils jugent opportuns.

Ils établissent pour chaque exercice social le rapport dans lequel ils rendent compte au Conseil d'Administration et au Ministre de tutelle de l'exécution de leur mandat et signalent les irrégularités qu'ils auraient relevées. Un exemplaire de ce rapport est adressé au Directeur Général.

Il est alloué aux Censeurs une rétribution dont le montant est fixé par le Conseil d'Administration.

ARTICLE 17.- Le Directeur Général, le Directeur Général-Adjoint et les Censeurs assistent aux réunions du Conseil avec voix consultative. Le Directeur Général assure le secrétariat du Conseil.

## TITRE IV - EXERCICE - COMPTABILITE - RESULTATS

ARTICLE 18.- L'exercice budgétaire du Crédit Foncier du Cameroun commence le 1er juillet et finit le 30 juin de l'année suivante.

ARTICLE 19.- La comptabilité du Crédit Foncier du Cameroun s'inscrit dans le Plan comptable, répondant aux normes fixées par le Conseil National du Crédit.

Les détails de ce plan comptable sont fixés par le Conseil d'Administration sur proposition du Directeur Général, après avis des Censeurs.

ARTICLE 20.- Le Crédit Foncier arrête trimestriellement la situation de ses comptes qui est publiée au Journal d'annonces légales.

ARTICLE 21.- (1) A la fin de chaque exercice, le Directeur Général dresse l'inventaire des divers éléments de l'actif et du passif existant à cette date.

(2) Il arrête le compte d'exploitation générale, le compte de pertes et profits et le bilan, ainsi que les engagements hors bilan contractés par le Crédit Foncier ;

(3) Il établit un rapport sur la situation et l'activité du Crédit Foncier pendant l'exercice écoulé. Ce rapport est communiqué aux Censeurs préalablement à sa présentation au Conseil d'Administration.

ARTICLE 22.- Les bénéfices nets sont constitués par les produits nets de l'exercice, après déduction des frais généraux et autres charges du Crédit Foncier, y compris tous amortissements et provisions. Les bénéfices nets ainsi déterminés, diminués le cas échéant des pertes antérieures sont dans l'ordre suivant affectés :

--------a) à concurrence de 5 %, à la construction de la réserve légale, jusqu'à ce que le montant de celle-ci ait atteint le dixième du capital ;

b) à la constitution d'un fonds de réserve extraordinaire, à concurrence du montant estimé nécessaire par le Conseil d'Administration et approuvé par l'autorité de tutelle ;

...

- 6 -

c) s'il y a excédent, à la distribution aux participants au capital, d'un intérêt non cumulatif, n'excédant pas 5 % du capital non amorti ;

d) au report à nouveau du solde, s'il en existe, ou la répartition de celui-ci entre les participants au capital, proportionnellement à leurs apports.

ARTICLE 23.- Le présent décret sera enregistré et publié au Journal Officiel en français et en anglais./-

YAOUNDE, le 13 MAI 1977

LE PRESIDENT DE LA REPUBLIQUE,

AHMADOU AHIDJO

REPUBLIC OF CAMEROON                    PEACE-WORK-FATHERLAND

DECREE N° 81/236 OF JUNE 17, 1981
amending the decree n° 77/140 of May 13, 1977
bearing on the creation and organisation of the
Credit Foncier du Cameroun

### THE PRESIDENT OF THE REPUBLIC

MINDFUL of the June 2, 1972 constitution;

MINDFUL of decree n° 77/140 of May 13, 1977 bearing on the creation and organisation of the Credit Foncier du Cameroun;

MINDFUL of decree n° 79/473 of November 1979 bearing on government reshuffle;

### DECREES

**Article 1** paragraph 2 (new): The credit Foncier du Cameroun falls within the first category of public companies and placed under the tutelage:

-of the Ministry of Town Planning and Housing as concerns the execution of the housing policy;
-of the Ministry of Finance in all other cases

**Article 10** (new): The Board of Directors has the largest powers for the management of the Credit Foncier. In this regard:

-it drafts the internal regulation
-it approves the organisational chart
-it approves the staff statutes
-it approves the recruitment and dismissal of the management staff from the 11th category
-it appoints and dismisses staff from the Service Head or related functions as proposed by the General Manager.....

TRANSLATION SERVICE DE TRADUC
ILOT LINGUISTIC CENTRE LINGUISTIQUE PILOTE
P.O. BOX /B.P.7239 YAOUNDE-CAMEROUN
TEL.(237)222.13.74/58.34/58.23

PLAINTIFF'S
EXHIBIT
2.B

REPUBLIQUE UNIE DU CAMEROUN

PAIX - TRAVAIL - PAIX

▥)ECRET N° 81 / 236 DU 17 JUIN 1981

modifiant et complétant le décret n° 77/140 du 13
mai 1977 portant création et organisation du Crédit
Foncier du Cameroun.-

LE PRESIDENT DE LA REPUBLIQUE ;

VU   la Constitution du 2 juin 1972 ;

VU   le décret n° 77/140 du 13 mai 1977 portant création et organisation
du Crédit Foncier du Cameroun ;

VU   le décret n° 79/473 du 15 novembre 1979 portant réorganisation du
gouvernement ;

D E C R E T E

Article 1er : Les articles 1er (alinéa 2), 8, 9 10, 11 13 15 16, et
du décret n° 77/140 du 13 mai 1977 portant création et organisation du
Crédit Foncier du Cameroun sont abrogés et remplacés par les dispositions
suivantes :

Article 1er alinéa 2 (nouveau) :   Le Crédit Foncier du Cameroun est
classé dans la première catégorie des établissements publics et placé
sous la tutelle :

- du Ministère de l'Urbanisme et de l'Habitat en ce qui concer
ne l'exécution de la politique de l'habitat ;

- du Ministère des Finances dans tous les autres cas.

Article 8 (nouveau) : Le Crédit Foncier du Cameroun est doté des organes
suivants :

- un Conseil d'Administration ;

- un Comité de Direction ;

- une Direction Générale ;

. . . /2

~~Article 9 (nouveau) : Le Cré~~dit Foncier du Cameroun est administré
par un Conseil d'Administration composé d'un Président nommé par
décret présidentiel et de onze membres ainsi qu'il suit :

- un représentant de la Présidence de la République ;
- un représentant des Services du Premier Ministre ;
- un représentant du Ministère des Finances ;
- un représentant du Ministère de l'Urbanisme et de l'Habitat ;
- un représentant du Ministère de l'Economie et du Plan ;
- le Directeur National de la Banque des Etats de l'Afrique Centrale ou son représentant ;
- le Directeur Général de la Caisse Nationale de Prévoyance Sociale ou son représentant ;
- le Directeur Général de la Caisse Nationale de Réassurance ou son représentant ;
- le Directeur de la Caisse d'Epargne Postale ou son représentant ;
- deux personnalités désignées par le Chef de l'Etat.

Les membres du Conseil d'Administration autres que le
Président et les personnalités désignées par le Chef de l'Etat sont nommés
par les autorités qu'ils représentent. Lorsqu'un administrateur perd la
qualité qui a motivé sa nomination, il est pourvu à son remplacement dans
les mêmes conditions.

Les fonctions d'administrateur sont gratuites ; toutefois, il
est allouée aux membres du Conseil d'Administration une indemnité de
session conformément à la règlementation en vigueur et il est procédé
au remboursement de leurs frais de transport et de séjour en cas de
déplacement à l'occasion des réunions.

Le Conseil peut appeler à siéger à titre consultatif toute
personne ayant une compétence particulière pour l'examen d'une ou plu-
sieurs questions inscrites à l'ordre du jour. Les personnes ainsi con-
sultées n'assistent ni aux délibérations, ni aux votes.

Article 10 (nouveau) : Le Conseil d'Administration a les pouvoirs les
étendus pour la gestion et l'administration du Crédit Foncier du Came

... /3.

- 3 -

A ce titre :

1 - il élabore le règlement intérieur, qui est approuvé par décret présidentiel ;

2 - il approuve l'organigramme ;

12 - il approuve les statuts du personnel ;

11 - il approuve le recrutement et le licenciement du personnel cadre à partir de la 11e catégorie ;

11 bis - il nomme et revoque aux fonctions à partir de chef de service, ou assimilé sur proposition du Directeur Général ;

4 - il approuve le budget prévisionnel ;

4 bis - il approuve le bilan et les comptes annuels et décide de la répartition des bénéfices ;

- il donne quitus au Directeur Général pour sa gestion ;

6 - il constitue toutes garanties hypothécaires et autres à l'exception de celles garantissant les emprunts obligatoires ;

7 - il propose l'extension des opérations ;

13 - il propose l'augmentation ou la réduction du capital ;

Le Conseil d'Administration peut :

8 - conférer à un ou plusieurs de ses membres ou à des tiers des mandats spéciaux pour un ou plusieurs objets déterminés ;

10 - déléguer une partie de ses pouvoirs au Comité de Direction ou au Directeur Général.

Article 11 (nouveau) : Le Conseil d'Administration se réunit conformément aux dispositions règlementaires en vigueur.

Article 12 bis (nouveau) : Dans le cadre des pouvoirs qui lui sont délégués par le Conseil d'Administration, le Comité de Direction est notamment chargé de statuer sur les offres de ressources et les demandes de prêts.

Le Comité de Direction est composé des membres suivants :

- le Président du Conseil d'Administration ou son représentant choisi parmi les administrateurs, président du Comité ;

- l'administrateur représentant le Ministère des Finances ;

- l'administrateur représentant le Ministère de l'Urbanisme et de l'Habitat ;

.../4

- le Directeur National de la Banque des Etats de l'Afrique Centrale ou son représentant ;

- le Directeur Général du Crédit Foncier du Cameroun ou représentant ;

Le Comité de Direction se réunit aussi souvent que l'intérêt Crédit Foncier l'exige.

Le Comité de Direction ne peut valablement délibérer que s trois au moins de ses membres sont présents. Chaque membre dispose d'une voix. Les décisions sont prises à la majorité simple des voix de membres présents ou représentés ; en cas de partage, la voix du Prés dent est prépondérante.

Le Directeur Général porte les affaires inscrites à l'ord du jour des réunions du Comité de Direction.

**Article 13 (nouveau)** : Placée sous l'autorité d'un Directeur Général na mé par décret présidentiel, assisté d'un Directeur Général Adjoint non dans les mêmes conditions, la Direction Générale du Crédit Foncier d Cameroun est chargée de l'exécution des décisions du Conseil d'Admi tration et du Comité de Direction.

**Article 15 (nouveau)** : Le Directeur Général reçoit du Conseil d'Adm tration les pouvoirs nécessaires pour assurer la gestion du Crédit Fo A ce titre :

- il assure l'application du règlement intérieur et les tex législatifs et règlementaires relatifs au Crédit Foncier ;

- il représente le Crédit Foncier dans les sociétés où celui détient des actions ;

- il organise et dirige tous les services du Crédit Foncier

- il représente le Crédit Foncier dans les actes de la vie c et en justice ;

- il prend toutes mesures d'exécution et toutes mesures co vatoires qu'il juge utiles ;

- sous réserve des dispositions de l'article 10 ci-dessus, i

.../5

recrute et licencie le personnel ;

- il nomme et révoque à tous les emplois autres que ceux vis à l'article 10 ci-dessus.

Article 16 (nouveau) : Les comptes du Crédit Foncier sont vérifiés annuellement par deux Censeurs nommés par l'Autorité de tutelle.

Les Censeurs ont mandat de vérifier les livres, la caisse, le portefeuille et les valeurs de la société, de contrôler la régularité et la sincérité des inventaires et des bilans ainsi que l'exactitude des informations données dans les comptes de la société et dans le rapport adressé au Conseil d'Administration par le Directeur Général.

Ils peuvent, à toute époque de l'année, opérer les vérifications ou contrôles qu'ils jugent opportuns.

Ils établissent pour chaque exercice social le rapport dans lequel ils rendent compte au Conseil d'Administration et au Ministre de tutelle de l'exécution de leur mandat et signalent les irrégularités qu'ils auraient relevées. Un exemplaire de ce rapport est adressé au Directeur Général.

Il est alloué aux Censeurs une rétribution dont le montant est fixé par le Conseil d'Administration.

Article 17 (nouveau) : Le Directeur Général, le Directeur Général Adjoint et les Censeurs participent aux réunions du Conseil d'Administration avec voix consultative.

Le Directeur Général Adjoint et le Directeur chargé du secteur d'activité concerné ou son représentant choisi parmi les cadres dudit secteur, participent aux séances du Comité de Direction avec voix consultative.

La Direction Générale assure le secrétariat du Conseil d'Administration et du Comité de Direction.

.../6

- 6 -

Article 2 : Le présent décret sera enregistré et publié au Journal Officiel en français et en anglais./-

YAOUNDE, le 17 JUIN 1981

LE PRESIDENT DE LA REPUBLIQUE :

AHMADOU AHIDJO

REPUBLIC OF CAMEROON                    PEACE-WORK-FATHERLAND

DECREE N° 2002/251 OF OCT 31, 2002

bearing on the reorganisation of the Palais des Congres (Congress Hall)

THE PRESIDENT OF THE REPUBLIC

MINDFUL of the June 2, 1972 constitution,

MINDFUl of the law n° 99 / 016 of December 1999 bearing on the general statutes of publics establishments and public and parapublic sector enterprises

MINDFUL of decree n° 2002/016 of August 2002 bearing on government reshuffle;

DECREES

CHAPTER 1

GENERAL PROVISIONS

**Article 3:** The Congress Hall is placed under the technical tutelage of the Ministry of Culture and under the financial tutelage of the Ministry of Finance

True to the original presented to us



PLAINTIFF'S
EXHIBIT
2C

**Article 17** (paragraph 1): The general management of the Congress Hall is placed under the authority of a General Manager, if necessary, assisted by a Deputy General Manager, both appointed by decree of the President of the Republic.



**REPUBLIQUE DU CAMEROUN**                    **PAIX-TRAVAIL-PATRIE**

**DECRET N° 2 0 0 2 / 2 5 1 7 DU 31 OCT. 2002**
portant réorganisation du Palais des Congrès.-

## LE PRESIDENT DE LA REPUBLIQUE,

VU  la Constitution ;
VU  la loi n°99/016 du 22 décembre 1999 portant statut général des établissements
    publics et des entreprises du secteur public et parapublic ;
VU  le décret n°2002/216 du 24 août 2002 portant réorganisation du Gouvernement,

## DECRETE :

### CHAPITRE I
### DISPOSITIONS GENERALES

**ARTICLE 1er.-** Le présent décret porte réorganisation du Palais des Congrès.

**ARTICLE 2.-** (1) Le Palais des Congrès est un établissement public administratif doté
de la personnalité juridique et de l'autonomie financière.

(2) Son siège est fixé à Yaoundé.

**ARTICLE 3.-** Le Palais des Congrès est placé sous la tutelle technique du Ministère
chargé de la culture et sous la tutelle financière du Ministère chargé des finances.

**ARTICLE 4.-** Le Palais des Congrès a pour missions :

- la location des salles et espaces en vue de l'organisation des
  manifestations à caractère administratif, politique, économique et
  socioculturel ;
- la promotion culturelle nationale et internationale ;
- la promotion des activités récréatives.

En outre, il réalise toute autre mission à lui confiée par le Gouvernement se
rattachant directement ou indirectement aux missions fixées par le présent article.

2

# CHAPITRE II
## DE L'ORGANISATION ET DU FONCTIONNEMENT

**ARTICLE 5.-** Le Palais des Congrès est administré par deux (2) organes :

- le Conseil d'Administration ;
- la Direction Générale.

## SECTION I
## DU CONSEIL D'ADMINISTRATION

**ARTICLE 6.-** (1) Le Conseil d'Administration est présidé par une personnalité nommée par décret du Président de la République.

Il comprend en outre, les membres ci-après :

- un représentant de la Présidence de la République ;
- un représentant des Services du Premier Ministre ;
- un représentant du Ministère chargé de la culture ;
- un représentant du Ministère chargé des finances ;
- un représentant du Ministère chargé des affaires économiques et de l'aménagement du territoire ;
- un représentant du Ministère chargé de l'urbanisme et de l'habitat ;
- un représentant du Ministère chargé de la jeunesse et des sports ;
- un représentant élu du personnel ;
- un représentant des usagers du Palais des Congrès.

(2) Les membres du Conseil d'Administration sont nommés par décret du Président de la République, sur proposition des administrations et organismes socioprofessionnels auxquels ils appartiennent, à la diligence du Ministre chargé de la Culture.

**ARTICLE 7.-** (1) Le Président et les membres du Conseil d'Administration sont nommés pour un mandat de trois (3) ans renouvelable une (1) fois.

(2) Le mandat d'Administration prend fin à l'expiration normale de sa durée, par décès, par démission, à la suite de la perte de la qualité qui avait motivé la nomination, ou par la révocation à la suite d'une faute grave ou des agissements incompatibles avec la fonction de membre du Conseil d'Administration.

(3) En cas de décès en cours de mandat ou dans toutes les hypothèses où un membre du Conseil d'Administration n'est plus en mesure d'exercer son mandat, il est procédé à son remplacement selon les mêmes modalités et formes que celles qui ont présidé à sa nomination, pour la période du mandat restant à courir.

3

**ARTICLE 8.-** (1) Le Président et les Administrateurs sont soumis aux mesures restrictives et incompatibilités prévues par la législation en vigueur.

(2) Ils sont en outre astreints à l'obligation de discrétion pour les informations, actes et faits dont ils ont connaissance dans l'exercice de leurs fonctions.

**ARTICLE 9.-** (1) La fonction de membre du Conseil d'Administration est gratuite. Toutefois, les Administrateurs bénéficient d'une indemnité de session et peuvent prétendre au remboursement des frais de déplacement, sur présentation des pièces justificatives.

(2) Le Président du Conseil d'Administration bénéficie d'une allocation mensuelle.

(3) Le taux de l'indemnité de session, ainsi que l'allocation mensuelle visés aux alinéas (1) et (2) ci-dessus sont fixés par le Conseil d'Administration dans les limites des plafonds prévus par la réglementation en vigueur.

**ARTICLE 10.-** (1) Le Conseil d'Administration dispose des pouvoirs les plus étendus pour administrer le Palais des Congrès, définir et orienter sa politique générale et évaluer sa gestion dans les limites fixées par son objet social.

A ce titre, il :

- fixe les objectifs et approuve les programmes d'action annuels du Palais des Congrès ;
- adopte le budget du Palais des Congrès et arrête, de manière définitive, les comptes et états financiers annuels ;
- arrête les plans d'équipement et les programmes d'investissement du Palais des Congrès ;
- adopte l'organigramme, le règlement intérieur, la grille des rémunérations et des avantages du personnel sur proposition du Directeur Général ;
- recrute et licencie, sur proposition du Directeur Général, le personnel d'encadrement relevant du code du travail ;
- nomme, sur proposition du Directeur Général, aux postes de responsabilités à partir du rang de Directeur Adjoint et assimilé ;
- accepte tous dons, legs et subventions;
- approuve les contrats de performance ou toutes autres conventions, y compris les emprunts, préparés par le Directeur Général et ayant une incidence sur le budget ;
- peut à tout moment, faire procéder à des contrôles relatifs au fonctionnement ou à la gestion du Palais des Congrès ;

ARTICLE 15.- (2) Le Conseil d'Administration peut déléguer certains de ses pouvoirs au Directeur Général à l'exception de ceux énumérés ci-dessus.

Le Directeur Général rend compte de l'utilisation de cette délégation.

**ARTICLE 11.-** (1) Le Président du Conseil d'Administration, convoque et préside les réunions du Conseil. Il veille à l'application de ses résolutions.

(2) Le Président du Conseil d'Administration peut inviter toute personne en raison de ses compétences sur une question inscrite à l'ordre du jour de la session, à prendre part aux travaux du Conseil avec voix consultative.

**ARTICLE 12.-** le secrétariat du Conseil d'Administration est assuré par le Directeur Général du Palais des Congrès.

**ARTICLE 13.-** (1) Sur convocation de son Président, le Conseil d'Administration se réunit au moins deux (2) fois par an en session ordinaire, dont une fois pour le vote du budget et une fois pour arrêter les états financiers annuels et examiner la marche des activités du Palais des Congrès.

Il examine toute question inscrite à l'ordre du jour soit par le Président, soit à la demande de deux tiers (2/3) de ses membres.

(2) Toutefois, à l'initiative du Président ou à la demande d'un tiers (1/3) au moins des membres du Conseil d'Administration, celui-ci se réunit en session extraordinaire. En cas de refus ou de silence du Président, les membres concernés du Conseil adressent une nouvelle demande au Ministre chargé des finances, qui procède à la convocation du Conseil d'Administration selon les mêmes règles de forme et de délai.

(3) Le Président du Conseil d'Administration est défaillant lorsqu'il ne convoque pas au moins deux (2) sessions du Conseil par an. Dans ce cas, le tiers (1/3) au moins des membres du Conseil ou le Ministre chargé des finances peut prendre l'initiative de convoquer le Conseil d'Administration en proposant un ordre du jour.

**ARTICLE 14.-** (1) Les convocations sont faites par télex, télégramme, télécopie ou par tout moyen laissant traces écrites, et adressées aux membres quinze (15) jours au moins avant la date prévue pour la réunion. Elles indiquent l'ordre du jour et le lieu de la réunion.

(2) Tout membre présent ou représenté à une séance du Conseil d'Administration est considéré comme ayant été dûment convoqué.

**ARTICLE 15.-** (1) Tout membre empêché peut se faire représenter aux réunions par un autre membre du Conseil d'Administration. Toutefois, aucun Administrateur ne peut, au cours d'une même session, représenter plus d'un Administrateur.

(2) En cas d'empêchement du Président, le Conseil élit en son sein un Président de séance à la majorité simple des membres présents ou représentés.

**ARTICLE 16.-** (1) Le Conseil d'Administration ne délibère valablement sur toute question inscrite à son ordre du jour que si les deux tiers (2/3) au moins de ses membres sont présents ou représentés. Si le quorum n'est pas atteint lors de la première convocation, il est ramené à la moitié des membres du Conseil d'Administration pour les convocations suivantes.

(2) Chaque Administrateur dispose d'une voix.

(3) Les décisions du Conseil d'Administration sont prises à la majorité simple des membres présents ou représentés. En cas de partage des voix, celle du Président est prépondérante.

(4) Les procès-verbaux des séances sont consignés dans un registre spécial tenu au siège du Palais des Congrès et cosignés par le Président et le Secrétaire de séance. Chaque procès-verbal mentionne les noms des membres présents ou représentés ainsi que ceux des personnes invitées à titre consultatif. Il est lu et approuvé par le Conseil d'Administration lors de la session suivante.

## SECTION II
## DE LA DIRECTION GENERALE

**ARTICLE 17.-** (1) La Direction Générale du Palais des Congrès est placée sous l'autorité d'un Directeur Général, éventuellement assisté d'un Directeur Général Adjoint, tous deux nommés par décret du Président de la République, pour un mandat de trois (3) ans, renouvelable deux (2) fois.

(2) Le Directeur Général et le Directeur Général Adjoint sont soumis aux mesures restrictives et incompatibilités prévues par la législation en vigueur.

**ARTICLE 18.-** (1) Le Directeur Général est chargé de la gestion et de l'application de la politique générale du Palais des Congrès sous le contrôle du Conseil d'Administration à qui il rend compte

A ce titre, il :

- prépare le budget, les états financiers annuels et les rapports d'activités ;
- assure la direction administrative, technique et financière du Palais des Congrès ;
- prépare les délibérations du Conseil d'Administration, assiste avec voix consultative à ses réunions et exécute ses délibérations

6

recrute, nomme, licencie et fixe la rémunération et les avantages du personnel, sous réserve des prérogatives reconnues au Conseil d'Administration et dans le respect des lois et règlements en vigueur, du règlement intérieur, des prévisions budgétaires et des délibérations du Conseil d'Administration ;

- gère les biens meubles et immeubles, corporels et incorporels du Palais des Congrès, dans le respect de son objet et des dispositions de l'article 10 ci-dessus ;
- représente le Palais des Congrès dans tous les actes de la vie civile et en justice.

(2) Le Directeur Général peut déléguer une partie de ses pouvoirs.

**ARTICLE 19.-** Le Directeur Général est responsable devant le Conseil d'Administration qui peut le sanctionner en cas de faute grave de gestion ou de comportement susceptible de nuire à la bonne marche ou à l'image du Palais des Congrès, suivant les modalités fixées par la législation en vigueur.

**ARTICLE 20.-** (1) En cas d'empêchement temporaire du Directeur Général pour une période n'excédant pas deux (2) mois, celui-ci prend toutes les dispositions pour assurer la bonne marche du Palais des Congrès.

(2) En cas de vacance du poste de Directeur Général pour cause de décès, de démission ou d'empêchement définitif dûment constaté par le Conseil d'Administration et en attendant la nomination d'un nouveau Directeur Général par l'autorité compétente, le Conseil d'Administration prend toutes les dispositions pour assurer la bonne marche du Palais des Congrès.

**ARTICLE 21.-** La rémunération et les avantages divers du Directeur Général sont fixés par le Conseil d'Administration à la majorité des deux tiers (2/3) de ses membres, dans le respect des plafonds prévus par la réglementation en vigueur.

### CHAPITRE III
### DES DISPOSITIONS FINANCIERES

#### SECTION I
#### DES RESSOURCES

**ARTICLE 22.-** les ressources financières du Palais des Congrès sont des deniers publics gérés suivant les règles prévues par le régime financier de l'Etat. Toutefois, les fonds provenant des conventions et accords internationaux sont gérés suivant les modalités prévues par ces conventions et accords.

7

**ARTICLE 23.-** les ressources du Palais des Congrès sont constituées par :

- les subventions ou contributions de l'Etat ;
- les dons, legs et libéralités ;
- les emprunts ;
- les recettes propres ;
- toutes autres ressources éventuelles, qui lui sont attribuées ou dont la gestion lui est confiée au regard de ses missions.

**ARTICLE 24.-** (1) Les biens du domaine public et du domaine national, ainsi que les biens du domaine privé de l'Etat transférés en jouissance au Palais des Congrès, conformément à la législation domaniale conservent leur statut d'origine.

(2) Les biens du domaine privé de l'Etat transférés en propriété au Palais des Congrès sont intégrés de façon définitive dans son patrimoine.

## SECTION II
## DU BUDGET ET DES COMPTES

**ARTICLE 25.-** L'exercice budgétaire du Palais des Congrès commence le 1er janvier et se termine le 31 décembre de la même année.

**ARTICLE 26.-** le Directeur Général est l'ordonnateur principal du budget du Palais des Congrès. Sur sa proposition, des ordonnateurs secondaires peuvent être institués.

**ARTICLE 27.-** Le projet de budget annuel et les plans d'investissement sont préparés par le Directeur Général, adoptés par le Conseil d'Administration et transmis pour approbation au Ministère de tutelle technique et au Ministère chargé des finances avant le début de l'exercice budgétaire suivant.

**ARTICLE 28.-** (1) Le budget du Palais des Congrès doit être équilibré en recettes et en dépenses.

(2) Toutes les recettes et toutes les dépenses du Palais des Congrès sont inscrites dans le budget adopté par le Conseil d'Administration.

(3) Les sommes indispensables à la couverture des dépenses de fonctionnement arrêtées par le Conseil d'Administration peuvent être déposées dans un compte bancaire. Toutefois, l'engagement, la liquidation, le mandatement et le paiement des sommes déposées dans ce compte s'effectuent conformément aux règles de la comptabilité publique.

8

**ARTICLE 29.-** (1) Un agent comptable est nommé par le Ministre chargé des finances auprès du Palais des Congrès.

(2) L'agent comptable enregistre toutes les recettes et toutes les dépenses du Palais des Congrès. Il contrôle la régularité des autorisations des recettes, des mandatements et des paiements ordonnés par le Directeur Général.

(3) Le paiement des dépenses autorisées s'effectue uniquement auprès de l'agent comptable du Palais des Congrès.

**SECTION III**
**DU CONTROLE ET DU SUIVI DE LA GESTION**

**ARTICLE 30.-** (1) Un contrôleur financier est nommé par le Ministre chargé des finances auprès du Palais des Congrès.

(2) Le contrôleur financier est chargé du contrôle de la régularité des opérations financières conformément à la législation et à la réglementation en vigueur.

(3) Le contrôleur financier a mandat de vérifier les valeurs, la régularité et la sincérité des états financiers ainsi que des informations contenues dans les rapports des organes statutaires du Palais des Congrès.

**ARTICLE 31.-** (1) Le Directeur Général établit à la fin de chaque exercice budgétaire tous les états relatifs à la situation de tous les comptes bancaires, des comptes de dépôt et de portefeuille. Il établit également les inventaires ainsi que l'état des créances et des dettes.

Il présente au Conseil d'Administration et, selon le cas, au Ministre chargé de la culture et au Ministre chargé des finances, les situations périodiques et un rapport annuel d'activités.

Il leur présente également dans les six (6) mois suivant la clôture de l'exercice budgétaire, les états financiers annuels, le rapport d'exécution du budget de l'exercice écoulé et un rapport sur l'état du patrimoine du Palais des Congrès.

(2) Le contrôleur financier et l'agent comptable présentent au Conseil d'Administration leurs rapports respectifs sur l'exécution du budget du Palais des Congrès. Les copies de ces rapports sont transmises au Ministre chargé des finances, au Ministre chargé de la culture et au Directeur Général du Palais des Congrès.

**ARTICLE 32.-** Le suivi de la gestion et des performances du Palais des Congrès est assuré par le Ministre chargé des finances.

9

A cet effet, le Palais des Congrès adresse au Ministre chargé des finances, tous les documents et informations relatifs à la vie de l'Etablissement, qui doivent être tenus, en vertu du droit commun, à la disposition des Administrateurs et, notamment, les rapports d'activités, les rapports du contrôleur financier et de l'agent comptable ainsi que les états financiers annuels.

En outre, le Palais des Congrès est tenu de publier annuellement une note d'information présentant l'état de ses actifs et de ses dettes et résumant ses comptes annuels dans un journal d'annonces légales et dans la presse nationale.

Le Ministre chargé des finances peut également demander la production des états financiers avec une périodicité inférieure à un exercice.

Des audits indépendants peuvent être demandés par le Conseil d'Administration ainsi que par le Ministre chargé des finances.

## CHAPITRE IV
## DU PERSONNEL

**ARTICLE 33.**- (1) Le Palais des Congrès peut employer :

- le personnel recruté directement ;
- les fonctionnaires en détachement ;
- les agents de l'Etat relevant du Code du Travail, qui lui sont affectés à l'initiative du Directeur Général.

(2) Les fonctionnaires en détachement et les agents de l'Etat affectés au Palais des Congrès relèvent pendant toute la durée de leur emploi en son sein, de la législation du travail et des textes particuliers du Palais des Congrès, sous réserve, en ce qui concerne les fonctionnaires, des dispositions du Statut Général de la Fonction Publique relatives à la retraite et à la fin du détachement.

**ARTICLE 34.**- (1) La responsabilité civile et/ou pénale du personnel du Palais des Congrès est soumise aux règles de droit commun.

(2) Les conflits entre le personnel et le Palais des Congrès relèvent de la compétence des juridictions de droit commun.

## CHAPITRE V
## DISPOSITIONS DIVERSES ET FINALES

**ARTICLE 35.**- La dissolution et la liquidation du Palais des Congrès s'effectuent conformément à la législation en vigueur.

PRIME MINISTER'S OFFICE

SECRETARIAT GENERAL

REPUBLIC OF CAMEROON

Peace – Work – Fatherland

---

**MINUTES OF THE INTERMINISTERIAL MEETING RELATED TO THE FINANCING BY THE CFC OF A SOCIAL HOUSING PROGRAMME IN THE TOWNS OF YAOUNDE AND DOUALA.**

---

The Prime Minister, Head of government, H.E. Peter MAFANY MUSONGUE, on Thursday 12 July 2001 in the meeting hall of his cabinet, presided over an interministerial meeting related to the Financing by the Credit Foncier du Cameroon (CFC) of a Social Housing programme in the towns of Yaounde and Douala.

The list of participants in this meeting is attached herewith.

Opening the meeting, the Prime Minister recalled that the objective of the meeting was to examine the modalities for the support the Government could give to Credit Foncier du Cameroon within the framework of the realisation of the above social housing programme, following a request to this effect by the General Manager of this establishment.

He later specified that Government support to this programme fell within the framework of the improvement of the living conditions of Cameroonians which forms one of the main engagements of the current mandate of the Head of State.

Then he recalled the contents of the request sent by the CFC based on the following points:

-Servicing by the Ministry of  Affairs of the building sites  for the said programme,
-Provision by the Ministry of Town Planning and Housing of the 70 hectares of land necessary for its extension
-Provision by the Minister of Economy and Finance of the benefits and taxes related to the programme such as the rights  to transfer the main land title and /or of the Value Added Tax on building materials.

Concluding his presentation, the Prime Minister insisted on the need to arrive at practical modalities for the solicited administrations to do everything so that this important project should come to fruition soonest. Then he gave the agenda as follows:

-Presentation of the social housing programme  by the GM/CFC
-Contributions of the ministerial departments concerned
-Instructions of the Prime Minister Head of Government

PLAINTIFF'S EXHIBIT
3

I- PRESENTATION OF THE SOCIAL HOUSING PROGRAMME BY THE GM/CFC

In his presentation, the General Manager of Credit Foncier du Cameroun first recalled the context in which the programme was initiated. In this respect, he said that after a decade marked by negative operating costs owing mostly to the economic crisis that severely hit our country, his establishment has experienced positive operating costs. Thus, in accordance with the provisions of the law of 1997 on housing policy and of the fact that 500 000 housing applications are still to receive positive answers from the Housing Company SIC, the GM/CFC decided to launch this project that will help realise one of the engagements of the Head of State in favour of social housing.

But owing to the low purchasing power of Cameroonians, of whom more than 80% earn less than 120 000 FCFA/month, and the high cost of this operation, he was forced to look up to Government so that they could help reduce the cost price of houses envisaged and thereby their selling price to customers.

The said programme, said the GM/CFC, has two components: Olembe 2001 Horizon in Yaounde, comprising 1800 houses with a first construction phase of 200 houses; and Mbanga-Japoma in Douala, comprising 1940 houses with 970 for the first phase.

He concluded his presentation by saying that within the perspective of the reduction of the houses, the CFC reduced the debit interest rates applicable on loans that will be given to the vendees of these houses ( from 11,5% to 7%) , which samples have already been built and can be seen at Olembe, North of Yaounde

Elsewhere, the GM/CFC revealed that 30% of the houses previewed for the first phase of the programme have already been acquired.

Taking the floor once more after this presentation, the Prime Minister asked the government officials to present their contributions.

**II-CONTRIBUTIONS OF GOVERNMENT OFFICIALS**

The first to take the floor was the Minister of Urban Affairs. He said that when the project was brought to him by the GM/CFC, he immediate showed interest. He however indicated that he has never promised any financial support of the Ministry of Town Planning to this effect, owing  to the fact that numerous unanswered questions still remain. One example being the judicial system of the programme that has initiated the project, similar programmes having found no headway at the level of the Housing Companies SIC and MAETUR; the risk of conflict of competence between these two institutions and the CFC and, lastly, the lack of clear view on the water and electricity supply of the chosen sites.

He concluded his presentation by saying that his Ministry could have given its contribution to the realisation of the project if the resources previewed in his draft budget, that is 500 million FCFA, had been accorded him after arbitration.

On his part, the Minister of Town Planning and Housing, after having echoed the wish that the more global problem of State social housing policy including public and parapublic sectors (SIC, MAETUR) be examined later, indicated that his Ministry supports Credit Foncier du Cameroun's programme.

To this effect, he remarked that the examples of countries such as Morocco and Tunisia which have successfully carried out similar projects could be followed.

He also confirmed that his Ministry would give its contribution to the realisation of this project through the provision of 70 hectares of MAETUR land.

Coming back to the drafting of the State's general policy on social housing, the Minister of Town Planning and Housing indicated that following the Prime Minister's instructions, his Ministry is carrying out a study on land tenure reform with a view to easing access to land property and on the law sureties related to mortgage credit

The Minister Delegate in the Ministry of Economy and Finance in charge of the Budget on his part revealed that due to the current engagements taken with donors within the framework of the three year programme, no exoneration on taxes or rights can be granted apart from those concerning computer equipment and AIDS control equipment. He added that CFC's request in this respect cannot be granted. However, said the MINDEL/BUDGET, the possibility of subsidising the programme could be envisaged through HIPC resources.

As concerns the Minister of Public Investments and Regional Development, the last to take the floor in this first round of discussions, he revealed that in countries like Ivory Coast, similar programmes have witnessed the contribution of private investors and this could be a possible way-out. But he also added that such projects could be financed by the World Bank through IDA funds. A request to this effect was recently sent to this institution by the Cameroonian authorities but was not granted, said the Minister, owing to the lack of a clear sector-based strategy in this area in our country.

Rounding up the various contributions above, the Prime Minister made the following remark: amongst the three points of the request made by the General Manager of Credit Foncier du Cameroun, only that related to the provision of 70 hectares by the Ministry of Town Planning and Housing has been approved. Thus, he decided to do another round of discussions to the effect of sampling concrete proposals that can permit to reduce significantly the cost of this project whose social impact is notable.

This second round of discussions yielded the following proposals:
    -FCF should reconsider the institutional mapping of its project by bidding the land servicing to a registered contractor such as MAETUR which meets the fiscal requirements in this area. It should see with the taxation department to examine with them other possible tax exemptions.

-the Social housing/CFC programme could be submitted to the HIPC resources follow-up Committee for financing.

At the end of this second round of discussions, the Head of Government, after having requested the GM/CFC to take good note of the proposals concerning the reconsideration of the institutional mapping and the consultation with the taxation department for tax exemption, gave the following directives:

### III- DIRECTIVES OF THE PRIME MINISTER HEAD OF GOVERNMENT

-To the Minister of Urban Affairs, the Prime Minister requested to write an application to the HIPC resources follow-up Committee for the financing of the programme especially the servicing of the sites, which will be presented as a government project and not a Credit Foncier project.

-To the Minister of Town Planning and Housing and to the GM/CFC, the Head of Government requested the organisation of a well-publicised visit of the site after the construction of at least 10 houses.

-To the Minister of Town Planning and Housing, the Head of Government instructed to take all necessary measures to put at the disposal of the Social Housing/CFC the 70 hectares of land promised, and to continue work on the drafting of a sector-based strategy on social housing in Cameroon. He could initiate missions to other African countries which have successfully carried out such programmes.

-To the Secretary General of the Prime Minister's office, the Head of Government instructed to prepare a memo to the attention of the President of the Republic to give the reasons of government support to this programme and allude to the current general reflexion concerning social housing in our country.

The Prime Minister, Head of Government, closed the meeting at 12h10.

Done in Yaounde, on AUGUST 09, 2001

The Secretary General of the Prime minister's office

Louis Marie ABOGO NKONO

True to the original presented to us

TRANSLATION SERVICE DE TRADUCTION
ILOT LINGUISTIC CENTRE LINGUISTIQUE PILOTE
P.O. BOX /BP.7239 YAOUNDE-CAMEROON
TEL.(237)222. 13.74/58.31/58.29

S... CES DU PREMIER MINISTRE

-------------------

SECRETARIAT GENERAL

-------------------

REPUBLIQUE DU CAMEROUN
Paix-Travail-Patrie

-------------------

---

*COMPTE RENDU DE LA REUNION INTERMINISTERIELLE*
*RELATIVE AU FINANCEMENT PAR LE CREDIT FONCIER DU*
*CAMEROUN D'UN PROGRAMME D'HABITAT SOCIAL*
*DANS LES VILLES DE YAOUNDE ET DE DOUALA*

---

Le Premier Ministre, Chef du Gouvernement, S.E.M. Peter MAFANY MUSONGE, a présidé le jeudi 12 juillet 2001 à partir de 10 h et 30 mn, dans la salle des conseils de cabinet, une réunion interministérielle relative au financement par le Crédit Foncier du Cameroun (CFC) d'un programme d'habitat social dans les villes de Yaoundé et de Douala.

*La liste des participants à cette réunion est jointe en annexe.*

Ouvrant les travaux par son mot introductif, le **Premier Ministre** a rappelé que cette réunion avait pour objectif d'examiner les modalités de l'appui que le Gouvernement pourrait apporter au Crédit Foncier du Cameroun dans le cadre de la réalisation du programme d'habitat social sus-évoqué, suite à la demande formulée dans ce sens par le Directeur Général de cet établissement.

Il a ensuite précisé que le concours du Gouvernement à ce programme s'inscrit dans le cadre de l'amélioration des conditions de vie des Camerounais qui constitue l'un des engagements essentiels du septennat actuel du Président de la République.

Puis, il a rappelé le contenu de la demande formulée par le CFC portant sur le triple volet ci-après :

- prise en charge par le Ministère de la Ville des travaux de viabilisation des sites devant abriter les logements sociaux objet dudit programme ;
- octroi par le Ministère de l'Urbanisme et de l'Habitat des 70 hectares de terrain nécessaires à son extension ;
- exonération par le Ministère de l'Economie et des Finances des droits et taxes inhérents à ce programme à l'instar des droits de mutation du titre foncier mère et/ou de la TVA sur les matériaux de construction.

Concluant son propos, le Premier Ministre a insisté sur la nécessité que soient arrêtées au cours de cette réunion, les modalités pratiques d'intervention des administrations sollicitées, pour que cet important projet voie le jour dans les meilleurs délais.

-2-

Puis, il a donné l'ordre du jour de la réunion articulé autour des points suivants :

- présentation du programme d'habitat social pour le DG/CFC ;
- contributions des départements ministériels concernés ;
- directives du Premier Ministre, Chef du Gouvernement.

## I - *PRESENTATION DU PROGRAMME D'HABITAT SOCIAL PAR LE DG/CFC*

Dans son exposé, le Directeur Général du Crédit Foncier du Cameroun a tout d'abord tenu à rappeler le contexte dans lequel ce programme a été initié. Il a, à cet égard, souligné qu'après une décennie marquée par des résultats d'exploitation déficitaires dus, en grande partie, à la crise économique qui a durement frappé notre pays, son organisme a retrouvé des résultats d'exploitation bénéficiaires. Aussi, se prévalant des dispositions de la loi de 1997 sur la promotion immobilière et du fait que 500 000 demandes de logements se trouvent à ce jour non satisfaites au niveau de la SIC, a-t-il décidé de lancer ce projet qui permettra de concrétiser l'un des engagements du Chef de l'Etat en faveur de l'habitat social.

Mais compte tenu, a-t-il poursuivi, du niveau assez-bas des revenus des camerounais, dont plus de 80 % gagnent moins de 120 000 francs CFA/mois, et du coût élevé de cette opération, il s'est trouvé contraint de se tourner vers le Gouvernement afin de réduire, grâce au concours de ce dernier, le prix de revient des logements envisagés et par conséquent leur prix de vente aux futurs clients.

Le programme en question, a enchaîné le DG/CFC, comporte deux volets : *Olembé Horizon 2001* à Yaoundé, comprenant 1800 logements avec une première phase de construction de 200 maisons ; et *Mbanga-Japoma* à Douala, comprenant 1940 logements dont 970 pour la première phase.

Il a conclu son propos en précisant que dans l'optique de la réduction du prix de vente de ces logements, le CFC a ramené le taux d'intérêt débiteur applicable aux prêts qui seront accordés aux acquéreurs de ces maisons, dont quelques spécimens ont déjà été construits et peuvent être visités à Olembé à la sortie nord de Yaoundé, de 11,5 % à 7 %.

Par ailleurs, le DG/CFC a signalé que 30 % des logements prévus pour la première phase du programme étaient déjà acquis.

Reprenant la parole à l'issue de cet exposé, le Premier Ministre a demandé aux membres du Gouvernement de présenter leurs contributions.

- 3 -

II - *CONTRIBUTIONS DES MEMBRES DU GOUVERNEMENT*

Premier à prendre la parole, le *Ministre de la Ville* a fait connaître que lorsque ce projet lui avait été présenté par le DG/CFC, il lui a tout de suite manifesté son intérêt. Il a tenu cependant à préciser qu'il n'a jamais promis un concours particulier du MINVILLE à ce sujet, compte tenu du fait que de nombreuses questions liées à ce projet demeurent sans réponse. Il en est ainsi, a-t-il poursuivi, du régime juridique de programme initiateur de projet ; des programmes similaires restés sans suite notamment au niveau de la SIC et de la MAETUR ; du risque de conflit de compétence entre ces deux organismes et le CFC et, enfin, du manque de lisibilité quant à l'équipement des sites choisis en adductions d'eau et en électricité.

Il a conclu son propos en soulignant que son département ministériel aurait pu apporter son concours à la réalisation de ce projet si les ressources prévues à cet effet dans son projet de budget, soit 500 millions de FCFA, lui avaient été allouées au terme des arbitrages.

Pour sa part, le *Ministre de l'Urbanisme et de l'Habitat*, après avoir émis le vœu que le problème plus global de la politique du logement social de l'Etat intégrant les organismes du secteur public et parapublic (SIC, MAETUR), soit examiné à l'avenir, a indiqué que son département ministériel soutient le programme du Crédit Foncier du Cameroun.

Pour cela, il a fait remarquer que l'exemple des pays tels que le Maroc et la Tunisie qui ont effectué des réalisations similaires avec succès pourrait être suivi.

Il a ensuite confirmé que son département ministériel apportera sa contribution à la réalisation de ce projet à travers l'octroi au CFC de terrains titrés de terrain de la MAETUR.

Revenant sur l'élaboration d'une politique générale de l'Etat en matière de logement social, le Ministre de l'Urbanisme et de l'Habitat a signalé que sur instructions du **Premier Ministre**, son département ministériel mène une réflexion qui porte notamment sur la réforme du régime foncier visant à faciliter l'accès à la propriété immobilière et sur les garanties juridiques liées au Crédit hypothécaire.

Le *Ministre Délégué auprès du Ministre de l'Economie et des Finances chargé du Budget* a quant à lui tenu à relever que compte tenu des engagements pris vis-à-vis des bailleurs de fonds dans le cadre du programme triennal en cours, aucune exonération de taxe ou de droits ne peut être consentie en dehors de celles concernant les matériels informatiques et les équipements liés au programme de lutte contre le VIH-Sida. Aussi a-t-il poursuivi, la demande formulée par le CFC à cet égard ne peut

MINDEL/BUDGET, l'on pourrait examiner la possibilité de subventionner ce programme à travers les ressources PPTE.

Quant au *Ministre des Investissements Publics et de l'Aménagement du Territoire*, dernier à prendre la parole au cours de ce premier tour de table, il a tenu à relever que dans les pays tels que la Côte-d'Ivoire, des programmes similaires ont connu dans un passé récent la participation des investisseurs privés, et que ce pourrait être l'une des pistes à explorer à l'avenir. Mais il a surtout fait connaître qu'il est possible que la Banque Mondiale finance de tels projets grâce notamment aux prêts IDA. Une demande a d'ailleurs été adressée à cette institution financière dans ce sens par les autorités camerounaises, mais celle-ci n'a pas connu une suite favorable, a poursuivi le MINPAT, en raison de l'absence d'une stratégie sectorielle en la matière dans notre pays.

Récapitulant les interventions ci-dessus le Premier Ministre a fait le constat suivant : parmi les trois points de la demande formulée par le Directeur Général du Crédit Foncier du Cameroun, seul celui relatif à l'octroi par le MINUH de 70 hectares de terrain a reçu un avis favorable. Aussi, a-t-il décidé de procéder à un second tour de table à l'effet de recueillir des propositions concrètes de nature à permettre une réduction sensible du coût de ce projet dont l'impact social, a-t-il souligné, serait notable.

De ce tour de table sont sorties les propositions ci-après :

- le CFC devrait revoir le montage institutionnel de son projet en confiant le volet viabilisation des terrains à un aménageur agréé tel que la MAETUR qui bénéficie de conditions fiscales favorables dans ce domaine. Il devra également se rapprocher des Services des Impôts afin d'examiner avec ces deniers la possibilité d'obtenir d'autres mesures fiscales favorables ,

- le programme *habitat social/CFC* pourrait être soumis au Comité de suivi des ressources PPTE pour demande de financement.

A l'issue de ce deuxième tour de table, le Chef du Gouvernement, après avoir demandé au DG/CFC de prendre bonne note des propositions concernant la révision du montage institutionnel et la consultation des Services des Impôts au sujet des mesures fiscales, a donné les directives suivantes :

## III- *DIRECTIVES DU PREMIER MINISTRE, CHEF DU GOUVERNEMENT*

- Au Ministre de la Ville, le Premier Ministre a demandé d'introduire auprès du Comité de suivi des ressources PPTE une demande tendant à obtenir le financement de ce programme notamment à l'effet

REPUBLIC OF CAMEROON
Peace – Work – Fatherland

PRIME MINISTER'S OFFICE

SECRETARIAT GENERAL

N B 1234/SG/PM

Ref.:

**Subject**: Financing by the CFC of a Social
Housing programme in the Yaounde
and Douala towns

Yaounde, on August 29, 2001

THE SECRETARY GENERAL

To The General Manager of credit
Foncier du Cameroun

**YAOUNDE**

Dear Mr General Manager,

While sending to you herewith the minutes of the interministerial meeting related to the subject above,

I wish to let you know the instruction of the Prime Minister Head of Government enjoining you to prepare in collaboration with the Minister of Town Planning and Housing and the Minister of Urban Affairs, a visit of the above mentioned programme, after the construction of at least 10 sample houses.

Yours faithfully

| True to the original presented to us |
| --- |

For the Secretary General and by Delegation
The Deputy Secretary General

Emmanuel Nganou D.



REPUBLIQUE DU CAMEROUN
Paix-Travail-Patrie
--------
SERVICES DU PREMIER MINISTRE
--------
SECRETARIAT GENERAL
--------
N° 123U /SG/PM

Réf. :

Objet : Financement par le CFC
d'un programme d'habitat
social dans les villes de
Yaoundé et Douala.-

REPUBLIC OF CAMEROON
Peace-Work-Fatherland
--------
PRIME MINISTER'S OFFICE
--------
SECRETARIAT GENERAL
--------

Yaoundé, le   2 9  AOUT 2001

Le Secrétaire Général,
The Secretary General

À   Monsieur le Directeur Général du
Crédit Foncier du Cameroun.

YAOUNDE

Monsieur le Directeur Général,

En vous faisant parvenir, ci-joint, le compte rendu ayant sanctionné les travaux de la réunion interministérielle relative à l'objet repris en marge,

J'ai l'honneur de vous communiquer la directive du Premier Ministre, Chef du Gouvernement vous prescrivant, de préparer, en collaboration avec le Ministre de l'Urbanisme et de l'Habitat et le Ministre de la Ville, une visite du site du programme visé en objet, après la construction d'au moins dix (10) maisons-témoins.

Veuillez agréer, Monsieur le Directeur Général, les assurances de ma considération distinguée.

Pour le Secrétaire Général
et par Délégation
Le Secrétaire Général Adjoint

Emmanuel Nganou SD

REPUBLIC OF CAMEROON
Peace – Work – Fatherland

PRIME MINISTER'S OFFICE

SECRETARIAT GENERAL

N B 1234/SG/PM                                      Yaounde, on August 29, 2001

Ref.:
                                                   The Secretary General
Subject: Financing by the CFC of a Social
        Housing programme in the Yaounde
        and Douala towns                           To the Minister of Urban Affairs

                                    **YAOUNDE**

Please find herewith the minutes of the interministerial meeting related to the subject stated above. I wish to forward to you the Prime Minister Head of Government's directives instructing you to:

-forward an application to the HIPC Resources follow-up Committee in view of obtaining financing for the above programme from the said resources, specially concerning sites management, that will be presented as a project of the Government and not that of the Credit Foncier du Cameroun.

-prepare in collaboration with the General Manager of Credit Foncier du Cameroun, a site visit of the said programme in Yaounde after the construction of at least ten sample houses.

P.J.: 01

For the Secretary General and by Delegation
The deputy Secretary General

Emmanuel Nganou D.

True to the original presented to us

TRANSLATION SERVICE DE TRADUCTION
PILOT LINGUISTIC CENTRE LINGUISTIQUE PILOTE
P.O. BOX /BP.7239 YAOUNDE-CAMEROON
TEL.(237)222.13.74/58.31/58.39

PLAINTIFF'S
EXHIBIT
_4B_

| REPUBLIQUE DU CAMEROUN | REPUBLIC OF CAMEROON |
|---|---|
| *Paix-Travail-Patrie* | *Peace-Work-Fatherland* |
| ------- | --------- |
| *SERVICES DU PREMIER MINISTRE* | *PRIME MINISTER'S OFFICE* |
| ------- | --------- |
| *SECRETARIAT GENERAL* | *SECRETARIAT GENERAL* |
| ------- | ------- |

N° 15/12 34/SG/PM/4

*Yaoundé, le* 2 9 AOUT 2001

Réf. :

*Le Secrétaire Général,*
*The Secretary General*

**Objet :** Financement par le CFC
Subject d'un programme d'habitat
social dans les villes
de Yaoundé et Douala.-

A   Monsieur le Ministre de la VILLE.

*YAOUNDE*

En vous faisant tenir, ci-joint, le compte rendu ayant sanctionné les travaux de la réunion interministérielle relative à l'objet repris en marge,

J'ai l'honneur de vous communiquer les directives du Premier Ministre, Chef du Gouvernement vous prescrivant :

- d'introduire auprès du Comité de Suivi des Ressources PPTE une demande tendant à obtenir le financement du programme susvisé par lesdites ressources, notamment en ce qui concerne le volet aménagement des sites, qui sera présenté comme un projet du Gouvernement et non comme celui du Crédit Foncier du Cameroun ;

- de préparer, en collaboration avec le Directeur Général du Crédit Foncier du Cameroun, une visite du site dudit programme à Yaoundé, après la construction d'au moins dix (10) maisons-témoins./-

P.J. : 01

Pour le Secrétaire Général
et par Délégation
Le Secrétaire Général Adjoint

*Emmanuel Nganou D.*

REPUBLIC OF CAMEROON
Peace – Work – Fatherland

PRIME MINISTER'S OFFICE

SECRETARIAT GENERAL

N B 1234/SG/PM                                    Yaounde, on August 29, 2001

Ref.:

                                                  THE SECRETARY GENERAL

**Subject**: Financing by the CFC of a Social
           Housing programme in the Yaounde
           and Douala towns                    To the Minister of Town
                                               Planning and Housing

                          **YAOUNDE**

Please find herewith the minutes of the interministerial meeting related to the subject stated above. I wish to forward to you the Prime Minister Head of Government's instruction:

-To start the procedure of putting at the disposal of the Social Housing Programme/ Credit Foncier du Cameroun (CFC) the 70 hectares of land promised and to persue with the reflexion underway on the definition of a sectorial strategy in matters of social housing in Cameroon; as the case may be, you could send missions to some African countries where such programmes have been carried out successfully.

-Prepare, in collaboration with the General Manager of Credit Foncier du Cameroun a visit to the site of the programme in Yaounde, after the building of at least ten sample houses.

P.J.: 01

                                               For the Secretary General and by
                                               Delegation
                                               The Deputy Secretary General


True to the original presented to us

TRANSLATION SERVICE DE TRADUCTION
PILOT LINGUISTIC CENTRE LINGUISTIQUE PILOTE
P.O. BOX /BP.7239 YAOUNDE-CAMEROON
TEL.(237)222.13.74/58.31/58.29

                                               Emmanuel Nganou D.



REPUBLIQUE DU CAMEROUN
*Paix-Travail-Patrie*

-------

SERVICES DU PREMIER MINISTRE

-------

SECRETARIAT GENERAL

-------

REPUBLIC OF CAMEROON
*Peace-Work-Fatherland*

---------

PRIME MINISTER'S OFFICE

---------

SECRETARIAT GENERAL

-----

N° 712 3U/SG/PM

*Yaoundé, le* 2 9 AOUT 2001

*Le Secrétaire Général,*
*The Secretary General*

Réf. :

Objet : Financement par le CFC
Subject   d'un programme d'habitat
social dans les villes
de Yaoundé et Douala.-

A   Monsieur le Ministre de
l'Urbanisme et de l'Habitat

*YAOUNDE*

En vous faisant tenir, ci-joint, le compte rendu ayant sanctionné les travaux de la réunion interministérielle relative à l'objet repris en marge,

J'ai l'honneur de vous communiquer les directives du Premier Ministre, Chef du Gouvernement vous prescrivant :

- d'engager d'ores et déjà la procédure de mise à la disposition du Programme Habitat Social/Crédit Foncier du Cameroun (CFC) des 70 hectares de terrain promis, et de poursuivre la réflexion en cours au sujet de la définition d'une stratégie sectorielle en matière d'habitat social au Cameroun, en initiant au besoin des missions auprès des pays africains ayant développé avec succès des programmes analogues ;

- de préparer, en collaboration avec le Directeur Général du Crédit Foncier du Cameroun, une visite du site dudit programme à Yaoundé, après la construction d'au moins dix (10) maisons – témoins./-

P.J. : 01

Pour le Secrétaire Général
et par Délégation
Le Secrétaire Général Adjoint

REPUBLIC OF CAMEROON
Peace – Work – Fatherland

MINISTRY OF ECONOMY
AND FINANCE

*V/Ref:026/CFC/DG of 25/05/05*

Yaounde, on AUGUST 10, 2005

N 3857/CFC/MINEFI/DG

THE MINISTER OF ECONOMY
AND FINANCE

To THE GENERAL MANAGER
OF CREDIT FONCIER DU
CAMEROOUN
P.O.BOX: 1531

<u>YAOUNDE</u>

<u>Subject:</u>   Request for a normal
temporary importation

Dear Sir,

By the correspondence mentioned above, you requested to benefit from the normal
temporary importation for public works materials and equipment destined for the
execution by the Five Group Company of the construction of 1034 social houses in
Yaounde (Olembe II). They are:

-2 blocks making machines, MK2E model
-1 elevator Komatsu
-1 dumper winget, 4b200LD model
-1 roller bomag, BN2120D-30 model
-1 caterpillar, 140G model
-1 caterpillar 950
-1 caterpillar 428
-1 trench digger RT40
-1 trench digger, 5700
-7 dump trucks, BELL brand, B20C model
-1 truck 4x4 Range Rover
-2 water cart, BELL brand, BD200 model



PLAINTIFF'S
EXHIBIT

5

-1 water pump, Seitorque Hatz 4m4l
-2 tractor Massey Ferguson, 440SE4WD model
-1 generator, caterpillar brand, Olympie 110 model
-1 truck Mercedes Benz, 1317/48
-2 Rev 4x4 Mitsubishi Native
-4 pick up 4x4 Mitsubishi dual cabin
-5 pick up 4x4 Mitsubishi single cabin
-1 truck 4x4 Toyota Land Cruiser
-2 Truck Toyota, 7 tons

In reply, I wish to inform you that following the provisions of the decree N 2003/651/PM of 16 April 2003, bearing on the modalities of application of fiscal and customs regime of public works as well as article 171 of the CEMAC customs code, I rather grant you the benefit of the special temporary importation regime for a period of one year, pending bank security of the related D28 receipts

It is agreed that the first annual instalment, calculated on the basis of the account amortization length, shall be paid during the D28 subscription.

The General Manager of Customs in Douala is hereby instructed.

Yours faithfully


(sgd) The Minister of Economy and Finance




Abah Abah Polycarpe



| True to the original presented to us |
| --- |

TRANSLATION SERVICE DE TRADUCTION
PILOT LINGUISTIC CENTRE LINGUISTIQUE PILOTE
P.O. BOX /BP.7239 YAOUNDE-CAMEROUN
TEL.(237)222.19.74/58.34/58.29

RÉPUBLIQUE DU CAMEROUN
PAIX-TRAVAIL-PATRIE

MINISTÈRE DE L'ECONOMIE
ET DES FINANCES

V/Réf. : 026/CF/DG du 25.05.05

REPUBLIC OF CAMEROON
PEACE-WORK-FATHERLAND

MINISTRY OF ECONOMY
AND FINANCE

Yaoundé, le 10 AOUT 2005
N° 3857/CF/MINEFI/DGD

LE MINISTRE DE L'ECONOMIE
ET DES FINANCES

A    MONSIEUR LE DIRECTEUR GENERAL
DU CREDIT FONCIER DU CAMEROUN
BP 1531

YAOUNDE

Objet : Demande d'admission
temporaire normale.

Monsieur le Directeur Général,

Par correspondance reprise en référence, vous sollicitez le bénéfice du régime de l'admission temporaire normale sur les matériels et équipements de travaux publics ci-après destinés à l'exécution par la société Group Five des travaux de construction de 1034 logements sociaux à Yaoundé (Olembé II). Il s'agit de :

- 2 blocs making machines, modèle MK2E
- 1 ecavator komatsu
- 1 dumper winget, modèle 4b200LD
- 1 roller bomag, modèle BNZ12D-30
- 1 caterpillar, modèle 140G
- 1 caterpillar 950
- 1 carterpillar 428
- 1 trench digger RT40
- 1 trench digger 5700
- 2 dump trucks de marque BELL, modèle B20C
- 1 truck 4x4 Range Rover
- 2 water cart de marque BELL, modèle BD20D
- 1 water pump de marque Seltorque Hatz 4m4l
- 2 tractor Massey Ferguson, modèle 440SE4WD

1 generator de marque caterpillar, modéle Olympia 110

1 truck Mercedes Benz 1317/48

2 Rav 4x4 Mitsubishi Nativa

4 pick up 4x4 Mitsubishi double cabine

6 pick up 4x4 Mitsubishi single cabine

1 truck 4x4 Toyota Land Cruiser

2 Truck Toyota, 7 tonnes.

En réponse, j'ai l'honneur de vous faire connaître qu'en application des dispositions du décret n° 2003/6517PM du 16 avril 2003, fixant les modalités d'application du régime fiscal et douanier des marchés publics ainsi que de l'article 171 du Code des Douanes de la CEMAC, je vous accorde plutôt le bénéfice du régime de l'admission temporaire spéciale pour une période d'un an, sous réserve du cautionnement bancaire des acquits D28 y afférents.

Il reste entendu que la première annuité, calculée sur la base de la durée d'amortissement comptable, sera payée au moment de la souscription de l'acquit D28.

Je donne des instructions dans ce sens au Directeur Général des Douanes à Douala.

Veuillez agréer, Monsieur le Directeur Général, l'expression de ma parfaite considération.

# Credit Foncier
# du Cameroun

---

P.O.Box 1531 YAOUNDE    - Telephone: 23.52.15    - Telex: 8368 KN

## ORDINARY BOARD MEETING
## OF AUGUST 18, 2005

RESOLUTIONS

The Board deliberated on the following agenda

1- Olembe 1 extension project

2- AOB

5-09 OLEMBE 1 EXTENSION PROJECT

The board of Directors approved, with absolute majority of the administrators present, the continuation of the Olembe 1 extension project and recommended the presentation of the report of the works at every board meeting.

05-10 CHOICE OF THE COMMITTEE MEMBERS IN CHARGE OF ADOPTING THE INTERNAL AUDIT CHARTER

The Board after adopting the Internal Audit Charter on June 14, 2005, choose as members representing the Board of Directors in the said Committee, the representative of the Board as the President of the Committee and Mrs EPEE KOTTO MOUYEMA administrator representing the CNPS.

Done in Yaounde, on AUGUST 18, 2005

An Administrator                                     For the Board of Directors

Mrs Epee Kotto Mouyema                          ABDOUO A NGON

True to the original presen...

TRANSLATION SERVICE
PILOT LINGUISTIC CENTRE
P.O. BOX 7 BP.7239 YAOUNDE-CAMEROON
TEL. (237)222.13.74/58...

PLAINTIFF'S
EXHIBIT
6

# Crédit ⬡CFC Foncier du Cameroun

**B.P. 1531 - YAOUNDE - Téléphone : 23.52.15 - Télex : 8368 KN**

## CONSEIL D'ADMINISTRATION ORDINAIRE DU 18 AOUT 2005

$$\boxed{\textbf{R E S O L U T I O N S}}$$

**Le Conseil a délibéré sur l'ordre du jour suivant :**

1- Projet d'extension d'Olembé 1
2- Divers

### 05-09    PROJET D'EXTENSION D'OLEMBE 1

Le Conseil d'Administration approuve, à la majorité des Administrateurs présents, la poursuite du projet d'extension d'Olembé 1 et recommande la présentation d'un compte rendu de l'évolution des travaux à chaque session de conseil.

### 05-10    DESIGNATION DE MEMBRES AU COMITE CHARGE DE L'ADOPTION DE LA CHARTE D'AUDIT INTERNE

Le Conseil, après adoption de la Charte d'Audit Interne le 14 juin 2005, désigne comme membres représentant le Conseil d'Administration audit Comité, Monsieur l'Administrateur représentant la tutelle en qualité de Président du Comité et Mme EPEE KOTTO MOUYEMA, administrateur représentant la CNPS, comme membre.

Fait à Yaoundé le 18 AOUT 2005

Un administrateur,

Le Président du Conseil d'Administration,

Mme Epee Kotto Mouyema

A. BOOTO A NGON

Soninka Dupeyron Translations
210 Redland Blvd
Rockville, MD 20850
Tel: 202 246 2716

**COURT OF APPEALS /CENTRE**            **REPUBLIC OF CAMEROON**
\*\*\*\*\*\*\*
**PROSECUTION OFFICE**
**FOR THE HIGHER COURT IN MFOUNDI**

\*\*\*\*\*
**OFFICE OF JUDICIAL INFORMATION**
**N°06-A1-1829**
\*\*\*\*\*\*\*

### CASE: MP & CRÉDIT FONCIER DU CAMEROON

### VS.

### BOOTO A NGON, ANDRE ; EDOU, JOSEPH *et al.*

(Misappropriation of public funds in co-action, complicity in the
misappropriation of public funds, use of public and private forged
documents, interest in a deed and extortion of public funds).

## ORDER FOR A PARTIAL DISMISSAL
## AND CHANGE OF VENUE BEFORE THE HIGHER COURT IN
## MFOUNDI IN A CRIMINAL CASE

**December 2006**

1

**Certified True Translation**
Qualified Court Translator & Interpreter in the state of Maryland and Consortium of 41

PLAINTIFF'S
EXHIBIT

7

Sohmka Dupeyron Translations
210 Redland Blvd
Rockville, MD 20850
Tel: 202 246 2716

# PARAGRAPH TRANSLATIONS:

### p.6
### § 6)

**§§2**    In 2004, without drawing consequences from the ruinous real estate program OLEMBE I, Edou, Joseph et Booto A. Ngon launched a new real estate program under the name OLEMBE II through which they misappropriated funds, through fictive shell companies SCI ATLANTIC GROUP and GROUP FIVE*** for a total amount of 3 586 554 577 FCFA;

*************************************

### p.17
### 1.4. Regarding misappropriations perpetrated through the Program Olembe II Extension (1034 housing units)

Whereas interrogated about the OLEMBE II project for which the indicted acted in co-action with Edou, Joseph a misappropriation of 3,586,639,792 FCFA, Booto A Ngon, André claimed that the project was a response from the Crédit Foncier du Cameroon to a government need for social housing construction;

In order to respond to this need, he contacted an American promoter, ATLANTIC GROUP, which called upon GROUP FIVE***, that was supposed to begin construction in September 2005 and received a 2.4 billion advance against a bank deposit covering for the total amount of the advance;

When presented before the Board of Trustees, the project was unanimously approved

(… five Paragraphs )

Whereas, the analysis of the evidence and the testimonies collected in this case that resolution n°05-09 from the Board of Trustees of the Crédit Foncier held on August 18, 2005 took place long after the disbursement of 2.4 Billion by Edou, Joseph, following the instructions given by the President of the Board of Trustees, Booto A Ngon, André;

According to witnesses attending the Board meeting during which the project was approved, the President of the Board took the Director General's defense, arguing that the latter had received a verbal agreement from his financial trusteeship; the Ministry of Finances and Budget, which argument was confirmed by his special guest at the meeting: the director General to the Treasury;

10

**Certified True Translation**
Qualified Court Translator & Interpreter in the state of Maryland and Consortium of 41 States

Soninka Dupeyron Translations
210 Redland Blvd
Rockville, MD 20850
Tel: 202 246 2716

It is established that the President of the Board of Trustees has personally endorsed the project from his correspondence dated March 21, 2005;

(… 2 paragraphs)

In fact, the amount of 3,588,639,702 FCFA that was wired on the account of the ATLANTIC GROUP did not contribute in the building of housing units; at best did it help do some basic land clearing on the site.

*****************************************

**p. 27**

## 2.4.B REGARDING MISAPPROPRIATIONS PERPETRATED THROUGH THE OLEMBE II EXTENSION PROGRAM (1034 HOUSING UNITS)

Whereas Edou, Joseph claimed that the project Olembe II is formed of 1034 social housing units, all built by developer ATLANTIC GROUP on a 70 hectares lot granted by the government and based on two loans by the CFC for a 10% rate approved in exchange for a first class guarantee,

According to him, the government agreed to Olembe II because the project was only an extension of Olembe I, which was granted by the Board of Trustees;

He asked and obtained from the President of the Board of Trustees a provisional signature of the loan agreements; which made funds available for the project. Namely: 2.4 Billion Francs CFA for building the housing units, 980 million Francs for development, in compliance with the power that the President of the Board of Trustees had received from the Board at the beginning of the real estate programs;

A US$ 4,750,000 first class guarantee underlies the project, or according to the exchange rate at the time: 600 FCFA for 1 US$, an approximate 2.58 million FCFA. The guarantee could be implemented upon the first request;

(…)

*****************************************

**p. 28**

§§4    Whereas, the Crédit Foncier du Cameroun launched a program for the construction of 1034 social housing units under the name Olembe I Extension on 70 hectares of land provided by MAETUR under a request from the Ministry of Urbanism and Housing. Whereas, the Crédit Foncier du Cameroun had two partners in this program; namely: ATLANTIC GROUP and GROUP FIVE***;

11

**Certified True Translation**
Qualified Court Translator & Interpreter in the state of Maryland and Consortium of 41 States

COUR D'APPEL DU CENTRE
************

REPUBLIQUE DU CAMEROUN

PARQUET PRES LE TRIBUNAL DE
GRANDE INSTANCE DU MFOUNDI
***********

CABINET D'INFORMATION JUDICIAIRE
N°06-A1-1829
***********

# AFFAIRE MP & CREDIT FONCIER DU CAMEROUN
# C/
# BOOTO A NGON ANDRE, EDOU JOSEPH ET AUTRES

*(Détournement de deniers publics en coaction, complicité de détournement de deniers publics, faux et usage de faux en écritures publiques et privées, intérêt dans un acte et concussion).*

# ORDONNANCE DE NON LIEU PARTIEL ET DE RENVOI DEVANT LE TRIBUNAL DE GRANDE INSTANCE DU MFOUNDI STATUANT EN MATIERE CRIMINELLE

DECEMBRE 2006

**2)** EDOU Joseph, alors Directeur Général du Crédit Foncier du Cameroun a, notamment dans **le cadre des marchés publics** :

- Signé une lettre de mission et une convention d'assistance avec le cabinet Arthur Andersen pour un montant de 340 millions de FCFA sans recourir à la Commission Nationale des Marchés ;

- Engagé le Crédit Foncier du Cameroun dans des opérations manifestement ruineuses à travers la dite lettre de mission ;

**3) Sur le plan comptable,** le Président du Conseil d'Administration BOOTO A NGON André, EDOU Joseph, les commissaires aux comptes Côme TIENTA ET KOOH II Charles ont été responsables de la présentation de documents comptables non conformes et faux ;

**4)** Entre 1998 et 2000 le Directeur Général du Crédit Foncier du Cameroun, EDOU Joseph a permis la sortie du patrimoine de plusieurs véhicules automobiles et immeubles en minorant les prix de ces biens, notamment en les cédant à vil prix et en omettant d'indiquer la destination du fruit de la vente ;

**5)** Les déficits de caisse de 58 millions, 50 millions et de 12.215.300 FCFA ont été relevés par les rapports des commissaires aux comptes respectivement dans les agences de Bafoussam, Maroua et Douala pour le compte de l'exercice budgétaire 1997-1998;

**6) Au niveau de la gestion du portefeuille de l'entreprise,** le Président du Conseil d'Administration BOOTO A NGON et le Directeur Général du Crédit Foncier du Cameroun EDOU Joseph ont,dans le seul but de distraire des fonds publics, lancé des programmes immobiliers d'envergure sans l'aval du gouvernement, de même qu'ils ont simultanément accordé des prêts à des promoteurs privés incapables et inexpérimentés en violation du règlement intérieur de l'entreprise dont ils avaient la charge dans la mise en œuvre des programmes immobiliers de la Nsole à Odza I;

**Qu'en** 2004, sans avoir tiré les conséquences du programme immobilier ruineux de OLEMBE I, EDOU Joseph et BOOTO A NGON ont lancé un autre programme immobilier dénommé OLEMBE II à travers lequel ils ont détourné, par le biais des sociétés écrans SCI ATLANTIC GROUP, GROUP FIVE, la somme totale de **3 586 554 577 FCFA** ;

**Que** par ailleurs, peu de temps avant son départ du Crédit Foncier du Cameroun, EDOU Joseph a acquis avec les fonds de cette institution, un véhicule de marque de MERCEDES S 500 T d'une valeur de 147 millions FCFA qu'il a détourné en le dissimulant chez son ami LENTEU NGUEMENI Ernest à Douala ;

**Qu'en** outre,il n'a pas cru devoir restituer à l'institution dont il avait la charge, le véhicule de service de marque PAJERO CLEAN immatriculé sous le N° CE 8321 O acquis à la SUMOCA le 26 Janvier 2000 à **34.960.339 FCFA** ;

**Qu'en** se fondant sur une correspondance du 22 avril 2005 du Ministre de l'Economie et des Finances lui demandant un audit de la dette intérieure de l'institution dont il avait la charge au 31 décembre 2004, EDOU Joseph a signé une lettre de mission avec le cabinet DREAM SOFT AND TECHNOLOGY en vue du rattrapage comptable lié au redressement du compte du Crédit Foncier du Cameroun n° 470 532 ouvert dans les livres de la Paierie Générale de Yaoundé; Que cette manœuvre lui a permis de décaisser, le 08 septembre 2005 après concertation avec BEMA Emmanuel un pseudo prestataire de service, MEKE Raphaël, le sous directeur des opérations bancaires et du trésor et

6

Qu'en agissant comme il l'a fait, il s'est rendu coauteur de pertes et détournements de fonds publics constatées dans ce programme immobilier, l'usage abusif du crédit social consistant dans le fait d'avoir engagé le Crédit Foncier du Cameroun dans une opération pouvant entraîner des pertes éventuelles ;

**Qu'il ressort** des pièces du dossier de la procédure que ce projet a enregistré un déficit de 2 000 318 768 FCFA qui à ce jour a été passé en provision occasionnant ainsi une perte pour le Crédit Foncier du Cameroun ;

**Qu'il** convient de lui imputer le crime de détournement en coaction, en dépit de ses explications ;

### 1.4. b- Sur les détournements perpétrés à travers Programme OLEMBE II Extension (1 034 Logements)

**Attendu qu'**interrogé sur le projet OLEMBE II pour lequel l'inculpé a opéré en coaction avec EDOU Joseph un détournement de 3.588.639.702F CFA, BOOTO A NGON André a déclaré que ce projet était une réponse du Crédit Foncier du Cameroun à la préoccupation du gouvernement de construire des logements sociaux ;

**Que** pour y répondre, il a pris contact avec un promoteur américain ATLANTIC GROUP qui, de son côté, a fait appel au GROUP FIVE qui devait débuter les travaux au mois de septembre 2005, et a reçu une avance de 2.4 milliards contre une caution bancaire couvrant l'intégralité de l'avance ;

**Que** présenté au conseil d'administration le projet a été approuvé mais pas à l'unanimité ;

**Que** l'inculpé a reconnu cependant que ce projet a été suspendu suite à un appel téléphonique des services du Premier Ministre qui, par la suite, aurait reçu le Directeur Général du Crédit Foncier en présence du Ministre des Finances;

**Que** ce fait a motivé l'accord de déblocage de fonds qu'il a donné à EDOU Joseph hors conseil d'administration dans la mesure où il ne s'agissait que de l'extension du projet OLEMBE I ;

**Que** c'est ainsi que les conventions avec les partenaires du Crédit Foncier du Cameroun ont été signées et les fonds débloqués ; que c'est par la suite qu'il a convoqué un conseil d'administration pour entériner leurs actes ;

**Qu'il** a soutenu que la société ATLANTIC GROUP est une succursale d'une société américaine mais a déclaré n'avoir jamais pris connaissance de ses statuts, bien qu'il ait rencontré le responsable d'ATLANTIC GROUP à Washington ;

**Qu'il** ignorait que le Directeur Général EDOU Joseph, par personne interposée, faisait partie des actionnaires d'ATLANTIC GROUP, le second actionnaire étant un autre camerounais ;

**Mais attendu** qu'il ressort de l'examen des pièces et des témoignages recueillis que la résolution N°05-09 du conseil d'administration du Crédit Foncier tenue le 18 août 2005 est intervenue bien après le décaissement de la somme de 2,4 milliards par EDOU Joseph sur instructions de son Président du Conseil d'Administration BOOTO A NGON André ;

**Que** selon les témoins ayant assisté au conseil d'administration qui a approuvé ce projet, le Président du conseil d'administration a pris la défense du Directeur Général, soutenant que ce dernier

17

**Qu'un** chèque de 40 000 000 FCFA a été tiré par l'entreprise CHINA STATES au profit de THE FALLS société appartenant à EDOU Joseph comme l'a confirmé KOH KOH dans son interrogatoire du 1er novembre 2006 ;

**Qu'il** convient dès lors d'imputer à l'inculpé EDOU Joseph et à BOOTO A NGON André le déficit de **2 205 479 766 FCFA** affichée par ce projet dans lequel il s'est illustré par des violations itératives des dispositions réglementaires en vigueur en vue de favoriser l'entreprise CHINA STATE ;

## 2.4. B- SUR LES DETOURNEMENTS PERPETRES A TRAVERS PROGRAMME OLEMBE II EXTENSION (1 034 LOGEMENTS)

**Attendu que sur ce volet,** EDOU Joseph a déclaré qu' Olembe II c'est 1034 logements sociaux construit par le promoteur ATLANTIC GROUP sur un terrain de 70 hectares donné par le gouvernement et deux prêts mis en place par le CFC au taux de 10% en contrepartie d'une garantie de premier ordre ;

**Que** selon lui il y a eu accord du gouvernement car Olembe II n'étant que l'extension de Olembe I, projet entériné par le Conseil d'Administration;

**Qu'il** a demandé et obtenu du Président du Conseil D'administration, la signature à titre conservatoire des conventions de prêt et a débloqué les fonds y relatifs, à savoir 2,4 milliards de francs CFA au titre des constructions des logements, 980 millions de francs au titre des travaux d'aménagement, ce conformément au pouvoir que le Président du Conseil D'administration avait lui-même reçu du Conseil d'Administration au démarrage des programmes immobiliers ;

**Qu'une** garantie de premier ordre de 4.750.000 dollars américains soit, au taux de change de 600 FCFA le dollar de l'époque, 2,58 milliards de FCFA environ sous tendait le projet ; que celle-ci peut être mise en jeu à la première demande ;

**Que** le GROUPE FIVE étant une société de construction internationale, pouvait à partir de cette garantie obtenir une contre garantie d'une banque locale mais ne l'a pas fait car non seulement on ne la lui avait pas demandée mais en plus elle n'avait pas encore procédé au démarrage des travaux ; Que le promoteur ATLANTIC GROUP n'avait pas à présenter une garantie propre mais celles des sous-traitants (constructeurs, aménageurs et autres) ;

**Qu'au** moment où il partait du Crédit Foncier du Cameroun les travaux avaient commencé sur le site, les 70 hectares de terrain avaient été entièrement débroussaillés, une voie d'accès secondaire au site avait été aménagée pour permettre le passage des engins et l'installation du chantier ; qu'il a appris par la suite que les nouveaux dirigeants ont, par écrit et à deux reprises, intimé l'ordre d'arrêter tous les travaux ;

**Que** la somme de 152.825.383 FCFA objet du bon de virement du 14 juin 2005 correspond au paiement des frais d'étude d'ingénierie et de géotechnique (21.465.000 FCFA) aux frais de contrôle des travaux, 48.908.718 FCFA aux frais administratif (50%) pour l'approbation du lotissement et l'obtention du permis de bâtir (82.451.665 FCFA) ;

**Que** devant l'urgence, ces fonds débloqués n'ont plus transité par le compte d'opération car le constructeur menaçait de quitter le projet, c'est ce qui explique qu'il ait choisi cette voie expresse pour cette partie de l'avance de démarrage ;

**Que** sur l'utilisation des fonds débloqués pour l'acquisition de ses biens personnels, notamment un immeuble bâti à Bastos sous le couvert de la société THE FALLS, il a soutenu que le promoteur d'Atlantic Group lui a dit avoir acheté une maison à Bastos avec un prêt de la maison mère de sa structure (MBI- USA) afin de loger le constructeur GROUPE FIVE, et pour éviter la fiscalité que cette maison a été mise sous le nom de THE FALLS ;

**Que** la gestion lui a été confiée de cette maison quand il n'était plus Directeur du Crédit Foncier du Cameroun raison pour laquelle il percevait les loyers pour apurer le prêt consentis par MBI-USA ;

**Que** les sommes débloquées ont servi à importer les machines des chantiers pour une valeur totale de 4.300.000 dollars américains soit 2,5 milliards de FCFA à quoi il faut ajouter 40 millions FCFA de frais de stationnement au port de Douala et à payer les différentes dépenses destinées à installer le chantier (voie d'accès et autres) ;

**Mais attendu** que le Crédit Foncier du Cameroun a lancé un programme de construction de 1034 logements sociaux baptisé OLEMBE I EXTENSION sur 70 hectares mis à sa disposition par la MAETUR sur instruction du Ministre de l'Urbanisme et de l'Habitat ; Qu'en vue de réaliser ce programme, e Crédit Foncier du Cameroun s'est entouré de deux partenaires à savoir la société civile immobilière ATLANTIC GROUP et le GROUP FIVE ;

**Qu'il** ressort des statuts du Crédit Foncier du Cameroun, complétés par son règlement intérieur que les financements octroyés par cet organisme ne peuvent être faits que sous forme de prêts ;

**Qu'EDOU** Joseph n'a exigé aucun apport personnel à la SCI ATLANTIC GROUP alors qu'il s'agit d'une condition substantielle pour l'octroi du prêt promoteur par le Crédit Foncier du Cameroun, pour la simple raison qu'il contractait avec lui même ; Qu'en outre il n'a pas respecté les statuts de l'institution dont il avait la charge pour solliciter dans le cadre d'une opération aussi ambitieuse l'aval de l'Etat du Cameroun ;

**Qu'il** a eu à ordonner le décaissement de la somme de 2,4 milliards sans l'accord du conseil d'administration et du gouvernement Camerounais avec pour seul quitus la lettre n° 005/CF/PCA du 21 mars 2005 du Président du Conseil d'Administration du Crédit Foncier BOOTO A NGON André;

**Attendu** qu'en agissant de la sorte, EDOU Joseph n'a pas préservé la probité dans la gestion des affaires publiques :

**Qu'il** est constant que EDOU Joseph a participé à la préparation des actes pouvant être mis en cause et a pris, reçu, ou conservé, directement ou indirectement un intérêt dans ces conventions avec la SCIATLANTIC GROUP et GROUP FIVE ;

**Que** la prise d'intérêt n'étant pas toujours la réalisation de l'opération mais aussi la simple mise en place du lien matériel ou juridique dont l'inculpé espérait ensuite tirer avantage, il convient de dire cette infraction consommée dans le cas d'espèce;

**Que** le lien d'ingérence a été ici dissimulé par l'interposition d'autres personnes morales et physiques, à l'instar de TCHOUFA Roger et ATLANTIC GROUP, considérées comme coauteurs ; Qu'enfin, l'intérêt dans le cas d'espèce est un avantage financier doublé d'un intérêt moral et affectif ; Qu'ainsi, en abusant de sa position de Directeur Général du Crédit Foncier du Cameroun, EDOU

28

JOSEPH et BOOTO A NGON André ont recherché dans le cadre de cette opération de OLEMBE II leur avantage personnel, consommant ainsi le délit d'intérêt dans un acte de l'article 135 du code pénal et le crime de l'article 184 du même code;

**Qu'en** dépit de ses dénégations, il est constant qu'EDOU Joseph était partie prenante dans cette société, les documents y relatifs ayant été trouvés dans ses affaires personnelles à l'instar d'une lettre du 18 juillet 2002 qu'il adressait à SCHERMI HAI de la PHILIPS INDIA LTD en Inde;

**Que** dans un prospectus dans lequel il vantait les mérites de ses différentes sociétés écrans, document retrouvé dans son ordinateur personnel, EDOU Joseph a présenté lui-même la fameuse société THE FALLS qu'il a mis sur pied avec son fils ASSOLO'O Serge comme étant « *née des cendres de Ingeni s.a créée en 1990 et qui était spécialisé dans le Conseil en investissement et avait, à ce titre, conseillé les grands groupes européens tels que France Telecom, Terre Rouge (France), ING Barings, COGEFAR (Italie) dans le cadre de la privatisation des entreprises camerounaises, du rééchelonnement de la dette du Cameroun au Club de Londres, des opérations sur les bons du trésor camerounais* » ;

**Que** le même prospectus précisait que THE FALLS, créée par les mêmes promoteurs, a opté pour l'immobilier, le tourisme et les loisirs qui ont de meilleurs taux de rentabilité au Cameroun ;

**Que** curieusement l'objet social de cette société correspond comme par hasard à l'objet social du Crédit Foncier du Cameroun  ; Que pour mieux contrôler la situation, il a placé à la tête de celle-ci son beau frère ATEBA MINKOULOU le père de AKABA ATEBA Léonie ;Que les choses et les enjeux devenant intéressants,il a recruté KOH KOH qui bénéficiera d'une cession de l'ensemble des actions de la société THE FALLS et ira retrouver un de ses partenaires venu tout droit des Etats-Unis en la personne de TCHOUFA Roger pour créer la société SCI ATLANTIC GROUP au sein de laquelle THE FALLS est majoritaire comme ayant le plus grand nombre de parts ;

**Qu'ils** ont ainsi, avec l'aide de plusieurs autres sociétés satellites, à l'exemple de la SARL SECRE appartenant à NKORO Jacques mis sur pied un système de détournement des deniers publics à travers le programme immobilier dénommé OLEMBE II; Que c'est ainsi qu'après avoir viré plus de 3 milliards dans le compte de SCI ATLANTIC GROUP, ils se sont mis à décaisser cette somme à un rythme soutenu pour leur usage personnel, achat de terrains et d'immeubles notamment ;

**Qu'ainsi** on a constaté des décaissements pour le compte de la société SECRE dirigée par NKORO Jacques, et censée effectuer le contrôle des travaux purement fictifs à OLEMBE II, alors même que les travaux n'avaient pas encore commencé sur le site ;

**Que** l'implication de l'ex-Directeur Général du Crédit Foncier du Cameroun EDOU JOSEPH dans les détournements des deniers publics et la prise d'intérêt dans un acte dénoncés dans cet établissement public ne fait l'ombre d'aucun doute ;

**Attendu** que le préjudice subi par le Crédit Foncier du Cameroun dans le cadre de ce programme où le service fait ne se résume qu'en de travaux sommaires de défrichage et les terrassements s'élèvent à la faramineuse somme de 3 581 718 452 FCFA à laquelle il faut ajouter 4 844 875 FCFA représentant le manque à gagner des loyers de la SCI ATLANTIC GROUP qui occupait des locaux du Crédit Foncier du Cameroun soit au total **3 586 554 577 FCFA** ;

Qu'il convient d'imputer ces infractions à EDOU en dépit de ses dénégations sur ce volet ;

29



## Cameroon

Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

Cameroon, with a population of approximately 17.3 million, is a republic dominated by a strong presidency. Despite the country's multiparty system of government, the Cameroon People's Democratic Movement (CPDM) has remained in power since it was created in 1985. In October 2004 CPDM leader Paul Biya won re-election as president. The election was flawed by irregularities, particularly in the voter registration process, but observers believed the election results represented the will of the voters. The president retains the power to control legislation or to rule by decree. He has used his legislative control to change the constitution and extend the term lengths of the presidency. Although civilian authorities generally maintained effective control of the security forces, security forces sometimes acted independently of government authority.

The government's human rights record remained poor, and it continued to commit numerous human rights abuses. Security forces committed numerous unlawful killings; they regularly engaged in torture, beatings, and other abuses, particularly of detainees and prisoners. Impunity was a problem in the security forces. Prison conditions were harsh and life-threatening. Authorities arbitrarily arrested and detained anglophone citizens advocating secession, local human rights monitors and activists, and other citizens. The law provides for the arrest of homosexuals and persons not carrying identification cards. There were reports of prolonged and sometimes incommunicado pretrial detention and infringement on citizens' privacy rights. The government restricted citizens' freedoms of speech, press, assembly, association, and harassed journalists. The government also impeded citizens' freedom of movement. The public perceived government corruption to be a serious problem. Societal violence and discrimination against women; trafficking in persons, primarily children; discrimination against indigenous Pygmies and ethnic minorities; and discrimination against homosexuals were problems. The government restricted worker rights and the activities of independent labor organizations, and child labor, slavery, and forced labor, including forced child labor, were reported to be problems.

Poor understanding of human rights has contributed to abuses in the country. The government took significant steps during the year to improve citizen's understanding of their specific human rights and protection through publication of its own human rights report. The government also conducted training sessions throughout the country on the provisions of the penal code scheduled for implementation in 2007.

RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including

Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

Unlike in previous years, there were no reports that government agents committed politically motivated killings; however, throughout the year security forces continued to commit unlawful killings, including killings resulting from beatings and other use of excessive force.

There were new developments in the 2004 killing of John Khontem. On April 12, the Ngoketunjia High Instance Court sentenced National Assembly member Doh Gah Gwanyin III and each of nine codefendants to 15 years in prison and a $1,000 fine (500,000 CFA francs). Gwanyin filed a motion for bail because of poor health, and, on August 18, the Bamenda Court of Appeals granted him bail.

On November 29, security forces mistakenly shot and killed a man while trying to arrest another person who allegedly participated in a violent demonstration the day before in Maga, Far North Province.

There were reports that police used excessive force to disperse demonstrators, resulting in the deaths of several of them (see section 2.b.).

Prisoners reportedly died in custody during the year due to beatings and abuse by security forces.

There were new developments in the February 2005 torture case of banker Emmanuel Moutombi. The Douala Military Tribunal's investigation yielded the names of those involved in Moutombi's death. On March 21, the tribunal sentenced gendarmerie officers Athanase Domo, Pierre Minkeng Ndjemba, and Jean Mbiakop to 10, nine, and eight years in jail, respectively, on charges of torture that resulted in death. Two other officers, Anatole Clement Banem and Jean-Claude Menanga Ahanda, received 10 and six month sentences, respectively, on violation of instructions charges. The court released two of the codefendants due to lack of evidence. The court also ordered the government to pay $90,000 (44 million CFA francs) in damages to Moutombi's family.

There were new developments in the March 2005 shooting death of Jean-Pierre Mpohede. On October 27, the Kribi High Court sentenced Police Commissioner Japhet Bello Miagougoudom to 15 years in prison and awarded $40,000 (20 million CFA francs) in damages to the victim's family. The court also sentenced Police Inspector Aboubakari Modibo to 10 years in jail but acquitted the seven other codefendants.

There were no new developments in the 2005 police killings of Denis Serge Etoundi, Aurelien Mayouga Noundou, Elvis Sigala Tasama, or Claude Obam Ndoum.

There were no new developments in the 2004 beating death of Emmanuel Song Bahanag or the torture death of Laurent Gougang.

There were no new developments in the 2004 police killings of Justin Abena Ngono or Desire Etoundi.

There were new developments in the 2000 high-profile case of the shooting death of Luc Benoit Bassilekin. On April 27, after a two year suspension, the Douala Military Tribunal resumed hearings on the case. The trial was ongoing at year's end.

There were fewer reports that police used excessive, including deadly, force than in the previous year.

There were fewer incidents where police beat or shot suspects. The government took more steps to investigate and prosecute officers who used excessive force (see section 1.d.).

PLAINTIFF'S
EXHIBIT
8 A

On February 23, police officer Daniel Ayissi Fouda of the Mbengwi police station in the Northwest Province allegedly shot and killed Elvis Ndengue, a motorcycle taxi driver, after Ndengue refused to transport a young woman who Ayissi Fouda had just arrested to the police station. Ayissi Fouda fled the crime scene. The investigation was ongoing at year's end.

On August 22, the Yaounde district attorney charged Ni John Fru Ndi, chairman of the Social Democratic Front (SDF), with the murder of Gregoire Diboule. Fru Ndi was accused of being responsible for violence that resulted in the death. On May 28, SDF vanguards from Bamenda stormed the party's head office in order to prevent the party's dissenting faction from holding a congress (see section 3). The charges against Fru Ndi were still under investigation at year's end.

During the year mob violence and summary justice against persons suspected of theft and the practice of witchcraft continued to result in deaths and serious injuries. The press reported 43 deaths from beatings and burning, the most ever reported.

Douala, the economic capital, had the highest number of mob "justice" incidents. The mob violence was attributed in part to public frustration over police ineffectiveness and the release without charge of many individuals arrested for serious crimes (see section 1.d.). During the year there was a notable rise in crime, and authorities responded by purchasing 60 vehicles to increase police efficacy. The country has a functional police academy and engaged in training police for neighboring countries.

On January 19, former subjects of Fon Vugah Simon II, the former traditional ruler of Kedjom Keku, a village of Mezam Division in the Northwest Province, beat him to death and then burned his body upon his return to the village after having been deposed two years earlier. They accused him of immorality and destroying their tradition. Shortly after the killing, the gendarmerie arrested 59 persons. Approximately 20 were released and the rest remained in pretrial detention. Hearings began on June 28 and were still ongoing at year's end.

On March 4, a mob burned to death Jean-Pierre Onguene, Serge Toussaint Awa Amougou, and Joseph Cyrille Meba'a, whom they caught stealing in the Yaounde neighborhood of Nsimeyong-Damase. The police initially caught and held the suspects, until a large mob broke into the police station, pulled out the three, and killed them. An investigation was still ongoing at year's end.

On June 2, an angry crowd burned to death Jean Bape, Daniel Fotie, and Clovis Koagne on allegations of theft in various houses of Tchokaong, a village of Mifi Division in the West Province. The gendarmerie was still investigating the case at year's end.

In October 2005 the Meme High Court (Southwest Province) sentenced Police Inspector Stephen Ngu to eight years in prison for beating and burning to death Afuh Bernard Weriwo.

There were no new developments in the 2005 burning deaths of Papi Gosse, Jonas Benang, and an unknown individual in Douala.

There were no new developments in any of the killings by mobs in 2004. There were no new developments in the 2003 appeal of the acquittal of six army officers who were charged with executing nine youths in Bepanda.

b. Disappearance

There were no reports of politically motivated disappearances during the year.

There were no developments in the 2005 case of 20 citizens reportedly captured by agents of Equatorial Guinea's government and taken to Equatorial Guinea for alleged crimes.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The constitution and law prohibit such practices; however, there were credible reports that security forces continued to torture, beat, and otherwise abuse prisoners and detainees.

In the majority of cases of torture or abuse, the government rarely investigated or punished any of the officials involved; however, in at least one case during the year, gendarmerie officers accused of torturing a citizen to death in 2005 were detained and investigated (see section 1.a.).

During the year there were no reports that persons in police and gendarmerie custody died as a result of torture.

There were reports that security forces detained persons at specific sites where they tortured and beat detainees. Security forces also reportedly subjected women, children, and elderly persons to abuse.

Numerous international human rights organizations and some prison personnel reported that torture was widespread; however, most reports did not identify the victim because of fear of government retaliation against either the victim or the victim's family. Most victims did not report torture for fear of government reprisal or because of ignorance of, or lack of confidence in, the judicial system.

In Douala's New Bell Prison and other nonmaximum security penal detention centers, prison guards inflicted beatings, and prisoners were reportedly chained or at times flogged in their cells. Authorities administered beatings in temporary holding cells within police or gendarme facilities.

Two forms of physical abuse commonly reported by male detainees were the "bastonnade," where authorities beat the victim on the soles of the feet, and the "balancoire," during which authorities hung victims from a rod with their hands tied behind their backs and beat them, often on the genitals.

Security forces reportedly continued to subject prisoners and detainees to degrading treatment, including stripping them, confining them in severely overcrowded cells, denying them access to toilets or other sanitation facilities, and beating detainees to extract confessions or information about alleged criminals. Pretrial detainees reported that they were sometimes required, under threat of abuse, to pay "cell fees," a bribe paid to prison guards to prevent further abuse.

On June 13, Yaounde police stormed a gathering of students from the University of Yaounde II, who were protesting an unannounced hike in taxi fares. Police, who arrived to disperse the spontaneous demonstration, violently beat and seriously injured many students. They also arrested 50 students, who were later released.

In June officers from the Yaounde antiriot squad beat Wackenhut guard service employee Felix Ahanda and many of his colleagues, who were demonstrating to demand payment of money they alleged the firm owed them. The beating left Ahanda with damaged testes.

According to the French-language news site Afrique Centrale, in August soldiers severely injured and wounded five policemen while trying to free a fellow soldier from police custody by force.

There were no new developments in the 2005 police beatings of Genevieve Toupouwou, Gregoire Angotchou, or Nelson Ndi Nagyinkfu.

There were also no developments in the 2005 incident in which security forces beat and arrested 50 students in Bafoussam, West Province, for participating in an illegal demonstration.

There were no new developments in the 2004 beating of a man named Bikele by police officers, or the 2004 assault and arrest of Epie Nzounkwelle by a local government official.

Security forces physically abused and harassed journalists during the year (see section 2.a.).

There were no reports that security forces sexually abused individuals during the year.

There were no new developments in the 2004 case of sexual abuse of Biloa Ndongo by a gendarmerie mobile unit in the Melen neighborhood of Yaounde.

Illegal immigrants from Nigeria and Chad reported that they were subjected to harsh treatment and imprisonment (see section 5).

Prison and Detention Center Conditions

Prison conditions remained harsh and life threatening. Prisons were seriously overcrowded, unsanitary, and inadequate, especially outside major urban areas. The government did not provide funds to cover serious deficiencies in food, health care, and sanitation, which were common in almost all prisons, including "private prisons" operated by traditional rulers in the north. Prisoners were kept in dilapidated, colonial-era prisons, where the number of inmates was four to five times the intended capacity. According to a 2004 report by the International Center for Prison Studies, published by the Catholic newspaper La Croix, there were 67 prisons for the country's approximately 20,000 detainees.

Overcrowding was exacerbated by the large number of long pretrial detentions.

In 2005, 800 persons were hired and trained to work in the prison system. In 2004 the government shifted responsibility for administering prisons and detention centers and all individuals arrested by security forces from the Ministry of Territorial Administration and Decentralization to the Ministry of Justice. In addition the government created a human rights body within the Ministry of Justice to monitor abuses in prisons and jails (see section 4).

There were reports that prisoners died due to a lack of medical care.

There were no developments in the March 2005 case of Djabba Bouba, a prisoner in the Douala prison who reportedly starved to death in a Douala prison.

Health and medical care were almost nonexistent in the country's prisons and in its detention cells, which were housed in gendarmeries and police stations. Between August 5 and 7, three inmates died at the Kumba prison in the Southwest Province, reportedly from untreated tuberculosis.

Prisoners' families were expected to provide food for their relatives in prison. Douala's New Bell Prison contained seven water taps for a reported 3,500 prisoners, contributing to poor hygiene, illness, and death.

Prison officials reportedly tortured, beat, and otherwise abused prisoners with impunity. Corruption among prison personnel was widespread.

Prisoners sometimes could bribe wardens for special favors or treatment, including temporary freedom. Prisoners in New Bell Prison could pay bribes for more comfortable sleeping arrangements and to avoid doing prison chores.

There were two separate prisons for women.

There were also a few pretrial detention centers for women; however, women routinely were held in police and gendarmerie complexes with men, occasionally in the same cells. The secretary of state in charge of penitentiary administration acknowledged this was a serious problem. Mothers sometimes chose to be incarcerated with their children or babies while their children were very young or if they had no other child care option.

Juvenile prisoners were often incarcerated with adults, occasionally in the same cells or wards. There were credible reports that adult inmates sexually abused juvenile prisoners.

Pretrial detainees routinely were held in cells with convicted criminals.

Some high-profile prisoners were separated from other prisoners and enjoyed relatively lenient treatment.

Authorities held adults, juveniles, and women together in temporary detention centers. Detainees usually received no food, water, or medical care. Detention center guards at times resorted to corruption, accepting bribes from detainees in return for access to better conditions, including permission to stay in an office instead of a cell. Detainees whose families were informed of their incarceration relied on their relatives for food and medical care. Overcrowding was common in the detention centers and was often aggravated by the practice of "Friday arrests" (see section 1.d.).

In the North and Extreme North provinces, the government continued to permit traditional chiefs, or Lamibe, to detain persons outside the government penitentiary system, in effect creating private prisons. Traditional rulers throughout the country derive support and legitimacy from their subjects, many of whom turn to the Lamibe for dispute resolution. Within the palaces of the traditional chiefdoms of Rey Bouba, Gashiga, Bibemi, and Tcheboa there were private prisons that had a reputation for serious abuse. Prior to the destruction of the palace prison in 2005 in Garoua, in the North Province, palace staff estimated that a total of 50 prisoners were held in the palace prison annually, normally for one to two weeks.

Individuals who were found guilty in Garoua were reportedly often beaten or subject to other forms of physical abuse. According to members of all the chiefdoms' palace staffs, individuals accused of serious crimes such as murder were turned over to local police.

The government permitted international humanitarian organizations access to prisoners. Both the local Red Cross and the National Commission on Human Rights and Freedoms (NCHRF) made infrequent, unannounced prison visits during the year. The government continued to allow the International Committee of the Red Cross (ICRC) to visit prisons. In 2005 the ICRC stated that the government allowed international nongovernmental organizations (NGOs) increased access to prisons.

In July 2005, during a visit by diplomatic observers to the Douala New Bell Prison, the prison administrator said that the prison, built to hold 700 inmates, held 3,194. Of these, 2,300 were pretrial detainees, who were not held separate from convicted prisoners. In August 2005, during a similar visit to the Yaounde Kondengui Prison, the same observers learned that the prison, built for 800 inmates, held 3,521 of whom were awaiting trial. In May 2004 a senior official estimated that 1,600 out of 1,800 inmates in Bafoussam Prison were pretrial detainees.

d. Arbitrary Arrest or Detention

The constitution and law prohibit arbitrary arrest and detention; however, security forces continued to arrest and detain citizens arbitrarily.

Role of the Police and Security Apparatus

The national police, the National Intelligence Service (DGRE), the gendarmerie, the Ministry of Territorial Administration, the army's military security department, the army, the minister of defense, and, to a lesser extent, the Presidential Guard are responsible for internal security; the national police and gendarmerie have primary responsibility for law enforcement. The Ministry of Defense, including the gendarmerie, national police, and DGRE, are under an office of the presidency, resulting in strong presidential control of security forces. The national police include the public security force, judicial police, territorial security forces, and frontier police. In rural areas, where there is little or no police presence, the primary law enforcement body is the gendarmerie.

Citizens viewed police as ineffective, which frequently resulted in mob "justice" (see section 1.a.). It was widely believed that individuals paid bribes to law enforcement and the judiciary to secure their freedom. Police officers and members of the gendarmerie were widely viewed as corrupt officials who frequently and arbitrarily arrested and detained citizens. Police demanded bribes at checkpoints, and influential citizens reportedly paid police to make arrests or abuse individuals involved in personal disputes. Private disputes, such as feuds between business partners, frequently resulted in one party making allegations of impropriety or homosexuality about the other and involving the security forces.

According to Transparency International's 2005 Global Corruption Barometer, citizens viewed the police as extremely corrupt. Impunity remained a problem but was less severe than in previous years. Insufficient funding and inadequate training contributed to a lack of professionalism in the national police. The Center Province purchased 150 police vehicles to improve police effectiveness.

Edgar Alain Mebe Ngo'o, who in 2004 was appointed the general delegate for national security, took significant steps during the year to investigate, suspend, and prosecute security forces accused of abuses.

In 2005 Mebe Ngo'o rehabilitated the "police of the police," an internal affairs unit of undercover agents that had been dormant for many years. By year's end the unit was functioning and had received funding, although there were no public reports of any cases investigated by this unit.

During the year Mebe Ngo'o also sanctioned at least 17 police officials who violated laws and regulations, including those on corruption and extortion. Seven others were also sanctioned by the courts.

For example, on March 2, pending legal action, Mebe Ngo'o suspended three police commissioners for three months without pay for intimidation and aggravated corruption. On September 4, the president signed decrees terminating them from the police force, and revoking their pension rights. On August 21, Mebe Ngo'o suspended eight police officers for three months without pay who were involved in the trafficking of original passports.

In March 2005 Mebe Ngo'o suspended a Douala police officer and a Yaounde police inspector for three months for behavior that "tarnished the image of the police." He suspended another Yaounde-based police inspector for two weeks for keeping a citizen's driving license unnecessarily.

During the year courts convicted at least seven police and gendarmerie officers for human rights abuses.

On May 15, the Douala prosecutor detained four police officers

from the Douala Central Police Station No. 2 for the theft of $2,000 (one million CFA francs) seized from a thief who had stolen the money from a shop. In June the Bafoussam tribunal sentenced a police inspector from the Foumban police station to one year in jail, a $400 fine (200,000 CFA francs), and $300 in damages (150,000 CFA francs) to be paid to Raoul Noka for the 2003 suit that his lawyer filed against him for the nonpayment of his legal fees. On August 4, the Yaounde High Court sentenced a gendarmerie commissioned officer to 18 months in jail for the 2005 murder of his young neighbor.

On August 23, the Bamenda Court sentenced the Bamenda judicial police commissioner to pay damages of $1,200 (600,000 CFA francs) to Edwin Nkwain Mbang for arbitrarily arresting and detaining him for 18 days in 2001.

In May 2005 the Douala Military Tribunal sentenced two police inspectors from the Douala Central Police Station No. 1 to six months in jail for the 2001 armed assault and robbery of three Nigerian citizens.

The government also took actions to reform security forces including the police and gendarmerie. On June 22, several gendarmerie and police officers completed a four-week training seminar on order preservation, with an emphasis on citizens' rights, human rights, and individual freedoms. The government also sent candidates to attend the International Law Enforcement Academy police training.

Arrest and Detention

The law requires police to obtain an arrest warrant except when a person is caught in the act of committing a crime. Police legally may detain a person in connection with a common crime for up to 24 hours and may renew the detention three times before bringing charges. While this provision was generally respected, there were unverifiable reports that police occasionally violated it.

The law provides for the right to judicial review of the legality of detention only in the country's two anglophone provinces, and this provision was respected in practice. In the francophone provinces, French legal tradition applies, precluding judicial authorities from acting on a case until the authority that ordered the detention turns the case over to a prosecutor. In practice these processes took between 15 days to a month. In francophone provinces, after a magistrate has issued a warrant to bring a case to trial he may hold the detainee in administrative or pretrial detention indefinitely, pending court action. During the year such detention often was prolonge, due to the understaffed and mismanaged court system. The law permits detention without charge by administrative authorities such as governors and senior divisional officers for renewable periods of 15 days, ostensibly to combat banditry and maintain public order. Persons taken into detention frequently were denied access to both legal counsel and family members. The law permits release on bail only in the anglophone provinces; bail was granted infrequently.

To prepare for the new Code on Criminal Procedure scheduled to enter into force in January 2007, the Ministry of Justice organized training sessions on the code in each of the country's 10 provinces. The code extends the right of individuals to be released on bail to the whole country. It also allows those arrested and held in police and gendarmerie facilities for investigation to be assisted by a lawyer from the beginning of their detention.

Police and gendarmes often arrested persons on spurious charges on Fridays at mid-day or in the afternoon. While the law in the anglophone provinces provides for judicial review of an arrest within 24 hours, the courts did not convene on weekends, so individuals arrested on a Friday typically remained in detention until Monday at the earliest. Police and gendarmes made such "Friday arrests" after accepting bribes from persons who had private grievances. There were no known cases of policemen or gendarmes being sanctioned or punished for this practice.

Security forces and government authorities reportedly continued to arbitrarily arrest and detain persons, often holding them for prolonged periods without charges or trial and, at times, incommunicado.

There were reports of political detainees, including anglophone citizens advocating secession, local human rights monitors or activists, journalists, and other critics of the government (see sections 2.a. and 2.b.).

Police also arrested persons during unauthorized demonstrations, invariably releasing them within a few hours unless they engaged in violence (see section 2.b.).

During the year security forces preemptively arrested approximately 70 leaders, members, and supporters of the Southern Cameroons National Council (SCNC), an anglophone secessionist group (see section 3).

There were no developments in the 2005 trial of three SCNC members charged with disturbing the public order.

On April 2, gendarmes of the Center Province town of Bokito arrested and detained Suzanne Binyom and Felicite Atchang for 24 hours at the request of Ernest Oloume, the ruling party deputy from the locality. The women had come to pay a courtesy call on their parliamentarian. Oloumi told the gendarmes that the women looked suspicious; they in turn filed a complaint for arbitrary arrest and detention.

On April 17, gendarmes from the Yaounde-Kondengui brigade arrested and briefly detained Alice Nkom, a prominent Douala-based lawyer. She was visiting her clients, alleged homosexuals who had been awaiting trial for several months, in the Yaounde central prison. Nkom took some pictures of her clients but was prevented from continuing by prison wardens, who claimed she had no right to take pictures. Nkom told them that there was no law prohibiting her actions. Unable to cite a law backing their claim, prison officials called the gendarmes to have Nkom removed.

On September 15, Police Commissioner Mve of the Douala judicial police office ordered the arrest and detention of Conrad Mongue-Din, a Douala-based lawyer. Mongue-Din went to the judicial police office to assist a client. The police commissioner denied his request for access. When Mongue-Din insisted, Commissioner Mve ordered Monque-Din detained, claiming he created a disturbance. Mongue-Din filed a complaint through the Douala branch of the Cameroon Bar Association.

There were no developments in the 2005 arrest of a labor leader during a sit-in (see section 6.a.).

There were no developments in the 2004 arrest of a Human Rights Defense Group member by a Northwest Province chief.

Police frequently arrested persons without identification during sweeps (see section 1.f.). Citizens are required to carry identification with them at all times.

The law provides that detainees must be brought promptly before a magistrate; however, bureaucratic inefficiency and, at times, arbitrary actions led to prolonged pretrial detention, and sometimes persons were held incommunicado for months or even years (see section 1.c.). For example, in 2005, in Douala's New Bell Prison and Yaounde's Kondengui Prison, 5,300 of the 6,715 persons incarcerated were in pretrial detention. This high number was due to many factors, including the complexity of cases, staff shortages, and corruption. The average pretrial detention period ranged from one to five years. Longer detention periods were often linked to the loss of a file and the absence of a lawyer to follow up on the case. In January 2005 the Union of Northwest Human Rights Organizations stated it had visited 20 detainees in the Bamenda Prison who had each been awaiting trial for 10 years.

In 2003 the Ministry of Justice and the European Union launched an assistance program to examine cases of prolonged pretrial detention and resolve them. The program was still ongoing at year's end; however, the lack of personnel impeded its effectiveness.

There was no information available on Barnabe Atangana or Beniot Bilongo, who remained in pretrial detention at the end of the year after 22 years and nine years, respectively.

The law specifies that, after an investigation has concluded, juveniles should not be detained without trial for longer than three months; however, in practice the government detained juveniles for longer periods of time. For example, at the end of 2004, Michel Sighanou, a juvenile who was transferred from the Yabassi prison to another prison in 1996, had been awaiting trial for more than seven years. No additional information was available at year's end.

In recent years there have been reports that some prisoners were kept in prison after completing their sentences or having been released under a court ruling. During a July visit to Douala, a Catholic prison chaplain told diplomatic observers that there were still many such cases. Authorities kept more than 100 prisoners in jail past their release dates due to the prisoners' inability to pay court fees or damages.

The government took steps to implement a tracking system that would permit authorities to locate released prisoners and collect fines or damages.

e. Denial of Fair Public Trial

The constitution and law provide for an independent judiciary; however, the judiciary remained highly subject to executive influence, and corruption and inefficiency remained serious problems. The court system was subordinate to the Ministry of Justice, which was part of the presidency. A constitutional anomaly names the president as "first magistrate," thus "chief" of the judiciary and the theoretical arbiter of any sanctions against the judiciary, which could influence judicial action. In practice, however, the president has not filled this role. The constitution specifies that the president is the guarantor of the legal system's independence. He also appoints all judges with the advice of the Supreme Council of the Magistrature. Some politically sensitive cases were never heard by the courts. However, the judiciary showed modest signs of growing independence. During the year the courts found the government liable for damages in a few human rights cases involving abuses by security officers. For example, in the Miagougoudom case, the government awarded the victim's family $40,000 (20 million CFA francs) in damages (see section 1.a.).

The court system includes the Supreme Court, a court of appeals in each of the 10 provinces, and courts of first instance in each of the country's 58 divisions.

The legal system includes both national and customary law, and many criminal and civil cases can be tried using either one. However, criminal cases are generally tried in statutory courts, and customary court convictions involving witchcraft automatically are transferred to the statutory courts, which act as the Court of First Instance. Customary law, which is used most frequently in rural areas, is based upon the traditions of the ethnic group predominant in the region and is adjudicated by traditional authorities of that group. Customary law is deemed valid only when it is not "repugnant to natural justice, equity, and good conscience." However, many citizens in rural areas remained unaware of their rights under civil law and were taught that they must abide by customary laws. Customary law ostensibly provides for equal rights and status; however, men may limit women's rights regarding inheritance and employment, and some traditional legal systems treat wives as the legal property of their husbands.

Customary courts served as a primary means for settling civil disputes in rural areas, primarily in family-related civil cases, such as in matters of succession, inheritance, and child custody. Divorce cases can be brought to customary courts only if the government has not sanctioned the marriage through an official license. Customary courts may exercise jurisdiction in a civil case only with the consent of both parties. Either party has the right to have a case heard by a statutory court and to appeal an adverse decision by a customary court to the statutory courts. Most traditional courts also permitted appeal of their decisions to traditional authorities of higher rank.

The legal structure is strongly influenced by the French legal system, although in the two anglophone provinces certain aspects of the Anglo-Saxon tradition apply. In the past this mixed legal tradition led to conflicting court action in cases handled in both francophone and anglophone jurisdictions.

During the year the government approved a new Criminal Procedure Code and conducted training on the code throughout the country, in anticipation of its implementation in 2007.

Trial Procedures

The law provides for a fair public hearing in which the defendant is presumed innocent. However, this provision often was not respected. There is no jury system. Defendants have the right to be present and to consult with an attorney in a timely manner. Defendants generally were allowed to question witnesses and to present witnesses and evidence on their own behalf. Defendants also had access to government-held evidence relevant to their cases. Because appointed attorneys received little compensation, the quality of legal representation for indigent clients often was poor. The bar association and some voluntary organizations, such as the Cameroonian Association of Female Jurists, offered free assistance in some cases. The Project for the Improvement of Conditions of Detention continued to engage lawyers to work on prison cases. Trials normally were public, except in cases judged by the Ministry of Justice to have political overtones or to be disruptive to social peace. In practice defendants enjoyed a presumption of innocence and exercised their right to appeal their cases.

There were reports that officials continued to hold individuals in prison beyond the jail terms set by the courts. In 2005 the general prosecutor of the Yaounde Superior Court reviewed the files of approximately 150 prisoners at the Kondengui Prison to check their judicial status.

Political bias by judges (often instructed by the government) often stopped trials or resulted in an extremely long process with extended court recesses. Powerful political or business interests enjoyed virtual immunity from prosecution; some politically sensitive cases were settled through bribes.

Military tribunals may exercise jurisdiction over civilians when the president declares martial law and in cases involving civil unrest or organized armed violence. Military tribunals also have jurisdiction over gang crimes, banditry, and highway robbery. The government interpreted these guidelines broadly and sometimes used military courts to try matters concerning dissident groups.

Military trials were subject to irregularities and political influence.

Political Prisoners

During the year authorities continued to hold two groups of prisoners who could be considered political prisoners.

There were no developments in the case of 15 members of the secessionist group SCNC serving long prison sentences following their 1999 convictions in military trials. Their trials and convictions did not meet international or national legal standards; Amnesty International and other international human rights NGOs criticized the trials as unfair. In addition the military tribunal admitted into evidence confessions that were credibly alleged in court to have been exacted under torture.

The prisoners maintained they were political prisoners convicted for supporting a political belief; however, the government claimed they were imprisoned for acts of violence against government offices and officers. The government permitted access to the prisoners on a regular basis by international humanitarian organizations.

Because it advocates succession the government considered the SCNC an illegal organization and refused to register it as a political organization.

During the year the government continued to hold two individuals widely considered by human rights NGOs to be political prisoners because of irregularities in their trials and restricted access to counsel. Titus Edzoa, former minister of health and long-time aide to President Biya, and Michel Thierry Atangana, Edzoa's 1997 campaign manager, were arrested in 1997, three months after Edzoa resigned from government and launched his candidacy for president. They were convicted on charges of embezzling public funds and sentenced to 15 years in prison.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The constitution and law prohibit such actions; however, these rights were subject to the "higher interests of the state," and there were numerous, credible reports that police and gendarmes harassed citizens, conducted searches without warrants, and opened or seized mail with impunity. The government continued to keep some opposition activists and dissidents under surveillance. Police sometimes punished family members and neighbors of criminal suspects.

The law permits a police officer to enter a private home during daylight hours without a warrant if he is pursuing an inquiry and has reason to suspect that a crime has been committed. The officer must have a warrant to make such a search after dark; however, a police officer may enter a private home at any time in pursuit of a criminal observed committing a crime.

During the year police put the houses of SCNC officials and activists under surveillance, searched the houses of some SCNC leaders, and disrupted SCNC meetings in private residences (see section 3).

An administrative authority may authorize police to conduct neighborhood sweeps without warrants. Such sweeps at times involved forced entry into homes in search of suspected criminals or stolen or illegal goods. Security forces sometimes sealed off a neighborhood, systematically searched homes, arrested persons, sometimes arbitrarily, and seized suspicious or illegal articles.

In 2005 there were credible reports that security forces in Douala and Yaounde used such sweeps as a pretext to loot homes and arbitrarily arrest persons for minor offenses, such as not possessing identity cards. For example, in June 2005 the Douala police, accompanied by gendarmes and soldiers, conducted a sweep in the Douala neighborhoods of Bonakuamouang, Bessengue Valley, and Bessengue, and arrested approximately 100 individuals, mostly young men and women. Police held them in a Douala police station until their identity was established, a process that took 24 hours.

Citizens without ID cards were detained until their identity could be established and then released. Several complained of the police's arbitrary seizure (theft) of electronic devices and cell phones, and registered their complaints at the police station.

There continued to be accusations, particularly in the North and Far North provinces, that traditional chiefs arbitrarily evicted persons from their land.

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech and of the press, and while the government continued to restrict these rights in practice, media groups were vibrant and active.

The government sometimes invoked strong libel laws to silence criticism of the government and officials. Journalists, particularly broadcast journalists, often practiced self censorship as a result of real or expected government intimidation, harassment, and criminal penalties for speech-related offenses.

Individuals generally were able to criticize the government publicly and privately without being subjected to government reprisal, although the country's strict libel law resulted in self-censorship. However, the government prohibited discussion or advocacy of secession, which resulted in numerous arrests of SCNC members during the year (see section 3).

On May 12, the Yaounde administrative authorities pressured the Cameroon Episcopal Conference to cancel a press conference where it was to present its final report

for the 2004 presidential election. The Justice and Peace Committee, which organized the conference, finally cancelled it.

On September 1, the Sous-prefet of Yaounde I banned opposition leader Woungly Massaga's press conference on an electoral reform plan based on a project by the Catholic Church. The Sous-prefet asserted that Woungly Massaga could not hold the conference because he failed to demonstrate that the Catholic Church authorized him to endorse its project. A week later, the Sous-prefet of Yaounde III banned a press conference by Massaga in that locale on the same grounds.

On September 19, the Sous-prefet of Yaounde I banned a meeting that Nouveaux Droits de l'Homme, a democracy and human rights NGO, organized at the Chamber of Agriculture. Droits de l'Homme wanted to launch a "National Forum of Civil Society on Elections," to discuss electoral reform and the creation of an independent electoral body that would govern all elections. In his ban order, the Sous-prefet asserted that he did not understand the real purpose of the meeting.

The government published one of the country's few daily newspapers, the Cameroon Tribune. The newspaper did not report extensively on protests or political parties critical of the government, overtly criticize the ruling party, or portray government programs in an unfavorable light.

During the year approximately 200 privately owned newspapers were published; however, only an estimated 25 were published on a regular basis, primarily for lack of funding. Mutations, La Nouvelle Expression, and Le Messager were the only privately owned daily newspapers. Newspapers were distributed primarily in urban areas, and most continued to criticize the government and report on controversial issues, including corruption, human rights abuses, homosexuality, and economic policies. However, the government used criminal libel laws to inhibit the press by criminalizing the propagation of false information.

Despite the large number of private newspapers in the country, the influence of print media was minimal. Distribution was problematic outside of major towns, and prices of independent newspapers were high, due largely to high government taxes on newsprint.

In 2004 the government established a special fund to support the development of the press, particularly newspapers, and funds were disbursed to some private newspapers and radio stations. The government continued to disburse such funds during the year. According to media reports, funding was awarded very selectively, and some media outlets, such as Mutations and Radio Reine, refused to apply for funds. The government exerted control over some newspaper warehouses and seized editions of controversial newspaper editions prior to distribution or after they were released.

The government tightly controlled the broadcast media. Radio remained the most important medium reaching most citizens. There were approximately 20 privately owned radio stations operating in the country. Approximately 75 percent of private radio stations were concentrated in Yaounde and Douala. Ownership of the private radio stations was very diverse, with only one owner having more than one station. The state owned CRTV broadcast on both television and radio and was the only officially recognized and fully licensed broadcaster in the country. The government levied taxes on all registered taxpaying citizens to finance CRTV programming, which allowed CRTV a distinct advantage over independent broadcasters.

Nonprofit rural radio stations were required to submit an application to broadcast but were exempt from paying licensing fees. Potential commercial radio and television broadcasters must submit a licensing application and pay an application fee when the application is submitted. Once the license is issued, the stations must then pay an annual licensing fee, which can be expensive. Although the government had not issued new broadcast licenses in many years, companies operated without them.

During the year the National Communications Council (NCC), whose members were appointed by the president, continued to review all broadcasting license applications, the first step in issuing licenses. In addition a technical committee composed of government-appointed members--including government officials, journalists, and jurists-- continued to review the NCC's decisions.

There were no developments in the 2005 case of the closure of Lake Side Independent Radio for broadcasting without a license.

There were several low-power, rural community radio stations with extremely limited broadcast range that were funded by the UN Educational, Scientific, and Cultural Organization and foreign countries. The government prohibited these stations--which broadcast programs on education, health, the environment, and development to small audiences--from discussing politics.

The law permits broadcasting by foreign news services but requires them to partner with a national station. The BBC, Radio France International, and other foreign services broadcast in partnership with state-owned CRTV.

Television was less pervasive but more influential than print media. The five independent television stations largely avoided criticizing the government, although their news broadcasts sometimes focused on poverty, unemployment, poor education, and government neglect, and corruption which the broadcasts said had caused these problems.

Like the Cameroon Tribune, CRTV provided broad reporting of CPDM activities, while giving relatively little attention to the political opposition. During the year CRTV management continued to instruct staff repeatedly to ensure that government views prevailed at all times.

Security forces, usually acting under the command of local provincial government officials, reportedly continued to restrict press freedom by arresting, detaining, physically abusing, threatening, and otherwise harassing journalists.

On January 3, gendarmes from the Douala neighborhood of Bonaberi attacked Pius Njawe, a journalist and the publisher of Le Messager newspaper. Njawe was driving his car on the Wouri bridge in Douala when he witnessed a car accident. He stopped to take pictures, but the investigating gendarmes barred him from doing so. When Njawe insisted, the gendarmes beat and kicked him, finally pushing him back into his car. Njawe did not file a complaint against the gendarme officers.

On September 3, officers from the Yaounde military security agency (Semil) arrested and detained Duke Atangana Etotogo, publisher of the monthly L'Afrique Centrale, without a warrant and seized magazine copies that were on sale. Etotogo published a series of analytical reports on the armed forces and their leadership. The purpose of the arrest was to force him to reveal his sources. Semil released Etotogo after five days of intensive interrogation. Before his release on September 7, the military security agency demanded that Etotogo write a letter of apology to the president, who is the supreme chief of the armed forces, which he did.

According to the NGO Committee to Protect Journalists in April Eric Motomu, editor of The Chronicle, was beaten unconscious by the bodyguard and driver of opposition leader John Fru Ndi. Motomu said he was treated for head and chest injuries. Earlier, Motomu had been summoned by police in Bamenda in connection with a defamation case brought against him by Fru Ndi. However, Motomu was not formally charged.

On November 6, Sweet FM radio presenter Agnes Taile was attacked by three hooded intruders, who forced their way into Taile's home in Douala, dragged her outside, beat her, and tried to strangle her. She was hospitalized with multiple injuries. Authorities had not made any arrests by year's end.

There were no developments in the 2005 police beatings of journalists Philip Njaru and Innocent Yuh, who were hospitalized from their wounds. There were also no developments in the 2005 case of broadcasters Freedom FM and Radio Oku, which were both closed by government officials.

There were no reports that the government indirectly censored the media by controlling advertising revenues. Since the government was the largest advertiser in the country, however, and could choose which media outlets to pay to place advertising, it continued to have a certain degree of influence over media outlets.

The government prosecuted its critics in the print media through criminal libel laws. These laws authorize the government, at its discretion and the request of the plaintiff,

to criminalize a civil libel suit or to initiate a criminal libel suit in cases of alleged libel against the president and other high government officials; such crimes are punishable by prison terms and heavy fines. The libel law places the burden of proof on the defendant. Local leaders in particular abused this law to keep local reporters from reporting on corruption and abusive behavior. Various government members and senior government officials filed nine libel suits against journalists.

On March 3, a Yaounde court sentenced Jean-Pierre Amougou Belinga, publisher of the Yaounde-based weekly L'Anecdote, to four months in jail on defamation charges. In February Belinga published a list of alleged homosexuals, which included Gregoire Owona, a government member, who filed a libel suit. The court ruling found only that the publisher could not substantiate his claim. The court fined Belinga $2,000 (one million CFA francs) and ordered him to pay symbolic damages to the plaintiff and publish the ruling in several newspapers. Similar suits were filed by Owona and by Jean-Pierre Mayo, the general manager of the Yaounde-based National Social Insurance Fund hospital, against Biloa Ayissi, publisher of the Yaounde-based weekly Nouvelle Afrique. In the Owona case, the court sentenced Ayissi on March 24 to six months in jail for defamation, fined him $2,000 (one million CFA francs), ordered him to pay symbolic damages to the plaintiff and to publish the ruling in several newspapers and some electronic media. In the Mayo case, the court ordered Ayissi to pay $6,000 (three million CFA francs) in damages.

The other journalists whom courts convicted on defamation charges in private cases included Dieudonne Mveng, publisher of the weekly newspaper La Meteo, Socrate Dipanda, publisher of the weekly Le Constat, Peter William Mandio, publisher of the weekly Le Front, Henriette Ekwe, columnist with Le Front, and Georges Gilbert Baongla, publisher of the weekly Le Dementi. Most received suspended prison sentences. None of the journalists sentenced to prison terms were sent to prison.

There were no developments in the April 2005 defamation case against Guibai Gatema and Abdoulaye Oumate.

There were no developments in the 2005 libel case against Le Jeune Observateur publisher Jules Koum Koum.

There were no developments in the 2004 case of Eric Wirkwa Tayu, convicted of defamation.

In March 2005 the Union of Cameroonian Journalists created the Cameroon Media Council (CMC), an independent, self-regulating body of journalists aiming to promote press freedom, access to information, professionalism, and ethical reporting. The CMC, supported by the minister of communication, also had as part of its mission the goal of reviewing and disciplining media professionals and arbitrating complaints against journalists. Complaints included ethical breeches, such as the common practice for newspaper reporters and editors of accepting payments from politicians and businessmen to write articles containing unsubstantiated allegations against the opponents and competitors of their benefactors.

Internet Freedom

There were no reports that the government attempted to monitor the Internet. There were also no reports that the government restricted access to the Internet. The Internet was available and used by citizens, although access was limited by cost and slow connections.

Academic Freedom and Cultural Events

Although there were no legal restrictions on academic freedom, state security informants reportedly operated on university campuses. Professors said that participation in opposition political parties could adversely affect their professional opportunities and advancement. During the year strikes in the state universities of Yaounde I, Yaounde II, and Douala deteriorated and resulted in violent confrontations between students and security forces (see section 2.b.).

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law provides for freedom of assembly; however, the government restricted this right in practice.

The law requires organizers of public meetings, demonstrations, or processions to notify officials in advance but does not require prior government approval of public assemblies and does not authorize the government to suppress public assemblies that it has not approved in advance. However, officials routinely have asserted that the law implicitly authorized the government to grant or deny permission for public assembly. Consequently, the government often did not grant permits for assemblies organized by persons or groups critical of the government and repeatedly used force to suppress public assemblies for which it had not issued permits.

Security forces forcibly disrupted the demonstrations, meetings, and rallies of citizens, trade unions, and groups of political activists throughout the year.

On numerous occasions throughout the year, authorities refused to grant the SCNC, an unregistered political group the government deemed illegal because it advocated secession, permission to hold rallies and meetings, and security forces arrested and detained some activists (see section 3).

On March 9, Douala gendarmes disrupted a gathering of Manifeste Africain pour la Nouvelle Independence et la Democratie (MANIDEM), an opposition party, although the party claimed it had received tacit approval for the meeting from the competent administrative authority. Some benches were broken in the altercation, but MANIDEM resumed its meeting after the gendarmerie group commander intervened and called his subordinates to order.

Police forcibly dispersed student demonstrators during the year, which resulted in deaths and injuries. For example, on June 13, Yaounde police dispersed a gathering from the University of Yaounde II and arrested 50 students (see section 1.c.). The rector filed suits against some of the students.

On August 4, the Yaounde First Instance Court began hearings on the cases of four leaders of the Association for the Defense of Students' Interests (ADDEC)--Ibrahim Mohaman, Rodrigue Batogna, Messi Bela, and Tememou--in connection with charges of rebellion and disturbance of public order. The trial was ongoing at year's end.

On November 29, the Buea antiriot police shot and killed two students, Ufeanoi Ivo Abiandong and Bennett Moma Kenyufon, while dispersing a demonstration at the University of Buea. The students were protesting those admitted to the faculty of medicine because the protesters believed the minister of higher education had tampered with the names on the admission's list. An investigation was ongoing at year's end.

On December 21, Foumban gendarmes shot and killed Issah Njifouh, a night watchman, during a demonstration in Njinka Chiefdom in Foumban. The demonstrators were protesting the government's decision to replace Adamou Ndam Njoya, an opposition leader and traditional ruler of their chiefdom, with another person. An investigation was still ongoing at year's end.

The Yaounde First Instance Court sentenced students to prison terms during the year in connection with events that occurred in 2005.

On April 11, the Yaounde First Instance Court sentenced Thierry Okala Ebode, a leader of the ADDEC, to a suspended six month jail term (which could be imposed at any time over the next three years if arrested on similar charges) on charges of rebellion and disturbance of public order. In November 2005 ADDEC had organized a meeting on the campus of the University of Yaounde I to discuss issues that made students' lives difficult. The university rector reportedly called the gendarmes to break up the meeting. This resulted in clashes between the gendarmes and the students, of whom many were arrested. There were no developments in the 2005 killing of two University of Buea students by security forces.

There were no reports that security forces broke up or disrupted gatherings of the SDF during the year. However, administrative authorities banned marches and meetings that the SDF wanted to conduct in Douala and Limbe. For example, on July 4, the Sous-prefet of Douala I banned a march organized by the SDF to protest the pauperization of citizens. The Sous-prefet justified the ban by claiming the march might disturb public order. On October 13, the Sous-prefet of Limbe banned a meeting of the National Executive Committee of the SDF on the grounds that internal fighting might disrupt public order.

Freedom of Association

The law provides for freedom of association, but the government limited this right in practice.

The conditions for government recognition of a political party, a prerequisite for many political activities, precluded peaceful advocacy of secession. While more than 180 political parties, together with a large and growing number of civic associations, operated legally, the government continued to refuse to register the SCNC as a political party and harassed and arrested its leaders and members (see section 3).

c. Freedom of Religion

The law provides for freedom of religion and the government generally respected this right in practice; however, there were a few exceptions.

Religious groups must be approved and registered with the Ministry of Territorial Administration and Decentralization to function legally. Although there were no reports that the government refused to register any group, the process usually took several years, due primarily to administrative delays. The government did not register traditional religious groups on the grounds that the practice of traditional religion was a private concern observed by members of a particular ethnic or kinship group or the residents of a particular locality.

There were no further developments in the January 2004 arrest and detention of Michel Atanga Effa and Gervais Balla for the 2003 murder of a priest or in the May 2004 beating of Pastor Alombah Godlove by the traditional ruler of his village.

The practice of witchcraft is a criminal offense under the law; however, individuals generally were prosecuted for this offense only in conjunction with another offense, such as murder. Witchcraft traditionally has been a common explanation for diseases of unknown cause.

Societal Abuses and Discrimination

There were occasionally reports of discrimination in the northern provinces, particularly in rural areas, by Muslims against Christians and persons who practiced traditional indigenous religions. However, the overall amicable relationship among religious groups in society contributed to religious freedom.

The size of the Jewish community was very small, and there were no reports of anti-Semitic acts.

For a more detailed discussion, see the 2006 International Religious Freedom Report.

d. Freedom of Movement within the Country, Foreign Travel, Emigration, and Repatriation

The constitution and law provide for these rights; however, security forces routinely impeded domestic travel during the year.

Roadblocks and checkpoints manned by security forces proliferated in cities and on most highways, making road travel both time-consuming and costly. Extortion of small bribes was commonplace at these checkpoints. Police frequently stopped travelers to check identification documents, vehicle registrations, and tax receipts as security and immigration control measures. There were no reports that security forces killed individuals suspected of evading checkpoints. However, there were credible reports that police arrested and beat individuals who failed to carry their identification cards as required by law.

The law prohibits forced exile, and the government did not use it; however, some human rights monitors or political opponents who considered themselves threatened by the government left the country voluntarily and declared themselves to be in political exile.

In 2005 the government, the Nigerian High Commission to Cameroon, and the Office of the UN High Commissioner for Refugees (UNHCR) signed a tripartite agreement for the voluntary repatriation of 10,000 of the 17,000 Nigerian Fulani cattle breeders who fled their homes in 2001 to escape ethnic fighting. During the year a large number of Nigerians returned home.

Internally Displaced Persons (IDPs)

In March 2005 between 10,000 and 15,000 citizens in and around the Adamawa Province villages of Djohong and Ngaoui were displaced following attacks and looting by unidentified armed groups from the Central African Republic (CAR).

According to the Adamawa Province's governor, the groups targeted cattle herders of the M'bororo ethnic group, kidnapping them and demanding ransom due to the group's perceived wealth. The government reportedly sent troops in 2005 to restore order in the border area, and during the year a rapid intervention unit operated in the area.

During the year the government worked with the UNHCR to protect and assist IDPs.

Protection of Refugees

The law provides for the granting of asylum and refugee status in accordance with the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol, and the government has established a system of providing protection to refugees. In practice, the government provided protection against refoulement, the return of persons to a country where they feared persecution, and granted refugee status or asylum. In 2005 the National Assembly passed legislation that formally established the status of refugees, and the president signed it into law in July 2005.

The government also provided protection to certain individuals who may not qualify as refugees under the 1951 convention and its 1967 protocol. At year's end the UNHCR estimated that the country provided temporary protection to approximately 17,500 refugees, the majority of whom were Chadian and Nigerian, in addition to 5,300 asylum seekers, some of whom were economic refugees presenting themselves as political victims.

During the year, as a result of numerous attacks and kidnappings by unidentified armed groups in the CAR, approximately 20,000 members of the M'bororo ethnic group reportedly fled to the country, according to UN agencies and local human rights groups, bringing the total number of refugees to 35,083. In June the UNHCR reported that 20,383 M'bororos from CAR settled near the CAR border, with approximately 13,000 in the East Province and 7,000 in Adamoua. There were also 2,948 Nigerian refugees in Banyo (Adamaoua and Northwest provinces) and 11,752 urban refugees in Yaounde and Douala.

The government cooperated with the UNHCR and other humanitarian organizations in assisting refugees and asylum seekers. The government has been tolerant and understanding of CAR and Chadian citizens coming across the borders to flee their countries, facilitating their entry and providing assistance.

A special task force, including troops from the Economic and Monetary Community of Central Africa (comprised of Cameroon, Gabon, CAR, Equatorial Guinea, Congo Brazzaville, and Chad), regularly launched joint operations, with logistical support from the French army, against CAR and Chadian rebels.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law provides that citizens have the right to change their government peacefully; however, dominance of the political process by the president and his party and electoral intimidation, manipulation, and fraud limited the ability of citizens to exercise this right in past elections.

Elections and Political Participation

In October 2004 President Biya, who has controlled the government since 1982, was re-elected with approximately 70 percent of the vote in an election widely viewed as freer and fairer than previous elections, and in which opposition parties fielded candidates. However, the election was poorly managed and marred by irregularities, in particular in the voting registration process, but most international observers deemed that the irregularities did not prevent the elections from expressing the will of the voters.

Some observers said progress had been made and called the election transparent; others, such as the Commonwealth Observer Group, stated that the election lacked credibility. Some opposition parties alleged that there was multiple voting by individuals close to President Biya's party and massive vote rigging. One domestic group described the election as a masquerade. The 2002 legislative elections, which were dominated by the CPDM, largely reflected the will of the people; however, there were widespread irregularities.

In December the National Elections Observatory published its assessment of the 2004 elections; the assessment cited electoral weakness in voter registration and report collection, recommended that the observatory assume control of voter registration, and called for an increased responsibility for the observatory in organizing elections. The government also established an independent electoral commission.

Since 1991 only government bills proposed by the presidency have been enacted by the National Assembly. However, in March the National Assembly agreed to consider a private member's bill on the funding of political parties and electoral campaigns that an opposition party tabled at the session opening. This consideration followed another one that took place in 2004. Only parties with representatives in the National Assembly can submit bills for consideration. During its June 2005 session, the National Assembly refused to consider a bill on electoral reform tabled by the SDF, the leading parliamentary opposition party.

Members of the Beti ethnic group, including the Bulu subgroup to which the president belongs, figured prominently in the government, civil service, and management of state-owned businesses.

The president's control over the country's administrative apparatus was extensive. The president appoints all ministers, including the prime minister, and also directly appoints the governors of each of the 10 provinces. The president also has the power to appoint important lower level members of the 58 provincial administrative structures.

The right of citizens to choose their local governments remained circumscribed. The government increased greatly the number of municipalities run by presidentially appointed delegates, who have authority over elected mayors. Delegate-run cities included most of the provincial capitals and some division capitals in pro-opposition provinces; however, this practice was almost nonexistent in the southern provinces, which tended to support the ruling CPDM party. In municipalities with elected mayors, local autonomy was limited since elected local governments relied on the central government for most of their revenue and administrative personnel.

There were more than 180 registered political parties in the country. Fewer than 10, however, had significant levels of support, and only five had seats in the National Assembly. The ruling CPDM held an absolute majority in the National Assembly; opposition parties included the SDF, based in the anglophone provinces and some major cities. The largest of the opposition parties were the National Union for Democracy and Progress, the Cameroon Democratic Union, and the Union of the Peoples of Cameroon.

The government considered one unregistered anglophone political group, the SCNC, illegal, because it advocated secession from the country and authorities refused to register it as a political organization. During the year security forces preemptively arrested approximately 70 leaders, members, and supporters of the SCNC; such arrests were conducted to prevent persons from participating in political meetings.

On numerous occasions throughout the year, authorities refused to grant the SCNC permission to hold rallies and meetings. Security forces disrupted SCNC meetings, including in private residences, arresting SCNC activists and releasing them a couple of days later. For example, on April 27, gendarmes arrested 65 SCNC activists in Oku, in the Northwest Province, while they were holding a meeting in a private residence. They were not charged and were released four days later. On May 7, the Bamenda police broke up Hitler Mbinglo Humphrey's press conference in the Musang-Rendez-vous neighborhood, arresting Mbinglo Humphrey and three others. The police subsequently arrested 17 other activists who protested the arrest of their leaders. They were released after a brief detention.

In August SDF Chairman Fru Ndi was accused of being responsible for violence that resulted in the death (see section 1.a.).

On September 16, gendarmes from the Bamenda gendarmerie legion in the Northwest Province arrested five SCNC activists in their office: Fidelis Tchenkwo, Emmanuel Enu, Prescilla Khan, Elvis Bandzeka, and Cletus She. They were released after a brief detention. The SCNC claimed that the arrests were to prevent the activists from preparing and holding a meeting of the "Northern Zone."

On September 19, the Prefect of Mezam Division in the Northwest Province signed an order banning all public meetings, rallies, or gatherings of more than four persons and prohibiting access to electronic media for any SCNC official or sympathizer.

On October 1, security forces arrested and detained some activists in the Northwest and Southwest provinces for activities such as raising an SCNC flag in a public market place. They were released after a few days' detention.

On October 1, the Bamenda police blocked access to radio and television stations, put the houses of SCNC officials and activists under surveillance, and searched the houses of some SCNC leaders, including Chief Ayamba Ette, the SCNC chairman, Nfor Ngalla Nfor, the vice president, and Binlo Hitler, the president of the Northern Zone.

In advance of the annual celebration of Southern Cameroon "independence" on October 1, the government engaged in a campaign of closing down SCNC rallies and meetings.

There were no developments in the 2005 arrests of three SCNC members charged with disturbing the public order.

The government also continued to hold some SCNC activists in temporary detention pending trials.

Women held 18 of 180 seats in the National Assembly, six of 61 cabinet posts, and a few of the higher offices within the major political parties, including the ruling CPDM.

Many of the key members of the government were drawn from the president's Beti/Bulu ethnic group, as were disproportionately large numbers of military officers and CPDM officials. Pygmies were not represented in the National Assembly or the government.

Government Corruption and Transparency

Corruption remained a serious problem in all branches of government. The public perception was that judicial and administrative officials were open to bribes in almost all situations. According to a Transparency International survey published in December 2005, an average household paid $205 (113,000 CFA francs) each year in bribes, or more than 20 percent of the average person's annual income; the average annual income per person was approximately $800 (440,000 CFA francs).

According to Transparency International's 2006 Corruption Perceptions Index, corruption among the country's public officials was perceived by both resident and nonresident experts to be "rampant," which was the most severe assessment designation used by Transparency International.

Unlike in the previous year, international activists did not criticize the government's lack of transparency in managing revenues from an international oil pipeline.

During the year the government also took some steps to fight corruption. For example, on January 25, the government officially launched the activities of the National Agency for the Investigation of Financial Crimes (ANIF). Part of its mission is to fight money laundering, corruption-related enrichment, and the embezzlement of public funds.

On February 3, ANIF conducted a working session with the managers of the financial institutions to train them on effectively participating in the fight against corruption.

On March 11, the president signed a decree repealing the order that created the National Corruption Observatory and a decree creating the National Anticorruption Commission, which replaced the observatory. The commission is under the president's authority. Its leading mission was to monitor and evaluate the effective implementation of the government's anticorruption plan. It also gathered, centralized, and analyzed allegations and information regarding corrupt practices. Findings of the investigations conducted by the commission could lead to disciplinary or legal proceedings.

During the year the government sanctioned approximately 45 government employees and senior officials on corruption and embezzlement charges. Sanctions ranged from suspensions to dismissals.

On April 6, the National Assembly passed legislation requiring senior state administrators and managers to declare their assets after their appointment and again when they leave office.

On October 5, the National Assembly lifted the parliamentary immunity of Edouard Etonde Ekoto, the former board chairman of the Douala Port Authority, and Andre Boto'o a Ngon, the former board chairman of the Cameroon Real Estate Corporation, in connection with the high profile arrests of Ndong, Belinga, and Edou. Prosecutors interrogated them and while they were formally charged with embezzling public funds, Ekoto and Ngon were not arrested. Interrogations continued at year's end.

There were publicized prosecutions of government officials accused of corruption during the year.

The government began legal proceedings against the general managers of three government-owned corporations and some of their close collaborators. On February 21, police arrested Emmanuel Ondo Ndong, general manager of FEICOM, the financial institution that funds councils; Gilles Roger Belinga, the general manager of the Cameroon Real Estate Corporation; and Joseph Edou, the general manager of Credit Foncier, a real estate funding company. In connection with these cases, the prosecutor ordered the arrest and detention of 52 persons who were already under pretrial detention. The trials, which began in December, were still ongoing at year's end.

On February 24, Minister of Energy and Water Resources Alphonse Siyan Siwe was arrested, and dismissed from his job, on corruption charges stemming from his tenure as the director of the Douala Port before he joined the government in December 2004. The investigation was still ongoing at year's end.

On May 23, the prosecutor of Mbalmayo (Center Province) ordered the arrest and detention of Dieudonne Zang Mba Obele, for embezzlement of public funds. Hearings were held in June and Obele was ultimately released for lack of evidence.

There were no developments in the 2005 government corruption case in which three postal service officers were accused of embezzling $2 million (101 million CFA francs) in public funds in 2002.

In March 2005 the government installed a new computer program to detect fraud by government employees and to better control the number of its civil servants and employees. By year's end the system revealed at least 3,000 "ghost" employees who did not exist or who were fraudulently drawing salaries. From the end of 2005 to March, the government sanctioned scores of fraudulent employees.

In June and August 2005, the government hired 22 potential candidates for the Audit Bench of the Supreme Court. In August 2005 the candidates started a two-month training program at the National School of Administration and Magistracy. In December 2005 the president appointed them Audit Bench Magistrates and they became fully active during the year.

There were no laws providing citizens with access to government information, and in practice such access was difficult to obtain. Most government documents, such as statistics, letters exchanged between various administrations, draft legislation, and investigation reports, were not available to the public or the media.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing findings on human rights cases; however, government officials repeatedly impeded the effectiveness of local human rights NGOs during the year by harassing members of human rights groups, limiting access to prisoners, refusing to share information, and threatening and using violence against personnel. Philip Njaru, a human rights activist and executive director of the Kumba-based Friends of the Press Network, a human rights organization in Southwest Province, reported that police continued to harass him throughout the year.

Access to prisons by international NGOs reportedly improved during the year (see section 1.c.).

The activities of virtually all of these groups were limited by a shortage of funds and trained personnel. Observers criticized the country's NGO laws for giving the government the power to deny NGOs authorization to operate and to eliminate them by decree.

Numerous domestic human rights NGOs operated in the country, including, among others, the National League for Human Rights, the Organization for Human Rights and Freedoms, the Association of Women against Violence, the Movement for the Defense of Human Rights and Freedoms, and the Cameroonian Association of Female Jurists.

Unlike in the previous year, there were no reports that the government arrested NGO members.

In September 2005 Amnesty International released a report, Contracting Out of Human Rights: The Chad-Cameroon Pipeline Project, that criticized the government for placing financial interests above the concerns of citizens. Citing claims that the 2003 construction of an oil pipeline running from Douba in southern Chad to the port city of Kribi in the southwest of the country had damaged the livelihoods of fishermen, Amnesty International called on the government to offer recourse to the fishermen and to amend the agreements with oil companies to safeguard human rights. The government continued to work with the conglomerate running the pipeline to identify communities affected by the pipeline and to offer remuneration and other self-help projects.

The government cooperated with international governmental organizations and permitted visits by UN representatives and other organizations such as the ICRC.

The NCHRF, instituted in the 1990s, has the authority to summon witnesses and publish reports and the findings of its investigations. In July 2005 the president signed the implementing decree for a law passed by the National Assembly in 2004 that expanded the powers of the NCHRF and authorized it to summon witnesses and publish reports and investigative findings. It also created a permanent secretariat and a division in charge of the protection and promotion of human rights and freedoms. While the NCHRF remained hampered by a shortage of funds, during the year it conducted a number of investigations into human rights abuses, visited prisons, and organized several human rights seminars aimed at judicial officials, security personnel, and other government officers. Although the commission infrequently criticized the government's human rights abuses publicly, its staff intervened with government officials in specific cases of human rights abuses by security forces, attempted to stop "Friday arrests" (see section 1.d.), and sought to obtain medical attention for jailed suspects in specific cases. In September the president signed a decree appointing members to the commission and dismissing all incumbents but the chairman. The incumbents were appointed 15 years ago.

In February 2005 the government created a division of human rights in the Ministry of Justice to investigate and report on all cases of human rights abuses in the areas under the ministry's responsibility, including prisons, jails, and courtrooms.

During the year the government published its own human rights report, which included a complete list of all the legal rights and protections afforded to citizens.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law does not explicitly forbid discrimination based on race, language, or social status, but does prohibit discrimination based on gender and mandates that "everyone has equal rights and obligations." The government, however, did not enforce these provisions effectively. Violence and discrimination against women, trafficking in persons, discrimination against ethnic minorities, and discrimination against homosexuals were problems.

Women

Domestic violence against women was common. While there were no reliable statistics, a large number of newspaper reports indicated that the problem was widespread. The law does not specifically prohibit domestic violence. While assault is prohibited and is punishable by prison terms and fines, the government did not effectively enforce it in cases of assault on women. Women's rights advocates asserted that the law does not impose effective penalties against men who commit acts of domestic violence. There are no gender-specific assault laws, even though women were the predominant victims of domestic violence. Spousal abuse is not a legal ground for divorce. In cases of sexual assault, a victim's family or village often imposed direct, summary punishment on the suspected perpetrator through extralegal means, ranging from destruction of property to beating. During the year there were no reports of any convictions or of any action by the government to combat domestic violence.

The law prohibits rape; although rape occurred, police and the courts rarely investigated and prosecuted rape cases, which resulted in some convictions during the year. Official and private media regularly covered rape cases handled by the courts. During the year newspapers covered nine high profile rape cases which resulted in the arrest and detention of the perpetrators, whose pending trials were ongoing. In 2005 a couple of newspapers released special issues on the problem of rape, which was becoming acute, particularly in Douala and Yaounde. According to one of the reports, the Douala Courts heard approximately 40 cases per month.

The law does not prohibit female genital mutilation (FGM), and FGM was not practiced widely; however, it continued to be practiced in isolated areas in three of the 10 provinces, including some areas of Far North, Eastern, and Southwest provinces.

Internal migration contributed to the spread of FGM to different parts of the country. The majority of FGM procedures were clitorectomies. The severest form of FGM, infibulation, was performed in the Kajifu region of the Southwest Province. FGM usually was practiced on infants and preadolescent girls. Public health centers in areas where FGM is frequently practiced counseled women about the harmful consequences of FGM; however, the government did not prosecute any persons charged with performing FGM. The Association of Women Against Violence continued to conduct a program in Maroua to assist victims of FGM and their families and to educate local populations.

During the year breast ironing emerged as another form of violence against women, practiced in an effort to protect prematurely well-developed young girls from predatory older men. NGOs were leading public awareness campaigns to combat this practice.

While the law prohibits prostitution, it was tolerated. Prostitution was practiced predominantly in urban areas and places frequented by tourists. Trafficking for the purposes of commercial sexual exploitation occurred (see section 5, Trafficking).

There were no developments in the 2005 case of a foreign pharmaceutical company that had conducted a clinical study of a drug intended to prevent the spread of HIV/AIDS among 400 female prostitutes, none of whom had HIV at the beginning of the trial. Local and international NGOs criticized the company and the Ministry of Health for lack of transparency and negligence, asserting that the government and the company did not sufficiently inform the prostitutes of the risks involved with taking part in the trials. In response to the allegations of misconduct, the Ministry of Health suspended the clinical tests in 2005, citing "dysfunctions" and saying that "certain corrective measures" needed to be taken by the research team. The minister also set up an independent inquiry, which reported that although allegations about safety made by certain NGOs were not true, new procedures needed to be instituted to ensure more regular reporting and study site accreditation before the trials could resume.

While the law prohibits sexual harassment, very few cases were reported or prosecuted during the year. The government did not conduct any public education campaigns on the subject and there were no statistics available on its occurrence.

Despite constitutional provisions recognizing women's rights, women did not enjoy the same rights and privileges as men. Some points of civil law were prejudicial to women.

The law allows a husband to oppose his wife's right to work in a separate profession if the protest is made in the interest of the household and the family; a husband may also end his wife's commercial activity by notifying the clerk of the commerce tribunal of his opposition based upon the family's interest. Partly for this reason, some employers required a husband's permission before hiring female employees.

Customary law is far more discriminatory against women, since in many regions a woman traditionally was regarded as the property of her husband. Because of the importance attached to customs and traditions, civil laws protecting women often are not respected. In the customary law of some ethnic groups, husbands not only maintain complete control over family property, but also can divorce their wives in a traditional court without being required to provide either verifiable justification or alimony. Polygamy is permitted by law and tradition. In cases of divorce, the husband's wishes determine the custody of children over the age of six. While a man may be convicted of adultery only if the sexual act takes place in his home, a woman may be convicted without respect to venue.

Traditional law normally governs the extent to which a woman may inherit from her husband in the absence of a will, and traditions varied from group to group. In many traditional societies, customs grant greater authority and benefit to male heirs than to female heirs. Women were also forced to marry and in some regions parents could, and did, give girls away in marriage without the bride's consent. Often the husband, who could be many years older than his bride, paid his wife's parents a "bride price." Once a price had been paid, the girl was considered the husband's property. When a married man died, his widow often was unable to collect any inheritance, since she herself was considered part of the man's property. Often the widow was forced to marry one of the deceased husband's brothers. If she refused, she had to repay the bride price in full and leave the family compound. In the northern provinces, some Lamibe reportedly prevented their wives and concubines from leaving the palace. The lack of a national legal code covering such family issues often left women defenseless against these male-oriented customs.

In 2004 religious leaders, including Catholics, Protestants, and Muslims, launched a nationwide program to fight violence against women.

Children

During the year the government made some efforts to protect children's rights and welfare, including participation in seminars on children's rights.

The law provides for a child's right to education, and schooling was mandatory through the age of 14 and free in public primary schools. Since parents had to pay uniform and book fees for primary school, and because tuition and other fees for secondary education remained costly, education was largely unaffordable for many children. The government took measures during the year to improve access to schools, such as the construction of new classrooms, recruitment of new teachers, and provision of water fountains.

According to 2005 government statistics, 72.2 percent of girls between the ages of six and 14 were enrolled in school, compared to 81.3 percent of boys in the same age group. According to the UN Children's Fund (UNICEF), the secondary school enrollment ratio (gross) was 36 percent for boys and 29 percent for girls. The low education rate continued to be attributed to socio-cultural prejudices, early marriage, sexual harassment, unwanted pregnancy, and domestic chores.

A 2004 government study found there is a large gap between the capacity of the schools and the number of potential students. According to the study, preschools served only 16 percent of the potential student population. Within the school system, the northern provinces were the most underprivileged, with only 5.7 percent of all teachers working in the Adamawa, North, and Extreme North provinces combined. The study showed that elementary schools only had enough seats for 1.8 million students, although 2.9 million attended school.

The government provided limited and basic medical care through local clinics and hospitals as well as through a limited number of school doctors. Boys and girls had equal access to state-provided medical care.

The exact extent of familial child abuse was not known, although children's rights organizations targeted the problem. Newspaper reports often cited children as victims of kidnapping, mutilation, and even infanticide. There were several credible stories of mothers (usually young, unemployed, and unmarried) abandoning their newborns in streets, garbage cans, and pit toilets.

FGM was performed primarily on young girls (see section 5, Women).

While the minimum legal age for a woman to marry is 15, many families facilitated the marriage of young girls by the age of 12. Early marriage was prevalent in the northern provinces of Adamawa and North, but was particularly characteristic of the remote Far North Province, where many women as young as 13 faced severe health risks from pregnancies. There were no statistics on the prevalence of child marriage. Anecdotal evidence indicates that some parents might have promised a female baby to an older male in order to begin receiving dowry payments.

There were reports of child prostitution and trafficking in children during the year (see section 5, Trafficking).

Child labor remained a problem (see section 6.d.).

Although exact numbers were unavailable, the country had a significant number of displaced or street children, most of whom resided in urban areas such as Yaounde and Douala.

On July 24, the Douala gendarmerie legion deported approximately 30 street children from the Akwa neighborhood to a suburb 18 miles from the city. The gendarmes' operation followed a series of aggravated thefts, allegedly perpetrated by the street children. The children were reportedly left along the road because there was no facility to harbor them, and they subsequently returned to Douala by their own means.

Trafficking in Persons

The law does not specifically prohibit trafficking in persons, but the law does prohibit slavery, prostitution, forced labor, and other crimes related to trafficking in persons and establishes minimum age requirements for workers. Trafficking remained a problem. Courts prosecuted traffickers using various provisions of the Penal Code that address related crimes. The country was a source, transit, and destination point for internationally trafficked persons; trafficking also occurred within the country. The Anti-Child Trafficking law, drafted by the government in cooperation with the International Labor Organization (ILO), took effect in December 2005.

The law provides that any person who engages in crimes often associated with trafficking in persons shall be punished by prison terms of between six months and 20 years.

The Ministry of Labor, Employment, and Social Insurance was primarily responsible for fighting trafficking; however, the ministry was severely underfunded. It was believed that authorities prosecuted several trafficking cases during the year, but actual rates were difficult to determine since traffickers could be prosecuted under various sections of the penal code; there was no system for tracking outcomes.

In February 2005 a Yaounde court sentenced an individual named Nkodo to three years in jail and ordered her to pay damages of $2,000 (one million CFA francs) to her victim, a 19-year-old girl who worked for her as a prostitute.

In May 2005 gendarmes in Yaounde dismantled a prostitution ring which exploited young boys. The boys were lured into the ring with promises of being hired by prestigious soccer clubs in a foreign country. Police arrested three of the organization's five members, who were in detention and awaiting trial at year's end; the other two were still in hiding. The boys were returned home.

In May 2005 police arrested three members of a homosexual and pedophile network of child traffickers. The three were formally charged and put under detention in the Yaounde central prison pending trial.

In June 2005 police arrested three individuals, including a local woman and two Gabonese men, in the South Province close to the Gabonese border. The three individuals were arrested while trying to smuggle two 13-year-old girls, who were kidnapped in the Boyo Division of the Northwest Province, into Gabon. The three were put under detention pending trial. During the investigation, South Province police officials said it was the third time that they had arrested traffickers at the country's borders with Gabon and Equatorial Guinea.

The government continued to fight trafficking through the use of an interagency committee and a program to find and return trafficked children. In addition the government cooperated with Gabon, Nigeria, Togo, and Benin in fighting trafficking through the exchange of information and preparation of common legislation on trafficking. In 2005 the ILO and some local NGOs briefed parliamentarians on the problem of trafficking in persons.

Women and children traditionally have faced the greatest risk of trafficking and have been trafficked most often for the purposes of sexual exploitation and forced labor. Most trafficking in children occurred within the country's borders, while most trafficked women were transported out of the country. According to anecdotal evidence from the NCHRF, women often were "hired" into hubs of prostitution, often in Europe. The method for trafficking women usually involved a marriage proposition by a foreign businessman. The woman was inducted into servitude upon arrival at a foreign destination. Girls were internally trafficked from the Adamawa, North, Far North, and Northwest provinces to Douala and Yaounde to work as domestic servants, street vendors, or prostitutes. Children were also internally trafficked to work on cocoa bean plantations. There have been credible reports of slavery, especially in some chiefdoms in the North Province (see section 6.c.). For example, there were reports that the Lamido (the traditional Muslim chief) of Rey Bouba in the Northern Province held slaves inside his compound. Although he was replaced by his son in 2004, there was no indication that the slaves were released.

According to a 2005 study by the International Circle for the Promotion of Creation and the Cameroon Society for Prevention of Child Abuse and Neglect, of 722 young girls between nine and 20 years old interviewed in the cities of Yaounde, Douala, Bamenda, and Bafoussam, 291 were the victims of sexual exploitation.

There were no reports of radio advertisements offering to take adolescent girls between the ages of 10 and 17 to Yaounde and Douala for domestic labor; however, there continued to be flyer advertisements.

A 2000 ILO study conducted in Yaounde, Douala, and Bamenda, reported that trafficking accounted for 84 percent of child laborers in those three cities. Local NGOs believed this statistic was still accurate. In most cases, intermediaries presented themselves as businessmen, approaching parents with large families or custodians of orphans and promising to assist the child with education or professional training. The intermediary paid parents an average of $12 (6,000 CFA francs) before transporting the child to a city where the intermediary would subject the child to forced labor with little remuneration. In four out of 10 cases, the child was a foreigner transported to the country for labor. The report also indicated that the country was a transit country for regional traffickers, who transported children between Nigeria, Benin, Niger, Chad, Togo, the Republic of the Congo, and the CAR for indentured or domestic servitude, farm labor, and sexual exploitation. Citizens also were trafficked to South Africa.

During the year the ILO and the government continued to support an awareness campaign to eradicate child trafficking in airports. Special antitrafficking embarkation and disembarkation cards continued to be designed and distributed. The cards explained the dangers of trafficking and how to recognize the phenomenon.

The government continued to work with local and international NGOs to provide temporary shelter and assistance to victims of trafficking. In August 2005 a local NGO graduated 70 trafficking victims from its rehabilitation and reintegration program. The Catholic Relief Service worked to combat corruption in local schools that led to child prostitution. UNICEF was also actively engaged in combating girls' prostitution throughout the year.

Persons with Disabilities

The law provides certain rights to persons with disabilities, including access to public institutions, medical treatment, and education, and the government was obliged to bear part of the educational expense of persons with disabilities, to employ them where possible, and to provide them with public assistance when necessary. On August 2, the minister of secondary education and the minister of social affairs signed an order that made access to public secondary education free for persons with disabilities and children born of poor parents with disabilities. There were few facilities for persons with disabilities and little public assistance; lack of facilities and care for persons with mental disabilities was particularly acute. Society largely tended to treat those with disabilities as outcasts, and many felt that providing assistance was the responsibility of churches or foreign NGOs. The law does not mandate special access provisions to private buildings and facilities for persons with disabilities.

National/Racial/Ethnic Minorities

The population consists of more than 200 ethnic groups, among which there were frequent and credible allegations of discrimination. Ethnic groups commonly gave preferential treatment to fellow ethnic group members in business and social practices. Members of the president's Beti/Bulu ethnic group from southern parts of the country held key positions and were disproportionately represented in government, state-owned businesses, the security forces, and the ruling CPDM party.

There were no developments in the 2005 M'Bororo case against Alhadji Baba Ahmadou Danpullo. Since 1986 the M'Bororo have claimed that Danpullo kidnapped M'Bororo women, forcibly displaced the M'Bororo and seized their land and cattle, and used his money and influence with the government to order the beating and false imprisonment of members of the M'Bororo.

Northern areas of the country continued to suffer from ethnic tensions between the Fulani (or Peuhl) and the Kirdi. The Kirdi remained socially, educationally, and economically disadvantaged relative to the Fulani in the three northern provinces. Traditional Fulani rulers, called Lamibe, continued to wield great power over their subjects, often including Kirdi, sometimes subjecting them to tribute and forced labor. Isolated cases of slavery were reported, largely Fulani enslavement of Kirdi.

Natives of the Northwest and Southwest provinces tended to support the opposition party SDF and consequently suffered disproportionately from human rights abuses committed by the government and its security forces. The anglophone community was underrepresented in the public sector. Although citizens in certain francophone areas--the East, Far North, North, and Adamawa provinces--voiced similar complaints about under-representation and government neglect, anglophones said they generally believed that they had not received a fair share of public sector goods and services within their two provinces. Some residents of the anglophone region sought greater freedom, equality of opportunity, and better government by regaining regional autonomy rather than through national political reform and have formed several quasi-political organizations in pursuit of their goals.

Police and gendarmes subjected illegal immigrants from Nigeria and Chad to harsh treatment and imprisonment and often targeted Nigerian and Chadian communities when seeking to identify illegal immigrants. During raids, members of the security forces extorted money from those who did not have regular residence permits or those who did not have valid receipts for store merchandise. Some members of the country's large community of Nigerian immigrants complained of discrimination and abuse by government officials. Authorities repeatedly announced crackdowns on undocumented Nigerian immigrants, and illegal immigrants were subject to harassment on some occasions, although at a lower level than in previous years.

Indigenous People

Approximately 50,000 to 100,000 Baka, Bakola, and Bagyeli (Pygmies) primarily reside (and were the earliest known inhabitants) in the forested areas of the South and East provinces. While no legal discrimination exists, other groups often treated the Baka as inferior and sometimes subjected them to unfair and exploitative labor practices. Baka reportedly continued to complain that the forests they inhabit were being logged without fair compensation. Some observers believed that sustained logging was destroying the Baka's unique, forest-oriented belief system, forcing them to adapt their traditional social and economic systems to a more rigid modern society similar to their Bantu neighbors.

Local Baka along the path of the Chad-Cameroon pipeline continued to complain that they were not compensated fairly for their land. Others alleged that they had been cheated of their compensation by persons posing as Baka representatives. On June 22, the committee in charge of the follow-up on the pipeline organized an evaluation seminar to determine compensation for the Bakola and Bagyeli. The committee agreed that despite improved access to education and healthcare, much remained to be done to improve living conditions for the pygmies.

An estimated 95 percent of Baka did not have national identity cards; most Baka could not afford to provide the necessary documentation to obtain national identity cards,

which were required to vote in national elections. In 2004 Plan International and another NGO launched a program to educate Bakas about their political rights, which included the construction of a communal radio in the region of Abong-Mbang (Upper Nyong Division, East Province).

In August 2005 the Ministry of Social Affairs launched the Project to Support the Economic and Social Development of Bakas in South Province. The mission of the three-year project was to allow the issuance of birth certificates and national identity cards to 2,300 Bakas, as well as to help register hundreds of students in school.

Other Societal Abuses and Discrimination

Homosexual activity is illegal, with a possible prison sentence of six months to five years and a possible fine ranging from approximately $40 to $400 (20,000 to 200,000 CFA francs). While prosecution under this law was rare, homosexuals suffered from harassment and extortion by law enforcement officials. In addition, false allegations of homosexuality were used to harass enemies or to extort money.

There were new developments in the May 2005 arrest of 17 suspected homosexuals; five of whom were released shortly after their arrest for lack of evidence. On June 12, the Yaounde First Instance Court found the remaining men guilty of sodomy and sentenced them to 10 months in jail, although they were subsequently released for time served.

In June the administration of the Douala-based Eyengue Nkongo College, a private high school, expelled 34 students (including 12 females), alleging they were homosexuals. One female student was arrested upon her expulsion. One woman who lived near the school and two former schoolmates were also arrested. On July 7, the Douala First Instance Court released them after giving them a suspended three-year prison term and a fine of $50 (25,000 CFA francs) on homosexuality charges.

Section 6 Worker Rights

a. The Right of Association

The law allows workers to form and join trade unions. However, the government imposed numerous restrictions. The law does not permit the creation of a union that includes both public and private sector workers, or the creation of a union that includes different, even closely related, sectors.

The law requires that unions register with the government, permitting groups of no less than 20 workers to organize a union by submitting a constitution, internal regulations, and nonconviction certifications for each founding member. The law provides for prison sentences and fines for workers who form a union and carry out union activities without registration. Government officials said that the government provided union certification within one month of application. However, independent unions, especially in the public sector, have found it difficult to register.

Registered unions were subject to government interference. The government chose the unions with which it would bargain; some independent unions accused the government of creating small nonrepresentative unions amenable to government positions and with which it could "negotiate" more easily. Some sections of labor law have no force or effect because the presidency had not issued implementing decrees.

In January and February 2005, the Ministry of Labor, with the assistance of experts from the ILO, held discussions with all trade unions in an effort to put in place a system for tracking and recognizing unions that would meet international criteria. The initial focus of this effort was on determining the actual, paid membership of each union to determine the size and importance of each group.

In 2005 the government restricted the civil rights of union leaders. For example, in 2005, police arrested and detained Alain Marcellin Mibo (for one hour), the leader of the Primary Education Teachers Association. For several weeks Mibo and his colleagues had been holding sit-ins in front of the prime minister's office to demand that they be given full-time civil servant status, instead of the part-time or temporary status they were employed under.

The constitution and law prohibit antiunion discrimination and employers guilty of such discrimination were subject to fines of up to approximately $2,000 (one million CFA francs). However, employers found guilty were not required to compensate the workers for discrimination or to reinstate fired workers. The Ministry of Labor did not report any complaints of antiunion discrimination during the year, although there were credible press reports of union leader harassment.

b. The Right to Organize and Bargain Collectively

The constitution and law provide for collective bargaining between workers and management as well as between labor federations and business associations in each sector of the economy. Two formal collective bargaining negotiations took place during the year, one with truck drivers and one in the tourism sector, including hotels, bars, restaurants, and night clubs.

There were no developments in the 2005 media sector collective bargaining dispute.

When labor disputes arose, the government chose the labor union with which it would negotiate, selectively excluding some labor representatives. Once agreements were negotiated, there was no mechanism to enforce implementation; some agreements between the government and labor unions were ignored by the government.

There were no developments in the May 2005 case involving workers from AES-Sonel who, through the Confederation of Free Cameroon Trade Unions, sought to annul a March 2005 collective bargaining agreement.

The Labor Code explicitly recognizes workers' right to strike but only after mandatory arbitration, and workers exercised this right during the year. Arbitration decisions are legally binding, but often unenforceable because the parties refuse to cooperate. It is not uncommon for such decisions to be overturned or simply ignored by the government or employers. The provision of the law allowing persons to strike does not apply to civil servants, employees of the penitentiary system, or workers responsible for national security. Instead of strikes, civil servants were required to negotiate grievances directly with the minister of the appropriate department in addition to the minister of labor.

In June there were five separate strikes, although some of them were related.

There were no developments in the 2004 case involving workers from the National Agency for Support to Forestry Development.

c. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit forced or compulsory labor; however, there were reports that such practices occurred. Authorities continued to allow prison inmates to be contracted out to private employers or used as communal labor for municipal public works. Money generated from these activities was usually pocketed by prison administrators and not given to detainees.

The ILO confirmed that there was an increase during the year in serious trafficking issues, and slavery situations have been identified in the northern provinces (see section 5). NGOs and religious associations reported that children were kidnapped, sold, or "lent" by their parents to individuals claiming to look after their interests and sent to Yaounde or Douala to work in child beggar networks and, in some cases, prostitution rings. Some children were sent to neighboring countries to work. These

victims were generally of both sexes and between the ages of six and 14 years old. According to a local human rights monitor the majority of parents implicated in this practice were naive, thinking only of the money to be earned and failing to imagine the conditions in to which their children would be placed.

In the South and East provinces, some Baka, including children, continued to be subjected to unfair and exploitative labor practices by landowners, including work on the landowners' farms during harvest seasons without payment (see section 5).

The government expressly prohibits forced and compulsory labor by children, but these practices occurred (see sections 5 and 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The law generally protects children from exploitation in the workplace and specifies penalties ranging from fines to imprisonment for infringement; however, child labor remained a problem. The government specifically prohibits forced and compulsory labor by children, but there were reports that it occurred in practice.

The law sets a minimum age of 14 for child employment, which is inconsistent with the age for completing educational requirements (see section 5).

The law also bans night work and enumerates tasks that children under the age of 18 cannot legally perform. These included moving heavy objects, dangerous and unhealthy tasks, working in confined areas, and prostitution. The law also states that a child's workday cannot exceed eight hours. Employers were required to train children between the ages of 14 and 18, and work contracts must contain a training provision for minors. The prohibition against night work was not effectively enforced.

Information on child labor was difficult to obtain. However, according to a 2000 study by the ILO and Ministry of Labor, child labor existed chiefly in urban areas and in the informal sector such as street vending, car washing, agricultural work, and domestic service. Many urban street vendors were less than 14 years of age. An increasing number of children worked as household help, and some children were involved in prostitution. In the north there were credible reports that children from needy homes were placed with other families to do household work for pay. In the nation's major cities of Yaounde, Douala, and Bamenda, the ILO estimated that 40 percent of employed children were girls, of whom 7 percent were less than 12 years of age, and 60 percent had dropped out of primary school.

Parents viewed child labor as both a tradition and a rite of passage. Relatives often employed rural youth, especially girls, as domestic helpers, and these jobs seldom allowed time for the children to attend school. In rural areas, many children began work at an early age on family farms. The cocoa industry also employed child laborers. According to estimates, up to 8,000 underaged children (between the ages of five and 17) were working in the cocoa industry at year's end. These children originated, for the most part, from the Northern and Northwestern provinces.

In March 2005 the ILO presented the preliminary draft of the ILO West Africa Cocoa/Agriculture Program to eliminate child labor. The program was started in the country in 2003 and ended in April. The program met its goal by removing approximately 1,300 children from hazardous work and forced labor conditions in the cocoa sector by March. Lack of additional funding for the program, however, raised concerns about what will happen to these rescued children.

The Ministry of Social Affairs and the Ministry of Labor were responsible for enforcing existing child labor laws through site inspections of registered businesses; however, the government did not allocate sufficient resources to support an effective inspection program. Moreover, the legal prohibitions do not include family chores, which in many instances were beyond a child's capacity. In 2005 the government employed 58 general labor inspectors to investigate child labor cases.

During the year foreign government officials visited the Cameroon Development Cooperation's (CDC) Del Monte banana and rubber plantations. They found children as young as six and seven working in the Tiko banana plantation, carrying heavy banana bunches on their heads, carting water to the fields, working around the nurseries, or harvesting rubber from the trees. Officials denied that children under 21 were hired on the plantation. Foreign observers, having met with both CDC and Del Monte officials, were satisfied that the companies neither recruited nor condoned child labor (and had systems in place to prevent this), and that the children observed at the Tiko project were primarily "free lancers," village children delivering water or collecting discarded bananas. There were fewer controls at the rubber plantation, where officials admitted that children often collected rubber in the mornings and evenings, mostly to help their family members working on the plantation.

The ILO continued to work with specific contact persons in various ministries and agencies involved in antitrafficking activities; it also conducted nationwide investigations and cooperated with local organizations.

e. Acceptable Conditions of Work

The minimum wage was approximately $47 (23,514 CFA francs) per month and was applicable in all sectors. The minimum wage did not provide for a decent standard of living for an average worker and family. The Ministry of Labor was responsible for enforcing the minimum wage nationally.

The law establishes a standard workweek of 40 hours in public and private nonagricultural firms and 48 hours in agricultural and related activities. There are exceptions for guards and firemen (56 hours a week), service sector staff (45 hours a week), and household and restaurant staff (54 hours a week). The law mandates at least 24 consecutive hours of weekly rest. Premium pay for overtime ranges from 120 to 150 percent of the hourly pay depending on amount and whether it is for weekend or late-night overtime. There is a prohibition on excessive compulsory service. Ministry of Labor inspectors were responsible for monitoring these standards; however, they lacked the resources for a comprehensive inspection program.

The government sets health and safety standards. Ministry of Labor inspectors and occupational health physicians were responsible for monitoring these standards; however, they lacked the resources for a comprehensive inspection program. The law does not provide workers with the right to remove themselves from situations that endanger health or safety without jeopardizing their continued employment.

🔼 BACK TO TOP

AppsTech
APPLICATION TECHNOLOGIES, INC

December 21, 2006

**His Excellency Niels Marquardt
Ambassador, Republics of Cameroon and Equatorial Guinea
Embassy of the United States of America
Yaounde, Cameroon**

**Re:** Judicial Corruption in Cameroon

Mr. Ambassador,

As I shared with you this summer, we received evidence of judicial corruption in our case against MTN. Despite our fears of the repercussions in reporting this information to Cameroon authorities, we notified the police (Renseignements Généraux), providing them specific details of the evidence we had; we subsequently met with Ama Muna, Secretary of State at the Ministry of Commerce who passed on the information to the Prime Minister. I met with the Prime Minister for more than an hour over the issue in October 2006.

A couple weeks ago, we also met with Mr. Fouman Akame, Legal Adviser to the President. He asked us to meet urgently with the Vice-Prime Minister, Minister of Justice. Unfortunately, we have not been able to get an appointment.

We had hoped, given the strength of the information we provided and the commitment we received from Cameroon government authorities, that something would be done, even symbolically. You can well imagine our surprise when the judicial nominations were announced yesterday and the magistrates involved in the MTN matter were kept in place. These same magistrates obviously knew that nothing would happen to them since they recently blatantly violated the law in preventing the execution of a second judgment in our favor, even though the decision being enforced was final, not subject to appeal.

We are a small company and every one of these legal matters has very serious repercussions. Trying to do business ethically in an environment where honesty is tantamount to stupidity is hard enough. Trying to do business with the highest legal authorities as enemies is simply suicide.

Between 2002 and 2003, AppsTech invested over US$4 million in Cameroon to establish our presence here and carry out the MTN project. These are funds that came directly out of our US operations. Much more has been spent trying to recover from the damage done to our business by MTN and the Cameroon legal system. We cannot sit back while our rights are repeatedly trampled upon.

Other than a couple mild letters to our US Congressman and to the Millennium Challenge Corporation, we have been careful not to launch an outright campaign against the Cameroon government. This despite the advice of our US lawyers who encouraged us to file a claim for denial of justice with the International Center for Settlement of Investment Disputes (ICSID) under the Bilateral Investment Treaty (BIT) agreement signed by Cameroon and the United States.

PLAINTIFF'S
EXHIBIT
8 B

■ ■ ■

Today, with no resolution or even reaction from government authorities and continued abuses of the judicial system, we are prepared to speak out against the Cameroon government, especially in US investment and political circles, and potentially file the proceedings against Cameroon with the ICSID.

I built my reputation in the US as an entrepreneur encouraging others to invest in Africa, and in Cameroon in particular. As ironic as it is that today I would be the one to discourage such investments, I would hate to see others go through what I have been through.

Mr. Ambassador, you have been such tremendous support for us throughout our ordeals that I felt that I ought to let you know of our intentions.

Thanks once more for all your assistance. I will make sure to keep you informed of our activities.

Respectfully,

Rebecca Enonchong
Chief Executive Officer
AppsTech Group


**Cameroon Local Contact:**
AppsTech Cameroon
1389 Boulevard de la Liberté
BP 15412 Akwa
Douala, Cameroon
342-5266
342-5295 (fax)
renonchong@appstech.com

**Maître NKANA J.Jules**
Avocat au Barreau du Cameroun

B.P. 7001 Yaoundé                                    Tél. (B) : (237)223.42.65
B.P. 176 Eséka                                       Eséka : (237) 228.64.58
                                                     Mobile : (237)953.76.75

November 20, 2006

Via Fax: +1-202-775-7477

Mr. Phil Musolino
Musolino & Dessel
1615 L Street, NW Suite 440
Washington, DC 20036

Our Reference: In the Matter of

        Atlantic Group SCI and MBI Group, Inc.

        Vs

        Credit Foncier du Camroun
        And
        Camille Ekindi, Director General
        Credit Foncier du Cameroun
        And
        The Ministry of Finance
        Republic of Cameroon

Dear Mr. Musolino:

It is our understanding that your firm represents Atlantic Group SCI (a Cameroonian company), and MBI Group, Inc. (an American company), with respect to their ongoing dispute with Credit Foncier du Cameroun and the other named parties, in connection with CFC's illegal stoppage of the 1,034 affordable housing unit project development at Olembe, Yaounde, as well as the two other affordable housing projects in Yaounde and Douala.

In our professional opinion, specifically based on the current legal environment in Cameroon, as well as the significance and sensitivities of the underlying issues regarding CFC's motives for the illegal stoppage of the housing projects, as well as additional sensitive matters that may be (and probably will be) raised in litigation, it is our opinion

Cabinet situé au carrefour de la Pharmacie de l'Intendance
N° contribuable :

PLAINTIFF'S
EXHIBIT
8c

that Atlantic Group SCI and MBI Group, Inc. would not, and will not have a fair hearing in the Cameroonian court/legal system. This is evidenced by CPC's and the Cameroonian Government's treatment of Atlantic Group SCI and MBI Group, Inc. (and their principals) so far.

We recommend therefore, that Atlantic Group SCI and MBI Group, Inc. pursue legal action in United States Courts, particularly since, from the history of the case, they have established jurisdiction in the United States.

If you have any questions or require additional information, please do not hesitate to contact mo.

Respectfully,

jules J. Nkana
Attorney at Law
NKANA LAW

# YAO EMMANUEL

## AVOCAT A LA COUR
BARREAU DE COTE D'IVOIRE

---

*Abidjan, le 02 Novembre  2007*

*N/Réf :* EY/FO/Dos Inst
*V/Réf :*

*Affaire : Roger TCHOUFA*
         *C/*
         *CAMEROON*

**Maitre Yao Emmanuel's Declaration.**

I declare under the penalty of perjury under the law of the United States of America that the statements in my declaration are true.

On April 29, 2007 the police at Abidjan International Airport, Ivory Coast detained Mr. Roger Tchoufa born on November 27, 1961 at Melong, Cameroon as he was waiting to board his plane bound to the United States of America. Police officers who detained him told him they were executing an arrest warrant issued by the Cameroonian authority, Mr. Tchoufa was then taken to local Criminal Police Head office in Abidjan.

That same evening, Interpol National office informed the Cameroonian authority of his arrest but the Cameroonian authority suggested to the police in Ivory Coast that Mr. Tchoufa be sneaked to Cameroon Embassy in Abidjan, Ivory Coast and they will do the rest. That request was turned down by the Interpol police on the ground that the law of the country does not allow that kind of dealing and that anyone in Ivory Coast is allowed due process under the law.

On May 03, 2007 Mr. Tchoufa Roger was sent from the police to the Prosecutor Attorney office that then signed his detention warrant and he was sent to jail while waiting for Cameroonian to react on the news of his arrest. After three weeks of detention the court decided that because the Cameroonian Government did not file for an extradition request or a claim of some kind for them to even look at the case, it would be unlawful to detain someone for more than three weeks without plaintiff, and on May 23, 2007 Mr. Tchoufa was released on probation.

*Even after his released Mr. Tchoufa stayed in Ivory Coast till June 03, 2007 carrying on his business. That alone was an indication that Cameroon realized that their arrest warrant was bogus. If you are looking for a so call "criminal" on the run and you are told the person of interest to you is around the corner from your house I believe the next best thing to do would be to go for him. No one showed up or filed anything against Mr. Tchoufa until he left Ivory Coast a month after his arrest.*

The trip from Cameroon to Ivory Coast is two and half hour by plane, and they are daily flight from Douala to Abidjan, Cameroonian authority knew that their claims and arrest warrant would not stand the court challenge in Ivory Coast and they were hoping to work out some kind of a deal with the police, that didn't work. Cameroon Government claim that Mr. Tchoufa is a fugitive would never stand in any court outside Cameroon. The address that is on Mr. Tchoufa arrest warrant is Mr. Tchoufa's address in United States of America which mean that the Cameroonian authority know where Mr. Tchoufa resides but yet they don't go after him in America because they know they would be scrutinized on their bogus claim.

Résidence ATTA - TOUR A - RDC - Face Stade U. B

**PLAINTIFF'S EXHIBIT**
8 D

CONTINUE FROM PREVIOUS PAGE 001

... A third clause they know how they would be scrutinized on their bogus claim.

**Résidence ATTA – TOUR A – RDC – Face Stade H. B.**
**01 BP 6714 ABIDJAN 01 – Tél : 20 324 244 / 20 324 210 – Téléfax : 20 324 210**
Email : yaoemmanuel @ aviso.CI

1

In a nutshell, baseless arrest warrant was issued for Mr. Tchoufa, and in Ivory Coast Human Right is the foundation of our court system unlike other part of the continent.

**Me YAO EMMANUEL**
Avocat à la Cour
01 B.P. 6714 Abidjan 01
Tél. 20.32.42.44/20.32.42.10

CONTINUE FROM PREVIOUS PAGE

**Résidence ATTA – TOUR A - RDC - Face Stade H. B.**
**01 BP 6714 ABIDJAN 01 - Tél : 20 324 244 / 20 324 210 - Téléfax : 20 324 210**
Email : yaoemmanuel @ aviso.CI

2

In a nutshell, baseless arrest warrant was issued for Mr. Tchoufa, and In Ivory Coast Human Right Is the foundation of our court system unlike other part of the continent.

**Me YAO EMMANUEL**
Avocat à la Cour
01 B.P. 6714 Abidjan 01
Tél. 20.32.42.44/20.32.42.10

Résidence ATTA ~ TOUR A - RDC - Face Stade H. B.
01 BP 6714 ABIDJAN 01  - Tél : 20 324 244 / 20 324 210  - Téléfax : 20 324 210
Emall : yaoemmanuel @ aviso.CI

2

MINUTES OF OBSERVATION

The year two thousand and seven
And the twenty five of the month of October

Acting upon request from MAC ARTHUR & BAKER INTERNATIONAL GROUP INC
(M.B.I GROUP INC ) 7002 WISCONSIN, Avenue Suite 702 BETHESDA, M 208 14,
USA, the building company ATLANTIC GROUP (SCI A.G.)m headquarters in Douala
Cameroon; P.O.Box 12560 Douala, Subsidiary of M.B.I. Group INC with counsel
NKANA J. Jules, advocate in the Cameroon Bar Council, P.O. Box 7001, Tel. : 99-53-
76-75;

WHO CAME TO MY OFFICE AND EXPLAINED TO ME:
That within the framework of the case against the plaintiffs to Credit Foncier du
Cameroun and the State of Cameroon, proceedings pending in the United States
(DISTRICT OF COLUMBIA);

That he required me to go to the Secretariat of State for Defence (SED) to interrogate Mr
EDOU Joseph, former General Manager of Credit Foncier du Cameroun currently under
detention there, and to establish a true and fair account of my firm for the safeguard of
the rights and interests of my client.

IN RESPONSE TO THIS REQUISITION

I, NGOUFACK Samuel, bailiff, at the 20th charge of the court of appeal of the Centre
and the courts, with residence at Tsinga, former "Les Dauphins" clinic building, next to
"GUINNESS" depot; P.O.Box 7001 Yaounde; tel.: 330-140-25; email.: **etude-maitre-
ngoufack@yahoo.fr**, undersigned;

I immediately in the company of the applicant went to Melen Centre where I realised:



PLAINTIFF'S
EXHIBIT
8 E

The Secretariat of State for Defence is located in the heart of the aforementioned quarter, more precisely in front of the First Region Gendarmerie of the Centre province.

At the gate of the detention centre, after the usual formalities, I gave reasons for our presence there; the army officers on duty were categorically opposed to Mr EDOU Joseph being interviewed or to make any declaration whatsoever.

And I went back to draft the present minutes of observation from 12h30 to 15h to serve whatever purpose deemed necessary, and whose cost stands at: Fifty thousand francs CFA.

```
E:       4.000
T:       2.000
VACC:    4.200
C:       400
TVA:     886
Frac :   37.814
Pap :    300
Tr :     400
         _____
TOTAL    50.000
```

(sgd) Ngoufack Samuel



TRANSLATION SERVICE DE TRADUCTION
ILOT LINGUISTIC CENTRE LINGUISTIQUE ÉCOLE
P.O. BOX /BP.7239 YAOUNDE-CAMEROUN
TEL.(237)222.13.74/58.31/58.29

True to the original presented to us