# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MBI Group, Inc., and<br>Atlantic Group, SCI, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | **1:07-cv-00637-JDB** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Crédit Foncier du Cameroun, and** | ) | |
| **The Government of the Republic of** | ) | |
| **Cameroon,** | ) | |
| | ) | |
| *Defendants.* | | |

## DEFENDANTS' REPLY IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFFS' COMLAINT

Knox Bemis
Dewey & LeBoeuf LLP
1101 New York Avenue N.W.
Suite 1100
Washington, D.C.  20005-4213
Telephone: (202) 986-8000
Direct:  (202) 986-8035
Facsimile:  (202) 956-8230
*Counsel for Defendants*

January 7, 2008

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... iii

SUMMARY OF POSITION......................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT.................................................................................................................. 7

I.     The Court Has No Subject Matter Jurisdiction over Plaintiffs' Lawsuit. ........................... 7

    A.    The Commercial Activity Exception of 28 U.S.C. § 1605(a)(2) Does Not Apply to Any Act of either CFC or the Government of Cameroon......................... 7

        1.    There Was No Act of CFC or the Government in the United States upon Which Plaintiffs' Claim Could Be Based............................................. 7

            a.    The Alleged May 18, 2004 "Memorandum of Agreement" Was Not an Act of CFC or the Government of Cameroon in the United States for Purposes of Section 1605 (a)(2)..................... 7

                i.    Plaintiffs do not dispute that Joseph Edou lacked authority, and that his execution of the alleged agreement was not an act of CFC or the Government........................................................................................ 7

                ii.    There was no act of CFC or the Government in the United States by ratification.................................................. 8

                iii.    None of the other alleged activities in Cameroon constitute acts that fall within either of the first two branches of § 1605(a)(2). .................................................... 11

            b.    There Was No Other Act of CFC or the Government in the United States That Is a Basis for § 1605(a)(2) Jurisdiction. .......... 12

        2.    No act of CFC or the Government in Cameroon upon which Plaintiffs claims are based had a direct effect in the United States. .......... 12

    B.    Plaintiffs Allege No Facts that Could Provide a Basis for Subject Matter Jurisdiction over the Government of Cameroon. ................................................... 14

## TABLE OF CONTENTS
(continued)

**Page**

II.    The Court Lacks Personal Jurisdiction over CFC.............................................................15

III.   The Doctrine of Forum Non Conveniens Requires Dismissal of this Action in Favor of the Courts of Cameroon. ....................................................................................16

       A.     The Courts of Cameroon Represent an Adequate Alternative Forum. ..................16

       B.     The Relevant Private Interests Favor the Courts of Cameroon. ...........................20

       C.     The Public Interests Strongly Favor the Courts of Cameroon................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

\*_American Telecom Co. v. Republic of Lebanon,_
    501 F.3d 534 (6th Cir. 2007) ........................................................................13

\*_Antares Aircraft, LPV Federal Republic of Nigeria,_
    999 F.2d 33 (2d Cir. 1993)............................................................................13

_Burger King v. Rudzewicz,_
    471 U.S. 462 (1985)......................................................................................16

_Cabrini v. Assasie-Gyimah,_
    921 F.Supp. 1189 .........................................................................................20

\*_Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,_
    212 F.Supp.2d 30 (D.D.C. 2002) ...............................................2, 21, 23, 24, 25

_Doe v. State of Israel,_
    400 F.Supp.2d 86 (D.D.C. 2005)..................................................................13

\*_El-Fadl v. Central Bank of Jordan,_
    75 F.3d 668 (1996) .......................................................................................17

_FC Investment Group LC v Lichtenstein,_
    441 F.Supp.2d 3 (D.D.C. 2006) ...................................................................21

_Helicopteros Nationales de Columbia, S.A. v. Hall,_
    466 U.S. 408 (1984)......................................................................................16

_International Shoe Co. v. Washington,_
    326 U.S. 310 (1945)......................................................................................15

_Iragorri v. Int'l Elevator, Inc.,_
    203 F.3d 8 (1st Cir. 2000).............................................................................20

\*_Irwin v. World Wildlife Fund, Inc.,_
    448 F.Supp.2d 29 (D.D.C. 2006) .................................................................17

_M/S Bremen v. Zapata Off-Shore Co.,_
    407 U.S. 1 (1972).........................................................................................24

\*_Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,_
    901 F.2d 1124 (D.C. Cir. 1990) ...................................................................10

_Orient Mineral Co. v. Bank of China,_
    506 F.3d 980 (10th Cir. 2007) .......................................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    244 F.Supp.2d 289 (S.D.N.Y. 2003).................................................................20

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
    246 F.Supp.2d 273 (S.D.N.Y. 2003)...................................................................9

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993).........................................................................................12

*TMR Energy Limited v. State Property Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) .........................................................................15

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000)...................................................................14, 16

*Verlinden B.V. v. Central Bank of Nigeria*,
    461 U.S. 480 (1983).........................................................................................13

**Statutes**

28 U.S.C. § 1404(a) ...............................................................................................21

*28 U.S.C. § 1605(a)(2)...............................................................................*passim*

Fed. R. Civ. P. 44.1.................................................................................................24

**Miscellaneous**

Kofele-Kale, *Asserting Permanent Sovereignty over Ancestral Lands: The
    Bakweri Land Litigation against Cameroon*,
    13 Ann. Surv. Int'l & Comp. L. (2007) ...........................................................17

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**SUMMARY OF POSITION**

Based on the law and the evidence the parties have submitted, Plaintiffs' Complaint must be dismissed because no alleged act of either of the Defendants – Crédit Foncier du Cameroun ("CFC") or the Government of the Republic of Cameroon (the "Government") – falls within any of the three branches of 28 U.S.C. § 1605(a)(2) of the Foreign Sovereign Immunities Act ("FSIA"). [1] Plaintiffs' action is not based on any act of CFC or the Government in the United States, and no complained-of act in Cameroon had a direct effect in the United States. Plaintiffs fail to produce evidence that CFC ratified the unauthorized execution of a contract by its General Manager in the United States, and in any event such ratification would not constitute an act of CFC in the United States for purposes of Section 1605(a)(2). Because §1605(a)(2) is the only basis upon which Plaintiffs claim subject matter jurisdiction, Defendants retain their sovereign immunity and the lawsuit must be dismissed.

Such dismissal is required on the evidence already submitted by the parties. The argument in support of dismissal on this ground is set out in Argument I.A below, as well as in Defendants' original memorandum in support of its motion to dismiss, in Arguments I.A and I.C. [2]

---

[1]  Section 1605(a)(2) provides an exception to sovereign immunity in any case –

in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

(Bracketed numbers supplied to identify the three branches of the exception.)

[2]  Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Complaint, filed September 26, 2007 (herein "Memorandum" or "Mem."), 10-11, 12-18.

Defendants also show that in any event none of the acts of CFC that Plaintiffs contend support dismissal are attributable to the Government (Mem. 11-12 and Argument I.B below) and that this Court lacks personal jurisdiction over CFC (Mem. 18-20 and Argument II below). However, neither of these grounds is necessary for dismissal because, for the reasons stated above, none of Plaintiffs' claims qualifies for the § 1605(a)(2) exception in any event.

Even if this Court had subject matter jurisdiction, the lawsuit should be dismissed on the doctrine of *forum non conveniens*.[3]  The courts of Cameroon represent an adequate alternative forum, and both the private and public interest factors strongly favor litigation in Cameroon. This is a dispute about an alleged Cameroon real estate development project and activities that occurred almost entirely in Cameroon.  The dispute is governed by the law of Cameroon (a Civil Law jurisdiction), and contracts Plaintiffs have submitted provide for the exclusive jurisdiction of the courts of Cameroon.  The witnesses would be mostly from Cameroon and are for the most part native speakers of French rather than English.  The interest of Cameroon in the proceeding is substantial while that of the United States is minimal.  The argument for *forum non conveniens* dismissal is set out in Argument III below and at Mem. 20-29.

## STATEMENT OF FACTS

Plaintiffs' Opposition[4] contains an extensive list of allegations, most of which are not relevant to the issues before this Court on Defendants' motion.  However, Plaintiffs do not

---

[3]  Of course, because the Complaint must be dismissed for lack of jurisdiction under § 1605(a)(2), the doctrine of *forum non conveniens* is not necessary to support dismissal.  However, because the reasons for the application of the doctrine are clear, it furnishes an alternative ground for dismissal. See *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F.Supp.2d 30, 37 (D.D.C. 2002).

[4]  Plaintiffs' Memorandum of Points and Authorities in Opposition to Motion of Defendants Crédit Foncier du Cameroun and the Government of the Republic of Cameroon to Dismiss the Complaint, filed November 5, 2007 (herein "Opposition" or "Opp.").

attempt to refute the basic facts that support Defendants' motion to dismiss for lack of subject matter jurisdiction under the FSIA. Plaintiffs do not deny that:

1.  Joseph Edou as General Manager of CFC did not have the authority to execute the May 18, 2004 "Memorandum of Agreement" on behalf of CFC. An undertaking of this magnitude required the authorization of the CFC Board of Directors.

2.  Joseph Edou did not have apparent authority to execute the May 18, 2004 "Memorandum of Agreement." A businessman with even a basic acquaintance with funding by government-owned corporations such as CFC could not have reasonably believed that the general manager could authorize a commitment of the magnitude of $49 million.

3.  On March 24, 2004 – prior to the alleged May 18, 2004 "Memorandum of Agreement" – Plaintiffs permitted The Falls, a Cameroon corporation owned in the name of Joseph Edou's brother-in-law, to acquire for the equivalent of only $1,800 a 45% ownership interest in Atlantic, the project developer and one of the Plaintiffs herein. Joseph Edou purported to execute the alleged May 18, 2004 "Memorandum of Agreement" on behalf of CFC, but at the same time Joseph Edou's brother-in-law (or Joseph Edou himself) owned 45% of the developer with which CFC was purportedly contracting.

Plaintiffs' position is that Joseph Edou's lack of authority was cured because the CFC Board of Directors ratified the May 18, 2004 "Memorandum of Agreement" by Resolution 5-09 that the Board adopted on August 18, 2005. Opp. 24-25. However, there was no such

ratification, and the evidence presented by Plaintiffs in support of their Opposition shows none.[5] Neither Resolution 5-09 itself nor any document Plaintiffs have produced shows that Resolution 5-09 was intended to address the May 18, 2004 "Memorandum of Agreement." Moreover, on August 18, 2005, the Board was not even aware of the existence of the May 18, 2004 "Memorandum of Agreement." The document was never disclosed to the Board. Second Declaration of Henri Mekongo Mbala ("Mekongo 2d Decl.") (appended to this Reply) ¶¶ 6-7; Declaration of Ndoua Ndzana Remy ("Remy Decl.") (appended to this Reply) ¶¶ 3-4.

In addition, the Board was not aware that 45% of the ownership of the developer, Atlantic, was held in the name of Joseph Edou's brother-in-law. Mekongo 2d Decl. ¶ 9-10; Remy Decl. ¶ 5. The Board would have been ratifying a contract between Joseph Edou, ostensibly representing CFC, and a corporation 45% owned by Joseph Edou's brother-in-law (or by Joseph Edou himself), and hence presenting the virtual certainty of self-dealing.[6]

Plaintiffs make a number of allegations about activities Plaintiffs claim to have undertaken in Cameroon in furtherance of the project. Opp. 13-17, 18-20. These allegations are not relevant to the issue of jurisdiction under the FSIA because they did not take place in the United States, nor did they have any direct effect in the United States. The allegations relate almost entirely to the alleged dealings of Atlantic and Roger Tchoufa with Joseph Edou and Mr.

---

[5]  Moreover, as a matter of law, ratification outside the United States would not constitute an act of CFC within the United States so as to support jurisdiction under 28 U.S.C. § 1605(a)(2). See Argument I.A.1.a.ii below. Plaintiffs' ratification theory fails on both the law and the facts.

[6]  Plaintiffs' only attempt to address the issue of the ownership of Atlantic is a footnote (Opp. 10, n.6) in which Plaintiffs assert that the interest of Joseph Edou's brother in law "was a matter of public record and public knowledge." However, Plaintiffs provide no support for this assertion. Neither the Board nor others at CFC were aware that Atlantic was 45% owned by a company, The Falls, that was held in the name of Joseph Edou's brother-in-law. Mekongo 2d Decl. ¶ 10; Remy Decl. ¶ 5. There is no evidence of any effective notification of his ownership. Indeed, only three days after The Falls was formed, Joseph Edou's brother-in-law transferred full authority to act on behalf of the The Falls to Koh Koh, a person who carried out the directives of Joseph Edou. See Mem. 4-5 and the evidence there cited. One obvious purpose of such an arrangement was to permit acts to be taken on behalf of The Falls without disclosing the true nature of the ownership of the company.

Booto a Ngon, who was at that time Chairman of the Board at CFC.[7]  Mr. Booto a Ngon was dismissed as Chairman on September 13, 2005, the same day Joseph Edou was dismissed as General Manager, and was indicted along with Joseph Edou for misusing his position at CFC for personal gain. Mekongo 2d Decl. ¶ 5. Like Joseph Edou, Mr. Booto a Ngon had no authority to act for CFC in a matter such as the execution of the May 18, 2004 "Memorandum of Agreement." As Chairman, Mr. Booto a Ngon had only one vote as a board member and no authority to act for the Board. Mekongo 2d Decl. ¶¶ 3-4.

Thus, Plaintiffs assert that "a representative of CFC witnessed the Yaounde Phase I FIDIC Contract" between Atlantic and Group Five in the CFC offices on January 28, 2005. Opp. 14. However, a copy of the January 28, 2005 FIDIC Contract is an unnumbered exhibit to Plaintiffs' Maryland Complaint.[8]  It shows Joseph Edou simply witnessed Roger Tchoufa's signature. CFC is not purported to be a party to the alleged contract. No CFC officials other than Joseph Edou and Mr. Booto a Ngon are indicated to have been aware of the signing.

Similarly, Plaintiffs attempt to make much of the July 23, 2005 public ceremony at which, they assert, "CFC handed over to Plaintiffs and to Group Five 102 hectares of land" for what Plaintiffs call the "Yaoundé Phase I Project." Opp. 15. However, this is not correct. The July 23, 2005 ceremony was to observe the transfer of a tract of land (70 hectares) by MAETUR, a Cameroon Government agency, to CFC. No land was ever transferred to Atlantic or Group Five. Mekongo 2d Decl. ¶ 8.

Plaintiffs also allege CFC made payments to Atlantic on April 1, June 16, and August 29, 2005. (Opp. 15, 18) However, there is no evidence that any of the payments were made

---

[7]    In Defendants' Memorandum and supporting documents, Defendants did not address Mr. Booto a Ngon's role because Plaintiffs made no mention of him in their Complaint.

[8]    See Mem. 1 n.1.

"pursuant to the May 2004 Agreement," as Plaintiffs assert. *Id.* Indeed, if the payments were linked to any agreements, it was the Conventions de Financement submitted by Plaintiffs that state they were executed in Cameroon (again solely by Joseph Edou purportedly on behalf of CFC) on March 29, 2005, two days before the April 1, 2005 payment, and on August 19, 2005, ten days before the August 29, 2005 payment. The March 29, 2005 Convention de Financement[9] purported to provide (in Article 6) for a "pre-financing" advance to Atlantic of 2,446,250,000 FCFA, equivalent to approximately US$4,892,500. The US$4,007,083 payment (Opp. 15) came on April 1, 2005, two days after the alleged execution of the Convention de Financement. This amount together with the US$254,709 payment on June 16, 2005, was within but closely related to the amount of the advance specified in the March 29, 2005 Convention de Financement. Similarly, the August 19, 2005 Convention de Financement[10] purported to provide (in Article 6) for "advance financing" of 982,643,069 FCFA, equivalent to approximately US$1,965,286. The alleged US$1,637,738 advance that was made ten days later was again within but closely related to the amount specified in the Convention de Financement.

Plaintiffs also allege that Roger Tchoufa was solicited for bribes by CFC officials. Opp. 19-22. Defendants reject these allegations, which are supported only by Roger Tchoufa's assertions. The allegations are not relevant to the issues raised in Defendants' motion to dismiss. Moreover, Roger Tchoufa has no credibility to accuse other persons of bribery. The uncontradicted record shows that Mr. Tchoufa permitted 45% of Atlantic, the property developer, to be acquired for only $1,800 by The Falls, a corporation owned nominally by

---

[9]   The March 29, 2005 Convention de Financement was attached as an unnumbered exhibit to Plaintiffs' Maryland Complaint. *See* Mem. 1 n. 1.  A copy, together with a translation, is also attached to Defendants' Memorandum.

[10]  The August 19, 2005 Convention de Financement was also attached as an unnumbered exhibit to Plaintiffs' Maryland Complaint.

Joseph Edou's brother-in-law, and most likely by Joseph Edou himself. *See* Mem. 5-6 and the evidence cited therein. Later, on September 13, 2005, at Mr. Tchoufa's direction, Atlantic paid the equivalent of US$192,000 for a residential property that was deeded to The Falls. *See* Mem. 8-9 and the evidence cited therein. Mr. Tchoufa's allegations that he righteously rejected demands for bribes are entitled to no credence at all.

## ARGUMENT

**I.    The Court Has No Subject Matter Jurisdiction over Plaintiffs' Lawsuit.**

**A.    The Commercial Activity Exception of 28 U.S.C. § 1605(a)(2) Does Not Apply to Any Act of either CFC or the Government of Cameroon.**

Plaintiffs' Complaint must be dismissed because there is no act of either CFC or the Government of Cameroon that falls within the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2).[11]   As Defendants showed (Mem. 10-11), and as Plaintiffs do not dispute, Defendants retain their sovereign immunity and the Court has no subject matter jurisdiction unless Plaintiffs' action is based upon one of the three branches of this exception.

**1.    There Was No Act of CFC or the Government in the United States upon Which Plaintiffs' Claim Could Be Based.**

**a.    The Alleged May 18, 2004 "Memorandum of Agreement" Was Not an Act of CFC or the Government of Cameroon in the United States for Purposes of Section 1605 (a)(2).**

**i.    Plaintiffs do not dispute that Joseph Edou lacked authority, and that his execution of the alleged agreement was not an act of CFC or the Government.**

The only alleged act in the United States that any of Plaintiffs' claims could be based upon is the alleged execution of the May 18, 2004 "Memorandum of Agreement" by Joseph Edou, then general manager of CFC. However, Defendants showed (Mem. 13-17) that when the

---

[11]    The text of § 1605(a)(2) is set out at n.1 above.

act of an agent of a foreign state is beyond the scope of his authority, the unauthorized act does not constitute the act of the foreign state for purposes of § 1605(a)(2).  Plaintiffs do not dispute this principle.  *See* Opp. 23-27.

Defendants also showed that Mr. Edou as General Manager did not have the authority to execute an agreement such as the alleged May 18, 2004 "Memorandum of Agreement".  *See* Mem. 7-8 and supporting documents cited therein.  Plaintiffs do not dispute the fact that Mr. Edou lacked the authority to execute the alleged contract.  *See* Opp. 23-27.  Plaintiffs allege that Mr. Edou was accompanied by Mr. Booto a Ngon, then Chairman of the Board of CFC, and that Mr. Booto a Ngon "directed" Mr. Edou to sign the agreement.  *E.g.*, Opp. 26.  However, Mr. Booto a Ngon did not possess the authority to execute the alleged contract himself or to direct Mr. Edou to execute it.  Mekongo 2d Decl. ¶¶ 3-4.  Indeed, Plaintiffs do not contend that he had such authority.  Only the CFC Board could authorize the execution of such a contract, and the Board had voted no such authorization.  Mr. Booto a Ngon, as chairman, was a member of the Board, but as such, he had only one vote.  He had no power to act for the Board.  *Id.*

Thus, the execution of the alleged May 18, 2005 "Memorandum of Agreement" was not authorized and accordingly was not an act of either CFC or the Government for purposes of § 1605(a)(2). [12]

### ii.     There was no act of CFC or the Government in the United States by ratification.

Plaintiffs base their argument for the application of § 1605(a)(2) not on the contention that Mr. Edou (or Mr. Booto a Ngon) was authorized to execute the document.  Instead, they

---

[12]   Of course, even if the execution of the alleged "Memorandum of Agreement" had constituted an act of CFC in the United States, FSIA jurisdiction would exist only for claims based upon that contract. Under § 1605(a)(2), jurisdiction applies only to an action "based upon" the act defined in the section. *See Orient Mineral Co. v. Bank of China*, 506 F.3d 980, 996, 1000-1001 (10th Cir. 2007) (FSIA jurisdiction held to apply solely to claims based upon the one act that had a direct effect in the United States and not to claims based upon related transactions).

argue that the "Memorandum of Agreement" was ratified by the CFC Board on August 18, 2005. Opp. 24-25. Plaintiffs' argument fails for two different reasons.

First, the alleged ratification occurred in Cameroon, not in the United States. The only relevant act that occurred in the United States was Mr. Edou's unauthorized execution of the document, which by itself was not an act of CFC. The only relevant act of CFC, the alleged ratification, occurred in Cameroon. The only act *of CFC* upon which Plaintiffs' claim is based, i.e. the alleged ratification, did not occur in the United States. Thus, even if CFC had ratified the alleged May 18, 2004 "Memorandum of Agreement", which it did not, there would have still been no act of CFC in the United States upon which Plaintiffs' action is based.[13]

Second, Plaintiffs' argument fails because CFC never ratified the May 18, 2004 "Memorandum of Agreement." Indeed, the CFC Board of Directors did not know of the existence of the "Memorandum of Agreement" on August 18, 2005, when Plaintiffs' allege they ratified it. Mekongo 2d Decl. ¶¶ 6-7; Remy Decl. ¶¶ 3-4.

There is no support for Plaintiffs' assertion (Opp. 25) that Defendants have "memorialized, asserted and conceded" that the "Memorandum of Agreement" was ratified at the CFC Board meeting on August 18, 2005. There is no reference whatsoever to the "Memorandum of Agreement" in Board Resolution No. 5-09 or in the excerpt from the indictment of Mr. Edou and Mr. Booto a Ngon quoted by Plaintiffs. Opp. 24-25. The Board resolution refers only to "the continuation of the Olembe I Extension Project." Opp., Ex. 6. The indictment nowhere refers to the "Memorandum of Agreement" Opp. 24-25 and Ex. 7.

---

[13] *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 246 F. Supp.2d 273 (S.D.N.Y. 2003), the only decision Plaintiffs cite for the proposition that ratification cures the defect in the original act of authority (Opp. 27), did not address the issue raised here – i.e., it assumed without discussion that ratification would cure the original unauthorized act.

Plaintiffs have presented no evidence that supports their contention that the CFC Board ratified the May 18, 2004 "Memorandum of Agreement" on August 18, 2005, or at any other time.

Indeed, as noted above, Defendants' evidence shows that the Board (except for Chairman Booto a Ngon) did not know of the existence of the "Memorandum of Agreement" on August 18, 2005. Mekongo 2d Decl. ¶¶ 6-7; Remy Decl. ¶¶ 3-4. No evidence of Plaintiffs shows the contrary. This absence of knowledge eliminates the possibility of ratification. Ratification of the unauthorized execution of a contract presupposes the knowledge of the existence of the contract itself.

Moreover, ratification cannot be effective if it was made without knowledge of material facts involved in the original act. "Ratification occurs only when the [principal], with full knowledge of the facts, manifests his intention to adopt the unauthorized transaction." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1129 (D.C. Cir. 1990).[14] Because the Board did not know of the existence of the "Memorandum of Agreement," it did not know that the agreement purported to obligate CFC to provide $49 million in construction financing, as well as necessary financial guarantees, and mortgage financing for all qualified buyers if required. Complaint, Ex. A ¶3.b, 4.c and 4.d. Nor did the Board know that the "Memorandum of Agreement" was allegedly executed in the United States, a factor that Plaintiffs claim subjects CFC and the Government to a lawsuit in U.S. Courts. In sum, the Board knew neither of the alleged contract itself, nor of the obligations that it purportedly imposed upon CFC.

Moreover, in August 2005, the Board did not know that the project developer, Atlantic, was owned 45% by a company (The Falls) that was itself wholly owned nominally by Joseph Edou's brother-in-law. Some persons at CFC knew of the family relationship between Mr. Edou

---

[14] Knowledge of material facts is also required under the law of Cameroon. Third Declaration of Professor Ephraim Ngwafor ("Ngwafor 3d Decl.") (appended to this Reply) ¶¶ 3-4.

and Ateba Minkoulou Gabriel, his brother-in-law, but there was no knowledge that Mr. Minkoulou was the nominal owner of 45% of Atlantic.[15]  Mekongo 2d Decl. ¶¶ 9-10; Remy Decl. ¶ 5.  No alleged ratification of the "Memorandum of Agreement" could have been effective in the absence of knowledge that the developer that stood to benefit from the contract was 45% owned by the brother-in-law of the general manager who purportedly executed the contract on behalf of CFC.

In sum, there is no evidence that supports Plaintiffs' argument that the CFC Board ratified the alleged May 18, 2005 "Memorandum of Agreement."

### iii.    None of the other alleged activities in Cameroon constitute acts that fall within either of the first two branches of § 1605(a)(2).

Plaintiffs argue (Opp. 25-27) that circumstances show that Joseph Edou did not "act alone."  In fact, almost all Plaintiffs' alleged activities relating to the project were carried out with Mr. Edou, or with Mr. Edou and Chairman Booto a Ngon.  *See* discussion at 4-6 above

However, it is irrelevant whether Plaintiffs acted with Mr. Edou alone or with others at CFC.  All the alleged activities (except the alleged execution of the May 18, 2004 "Memorandum of Agreement") took place in Cameroon and therefore cannot be a basis for subject matter jurisdiction under either of the first two branches of § 1605(a)(2).[16]  Plaintiffs' allegations of broader CFC involvement in the alleged activities in Cameroon could be pertinent to the adjudication of Plaintiffs' claims on the merits, but they do not constitute a basis for FSIA jurisdiction.

---

[15]   As discussed above (n.6), Plaintiffs provide no support for their assertion (Opp. 10 n.6) that Mr. Minkoulou's interest in The Falls was a matter of "public record and public knowledge."

[16]   As shown in Argument I.A.2 below, the activities had no direct effect in the United States and therefore cannot be a basis for subject matter jurisdiction under the third branch of § 1605(a)(2) either.

**b.    There Was No Other Act of CFC or the Government in the United States That Is a Basis for § 1605(a)(2) Jurisdiction.**

Plaintiffs argue (Opp. 27) that the second branch of § 1605(a)(2) is satisfied by the two alleged trips of CFC officials to the United States because the trips were allegedly "in connection with" the Cameroon housing project. However, this argument fails because no claim of Plaintiffs' is "based upon" the trips themselves. The term "based upon" in § 1605(a)(2) means "those elements of a claim that, if proven, would entitled a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). The fact of the alleged trips to the United States does not constitute any necessary part of what Plaintiffs must prove to support their claims.

**2.    No act of CFC or the Government in Cameroon upon which Plaintiffs claims are based had a direct effect in the United States.**

Plaintiffs err in arguing (Opp. 27-30) that the alleged acts of CFC and government officials in Cameroon upon which they base their claims had a direct effect in the United States. The Courts have consistently rejected the argument that a financial loss to a U.S. corporation from the act of the foreign state abroad constitutes a direct effect in the United States for purposes of the third branch of § 1605(a)(2).

Thus, the Second Circuit held:

> [Plaintiff] argues that [for purposes of § 1605(a)(2)] a "direct effect" of the tort occurred in the United States because an American partnership suffered a financial loss. We are unpersuaded. . . . [T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception . . . .
>
> If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states.

12

*Antares Aircraft, L.P. v Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993). Similarly, in *American Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 540-541 (6th Cir. 2007), the Court rejected the argument that an American firm's allegedly wrongful exclusion from a foreign bidding process caused a direct effect in the United States for purposes of § 1605(a)(2). The plaintiffs argued that the financial loss to the American company, the loss of revenues flowing to the company in the United States, and the resulting loss of taxes to the U.S. Treasury constituted "direct effects." Rejecting Plaintiffs' argument, the Court noted that: "It is hard to imagine a circumstance under [plaintiffs'] theory that would not cause a direct effect in the United States." *Id.* 541.

In the same manner, under Plaintiffs' theory that the alleged financial loss to MBI was a "direct effect" in the United States, any claim by a U.S. company arising entirely out of a foreign business venture it undertook could be brought in the U.S. courts. As noted in *Antares Aircraft*, this would "eviscerate" in large part the FSIA immunity. Such a principle would add an enormous volume of litigation to Federal court dockets because virtually any foreign commercial dispute to which a U.S. person or corporation was a party could be brought in U.S. courts. Moreover, such jurisdiction would encompass lawsuits brought by foreign as well as U.S. plaintiffs because the FSIA does not require that the plaintiff be a United States person. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983). If Congress had intended by the third branch of § 1605(a)(2) that U.S. court jurisdiction would extend to any lawsuit in which a U.S. party has a financial interest, it would have done so in much simpler and plainer language.[17]

---

[17] Plaintiffs' projections (Opp. 29 n. 20) of an "increase in employment" and a "significant inflow of capital" in the United States are not direct effects. Such "speculative" and "unverifiable" potential effects that are dependent upon a "multitude of intervening events" do not constitute a "direct effect." *Doe v. State of Israel*, 400 F.Supp.2d 86, 107 (D.D.C. 2005); *and see American Telecom Co. v. Republic of Lebanon, supra*, 540-541. For the same reason, the failure to obtain loans from U.S. based institutions does not constitute a direct effect. The possibility of obtaining such financing

**B.    Plaintiffs Allege No Facts that Could Provide a Basis for Subject Matter Jurisdiction over the Government of Cameroon.**

As shown in Argument I.A above, there is no basis for subject matter jurisdiction over either Defendant because there was no act on the part of either CFC or the Government that falls within § 1605(a)(2), and Plaintiffs' Complaint must be dismissed for that reason.

In addition, as Defendants showed, there were no acts of the Government, as distinguished from the acts of CFC itself, that even arguably could provide a basis for jurisdiction. Mem. 11-12. In their response (Opp. 30-33), Plaintiffs do not contend that the Government itself took actions that fall within § 1605(a)(2). Plaintiffs argue instead that the relation of the Government to CFC was equivalent to that of principal to agent. Plaintiffs' argument, however, has no validity.

Plaintiffs' purported statement of the legal standard is misleadingly incomplete. Opp. 31. *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843 (D.C. Cir. 2000), upon which Plaintiffs rely (Opp. 31), makes it clear that the test for ignoring the separation between a government and its wholly-owned corporation is a higher hurdle than Plaintiffs suggest: it requires a *right to control* the acts in question.

> The relationship of principal and agent depends, however, upon the principal having "the right to control the conduct of the agent with respect to matters entrusted to [the agent]."

*Id*. at 849 (citation omitted). The Government did not have such a right to control the conduct of CFC. The 1977 and 1981 decrees Plaintiffs cite (Opp. 31) are not applicable. CFC was reorganized effective August 30, 2001, under Law No. 99/016 of 22 December 1999. Ngwafor 3d Decl. ¶ 2. CFC's Board acts independently on behalf of CFC, although it takes into account

---

depended upon a multitude of factors. One difficult hurdle would have been the ownership interest of Mr. Edou's brother-in-law in the project developer, Atlantic.

advice or requests it receives from the Government or from others.  Mekongo 2d Decl. ¶ 2.
Under Law No. 99/016, "supervisory authority" is the power "to define and orient government
policy" in the sector in which CFC operates.  Ngwafor 3d Decl., Ex. EN-5 at 4 (Law No. 99/016,
Sec. 2.8).  This does not include the right to control CFC actions upon which Plaintiffs argue that
§ 1605(a)(2) jurisdiction is based.

Plaintiffs cite allegations, most of which are based upon hearsay evidence from Mr.
Tchoufa, that unnamed "CFC officials" sought "guidance, supervision and approval" from
Cameroon Government officials on all aspects of the housing project.  Opp. 31-32.  Such
purported evidence is entitled to no weight, and in any event would not establish that the
Government had the right to control CFC's actions.  Nor does anything Plaintiffs quote from the
indictment (Opp. 32-33) show such a right of control.

## II.    The Court Lacks Personal Jurisdiction over CFC.

As shown in Argument I.A above, there is no basis for subject matter jurisdiction over
either Defendant because there was no act on the part of either CFC or the Government that falls
within § 1605(a)(2), and Plaintiffs' Complaint must be dismissed for that reason.

In addition, as Defendants showed (Mem. 18-20), CFC does not have contacts with the
United States sufficient to satisfy the due process standard of "fair play and substantial justice."
*International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Plaintiffs point out that the
D.C. Circuit has questioned whether the due process requirements of the Fifth Amendment of the
U.S. Constitution apply to agencies and instrumentalities of foreign states.  *TMR Energy Limited
v. State Property Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005).  The Court also pointed
out the decisions Plaintiffs discuss (Opp. 34-35) holding that foreign alien individuals with
insufficient contacts with the United States are not entitled to constitutional due process
protection.  *Id.*  Nonetheless, courts have accorded due process protection to foreign private

corporations in determining whether the U.S. courts possess personal jurisdiction over them. *E.g.*, *Helicopteros Nationales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984). The protection should not be withheld from foreign corporation owned by the foreign government unless the government controls the corporation under the test set out in *Transamerica Leasing, Inc. v. La Republica de Venezuela*, *supra*. As shown in Argument II.B above, the Government of Cameroon did not possess such control over CFC.

Plaintiffs err in arguing that CFC has sufficient contacts with the United States not to offend due process. Opp. 35-36. There is nothing that provided CFC with "fair warning" that its alleged activities might subject it to jurisdiction of the U.S. courts. *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985). The alleged May 18, 2004 "Memorandum of Agreement" related to a housing project in Cameroon, and nothing about the contract suggested that CFC was purposefully availing itself of the benefits and protections of U.S. laws.[18] *Id.* at 475.

III.   **The Doctrine of *Forum Non Conveniens* Requires Dismissal of this Action in Favor of the Courts of Cameroon.**

Defendants showed (Mem. 20-29) that this lawsuit should be dismissed under the doctrine of *forum non conveniens*. The courts of Cameroon represent an adequate alternative forum, and both the private and public interests overwhelmingly favor litigation in Cameroon. Plaintiffs have failed to refute this showing. Opp. 36-45.

A.   **The Courts of Cameroon Represent an Adequate Alternative Forum.**

Plaintiffs attempt to show that the courts of Cameroon are an inadequate forum, first, by quoting allegations critical of Cameroon's judiciary from a U.S. State Department report and from a counsel's commentary on an adverse decision by the African Human Rights

---

[18]   Of course, Joseph Edou did not have the authority to execute a contract such as the May 18, 2004 "Memorandum of Agreement," and for this reason any "purposeful availment" in Joseph Edou's actions is not attributable to CFC.

Commission.[19]  Opp.37-38.  However, such "general allegations" of unfairness or corruption do not disqualify the foreign forum.

> A foreign forum is not inadequate merely because it has less favorable substantive law, because it employs different adjudicative procedures, or because of general allegations of corruption in the judicial system.  [Plaintiffs'] repeated reliance on a State Department report expressing "concern about the impartiality" of the Jordanian court system, for example, is unavailing.

*El-Fadl v. Central Bank of Jordan,* 75 F.3d 668, 678 (1996) (citations omitted).  *See also, Irwin v. World Wildlife Fund, Inc.,* 448 F.Supp.2d 29, 34 (D.D.C. 2006) ("Generalized allegations" – such as a U.S. State Department report that the judiciary of Gabon was "subject to government influence" and "slow, inefficient and subject to corruption" – "do not establish that a foreign forum is inadequate.").[20]

In any event, Plaintiffs are in no position now to make such complaints against the Cameroonian courts because, according to documents Plaintiffs filed with their Maryland Complaint, Atlantic expressly agreed to the exclusive jurisdiction of the High Court of Yaoundé, Cameroon, for any disputes arising out of two alleged contracts, i.e., the March 29, 2005 Conventions de Financement and the August 19, 2005 Convention de Financement.[21]  Both the

---

[19]  Plaintiffs fail to identify adequately the context of their lengthy quotation from the article by Mr. Kofele-Kale at Opp. 38.  This is not a quotation from a judicial or arbitral decision.  It is an extract from a commentary written by one of the counsel for certain claimants before the African Human Rights Commission criticizing the decision of the Commission that held the claims inadmissible because the claimants had failed to exhaust their domestic remedies in the courts of Cameroon.  Kofele-Kale, *Asserting Permanent Sovereignty over Ancestral Lands: The Bakweri Land Litigation against Cameroon,* 13 Ann. Surv. Int'l & Comp. L., 103, 103 n. a1, 108, 134-135 (2007).

[20]  Plaintiffs also introduced a letter complaining about alleged "judicial corruption" in the treatment of a foreign corporation in Cameroon.  Opp. 38, n. 30, Ex. 8B.  In contrast, the declaration of an experienced lawyer who has represented a number of foreign companies in Cameroon attests the independence and absence of corruption in his experience in the Cameroon courts and his opinion that the Plaintiffs would receive a fair and impartial hearing.  Declaration of Gerard Wolber (appended to this Reply) ¶¶ 4-7.

[21]  As Defendants previously noted (Mem. 27 n. 10), both the March 29, 2005 and the August 19, 2005 Conventions de Financement were attached as unnumbered exhibits to Plaintiffs' December 6, 2006

Conventions de Financement provide that any disputes arising under them "shall fall under the jurisdiction of the High Court of the Yaoundé."[22] Moreover, these alleged agreements do not purport to address only the details of financing. For example, the March 29, 2005 Convention de Financement states (in Article I) that it "sets out the terms and conditions of collaboration between" CFC and Atlantic "for the implementation of the construction program for the construction program for 1034 low-cost housing units" at Olembe II, and then purports to define in detail the purported obligations of the parties with respect to construction and other matters as well as financing. Plaintiffs should not now be permitted to argue that the Courts of Cameroon are inherently inadequate.

Second, Plaintiffs argue that the "treatment of Mr. Tchoufa by Cameroon" shows that the courts of Cameroon do not represent an adequate alternative forum. Opp. 38-40. Mr. Tchoufa alleges that he was mistreated by the Cameroonian authorities because he disclosed demands by Cameroon officials for bribes. However, there are at least two fatal flaws in Plaintiffs' theory.

First, Mr. Tchoufa's claim is that he is being targeted because he disclosed that Cameroonian officials had solicited him for bribes. However, there is no evidence that Mr. Tchoufa made any "disclosure" of the alleged solicitation before Cameroon took action against him in August 2006.[23] Plaintiffs do allege (Complaint ¶ 89) that their counsel wrote a demand letter dated March 23, 2006, in which it was stated that "MBI declines to speculate" as to CFC's

---

Maryland Complaint. A copy of the alleged March 29, 2005 Convention de Financement, together with a translation, is also attached to Defendants' Memorandum.

[22]  The provision appears in Article 21 of the March 29, 2005 Convention de Financement and in Article 20 of the August 19, 2005 Convention de Financement.

[23]  Indeed, Defendants are aware of no "disclosure" prior to Plaintiffs' January 2007 District of Columbia Complaint. There was no allegation of solicitation of bribes in the Plaintiffs' December 2006 Maryland Complaint, and the absence of such allegations was not due to Plaintiffs' reluctance to make attacks upon Cameroonian officials, whom the Plaintiffs did accuse of extortion (¶ 43) and creation of false documents (¶ 44), among other things.

motives and that MBI "note[d]" that such conduct was "conventionally associated with allegations of graft and corruption." However, this comment was made by counsel, not by Mr. Tchoufa, and was attributed to MBI, not to Mr. Tchoufa. Moreover, the criminal action against Mr. Tchoufa did not commence until four months later. It is purely speculative and highly improbable that the indictment against Mr. Tchoufa was a reaction to such carefully phrased innuendo.

Second, there are substantial grounds for the issuance of the arrest warrant against Mr. Tchoufa. [24] Mr. Tchoufa represented MBI at the formation of Atlantic, and permitted The Falls (the company nominally owned by Mr. Edou's brother-in-law) to acquire 45% of Atlantic for the equivalent of $1,800. See Mem. 5-6, and the evidence cited therein. Mr. Tchoufa represented Atlantic in the transaction in which Atlantic paid the equivalent of $192,000 to purchase a residential property in Yaounde that was transferred to The Falls. *See* Mem. 8-9, and the evidence cited therein; and Opp., Ex. 1, Declaration of Roger Tchoufa ("Tchoufa Decl.") ¶ 34.

Plaintiffs allege that the Cameroon authorities acted excessively and illegally in attempting to arrest him. Complaint ¶¶ 90-91; Opp. Ex. 8D. Of course, Cameroon does not admit these allegations, but in any event, they are not relevant to the adequacy of the Cameroon courts for purposes of *forum non conveniens*. The allegations relate to alleged actions by the executive authorities of Cameroon, not by the courts, and the alleged actions relate to Mr. Tchoufa personally rather than the companies MBI and Atlantic. Plaintiffs have presented no evidence that the courts would be unfair or that they would be improperly influenced by the

---

[24]   Cameroon has no extradition treaty with the United States. Accordingly, Mr. Tchoufa's freedom from arrest in the United States does not reflect a lack of substance in the Cameroon charges, as Plaintiffs argue (Opp. 39). Ngwafor 2d Decl. ¶ 5.

Cameroonian executive authorities.[25]  Plaintiffs are attempting to avoid the jurisdiction of the courts of Cameroon, not because they have shown bias in the courts, but because an employee of the Plaintiffs has engaged in activity that has understandably resulted in criminal charges against him in Cameroon.[26]

**B.      The Relevant Private Interests Favor the Courts of Cameroon.**

Plaintiffs err in arguing (Opp. 40-41) that their choice forum is entitled to full weight in evaluating the private interests for purposes of forum non conveniens.  Plaintiff Atlantic is a Cameroonian corporation itself and is 45% owned by another Cameroonian company, The Falls. The U.S. Plaintiff, MBI, is affected primarily through its minority interest (35%) in Atlantic. Even if the District of Columbia is deemed to be MBI's "home forum,"[27] its entitlement to its own choice must be mitigated by countervailing factors – i.e., that its co-plaintiff, Atlantic, is a Cameroon corporation; that the lawsuit involves a business venture MBI undertook in Cameroon; and that Atlantic, with the agreement of Mr. Tchoufa and apparently MBI, entered into two contracts, Plaintiffs have alleged, that accorded the Courts of Cameroon exclusive jurisdiction over disputes arising under the agreements.

---

[25]    As Defendants have shown (Mem. 28; Ngwafor Supp. Decl. ¶ 3.), Mr. Tchoufa's testimony can be presented and will given its due weight in a proceeding in Cameroon even if Mr. Tchoufa declines to return to Cameroon to testify in person.

[26]    The decisions Plaintiffs cite (Opp. 39, n.10) are cases in which the plaintiffs themselves were allegedly subject to serious physical danger.  *E.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, (S.D.N.Y. 2003) (alleged victims of ethnic cleansing); *Cabrini v. Assasie-Gyimah*, 921 F.Supp. 1189 (alleged victim of lengthy torture in Ghana).  And Plaintiffs have miscited *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8 (1st Cir. 2000): the factors that the Court deemed "relevant" in the passage quoted by Plaintiffs were those that showed Plaintiffs had less to fear from the foreign forum than she alleged.  203 F.3d at 13-14.

[27]    Plaintiffs cite decisions from the Second Circuit, which has treated any U.S. Court as a U.S. plaintiff's home forum, notwithstanding the actual residence or domicile of the plaintiff.  *E.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, *supra*, at 338-339.

In any event, the plaintiff's choice of its home forum is not determinative if the other private interest factors strongly favor the foreign forum. *E.g., Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, supra*, at 38-39. In this case, the other private interest factors overwhelmingly favor litigation in Cameroon. Plaintiffs' arguments to the contrary (Opp. 41-43) are without substance.

First, this dispute centers on Cameroon and almost everything relevant to the dispute occurred in Cameroon. The dispute concerns an alleged real estate development project in Cameroon and will involve Cameroon legal issues, Cameroon witnesses, and events in Cameroon. Plaintiffs cite (Opp. 41-42) events that are alleged to have occurred in the United States, but none of these is of more than peripheral relevance to the matters in dispute, and all relate to alleged events in Cameroon. Thus, it has little bearing on the merits of the dispute that MBI was a "resident" of the United States or that Atlantic and MBI sought financing from agencies based in the United States. Nor does it weigh in favor of a United States forum that Plaintiffs wrote a letter from the United States with a suggestion of "graft and corruption" in Cameroon. Everything that allegedly happened in the United States was about something that happened or allegedly happened in Cameroon.

Similarly, the convenience of the parties strongly favors litigation in Cameroon. Plaintiffs err in suggesting that the only consideration on this point is whether the officers and employees of the Government and CFC would refuse to appear in the United States.[28] Opp. 42. The expense of transporting to the United States the officers and employees of Defendants and

---

[28] Plaintiffs' reliance on *FC Investment Group LC v Lichtenstein*, 441 F.Supp.2d 3 (D.D.C. 2006), is misplaced because that decision involved a transfer of venue under 28 U.S.C. § 1404(a). While many of the § 1404(a) factors are parallel to the *forum non conveniens* considerations, there is a vast difference between requiring the Defendant to produce party witnesses in a different state of the United States and requiring a party to defend on a different continent, in a foreign language and under a different legal system.

other witnesses who are willing to appear, and the cost of translating testimony into English, would be enormous. Moreover, the disruption to the business of CFC and any government offices affected would be equally burdensome.[29] It demands strong justification to require CFC and the Cameroon Government to come the United States to litigate a dispute about a real estate project in Cameroon.

Similarly, despite Plaintiffs' arguments (Opp. 42-43), the convenience of witnesses strongly favors litigation in Cameroon. The witnesses who will be required from the United States are limited to Mr. Tchoufa, if he chooses to appear, and perhaps John Kamya. Plaintiffs' cite "officials and employees at OPIC, HUD and the World Bank," but it is not apparent what evidence such persons would have to offer on any disputed issue.

In contrast, the testimony of a number of Cameroon witnesses will be required. Testimony will be necessary from Cameroon legal experts (if the proceeding is in the United States), present and former officials of CFC and the Government of Cameroon, and other residents of Cameroon. Potential Cameroonian witnesses with relevant testimony on the merits include Joseph Edou, former general manager of CFC; Mr. Booto a Ngon, former chairman of CFC; Ateba Minkoulou Gabriel, Joseph Edou's brother-in-law and nominal owner of The Falls; Koh Koh, who carried out Mr. Edou's instructions with respect to The Falls; the tenant of the residence Atlantic purchased for The Falls; Directors of CFC, any CFC employees who have knowledge of the transactions or events in dispute; Camille Ekindi, the present General Manager of CFC, whom Mr. Tchoufa has accused of soliciting bribes; and other government and CFC officials who may have evidence with respect to Mr. Tchoufa's bribery allegations. Moreover,

---

[29] Travel by air between Washington, DC and Cameroon is expensive and requires most of 2 days, including approximately sixteen hours in the air.

because virtually all of the events in dispute took place in Cameroon, there will likely be additional Cameroonian witnesses, not yet identified, whose testimony will be required.

A trial in the United States will extremely inconvenient for those Cameroonian witnesses who appear. However, apart from present officers and employees of the Defendants, witnesses cannot be required to appear at trial in the United States. In a trial in the United States the parties and the Court will likely be deprived of the appearance of a number of witnesses who have relevant knowledge.

Access to other evidence also favors litigation in Cameroon. The books and records of CFC and other documents related to the alleged housing project are located in Cameroon. The site of the alleged project is in Cameroon, the location of the official corporate records of Atlantic and The Falls is in Cameroon, and any documents related to the alleged misappropriation of trade secrets are located in Cameroon.

In *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, supra,* at 38-39, this Court analyzed the private interest factors relating to the *forum non conveniens* dismissal of an action brought by U.S. plaintiffs. The factors the Court identified there are equally applicable here:

> this litigation will center around an analysis of Brazilian legal issues. Accordingly, the parties will have to obtain testimony from Brazilian law experts and from members of the Brazilian government, most of whom are likely to live in Brazil. Moreover, to the extent that the parties require testimony from former members of the Brazilian government, these witnesses, too, are likely to reside in Brazil, outside the reach of compulsory process. The parties will also have to examine documents of the Brazilian government, which are located in Brazil. In addition, for the purposes of motion practice and trial, documents from the Brazilian government, as well as the testimony of various Brazilian legal experts and fact witnesses, will have to be translated into English. The Court notes that in briefing the instant motion, the parties not only obtained opinions from Brazilian legal experts, but also translated an abundance of materials from Portugese into English.

*Id.* (footnote omitted).  The Court concluded that the private interests were "in equipoise or near equipoise."  *Id.* 39.  In this case, the balance of private interests is at least as strong in favor of the foreign forum.

### C.    The Public Interests Strongly Favor the Courts of Cameroon.

Defendants have shown that the public interests clearly favor litigation in the Courts of Cameroon.  Mem. 25-28.  Plaintiffs produce no arguments of substance to the contrary.  Opp. 43-45.

For example, the dispute will be governed by foreign law, the law of Cameroon, with which the U.S. courts are not familiar.  Plaintiffs' answer (Opp. 43-44) is that foreign law can be proved under Fed. R. Civ. P. 44.1.  However, the Rule 44.1 procedure is a poor substitute for first-hand familiarity with the law, especially as the applicable law is from a different legal system (Civil Law) and the legal authorities are in French rather than English.

Moreover, the March 29, 2005 and the August 19, 2005 Conventions de Financement that Plaintiffs filed contain mandatory choice of forum clauses that require any disputes to be litigated in the High Court of Yaoundé, Cameroon.  There is no reason these mandatory forum clauses would not be enforced.  See, e.g., *M/S Bremen v, Zapata Off-Shore Co.*, 407 U.S. 1 (1972).  Since the two alleged contracts purport to cover in detail the respective obligations of CFC and Atlantic, it is not clear how any of the purported claims of Plaintiffs under the May 18, 2004 "Memorandum of Agreement" could be adjudicated in the United States.

Similarly, Plaintiffs fail to show that any interest of the United States in the controversy compares to the strong interests of Cameroon.  Opp. 44-45.  As Defendants pointed out (Mem. 26), Plaintiffs' claims raise issues of vital concern to Cameroon.  The dispute involves a public housing project in Cameroon allegedly sponsored by a government owned corporation, CFC, and unauthorized disbursements from CFC to the Plaintiffs.  Uncontroverted evidence shows self-

dealing on the part of the General Manager of CFC, and Plaintiffs allege that Cameroonian officials solicited bribes from one of their officers. Plaintiffs seek very substantial damages, $500 million, which would be awarded against the Cameroon Government and/or CFC. Any interest of the United States in protecting a U.S. company's investment in a foreign business venture or in pursuing alleged corruption in foreign countries is heavily outweighed by the strong interests of Cameroon in this controversy. The marginal nature of the United States' interest stands in stark contrast to the magnitude of the interests of the foreign state. *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil, supra*, at 40.

## CONCLUSION

For the reasons stated herein and in Defendants' Memorandum, Plaintiffs' Complaint must be dismissed. The Court lacks subject matter jurisdiction under § 1605(a)(2), and the Defendants retain their sovereign immunity under the FSIA. Alternatively, even if the Court possessed subject matter jurisdiction, the lawsuit should be dismissed on the doctrine of *forum non conveniens* in favor of the courts of Cameroon.

Respectfully submitted,

Knox Bemis #14852
Dewey & LeBoeuf LLP
1101 New York Avenue, N.W.
Suite 1100
Washington, DC  20005-4213
(202) 986-8035
(202) 956 3230 (Fax)

January 7, 2008

25

**INDEX OF DECLARATIONS AND EXHIBITS**
**TO DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**<u>Professor Ephraim Ngwafor</u>**

Third Declaration

EN-5   Law No. 99/016 of 22 December 1999

**<u>Henri Mekongo Mbala</u>**

Second Declaration
Translation

**<u>Ndoua Ndzana Remy</u>**

Declaration
Translation

**<u>Gerard Wolber</u>**

Declaration

**THIRD DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.,* | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun, | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants.* | : | |

## THIRD DECLARATION OF PROFESSOR EPHRAIM NGWAFOR

PROFESSOR EPHRAIM NGWAFOR declares pursuant to 28 U.S.C. § 1746:

1.  I am a Professor of Law at the University of Yaoundé II. I made a Declaration and a Supplemental Declaration in support of the Defendants' September 26, 2007 motion to dismiss Plaintiffs' Complaint. I make this Third Declaration in response to the matters raised in Plaintiffs' November 5, 2007 opposition to the Defendants' motion to dismiss.

2.  CFC was originally organized under Decree No. 77/140 of May 13, 1977, and Decree No. 81/236 of June 17, 1981. However, CFC was reorganized effective August 30, 2001, under Law No. 99/016 of 22 December 1999 Governing Public Establishments and Enterprises of the Semi-Public Sector. A copy of Law No. 99/016 is appended to this Declaration as Exhibit EN-5. CFC operates as an independent entity subject to the decisions of its Board of Directors. The provisions of Decree No. 77/140 and Decree No. 81/236 are no longer applicable.

3.     Although I am aware of no Cameroon authority directly on point, my opinion is that under the laws of Cameroon the ratification by a principal of an act of its agent that was outside the agent's authority when performed requires that the principal know the material facts with respect to the act purportedly authorized. Knowledge of the act in question is inherent in the concept of ratification. Accordingly, Resolution 5-09 of the CFC Board on August 18, 2005 could not constitute a ratification of the May 18, 2004 "Memorandum of Agreement" allegedly executed by Joseph Edou if the Board did not know of that alleged agreement.  Resolution 5-09 states that the Board approved a continuation of the Olembe I extension project, but there is nothing in the Resolution to suggest that the Board intended to approve the May 18, 2004 "Memorandum of Agreement" or that the Board was aware of that alleged agreement or its terms.

4.     One material fact with respect to the May 18, 2004 "Memorandum of Agreement" (and with respect to any other alleged agreement between CFC and Atlantic that was executed by Joseph Edou) is that Atlantic was owned 45% by a company, The Falls, that was nominally owned by Joseph Edou's brother-in-law. This fact, which strongly suggests self-dealing on the part of Joseph Edou and Atlantic, would be deemed highly relevant to the CFC Board's consideration of the potential ratification of the May 18, 2004 "Memorandum of Agreement."  No ratification of the May 18, 2004 "Memorandum of Agreement" could be effective without disclosure of the ownership of Atlantic to the CFC Board.

5.     Cameroon's arrest warrant for Roger Tchoufa has been filed in the United States. However, there is no extradition treaty between Cameroon and the United States, and no action has been taken on the arrest warrant.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on $\cancel{H}$ January 2008.

Professor Ephraim Ngwafor

**EXHIBIT EN-5**

**TO THIRD DECLARATION OF PROFESSOR EPHRAIM NGWAFOR**

**LAW NO. 99/016 OF 22 DECEMBER 1999**

LAW N° 99/016 OF 22 DECEMBER 1999
ON GENERAL RULES AND REGULATIONS
GOVERNING PUBLIC ESTABLISHMENTS AND ENTERPRISES
OF THE PUBLIC AND SEMI-PUBLIC SECTOR

## PART I

### GENERAL PROVISIONS

**Section 1.** — (1) This law lays down the general rules and regulations governing public establishments and enterprises of the public and semi-public sectors.

(2) Special laws may, as and when necessary, set up other establishments of the public and semi-public sectors.

CHAPTER ONE

DEFINITIONS

**Section 2.** — For the purposes of this law and the regulations resulting therefrom :

1. **Financial autonomy** shall mean the powers granted to a corporate body to freely administer and manage its movable and immovable, tangible, intangible or liquid assets in the pursuit of its object.

2. **Regional or local authority** shall mean a region, council, or other regional or local entity set up by the law.

3. **Administrative public establishment** shall mean any corporate body governed by public law having financial autonomy and legal personality to which the State or a regional or local authority has allocated property to be used to carry out a general interest mission or provide a public service.

4. **Allocated property** shall mean all the movable or immovable, tangible or intangible or liquid assets placed by the State or regional or local authorities at the disposal of an administrative public establishment.

5. **Public corporation** shall mean any corporate body governed by private law and having financial autonomy whose share capital is held exclusively by the State, one or more regional and local authorities or one or more other public corporations, and whose object is to carry out, in the general interest, activities of an industrial, commercial and financial nature.

6. **Semi-public corporation** shall mean any corporate body governed by private law and having financial autonomy whose share capital is jointly held by either the State, regional and local authorities or public corporations on the one hand, and by corporate bodies or natural persons governed by private law on the other hand.

— 3 —

7. **Memorandum and Articles of Association** shall mean the instrument of incorporation or the regulations in lieu thereof of an administrative public establishment or a public corporation or semi-public corporation.

8. **Supervisory authority** shall mean the power of the State to define and orient government policy in the sector where the administrative public establishment or corporations of the public or semi-public sectors operate to safeguard the general interest. It shall be exercised at the technical and financial levels by a ministry or any other service or body designated by the articles of association.

The purpose of technical supervision shall be to set the objectives for all the corporations in the sector, readjusting such objectives as and when necessary to ensure the smooth operation of the sector.

The purpose of financial supervision shall be to evaluate the financial management operations of administrative public establishments and audit the accounts of other categories of corporations of the public and semi-public sector. Such supervision shall be exercised by the ministry in charge of finance for administrative public establishments and corporations of the public and semi-public sectors in which the State holds at least 25 % of the share capital.

CHAPTER II

COMMON PROVISIONS

*I — Legal status*

Section 3. — (1) The public and semi-public sector shall comprise administrative public establishments, public corporations and semi-public corporations, without prejudice to the provisions of Section 1 (2) above.

(2) Administrative public establishments shall be set up and shall carry out their activities in accordance with this law and with their articles of association.

(3) Public as well as semi-public corporations shall be set up and shall carry out their activities in accordance with the laws, regulations and practices governing limited liability companies, subject to the provisions of this law.

Section 4. — (1) Any public and national property as well as the private property of the State granted for enjoyment to a corporation in accordance with the laws governing State property shall retain its original status.

(2) The transfer of ownership of the private property of the State to a corporation, particularly as contribution to the constitution of its capital, shall make such property permanently that of the beneficiary corporation.

(3) Administrative public establishments, public corporations and semi-public corporations in which the State holds more than half of the share capital and voting rights shall be governed by regulations on public contracts, subject to separate instruments laying down waivers thereto.

**Section 5.** — (1) The privatization of administrative public establishments, public corporations and semi-public corporations, particularly through the transfer of assets or shares to the private sector shall be carried out in accordance with the laws applicable to privatization.

(2) The other operations not entailing privatization shall be carried out according to the rules of ordinary law and in conformity with the articles of association.

**Section 6.** — (1) The shares and stocks held by the State, regional and local authorities, public corporations and semi-public corporations shall be registered in their own name.

(2) Shares of public corporations and semi-public corporations belonging to the State shall be held on behalf of the State by the minister in charge of finance.

### II — Follow-up of management and performance

**Section 7.** — The State and regional and local authorities shall participate in the management of enterprises in their portfolios only through their representatives in the management and administrative bodies.

**Section 8.** — (1) The follow-up of the management and performance of administrative public establishments as well as public and semi-public sector corporations shall be carried out by the ministry in charge of finance.

(2) Public corporations, semi-public corporations and administrative public establishments shall forward to the ministry in charge of finance all documents and information relating to their activities. In accordance with ordinary law, such documents and information shall be placed at the disposal of shareholders and board members. The documents shall include the management reports, the audit reports, annual financial statements and the certified accounts.

(3) Administrative public establishments, public corporations and semi-public corporations shall be bound to publish, at least once a year, a notice on the position of their assets and liabilities and a summary of their annual accounts in a journal of legal notices and in a national press organ.

### III. — Audit

**Section 9.** — External audits may be requested by the statutory organs of public and semi-public sector corporations, or by the minister in charge of finance, save for semi-public corporations in which the State holds less than 25 % of the capital and voting rights.

**Section 10.** — A financial controller shall be appointed by decision of the minister in charge of finance for administrative public establishments.

**Section 11.** — (1) One or more auditors approved by the Economic and Monetary Community of Central African States shall be appointed for public corporations and semi-public corporations.

(2) Auditors of public corporations and semi-public corporations in which the State holds an absolute majority of the shares shall be appointed in accordance with the terms and conditions defined in Sections 30 and 33 below.

(3) The auditors shall have the authority to audit the accounts and check the amounts thereof in order to establish the consistency and accuracy of the financial statements as well as the information contained in the reports of the statutory organs, without interfering in the management of the corporation.

(4) The auditors and financial controllers shall forward, at least once a year, a general report on the accounts and a special report on the conformity of management activities to the general meeting of the corporation's shareholders and to the minister in charge of finance.

Section 12. — The auditor(s) may, at any time of the financial year, require the Board chairman to account for any negligence, irregularity and, in general, any act likely to compromise the solvency and continuity of the enterprise noticed in the exercice of their functions. Where the chairman fails to respond to such request within a period of two months or where the response is unsatisfactory, the auditors shall immediately inform, by special report, the statutory organs of the public and semi-public sector corporation concerned and the minister in charge of finance of the situation.

Section 13. — (1) The functions of auditor shall be incompatible with :

* any activity or act which may compromise his independence;
* any other function or gainful employment, even temporary, with the corporation concerned.

(2) An auditor may not be appointed board member, general manager or deputy general manager of a public corporation or semi-public corporation less than five years after the end of his mission in the structure concerned.

Section 14. — Relations between the State and regional and local authorities on the one hand and the corporations in their portfolio on the other hand may be the subject of performance contracts or any other agreement.

### IV — Tax and customs regulations

Section 15. — The tax and customs regulations of administrative public establishments, public corporations and semi-public corporations shall be laid down by the General Tax Code, the Customs Code and the Registration, Stamp Dupy and Trusteeship Code.

### V — Personnel

Section 16. — The personnel of administrative public establishments, public corporations and semi-public corporations, and public servants or State employees on secondment or placed at the disposal of a corporation shall be governed by the labour code for the duration of their employment, subject to the provisions of the General Rules and Regulations of the Public Service relating to retirement, advancement and end of secondment.

Section 17. — (1) The civil liability and/or criminal responsibility of the personnel in administrative public establishments, public corporations and semi-public corporations shall be subject ordinary law regulations.

(2) Disputes between personnel and the corporation shall fall within the competence of ordinary law courts.

— 6 —

*VI. — Restrictions and incompatibilities*

**Section 18.** — Appointed on their individual merit, board members representing the State or local government authorities in public establishments as well as in public and semi-public sector corporations may not delegate their duties, save as otherwise provided for in the articles of association.

**Section 19.** — (1) No one may serve as board member representing the State or local government authority on more than two boards of directors of administrative public establishments, public corporations and semi-public corporations. Moreover, a board member representing the State may not hold more than two successive terms within the same corporation.

(2) Board members of administrative public establishments as well as public and semi-public sector corporations who, during their term of office, directly or indirectly have interests in a business involving the establishment or corporation, or a personal interest in the said corporation, other than a contract of employment for a board member representing the staff, shall be bound to keep the board informed of such interest(s).

**Section 20.** — No one may be board chairman of more than one adminstrative public establishment, public corporation and semi-public corporation as a representative of the State or a regional or local authority.

**Section 21.** — (1) The position of board chairman of an administrative public establishment, public corporation and semi-public corporation shall be incompatible with that of member of government, member of parliament, general manager or deputy general manager, manager or deputy manager of an administrative public establishment, public corporation or semi-public corporation.

(2) The functions of member of Government or person of similar rank and of member of parliament shall be incompatible with the function of manager or deputy manager of an administrative public establishment, general manager or deputy general manager of a public or semi-public corporation or any other similar function.

**Section 22.** — It shall be forbidden for any establishment or public and semi-public sector corporation to grant a loan, on an individual basis, to any of its board members.

*VII — Precautionary measures*

**Section 23.** — (1) Notwithstanding the provisions of this law, in case of serious crisis that could undermine the missions of general interest, the corporation's object or the sectoral policies of the Government, a Provisional Administrator may be designated by statutory instrument and not by the administrative organs of public adminstrative establishments and public corporations having the State as sole shareholder.

(2) The instrument appointing the Provisional Administrator shall specify his power and the duration of his term of office which, in any case, may not exceed six months.

PART II
PUBLIC CORPORATIONS

CHAPTER I
ESTABLISHMENT

**Section 24.** — (1) Public corporations having the State as sole shareholder shall be set up by decree of the President of the Republic. Their articles of association shall be approved in the same manner.

(2) The State's share capital in a public corporation shall be approved by decree of the President of the Republic.

**Section 25.** — The setting up of a public corporation having a regional or local authority as sole shareholder shall be established by the articles of association approved according to the rules of procedure specific to the said authority.

**Section 26.** — The setting up of a public corporation having several shareholders shall be subject to incorporation regulations for limited liability companies.

**Section 27.** — (1) In addition to the mandatory provisions of the articles of association of limited liability companies, the articles of association of a public corporation shall :

* specify the equity ownership of each public shareholder ;

* establish the payment by the shareholders of at least three quarters (3/4) of this amount ;

* specify the deadline for the payment of the remaining one quarter (1/4), which deadline must not exceed three (3) years with effect from registration in the Trade and Personal Property Credit Register and in accordance with the conditions defined in the articles of association, or by decision of the board of directors.

(2) Shares representing cash contributions which have not been paid in full must remain in nominal form.

(3) As long as the capital has not been completely paid up, the corporation may not increase its capital unless such increase in capital is in kind, nor issue shares.

**Section 28.** — Public corporations shall be subject to registration in the Trade and Personal Property Credit Register.

They may settle disputes out of court and reach a compromise unless otherwise provided for by their articles of association.

— 8 —

CHAPTER II

MANAGEMENT

Section 29. — The management organs of a public corporation shall be :

* the general meeting of shareholders ;

* the board of directors ;

* the general management.

*I — The general meeting of shareholders*

Section 30. — (1) Where the State is the sole shareholder of a public corporation, the role of the general meeting shall devolve on a college of five members whose composition shall be determined by the articles of association.

This college must include a representative of the minister in charge of finance and a representative of the minister in charge of technical supervision. The representative of the minister in charge of finance shall act as chairman of the general meeting.

(2) Each ministry shall appoint its representative to the general meeting in accordance with the conditions laid down by the articles of association.

(3) The general meeting thus formed shall :

* approve audit reports ;

* approve the accounts of the corporation ;

* approve the sharing of dividends ;

* appoint and dismiss auditors and determine their remuneration ;

* set the amount of session allowances of board members as well as the montly allowance of the chairman of the board of directors, subject to the ceilings fixed by the regulations in force.

(4) The duties of college members shall be free of charge. However, they may receive reimbursement of expenses incurred for general meetings.

Section 31. — Where a regional or local authority is sole shareholder, the role of the general meeting shall devolve on a college of five (5) members designated by the authority's policy-making organ.

Section 32. — Where the public corporation has several shareholders, the general meeting shall be composed of representatives of the shareholders.

Section 33. — (1) Subject to the provisions of this law, the general meeting of public corporations having several shareholders shall have same powers general meetings of shareholders by limited liability companies.

In this respect, in particular :

(*a*) The ordinary general meeting shall :

* approve audit reports ;
* approve the annual accounts and balance sheets as well as the distribution of dividends ;

* appoint, reappoint and, as the case may be, dismiss members of the board of directors ;

* set the amount of session allowances as well as the monthly allowance of the chairman of the board of directors, subject to the ceilings fixed by the rules and regulations in force ;

* appoint and dismiss auditors and fix their remuneration.

(*b*) The extraordinary general meeting may, on the recommendation of the board of directors, amend the articles of association of the public corporation. However, the amendment of the articles of association of public corporations with a sole shareholder must be approved under the same conditions which governed their adoption.

(2)    The convening of ordinary and extraordinary general meetings shall be done by telex, telegram or facsimile, or by any other means with written proof, and addressed to shareholder representatives at least fifteen (15) days before the date of the meeting. The convening notices shall indicate the agenda and venue of the meeting.

Section 34. — General meetings of public corporations with several shareholders shall function under the same conditions and, in particular, the same quorum and majority rules as those stipulated in the law and limited liability companies.

Section 35. — For public corporations having the State or a regional or local authority as sole shareholder :

(*a*)    The ordinary general meeting shall hold at least once a year within six (6) months following the end of the financial year when convened by Chairman ;

(*b*)    The extraordinary general meeting shall meet at the request of the chairman of the board of directors or that of one-third of the board members where necessary ;

(*c*)    The ordinary and extraordinary general meetings may not validly conduct business except in the presence of four-fifths (4/5) of their members, including, compulsorily, the representatives of the technical and financial supervisory authorities.

(*d*)    The decisions of the ordinary general meeting shall be taken by a three-fifths (3/5) majority of members. Those of the extraordinary general meeting shall be taken by a four-fifths (4/5) majority of members.

## *Ii — Board of directors*

### *A.   Composition of the board of directors*

Section 36. — (1) The board of directors shall be made up three members at least and twelve at most. It must include one (1) elected staff representative.

(2)    The board members shall be designated by the general meeting of shareholders for a three-year term, renewable once.

(3)   For a public corporations with only one shareholder, the articles of association shall specify the methods of appointing board members.

(4)      With the exception of the staff representative, each shareholder is entitled to representation proportionate to the number of shares he holds. Small shareholders may form a group for the purpose of representation on the board of directors.

**Section 37.** — (1) The board of directors shall elect its chairman from amongst its members, excluding the representatives of the supervisory authority, by a 2/3 (two-thirds) majority of the members present or represented.

(2)   The board chairman shall be elected for a three-year term. renewable once.

*B — Term of office of board members*

**Section 38.** — The legal provisions governing the acquisition of shares by board members to guarantee the proper performance of their duties shall not be applicable.

**Section 39.** — (1) A board member's term of office shall end :

\* at the expiry of its normal duration, on his death or resignation ;

\* following the loss of the capacity that prompted the appointment ;

\* by termination following a serious fault or activities incompatible with the status of board member ;

\* following the dissolution of the corporation.

(2)   The term of the office shall expire under the same conditions as those applicable to its assumption.

(3)   In case of death during the term of office, or in any situation where a board member is no longer able to perform his duties, the body which appointed him shall select another board member to complete the term of office.

**Section 40.** — (1) The duties of board member shall be honorary. Board members may, however, receive sitting allowances and a refund of expenses occasioned by board meetings upon presentation of supporting documents.

(2) The board chairman may receive a montly allowance.

*C — Powers of the board of directors*

**Section 41.** — (1) The board of directors shall have the widest powers to act on behalf of the corporation, define and provide its general policy guidelines and assess its management within the limits fixed by its objectives. subject to the provisions of this law.

(2)   In particular, and without this list being exhaustive, the board of directors shall have powers to :

(a)   Set the objectives and approve the programmes of action established in accordance with the overall objectives of the sector in question ;

(b)   Approve the budget and take final decisions on annual accounts and financial statements ;

(c)   Approve the progress report ;

(d)   Adopt the organisation chart, the internal regulations, the salary scale and staff benefits prepared by the general manager ;

(e)   Recruit and dismiss the supervisory staff on the recommendation of the general manager ;

(*f*) Appoint, on the recommendation of the general manager, persons to positions of responsability from the rank of deputy director and persons ranking as such ;

(*g*) Appoint or dismiss, on the recommendation of the general manager, the company representatives at general meetings and board meetings of other corporations ;

(*h*) Accept gifts, legacies and subsidies ;

(*i*) Approve performance contracts and all other agreements, including loans, prepared by the general manager and having an incidence on the budget ;

(*j*) Authorize all transfers of movable or immovable, tangible or intangible property, in accordance with Section 4 above and of technical supervision and by any other administration involved, subject to compliance with privatization legislation ;

(*k*) Authorize the acquisition of shares in associations, groups or other bodies, as well as the creation of branches whose activities are linked to the mission of the corporaton;

(3) The board of directors may delegate all or part of its powers with the exception of those indicated above.

### D. Rules of procedure of the board of directors

Section 42. — (1)   Convened by its chairman, the board of directors shall meet at least twice a year in ordinary session, once to vote the budget and once to adopt the annual financial statement and assess the functioning of the corporation.

It shall discuss all items included on the agenda either by the chairman or at the request of 2/3 (two-thirds) of board members.

(2) However, at the request of at least 1/3 (one-third) of the board members, the chairman shall be bound to convene the board in extraordinary session.

(3) In case of refusal or failure by the chairman to convene a board meeting, the board members concerned shall forward another request to the minister of finance, who shall convene the board of directors in accordance with the same rules of procedure and deadlines.

(4) The board chairman shall be considered to have failed in his duties if he does not convene at least two board meetings per year. In that case, at least one-third of the board members or the minister in charge of finance may take the initiative to convene a board meeting and propose an agenda.

Section 43. — Members shall be convened by telex, telegram, fax or any other means with written proof at least fifteen days before the scheduled date of the meeting. Convening notices shall bear the agenda and venue of the meeting.

Section 44 : (1) Any member who is unable to attend a board meeting may request another board member to represent him. However, no board member may represent more than one other member at the same meeting.

(2)  All members present or represented at a board meeting shall be deemed to have been duly invited.

(3)   Where the chairman is absent, the board shall elect from amongst its members a session chairman by simple majority of the members present or represented.

— 12 —

**Section 45.** — (1) The board of directors may not deliberate validly on any item on the agenda unless at least two-thirds of its members are present or represented. If the quorum is not reached during the first meeting, it shall be reduced to half of the members present for subsequent meetings.

(2) Each member shall have one vote. Decisions shall be taken by simple majority of members present or represented, subject to the qualified majority provided for by the articles of association or this law. In the event of a tie, the chairman shall have the casting vote.

**Section 46.** — (1) The general management of the corporation shall perform the secretarial duties of the board of directors.

(2) The minutes of meetings shall be entered in a special minutes book kept at the head office, and signed by the chairman and secretary of the session. They shall mention the members present or represented. They shall be read and adopted by the board of directors at its next meeting.

### III — General management
#### A. Status of the general manager

**Section 47.** — (1) The general manager and, where applicable, the deputy general manager, shall be appointed by a 2/3 (two-thirds) majority of the board of directors upon recommendation of the majority or sole shareholder for a period of three years, renewable twice.

(2) The remuneration and benefits of the general manager and deputy general manager shall be fixed by a 2/3 (two-thirds) majority of the board of directors, subject to the ceilings fixed by the regulations in force.

**Section 48.** — The duties of the general manager shall cease through :

* dismissal ;

* non-renewal of his term of office ;

* death or resignation ; or

* as a result of the dissolution of the corporation.

**Section 49.** — (1) The general manager shall be answerable to the board of directors which may penalize him in case of serious management error or conduct likely to undermine the smooth functioning or tarnish the image of the corporation.

To this end, the board chairman shall be bound to convene an extraordinary board meeting during which the general manager shall be heard. The board of directors may impose one of the following sanctions on him :

* suspension of some of his powers ;

* immediate suspension from his duties for a limited period ;

* dismissal.

(2) The extraordinary session may not validly deliberate unless two-thirds of the board members are present. Representation shall not be allowed in this case.

Decisions shall be reached through :

* a unanimous vote of members present, in case of dismissal ;

* a two-thirds majority for the other sanctions.

(3) In case of suspension form duty, the board of directors shall take the necessary measures to ensure the smooth running of the corporaton.

(4) Decisions shall be transmitted to the technical supervisory minister and the minister in charge of finance, for their information, by the chairman of the board of directors.

**Section 50.** — (1) Where the general manager is temporarily unable to perform his duty for a period up to 6 (six) months, the board of directors shall appoint the deputy general manager to act in his place.

Where there is no provision for the post of deputy general manager or where such deputy general manager is unable to perform his duties, the board of directors shall appoint a senior official of the corporation to act for him.

(2) Where the general manager is permanently unable to perform his duties, whatever the reason therefor, the board of directors shall immediately make provision for his replacement within a period of not more than one month.

### B. Powers of the general managers

**Section 51.** — (1) The general manager shall be responsible for the management of the corporation and the implementation of its general policy under the supervision of the board of directors to which he shall report on his stewardship.

In that capacity, and without the list being exhaustive, the general manager shall be responsible for :

* preparing the budget, annual financial statements and progress reports ;

* preparing the deliberations of the board of directors, participating in an advisory capacity in its meetings, and implementing its decisions ;

* carrying out the technical and administrative management of the corporation ;

* recruiting, appointing, awarding marks to and laying off staff subject to the provisions of Section 41 above, and fixing their remuneration and benefits in keeping with the rules and regulations in force, the internal regulations, the budget estimates and the decisions of the board of directors ;

* managing the movable and immovable, tangible and intangible property of the corporation, with respect for the company object and the provisions of Section 34 (10) above ;

* taking, in cases of emergency, any precautionary measure necessary for the smooth functioning of the corporation, and giving an account thereof to the board of directors ;

* representing the corporation in all civil matters and before the law.

(2) Furthermore, the board of directors may delegate some of its responsibilities to the general manager, who may also delegate some of his powers.

CHAPTER III

BUDGET AND ACCOUNTS

**Section 52.** — The draft annual budget of public corporations shall be prepared by the general manager and adopted by the board of directors before the beginning of the financial year.

The budget so adopted shall be forwarded, for information, to the minister in charge of finance and, as the case may be, to the technical supervisory ministry or the policy-making body of the regional or local authority.

**Section 53.** — Each year, the general manager shall prepare at the same time as the draft budget a programme of action specifying the objectives and results to be achieved during the financial year to be approved by the board of directors. These documents shall be forwarded for information to the minister in charge of finance and, as the case may be, to the technical supervisory minister or the policy-making body of the regional or local authority.

**Section 54.** — (1) Public corporations shall be managed according to the rules of private accounting.

(2) Annual accounts and balance sheets shall be adopted by the board of directors, checked by one or more auditors and approved by the general meeting within 6 (six) months of the financial year.

They shall be notified for information to the minister in charge of finance and, as the case may be, to the technical supervisory minister or the policy-making body of the regional or local authority, together with the management report of the board of directors to the general meeting and the auditors' report.

**Section 55.** — (1) The distribution of profits shall be submitted by the board of directors to the general meeting of shareholders for approval.

(2) The profit to be distributed shall comprise the profit for the financial year, less outstanding losses and the reserve provision, in accordance with Section 56 below or the articles of association, and any brought forward profit.

(3) The distribution of declared profits shall be in accordance with the provisions of the articles of association relating to statutory dividend.

**Section 56.** — Under pain of a contrary decision being declared void, at least 10% of the net profit of the financial year shall be deducted and allocated to the building up of a legal reserve fund. Such deduction shall cease when the reserve amounts to 15% of the share capital.

**Section 57.** — The auditors designated in accordance with the provisions of Section 11 above shall have a three-year term of office, renewable once.

**Section 58.** — (1) The general manager and, if necessary, the deputy general manager, as well as the staff of public corporations may share in the productivity of their corporation to the tune of at most 10% of the net profit realized during each financial year, in accordance with the statutory procedures.

(2) The ordinary general meeting may, taking into account the productivity of the corporation, grant a discretionary fixed annual allowance to board members as remuneration for their activities.

PART III

ADMINISTRATIVE PUBLIC ESTABLISHMENTS

CHAPTER ONE

SETTING UP ADMINISTRATIVE PUBLIC ESTABLISHMENTS

**Section 59.** — (1) State-owned administrative public establishments shall be set up by decree of the President of the Republic.

(2) Administrative public establishments belonging to a regional or local authority shall be set up by decision of the authority's policy-making body.

**Section 60.** — (1) The instrument setting up a State-owned administrative public establishment shall specify, *inter alia*,

* its mission, and earmarked assets as well as the technical supervisory ministry ;

* the bodies in charge of its management, the scope of their powers and the conditions for designating the officials as well as the rules of procedure of these bodies.

(2) Administrative public establishments shall not operate as business ventures.

(3) The private estate of administrative public establishments shall comprise :

* the property acquired by the said establishment ;

* the private property of the State transferred in ownership and finally incorporated into the estate of the establishment ;

* public and national assets as well as the private property of the State transferred in possession according to the land legislation, but which have maintained their original status.

(4) Part of the private property of administrative public establishments shall be managed under to ordinary law, subject to the provisions of Section 4 of this law.

CHAPTER II

MANAGEMENT

**Section 61.** — The management organs of an administrative public establishment shall be :

* a board of directors or any other body in lieu thereof ;

* a general management.

*I — Board of Directors*

*A. Composition and functioning*

**Section 62.** — (1) The board of directors of an administrative public establishment or any other policy-making body provided for by its articles of association shall comprise at least 5 (five) and at most 12 (twelve) members.

(2) The instrument setting up an administrative public establishment shall specify the number of board member as well as the conditions of their appointment.

**Section 63.** — The board of directors shall comprise representatives of the ministries concerned with the execution of the tasks assigned to the administrative public establishment.

It shall of necessity comprise :

* a representative of the technical supervisory ministry ;

* a representative of the ministry in charge of finance ;

* a representative of users or beneficiaries of the establishment's services;

* a staff representative.

**Section 64.** — (1) The board of directors of State-owned administrative public establishments shall be chaired by a person designated by decree of the President of the Republic.

(2) The board chairman shall convene and preside over board meetings. He shall ensure the implementation of its resolutions.

*B. Term of office*

**Section 65.** — (1) Board members shall be appointed by statutory instrument for a term of 3 (three) years, renewable once.

(2) Their term of office shall expire as provided for under Section 39 above.

**Section 66.** — (1) The duty of board member shall be honorary. However, board members may be paid sitting allowances and may be reimbursed any expenses incurred during the sessions upon presentation of supporting documents.

(2) The board chairman shall receive a monthly allowance.

(3) The rate of the sitting allowance as well as the monthly allowance of the chairman shall be fixed by the board of directors within the ceilings set by the regulations in force.

*C. Powers*

**Section 67.** — (1) The board of directors shall have full powers to :

* act on behalf of the administrative public establishment :

* define and guide the general policy of the said establishment and assess its management within the scope of its object, subject to the provisions of this law.

(2) The regulations laid down in Section 41 to 46 shall apply to the boards of directors of administrative public establishments.

## II — General Management
### A. General provisions

**Section 68.** — The general manager shall be appointed by decree of the President of the Republic for a period of three (3) years renewable twice.

**Section 69.** — (1) The general manager shall be answerable to the board of directors which may penalize him for a serious management offence or for conduct likely to impair the proper functioning or tarnish the image of the establishment, in accordance with the rules laid down in Section 49 above, unless otherwise provided for in this section.

(2) The following penalties may be inflicted upon the general manager :

* suspension of some of his powers ;

* immediate suspension for a limited period ;

* immediate suspension with a request for dismissal submitted to the appointing authority.

Decisions shall be taken by a two-thirds majority of board members.

**Section 70.** — (1) Where the general manager is temporarily unavailable for a period of not more than 2 (two) months, the latter shall take all the necessary steps to ensure the smooth functioning of the service.

(2) In case of vacancy of the post of general manager, as a result of death, resignation or permanent disability and pending the appointment of a new general manager by the competent authority, the board of directors shall take all the necessary steps to ensure the proper functioning of the administrative public establishment concerned.

### B. Powers of the manager

**Section 71.** — (1) The manager shall be responsible for managing and implementing the general policy of the administrative public establishment, under the supervision of the board of directors to which he shall report.

(2) To perform his duties, the general manager of the administrative public establishment shall have the same prerogatives as a general manager of a public corporation as stipulated in Section 51 above.

(3) Furthermore, the board of directors may delegate some of its powers to the general manager.

### CHAPTER III
### BUDGET AND ACCOUNTS

**Section 72.** — State-owned administrative public establishments shall be managed according to the rules laid down by the State financial regulations.

**Section 73.** — The general manager shall be the main authorizing officer of the budget of an administrative public establishment. He may propose the appointment of assistant authorizing officers by the board of directors.

**Section 74.** — (1) The minister in charge of finance shall appoint an accounting officer for administrative public establishments.

(2) The accounting officer shall keep accounts of all the income and expenditure of the administrative public establishment. He shall ensure regularity of all revenue payments, payment authorizations and all the payments authorized by the general manager of the public establishment.

(3) The payments of authorized expenditure shall be made solely by the accounting officer of the public establishment.

**Section 75.** — (1) Before the beginning of a new financial year, the general managers of state-owned administrative public establishments shall prepare their annual draft budget and investment plans which, after adoption by the board of directors, shall be submitted to the technical supervisory ministry and the minister in charge of finance for approval.

(2) The annual draft budget of non-State-owned administrative public establishments shall be prepared by the general manager and forwarded for approval to the deliberative organ of the regional or local authority before the beginning of the next financial year.

**Section 76.** — (1) The budget of administrative public establishments must be balanced.

(2) The total income and expenditure of administrative public establishments shall be entered in the budget adopted by the board of directors.

(3) The funds needed to cover the recurrent expenditure approved by the board of directors may be deposited in a bank account. However, the commitment, settlement, payment authorization and payment of the funds deposited shall be carried out in accordance with public accounting regulations.

**Section 77.** — (1) The General manager shall present to the board of directors and, as the case may be, the minister in charge of finance and the technical supervisory ministry, periodic statements and an annual progress report.

(2) Furthermore, he shall, within 6 (six) months of the close of the financial year, present the annual financial statements and the report on the execution of the budget of the previous financial year.

(3) The financial controller and the accounting officer shall present the reports on the execution of the budget of administrative public establishments to the board of directors :

(4) Copies of these reports shall be forwarded to the Minister in charge of finance, the technical supervisory ministers and the general manager of the administrative public establishment.

PART IV

## DISSOLUTION AND LIQUIDATION

### CHAPTER ONE

### GENERAL PROVISIONS

**Section 78.** — The provisions of this part shall apply to administrative public establishments, public corporations and semi-public corporations in which the State holds more than half of the share capital and voting rights.

The provisions of this part shall not apply to credit establishments.

*I — Dissolution and liquidation*

**Section 79.** — (1) Dissolution of a State-owned administrative public establishment shall be pronounced by decree of the President of the Republic, on the joint recommendation of the minister in charge of finance and the minister in charge of the technical supervision.

(2) Where the enterprise is a public corporation with the State as sole shareholder, the dissolution shall be pronounced by decree of the President of the Republic, on the joint recommendation of the minister in charge of finance and the minister in charge of the technical supervision and on the recommendation of the college referred to in Section 30 above.

(3) The dissolution of an administrative public establishment owned by a regional or local authority or of a public corporation in which a regional or local authority is sole shareholder shall be by decision of its deliberative organ.

(4) The dissolution of public corporations with several shareholders and of semi-public corporations shall be by decision of the extraordinary general meeting of shareholders, in accordance with the statutory provisions relating thereto.

(5) A dissolution decision shall, within 8 (eight) clear days from the time it is reached, be published in a legal notices newspaper and in the national press. The liquidation procedure shall be open from the date of such publication.

From such date and unless otherwise decided by the dissolution instrument, the following measures shall be taken:

\* the board of directors and the general management shall be relieved of their duties, without prejudice to the provisions of Section 90 below;

\* all ongoing contracts shall be suspended, subject to the pursuance of certain contracts under Section 91 below.

**Section 80.** — (1) An administrative public establishment shall be dissolved where its mission comes to an end or for any other reason provided for by its articles of association. The State or a regional or local authority, as the case may be, shall be responsible for the liabilities of an administrative public establishment.

(2) The dissolution of public corporations and semi-public corporations shall be pronounced for the reasons stipulated in their articles of association or in the law governing limited liability companies.

(3) Where the equity capital of the corporation is less than half of its authorized capital as a result of losses shown in the accounting documents, board members shall be bound to cause the holding of an extraordinary general assembly within six months following the establishment of the losses in order to rule on the regularization measures to be taken or, failing that, on an early dissolution.

(4) In any case, failing regularization, early dissolution shall be pronounced at the close of the second financial year following that during which the losses were established. The auditor(s) shall be bound to inform the minister in charge of finance at the close of the first financial year in which the losses were established.

**Section 81.** — The instrument pronouncing the dissolution of the enterprise shall specify whether or not operations shall continue during the liquidation period.

**Section 82.** — (1) The liquidation of the enterprises referred to in Section 79 above shall be carried out exclusively within an amicable framework according to the provisions of this law.

(2) The publication of the instrument pronouncing the dissolution of the enterprise shall suspend or bar any principal action or counter-claim, summary procedure or any other out-of-court settlement, any ongoing action against the enterprise as well as any execution on its assets.

(3) However, creditors who have a security or special privilege may, once their debts have been declared, exercise their right of personal action if the liquidator has not undertaken liquidation of the entailed property within six months after assuming duty.

(4) At the closure of the liquidation, creditors shall recover their right of personal action within the limits fixed by Section 107 below.

**Section 83.** — (1) The debts of the dissolved enterprise shall become due, where applicable, at the expiry of the period specified above, upon publication of the instrument pronouncing dissolution of the enterprise.

(2) The dissolution shall freeze legal and conventional interest on the debts of the enterprise as well as all interest in arrears and additional charges.

(3) The publication shall, as of right, entail the prohibition, under pain of nullity, to pay any debt contracted prior to the publication of the instrument dissolving the enterprise. However, the liquidator may pay previous debts in order to redeem the security or item that was legitimately withheld where such redemption is justified for the continuation of liquidation transactions.

(4) The securities and privileges as well as legal transactions and decisions transferring or constituting chattels real may not be registered after the publication of the instrument dissolving the enterprise.

**Section 84.** — (1) Enterprises in liquidation shall be exempted from making any deposit with the registries of courts.

(2) Decisions rendered against them under the debt contention procedure shall be registered free of charge.

(3) Decisions rendered in their favour shall be registered as debit balance.

## II — Liquidation organs

Section 85. — (1) By decision of the minister in charge of finance as concerns the enterprises referred to in Section 79 (1) and (2) following the same procedure as laid down in Section 79 (3) and (4) for the dissolution of other enterprises, a liquidator that may be a commission or a natural person or corporate body shall be designated concomitantly with the instrument dissolving the enterprise without prejudice to any possible incompatibilities.

(2) Where a corporate body is designated liquidator, the name of its representative shall be indicated.

(3) The instrument appointing the liquidator, its form notwithstanding, shall be published within one month upon appointment in a legal notices journal.

(4) The liquidator, in the execution of his mandate, may consult any person by reason of his special knowledge.

(5) The ceiling of the monthly fees or emoluments of the liquidator shall be fixed as the case may be, by decision of the minister in charge of finance or by the general assembly of the semi-public corporation, or by the deliberative organ of the regional or local authority.

Section 86. — (1) The liquidator shall be appointed for a maximum period of one year renewable. However, the liquidation period shall not exceed 3 (three) years. The instrument appointing the liquidator shall define his duties and powers, the scope of his mandate and date on which he shall assume duty.

(2) The duties of liquidator shall cease notably by non-renewal of this term or by dismissal on justified grounds. His replacement shall take place under the same conditions as those which prevailed at his appointment.

Section 87. — (1) Subject to compliance with the regulations on privatization and the provisions of this law, the liquidator shall have extensive powers to recover the assets, settle the liabilities of the dissolved enterprise and, where applicable, share the remaining net assets among the subsisting partners or pay same into the Treasury as the case may be.

(2) However, some actions taken by the liquidator and the option to compromise or settle matters out of court may be subject to specific authorizations provided for in his mandate.

Section 88. — (1) Once in office, the liquidator shall draw up a draft budget and a programme of action which he shall submit to the organ that appointed him for approval. The draft budget shall comprise notably the liquidation expenses as defined in Section 104 below.

(2) He shall prepare an opening liquidation statement which he shall submit to the organ that appointed him.

(3) A decision of the minister in charge of finance shall lay down, if need be, the conditions for executing the liquidation budget.

**Section 89.** — (1) The liquidator shall submit a quarterly report on his activities to the organ that appointed him.

(2) The liquidator shall keep an account of the liquidation transactions. Upon completion of the liquidation transactions he shall submit a report and the closing accounts of the liquidation to the organ that appointed him.

Approval of the liquidation accounts shall discharge the liquidator of his duties.

CHAPTER II

LIQUIDATION TRANSACTIONS

*I — Interim measures of protection*

**Section 90.** — (1) Once in office, the liquidator shall, within a period of fifteen days, make a physical and accounting inventory of the assets of the dissolved enterprise. He shall draw up a report thereon after consultation with the general manager as well as staff who are in possession of the property of the enterprise.

(2) The general manager, under pain of assuming liability, shall hand over to the liquidator, the financial statements as well as the list of creditors and the total amount of debts as at the date of the instrument pronouncing the liquidation of the enterprise.

**Section 91.** — (1) Once in office, the liquidator shall be bound to request for or, as the case may be, himself issue all instruments needed to protect the rights of the enterprise against its debtors and to preserve its assets and, where necessary, to ensure continuation of operations during the liquidation period.

(2) In general, the liquidator shall expedite the taking of the necessary precautionary measures which may include :

(*a*) Freezing bank accounts, limiting the powers of officials in service, sealing stores or designating new caretaker officials, identifying personnel necessary for maintaining the property of the enterprise in good condition and limiting access to sensitive areas;

(*b*) Registering on behalf of the enterprise all securities or all liens which may not have been taken or renewed ;

(*c*) Pursuing on-going contracts ;

(*d*) Restoring certain assets for a more profitable transfer ; and

(*e*) Requesting assistance from the authorities to take any security measures which might help to safeguard the property of the enterprise.

*II — Transactions relating to assets*

**Section 92.** — Assets shall be realized mainly in two ways :

* debt recovery ; and

* transfer of assets.

*A. Debt recovery*

**Section 93.** — (1) The liquidator shall recover debts owed to the enterprise by amicable agreement, judicial process or by the treasury preferential claim procedure if the enterprise enjoyed such preferential right prior to its liquidation.

(2) General recovery notices shall be put out through the press.

(3) Specific notices may be put out through the press or served through personal letters on the basis of the schedules of assets and liabilities. Notices shall be given out even for secured debts.

(4) Only debtors whose debts are established through the accounting procedure shall be served with notices and warnings prior to recovery proceedings.

(5) The recovery of certain debts may, by virtue of their specificity, be entrusted to a debt recovery corporation.

### B. Realization of assets

Section 94. — (1) The realization of assets shall help in the payment of liquidation costs and in the settlement of liabilities.

(2) Movable and immovable property may be sold by auction. The liquidator shall invite tenders by publication in a journal of legal notices and fix the deadline for receiving same.

(3) Production units forming part of the immovable property may be the object of a package deal.

Section 95. — (1) In order to determine their reserve price, the liquidator shall organize the sale of movable and immovable property on the basis of :

* physical inventories establishing the existence and condition of the property; and
* of valuations assessing the purchase value, depreciation and salvage or book value of each property.

(2) An appraisal by an expert registered with the competent court of appeal may also determine any appreciation in value depending on the state of the property or its possible use.

Section 96. — (1) The enterprise's movable and immovable property not mortgaged may be :

* sold by auction ;

* assigned against payment or through the assumption of liabilities equivalent to the cost of the property to any regional or local authority or body corporate entrusted with the whole or part of the mission that originally devolved upon the dissolved entity.

(2) Movable and immovable property not  mortgaged belonging to administrative public establishments and to public corporations may, exceptionally, after paying of all creditors :

* be assigned free of charge by the minister in charge of finance, upon the recommendation of the technical supervisory ministry, to any regional or local authority or body corporate entrusted with the whole or part of the mission that originally devolved upon the dissolved entity; and

* re-incorporated into the property of the State where the value of such property cannot be expected to yield significant proceeds from their sale or where the Government's economic, social and cultural policy requirements so dictate.

Section 97. — (1) In the case of sale of mortgage assets, the share of the price corresponding to the enterprise's secured debts shall be paid into a special liquidation account and the creditors paid following the established order of preference in accordance with rules of ordinary law. The liquidator shall obtain or ensure the write-off the corresponding mortgage.

(2) The liquidator may propose to the mortgage or secured creditor to take over mortgaged assets in proportion to his claim. If the value of the asset assessed in accordance with Section 95 above is more than his claim, the creditor shall have to make an equalization payment, otherwise, he shall continue to be a creditor of the liquidator.

Section 98. — (1) The liquidator shall deposit any sums received by him in the performance of his duties into a special liquidation account.

(2) Any sale of property that is part of the assets of the enterprise to the liquidator, his employees or their spouse, ascendants or descendants shall be null and void.

### III — Transactions relating to liabilities

Section 99. — The liquidator shall be responsible for listing and classifying the debts due in order of preference for settlement purposes.

### A. Listing of claims

Section 100. — (1) With effect from the date of publication of the dissolution instrument, all creditors whose claims were due prior to the initiation of the liquidation process shall forward their statement of claims to the liquidator. This shall not apply to the enterprise's employees whose statement of claims shall be drawn up and forwarded to the staff representative and the labour inspectorate by the liquidator.

(2) Creditors resident in Cameroon shall have 2 (two) months from the date of publication of the instrument initiating the liquidation process to produce their claims together with supporting documents and especially statement of claims.

(3) If after this deadline, creditors known to the liquidator do not produce their claims, the liquidator shall serve them with notice to do so within 15 (fifteen) days, otherwise they shall be barred from producing the claims through the press. This time-limit shall be extended by 3 (three) months for creditors resident outside Cameroon who shall be notified by the liquidator by registered letter against acknowledgement of receipt.

(4) Only reported debts shall be considered, after verification, in the distribution of the liquidation proceeds.

Section 101. — (1) The liquidator shall, within 4 (four) months of assumption of duty, draw up a provisional list of claims after ascertaining that the claims are justified.

(2) The list of claims shall specify the order of preference of each creditor according to the rules of ordinary law and subject to the provisions of Section 103 below.

(3) The list of claims shall be made available to creditors who shall be notified thereof through the press. Non-resident creditors shall be notified individually by registered letter against acknowledgement to receipt.

Section 102. — (1) Disputes relating to claims shall be forwarded to the liquidator by registered letter against acknowledgement of receipt within a period of 1 (one) month from the date of notification referred to in Section 101 above. Failure to submit objection within this time-limit shall bar subsequent objection to the liquidator's proposal.

(2) The liquidator shall be bound to take a decision within 10 (ten) days following receipt of the registered letter referred to in the preceding subsection ; after this time limit, silence on his part shall be deemed acquiescence.

(3) The decision of the liquidator shall be subject to appeal by simple application addressed to the President of the High Court of the area where the headquarters of the enterprise is located.

(4) The President of the court shall take a decision, after hearing both parties, by order issued in private within 15 (fifteen) days following the date the matter was referred to him. He shall give a first ruling only on matters relating to claims and shall not act ultra vires.

(5) The liquidator shall forward the final list of claims to the minister in charge of finance who shall verify, adopt and render it enforceable by decision.

### B. Settlement of liabilities.

Section 103. — (1) The order of settlement of claims on the enterprises under liquidation referred to in this part shall be as follows:

* wage claims shall be preferred claims having top-most priority over other priorities regarding compensation for termination of contract of employment and the percentage of wages not liable to attachment as provided for by the laws and regulations in force ; and

* then follow the other preferential debts according to the order provided by ordinary law after prior and mandatory set-offs, wherever possible, of claims between the State and the enterprise under liquidation on the one hand, and between the enterprise under liquidation and other administrative public establishments, public corporations and semi-public corporations in which the Government holds more than the absolute majority of the share capital and voting rights, on the other hand.

The amount of assets remaining shall be distributed to the creditors in proportion to their verified and accepted debts, in accordance with the rules of ordinary law.

(2) An order of the minister in charge of finance shall lay down the conditions for payment of the debts referred to in the preceding subsection.

(3) The liquidation dividend, if any, shall be paid by the liquidator into the public treasury or to owners or shareholders proportionally to their shares of the capital, according to the circumstances.

### C. Liquidation costs

Section 104. — (1) The liquidation costs or expenses resulting directly from liquidation transactions shall be paid as the transactions are effected. They shall have priority over debt redemption costs, irrespective of their preferential rights.

(2) Liquidation costs shall be reduced to their lowest value and shall comply with the rules governing the management of public funds.

(3) All increases of liquidation costs in relation to the initial budget must first be forwarded by the liquidator to the authority which appointed him, for approval.

(4) Liquidation costs shall include :

* debt recovery expenses ;
* the monthly fees or allowances of liquidator ;
* charges for legal notices ;

\* expenses resulting from the performance of contracts, particularly contracts of employment that are still valid after the publication of the liquidation decision ; and

\* expenses incurred within the framework of interim measures of protection.

*IV — Termination of liquidation*

**Section 105.** — The liquidation may be terminated at any time by decision of the authority which appointed the liquidator in the following cases :

\* when there are no more current liabilities ; and

\* when liquidation transactions cannot be pursued owing to insufficient assets.

**Section 106.**    (1) Before the termination of liquidation, the liquidator shall draw up a liquidation statement which shall be attached to his final report.

(2) The liquidation statement shall be forwarded by the liquidator to the authority which appointed him, for approval. However, the minister in charge of finance shall in any case receive, for his information, the liquidation statement when the reason for termination of the liquidation is insufficiency of assets.

(3) The decision terminating the liquidation shall be taken by the same authorities and under the same conditions, especially of publication, as the decision to liquidate.

**Section 107.**    (1) When the liquidation is terminated because of the insufficiency of assets, the creditors whose claim have been verified and accepted shall recover their individual prosecution rights in case of fraud affecting the rights of creditors committed by the natural persons or corporate bodies referred to in Sections 108 and 109 of this law.

(2) The persons who during the liquidation process and in good faith acquired all or part of the enterprise's property cannot, unless otherwise agreed to by them, be individually or collectively liable for any of the debts of the enterprise under liquidation. In like manner, the employees of the enterprise under liquidation who are subsequently employed by the purchaser of such property shall be so recruited on the basis of a new contract of employment.

PART V

## PENALTY CLAUSES

Section 108. — (1) Any manager of an enterprise who :

* distributes sham dividends to shareholders through fraudulent balance sheets ;

* knowingly publishes or presents an inaccurate balance sheet even without distributing dividends in order to conceal the true situation of the enterprise ;

* uses his powers or the enterprise's property or repute for purposes contrary to its interest for personal reasons or in order to favour another company or business in which he owns interests diretly or indirectly shall be penalized.

(2) All the forfeitures relating to the civic, professional and honorary rights applicable in case of bankruptcy by virtue of the laws and regulations in force shall also be imposed on the manager found guilty of the offences referred to in Section 108 (1) above.

(3) Any court judgements passed against him shall be made public.

Section 109. — (1) The penalties provided for in Section 318 of the Penal Code shall be inflicted upon any liquidator of a company who, in that capacity, is guilty of :

* paying or authorizing payment to a creditor in violation of the provisions of this law relating to liquidations ;

* misappropriating or concealing part of the enterprise's property ;

* falsifying or causing the falsification of the liquidation accounts ;

* using the funds recovered for purposes other than those provided for the liquidation.

(2) The forfeitures provided for in Section 108 (2) above may be applied.

Section 110. — (1) The penalties provided for in Section 313 of Penal Code shall be applied to any auditor of an enterprise who knowingly gives, certifies or confirms false information on the said enterprise or who fails to inform the competent authorities of any criminal facts of which he is aware.

(2) The forfeiture provided for in Section 108 (2) above may be applied.

## PART VI
## MISCELLANEOUS, TRANSITIONAL AND FINAL PROVISIONS

**Section 111.** — The list of enterprises existing legally or undergoing liquidation at the date of publication of this law shall be fixed by decree.

(2) Enterprises which, on the date of publication of this law, are formed into limited liability companies and/or enjoy the status of development corporations, and in which the private sector owns less than half the capital shall be automatically transformed into semi-public corporations.

Unless otherwise provided for in this law, such enterprises shall continue to be governed by the regulations applicable to limited liability companies in the area where their headquarters are located, and all contrary provisions contained in their articles of association shall be null and void.

**Section 112.** — (1) Public establishments, enterprises in the public and semi-public sector must comply with the provisions of this law within 1 (one) year starting from the date of its enactment.

(2) At the expiry of this time-limit, ad hoc representatives shall be appointed by decision of the minister in charge of finance to enterprises which have not complied with the provisions of this law for a period of not more than 6 (six) months for the specific purposes of updating their articles of association, producing financial statements and setting up the appropriate governing bodies.

(3) The provisions of this law shall apply from the date of its enactment to public and semi-public sector enterprises undergoing liquidation.

**Section 113.** — The assets of public establishments and public and semi-public sector enterprises undergoing liquidation on the date of enactment of this law, which were freely transferred to government services or to other public establishments or enterprises in the public and semi-public sector and which were not effectively used for the purpose for which they were intended, shall automatically be returned to the enterprises under liquidation.

**Section 114.** — This law, which repeals all previous provisions repugnant hereto, shall be registered, published according to the procedure of urgency and inserted in the *Official Gazette* in English and French.

Yaoundé, 22 December 1999.

THE PRESIDENT OF THE REPUBLIC

PAUL BIYA

**SECOND DECLARATION OF HENRI MEKONGO MBALA**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MBI Group, Inc., *et al.*,                            :

      *Plaintiffs*,                                    :

v.                                                   :          1:07-cv-00637-JDB

Crédit Foncier du Cameroun,                           :

and                                                  :

The Government of the Republic of Cameroon,           :

      *Defendants*.                                    :

---

## DEUXIEME DEPOSITION DU SIEUR HENRI MEKONGO MBALA

En application de l'article 28 paragraphe 1746 du Code américain (U.S.C.), le Sieur Henri MEKONGO MBALA fait la déposition suivante :

1. Je suis Inspecteur général au Crédit Foncier du Cameroun (CFC), partie assignée dans cette affaire. J'avais fait une déposition demandant à la Cour, en date du 26 septembre 2007, de prononcer un non-lieu quant à la plainte des requérants. Je fais cette deuxième déposition en réaction aux points soulevés par les requérants en date du 5 novembre 2007 dans leur déclaration faisant objection à la demande de non-lieu faite par la partie assignée.

2. Tel qu'il ressort dans le paragraphe 7 de ma précédente déposition, le CFC est une personne morale distincte de l'Etat du Cameroun. Par ailleurs, le Conseil d'Administration du CFC administre les affaires du CFC comme une entité distincte

en vue d'atteindre les objectifs fixés dans les Statuts de cet organisme. Même si le Conseil d'Administration prend en compte les avis ou les demandes émanant du Gouvernement ou de toute autre source, elle agit en toute indépendance au nom du CFC. La tutelle technique et financière exercée par le ministère en charge des Finances conformément à l'article 6 des Statuts du CFC ne comprend pas le droit d'orienter les actions de son Conseil d'Administration.

3.  M. Booto à Ngon a asumé les fonctions de président du Conseil d'Administration (PCA) du 18 décembre 1998 au 13 septembre 2005. Même en sa qualité de membre du Conseil d'Administration, le PCA n'a pas pouvoir d'agir au nom de cet organe. Les pouvoirs du Conseil d'Administration sont exercés par l'ensemble de celui-ci, agissant ainsi en cette qualité. (Pièce HMM-1, article 33.1 des Statuts du CFC). Chaque administrateur, y compris le PCA, n'a qu'une seule voix (sauf que celle du PCA est prépondérante en cas d'égalité).   (Pièce HMM-1, article 34, dernier paragraphe, des Statuts du CFC).

4.  En tant que PCA du CFC, M. Booto à Ngon n'avait ni pouvoir de passer des contrats au nom de cet organisme, à l'exemple du prétendu « Mémorandum d'accord » du 18 mai 2004, versé comme pièce à conviction 'A' dans la plainte des requérants, ni pouvoir d'autoriser le directeur général, M. Joseph Edou à conclure un tel contrat.

5.  M. Booto à Ngon fut révoqué de ses fonctions de PCA du CFC le 13 septembre 2005, le même jour que le fut M. Joseph Edou, du poste de directeur général. M. Booto à Ngon était poursuivi en même temps que M. Joseph Edou, tous deux accusés pour agissements allant au-delà de leurs compétences au CFC. Au vu des pièces à conviction, M. Booto à Ngon bénéficiait des faveurs de M. Joseph Edou, aux frais du

CFC, y compris deux véhicules à usage personnel et des séjours au Hilton Hotel de Yaoundé.

6.    La Résolution 5-09 adoptée par le Conseil d'Administration du CFC le 18 août 2005 (Pièce 6 versée dans l'objection des requérants à la demande de non-lieu introduite par la partie assignée) ne ratifie, ni ne fait état du « Mémorandum d'accord » du 18 mai 2004. Le 18 août 2005, le Conseil d'Administration du CFC n'avait pas sur sa table, et (à l'exception manifestement du PCA Booto à Ngon) ignorait même l'existence de ce prétendu « Mémorandum d'Accord » du 18 mai 2004 qui constitue la pièce à conviction 'A' versée dans la plainte des requérants dans le cadre de ce procès.

7.    Le Conseil d'Administration du CFC n'a en aucun moment pris des mesures pour ratifier le « Mémorandum d'Accord » du 18 mai 2004. Le prétendu « Mémorandum d'Accord » du 18 mai 2004 n'a jamais été soumis à l'approbation du Conseil d'Administration, ni même de quelque autre façon porté à sa connaissance. En dehors de M. Edou, et manifestement du PCA Booto à Ngon, les responsables et les administrateurs du CFC ignoraient l'existence du « Mémorandum d'Accord » du 18 mai 2004 jusqu'au moment où les requérants l'ont versé comme pièce à conviction dans leur plainte du 6 décembre 2006 introduite au Tribunal Fédéral de Grande Instance de Maryland.

8.    Lors d'une cérémonie publique le 23 juillet 2005, la Mission d'aménagement et d'études de terrains urbains et ruraux (MAETUR), un organisme public camerounais, a procédé à la cession de 70 hectares de terre à Olembe II au CFC. Il n'y a pas eu de

cession de terre par le CFC ou par la MAETUR à Atlantic, MBI, ou Group Five le 23 juillet 2005, ni en aucun autre moment.

9.    Tel que je l'avais déclaré dans paragraphe 19 de ma précédente déposition, je connaissais le lien de parenté qui existait entre M. Joseph Edou et M. Ateba Minkoulou Gabriel, son beau-frère. Dans le même ordre d'idée, le lien de parenté entre M. Edou et sa nièce (la fille de M. Ateba Minkoulou Gabriel), était su des collègues de M. Edou au CFC.

10.   Cependant, en août 2005, ni moi-même, ni, à ma connaissance, personne d'autre au CFC (en dehors de M. Edou et probablement M. Booto à Ngon), ne savait rien de l'existence de la société à responsabilité limitée FALLS, ou que M. Ateba Minkoulou Gabriel, le beau-frère de M. Joseph Edou, n'était que le propriétaire apparent de Falls. De même, en août 2005, ni moi-même, ni, à ma connaissance, personne d'autre au CFC (en dehors probablement, de M. Booto à Ngon), ne savait qu'une société enregistrée au nom du beau-frère de M. Edou possédait des intérêts dans le groupe Atlantic SCI.

En foi de quoi, je déclare, en connaissance des lois américaines relatives aux poursuites judiciaires pour faux serment, que les déclarations contenues dans la présente déposition sont exactes et conformes à la vérité.

Fait le 7 janvier 200

Henri MEKONGO MBALA

4

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun, | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants*. | : | |

## SECOND DECLARATION OF HENRI MEKONGO MBALA

HENRI MEKONGO MBALA declares pursuant to 28 U.S.C. § 1746:

1. I am Inspector General of Crédit Foncier du Cameroun ("CFC"), a Defendant in this lawsuit. I made a Declaration in support of the Defendants' September 26, 2007 motion to dismiss Plaintiffs' Complaint. I make this Second Declaration in response to matters raised in Plaintiffs' November 5, 2007 opposition to the Defendants' motion to dismiss.

2. As stated in Paragraph 7 of my previous declaration, CFC is a corporate entity separate from the Government of Cameroon, and CFC's Board directs CFC's activities as a separate entity to accomplish the purposes stated in CFC's Articles. Although the Board takes into account advice or requests it receives from the Government, or from any other source, the Board acts independently on behalf of

CFC. The technical and financial supervision by the Ministry in charge of Finance under Section 6 of the CFC Articles does not include the right to direct the actions of CFC's Board.

3. Mr. Booto a Ngon was Chairman of the Board of CFC from 16 December 1998 to September 13, 2005. The Chairman is a member of the Board, but has no power to act for the Board. The powers of the Board are exercised by the full Board acting as such. Ex. HMM-1 (CFC Articles, Section 33.1). Each director, including the Chairman, has only one vote (except that the Chairman can vote to break a tie). Ex. HMM-1 (CFC Articles, Section 34 (final paragraph).

4. As Chairman of the Board of CFC, Mr. Booto a Ngon did not have the authority to enter into a contract on behalf of CFC such as the purported May 18, 2004 "Memorandum of Agreement" that is attached as Exhibit A to Plaintiffs' Complaint, nor did he have the authority to authorize the General Manager, Joseph Edou, to enter into such a contract.

5. Mr. Booto a Ngon was dismissed as Chairman of the Board of CFC on September 13, 2005, the same day Mr. Edou was dismissed as General Manager of CFC. Mr. Booto a Ngon was indicted along with Mr. Edou and charged with actions in violation of his duties to CFC. Evidence shows that Mr. Booto a Ngon received favors from Mr. Edou that were paid for by CFC including two cars furnished for Mr. Booto a Ngon's use, and stays for him at the Hilton Hotel in Yaoundé.

6. Resolution 5-09 that the Board of Directors of CFC adopted on August 18, 2005 (included in Ex. 6 to Plaintiffs' opposition to Defendants' motion to dismiss) does not ratify, or refer to, the May 18, 2004 "Memorandum of Agreement." On August 18,

2

2005, the CFC Board did not have before it, and (except apparently for Chairman Booto a Ngon) did not know of, the purported "Memorandum of Agreement" dated May 18, 2004, that is Exhibit A to Plaintiffs' Complaint in this proceeding.

7.   The Board of Directors of CFC took no action at any time to ratify the May 18, 2004 "Memorandum of Agreement." The purported May 18, 2004 "Memorandum of Agreement" was never submitted to the Board for approval, or otherwise made known to the Board. Except for Mr. Edou, and apparently Chairman Booto a Ngon, the officers and Board members of CFC were unaware of the May 18, 2004 "Memorandum of Agreement" until Plaintiffs filed it as an exhibit to their December 6, 2006 Complaint in their action in the United States District Court in Maryland.

8.   At a July 23, 2005 public ceremony, MAETUR (Mission d'Aménagement et d'Etudes de Terrains Urbain et Ruraux), a Cameroon Government agency, transferred 70 hectares of land at Olembe II to CFC. There was no transfer of land by CFC or MAETUR to Atlantic, MBI, or Group Five on July 23, 2005, or at any other time.

9.   As stated in Paragraph 19 of my previous declaration, the family relationship between Mr. Edou and Ateba Minkoulou Gabriel, his brother in law, was known to me. As also stated there, the family relationship between Mr. Edou and his niece (Ateba Minkoulou Gabriel's daughter), who also worked at CFC, was known among Mr. Edou's colleagues at CFC.

10.  However, in August 2005 neither I, nor to the best of my knowledge anyone else at CFC (except Mr. Edou and perhaps Mr. Booto A Ngon), knew even of the existence of The Falls PLC or knew that the nominal owner of The Falls was Mr. Edou's brother in law, Ateba Minkoulou Gabriel. Similarly, in August 2005 neither I, nor to

the best of my knowledge anyone else at CFC (except Mr. Edou and perhaps Mr. Booto A Ngon), knew that an interest in the Atlantic Group, SCI, was owned by a company held in the name of Mr. Edou's brother in law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 7 January 2008.

Henri Mekonpo Mbala

I the undersigned Jean Marcel Mouliom Njitoyap , Senior Translator, Ministry of External Relations, Republic of Cameroon do hereby attest under penalty of perjury that the above declaration is a true translation of the original.

Dated at Yaounde this 7 day of January 2008.

**Jean Marcel Mouliom Njitoyap**
**Senior Translator**

MOULIOM NJITOYAP Jean-Marcel
Traducteur principal
Senior Translator

**DECLARATION OF NDOUA NDZANA REMY**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MBI Group, Inc., *et al.*,                                    :
                                                             :
           *Plaintiffs*,                                     :
                                                             :
v.                                                           :
Crédit Foncier du Cameroun,                                  :         1:07-cv-00637-JDB
                                                             :
and                                                          :
                                                             :
The Government of the Republic of Cameroon,                  :
                                                             :
           *Defendants*.

## DEPOSITION DU SIEUR NDOUA NDZANA REMY

En application de l'article 28 paragraphe 1746 du Code américain (U.S.C.), le Sieur Ndoua
Ndzana Remy fait la déposition suivante :

1. Je suis membre du Conseil d'Administration du Crédit Foncier du Cameroun (CFC). Je
   fais la présente Je fais la présente déposition en réaction aux points soulevés par les
   requérants en date du 5 novembre 2007 dans leur déclaration faisant objection à la
   demande de non-lieu faite par la partie assignée.

2. J'assume les fonctions d'administrateur du CFC depuis 2001. En cette qualité, j'avais pris
   part au Conseil d'Administration du 18 août 2005, date à laquelle le Conseil a voté la
   résolution 5-09.

3. Lorsque, le 18 août 2005, le Conseil a voté la Résolution 5-09, celui-ci ignorait
   l'existence du prétendu « Mémorandum d'accord » qui aurait été signé le 18 mai 2004
   par M. Joseph Edou, au nom du CFC, dont copie est versée comme pièce à conviction
   'A' dans la plainte des requérants dans cette affaire. J'ignorais, l'existence du prétendu
   « Mémorandum d'accord » du 18 mai 2004, ainsi que, à ma connaissance, tous les autres
   membres du Conseil d'Administration. J'avais alors appris que le président du Conseil

d'Administration (PCA), M. Booto à Ngon, serait au courant du « Mémorandum d'Accord » sans toutefois en informer les autres administrateurs. Aucune copie de ce prétendu document n'avait été présentée, ou même distribuée lors de la réunion.

4. Lors de la réunion du 18 août 2005, le Conseil d'Administration du CFC n'avait pris aucune mesure pour ratifier le prétendu « Mémorandum d' Accord » du 18 mai 2004.

5. En votant la Résolution 5-09 du 18 août 2005, le Conseil d'Administration ignorait que 45% du groupe SCI Atlantic, l'une des partie au prétendu « Mémorandum d'Accord » du 18 mai 2004, étaient détenus par une autre compagnie, la société FALLS, dont toutes les actions étaient portées au nom du beau-frère de M. Joseph Edou. Il aurait été très utile pour le Conseil d'Administration de savoir que 45% du groupe SCI Atlantic , l'une des partie au prétendu « Mémorandum d'Accord » du 18 mai 2004, étaient secrètement détenus par le beau-frère de M. Joseph Edou, étant donné que celui-ci prétendait représenter les intérêts du CFC lors de la signature du prétendu « Mémorandum d'accord ». Etant donné que cet état de chose suscite une grande probabilité de délit d'initié, le Conseil d'Administration n'aurait pas dû ratifier un tel contrat.

En foi de quoi, je déclare, en connaissance des lois américaines relatives aux poursuites judiciaires pour faux serment, que les déclarations contenues dans la présente déposition sont exactes et conformes à la vérité.

Fait le 3 janvier 2008

NDOUA NDZANA REMY

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun, | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants*. | : | |

**DECLARATION OF NDOUA NDZANA REMY** declares pursuant to 28 U.S.C. § 1746:

1.  I am a member of the Board of Directors of Crédit Foncier du Cameroun ("CFC"), a Defendant in this lawsuit. I make this Declaration in response to matters raised in Plaintiffs' November 5, 2007 opposition to the Defendants' motion to dismiss Plaintiffs' Complaint.

2.  I have been a member of the Board of Directors of CFC since 2001. I was a member of the Board on August 18, 2005, and was present at the Board meeting on that date when the Board passed Resolution 5-09.

3.  When the Board voted on Resolution 5-09 on August 18, 2005, the Board had not been made aware of the alleged "Memorandum of Agreement" that was purportedly signed by Joseph Edou on behalf of CFC on May 18, 2004, a copy of which is attached as Exhibit A to Plaintiffs' Complaint in this proceeding. I did not know of

the alleged May 18, 2004 "Memorandum of Agreement," nor did any other Board member to my knowledge. I have since learned that Chairman Booto a Ngon was allegedly aware of the "Memorandum of Agreement," but he did not disclose it to the other Board members, and no copy of the alleged agreement was presented or otherwise made available at the meeting.

4.  At the meeting of August 18, 2005, the Board did not ratify the alleged May 18, 2004 "Memorandum of Agreement," nor did the Board ever ratify that alleged agreement.

5.  When the Board voted on Resolution 5-09 on August 18, 2005, it was not aware that Atlantic Group, SCI ("Atlantic"), one of the parties to the purported May 18, 2004 "Memorandum of Agreement," was owned 45% by another company, The Falls, all of the stock of which was held in the name of Joseph Edou's brother-in-law. It would have been material information to the Board that Atlantic, one of the parties to the alleged May 18, 2004 "Memorandum of Agreement," was secretly owned 45% by Joseph Edou's brother-in-law because Joseph Edou was purportedly representing CFC when he executed the alleged "Memorandum of Agreement." This situation raises the strong possibility of self-dealing, and the Board would not have ratified such a contract.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 3, 2008

NDOUA NDZANA REMY

I the undersigned Jean Marcel Mouliom Njitoyap , Senior Translator, Ministry of External Relations, Republic of Cameroon do hereby attest under penalty of perjury that the above declaration is a true translation of the original.

Dated at Yaounde this 7 day of January 2008.

**Jean Marcel Mouliom Njitoyap**
**Senior Translator**

MOULIOM NJITOYAP Jean-Marcel
Traducteur principal
Senior Translator

**DECLARATION OF GERARD WOLBER**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., *et al.*, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | 1:07-cv-00637-JDB |
| | : | |
| Crédit Foncier du Cameroun, | : | |
| | : | |
| and | : | |
| | : | |
| The Government of the Republic of Cameroon, | : | |
| | : | |
| *Defendants.* | : | |

## DECLARATION OF GERARD WOLBER

I Gérard Wolber declares pursuant to 28 U.S.C. § 1746:

1.    I am a citizen of the Republic of France and resident of Douala, Cameroon.

2.    I have the following academic and professional qualifications:

Master of Law (University of Paris 1, 1975

Certificat d'Aptitude à la Profession d'Avocat (Institut d'Etudes Judiciaires, University Paris 2) 1976

Lawyer in Training in Paris Bar Association 1976, registered in Paris Bar Association as senior advocate 1981

Registered in Cameroon Bar Association 1985. Former member of the Bar Council

Conseiller du Commerce Extérieur de la France (since 1982)

Avocat-conseil du Consulat Général de France à Douala (2006)

Officier du Mérite National (France)

3.    I was called to the Bar of the Republic of Cameroon in 1985 February 14th.

4.    In the course of my practice before the Courts of Cameroon, I have represented a number
      of foreign companies doing business in Cameroon.   These companies include:

           AXA Assurances, AIR LIQUIDE, SODEXHO, ACCOR, ELF Distribution,
           WARSTEINER Brauerei, SN BRUSSELS AIRLINE, Consulat Général de
           France,   HILTON   International,   SOLEL   BONEH,   LABORATOIRES
           FOURNIER, ERNST & YOUNG, Cabinet MAZARS

      These companies understand that in doing business in Cameroon, they will be subject to
      the jurisdiction of the Courts of Cameroon with respect to disputes arising out of their
      business activities in Cameroon.

5.    I have appeared on behalf of these companies in numerous actions before the civil, labor
      and criminal courts of Cameroon, including, the High Court of Bonanjo, Douala, the
      Court of Appeal , Littoral Province, Douala, the High Court of Mfoundi, the Court of
      Appeal, Centre province, Yaounde.

6.    The Courts of Cameroon have functioned as an independent judiciary in adjudicating
      these lawsuits.  I have seen no evidence of inappropriate influence exerted by other parts
      of the Cameroon Government on the decisions of the judiciary in these cases.  Similarly,
      I have seen no evidence that the outcome of the cases was influenced by bribery.

7.    I understand that MBI Group, Inc., a U.S. corporation, and Atlantic Group, SCI, a
      Cameroon corporation, have claims against Crédit Foncier du Cameroun and the
      Government of the Republic of Cameroon based on the alleged unlawful termination of a

housing construction project or projects and related contracts by Crédit Foncier du Cameroun and/or the Government of the Republic of Cameroon. There is no reason that the claimants will not receive a fair and impartial hearing in the Courts of Cameroon, and there is no reason to believe that Crédit Foncier du Cameroun or the Government of the Republic of Cameroon will exert any undue influence on the outcome of a lawsuit brought by the claimants in the Courts of Cameroon.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 1st December, 2007, at Douala, Cameroon.

Cabinet Gérard WOLBER
Avo sai au Barreau du Cameroun
B.P. 439 DOUALA