## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MBI GROUP, INC., et al.** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CRÉDIT FONCIER DU CAMEROUN** | : | **1:07-cv-00637-JDB** |
| | : | |
| **and** | : | |
| | : | |
| **THE GOVERNMENT OF THE REPUBLIC** | : | |
| **OF CAMEROON** | : | |

### PLAINTIFF'S  REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY

COME NOW plaintiffs MBI Group Inc and Atlantic Group, SCI (hereinafter "Plaintiffs"), by and through undersigned counsel, and replies to Defendants' Opposition to Plaintiff's Motion for Leave to Conduct Jurisdictional Discovery and in support of the instant motion aver as follows:

In support of their Motion to Dismiss Plaintiff's Complaint ("Motion to Dismiss"), docket # 9, defendants Credit Foncier du Cameroun ("CFC") and the Government of the Republic of Cameroon ("Cameroon, together with CFC "defendants"),  relied on two declarations from Professor Ephraim Ngwafor, along with four exhibits, a declaration from Henri Mekongo Mbala, along with four additional exhibits, a declaration from Beatrice R. Assena, along with four additional exhibits, and declarations from Koh Koh, Boscolo Andrea, and Ambassador Tibor P. Nagy, Jr.

In their Reply [1] In Support of Motion to Dismiss Plaintiff's Complaint ("Def.Reply"), docket # 18, defendants have submitted four new declarations, as well as an additional exhibit. The Reply included the third declaration of Professor Ngwafor, the second declaration of Henri Mekongo Mbala, and the first declarations of Ndoua Ndzana Remy and Gerard Wolber.

Thus, in their two substantive filings, defendants have relied on 12 declarations, from nine witnesses, and 13 separate exhibits.

Undoubtedly recognizing that reliance on extraneous matter constitutes a factual challenge, rather than a facial challenge to the complaint, defendants look to *Nemariam v. Federal Democratic Republic of Ethiopia* 491 F.3d 470, 475 (D.C.Cir. 2007) for the proposition that "(j)urisdictional discovery is not permissible simply because the motion to dismiss is supported by, and opposed by, declarations and exhibits." Defendants' Opposition ("Def.Opp."), at 3, n. 2. But there is absolutely no language in *Nemariam* which supports the proposition urged by defendants. More significantly, the court allowed the parties to engage in "jurisdictional discovery" following the remand. *Nemariam, supra,* at 474.

Similarly, in *El-Fadl v. Central Bank of Jordan* 75 F.3d 668(.D.C.,1996), upon which defendants also relied, Def.Opp., at 4, the Court of Appeals "reverse(d) the dismissal of El-Fadl's claims against Petra Bank for lack of personal jurisdiction and remand(ed) those claims to the district court in order to allow El-Fadl to conduct

---

[1] Counsel for plaintiff has advised counsel for defendants that plaintiffs expect to file a motion to strike portions of the Reply, to the extent that it contains evidence which is not appropriate for submission in a Reply. Counsel for defendants has advised counsel for plaintiff that defendants will oppose that motion.

Counsel for plaintiff has also requested consent to a motion for leave to file a surreply to address the new evidence. Counsel for plaintiff has not yet determined defendants' position on that motion.

reasonable discovery on personal jurisdiction. At 676. Defendants' reliance on this

court's denial of jurisdictional discovery in *Croesus EMTR Master Fund L.P. v.*

*Federative Republic of Brazil* 212 F.Supp.2d 30 (D.D.C.,2002) is also misplaced. In

*EMTR* this court described plaintiff's argument that the "direct effect" exception to the

Foreign Sovereign Immunities Act was satisfied as follows:

> Here, the parties disagree on whether payment was ever "supposed" to
> have been made in the United States. It is undisputed that up through the
> 1960s, payments were made at "empowered branch[es]," none of which
> was located in the United States, and that, under the terms of the Bonds, a
> bondholder had no right to designate a place of payment in the United
> States... But plaintiffs contend that because Brazil's Public Debt Office
> (which formerly served as an "empowered branch" for payment) no longer
> exists, "the creditor has the right to choose between any of the existent
> systems of payment that today Brazil utilizes to pay interest in its debt
> securities." Because Brazil currently uses agents in the United States for
> payments on some of its other financial obligations, plaintiffs argue,
> "Brazil likely would have honored a designation by the Plaintiffs of a
> place in the United States as the place of payment." At 36.

But the court's rejection of that argument underscored the absence of any asserted

or assertable fact sufficient to satisfy the court's construction of the direct effect test. As

the court wrote:

> Plaintiffs' argument fails. First, plaintiffs do no more than speculate that
> Brazil would "likely" have honored a designation of the United States as
> the place of payment. Second, plaintiffs never did designate the United
> States as the place of payment. Instead, they determined that presentment
> of the Bonds for payment would be futile and they proceeded to file this
> lawsuit. Thus the Court is left with *37 mere conjecture-that if plaintiffs
> had presented the Bonds for payment, they would have designated the
> United States as the place for payment, and that, under a hypothetical
> Brazilian regime that recognized the validity of the Bonds (which were
> formerly payable only in Brazil), Brazil would "likely" agree to plaintiffs'
> designation. This scenario is too full of contingencies to support the
> conclusion that payment was "supposed" to have been made in the United
> States. The non-payment could have had no "immediate consequences"-
> and thus no "direct effect"-in the United States where there was never any
> designation of a place in the United States where payment was to be
> received, much less any firm basis to believe that such a designation

would have been accepted by Brazil and proper as a matter of Brazilian law.  At 36-37.

Clearly, under this court's construction of the direct effect test, there was no fact to be considered in dispute. In stark contrast, virtually every material fact upon which defendants relied in their Motion to Dismiss was contested in plaintiff's opposition. Moreover, virtually every fact asserted in defendants' Reply is or will be contested. *See* the declaration [2] of Roger Tchoufa, appended hereto as Exhibit A, the declaration of Jules Nkana, Exhibit B, and the declaration of John Kamya, Exhibit C.

Defendants' insistence that "plaintiff has not shown a substantive basis in the record for a valid question as to a fact upon which FSIA jurisdiction depends," De.Opp., at 5, is, thus clearly wrong. Jurisdictional discovery is absolutely necessary to enable this court to ferret out the facts applicable to disposition of defendants' motion.

Accordingly, the instant motion must be granted.

---

[2] Plaintiffs are not attaching these exhibits in an attempt to file the equivalent of a surreply, but merely to show that the facts asserted in the Reply can and will be contested in comprehensive detail, if leave is provided to file a surreply.

Respectfully Submitted,

**COUNSEL FOR PLAINTIFFS**

Philip M. Musolino #294652
*Musolino & Dessel*
1615 L Street, N.W., Suite 440
Washington, D.C. 20036
(202) 466-3883
*Voice*:  (202) 466-3883
*Fax*:     (202) 775-7477
*Email*:  pmusolino@musolinoanddessel.com

Sylvia J. Rolinski, Esq. # 430573
Danielle M. Espinet # 478553
*Rolinski & Suarez, LLC*
14915 River Road
Potomac, Maryland 20854
*Voice*: (240) 632-0903
*Fax*:    (240) 632-0906
*Email*:  srolinski@rolinski.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MBI GROUP, INC., et al**

v.

**CREDIT FONCIER DU CAMEROUN**　　　　　　　　　1:07-cv-00637-JDB

**and**

**THE GOVERNMENT OF THE REPUBLIC
OF CAMEROUN**

### DECLARATION OF ROGER TCHOUFA

I, Roger Tchoufa, being duly sworn and under oath and under penalty of perjury under the laws of the United States, do hereby declare, swear and affirm that the statements in this declaration are true and accurate and are based on my personal knowledge.

1. I was born in Melong, Cameroon in 1961.

2. I first arrived in the United States in 1988 on a student visa.

3. I earned an M.B.A. in Finance from Lincoln University, Missouri in 1991.

4. I became a permanent resident of the United States in 1993.

5. I have lived in the United States with the exception of business and personal travel since 1988.

6. I have lived at the same address in Bethesda, Maryland since 1997.

7. I co-founded MBI Group, Inc. and have worked for, and with MBI since 1997. MBI's offices have always been in Bethesda, Maryland

8. I am very familiar with the complaint in this case. The statement made by Mr. Mekongo Mballa in his second declaration at paragraph 8 is not accurate. On July 23, 2005, a formal transfer of land took place at the King's palace in the Olembe suburb of Yaounde, in the presence of Credit Foncier du Cameroon senior management staff, the CFC Chairman, CFC Managing Director (Director General), the First Secretary of the South African Embassy (who was the Guest of Honor at the land transfer ceremony), the Group Five staff, Atlantic Group staff and people living in the suburb. There was no one from Maetur at that ceremony. I, was present at the ceremony.

9. I attach herewith at exhibit RT -1 a true and accurate copy of the Framework Agreement of June 3, 2005, which acknowledges the role of Atlantic Group SCI. This Agreement was negotiated by CFC's legal department, as well as its technical department. The Framework Agreement took several months to draft, and went through many versions.

10. In Mr. Mekongo Mballa's second declaration, at paragraph 10, his claim that no one knew of the existence of The Falls and its interest in Atlantic Group, is not true. I, had numerous meetings with the then chief of legal services of CFC, Mrs. Bakinde, the Technical Director, Mr.Kemajou, and Mr. Hamidou, Assistant to the Technical Director. At those meetings they all had the Atlantic Group/MBI Group file that contained all relevant information about the structure of the company, and its principals. In fact, it was a requirement that the Atlantic Group incorporation documents (including the shareholding structure) be submitted for review by CFC, as part of CFC's Olembe II project file. These Atlantic Group incorporation and shareholding documents (clearly showing The Falls as a shareholder in the company) were formally submitted to CFC on May 11, 2004, November 17, 2004, and December 8, 2004.

11. During the Chairman's and the Managing Director of CFC's visit here in the USA, they both told us that they were going to inform their hierarchy and their Board of the commitment they took with MBI and Atlantic Group in the USA

12. On numerous occasions between June 2004 and December 2004, as well as in January of 2005, Mr Booto A. Ngon told me that he had already informed the Government of Cameroon about all the agreements and commitments Credit Foncier du Cameroon had made with the American Developer MBI Group, Inc., and that MBI Group, Inc. should proceed with haste to implement the affordable housing project.

13. The May 18, 2004 Agreement was the Master Agreement that contains and specifies all the parties' responsibilities. The Financing Agreement that CFC is referring to was just one of the many components of the Master Agreement. The claim that no Board Member was informed of this Agreement is absolutely not correct. At a minimum, the Minister of Finance, who was also a CFC Board member, approved the project in writing via his letter of August 10, 2005, in which he authorized the importation of the construction equipment.

14. The May 18, 2004 Agreement was also one of the considerations for the loan application to OPIC, proving to OPIC that all parties were committed to the construction of affordable housing in Cameroon, and that CFC had in fact committed to provide mortgage funds to buyers of the houses for the Olembe II project, as well as the parallel OPIC-funded affordable housing expansion project. The housing project to be funded by OPIC was in fact officially titled by OPIC as the "Yaounde Affordable Housing Expansion Project" of Olembe II.

15. On August 4, 2004, I attended a meeting with Mr. Kemajou Robinson, and Mr. Hamidou from CFC. Also in attendance was the Technical and Financial Directors from Maetur. Everyone at that meeting was well aware of the May 18, 2004 Agreement. All we discussed was the performance of that Agreement. A copy of the meeting agenda is attached as RT-2 .

16. Mr. Ndoua Ndzana Remy's statement in his Declaration that no one at the meeting of August 18, 2005 knew about the Memorandum of Agreement except the Chairman Booto A Ngon and Joseph Edou is not true. Prior to that date the Minister for Finance, a Member of the

2

Board was already informed of the May 18, 2004 Agreement that CFC had signed with MBI Group, Inc. and Atlantic Group. As evidence of the Minister of Finance's knowledge of this Agreement, he granted Group Five, through Atlantic Group/MBI Group and CFC, the benefit of the "Special Temporary Importation Regime". If the Minister of Finance had not been aware of the Agreement and the Parties' obligations, he would never have given that privilege to Group Five, MBI Group, Inc., Atlantic Group and CFC.

17. Mr. Gerard Wolbert, a French attorney working in Cameroon, made a statement that must be considered with caution because he has in the past represented the Cameroon Government. One can easily understand the position of this attorney, who was chosen amongst thousands of other Cameroonian attorneys to make a value judgment on the justice system.

18. Attached as RT-3 is a true copy of the Advance Payment Guarantee to CFC from Group Five through Lombard Insurance Company. The contract to which it refers is the Atlantic Group/ Group Five construction contract for the Olembe II project. This Guarantee was formally handed over by Group Five in my presence to CFC's Director of Finance. Group Five also received and advance payment of $4,750,000 from CFC. The CFC Director of Finance was well aware at that meeting of MBI Group, Inc.'s and Atlantic Group's contracts with Group Five and CFC. Those Agreements were the reasons of the Guarantee and the Payment.

19. On September 2, 2005, CFC's Technical Director, Mr. Kemajou Robinson sent me a letter along with Maetur's comments regarding "Olembe 2, 1034 housing units". A true copy is attached. RT-4. I spoke many times with Mr. Kemajou Robinson in 2005, both before and after the August Board meeting. Mr. Kemajou Robinson was always familiar with the May 2004 Agreement.

20. In 2005, both before and after August 2005 Board meeting, I spoke many times with Mrs. Bakinde, and she was at all times the Chief of CFC's Legal Department. We discussed different aspects of our performance under the May 2004 Agreement. She was well aware that we had a contract with CFC to construct 1034 housing units called the Olembe II affordable housing project.

21. In August 2006, Cameroon improperly caused the arrest of my wife's secretary, and imprisoned her without charges for one week, and wrongfully seized my family's property, and wrongfully threatened the arrest of my other relatives, including a minor.

22. In September 2006, Cameroon improperly caused the arrest of my close relative and demanded a bribe in the amount of two hundred thousand dollars ($200,000) from my relative to dispose of the case, and threatened my life, as well as the lives of my wife and daughter if we ever returned to Cameroon. (Coincidentally, our company has about $200,000 on deposit in the bank in Cameroon, which has been seized by the Government).

23. In 2006, the Government of Cameroon seized all my family's property which has been in the family for over fifteen years (including real estate, operating businesses, factories, and movable assets). I am therefore genuinely concerned for my life as well as for the lives of my wife and minor child, if we were ever to step in Cameroon. Furthermore, I have been reliably informed that my life, and the lives of my family, would be in danger, if we were to step foot in Cameroon.

24. On the illegal and irregular instructions of the Government of Cameroon, on April 29, 2007, I

was detained and imprisoned in Abidjan, Ivory Coast, while I was in that country on a business trip. I was then illegally incarcerated in a prison for almost one month in Ivory Coast, on the instigation of the Government of Cameroon. The United States Embassy in Ivory Coast and the American Chamber of Commerce in Ivory Coast intervened in the matter. The Government of Cameroon was unable to provide any evidence to support the illegal incarceration and I was released by the Government of Ivory Coast, and in fact, it was later revealed that the so called Interpol notice issued surreptitiously and selectively by the Government of Cameroon to the Government of Ivory Coast (to support my illegal incarceration) was in fact fraudulent, and unsupported by fact.

I declare under penalty of perjury under the laws of the United States of America that what I have said in this declaration is true and accurate.

Executed on January 25, 2008

Roger Tchoufa

4

**Translated by Soninka A. Dupeyron**
**Certified Court Translator/ Interpreter for Maryland and the Consortium of 41 states**

# REPUBLIC OF CAMEROON
## Peace - Work- Motherland

MISSION D'AMENAGEMENT ET
D'EQUIPEMENT DES TERRAINS
URBAINS ET RURAUX (MAETUR)
B.P. 1248 - YAOUNDÉ

CREDIT FONC1ER
DU CAMEROUN (CFC)
B.P. 1531 YAOUNDÉ

# FRAMEWORK AGREEMENT

## TRANSFER OF PROPERTY FROM MAETUR TO CFC: A 70 HECTARES LOT; TITLE DEED N° 23105/MFOUNDI

*June 2005*

*Initials/ Initials*

Certified True
Translation



Translated by Soninka A. Dupeyron
Certified Court Translator/ Interpreter for Maryland and the Consortium of 41 states

Between:

**MISSION D'AMENAGEMENT ET D'EQUIPEMENT DES TERRAINS URBAINS ET RURAUX,** headquartered in Yaoundé BP 1248, represented by Mr. André MAMA FOUDA, Director,

Hereinafter referred to as **MAETUR,**


And:

**CREDIT FONCIER DU CAMEROUN,** a publicly funded company with a Board of Trustees, a 6,000,000,000 FCFA capital, registered in the Trade Registry under n° 1-046 and headquartered in Yaoundé BP 1531, Boulevard du 20 mai 1972; represented by Mr. Joseph EDOU, CEO.

Hereinafter referred to under the acronym **CFC.**

**PREAMBLE**

Whereas, MAETUR owns an open lot with a total area of 288 hectares 23 a 25 ca, registered under Title N°3105/Mfoundi since November 9, 1994. This lot is situated in the OLEMBE area, approximately 10 km North of downtown Yaoundé and 600 meters from the Yaoundé-Obala main road, bordered North by the Kama brook, West by the Yaoundé/Ngaoundere railway, South by the Ebengi brook and East by the National Domain (Domaine National);

Whereas, there was an inter-ministerial meeting on 07/12/2001concerning the financing of social housing units in Yaoundé and Douala by CFC; the Head of Government recommended that the Minister of Housing and Urban Affairs put a 70 hectares lot at the disposal of Habitat Social/CFC;

Whereas, the CFC proposes to allocate the lot to a real estate operation named "Olembe II 1034 housing units"; a project lead by SCI Atlantic Group;

*Initials/ Initials*

Certified True
Translation

Translated by Soninka A. Dupeyron
Certified Court Translator/ Interpreter for Maryland and the Consortium of 41 states

Whereas, MAETUR and CFC passed resolutions during their meetings aiming at facilitating the achievement of the project "70 hectares of livable space in Olembe-Yaoundé."

**The covenants hereto agree as follows:**

## Article 1: PURPOSE

The purpose of this convention is to set forth the terms and conditions under which a 70 hectares lot will be transferred from MAETUR to CFC and removed from the Title Deed N° 23 105/Mfoundi.

## Article 2: ROLE AND COMMITMENT OF MAETUR

MAETUR hereby commits to:

 - Give a technical opinion before the request for approval of a 70 hectares lot, which will be presented to administrative authorities by SCI ATLANTIC GROUP
 - Identify and demarcate the 70 hectares site
 - Study and develop:
      * The North inlet to the Title Deed N° 23105
      * The main access path serving the 70 hectares site.
 - Control operations relative to secondary and tertiary roads and utility systems completed by SCI ATLANTIC GROUP on behalf of CFC, once related studies are completed
 - Lead indemnification operations
 - Divide the Title Deed N° 23105 to the benefit of CFC

## Article 3: ROLE AND COMMITMENT OF CFC

CFC hereby commits to:
 - Provide MAETUR with the totality of the project before approval for technical reference.
 - Set up a non-refundable financing plan to cover the costs of:
      * Identification and demarcation of the 70 hectares site
      * The control of operations (after study approval) for secondary and

Certified True
Translation

Translated by Soninka A. Dupeyron
Certified Court Translator/ Interpreter for Maryland and the Consortium of 41 states

tertiary roads and utility systems on the 70 hectares

*Initials/ Initials*

* Minimum construction work to access the 70 hectares and primary roads and utility systems serving the site;
* Indemnification
* Change of title (for Title Deed n° 23105/Mfoundi)

## Article 4: ADMINISTRATION CONTRIBUTION

CFC reserves the right to request compensation from MINDAJF and MINUUH for costs incurred by indemnification and minimal construction work of the North access path and the primary transmission lines to the 70 hectares site.

## Article 5: SPECIFIC AGREEMENTS

This framework agreement will be implemented with specific conventions between participating parties, which will have to sign an agreement within a 6-month period (renewable once).

## Article 6: ADDRESS OF SERVICE

The parties choose their *domicilium citandi et executandi* in their respective headquarters.

## Article 7: MISCELLANEOUS DISPOSITIONS

Costs incurred by this agreement will be borne by CFC.


Yaoundé, June 3, 2005


**For MAETUR**
Andre MAMA FOUDA, Director

*Stamp/Signature*

**For CFC**
**Joseph EDOU, CEO**

*Stamp/Signature*

Certified True
Translation

**Translated by Soninka A. Dupeyron**
**Certified Court Translator/ Interpreter for Maryland and the Consortium of 41 states**

Certified True
Translation

# REPUBLIQUE DU CAMEROUN
## Paix-Travail-Patrie

**MISSION D'AMENAGEMENT
ET D'EQUIPEMENT DES TERRAINS
URBAINS ET RURAUX (MAETUR)
B.P. 1248 – YAOUNDE**

------------

**LE CREDIT FONCIER
DU CAMEROUN (CFC)
B.P. 1531 YAOUNDE**

---------

# CONVENTION CADRE

## POUR

## LA MISE A DISPOSITION D'UN TERRAIN DE 70 HECTARES PAR LA MAETUR AU CFC SUR LE TITRE FONCIER N° 23105/MFOUNDI

------------

*Juin 2005*

Entre

La **MISSION D'AMENAGEMENT ET D'EQUIPEMENT DES TERRAINS URBAINS ET RURAUX**, dont le siège est à Yaoundé BP 1248, représentée par Monsieur André MAMA FOUDA, son Directeur,

Ci-après dénommée la **MAETUR** d'une part,

Le **CREDIT FONCIER DU CAMEROUN**, Société à capital public avec Conseil d'Administration, au capital de 6 000 000 000 de FCFA, registre de commerce N° 1-046 dont le siège est à Yaoundé BP 1531, au Boulevard du 20 mai 1972 représenté par Monsieur Joseph EDOU, son Directeur Général.

Ci-après désigné en abrégé le **CFC**

D'autre part.

## PREAMBULE

Attendu que la MAETUR est propriétaire d'un immeuble urbain non bâti d'une contenance superficielle de 288 ha 23 a 25 ca, objet du Titre Foncier n° 23105/Mfoundi établi le 09 Novembre 1994, situé au quartier OLEMBE, à 10 km environ au Nord du Centre ville de Yaoundé et à 600 m de l'axe routier Yaoundé – Obala, limité au Nord par le ruisseau Kama, à l'Ouest par la voie ferrée Yaoundé/Ngaoundéré, au Sud par le ruisseau Ebengui et à l'Est par le Domaine National ;

Attendu qu'aux termes de la réunion interministérielle du 12/07/2001 relative au financement par le Crédit Foncier du Cameroun d'un programme d'habitat social dans les villes de Yaoundé et Douala, le Chef du Gouvernement avait prescrit au Ministre de l'Urbanisme et de l'Habitat de mettre à la disposition du programme Habitat Social/CFC un terrain de 70 hectares ;

Attendu que le CFC se propose d'affecter ledit terrain à une opération de promotion immobilière baptisée « Olembe II 1034 logements », conduite par la SCI Atlantic Group ;

Attendu que la MAETUR et le CFC ont pris au cours des réunions ad hoc, des résolutions visant à faciliter la réalisation du projet « 70 ha viabilisés à Olembé – Yaoundé ».

Il est convenu et arrêté ce qui suit :

## Article 1 : OBJET

La présente convention a pour objet, de préciser les conditions et modalités de mise à disposition par la MAETUR au CFC, d'un terrain d'une contenance superficielle de 70 hectares à prélever sur le titre foncier N° 23105/Mfoundi.

## Article 2 : ROLE ET ENGAGEMENTS DE LA MAETUR

La MAETUR s'engage expressément à :

- émettre son avis technique préalablement à la demande d'approbation du lotissement portant sur les 70 ha à présenter aux autorités administratives par la SCI ATLANTIC GROUP ;
- identifier et borner le site de 70 ha ;
- étudier et conduire les travaux d'aménagement de :
  * la voie d'accès Nord du TF 23105
  * la voie primaire desservant le site de 70 ha.
- contrôler, pour le compte du CFC et après validation des études y relatives, les travaux des VRD secondaires et tertiaires effectués par SCI ATLANTIC GROUP ;
- piloter les opérations d'indemnisation ;
- morceler le Titre Foncier n° 23105 au profit du CFC.

## Article 3 : ROLE ET ENGAGEMENTS DU CFC

Le CFC s'engage à :

- fournir à la MAETUR, pour avis technique avant approbation, l'ensemble du projet de lotissement ;
- mettre en place au profit de la MAETUR un financement non remboursable pour :
  * l'identification et le bornage des 70 ha ;
  * le contrôle après validation des études, des travaux des VRD secondaires et tertiaires des 70 ha ;
  * les travaux minima nécessaires à l'accès au site de 70 ha et les VRD primaires desservant ledit site ;
  * les frais relatifs aux indemnisations ;
  * les frais de morcellement du Titre Foncier n° 23105/Mfoundi au profit du CFC.

## Article 4 : CONTRIBUTION DES ADMINISTRATIONS

Le CFC se réserve le droit de réclamer auprès du MINDAF et MINDUH les coûts relatifs aux indemnisations et aux travaux minima de la voie d'accès Nord et de la voirie primaire du site de 70 ha.

## Article 5 : CONVENTIONS SPECIFIQUES

Le présent accord cadre sera mis en œuvre par des conventions spécifiques entre les parties prenantes qui s'accordent un délai maximal de 6 mois renouvelable une fois pour leur signature.

## Article 6 : ELECTION DE DOMICILE

Pour l'exécution des présentes, les parties font élection de domicile à leurs sièges sociaux respectifs.

## Article 7 : DISPOSITIONS DIVERSES

Les frais et droits de la présente Convention sont à la charge du CFC.

Yaoundé, le 1 3 JUIN 2005



**Pour la MAETUR**
**Le Directeur**

André MAMA FOUDA

**Pour le CFC**
**Le Directeur Général**

Joseph EDOU

Document translated by Soninka A. Dupeyron Certified Translator/Interpreter
For the state of Maryland and Consortium of 41 states. Tel: 240 477 8216

### Building Project: 1034 housing units
### Olembe- Yaounde
### Meeting CFC/ MAETUR/ ATLANTIC GROUP

Date: August 4, 2005

Place: CDC Yaoundé

Meeting Starting at: 9 a.m.

## ATLANTIC GROUP'S SOURCES OF CONCERN

1. Administrative and technical conditions for starting actual construction on the lot.
   If construction does not start within 10 (ten) days, there will be tremendous
   financial losses for ATLANTIC GROUP

2. Access path construction (financing of primary access paths). Construction of
   primary access paths should ideally be achieved simultaneously with secondary and
   tertiary construction financed by Atlantic Group.

3. Get rid of the access path stranglehold and level crossing problem (CAMRAIL/
   MINTRANSPORT.)

4. Clarify the role of each stakeholder within the project (project flowchart)

5. CFC has an opportunity to put MAETUR and ATLANTIC GROUP directly in
   relation with one another in order to manage the questions relative to primary
   roads and utility systems

6. Administrative and financial conditions for using a surface area exceeding the 70
   hectares stated in the framework convention CFC/ MAETUR

7. Setting up a realistic schedule for project and construction management: actions,
   timeframe and stakeholders

Certified True
Translation



**PROJET DE CONSTRUCTION DE 1034 LOGEMENTS**
**OLEMBE - YAOUNDE**

# REUNION CFC/MAETUR/ATLANTIC GROUP

Date : 04 août 2005

Lieu : **CFC** Yaoundé

Heure de début de la réunion : 9H 00

## PREOCCUPATIONS DE ATLANTIC GROUP

1. Conditions administratives et techniques en vue **du démarrage effectif des travaux sur le terrain** ; le non démarrage des travaux dans un délai maximal de **10 (dix)** jours entraînera des **frais financiers énormes** pour ATLANTIC GROUP .

2. Travaux d'aménagement de la voie d'accès **(financement des voies primaires)** .Il est souhaitable que **les travaux des réseaux primaires** soient réalisés en même temps que **les travaux des secondaires et tertiaires** financés par ATLANTIC GROUP.

3. Libération des emprises de la voie d'accès et problème du passage à niveau **(CAMRAIL/ MINTRANSPORT).**

4. Clarification des rôles de chaque intervenant dans le projet **(organigramme du projet).**

5. Possibilité pour le **CFC** de mettre en relation directe la **MAETUR** et ATLANTIC GROUP pour la **gestion technique** des points relatifs aux **réseaux primaires du projet.**

6. Conditions administratives et financières pour utilisation dans le cadre du projet des surfaces supplémentaires au **delà des 70 Ha de la convention cadre CFC / MAETUR.**

7. Etablissement d'un planning réaliste pour la maîtrise du projet et des travaux : **ACTIONS , DELAIS , ACTEURS IMPLIQUES**

**Lombard INSURANCE COMPANY**

Ground Floor, Broll Place
Sunnyside Office Park
2 Carse O'Gowrie Road
Parktown 2193
PO Box 2740
Parklands 2121
Tel (011) 642 3960
Fax (011) 643 8725

---

**GUARANTEE NO.  C04/17465**

---

## ADVANCE PAYMENT GUARANTEE

| | | |
|---|---|---|
| BRIEF DESCRIPTION | : | CONSTRUCTION OF 1034 RESIDENTIAL UNITS WITH |
| OF CONTRACT | | INFRASTRUCTURE, ROADS & SERVICES |
| NAME AND ADDRESS | : | |
| OF BENEFICIARY | | lunde, Cameroon  tr") |

*RT-3*

The Guarantor have been informed that

C    Do not have    TED

---

is your Principal under such Contract and wishes to receive an advance payment, for which  the Contract requires the Principal to obtain a guarantee.

At the request of the Principal, we the undersigned, **JACOBUS CHRISTIAAN KLEYNHANS** and **MARIA ELIZABETH LIGGETT** in our respective capacities as **SENIOR ADMINISTRATOR  : CONSTRUCTION DIVISION** and **ADMINISTRATOR : GUARANTEES CONSTRUCTION DIVISION** and hereby representing

### LOMBARD INSURANCE COMPANY LIMITED
(hereinafter called the "Guarantor")

hereby irrevocable undertake to pay you the Financier, any sum or sums not exceeding in total the amount of US$4 750 000.00 (**Four Million Seven Hundred and Fifty Thousand United States Dollars** ) (the "guaranteed amount") upon receipt by the Guarantor of your demand in writing and your written statement stating :

    (a)  that the Principal has failed to repay the advance payment in accordance with the conditions of the Contract, and

    (b)  the amount which the Principal has failed to repay.

This guarantee shall become effective upon receipt (of the first installment) of the Advance Payment by the Principal.  Such guaranteed amount shall be reduced by the amounts of the Advance Payment repaid to the Financier, as evidence by your notices issued under Sub–Clause 14.6 of the Condition of the Contract.    Following receipt (from the Principal) of a copy of each purported notice, we shall promptly notify you of the revised guaranteed amount accordingly.

Any demand for payment must contain your signature(s) which must be authenticated by your bankers or by a notary public. The authenticated demand and statement must be received by us at this office on or before 31 August 2007 (the expiry date) when this guarantee shall expire and shall be returned to the Guarantor.

The Guarantor have been informed that the Beneficiary may require the Principal to extend this guarantee if the advance payment has not been repaid by the date 28 days prior to such expiry date.  The Guarantor undertakes to pay you such guaranteed amount upon receipt by it, within such period of 28 days, of your demand in writing and your written statement that the advance payment has not been repaid and that this guarantee has not been extended.

2/ ... ...

X 100/230 102001

**Lombard INSURANCE COMPANY**

GUARANTEE NO.  C04/17465

Page 2

This guarantee shall be governed by the laws of Cameroon and shall be subject to the Uniform Rules for Demand Guarantees, published as Number 458 by the International Chamber of Commerce, except as stated above.

For and on behalf of LOMBARD INSURANCE COMPANY LIMITED

SIGNED AT PARKTOWN ON THIS 26TH DAY OF JANUARY 2005.

1. _____          2. _____
   J.G. KLEYNHANS                       M.E. LIGGETT
   SENIOR ADMINISTRATOR :               ADMINISTRATOR GUARANTEES
   CONSTRUCTION DIVISION                CONSTRUCTION DIVISION

AS WITNESSES:

1. _____          2. _____
   J. GREYLING                          L. ONVERWACHT

Address:  Ground Floor, Broll Place, Sunny Side Office Park, 2 Carse O'Gowrie Road, Parktown, 2193

PLEASE NOTE THAT A CLAIM UNDER THIS GUARANTEE WILL ONLY BE HONOURED
ON SUBMISSION OF THE ORIGINAL DOCUMENT

B 100/330.1F2001

**Document translated by Soninka A. Dupeyron Certified Translator/Interpreter**
**For the state of Maryland and Consortium of 41 states. Tel: 240 477 8216**

# Crédit Foncier
# du Cameroun

Headquarters- Main Office
BP 1531 Yaoundé
Telephone: 223 52 15-223 62 17
Fax: 223 52 21

*RT - 4*                    ₚP

eptember 2, 2005

Re: No. 1028/CF/DG/DE/SDT
OBECT Technical project «Olembe II, 1034
(One thousand and thirty-four) Housing Units

Mr. Director,

Please find enclosed a recapitulative statement of MAETUR's comments regarding the above-referenced subject.

In order to refocus the project, we are inviting you to participate in the CFC/MAETUR/SCI ATLANTIC GOUP meeting, held on 09/06/2005 at 9 a.m. at MAETUR's offices.

Respectfully,

RECEIVED
SEPT 2, 2005

*Signature*

*Stamp*

*Signature*

Certified True
Translation



# redit ⓒ Foncier du Cameroun

SIEGE SOCIAL-DIRECTION GENERALE
B.P. 1531-YAOUNDE
Téléphone : 223.52.15-223.52.17
Fax : 223.52.21

érences :  N°1028/CF/DG/DE/SDT
JET Dossier technique projet « Olembé II
1034 (mille trente quatre logements ».

A    Monsieur Roger TCHOUFA
Directeur Général
SCI ATLANTIC GROUP

_YAOUNDE_

Yaoundé, le    0 2 SEP. 2005

Monsieur le Directeur Général,

Veuillez trouver ci-joint, la note récapitulative des observations de la MAETUR au sujet de l'objet repris en marge.

Afin de recentrer ce projet, nous vous invitons à prendre part à la réunion CFC/MAETUR/SCI ATLANTIC GROUP prévue le 06/09/2005 à 9 heures dans les locaux de la MAETUR.

Veuillez agréer, Monsieur le Directeur Général, l'expression de notre considération distinguée./-

**RECEIVED**
0 2 SEP 2005

Société à Capital Public de 6.000.000.000 francs CFA avec Conseil d'Administration
CCP : YAOUNDE 9180 - RC YAOUNDE 1-046

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MBI GROUP, INC., et al**

**v.**

**CREDIT FONCIER DU CAMEROUN**                    **1:07-cv-00637-JDB**

**and**

**THE GOVERNMENT OF THE REPUBLIC
OF CAMEROUN**

### DECLARATION OF JULES NKANA

I, Jules Nkana, am an attorney authorized to practice in France and in Cameroon, and I hereby declare as follows :.

Professor Ngwafor's statement alleging that law No. 99/016 dated December 22, 1999 modified decrees No 81/236 of June 21, 1981 about CFC is untrue. This law is a general one and concerns all public and semi-public companies. Decree No 81/236 dated June 21, 1981, about the restructuring of CFC is still valid. If one would refer to the text about the restructuring of the *Palais des Congrès*, one would see that the same law is cited in the preamble and understand it is in no way specific to CFC.

Law No 99/016 dated December 22, 1999 regarding the general status of public and semi-public gives autonomy to all these companies. But the decrees structuring public places, public and semi-public companies take the autonomy provided by the above-referenced law away.

This is verified by the following facts:

1- The Executive Directors, Deputy Executive Directors, Director of the Board of Trustees and all members of this Board are nominated by a decree from the President of the Republic. See decree regarding the organization of the Credit Foncier of Cameroon. See decree regarding the restructuring of the *Palais des Congrès.*

2- All these companies are still under the authority of at least one Ministry. As far as the Credit Foncier du Cameroun is concerned, it is under the authority of both the Ministry of Housing and Urban Affairs and the Ministry of Finance. See above-referenced decrees.

3- Since those companies are mainly government-subsidized; government has a stranglehold on them; they must apply government policies. This is the reason why Maetur has agreed, at the government's request, to concede a 70 hectares lot for the Olembe II project. In addition, the current litigation, brought by the government against Edou Joseph et Botoo A Ngon, Director



General and Chairman of the Board of Directors of CFC, in itself shows the role of the State in the management and direct control of Crédit Foncier du Cameroun.

4- CFC applies government policies in its real estate procedures. This is why the two project main overseers always had to keep the government informed through line ministries. Mr. Edou stated in the ongoing litigation about Olembe II project in a hearing before the Superior Court in Yaoundé, that he met with the Minister of Finance twice, specifically to discuss the project and review documents pertaining to the housing project, and obtained the Minister's written approval for the project. The same Minister was a CFC Board member, and CFC reported directly to his Ministry. The Minister's approval is evidenced in by fact he issued a letter dated August 10, 2005, which authorized the importation into Cameroon (and customs clearance) of the Group 5 construction equipment, through Atlantic Group SCI/MBI Group, Inc.'s arrangements and coordination. In fact, the Minister issued a special tax regime (regulation) for the Olembe II project.

5- Mr. Edou Joseph confirms in his statement that after CFC and the Cameroonian Government realized their error in canceling the Olembe II project, the Ministry of Finance requested his advice on how CFC and the Cameroonian Government could mitigate the potential monetary exposure. He then wrote to the Minister of Finance on 01/5/2006 to provide him with ways and means to mitigate the losses, among which was that the Government should re-start the housing project, after negotiating the damage claims with MBI Group, Inc. and Atlantic Group SCI. This was especially critical given the fact that CFC was already a beneficiary to an Advance Payment Guarantee and a Parent Company Guarantee.

6- To further show the role Government plays in CFC, Mr. Edou states that besides executive members of CFC being able to refer to the Board of Directors, the Government also has that power when social loans (loans authorized by the government) are concerned.

7- Mr. Botoo A Ngon, Chairman of the CFC Board of Directors confirms the role of government in CFC when he explains in a statement that was also made before the Superior Court in Yaoundé that all real estate development files do not necessarily go through agencies's chain of command. Because these are government agencies, some of the projects are dictated from "the top", such as the Office of the President and the Office of the Prime Minister, since the agencies are required to carry out Government policy and programs.

B/ *FORUM NON CONVENIENS*

1. With regards to the ongoing trial in Cameroon, the law was violated on several occasions. Here are some examples. Some additional examples may be found in Mr. Edou's statement.

(a) The arrest warrant against Tchoufa Roger has not been issued in accordance to due procedure, which is a sign that something is suspicious. A summons has to be sent first. In case it is refused, a second summons is issued; if the person does not cooperate, a subpoena is issued. If the person does not appear, the prosecutor issues an arrest warrant in order to force the person charged to appear before him. But in this particular case, the prosecutor directly issued an arrest

warrant on May 6, 2006 and a summons on August 9, 2006 to Mr. Roger Tchoufa; which is a legal nonsense and an obvious violation of the law.

(b) All of Mr. Tchoufa's possessions in Cameroon, which he acquired more than 10 years ago (before he was involved with Crédit Foncier du Cameroun in 2003) have been confiscated. However, it was never established that these possessions had any connection with the "litigation matters" involving Crédit Foncier.

(c) No member of the CFC Board of Directors who was summoned to appear before the Mfoundi Superior Court in Yaoundé, Cameroon has ever appeared as a witness in this case, not even the current Director General of Credit Foncier who actually was responsible for the termination of the Olembe II project. But Mr. Ndzoua Ndzana Remy, member of the CFC Board of Directors elected to testify covertly in a pending procedure in the USA instead of testifying in Cameroon. Besides, since the trial in Cameroon has begun, the attorneys noted it was a civil case given the nature of the agreements that were signed between Group Five, Atlantic Group, MBI Group, and Crédit Foncier du Cameroun. But strangely, the justice system in Cameroon opted for a criminal case. The fact that Group Five and MBI Group were never summoned in this procedure is quite surprising when you consider that they are stakeholders in the Olembe II project. Cameroonian authorities have persecuted Mr. Roger Tchoufa, representing him as a white-collar criminal to the rest of the world. Furthermore, the Cameroonian judicial system refuses to provide the defense attorneys with the "discovery file" records on the Olembe II case.

These examples provide enough evidence to demonstrate that if a trial were to take place in Cameroon, it would not be fair to MBI Group and Atlantic Group.

## ABOUT PEOPLE WHO WITNESSED BEFORE THE SUPERIOR COURT IN YAOUNDE (OLEMBE II PROJECT)

Mrs. Dibong, the Deputy Director General of CFC was supporting the charges. I observed that she was unable to answer questions related to CFC's relation to Olembe II. Of the 40 questions asked of her, she answered 36 times that she knew nothing about the Olembe II project.

As for the other witness, Mr. Pendhom only supported the charges without providing any additional evidence, his testimony was nothing but a reiteration of the contents of the judicial expert report.

I have affixed my signature below on my own free will.

_____
Jules Nkana

25. JANVIER 2008
Date

**MBI Group, Inc. and**                           :

**Atlantic Group, SCI,**                          :

                                                  :

        *Plaintiffs,*              :    **1:07-cv-00637-JDB**

                                                  :

                                                  :

        **v.**                     :

                                                  :

**Crédit Foncier du Cameroun, and**               :

                                                  :

**The Government of the Republic of**             :
**Cameroon**
                                                  :

        *Defendants*               :

---

## <u>DECLARATION OF JOHN M. KAMYA</u>

1. My name is John M. Kamya, an American citizen, and over eighteen years of age. I am the founder, President/CEO of MBI Group, Inc., a Delaware corporation, with its headquarters in Bethesda, Maryland, USA.

2. I am also a Certified Public Accountant (CPA), a Certified Management Accountant (CMA), and started my career with Price Waterhouse (now PriceWaterhouseCoopers), followed by KPMG, and then founded several successful firms, including but not limited to Gardiner, Kamya & Associates, PC (now GKA, PC – "GKA"), MacArthur & Baker International, Inc. ("MBI"), and MBI Group, Inc. ("MBIG").

3. In my professional career, I specialize in conceptualizing large challenging projects, and implementing them, particularly in developing economies. Over the past twenty years, I have conceptualized and implemented such projects in Tanzania, Uganda, Kenya, Rwanda, South Africa, Namibia, Nigeria, Liberia, Ghana, Ivory Coast, Ethiopia, Somalia, Bolivia, Haiti, Guyana, Zambia, Sierra Leone, and Equatorial Guinea. As such, I am familiar with doing business in challenging emerging economies.

4. The projects' values range or ranged from $10 million to $400 million.



5. The projects in the countries above had, or have funding from host governments, host government agencies, foreign commercial investors, USAID, World Bank, Overseas Development Agency (UK), CIDA (Canada), Inter American Development Bank (IAD), Africa Development Bank (ADB), US Overseas Private Investment Corporation (OPIC), and others.

6. Within the United States, I have directed major projects/contracts in most civilian agencies, particularly the US Department of Housing and Urban Development ("HUD"), including projects involved with affordable housing, work-force housing, subsidized housing, mortgage products, sales of Federal Housing Authority ("FHA") - guaranteed mortgage loans, GNMA programs, multi-family housing programs, and others.

7. On affordable housing, in addition to Cameroon, we have conceptualized, raised debt and equity capital, as well as assembled project teams for such affordable housing projects from scratch in Uganda, Nigeria, Rwanda, and separately, in the Washington DC area. Currently, we have conceptualized and commenced on building work force / affordable housing developments in the Hurricane Katrina-ravaged region of the Mississippi Gulf Coast, and in certain areas of Memphis, Tennessee.

8. I am personally familiar with the issues relevant to the afore-captioned case involving MBI Group, Inc., Atlantic Group, SCI on one side, and the Government of Cameroon and Credit Foncier du Cameroun ("CFC"), on the other. At all materials times, I was (and still am) the President/CEO of MBI Group, Inc. and therefore was in the important meetings, and participated in making major decisions for MBI Group, Inc. and Atlantic Group, SCI.

9. I confirm that Roger Tchoufa is an Executive Vice President of MBI Group, Inc., and was responsible for running the affordable housing Olembe II project in Cameroon through Atlantic Group, SCI, our Cameroonian entity. At all times before and during the execution of various agreements pertaining to the Olembe II project (also known as "Olembe Extension"), Roger Tchoufa was, and still is, the Executive Vice President of MBI Group, Inc.

10. I confirm as to the veracity of the facts stated by Roger Tchoufa in his Declarations to the Court. I am personally aware of all the facts stated in Roger Tchoufa's Declarations, and specifically, I was informed contemporaneously, and was aware, of the demands for bribes by senior Cameroonian Government officials, at the time those bribery demands were made. MBI Group, Inc., its Principals, and the Company's affiliate Atlantic Group, SCI, all declined to participate in the bribery schemes. As a result, the Olembe II housing project, as well as the other housing expansion projects in Yaounde and Douala (which were to be funded by the United States Government, through its agency, the US Overseas Private Investment Corporation, among several financiers), were



2

terminated without cause by CFC and the Government of Cameroon, causing financial injury to the Plaintiffs, and the United States Government, among others.

11. According to the 2007 Transparency International Report, Cameroon, was once again ranked as the most corrupt country in Africa. It was also ranked as having the worst and most corrupt judiciary (Number 1) in Africa. The Cameroonian Government and its agencies' actions in this Court Case as well as the subject housing project, prove why Cameroon holds this infamous Number 1 ranking.

12. In a February 27, 2004 letter to the CFC Director General, I, on behalf of MBI Group, Inc. wrote to CFC submitting a formal expression of interest in the development of affordable housing in Cameroon. (See Exhibit 1). As a follow-up, in a letter dated May 11, 2004, CFC wrote to MBI Group, Inc (and Atlantic Group, SCI) confirming receipt of the incorporation documents for Atlantic Group, SCI. (See Exhibit 2).

13. Atlantic Group, SCI, the Cameroonian affiliate of MBI Group, Inc., was incorporated in Cameroon on March 24, 2004, as a direct result MBI Group, Inc.'s and CFC's mutual agreement for the two parties to cooperate in the development of the Olembe II affordable housing project. In fact, in an MBI Group, Inc. Board Resolution dated March 10, 2004, and titled: "Establishment and Incorporation of Atlantic Group (Cameroun) SA and Appointment of Roger Tchoufa, Executive Vice President of MBI Group, Inc. to Undertake the Matters Resolved Below" (and provided to CFC in early April 2004), MBI Group, Inc. resolved as follows (also see Exhibit 2):

> "(a) MBI Group, Inc. is to organize and incorporate a company (to be called Atlantic Group (Cameroun) SA), in Cameroun to undertake various construction/housing and mortgage industry related projects, including the project in (a) above; (b) MBI Group, Inc. is to carry out all the necessary business activities to start the projects contemplated in (a) above, including arranging for contractors, engineers, architects, urban planners, etc to start work, as may be considered prudent, in light of the projects' timelines; (c) MBI Group, Inc. hereby appoints Roger Tchoufa, Executive Vice President, to negotiate on MBI Group, Inc.'s behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroun; (d) MBI Group, Inc. empowers John M. Kamya, President of MBI Group, Inc. to issue a Notarized Power of Attorney to Roger Tchoufa, to enable Mr. Tchoufa to undertake the matters resolved in (a), (b), and (c) for and on behalf of the company."

3

Furthermore, on March 10, 2004, a Power of Attorney witnessed by AnnMarie Wilkinson, a Notary Public/State of Maryland, stated the following (also see Exhibit 3):

"...This is to confirm that the Board of Directors of MBI group, Inc. has given a Power of Attorney to Roger Tchoufa, Executive Vice President of MBI Group, Inc. (MBIG), to negotiate on MBIG's behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroon. MBI Group, Inc. shall become a shareholder in Atlantic Group (Cameroun) SA, and the company's Directors shall include Roger Tchoufa and John M. Kamya, in addition to others who shall be appointed".

14. The Olembe II project was initiated by MBI Group, Inc. as stated in our complaint. MBI Group, Inc. on numerous occasions, paid third parties directly from its US bank accounts for services rendered or for products. Such parties included consultants, contractors, and professional service providers, located in South Africa, Cameroon and the USA. In several cases, I, on behalf of MBI Group, Inc. (and from MBI Group Inc.'s US-based financial resources) personally wired funds or wrote checks to third parties, to such companies include Group Five International, Sivest SA, Atelier & Associates of South Africa, and several US-based companies and professionals.

15. MBI Group, Inc. has on file, numerous letters, emails, and other correspondence between the Company and CFC, as well as with other parties (architects, engineers, contractors, etc.). In addition, in May 2004, and on subsequent trips, MBI Group, Inc. had numerous meetings with the then CFC Chairman of the Board and the then CFC Director General in Washington DC, and in Maryland. MBI Group, Inc. also arranged (for and on behalf of CFC) attended meetings (together with the CFC Director General and the CFC Chairman) and with the US Department of Housing and Urban Development, the U.S. Overseas Development Corporation (OPIC), the US Treasury Department, Office of International Affairs, the White House Team in charge of the US Government's Emerging Economies Mortgage Market Initiative, staff from the Fannie Mae, the International Finance Corporation, and several American companies involved in the construction and mortgage industries. We also arranged for tours of several housing developments in Washington DC, Northern Virginia and Maryland.

16. On the trips made by CFC to the United States, the CFC Director General and the CFC Chairman used MBI Group, Inc.'s offices to conduct business on behalf of CFC. These CFC officials used our office facilities in Bethesda, Maryland, to maintain contact with CFC headquarters in Cameroon. They made and received phone calls, faxes and emails (which they accessed from our office computers) to and from CFC in Cameroon. They signed binding agreements (between CFC,

4 

MBI Group, Inc. and Atlantic Group, SCI) in MBI Group, Inc.'s offices in Bethesda, Maryland. These same CFC officials, in their official capacities, also held meetings in MBI Group, Inc.'s offices with other parties who had traveled to Bethesda, Maryland, specifically to meet with the CFC Director General and the Chairman of the Board (these parties were unrelated to MBI Group, Inc. or Atlantic Group SCI) to conduct CFC-related business. In fact, one of the parties (a developer who also eventually signed an agreement with CFC) traveled from England and signed agreements with CFC, at MBI Group, Inc.'s offices in Bethesda, Maryland. Thus CFC business was conducted at MBI Group, Inc. offices in Bethesda, Maryland.

17. MBI Group, Inc. and/or its affiliates are the entities which applied for Cameroonian visas at the Cameroon Embassy in Pretoria, South Africa, in those cases when construction trade staff had to travel to Cameroon (e.g. Sivest, Group Five, Atelier & Associates).

18. The May 18, 2004 tri-partite Memorandum of Agreement was signed by me on behalf of MBI Group, Inc. The Agreement was signed by Joseph Edou, representing CFC as its Managing Director (Director General), and in the presence and approval of the Chairman of the CFC Board, Honorable Booto A. Ngon. To date, this Agreement is still in force.

19. The May 18, 2004 Memorandum of Agreement, was, and is the Master Agreement, under which the housing project was implemented by MBI Group, Inc. It was expected and planned by all the Parties to this Agreement, that subsequent specific agreements (emanating from this May 18, 2004 Agreement) would be signed by the Parties, including but not limited to the following: construction agreement for the houses, construction agreement for the infrastructure (roads, electricity, water, etc.), financing agreements for the construction of the houses and the infrastructure, agreement for CFC to be the exclusive provider of mortgages to the home buyers, agreement for CFC to provide access to the 50,000 prospective home buyers in CFC's database, subcontractor agreements with the project management company, surveyors, architects, engineers, and others. In fact, after the signing of the May 18, 2004 Agreement, MBI Group, Inc. commenced incurring expenses, securing the services of several project-related companies (e.g. Group 5, Sivest, Atelier, US-based staff, US-based engineers, and US-based architects).

20. During the May 2004 meetings and subsequent meetings, and during the Director General and Chairman's's visit to our offices in Bethesda, Maryland, MBI Group, Inc. arranged for a seminar/meeting of committed buyers for the houses to be built by MBI Group, Inc. and CFC in Yaounde (Olembe II). The prospective buyers were residents of different parts of the United States, who wanted to buy houses in Cameroon. Mr. Edou made a presentation regarding the types of houses to be built by MBI Group, Inc. as well as the mortgage programs CFC would be offering to the buyers. Several prospective home buyers made commitments to

5

buy those houses. All home sales to buyers in the United States as well as in other parts of the world were to be handled directly by MBI Group, Inc.

21. The project referred to as "Olembe II", is the same project referred to as "Olembe Extension". The terms are used interchangeably, both by CFC and the Plaintiffs. As evidence, per CFC's letter dated April 1, 2005 addressed to the Plaintiffs, CFC authorized the transfer of approximately $4,750,000, in respect of the real estate development called "Olembe Extension" -- See Exhibit 4. (Note that there has always been an Olembe I project, which is the original Olembe project, which is adjacent (across the railroad tracks) to the Olembe II project site. There was no, and have never been any other Olembe project other than the original Olembe project (Olembe I – which comprises 103 houses and was completely about six years ago), and the Olembe II (Olembe Extension). Also see Exhibit 4(a), which is a fax from CFC to MBI Group, Inc., received on November 26, 2004, listing the documents required for the "Olembe Extension" project.

22. Regarding the $4,750,000 advanced by CFC to the Plaintiffs, these funds were paid to Group 5 International by Atlantic Group SCI. Specifically, see Exhibit 5, which is the May 20, 2004 letter from Group 5 to Sivest SA (Pty) Ltd, stating in item 5, that an advance payment of 20% (twenty percent) of the contract sum was required. Exhibit 6, is Guarantee no. C04/17465, dated January 26, 2005, issued by Lombard Insurance Company to CFC, for the sum of $4,750,000, on behalf Group 5. Exhibit 7 is a letter dated February 2, 2005 from Group 5 to Roger Tchoufa, in which Group 5 discusses the Advance Payment Guarantee, stating that of the $4,750,000, the sum of $4,000,000 should be wired to Group 5's overseas account, and that the balance of $750,000 should be paid into a local account in Cameroon. Exhibit 8, is the wire transfer confirmation for the $4,000,000, showing the beneficiary as Group Five Limited. Exhibit 9 is an email dated April 6, 2005, from Group Five to Roger Tchoufa (with a copy to me and others), confirming receipt of the funds, and states in part: "First off thank you very much for your efforts to get this transfer through to our Bank account".

23. The Defendants have continuously claimed that the company Group 5 International, was, and is a fictitious entity, a creation of MBI Group, Inc., and Atlantic Group, SCI and some CFC Board members. On the contrary, Group Five International is a large publicly traded construction and manufacturing company, with over $1.2 billion in annual revenues, and over $1.1 billion in assets. It is one of the largest construction companies in Africa. All the Defendants have to do is to visit www.g5.co.za, or to ask their Embassy in Pretoria to check out the existence of Group 5. Furthermore, MBI Group, Inc. made official requests (which were always granted) to the Cameroonian Embassy in Pretoria, South Africa, for visas of the South Africa engineers and construction professionals to travel to Cameroon to work on the housing project. Therefore, the Cameroonian Government knew about the housing project through multiple official channels.

24. Group Give International used the services of PricewaterhouseCoopers, and a copy of that Firm's Contract Review Questionnaire (on behalf of Group 5) is included as Exhibit 10.

25. On May 11, 2005, Group Five International also issued a Parent Company Guarantee (see Exhibit 11) for the full value of the contract , which states in part: "....we Group Five Limited irrevocable and unconditionally guarantee to you, as a primary obligation, the due performance of all the Contractor's obligations and liabilities under the Contract, including the Contractor's compliance with all its terms and conditions according to their true intent and meaning".

26. On July 23, 2005, CFC officially handed over the 70 hectare construction site to MBI Group, Inc./Atlantic Group, SCI and Group 5. Attached as Exhibit 12, is a July 21, 2005 letter of invitation (from Roger Tchoufa) to the South Africa Embassy High Commissioner to officiate at the handover ceremony. The letter states in part: "....Group Five International, a South African Construction Company, will construct a new residential township, "OLEMBE II", at Yaounde. The project consist[s] of 1034 residential houses 3, 4 and 5 bedroom units with roads, water and electrical infrastructure....".

27. The Guest of Honor at the July 23, 2005 handover ceremony was the First Secretary of the South African Embassy. There were about 12 senior management CFC staff at the ceremony, including the CFC Chairman, the CFC Director General, and several CFC Directors. Attached is Exhibit 13, which are pictures of the ceremony. (In the pictures, the white lady is the South African Embassy First Secretary, and was the Guest of Honor, and the SUV is her official diplomatic car with diplomatic plates with a South African flag. The white gentleman is the Group Five representative.) Contrary, to the Defendants' assertions, this was not a transfer of land from Maetur to CFC. As such there were no representatives from Maetur at that July 23, 2005 ceremony, as the ceremony had nothing to do with Maetur.

28. Furthermore, Exhibit 14, is an Agreement dated June 13, 2005 between CFC and Maetur, which states that 70 hectares were being transferred from Maetur to CFC for further transfer to Atlantic Group SCI for the housing development known as "Olembe II 1034 housing units". Maetur is a wholly owned entity of the Cameroonian Government.

29. Attached as Exhibit 15, is a picture of the billboard at the entrance into the project site (the billboard was on a main road). This billboard, which refers to the "Olembe II" housing project, was erected in July 2005, and clearly shows the following companies: Atlantic Group, SCI, Credit Foncier du Cameroun, Cabinet Medou, Maetur, Secre, Group Five (South Africa), TTRAC, GIEA, SOS SAM Confort, Sivest (South Africa), Atelier & Associates (South Africa), and SAL & Partners.

7

30. The Defendants claim that apart from Joseph Edou and Mboto Ngon, no other Board member knew about the Olembe II housing project, until the August 18, 2005 Board Meeting. Based on our first hand knowledge and interaction with other Board members (before the August 18, 2005 Board meeting), the fact is that other Board members knew about the May 18, 2004 Memorandum of Agreement, and also knew about the progress of the housing project. In fact, on August 10, 2005, a key Board Member, who was also the Minister of Finance (the Ministry to which CFC directly reports), issued written clearance to CFC, for the project team to import equipment and public works materials "destined for the execution by Group Five of the construction of 1,034 social houses in Yaounde (Olembe II)...". (See Exhibit 16). In addition, the President's office and the Prime Minister's office were also aware of the progress of the affordable housing project.

31. In terms of direct effect of the Olembe II project's on the United States, the affordable housing projects in Cameroon were initiated and run by MBI Group, Inc. as commercial ventures, and to make a profit. The projects, in addition to staff on location in Cameroon, were managed by several American staff resident in the United States. The staff were employees of MBI Group, Inc. who were directly charged with supporting the projects. (More US-based employees were scheduled to be added as the housing projects activity increased). These same US-based employees were laid off by MBI Group, Inc. after CFC's termination of the Olembe II project. In addition, the Olembe II housing project was supported by American-based consultants, engineers, lawyers, architects, and financial professionals, who were deriving revenue from MBI Group, Inc., and who as a result of CFC's termination of the project, lost work, and thus revenue.

32. The project resulted in funds being transferred between the United States and Cameroon (in both directions), with significant sums being spent by MBI Group, Inc. during the feasibility study period and initial project start-up period.

33. In addition to the Olembe II project, MBI Group, Inc. worked closely with CFC on two other affordable housing projects, a second project in Yaounde (1,200 houses), and another in Douala (2,000 houses). MBI Group, Inc. secured a construction loan facility from OPIC for the construction of the 1,200 housing units, and the IFC was working on a separate loan/equity facility for the Douala project. These projects were pursued by MBI Group, Inc. after securing agreements with CFC, for CFC to provide mortgages to end-buyers. The value of these projects is over $250 million. MBI Group, Inc. eventually secured preliminary OPIC loan approval for the Yaounde housing expansion project. At this time, MBI Group, Inc. has put these projects on hold until the subject matters are resolved by the US Federal Court.

34. I was present at the meeting with the OPIC officials and the CFC Managing Director in early December 2005 at the CFC headquarters in Yaounde, at which the current CFC Director General affirmed the existence of the May, 2004

8

Agreement between CFC and MBI Group, Inc., and CFC's intent to honor the said Agreement, as well as all the other contracts.

35. The project also had a direct commercial effect on several United States agencies, including, but not limited to the US Overseas Private Investment Corporation. OPIC spent US taxpayers funds by working on this project, and also committed and incurred funds by sending its team to Cameroon to work with MBI Group, Inc.

36. OPIC and the US Embassy (in Cameroon) conducted their own review of the subject matter and concluded that CFC and the Cameroonian Government had expropriated MBI Group, Inc.'s (and Atlantic Group SCI's) property and business products (including, but not limited to physical property, intellectual property, etc.). This information can be provided by OPIC and the US Embassy in Yaoundé, Cameroon.

37. As further evidence of Cameroon's conducting business in the United States, in March 2007, the Cameroonian Government and several of its agencies arranged investor forums in the Washington DC area, in an attempt to attract American investors and secure American capital, particularly investors in affordable housing. One of the projects they marketed in the investor forums was "Investment in Affordable Housing in Cameroon".

38. Before their first counter-filings in November 2007 in US Federal Court, CFC and the Cameroon Government had never claimed (or notified MBI Group, Inc and Atlantic Group, SCI) that Mr. Joe Edou and Mr. Booto A. Ngon, the former CFC Director General and former Chairman of the CFC Board, respectively, were never authorized to enter into the May 2004 Agreement. This Agreement was signed in Bethesda, Maryland, and authorized and witnessed by the CFC Chairman of the Board. (In fact, CFC and the Government of Cameroon first claimed that there had never been any kind of Agreement among the Parties, and that there had never been a Board meeting to approve the Olembe II /Extension project…that somehow, the project had happened by accident (or surreptitiously) without the CFC's staff and the CFC Board's knowledge, and without the Cameroonian Government's knowledge . However, the Defendants changed their story in their January 2008 filing, after being confronted with an August 2005 CFC Board Resolution approving the project. We expect that the Defendants will continue to change their story as more documents and facts are presented).

39. CFC and the Cameroonian Government assertion of the facts is wrong and a gross misrepresentation of facts, because MBI Group, Inc. and Atlantic Group, SCI started work on the housing project in 2004, a time lapse of almost four (4) years, to when CFC and the Cameroon Government first made the claim that CFC and its Board had no knowledge of the project, and/or that it had not been approved.

9

40. At the meetings in Washington DC, the same former CFC officials (Chairman and Director General), representing CFC in their official capacities, also made representations to the agencies of the US Government, resulting in decisions by those US Government agencies to work on those projects and also to work with MBI Group, Inc. by providing construction financing for the expansion of the affordable housing programs. In fact, the US Government agencies assigned staff to work with MBI Group, Inc. to bring the housing expansion projects to fruition.

41. Attached as Exhibit 17, is an email dated June 14, 2005 from me to Joseph Edou in which I, on behalf of MBI Group, Inc., invited him to the United States to seek additional funds from several international organizations to expand the affordable housing program. The result of his meetings in the US on that trip was funding considerations (or approvals) from the US Overseas Private Investment Corporation and the International Finance Corporation.

42. Based on information and knowledge, during the illegal incarceration of Roger Tchoufa in Ivory Coast (which incarceration was illegally initiated by the Cameroon Government), one of Cameroon's legal counsels (who is actually currently working on this case), was directly involved in that incarceration, and specifically directed the efforts to "kidnap and spirit" Roger Tchoufa out of Ivory Coast and into Cameroon, without the required due legal process. The Ivory Coast security and Court officials refused to cooperate with that Cameroonian legal counsel and his cohorts in their ill-advised illegal activities. It is our position that Roger Tchoufa's life and that of his family are in imminent danger, if they were to step foot in Cameroon.

43. The U.S. Embassy staff in Ivory Coast are aware of the circumstances of Roger Tchoufa's illegal incarceration and the US Embassy staff there made repeated visits to Roger Tchoufa while under illegal detention, to check on his safety, and to ensure that the Cameroonian Government did not do anything illegal, such as trying to kidnap Tchoufa and spirit him out of Ivory Coast, outside the proper legal channels.

44. Cameroon is not the appropriate legal forum for various reasons, among which is the fact that the lives of the Plaintiffs' principals would be in danger if they ever stepped foot in Cameroon. In fact, even the United States Embassy in Cameroon has advised the Plaintiffs' principals to stay out of Cameroon for our physical safety. On the other hand, the Defendants' principals would be safe in the United States. This is a very high profile case which has embarrassed Cameroon and the Cameroonian Government.

45. It is also a known fact and confirmed by the United States Department of State, that judiciary decisions in Cameroon, especially in major cases, are handed down by the Executive, regardless of the merits of the case at hand. The subject housing project got sucked into in-country political wrangling, and the refusal by

10



MBI Group, Inc. and its affiliate Atlantic Group, SCI to pay bribes, was the death knell in the project's coffin.

46. The United States Millennium Challenge Account, from which the Cameroonian Government is seeking financial aid in the hundred of millions of dollars, is also aware of the Plaintiffs complaint and actual circumstances of the housing project's termination (i.e. bribery demands by Cameroonian government officials). One of the Millennium Challenge Account pre-requisites for countries to qualify for financial aid, is a "clean" judiciary, and no corruption. The 2007 Transparency International Report clearly documents that Cameroon has the most corrupt judiciary in Africa and the most corrupt business environment on the African continent.

47. Based on credible information, CFC and the Cameroonian Government realized after the cancellation of the project, that they had committed a major error in its cancellation. They conceded that the project was indeed a good project for Cameroon, and that Cameroon was fortunate to have investors targeting the development of affordable housing, consistent with the Cameroon President's goals. Even more important, that MBI Group, Inc., was securing additional international financing for the expansion of the housing projects. However, as long as the Plaintiffs were not willing to pay bribes to Cameroonian Government officials, then the merits of the housing project were irrelevant.

48. Also attached as Exhibit 18, are: (a) a May 11, 2004 letter from CFC to MBI Group, Inc. confirming receipt of the corporate records for Atlantic Group, SCI, and CFC's intent to proceed with the project; (b) CFC's May 25, 2004 letter confirming that MBI Group, Inc. was under contract with CFC to "undertake a long-term large scale affordable mass housing program in Cameroon.."; (c) CFC's April 21, 2005 Financial Guarantee of approximately $20,000,000 to Atlantic Group, SCI; (d) MBI Group, Inc.'s June 22, 2005 letter to CFC regarding securing construction funding from OPIC and IFC; (e) CFC's June 24, 2005 letter regarding support for MBI Group, Inc.'s efforts in seeking and securing construction financing from international agencies, such as OPIC and IFC; (f) July 6, 2005 MBI Group letter to OPIC registering the Yaounde project expansion for OPIC funding; (g) registration of the Yaounde housing project for OPIC Insurance; (h) OPIC's preliminary Terms of Reference for the Yaoundé Housing Project for a Revolving construction loan amount of $10,000,000; and (i) MBI Group, Inc.'s September 19, 2006 letter to the President of Cameroon requesting his intervention in the matter, so as to avert litigation.

I declare, under the penalty of perjury, that the above is truth, and nothing, but the truth.

Signed : _____          Date: _____ 21, 2008
          John M. Kamya, Declarant

11





# MBI GROUP, INC.

7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814 USA
Ph: (301) 986-1595    Fax: (301) 986-1464

February 27, 2004

Mr. Joseph Edou
Director General
Credit Foncier du Cameroun
Yaounde, Cameroun

Re: Development of Quality Affordable Housing in Cameroon

Dear Mr. Edou:

We are pleased to submit this letter to formally express our interest in the development of affordable housing in Cameroon. Our company MBI Group, Inc., having studied the persistent acute shortage or non-existence of affordable housing in Africa, designed a program called "The Affordable Housing and Mortgage Industry Initiative for Africa". (Please see our website at www.mbigroupusa.com). Presently we are active in several African countries.

The objective of our program is to create **quality affordable mass housing for the people.** We do this through a careful study and understanding of the local housing market, what is considered affordable housing (i.e. pricing), the proposed housing estate locations, and the demonstrated commitment of the project participants. Our project team includes top-notch firms in the "quality affordable mass housing industry" with in-depth experience (particularly in Africa), and include: Sivest SA (Pty) Ltd. (for master planning and project management), Group Five (Pty), Ltd. (for construction), Atelier & Associates (Pty) Ltd. (for architectural design), and Outer Space Planning & Design Group (Pty) Ltd. (for landscape design).

**Our Proposal for Quality Affordable Mass Housing for Cameroon:**

After careful analysis of the affordable housing situation in Cameroon, and particularly Yaounde, we propose the following:

(a) Location of the First Affordable
    Housing Scheme:                          Yaounde

(b) Size of the land:                        70 hectares

Exhibit 1
(2×3)

(c) Proposed Size of the Housing Units:    Approximately 130 square meters per housing unit.

(d) Estimated Number of Houses on the Land:    Estimated that 1,000 to 1,200 houses will be built on the 70 hectares.

(e) Initial Estimated Project Cost (houses only):    US$15 million to US$20 million, assuming (a) land contribution by CFC, (b) exclusion of road and other major infrastructure costs (e.g. water and sewer, electric hook-up, main roads and secondary roads in the housing development, etc), (c) custom duty relief on construction equipment and construction materials.

(f) Proposed Layouts of the Houses:    3 bedrooms, 2 baths, and 4 bedrooms and 2 baths, plus a living room and a dining room. Each house would be situated on 0.10 to 0.15 acres.

(g) Number of Models:    Four to five models with different floor plans

(h) Proposed Prices of the Houses:    US$15,000 to US$18,000 per house

(i) Other Community Infrastructure:    Other infrastructure in the communities will include shopping malls, day care centers, community centers, etc.

(j) Proposed Primary Project Leader:    Atlantic Group (Cameroun) SA. The shareholders will include MBI Group, Inc., Transatlantic SA, and others.

(k) Other Project Participants:    Sivest SA (Pty) Ltd., Group Five (Pty) Ltd., Atelier & Associates (Pty) Ltd., Outer Space Planning & Design Group (Pty) Ltd.

(l) Proposed Project Start Date:    As soon as the project is approved by CFC. We propose that Sivest and Atelier start the initial phase of the project (including master planning,

EXHIBIT 1
(3×3)

project costing and architectural designs).

(m) Other Future Project Participants:

At a later stage we will include the participation of international organizations such as the United States Overseas Private Investment Corporation (OPIC) and IFC, who have already expressed an interest in our Affordable Housing Projects in Africa, and particularly Cameroon.

**Project Implementation Timeline:**

Our team is ready and capable of commencing this important project on a very fast track.

\*\*\*\*\*

We look forward to the opportunity of working with CFC, and making a significant contribution to the well-being and the housing needs of the Cameroonian people.

Please feel free to contact us at +1-301-986-1595 or fax +1-301-986-1464 (including emails mbiusa@aol.com; jkamya5356@aol.com, mobile +1-202-215-5348), or through Roger Tchoufa, MBI Group, Inc. Vice President at 237-763-2629 and 237-968-0214.

Sincerely,

John Kamya
President
MBI Group, Inc.

## MBI GROUP, INC.
## CORPORATE RESOLUTION

## ESTABLISHMENT AND INCOPORATION
## OF
## ATLANTIC GROUP (CAMEROUN) SA
## AND APPOINTMENT OF ROGER TCHOUFA, EXECUTIVE VICE PRESIDENT
## OF MBI GROUP, INC. TO UNDERTAKE THE MATTERS RESOLVED BELOW

It is hereby resolved on this 10ᵗʰ day of March 2004, in Bethesda, Maryland, USA, by the Members of the Board of Directors of MBI Group, Inc. that:

(a)   MBI Group, Inc. is to organize and incorporate a company (to be called Atlantic Group (Cameroun) SA), in Cameroun to undertake various construction / housing and mortgage industry related projects;

(b)   MBI Group, Inc. is to carry out all the necessary business activities to start the projects contemplated in (a) above, including arranging for contractors, engineers, architects, urban planners, etc to start work, as may be considered prudent, in light of the identified projects' timelines.

(c)   MBI Group, Inc. hereby appoints Roger Tchoufa, Executive Vice President, to negotiate on MBI Group, Inc's behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroun.

(d)   MBI Group, Inc. empowers John M. Kamya, President of MBI Group, Inc., to issue a Notarized Power of Attorney to Roger Tchoufa, to enable Mr. Tchoufa to undertake the matters resolved in (a), (b) and (c), for and on behalf of the company.

Signed: _____

By:   John M. Kamya, President
      MBI Group, Inc.

Signed: _____

By:   Miranda Amarquaye
      Corporation Secretary

# POWER OF ATTORNEY OF MBI GROUP, INC.
## TO
## ROGER TCHOUFA, Executive Vice President of MBI GROUP, INC.

This is to confirm that the Board of Directors of MBI Group, Inc., has given a Power of Attorney to Roger Tchoufa, Executive Vice President of MBI Group, Inc. (MBIG), to negotiate on MBIG's behalf, all matters involving the Cameroun projects, and to sign all necessary documents in the formation, incorporation and registration of Atlantic Group (Cameroun) SA in the Republic of Cameroun. MBI Group, Inc. shall become a shareholder in Atlantic Group (Cameroun) SA, and the company's Directors shall include Roger Tchoufa and John M. Kamya, in addition to others who shall be appointed.

Signed this 10th day of March, 2004 in Bethesda, Maryland, USA.

John M. Kamya, President
MBI Group, Inc.

ANNMARIE WILKINSON
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires September 1, 2006

**NOTARY:**

EXHIBIT 4 (ix)

# Credit (cfc) Foncier
# du Cameroun

SIEGE SOCIAL - DIRECTION GENERALE
B.P.: 1531 · YAOUNDE
Téléphone : 23.52.14 - 23.52.15 · 23.52.16
Fax : 23.52.21

**Société Civile Immobilière
ATLANTIC GROUP
BP : 12 560**

**Douala**

Références : OAS /CF/DG/DF/5008

OBJET        Notification de transmission du bon de virement
BEAC Yaoundé n° 3004183 de XAF 2 446 250 000
A votre ordre au profit de l'Agence UNION BANK
OF CAMEROON DOUALA.

Yaoundé, le - 1 AVR. 2005

*Messieurs,*

Nous vous informons avoir émis ce jour, un bon de virement BEAC Yaoundé n° 3004183 de
**FCFA 2 446 250 000** (deux milliards quatre cent quarante six millions deux cent cinquante
mille francs CFA) au profit de l'Agence UNION BANK OF CAMEROON DOUALA pour crédit de
votre compte n° 200 42 000 48 dans leurs livres.

Cette somme représente le virement relatif à l'avance de démarrage de l'opération immobilière
OLEMBE EXTENSION.

Nous vous prions d'agréer, *Messieurs,* l'assurance de notre parfaite considération.

Le Directeur
Général

**J. EDOU**

11-26-2004  12:28     De CREDIT FONCIER DU CAMEROUN     +237 23 82 21     T-667  P 002  F-866

EXHIBIT 4(a)(ix)

## Programme immobilier « OLEMBE EXTENSION »

## ELEMENTS COMPLEMENTAIRES DU DOSSIER DE FINANCEMENT

### 1- DOSSIER DU PROMOTEUR

- Statuts sociaux entiers
- Renseignements sur les actionnaires (adresses, activités, etc.)
- Pouvoirs du Gérant
- Photocopie de la CNI du Gérant
- Extrait n°3 du casier judiciaire du Gérant
- N° du registre de commerce
- Contrat d'association avec les Camerounais éventuellement
- Moyens humains + C.V. des principaux responsables
- Moyens matériels
- Références et réalisations
- Références bancaires
- L'offre de partenariat avec le CFC précisant les missions et les obligations du promoteur

### 2- DOSSIER DES PARTENAIRES, pour chaque partenaire :

- Adresses, activités, etc.
- Moyens humains + C.V. des principaux responsables
- Moyens matériels
- Références et réalisations
- Références bancaires
- L'offres technique et les conditions d'intervention

### 3- DOSSIER TECHNIQUE ET FINANCIER DU PROGRAMME

- l'offre ou le projet de contrat de maîtrise d'œuvre
- l'offre ou le projet de contrat du bureau de contrôle technique
- les dossiers techniques de chaque type de logement comprenant :
  - le nombre et les caractéristiques du modèle
  - les plans (distribution, façades, coupes)
  - les CCTP ou devis descriptif
  - les devis quantitatifs et estimatifs, tout frais compris, exprimés en Fcfa (Hors TVA et TTC)
- les méthodes constructives envisagées
- le descriptif et l'estimatif des travaux préliminaires
- le bilan financier du programme suivant modèle ci-joint et les justificatifs de chaque poste
- le plan de financement du programme
- le planning des travaux
- l'échéancier des dépenses
- le cahier des charges du lotissement

### 4- DOSSIER COMMERCIAL DU PROGRAMME

- la stratégie commerciale préconisée
- la structure des prix de vente prévisionnels intégrant toutes les dépenses

EXHIBIT 5
(1x2)

**FACSIMILE TRANSMITTAL MEMO**

| | |
|---|---|
| TO: John Kadiya | NO. OF PAGES: 4 |
| COMPANY: MBI | FROM: Russell Chappe |
| | COMPANY: SiVEST |
| FAX: 091-301-9864464 | FAX: 011-803-7272 |
| DATE: 21/05/2004 | PHONE: 011-803-6844 |

**GROUP FIVE**
International

Ltd Reg No 1133/9/006
Agents for Group Five Construction (Pty) Ltd

20th May 2004

SiVEST SA (Pty) Ltd
51 Wessel Road
Rivonia
2128
South Africa

Attention: Mr Russell Chappe

Dear Sir

**Re: Housing in Cameroon**

We thank you for the opportunity to meet with yourselves and Mr. Roger Tchoufa of MacArthur & Baker International, Inc. in connection with the above project.

As stated in the meeting, we as Group Five have previously looked at housing opportunities in Cameroon, which did not materialise because of financing difficulties. We are a construction company only interested in the building contract/design (if required), so it is comforting to know that the financing of the project is in place with Mr. Tchoufa.

At the meeting you requested our preferred conditions and us to state the role we would like to play in the project. Our proposal is detailed below.

**Conditions of Contract**

1. FIDIC Conditions of Contract for Construction for Building and Engineering Works designed by the Employer, First Edition 1999.

2. Particular Condition 1 – Provision is to be made that all parties will disclose the costs associated with their involvement in the project and work together in the goal of making the project feasible, ie, an open book policy.

3. Particular Condition 2 – Group Five require a 15% (fifteen percent) mark up on all net costs as a contribution to Head Office overheads and profit.

4. Clause 1.4 – Language to be English.

5. Clause 14.2 – Advance Payment 20% (twenty percent) of Contract Sum.

6. Clause 14.2 – Currency in United States of America Dollars.

7. Clause 14.6 – Engineer to prepare Interim Payment Certificates within 14 (fourteen) days of receipt of Group Five's valuation of work done.

Directors  C Bench  TRAH Dhalton  MH Lamar  HC Turner

Mauritius Office: 3rd Floor  TM Building  Pope Hennessy Street  Port Louis  Mauritius
Tel +230 207 1000  Fax +230 208 7949  E-mail info@g5.co.za  Web www.g5.co.za

EXHIBIT 5
(2x2)

8.  Clause 14.7 – Employer to make payment within 30 (thirty) days of receipt of any required documentation from Group Five into an offshore bank account of Group Five's choice.

These are the major essentials required for us to work effectively over border. The other details can be sorted out as we work through the design and feasibility stage of the project.

## General Requirements

From our experiences of working out of South Africa there are certain requirements that we would like the comfort of knowing are in place prior to our mobilising the construction activity. In stating these requirements, we must iterate that it is not intended in any way to reflect doubt on the integrity and professionalism of the other parties to the project, but rather because at the start of any project in which we are involved, our name is visible on site and if any of the items below are not in place and problems arise, it reflects badly foremost on our name and professionalism.

1.  The Employer owns the land and it is free of any rights and claims from third parties.

2.  The provision of bulk services, i.e., supply of water, supply of electricity and removal of sewage are in place by the Authorities and the project will link into these services.

3.  All the statuary requirements and planning approvals associated with a housing project have been met and are approved by any local Authority.

4.  Our activities in Cameroon have the blessing of the Government and that we will be assisted with the legal requirements such as work permits, visas, etc.

5.  Lastly, but most importantly, that the finance is in place and before proceeding further we would like documentary proof that this is the case.

As requested by you, we enclose a Schedule of Resources that Mr. Tchoufa will take back with him to Cameroon and obtain prices for us to update our initial costing exercise.

Once again, we would like to thank you for your vote of confidence in Group Five in identifying us as your potential Contractor. We will do our utmost and assist you wherever possible to make this a viable and successful project.

Yours Faithfully,

**Mike Higgins**
**Estimating Director**
**Group Five International**

**Lom*bard*
INSURANCE COMPANY**

Ground Floor, Broll Place
Sunnyside Office Park
3 Carse O'Gowrie Road
Parktown 2193
PO Box 2740
Parklands 2121
Tel (011) 642 3960
Fax (011) 643 6725

**GUARANTEE NO. C04/17465**

## ADVANCE PAYMENT GUARANTEE

BRIEF DESCRIPTION      :      CONSTRUCTION OF 1834 RESIDENTIAL UNITS WITH
OF CONTRACT                   INFRASTRUCTURE, ROADS & SERVICES

NAME AND ADDRESS      :      CREDIT FONCIER DU CAMEROUN
OF BENEFICIARY               Boulevard du 20 Mai, P.O. Box 1531 Yaounde, Cameroon
                             (whom the Contract defines as the "Financier").

The Guarantor have been informed that

GROUP FIVE INTERNATIONAL LIMITED
(Reg. No. 13379/1056)
(hereinafter called the "Principal")

is your Principal under such Contract and wishes to receive an advance payment, for which the Contract requires the
Principal to obtain a guarantee.

At the request of the Principal, we the undersigned, JACOBUS CHRISTIAAN KLEYNHANS and MARIA ELIZABETH
LIGGETT in our respective capacities as SENIOR ADMINISTRATOR : CONSTRUCTION DIVISION and
ADMINISTRATOR : GUARANTEES CONSTRUCTION DIVISION and hereby representing

LOMBARD INSURANCE COMPANY LIMITED
(hereinafter called the "Guarantor")

hereby irrevocable undertake to pay you the Financier, any sum or sums not exceeding in total the amount of
US$4 750 000.00 (Four Million Seven Hundred and Fifty Thousand United States Dollars ) (the "guaranteed amount")
upon receipt by the Guarantor of your demand in writing and your written statement stating :

(a)   that the Principal has failed to repay the advance payment in accordance with the conditions of the
      Contract, and

(b)   the amount which the Principal has failed to repay. .

This guarantee shall become effective upon receipt (of the first installment) of the Advance Payment by the Principal. Such
guaranteed amount shall be reduced by the amounts of the Advance Payment repaid to the Financier, as evidence by your
notices issued under Sub-Clause 14.6 of the Condition of the Contract.   Following receipt (from the Principal) of a copy of
each purported notice, we shall promptly notify you of the revised guaranteed amount accordingly.

Any demand for payment must contain your signature(s) which must be authenticated by your bankers or by a notary public.
The authenticated demand and statement must be received by us at this office on or before 31 August 2007 (the expiry date)
when this guarantee shall expire and shall be returned to the Guarantor.

The Guarantor have been informed that the Beneficiary may require the Principal to extend this guarantee if the advance
payment has not been repaid by the date 28 days prior to such expiry date. The Guarantor undertakes to pay you such
guaranteed amount upon receipt by it, within such period of 28 days, of your demand in writing and your written statement
that the advance payment has not been repaid and that this guarantee has not been extended.



## GUARANTEE NO. C04/17465

Page 2

This guarantee shall be governed by the laws of Cameroon and shall be subject to the Uniform Rules for Demand Guarantees, published as Number 458 by the International Chamber of Commerce, except as stated above.

For and on behalf of LOMBARD INSURANCE COMPANY LIMITED.

SIGNED AT PARKTOWN ON THIS 26TH DAY OF JANUARY 2005.

1. _____
J.S. KLEYNHANS
SENIOR ADMINISTRATOR:
CONSTRUCTION DIVISION

2. _____
M.E. LIGGETT
ADMINISTRATOR GUARANTEES:
CONSTRUCTION DIVISION

AS WITNESSES:

1. _____
J. GREYLING

2. _____
L. ONVERWACHT

Address: Ground Floor, Broll Place, Sunny Side Office Park, 7 Carse O'Gowrie Road, Parktown, 3193

PLEASE NOTE THAT A CLAIM UNDER THIS GUARANTEE WILL ONLY BE HONOURED
ON SUBMISSION OF THE ORIGINAL DOCUMENT



**GROUP FIVE**
Construction
International (SA)

2nd February 2005

**Dear Roger**

I hope that everything is well with you. I on the other hand, am still having difficulty overcoming the disappointment of not having the Project signed and finalized as yet.

However, in saying this it gives us time to have the following items in place for my visit on the 15th of this month.

- **Advance Payment Guarantee :**

    Note that, the Guarantee of which you have a copy, is for the amount of $ 4 750 000.00. As discussed with you, we then require the same amount from Crédit Foncier, which we would like as follows :

    o $ 4 000 000.00 - Paid into our bank account in Switzerland, as per the details in the contract.

    o The balance of $ 750 000.00 will have to be paid into a local bank in CFA. Johan Prinsloo will let us have the details. Can you please make sure that this will be in place.

- **Guarantee :**

    o We discussed this in detail and as per the contract, they had to submit this within 21 days. They must now actively work on this, as the commencement of the project is dependant on this.

- **Contract Document :**

    o I have had 1 original and 3 copies ready for signature on the 28/1 when we were supposed to sign.

Directors: PF Marker (Managing)  JR Coyne  F van Tonder  MH Lazaar (British)  R van Niekerk

Corner Witkoppen & 49 New Market Roads  North Riding  Randburg  2162  PO Box 604  Rivonia  2128  South Africa
Tel +27 11 806 5340  Fax +27 11 806 5345  E-mail gfiwanda@gf.co.za  Web www.gf.co.za



o   All these documents have been signed by me with a date of the 28/01/2005 on every page. Do we make new copies for the visit on the 15th ? This will be difficult as I have signed the originals already. It really does not matter as the commencement of the project is dependant on the items as per clause (8.1) of the contract.

o   I cannot afford another situation like what we have had. We have the people available to go to Yaounde just after we have finalized all the items on my upcoming visit. I will be traveling on my own.

Please set-up a meeting with Joseph and discuss these items in detail. If for whatever reason there is any doubt, please let me know, so that I may make alternative plans.

We are all excited about this project, but at the same time very disappointed that it is not finalized as yet.

I await your urgent reply.


Regards


**Piet Martins**
**Managing Director**

UCRACMCXXXX LT : X

UNION BANK OF CAMEROON LTD. (UBC LTD.)

18569 AKWA-DOUALA
AKWA-DOUALA
CM
CAMEROON

Receiver
CITIUS33XXX LT : X.

CITIBANK N.A.

NEW YORK,NY
UN
UNITED STATES

Transaction ref. - FT31070605    Related ref.

Amount    - 4000000, USD    Value/Date -
080407

:20:FT31070605
:23B:CRED
:32A:080407USD4000000,
:33B:XAFXXX7800000,
:36:516,5
:50K:ATLANTIC GROUP
601 M. LEERO
DOUALA
:57A:UBANCMCHXXX0A
:59:/CM1000213273201118760M
GROUP FIVE LIMITED
5,FLOOR TH BUILDING,POPS ERNESBY
STREET,PORT LOUIS
MAURITIUS
:70:AVANCE DE DEMARRAGE DES TRAVAUX
:71A:SHA

Message History

Subj:      **Project Responsibility Chart.xls**
Date:      4/6/2005 5:41:20 A.M. Eastern Daylight Time
From:      sfleicher@g5.co.za
To:        Rtchoufa@aol.com
CC:        rvanniekerk@g5.co.za, mlomas@g5.co.za, j_edou@yahoo.fr, JKamya5358@aol.com

**Email Legal Notice:** http://www.g5.co.za/EmailLegalNotice/G5ElectMailLegalNot.doc

---

**Dear Roger**

First off thank you very much for your efforts to get this transfer through to our Bank account. People sometimes do not understand the complexity and all the frustration that we have to go through to get it done. I see this as a commitment to the project, so thank you again.

As promised herewith, the Program with action items up to the 1st week in May of items that we need to arrange. Please can you ve a look and please feel free to add things that we need to do immediately.

As agreed, Rean van Niekerk will be the Director in charge of Cameroon full time. On the action list you will see that we will in due course send you the Organogram of the staff for the project.

All Plant and Equipment will come from Luanda, which I am busy arranging except for the Block Machines that we are buying ne rom Cape Town. Rean should have ordered it yesterday 05/04.

think if you do not mind that on all correspondence we should do the following:

- As per the Contract correspondence to Group 5 should be adressed to Rean van Niekerk with a copy to P F Martins, J Edou (CFC) and J Kamya.
- Correspondence to Atlantico should be adressed to Roger Tshoufa with a copy to: P F Martins, J Edou (CFC) and J Kamya.

Hope that this is in order.

You will see on the action list that we are going to need the 2 bedroom flats for time being, which you and Mike Higgins viewed nd discussed. Please reserve these for us if you can.

Certainly from our side, we have alot to do. The only item that you must now help with, which is a priority for Joseph is to issue he guarantee for the remainder of the contract. i.e. the 80%.

Regards

Piet Martins

Wednesday, April 06, 2005 America Online: JKamya5356

# PRICEWATERHOUSECOOPERS 🏢

## Contract review questionnaire

Instructions:

➢ Part A, B and C must be completed
➢ To be completed by Contract Director, Quantity Surveyor and divisional Financial Director (as applicable)
➢ This questionnaire is to be completed for every contract including joint ventures (whether administered by Group Five or not)
➢ Attach the final/latest internal and external certificate issued for the work done on the contract
➢ For contracts not administered by Group Five, please attach management accounts / financial statements submitted by the leading external partner

## Part A – Contract details

| | |
|---|---|
| Business unit: | Group Five Cameroon |
| JDE contract number: | 120820 |
| Contract name: | 1034 Houses Yaoundé Cameroon |
| Contract Director: | R van Niekerk |
| Contract Client: | Atlantic Group |
| Original contract value (this must reconcile to the profit taking schedule): | $21 440 222 |
| Total approved change orders (this must reconcile to the profit taking schedule): | Nil |
| Location of contract: | Olembe 11 Yaoundé Cameroon |
| Type of contract and description of work: | FIDIC – Infrastructure Roads and Services and 1034 Houses |

1

# PRICEWATERHOUSECOOPERS 🏢

| | |
|---|---|
| Contract commencement date: | June 2005 |
| Estimated date of completion: | Dec 2007 |
| Percentage of completion as at 30 June 2005: | 4.66% |
| Estimated final outcome on completion i.e. Profit/(Loss): | 2 100 000 USD |
| If loss on completion – reasons for loss: | N/A |
| Have such losses been taken into account as a cost effect i.e. recognised because probable: | N/A |
| Total billings as at 30 June 2005 i.e. work certified (this must reconcile to the profit taking schedule): | $4,750,000 |
| Value and reason for any difference from life to date revenue per the profit taking schedule: | |
| Total payments received as at 30 June 2005: | $ 4 750 000 |
| Total unpaid balance: | Nil |

EXHIBIT 10 (3X5)

# PRICEWATERHOUSE COOPERS 🏢

| | |
|---|---|
| Value and reason for any difference from contract receivable balance per age analysis: | N/a |
| Total retentions receivable and date of release: | Nil |
| Value and reason for any difference from contract receivable balance per age analysis: | N/A |
| Total retentions receivable and date of release: | Nil – Retention Bond |

| Provide a detail analysis of all revenue effects as at 30 June 2005 (this must reconcile to the profit taking schedule): | Description/Detail of effect | Value |
|---|---|---|
| | Advanced Payment | $ 3 750 000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Provide a detail analysis of all cost effects as at 30 June 2005 (this must reconcile to the profit taking schedule): | Description/Detail of effect | Value |
|---|---|---|
| | Unrecorded Cost | $ 347 528 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

3

# PRICEWATERHOUSECOOPERS 🅾

## Part B - Detail technical questions

1.   What are the major engineering and administrative problems (known and or expected) encountered or yet to be encountered and or overcome? What is the risk involved?

Tax Risk

2.   Are there any problems in completing the contract by its scheduled completion date (including any milestones)? If so, have these costs and penalties been included in final estimation of profit/loss on completion?

None

3.   Are there any known significant change orders, which have not been approved by the client? Provide details. Have this been included in your estimated final outcome on completion?

No

4.   Are there substantial non-recoverable costs? Please provide details. Have these been included in your estimation final outcome on completion?

Tax

5.   Are there any problems with billings and collections from the client? Please provide details

4

# PRICEWATERHOUSE COOPERS

No_____

_____

_____

_____

6.    What is the status of unresolved claims?

N/A_____

_____

_____

_____

7.    Are there significant uninstalled materials that may distort the computed percentage of completion based upon costs compared to the physical percentage of completion?

No_____

_____

_____

_____

8.    What are the main reasons for over/under certified revenue adjustments, where applicable?

Advanced
Payment_____

_____

_____

_____

12.    Are the contract costs complete and accurate? Are you satisfied that all costs and effects have been brought to account?

Yes_____

_____

_____

5



## Part C – Management certification

We have reviewed the above information and are satisfied that the representations made herein are correct.

_____

**Financial Director / Manager at Unit**



_____

**Responsible Contracts Director**



_____

**Responsible Quantity Surveyor**

6



## GROUP FIVE
International
Cameroon
Boulevard Du 20 Mai
Yaounde Cameroon
Telef.      Fax:
rvanniekerk@g5.co.za

23 May 2005

Our reference: A 120/RvN/0001

Atlantic Group SCI
40 Rue Gullien.
Douala
CAMEROON

Attention: Mr. Roger Tchoufa

### Re: Olembe II Project Parent Company Guarantee.

Attached please find the original Parent Company Guarantee for you safe keeping.

Please confirm your acceptance of the above by your signature below.

Yours faithfully

Rean ...... kerk
For Group Five International
rvanniekerk@g5.co.za

Roger Tchoufa
For Atlantic Group



**GROUP FIVE**
Limited
Reg No 1906/000303/06

0627.sds

Atlantic Group SCI
40 Rue Gullien
Douala
CAMEROON

Dear Sirs

## PARENT COMPANY GUARANTEE

THE CONSTRUCTION of INFRASTRUCTURE and 1034 HOUSES, OLEMBE II, YAOUNDE, CAMEROON

Name and address of Employer: ATLANTIC GROUP, SCI of 40 RUE GULLIEN, DOUALA, CAMEROON (together with successors and assigns).

We have been informed that Group Five International Limited (hereinafter called the "Contractor") is submitting an offer for such Contract in response to your invitation, and that the conditions of your invitation require his offer to be supported by a parent company guarantee.

In consideration of you, the Employer, awarding the Contract to the Contractor, we GROUP FIVE LIMITED irrevocable and unconditionally guarantee to you, as a primary obligation, the due performance of all the Contractor's obligations and liabilities under the Contract, including the Contractor's compliance with all its terms and conditions according to their true intent and meaning.

If the Contractor fails to so perform his obligations and liabilities and comply with the Contract, we will indemnify the Employer against and from all damages, losses and expenses (including legal fees and expenses) which arise from any such failure for which the Contractor is liable to the Employer under the Contract.

This guarantee shall come into full force and effect when the Contract comes into full force and effect. If the Contract does not come into full force and effect within a year of the date of this guarantee, or if you demonstrate that you do not intend to enter into the Contract with the Contractor, this guarantee shall be void and ineffective. This guarantee shall continue in full force and effect until all the Contractor's obligations and liabilities under the Contract have been discharged, when this guarantee shall expire and shall be returned to us, and our liability hereunder shall be discharged absolutely.

Directors: GM Thomas (Chairman) MH Lomas (CEO)(British) Barbrace L Chaber (British)  MR Marsina  HK Momas (D.R. Congo)
PG O'Flaherty  D Pabes
Company Secretary  AI Townsend

111 Church Boulevard Rivonia Sandton  PO Box 3951 Rivonia 2128  South Africa

- 2 -

This guarantee shall apply and be supplemental to the Contract as amended or varied by the Employer and the Contractor from time to time. We hereby authorize them to agree any such amendment of variation, the due performance of which and compliance with which by the Contractor are likewise guaranteed hereunder. Our obligations and liabilities under this guarantee shall not be discharged by any allowance of time or other indulgence whatsoever by the Employer to the Contractor, or by any variation or suspension of the works to be executed under the Contract, or by any amendments to the Contract or to the constitution of the Contractor or the Employer, or by any other matters, whether with or without our knowledge or consent.

This guarantee shall be governed by the law of the same country (or other jurisdiction) as that which governs the Contract and any dispute under this guarantee shall be finally settled under the Rules or Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with such Rules. We confirm that the benefit of this guarantee may be assigned subject only to the provisions for assignment of the Contract.

THUS DONE and SIGNED at RIVONIA on this 11th day of MAY 2005.

For and on behalf of
GROUP FIVE LIMITED


M.H. LOMAS                                    P.S. O'FLAHERTY

AS WITNESSES:

3923A.sds.05



# RESOLUTION OF THE DIRECTORS PASSED ON 11 MAY 2005

## CONSTRUCTION INTERNATIONAL 537

### RESOLVED

**THAT** MICHAEL HARRY LOMAS and PAUL SEAN O'FLAHERTY, in their capacities as directors of the **Company**, be and are hereby authorised to sign, for and on behalf of **the Company**, a Parent Company Guarantee whereby **the Company** binds itself in favour of Atlantic Group SCI for the due performance by GROUP FIVE INTERNATIONAL LIMITED, for the construction of infrastructure and 1034 Houses in Cameroon.

## CERTIFIED A TRUE COPY

**DIRECTOR**

21 July 2005

The South African High Commissioner
South African Embassy
Yaoundé
CAMEROON

**ATTENTION: He, Dr. SS Ripinga**

## RE: SITE HANDOVER TO SOUTH AFRICAN CONSTRUCTION COMPANY

We, Atlantic Group, the developer of a large residential housing project, "Olembe II" at Yaoundé, invite his Honorable to attend the handover of the construction site to a South African Construction Company. This will take place on Saturday, 23 July 2005 at 11h00 on site.

Group Five International, a South African Construction Company, will construct a new residential township, "OLEMBE II", at Yaoundé. The project consist of 1034 residential houses 3, 4 and 5 bedroom units with roads, water and electrical infrastructure.

It will be the honor of Atlantic Group to have the High Commission of South Africa present at this remarkable event.

Yours faithfully,

Roger Tchoufa

Case 1:07-cv-00637-JDB Document 24 Filed 02/01/2008 Page 65 of 94

Case 1:07-cv-00637-JDB    Document 21    Filed 02/01/2008    Page 66 of 94



EXHIBIT 13 (3A)

### REPUBLIQUE DU CAMEROUN
**Paix-Travail-Patrie**

**MISSION D'AMENAGEMENT
ET D'EQUIPEMENT DES TERRAINS
URBAINS ET RURAUX (MAETUR)
B.P. 1248 – YAOUNDE**

**LE CREDIT FONCIER
DU CAMEROUN (CFC)
B.P. 1531 YAOUNDE**

# CONVENTION CADRE

## POUR

## LA MISE A DISPOSITION D'UN TERRAIN DE 70 HECTARES PAR LA MAETUR AU CFC SUR LE TITRE FONCIER N° 23105/MFOUNDI

*Juin 2005*

Entre

## La MISSION D'AMENAGEMENT ET D'EQUIPEMENT DES TERRAINS URBAINS ET RURAUX, dont le siège est à Yaoundé BP 1248, représentée par Monsieur André MAMA FOUDA, son Directeur,

Ci-après dénommée la **MAETUR** d'une part,

**Le CREDIT FONCIER DU CAMEROUN**, Société à capital public avec Conseil d'Administration, au capital de 6 000 000 000 de FCFA, registre de commerce N° 1-046 dont le siège est à Yaoundé BP 1531, au Boulevard du 20 mai 1972 représenté par Monsieur Joseph EDOU, son Directeur Général.

Ci-après désigné en abrégé le **CFC**

D'autre part.

## PREAMBULE

Attendu que la MAETUR est propriétaire d'un immeuble urbain non bâti d'une contenance superficielle de 288 ha 23 a 25 ca, objet du Titre Foncier n° 23105/Mfoundi établi le 09 Novembre 1994, situé au quartier OLEMBE, à 10 km environ au Nord du Centre ville de Yaoundé et à 600 m de l'axe routier Yaoundé – Obala, limité au Nord par le ruisseau Kama, à l'Ouest par la voie ferrée Yaoundé/Ngaoundéré, au Sud par le ruisseau Ebengui et à l'Est par le Domaine National ;

Attendu qu'aux termes de la réunion interministérielle du 12/07/2001 relative au financement par le Crédit Foncier du Cameroun d'un programme d'habitat social dans les villes de Yaoundé et Douala, le Chef du Gouvernement avait prescrit au Ministre de l'Urbanisme et de l'Habitat de mettre à la disposition du programme Habitat Social/CFC un terrain de 70 hectares ;

Attendu que le CFC se propose d'affecter ledit terrain à une opération de promotion immobilière baptisée « Olembe II 1034 logements », conduite par la SCI Atlantic Group ;

Attendu que la MAETUR et le CFC ont pris au cours des réunions ad hoc, des résolutions visant à faciliter la réalisation du projet « 70 ha viabilisés à Olembé – Yaoundé ».

Il est convenu et arrêté ce qui suit :

## Article 1 : OBJET

La présente convention a pour objet, de préciser les conditions et modalités de mise à disposition par la MAETUR au CFC, d'un terrain d'une contenance superficielle de 70 hectares à prélever sur le titre foncier N° 23105/Mfoundi.

## Article 2 : ROLE ET ENGAGEMENTS DE LA MAETUR

La MAETUR s'engage expressément à :

- émettre son avis technique préalablement à la demande d'approbation du lotissement portant sur les 70 ha à présenter aux autorités administratives par la SCI ATLANTIC GROUP ;
- identifier et borner le site de 70 ha ;
- étudier et conduire les travaux d'aménagement de :
   * la voie d'accès Nord du TF 23105
   * la voie primaire desservant le site de 70 ha.
- contrôler, pour le compte du CFC et après validation des études y relatives, les travaux des VRD secondaires et tertiaires effectués par SCI ATLANTIC GROUP ;
- piloter les opérations d'indemnisation ;
- morceler le Titre Foncier n° 23105 au profit du CFC.

## Article 3 : ROLE ET ENGAGEMENTS DU CFC

Le CFC s'engage à :

- fournir à la MAETUR, pour avis technique avant approbation, l'ensemble du projet de lotissement ;
- mettre en place au profit de la MAETUR un financement non remboursable pour :
   * l'identification et le bornage des 70 ha ;
   * le contrôle après validation des études, des travaux des VRD secondaires et tertiaires des 70 ha ;
   * les travaux minima nécessaires à l'accès au site de 70 ha et les VRD primaires desservant ledit site ;
   * les frais relatifs aux indemnisations ;
   * les frais de morcellement du Titre Foncier n° 23105/Mfoundi au profit du CFC.

## Article 4 : CONTRIBUTION DES ADMINISTRATIONS

Le CFC se réserve le droit de réclamer auprès du MINDAF et MINDUH les coûts relatifs aux indemnisations et aux travaux minima de la voie d'accès Nord et de la voirie primaire du site de 70 ha.

## Article 5 : CONVENTIONS SPECIFIQUES

Le présent accord cadre sera mis en œuvre par des conventions spécifiques entre les parties prenantes qui s'accordent un délai maximal de 6 mois renouvelable une fois pour leur signature.

## Article 6 : ELECTION DE DOMICILE

Pour l'exécution des présentes, les parties font élection de domicile à leurs sièges sociaux respectifs.

## Article 7 : DISPOSITIONS DIVERSES

Les frais et droits de la présente Convention sont à la charge du CFC.

Yaoundé, le 1 3 JUIN 2005

Pour la MAETUR
Le Directeur

André MAMA FOUDA

Pour le CFC
Le Directeur Général

Joseph EDOU

EXHIBIT 15 (1×1)



**REPUBLIC OF CAMEROON**
Peace – Work – Fatherland

**MINISTRY OF ECONOMY**
**AND FINANCE**

*V/Ref: 026/CFC/DG of 25/05/05*

Yaounde, on AUGUST 10, 2005

N 3857/CFC/MINEFI/DG

**THE MINISTER OF ECONOMY**
**AND FINANCE**

To **THE GENERAL MANAGER**
**OF CREDIT FONCIER DU**
**CAMEROOUN**
**P.O.BOX: 1531**

**YAOUNDE**

Subject:    Request for a normal
            temporary importation

Dear Sir,

By the correspondence mentioned above, you requested to benefit from the normal
temporary importation for public works materials and equipment destined for the
execution by the Five Group Company of the construction of 1034 social houses in
Yaounde (Olembe II). They are:

-2 blocks making machines, MK2E model
-1 elevator Komatsu
-1 dumper winget, 4b200LD model
-1 roller bomag, BN2120D-30 model
-1 caterpillar, 140G model
-1 caterpillar 950
-1 caterpillar 428
-1 trench digger RT40
-1 trench digger, 5700
-7 dump trucks, BELL brand, B20C model
-1 truck 4x4 Range Rover
-2 water cart, BELL brand, BD200 model

EXHIBIT 16 (2x4)

-1 water pump, Seitorque Hatz 4m4l
-2 tractor Massey Ferguson, 440SE4WD model
-1 generator, caterpillar brand, Olympie 110 model
-1 truck Mercedes Benz, 1317/48
-2 Rev 4x4 Mitsubishi Native
-4 pick up 4x4 Mitsubishi dual cabin
-5 pick up 4x4 Mitsubishi single cabin
-1 truck 4x4 Toyota Land Cruiser
-2 Truck Toyota, 7 tons

In reply, I wish to inform you that following the provisions of the decree N 2003/651/PM
of 16 April 2003, bearing on the modalities of application of fiscal and customs regime of
public works as well as article 171 of the CEMAC customs code, I rather grant you the
benefit of the special temporary importation regime for a period of one year, pending
bank security of the related D28 receipts

It is agreed that the first annual instalment, calculated on the basis of the account
amortization length, shall be paid during the D28 subscription.

The General Manager of Customs in Douala is hereby instructed.

Yours faithfully

(sgd) The Minister of Economy and Finance

Abah Abah Polycarpe

"True to the original presented to us"

EXHIBIT 16 (3X4)

A l'attention de Mr TCHOUFA Robert



REPUBLIQUE DU CAMEROUN
PAIX-TRAVAIL-PATRIE

MINISTERE DE L'ECONOMIE
ET DES FINANCES

REPUBLIC OF CAMEROON
PEACE-WORK-FATHERLAND

MINISTRY OF ECONOMY
AND FINANCE

Yaoundé, le 10 AOUT 2005

N° 3857/CF/L/MINEFI/DGD

Vuref: 0564/FDO du 25.05.05

**LE MINISTRE DE L'ECONOMIE
ET DES FINANCES**

A    MONSIEUR LE DIRECTEUR GENERAL
DU CREDIT FONCIER DU CAMEROUN
BP 1531

YAOUNDE

Objet : Demande d'admission
temporaire normale.

Monsieur le Directeur Général,

Par correspondance reprise en référence, vous sollicitez le bénéfice du régime de l'admission temporaire normale sur les matériels et équipements de travaux publics ci-après destinés à l'exécution par la société Group Five des travaux de construction de 1034 logements sociaux à Yaoundé (Olembé II).

Il s'agit de :

- 2 blocs making machines, modèle MV2E
- 1 ecavator komatsu
- 1 dumper winget, modèle Kb200LD
- 1 roller bomag, modèle BN212D-30
- 1 caterpillar, modèle 140G
- 1 caterpillar 950
- 1 carterpillar 428
- 1 trench digger RT40
- 1 trench digger 5700
- 2 dump trucks de marque BELL, modèle B20C
- 1 truck 4x4 Range Rover
- 2 water cart de marque BELL, modèle BD20D
- 1 water pump de marque Seltorque Hatz 4m4l
- 2 tractor Massey Ferguson, modèle 440SE 4WD



1 generator de marque caterpillar, modèle Olympia 110

1 truck Mercedes Benz 1317/48

2 Rav 4x4 Mitsubishi Nativa

4 pick up 4x4 Mitsubishi double cabine

1 pick up 4x4 Mitsubishi single cabine

1 UHCR 4x4 Toyota Land Cruiser

2 Truck Toyota, 7 tonnes.

En réponse, J'ai l'honneur de vous faire connaître qu'en application des dispositions du décret n° 2003/651/PM du 16 avril 2003 fixant les modalités d'application du régime fiscal et douanier des marchés publics ainsi que de l'article 171 du Code des Douanes de la CEMAC, je vous accorde plutôt le bénéfice du régime de l'admission temporaire spéciale pour une période d'un an, sous réserve du cautionnement bancaire des acquits D28 y afférents.

Il reste entendu que la première annuité, calculée sur la base de la durée d'amortissement comptable, sera payée au moment de la souscription de l'acquit D28.

Je donne des instructions dans ce sens au Directeur Général des Douanes à Douala.

Veuillez agréer Monsieur le Directeur Général, l'expression de ma parfaite considération.

**INVITATION TO WASHINGTON DC WORK ON EXPANDING THE CAMEROON HOUSING PROJECTS**

Subj:
Date: 6/14/2005 4:54:56 P.M. Eastern Daylight Time
From: JKamya5356
To: j_edou@yahoo.fr

Mr Mr. Edou:

Atlantic Group SCI and its affiliate MBI Group, Inc. based in the Washington DC area has over the past several months, been busy working with several International institutions (including the International Finance Corporation -IFC; the US Oversea Private Investment Corporation, and the US Agency for International Development Bank, the US Dept of Housing and Urban Development, the US Treasury Department) in expanding the Cameroon Housing project together with Credit Foncier du Cameroon (CFC).

As you know, this project is the first of its kind in Africa, and the international institutions have been very interested in the Cameroon affordable housing project and its progress to-date. They have also expressed an interest in working with MBI Group / Atlantic Group SCI and CFC on the next phases of the housing initiative.

In particular, the Atlantic Group/CFC project in which IFC wishes to participate should be a minimum of 2,000 housing units. Therefore, please assist us in identifying land which can be allocated to Atlantic Group.

The Atlantic Group/CFC project in which OPIC would like to participate can be a minimum of 500 housing units. Larger projects (i.e. 1,000 units) are also acceptable. Again we would appreciate it if CFC could assist in identifying the land for this project.

Some of the key elements which have impressed the International organizations include:

(1) The fact that CFC has mortgage funds available for on-ward lending;
(2) The fact that significant demand exists;
(3) The fact that there is a project that is already underway (i.e. the Olembe project), with companies (i.e. Atlantic Group SCI, Group 5) with real-life practical experience on the ground;
(4) The fact that MBI Group, Inc., a US company is involved in the project (i.e. note that certain international funds can only be accessed by US companies);
(5) The Cameroon Government's commitment to affordable housing and its practical efforts to get the affordable housing iative off the ground.

Therefore, your meetings in Washington DC will involve senior management from the international organizations listed above. The objective of these meetings is to structure housing projects with CFC's involvement, particularly by CFC providing mortgage funds. In some cases, additional mortgage funds can be secured so as to expand the pool of mortgage funds available, particularly through IFC and or OPIC loan guarantees, or as in the case of OPIC, actual loans.

The primary objectives also includes securing construction loan funds for the other phases.

Kindly come prepared with information about CFC (including CFC's financial statements), etc., land parcels (if available), and any other information which would be helpful. Also please let us know of your arrival date and intended period of stay (which should be for a minimum of two weeks).

As always we look forward to building Cameroon's stock of affordable housing brick by brick.

Sincerely,

John M. Kamya
MBI Group, Inc.
7200 Wisconsin Avenue, Suite 702.
Bethesda, MD 20814
Ph: (301) 986-1595
Fax: (301) 986-1464

# Crédit Foncier du Cameroun

**SIEGE SOCIAL - DIRECTION GENERALE**
B.P. 1531 - YAOUNDE
Téléphone : 23.52.14 - 23.52.15 - 23.52.16
Fax : 23.52.21

Références :
**OBJET**    Public Housing Program

Yaoundé, le    May 11th, 2004

Société Civile Immobilière
Atlantic Group
P.O. Box 12560
Douala, Cameroon

And

MBI Group, Inc.
7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814, USA

To the CEO:

Dear Sir:

I have gone over the legal documents you passed along to me, in particular the bylaws of your company, Atlantic Group, registered in Douala, Cameroon under No. 3503 by notary deed on March 24th, 2004 by Maître ENPE as Société Civile Immobilière Atlantic Group in association with MBI Group USA.

I wish to draw your attention to the fact that Crédit Foncier du Cameroun's primary mission is financing public housing. For this purpose, we have budgeted and set aside, for the next two (2) years, a global amount of 30 (thirty) billion FCFA, or more than 50 million US dollars, targeted for the construction of approximately 2000 public housing units. We are prepared to provide additional funding so that we are rapidly able to construct 10,000 public housing units, which still falls far short of the current demand for 600,000 public housing units.

Therefore, I would very much appreciate your confirming, as soon as possible, your intention to carry out this test program of 2,000 units within the price range you provided to me.

Please confirm to me, via return mail, and in order to ensure the success of this program, that your Group, as Crédit Foncier's promoter and sole representative, has selected and signed contracts with a builder, a project manager, and/or any other consultant, in compliance with the pertinent regulations, along with the compensation modalities defined and agreed to by the parties.

I look forward to hearing from you.

Most sincerely,



Le Directeur Général

J. EDOU

Etablissement à statut spécial au capital de 6.000.000.000 francs CFA
Télex : CREFONCA 8368 KN - CCP : YAOUNDE 8180
RC YAOUNDE 1-046

Exhibit 18 (a)
(2x0)

# Crédit ⊕ Foncier
# du Cameroun

SIEGE SOCIAL - DIRECTION GENERALE
B.P. 1531 - YAOUNDE
Téléphone : 23.52.14 - 23.52.15 - 23.52.16
Fax : 28.52.21

Références :

OBJET        Programme de Logement Social

Yaoundé, le            11 Mai 2004

Société Civile Immobilière
Atlantic Group
B. P. 12560
Douala, Cameroun

Et

MBI Group, Inc.
7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814, USA

Monsieur le Directeur Général,

J'ai pris bonne note des instruments juridiques que vous m'avez fait tenir et notamment des statuts de votre société Atlantic Group enregistrée à Douala au Cameroun par acte notarié numero 3503 du 24 mars 2004 de Maître ENPE, comme Société Civile Immobilière appartenant au Groupe MBI USA.

Je voudrais préciser à votre attention que le Crédit Foncier du Cameroun a pour mission première de financer le logement social. Nous avons à ce titre budgétisé et réservé, pour les 2 (deux) prochaines années, une somme globale de FCFA 30 (trente) milliards, soit plus de 50 millions de dollars US, destinée à la construction de 2000 logements sociaux environ. Nous sommes prêt à mettre en place des financements plus importants pour atteindre rapidement 10.000 logements sociaux, chiffre toujours dérisoire par rapport à la demande actuelle de 600.000 logements.

Je vous serais par conséquent reconnaissant de me confirmer d'urgence votre intention de réaliser ce programme test de 2.000 logements dans la fourchette des prix que vous m'avez communiquée.

Vous voudrez bien me confirmer par courrier retour et pour m'assurer une bonne fin de ce programme, que votre Groupe, en tant que promoteur et seul interlocuteur du Crédit Foncier, a sélectionné et signé des contrats avec un constructeur, un bureau de contrôle et/ou tout autre consultant, suivant les formes reglementaires en la matière, et avec des modalités de retribution définies d'accord parties avec eux.

Dans cette attente,

Veuillez agréer, Monsieur le Directeur Général, l'expression de ma parfaite considération.

Le Directeur
Général

J. EDOU

Etablissement à statut spécial au capital de 6.000.000.000 francs CFA
Télex : CREFONCA 8388 KN - CCP : YAOUNDE 9180
RC YAOUNDE 1-046

# Credit ⓒ Foncier
# du Cameroun

EXHIBIT 18(6)
(1x2)

SIEGE SOCIAL - DIRECTION GENERALE
B.P. : 1531 - YAOUNDE
Téléphone : 23.52.14 - 23.52.15 - 23.52.16
Fax : 23.52.21

Références :

OBJET

Yaoundé, le                    May 25, 2004

Societe Civile Immobiliere
Atlantic Group
P. O. Box 12560
Douala, Cameroon

And

MBI Group, Inc.
7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814, USA

Re: Affordable Mass Housing Program for Cameroon

Dear Sirs:

This is to confirm that Societe Civile Immobiliere Atlantic Group ("Atlantic Group SCI"), a property development company incorporated and registered in the Republic of Cameroon, and MBI Group, Inc, an American company, have been contracted by Credit Foncier du Cameroun ("CFC"), the main housing finance banking institution in the country, to undertake a long-term large-scale affordable mass housing program in Cameroon.

CFC is mandated to create and provide affordable housing throughout the country. It is our understanding, based on our review of the corporation registration documents, that Atlantic Group is partly owned by MBI Group, Inc., an American company.

The first 24-month phase of the affordable mass housing project is valued at approximately US$49 million, and requires Atlantic Group/MBI Group, Inc. to build over 2,000 housing units in Cameroon. All the necessary funds for the project have been obligated and approved for this housing program. The Developer, Atlantic Group SCI/MBI Group, Inc., shall be directly and solely responsible for the selection and supervision of the contractors and consultants. In addition, Atlantic Group SCI/MBI Group, Inc. shall be the entity to execute contracts with contractors and consultants on this project.

Additional phases of the affordable housing construction program will follow after the initial 24-month phase.

All bank guarantees, similar financial instruments and contractor/consultant/vendor payments shall be provided/made directly by Atlantic Group SCI/MBI Group, Inc. subject to the terms of the relevant Atlantic Group SCI/MBI Group, Inc. contracts / financial arrangements with the contractors/consultants/vendors.

If you have any questions, please feel free to contact me.

Sincerely,

J. EDOU

Director General
Credit Foncier du Cameroun

# Credit Foncier
# du Cameroun

EXHIBIT 18(C)
(1 X 2)

SIEGE SOCIAL - DIRECTION GENERALE
B.P. 1531 - YAOUNDE
Téléphone : 23.52.14 - 23.52.15 - 23.52.16
Fax : 23.52.21

Société Civile Immobilière
**ATLANTIC GROUP**
**BP : 12 560**
**DOUALA**

Références :  020 /CF/DG

OBJET       Transmission garantie

Yaoundé, le 2 1 AVR. 2005

Messieurs,

Nous vous transmettons ci-joint la garantie financière relative au programme de construction
de 1034 logements à Olembé Extension.

Vous en souhaitant bonne réception;

Veuillez agréer, Messieurs, l'expression de nos sentiments distingués.

**P.J. 01**



Le Directeur
Général

J. EDOU

Etablissement à statut spécial au capital de 5.000.000.000 francs CFA
Télex : CREFONCA 8356 KN - CCP : YAOUNDE 9180
R.C. YAOUNDE 1-046

EXHIBIT 18(C)
(2×2)

# Crédit Foncier
# du Cameroun

B P 1531 – YAOUNDE – Téléphone : 223 52 16 / 223 52 17 – Télécopie : 223 52 21

## GARANTIE FINANCIERE

Nous nous référons à la garantie n° C04/17465 du 14 mars 2005 sous signature de Lombard INSURANCE COMPANY LIMITED, au profit du Crédit Foncier du Cameroun, boulevard du 20 mai, BP 1531 Yaoundé, en couverture de l'avance de démarrage pour le programme immobilier de construction de 1034 au lieu dit Olembé à Yaoundé (Cameroun).

Conformément aux engagements financiers de la garantie ci-dessus et des dispositions des articles 8,9 et 10 de la Convention signée le 29 mars 2005 entre le CFC et la SCI ATLANTIC GROUP, notre établissement doit vous remettre, en garantie de la bonne exécution de vos obligations contractuelles afférentes au contrat de 12 231 250 XAF (douze milliards deux cent trente-un millions deux cent cinquante mille francs CFA), une caution bancaire de 9 785 000 000 XAF (neuf milliards sept cent quatre vingt-cinq millions) représentant 80% du montant de la part précitée et compte tenu de l'avance de démarrage payée à hauteur de 20% dudit montant, soit 2 446 250 000 XAF (deux milliards quatre cent quarante-six millions deux cent cinquante mille francs CFA).

En conséquence, nous Crédit Foncier du Cameroun, Etablissement public avec Conseil d'Administration au capital de FCFA 6 milliards, représenté par son Directeur Général Monsieur Joseph EDOU, nous nous portons caution auprès de votre société à hauteur d'un montant maximum de 9 785 000 000 XAF (neuf milliards sept cent quatre vingt-cinq millions), en garantie du paiement de tout ou partie de la somme précitée, dans le cas où notre défaillance serait établie dans le cadre de l'exécution du contrat ci-dessus.

La présente caution deviendra automatiquement et de plein droit caduque pour toutes fins légales et bancaires de 28 (vingt-huit) jours après la date de délivrance du dernier certificat de réception provisoire ou du document en tenant lieu et au plus tard 28 (vingt-huit) jours après la fin des travaux.

A son échéance, cette lettre de garantie devra alors nous être retournée pour le bon ordre de nos dossiers.

La présente caution est régie à tous égards par les dispositions du contrat sus-mentionné.

Le Directeur
Général

J. EDOU

Société à Capital Public de 6 000 000 000 francs CFA avec Conseil d'Administration
CCP : YAOUNDE 5180-RC YAOUNDE 1-046

EXHIBIT 18(d)
(cx1)



# MBI GROUP, INC.

7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814 USA
Ph: (301) 986-1595   Fax: (301) 986-1464

June 22, 2005

Mr. Joseph Edou
Managing Director
Credit Foncier du Cameroun
Yaoundé, Cameroon

Re: Proposed Meetings with the U.S. Overseas Private Investment Corporation (OPIC)
and the International Finance Corporation (IFC)

Dear Mr. Edou:

In furtherance of our vision and initiative titled "The Affordable Housing and Mortgage
Industry Initiative for Africa", we are pleased to inform you that over the past several
months we have been holding high level discussions with the United States Overseas
Private Investment Corporation ("OPIC") and the International Finance Corporation
("IFC" – an affiliate of the World Bank), with the specific goal of securing construction
loan funds for new phases of the affordable housing projects in Cameroon (in addition to
the Olembe II housing project in Yaoundé which is already in progress).   Atlantic
Group/MBI Group's objective is to rapidly increase the stock of new affordable housing
in the major urban centers of Cameroon, and to build an additional 6,000 affordable
housing units in the next three years.

In that regard, during your visit to the Washington area in the next few days, we request
you to join us in our continuing discussions and negotiations with OPIC and IFC. CFC's
role as a provider of mortgage funds is crucial to the success of the affordable housing
program in Cameroon.

Kindly let us know of your availability to attend meetings with Atlantic Group/MBI
Group at OPIC and IFC on June 27, June 30 and July 6, 2005. We hope to obtain OPIC's
and IFC's commitment and interest in providing construction funds to Atlantic
Group/MBI Group for the Cameroon affordable housing projects.

We look forward to your presence at the OPIC and IFC meetings. In the meantime,
please feel free to contact Roger Tchoufa or me if you have any questions.

Sincerely,

John M. Kamya, President
MBI Group, Inc.

# Crédit (CFC) Foncier
# du Cameroun

EXHIBIT 18 (C)
(142)

SIEGE SOCIAL - DIRECTION GENERALE
B.P. 1531 - YAOUNDE
Téléphone : 23.52.14 - 23.52.15 - 23.52.16
Fax : 23.52.21

Références :

OBJET

Yaoundé, le

June 24, 2005

Atlantic Group, SCI
40 Rue Quillien Akwa, BP 12560
Douala, Cameroon

And

MBI Group, Inc.
7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814

Dear Sirs:

First of all, on behalf of Credit Foncier du Cameroun (CFC), I would like to commend you for your hard work and investment in making affordable mass housing a reality in Cameroon, beginning with the 1,034 housing-unit development project currently underway in Yaounde. At this juncture, CFC is ready to again work with Atlantic Group/MBI Group, as you source construction funds from various international financial institutions for the next phases of the affordable mass housing projects in Cameroon.

As you already aware, CFC is a financial institution whose mission is to provide mortgage loans to contributors to the national housing fund. Each salaried private-sector and public-sector employee commits 2% of his/her annual salary to the housing fund. Against these contributions, mortgage funds are made available to homebuyers. Given the limited number of housing units in Cameroon compared to the demand for housing (there is a housing shortage in excess of 600,000 housing units), CFC is committed to affordable mass housing development throughout the country.

Presently, CFC has sufficient funds available for mortgage lending for 5,000 to 6,000 affordable housing units (for the next three to four years) at an annual mortgage rate of 7%, amortized over a period of 15 to 20 years. In addition, CFC receives additional funds through monthly

EXHIBIT 18(2)
(2×8)

employee contributions as well additions from net interest income. This will enable CFC to provide mortgage loans for an additional 2,000 housing units. Therefore, in that regard, CFC will commit to the following:

(a) CFC will provide mortgage loans for the approved buyers of all of the housing units constructed by Atlantic Group SCI;

(b) CFC will make available to Atlantic Group the list of eligible buyers (also qualifying for mortgage loans) who currently number over 50,000;

(c) CFC will commit (in writing) to the availability of mortgage funds for at least 5,000 to 6,000 housing units (in a price range of US$ 25,000 to US$ 55,000) in the next three to four years.

In summary, CFC fully supports the efforts of Atlantic Group and MBI Group in sourcing construction financing from international financial institutions so as to continue supplying affordable houses so needed in Cameroon and against which CFC can make mortgage loans.

CFC looks forward to working with Atlantic Group/MBI Group in that making the dream of homeownership a reality for many Cameroonians.

Sincerely yours,

Joseph Edou
Managing Director



# MBI GROUP, INC.

7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814 USA
Ph: (301) 986-1595   Fax: (301) 986-1464

July 6, 2005

Ms. Debra Erb
Director of Housing
US Overseas Private Investment Corp.
1100 New York Avenue, NW
Washington, DC 20527

Re: Cameroon Affordable Housing Project – Number of Units: 1,200

Dear Ms. Erb:

We are pleased to register the above-referenced project with OPIC as we file our application for construction financing for approximately $10 million for the initial phase.

Just as a quick update, Atlantic Group SCI (an affiliate of MBI Group, Inc.) is currently developing 1,034 affordable housing units in Yaoundé, Cameroon. All relevant contracts have been signed and the construction crews led by Group 5 of South Africa are already on the ground. The project (the first of its kind and magnitude) will be completed in the next thirty months. Mortgage financing to homebuyers is being provided by Credit Foncier du Cameroon ("CFC").

There is an acute housing shortage in Cameroon, and particularly affordable housing. The estimate is a housing deficit of 600,000 housing units. Our efforts are to alleviate this shortage by increasing the stock of affordable housing. CFC has sufficient mortgage loan funds for over 6,000 units, excluding monthly additions to its pool of mortgage funds. In addition, CFC has over 50,000 eligible homebuyers.

The construction loan request is to therefore enable the construction of 1,200 housing units in three phases of about 400 units each. CFC will provide mortgage loans at a rate of 7% for term periods of 15 to 20 years. As noted in the second paragraph, MBI Group, Inc. is again the US sponsor of this 1,200 housing unit project. Atlantic Group has made arrangements to acquire over 60 hectares, which will constitute part of its equity in the project (in addition to other equity contributions). The full project document and application request will be submitted by month-end.

EXHIBIT 18(f)
(2 K 2)

Our request is therefore as follows:

(a) Acknowledgement by OPIC that this affordable housing project is in line with its project criteria making it eligible for OPIC financing;

(b) That the project will be fast-tracked through the "Small Business Fast Track" financing mechanism; and

(c) Acknowledgement by OPIC of CFC's role in its ability to provide mortgage loan financing to home buyers, as well as CFC's pool of eligible home-buyers.

We are very excited about this Cameroon housing project and genuinely believe that this is the first of many housing projects that MBI Group and OPIC will be working on together as a team.

Sincerely,

John M. Kanya
President
MBI Group, Inc.

EXHIBIT 18(9)
(1×2)



**OPIC** Overseas Private Investment Corporation

1100 New York Avenue, N.W.
Washington, D.C. 20527-0001
(202) 336-8400
FAX (202) 408-9859

October 25, 2005

John Kamya
President
MBI Group, Inc.
7200 Wisconsin Avenue
Suite 702
Bethesda, MD  20814

*********************************

Investor: MBI Group, Inc.
Country:  Cameroon
Registration Date: 09/21/2005
Registration No.: 631-2005-003
Estimated Investment: $16,000,000
Broker:  None
Project:  housing
*********************************

Dear Sir or Madam:

We are pleased to inform you that OPIC has registered the project identified
above to mark your interest in political risk investment insurance.  You may
apply for insurance for this project so long as the registration remains in
effect.  The registration is valid for two years.  Extensions are possible.
Please note that it is OPIC's policy to issue insurance prior to or
concurrent with the contribution of the investment.

Obtaining OPIC Insurance

To apply for insurance please return to OPIC three copies of a completed
Application for Political Risk Investment Insurance (forms enclosed).  We
will decide whether to offer insurance for this project only after we have
received your application and any supporting information required as part of
the application.  Since underwriting considerations change, it is in your
interest to apply for insurance as promptly as possible.

It is OPIC's policy to require payment of a retainer fee before significant
resources are committed to analysis of this project.

Foreign Government Approval

The approval of the government of the country in which your project is
located may be required for issuance of OPIC insurance on your investment.
You must request such an approval, except in selected countries which grant
the approval through automatic procedures or which require OPIC to secure it
directly.  Please review the enclosed Guidelines or Directive to determine
what action you may be required to take to obtain the approval in your
country of investment.

## Provisos

This registration does not constitute a commitment by OPIC to provide insurance for this project.

Insurance may at times be unavailable, or limited as to type or amount of coverage, in certain countries. Projects involving industries which have experienced significant losses in employment or sales in the United States, or projects which have other detrimental economic or developmental effects, may also be ineligible for insurance.

Please be aware that restrictions on your ability to assign your insured interest (e.g. shares) to OPIC in the event of a claim could deprive you of effective insurance coverage. To avoid this situation, please ensure that joint venture agreements, concession agreements, loan or other project agreements do not restrict your ability to assign insured interests to OPIC in the event of a claim.

## Brokers

Any broker designated on the previous page is acknowledged as the broker-of-record for purposes of obtaining insurance for this project. Brokers should call us as early as possible to be certain that the process is expeditious as possible.

## The Private Insurance Market

OPIC strongly encourages investors to consider the availability of political risk insurance in the private market for their investments. OPIC only offers insurance to investors who, having investigated the possibility of obtaining insurance from private political risk insurers, decide to pursue OPIC insurance because private insurance is not available on terms sufficient to make the investment viable for the investor. Upon application to OPIC, the investor will be required to demonstrate that the investor has sought insurance from at least two private political risk insurers. If you are unfamiliar with private insurers who offer political risk insurance, please refer to the list included. If you have a broker, they can provide guidance. If you are unfamiliar with political risk insurance brokers but have some interest in them, some examples are also included. The list is also available on our website at www.opic.gov.

Please call me at (202) 336-8595 if you need further information.

Sincerely yours,

Sharon M. Williams
Insurance Applications Officer
Insurance Department

Enclosure(s)

Preliminary Terms of Reference

## YAOUNDE HOUSING EXPANSION

*EXHIBIT 18(h)*
*(1×2)*

This draft Terms of Reference is for the purpose of discussion only. This draft Terms of Reference is not a legally binding document, does not constitute a commitment or an agreement by OPIC, and is subject to review and change. Any representation to the contrary is void.

October 26, 2005

| DIRECT LOAN | |
|---|---|
| Borrower/Project Company | Atlantic Group, SCI |
| Sponsor | MBI Group Inc. |
| Project Description | To construct 400 houses, which represents the first phase of a 1200 unit development. |
| Project Cost | $15,900,000 |
| Loan Amount | $10,000,000 |
| Term | 3 years, including a one year grace period on principal. |
| Commitment (Availability) Period | Eighteen months to draw down funds |
| Amortization | 8 quarterly payments expected to begin on March 15, 2007. |
| Loan Type | Project finance - SBC |
| Number and Amount of Disbursements | No less than 4 or more than 8, schedule and milestones to be determined. |
| Interest Spread | Four percentage points (4.00%) over the 5-year U.S. treasury rate. |
| Prepayment Premium | None |
| Commitment Fee | None |
| Facility Fee | 1% of the loan amount to be paid at first disbursement. |
| Maintenance Fee | $10,000 per year plus $5,000 for each disbursement |
| Conditions Precedent to Closing/Disbursement | • Confirmation of MBI Group's cash equity contribution(s) to the Project Company<br>• Final disbursement schedule with milestones, to include presales, completed sales and percentage of construction (Evidence of sales to include copy of sales contract, deposits or downpayments received, and evidence of mortgage qualification) completion measures.<br>• Evidence of land transfer to the Project Company, copy of sales contract and title documents.<br>• Evidence of all consents and approvals for commencement of construction.<br>• Copies of all executed construction contracts.<br>• Other conditions typical for transactions of this type. |
| Project Completion Support | • Completion guaranty from the Primary |

| | |
|---|---|
| | Contractor (Group Five), assignable to OPIC. |
| | • Completion guaranty for the infrastructure component of the project to be provided by MBI Group. |
| Insurance | Customary insurance coverages naming OPIC as loss payee or additional insured |
| Financial Reporting | Quarterly internal financial statements (income statements, balance sheet and cash flow statement) and annual audited statements for Borrower. Quarterly sales activity reports and construction progress reports. |
| Collateral | • Pledge of all shares in Atlantic Group SCI.<br>• Negative pledge on land and improvements<br>• Debt service reserve account for the benefit of OPIC in an amount to be determined. |
| Other | • OPIC will procure independent consultant to monitor significant construction milestones and confirm use of OPIC proceeds.<br>• Environmental, worker rights language that adheres to OPIC standards. |
| Ongoing Covenants/Financial Ratios | Loan to cost ratio (total disbursements as a percentage of direct construction costs) shall not exceed 67% at any time during the Commitment Period. Current ratio must be maintained at not less than 1.5/1. Debt-service coverage ratio must be not less than 1.5:1.0. Minimum cash on hand of $50,000. |
| Further Indebtedness Restrictions | No additional indebtedness permitted except for short-term trade obligations. |
| Restricted Payments | Payments to affiliated parties must be pre-approved by OPIC. |
| Profit Distributions | Not permitted until OPIC has been repaid. |



# MBI GROUP, INC.

7200 Wisconsin Avenue, Suite 702
Bethesda, MD 20814 USA
Ph: (301) 986-1595   Fax: (301) 986-1464

September 19, 2006

His Excellency
Mr. Paul Biya
The President of the Republic of Cameroon
Yaounde, Cameroon

Re: Atlantic Group, SCI / MBI Group, Inc. and Consequences of the Termination of the Companies' Affordable Housing Projects in Yaounde and Douala

Your Excellency:

We have attached for your review, documents and information pertaining to the wrongful termination and disruption of MBI Group, Inc.'s (an American Company), and Atlantic Group SCI's (its Cameroonian subsidiary) Affordable Housing Initiatives and activities on the ground in Cameroon.

Following are some of the main consequences of CFC's (Credit Foncier du Cameroun) actions:

(a) Stoppage of the affordable housing project of 1,034 houses in Olembe.

(b) Stoppage of a follow-on affordable housing project of 1,200 houses funded by the US Overseas Private Housing Corporation ("OPIC") of the US Government and sponsored and co-funded by MBI Group, Inc. This project is located in Yaounde. The value of this project is over $70 million.

(c) Stoppage of a second follow-on affordable housing project of 2,000 houses funded by IFC and sponsored and co-funded by MBI Group, Inc. in Douala. This project is valued at over $120 million.

(d) Due to the stoppage of the 1,034-unit housing project at Olembe, Group 5 of South Africa was forced to terminate its construction work and as a result, Group 5 is currently demanding in excess of US$10 million. This amount continues to increase every day.

(e) Due to the stoppage of the Olembe affordable housing project, numerous Cameroonian subcontractors were forced to stop their work and lose substantial sums of money. Many employees on the various sites had to be terminated. (It was projected that each site would employ over 1,000 employees).

(f) As a consequence of the stoppage referred to in (d) above, Group 5's construction equipment was stuck in the Port at Douala, and some of this equipment has already disappeared (stolen), and other equipment is rusting away thus making it obsolete.

(g) The personal and real property (including personal residence, commercial property and vehicles) of the Managing Director of Atlantic Group SCI has been seized by the Government without any due process.

(h) The Managing Director of Atlantic Group SCI is listed as a "wanted man" in Cameroon without any legal basis,

(i) The family of the Managing Director (including his wife and children) were also listed as "wanted" by the Government, and in fact attempts were made to arrest them, and fortunately they had traveled overseas for vacation. At this time, the Managing Director of Atlantic Group SCI and his family cannot return to Cameroon, because they fear for their lives.

(j) MBI Group, Inc. the American sponsor of the Cameroonian affordable housing initiatives has lost over $10 million as a consequence of CFC's work stoppage on the Olembe affordable housing project.

(k) The Board of Directors of MBI Group, Inc., after careful assessment of the situation, and given the fact that CFC and the Cameroonian Government have continued to ignore the situation and have also ignored our spirit of cooperation towards peaceful resolution of the situation, the Board is now contemplating filing suit in the American courts to seek judicial redress and monetary damages against the Cameroonian Government and CFC. However, after meeting with Mr. Omboudou Ndjina Fabien – FIG Corporate Member, the Managing Director of Cameroon Engineering SA on a business trip to Washington, DC, the Board has decided to once again try to find a peaceful resolution of the matter in the best interest of Cameroon and all parties involved. We are open and committed to a 'fruitful' dialogue that would contribute to getting the affordable housing project back on track. (The potential legal monetary exposure for CFC and the Government of Cameroon is in the hundreds of millions of US Dollars).

We respect and trust that you will assist us in resolving this matter peacefully, and assist us to get this important affordable housing initiative for Cameroon back on track. We recognize that affordable housing is extremely important to Your Excellency and to the people of Cameroon, and we vividly recall your public announcements of your vision for affordable housing in Cameroon. To a great extent, it was based on your stated vision and commitment to the development of affordable housing in Cameroon, that MBI Group, Inc. and Atlantic Group SCI decided to invest and build affordable housing in the country. At this juncture, we believe that it is only Your Excellency, with your stated vision and commitment, who can help us get the affordable housing program back on track, and to assist us to resolve the impasse with CFC and the Government of Cameroon.

Respectfully Submitted,

John M. Kamya
Chairman of the Board of Directors
MBI Group, Inc.

Enclosures (See Attachments)