## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MBI GROUP, INC.,  et al.,**

   **Plaintiffs,**

   v.

**CREDIT FONCIER DU CAMEROUN, et al.,**

   **Defendants.**

Civil Action No.  07-0637 (JDB)

## MEMORANDUM OPINION

Plaintiffs MBI Group, Inc. ("MBI") and Atlantic Group, SCI ("Atlantic") bring this lawsuit against Credit Foncier du Cameroun ("CFC") and the Republic of Cameroon seeking damages for breach of contract, fraud, misrepresentation, intentional interference with contract, and misappropriation of trade secrets and proprietary information.  This controversy arises out of an agreement by which plaintiffs would take the lead in constructing a series of affordable housing projects in Cameroon with CFC providing the land and funding for that initiative.  As plaintiffs would have it, the deal was scuttled by CFC and Cameroon when MBI and Atlantic refused to deliver bribes that were demanded by certain officials within the government of Cameroon.  Defendants, by contrast, deny the accusations of bribery and insist that there was no binding agreement to begin with.  Claiming immunity subject to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, defendants have moved to dismiss the complaint for an absence of subject matter jurisdiction.  They also claim that the action should be dismissed for lack of personal jurisdiction and on *forum non conveniens* grounds.  Plaintiffs, for their part,

oppose defendants' motion to dismiss and have moved for jurisdictional discovery in their own right. Those motions are fully briefed and ripe for resolution. Upon careful consideration, and for the reasons set forth below, the Court will deny plaintiffs' motion for discovery and grant defendants' motion to dismiss on *forum non conveniens* grounds.

## <u>BACKGROUND</u>

MBI is a Delaware corporation that has "designed and developed a business plan, program and model for the construction, marketing, sale and operation . . . [of] affordable housing in regions of the world with limited or undeveloped housing infrastructure." Compl. ¶¶ 4, 9. Cameroon, of course, is a sovereign nation located in Africa. CFC is a corporation organized under the laws of Cameroon. <u>See</u> Defs.' Mot. Mekongo Decl. ¶ 3. The majority of CFC's shares are owned by the government of Cameroon. <u>Id.</u> CFC's stated purpose is to make affordable housing available to Cameroon's citizens. <u>Id.</u> ¶ 5. To that end, CFC is funded in part by a 1% tax levied on the salaries of workers in Cameroon who earn over 50,000 CFA Francs per month, as well as a .25% payroll tax on employers in the country. <u>Id.</u> CFC's Board of Directors consists of twelve members, eight of whom are appointed directly by the government of Cameroon. <u>Id.</u> ¶ 4. Notwithstanding the government's involvement in funding CFC and appointing its directors, CFC allegedly "acts independently" and the government assertedly lacks "the right to direct the actions of CFC's Board." <u>See</u> Defs.' Reply Mekongo Decl. ¶ 2.

According to plaintiffs, CFC first approached MBI in November 2003 "and solicited MBI's participation in the development and the implementation of an affordable housing program in Cameroon." <u>See</u> Compl. ¶ 14. That contact was made through Joseph Edou, who was the General Manager of CFC during the relevant time period. <u>Id.</u> Edou represented to MBI

that Cameroon lacked a supply of affordable housing and that CFC "desired to enter into an agreement with an entity that would serve as a developer . . . [and] implement an affordable housing program which would be rolled out in various cities in Cameroon." Id. ¶ 15. The Overseas Private Investment Corporation ("OPIC") is a U.S. government agency that aims "to develop robust housing markets through construction of affordable homes in developing nations with the goal of bolstering retail banking and fueling local capital markets as engines of entrepreneurship." Id. ¶ 12 (internal quotation marks omitted). Plaintiffs assert that "CFC desired to attract financing and support for an affordable housing program from agencies such as OPIC," and CFC recognized that "financial support from OPIC required substantial financial participation from an American entity," such as MBI. Id. ¶ 15.

Due to MBI's familiarity with OPIC and its interest in the Cameroon project, MBI officials traveled to Cameroon to investigate the feasibility of the undertaking. Id. ¶ 16. MBI then submitted a "formal expression of interest" in the project at CFC's request. Id. ¶ 17. After CFC responded that the proposal "conformed with CFC's requirements," MBI began taking preliminary steps to "commence master planning" of the project. Id. ¶ 18. One such step was the creation of Atlantic on March 24, 2004. Id. ¶ 20. Atlantic was incorporated under the laws of Cameroon "specifically for the development and implementation of the Cameroon Housing Project." Id. Atlantic, however, is not a wholly owned subsidiary of MBI. In fact, MBI directly owns only 35% of Atlantic. See Defs.' Mot. Ngwafor Decl. ¶ 13. Roger Tchoufa, a co-founder of MBI, owns another 20% of Atlantic in his personal capacity. Id. The remaining 45% of Atlantic stock is owned by a company known as The Falls. Id. The Falls is a public limited company organized under the laws of Cameroon. Id. ¶ 10. The sole shareholder of The Falls is

Ateba Minkoulou Gabriel, who is evidently Joseph Edou's brother-in-law.  Id. ¶ 10; Defs.' Mot. Mekongo Decl. ¶ 19.  As defendants would have it, this arrangement is merely a front and the true owner and driving force behind The Falls is in fact Joseph Edou.

In any event, in May 2004 the parties were engaged in an effort to formalize the tentative agreement between MBI and CFC.  In order to facilitate that, Edou traveled to the United States for two weeks and MBI arranged for him to meet with several officials of OPIC and the U.S. Department of Housing and Urban Development, among other agencies.  See Compl. ¶ 25.  Also present during this period was Andre Booto A Ngon ("Booto"), then the Chairman of the Board of CFC.  See Pl.'s Opp'n Tchoufa Decl. ¶¶ 10-11.  On May 18, 2004, MBI and CFC signed a Memorandum of Agreement in Bethesda, Maryland memorializing the deal between the parties. See Compl. ¶ 26.  Edou signed the agreement on behalf of CFC, evidently at Booto's direction. Among other things, the Memorandum Agreement called for CFC to provide to plaintiffs:

> (a) project development and construction financing of approximately forty nine million dollars (US$49,000,000.00) and all necessary financial guarantees for the Yaounde Phase I Project; (b) land on which approximately 1,100 affordable housing units would be constructed by Plaintiffs for the Yaounde Phase I Project; (c) mortgage financing for the buyers of the 1100 units for the Yaounde Phase I Project; and (d) the identity of over 50,000 potential home buyers.  CFC also confirmed the availability of mortgage funds for at least 5,000 to 6,000 houses over the next four years.

Id. ¶ 27 (internal quotation marks omitted).  In return, MBI and Atlantic agreed to "be responsible for the selection and supervision of the contractors and consultants for the housing project," to "carry out a feasibility study for the housing project . . . [and to serve] the role of Developer."  Id. ¶¶ 28-29.

Soon thereafter, plaintiffs retained the services of Group Five International ("Group

Five"), a South African construction company, to "carry out pre-construction studies of the Project and to prepare detailed cost estimates." Id. ¶ 31.  During November 2004, plaintiffs submitted a feasibility study to CFC.  Id. ¶ 33.  CFC requested certain changes to the project in lieu of the study's findings; plaintiffs promptly made those changes and resubmitted another proposal to CFC on December 8, 2004, which plaintiffs allege was then accepted by CFC.  Id. ¶¶ 34-37.  Plaintiffs then contracted with Group Five to undertake the construction project dubbed "Yaounde Phase I."  Id. ¶¶ 39-40.  In furtherance of that agreement, CFC delivered $4,750,000 in funding to Group Five to begin the project.  Id. ¶ 40.

On July 23, 2005, plaintiffs allege that CFC "handed over to Plaintiffs and to Group Five 102 hectares of land for the construction and the completion of the Yaounde Phase I Project" at a public ceremony.  Id. ¶ 45.  On July 15, 2005 and August 11, 2005, respectively, plaintiffs and CFC signed two additional Memoranda of Agreement in Cameroon.  Id. ¶¶ 47-52.  Joseph Edou signed for CFC on both occasions.  Those agreements purported to expand upon the initial 2004 Memorandum of Agreement to provide for additional phases of the Cameroon housing project. Plaintiffs timely took steps to begin performance under both agreements.  Id. ¶¶ 54-57.  Indeed, in reliance upon the July 15th Agreement, plaintiffs submitted an application with OPIC in Washington, D.C. for construction financing for the Yaounde Phase II Project.  Id. ¶ 50.  And pursuant to the August 11th Agreement, plaintiffs also submitted a Preliminary Application for Guarantee with the Multilateral Investment Guarantee Agency of the World Bank.  Id. ¶ 54.

Notwithstanding the progress that the parties appeared to be making on the project, plaintiffs allege that the endeavor began to unravel during "August or September 2005" when "officials of Cameroon solicited and demanded a bribe in connection with the Cameroon

Project." Id. ¶ 60.  That demand was communicated to plaintiffs through Joseph Edou.  Plaintiffs

steadfastly refused to pay any bribe, a stance that Edou evidently shared.  Id. ¶¶ 60-61.  Due to

Edou's opposition to the bribery demands, plaintiffs contend that he was removed from his

position at CFC and replaced by Camille Ekindi on September 13, 2005.  Upon subsequent

meetings between plaintiffs and Mr. Ekindi, plaintiffs learned that Mr. Ekindi had been

"instructed" not to take any further action with respect to the housing project without specific

approval from the government of Cameroon.  Id. ¶ 65.  Shortly thereafter, CFC made several

unilateral and material changes to the Yaounde Phase I Project that was already underway;

plaintiffs noted that the changes constituted a material breach of the prior agreements, but

nevertheless proceeded to accommodate CFC's demands.  Id. ¶¶ 70-74.  Finally, on December

12, 2005, CFC "instructed Plaintiffs to cease all work on the Yaounde Phase I Project."  Id. ¶ 81.

Plaintiffs were allegedly informed by Mr. Ekindi that he had "been instructed to identify a pretext

for the termination of the Cameroon Housing Project and in particular the Yaounde Phase I

Project."  Id. ¶ 82.

    Plaintiffs "took all reasonable and prudent steps to continue or resume the Cameroon

Housing Project and, in particular, the Yaounde Phase I Project."  Id. ¶ 85.  Their efforts,

however, were ultimately unsuccessful.  As a result, "Group Five terminated its existing

agreements and commenced the repatriation of its employees."  Id. ¶ 84.  Tchoufa met a final

time with Mr. Ekindi at CFC's offices on February 15, 2006.  Id. ¶ 86.  At that meeting, Tchoufa

contends that Mr. Ekindi "admitted that Defendants had no basis for objection to the revised

plans, and that those plans had been approved by the relevant Cameroon land development

agency."  Id. ¶ 87.  Nevertheless, Mr. Ekindi reportedly indicated that "there was no hope that the

Cameroon Housing Project, and in particular the Yaounde Phase I Project would go forward." Id. After re-affirming that he "would not authorize any payments of any bribes," Tchoufa left Cameroon and returned to the United States. Id. ¶¶ 87-88.

On March 23, 2006, plaintiffs wrote to defendants demanding compensation for the damages caused by defendants' breach of the existing agreements. Id. ¶ 89. Plaintiffs explicitly noted that defendants' "conduct . . . is conventionally associated with allegations of graft and corruption." Id. Tchoufa asserts that, in apparent retaliation for those accusations, Cameroon officials improperly arrested his wife's secretary and imprisoned her for one week without any formal charges. Id. ¶ 90. Additionally, the government seized portions of property belonging to Tchoufa and his wife and supposedly directed threats towards other members of Tchoufa's family. Id. Moreover, during September 2006, one of Tchoufa's relatives was arrested and Cameroon officials allegedly demanded a $200,000 bribe to secure the relative's release. Id. ¶ 91. In fact, Tchoufa himself was incarcerated for nearly a month in the Ivory Coast on the basis of an Interpol notice allegedly issued by Cameroon; he was eventually released following the intervention of the United States Embassy. See Pl.'s Reply Tchoufa Decl. ¶ 24. These incidents have convinced Tchoufa and plaintiffs that they "cannot receive a fair hearing in any court in the Cameroon." See Compl. ¶ 96.

Defendants tell a different story, however. As they would have it, CFC was the victim of unauthorized self-dealing by rogue agents, specifically Edou and Booto. According to defendants, Edou had no authority to enter into the initial 2004 Memorandum Agreement because -- pursuant to CFC's by-laws -- the general manager lacks the capacity to bind CFC to any contract in excess of $20,000. See Defs.' Mot. At 7. Thus, because the various agreements

that Edou signed with plaintiffs called for CFC to deliver approximately $49 million in funding, any such arrangements would require explicit Board of Directors approval.  Id.  And defendants maintain that "[n]one of the purported 'Memorandums of Agreement' . . . nor any other purported contract relating to any of the projects in which MBI or Atlantic was involved was submitted to CFC's Board of Directors for approval."  Id.  at 8.  Moreover, defendants assert that "no businessman with even a basic acquaintance with funding by government-owned corporations such as CFC could have reasonably believed that one individual, a General Manager, could by himself authorize a commitment of the magnitude of US$49 million."  Id.

Under defendants' view, due both to Edou's purported lack of authority and also to his supposedly undisclosed ownership interest in Atlantic via The Falls, the agreements between Edou and plaintiffs should be viewed as unauthorized self-dealing.  Those acts, according to defendants, led to a criminal indictment against Edou that charged him "with misappropriation and embezzlement of public funds, and conspiring with others to misappropriate funds for fictitious services purportedly rendered."  Id. at 9.  Moreover, defendants allege that Tchoufa has been similarly charged and is presently "the subject of a fugitive warrant for his arrest."  Id.

## STANDARD OF REVIEW

*Forum non conveniens* is a discretionary non-merits threshold inquiry "'designed not merely to defeat the asserted claims, but to preclude judicial inquiry.'"  See Public Citizen v. U.S. Dist. Court, Dist. Columbia, 486 F.3d 1342, 1348 (D.C. Cir. 2007) (quoting Tenet v. Doe, 544 U.S. 1, 6 n. 4 (2005)).  "Dismissal for *forum non conveniens* reflects a court's assessment of a 'range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'"  Sinochem Int'l Co. Ltd. v.

Malaysia Int'l Shipping Corp., --- U.S. ---, 127 S. Ct. 1184, 1190 (2007) (quoting Quackenbush

v. Allstate Ins. Co., 517 U.S. 706, 723 (1996)).

The common-law doctrine has its primary application in federal courts where the

alternative forum under consideration is foreign, and in contrast to the statutory doctrine

governing venue within the federal-court system, dismissal rather than transfer is the appropriate

remedy.  Id. at 1190-91; see also 28 U.S.C. § 1404(a); American Dredging Co. v. Miller, 510

U.S. 443, 449 n. 2 (1994).  "The *forum non conveniens* determination is committed to the sound

discretion of the trial court."  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 256 (1981).  A three-

step test governs application of the doctrine: "A court first determines whether there is an

adequate alternative forum and, if so, then proceeds to balance both private interest factors and

public interest factors in favor of the respective forums."  Jackson v. American Univ., Cairo, 52

Fed. Appx. 518, 518 (D.C. Cir. 2002) (citing Piper, 454 U.S. at 541).[1]  A strong tilt towards a

---

[1] The prior *forum non conveniens* test in this Circuit, cited by defendants in their briefing, has been partially superseded by Supreme Court precedent.  In Pain v. United Tech. Corp., the D.C. Circuit outlined the following process for determining whether to dismiss a case for *forum non conveniens*:

> As a prerequisite, the court must establish whether an adequate forum exists which possesses jurisdiction over the whole case.  Next, the trial judge must consider all relevant factors of *private* interest, weighing in the balance a strong presumption against disturbing plaintiff's initial forum choice.  If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of *public* interest tip the balance in favor of a trial in a foreign forum.  If he decides that the balance favors such a foreign forum, the trial judge must finally ensure that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice.

637 F.2d 775, 784-85 (D.C. Cir. 1980).  As the D.C. Circuit recognized in Nemariam v. Federal Democratic Republic, Ethiopia, however, Piper "overrul[ed] the third part of the Pain test."  315 F.3d 390, 392-93 (D.C. Cir. 2003).  The upshot of Piper is that a trial judge must look to public interest factors even if the private interests are not "in equipoise or near equipoise."  See Jackson,

particular forum in the private interest factors or the public interest factors counsels towards

dismissal. Id. ("Piper also indicates that either private interest factors or public interest factors

may be cause for dismissal."). "Once the existence of an adequate alternative forum is

established, the Court must weigh all relevant factors of private and public interest against the

presumed validity of plaintiff's initial choice of forum." KPMG Fin. Advisory Servs. Ltd. v.

Diligence LLC, 2007 WL 335769 at *1 (D.D.C. Feb. 14, 2006). "If the balance favors the

foreign forum, and if the Court is convinced that plaintiff effectively can bring its case in the

alternative forum, the Court may dismiss the case on grounds of *forum non conveniens*." Id.

(emphasis in original).

## DISCUSSION

Although *forum non conveniens* involves a nonjurisdictional inquiry, the doctrine

nevertheless presents one of the rare occasions where a court may dismiss a case on prudential

grounds prior to assessing its own jurisdiction over the matter. See, e.g., Sinochem, 127 S. Ct. at

1188 ("We hold that a district court has discretion to respond at once to a defendant's *forum non*

*conveniens* plea, and need not take up first any other threshold objection. In particular, a court

need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or

personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is

plainly the more suitable arbiter of the merits of the case."); Public Citizen, 486 F.3d at 1348

("Sinochem thus firmly establishes that certain non-merits, nonjurisdictional issues may be

addressed preliminarily, because jurisdiction is vital only if the court proposes to issue a

---

52 Fed. Appx. at 518. With that modification, however, the basic Pain framework is
substantially in accord with the Jackson and Piper tests described above.

judgment on the merits.") (internal citations and quotations omitted).  Thus, a court may dismiss

a case on the basis of *forum non conveniens* in lieu of addressing questions of subject matter and

personal jurisdiction, particularly where, as here, those inquiries raise difficult issues that might

otherwise require jurisdictional discovery.  See, e.g., Croesus EMTR Master Fund L.P. v.

Federative Republic of Brazil, 212 F. Supp. 2d 30, 37 (D.D.C. 2002) ("Under controlling

precedent in this Circuit, jurisdictional discovery on FSIA issues 'should not be authorized at all

if the defendant raises either a different jurisdictional or an other non-merits ground[] such as

*forum non conveniens* . . . the resolution of which would impose a lesser burden on the

defendant.") (quoting Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir.

2000)).  In this instance, because the Court concludes that this case should be dismissed on *forum

non conveniens* grounds, the Court declines to reach the questions of subject matter and personal

jurisdiction posed by defendants.[2]

### I.    *Forum Non Conveniens* Analysis

As noted above, the *forum non conveniens* determination entails a three-step inquiry.  The

Court concludes that the public and private interest factors overwhelmingly favor trial in

Cameroon.  Only the initial step -- determining whether an adequate alternative forum exists to

hear plaintiffs' claims -- gives any real reason for pause.  Nevertheless, as explained below, the

Court finds that defendants have carried their burden of establishing that dismissal is appropriate

---

[2] Although it is not relevant to the *forum non conveniens* analysis, the Court notes that CFC qualifies as "an agency or instrumentality of a foreign state" under the FSIA.  See 28 U.S.C. § 1603(a).  CFC is an entity "a majority of whose shares or other ownership interest is owned by a foreign state," id. § 1603(b)(2), and the FSIA provides that such agencies or instrumentalities are entitled to sovereign immunity in the same capacity as the foreign sovereign itself.  Thus, both defendants in this case would be shielded by sovereign immunity unless one of the enumerated exceptions to the FSIA were to apply.

on *forum non conveniens* grounds.

        *a.*    *Adequate alternative forum*

      The threshold question here is whether Cameroon constitutes an adequate alternative

forum to hear this action.  Defendants make a strong initial showing that the courts of Cameroon

are open to hear plaintiffs' claims and represent an adequate alternative to proceeding before this

Court.  Their demonstration relies heavily upon various declarations submitted by Professor

Ephraim Ngwafor, a Professor of Law at the University of Yaounde II and an active participant in

the 1996 revision of Cameroon's Constitution.  See Defs.' Mot. Ngwafor Decl. ¶¶ 2, 8.  To begin

with, defendants maintain that courts in Cameroon would have jurisdiction over this lawsuit.  See

Defs.' Mot. Ngwafor Supp. Decl. ¶ 2.  Indeed, neither sovereign immunity nor the applicable

statute of limitations (evidently thirty years in Cameroon) would bar plaintiffs' claims before the

courts of Cameroon.  Id.  Moreover, according to defendants, there are analogous Articles

contained in the Civil Code of Cameroon that would encompass each of plaintiffs' asserted

causes of action here[3] and monetary damages are similarly available in that forum.  See Defs.'

Mot. Ngwafor Decl. ¶ 22.  Both CFC and the government of Cameroon would be required to pay

any damages that are awarded against them and CFC's property in Cameroon would be subject to

attachment in order to satisfy any judgment against the entity.  Id.  Defendants also contend that

Cameroon's judiciary is "independent of the executive branch of government" by virtue of its

Constitution and that "the executive branch of the government cannot direct the courts'

---

     [3] See Defs.' Mot. Ngwafor Decl. ¶ 22 (breach of contract covered by Articles 1147 and 1184, deceit and fraudulent misrepresentation covered by Article 1116, negligent misrepresentation covered by Article 1383, intentional interference with contract covered by Articles 1165 and 1382, misappropriation of intellectual property and trade secrets covered by Article 1382).

decisions." Id. ¶ 21.

Finally, defendants point out that all of the purported Memoranda of Agreement at issue in this case call for the law of Cameroon to govern any disputes arising out of the agreements. See Defs.' Mot. at 26-27.  Moreover, the latter two agreements contain an express forum selection clause that calls for adjudication before the High Court of Yaounde.  Id. at 27.  Thus, as defendants would have it, plaintiffs themselves view the courts of Cameroon as an adequate forum for adjudicating disputes because they specifically consented to exclusive jurisdiction before those tribunals in two of the purported agreements.

Plaintiffs, however, insist that Cameroon is not an adequate and independent forum to resolve this dispute.  In support of that contention, they cite to a recent report issued by the United States Department of State that indicates that although Cameroon's judiciary is formally independent as a matter of law, in practice "'the judiciary remained highly subject to executive influence, and corruption and inefficiency remained serious problems."  See Pl.'s Opp'n at 37 (quoting U.S. Dep't of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices (Cameroon, 2006) (2007), available at http://www.state.gov/g/drl/rls/hrrpt/2007/100470.htm).  Plaintiffs also cite to a law review article that indicates that "'one striking feature about Cameroon's judiciary is its total lack of independence, since it is under the firm control of the President of the Republic.'"  Id. at 38 (quoting Kofele-Kale, Ndiva Asserting Permanent Sovereignty Over Ancestral Lands: The Bakweri Land Litigation Against Cameroon, 13 Ann. Surv. Int'l & Comp. L. 103, 140 (2007)).  Moreover, plaintiffs have submitted an affidavit from a Cameroonian attorney who opined that Atlantic and MBI "would not and will not have a fair hearing in the Cameroonian court/legal

system.  This is evidence by CFC's and the Cameroonian Government's treatment of Atlantic

Group SCI and MBI Group, Inc. (and their principals) so far."  Id. Ex. 8C.

In addition to those generalized criticisms of Cameroon's judiciary system, plaintiffs

submit that Cameroon's "treatment of Mr. Tchoufa . . . leaves no room for the conclusion that

Cameroon is a viable alternative or that 'plaintiffs can reinstate their suit in the alternative forum

without undue inconvenience or prejudice.'"  Id. at 38 (quoting Friends for All Children, Inc. v.

Lockheed Aircraft Corp., 717 F.2d 602, 606 (D.C. Cir. 1983)).  Specifically, Tchoufa alleges that

Cameroon retaliated against his disclosure of the bribery demands "by improperly arresting and

imprisoning Mr. Tchoufa's wife's secretary, seizing Mr. Tchoufa's and his wife's property,

threatening the arrest of other relatives, . . . improperly arresting a relative and demanding a bribe

for his release, and threatening the lives of Mr. Tchoufa and his wife if either returned to

Cameroon."  Id. at 39 n. 31.  Plaintiffs also point out that Tchoufa has already been incarcerated

once in the Ivory Coast on the basis of Cameroon's arrest warrant.  Id. at 39.  Those actions,

plaintiffs contend, threaten Tchoufa's safety and liberty should he return to Cameroon for judicial

proceedings, thereby rendering Cameroon an inadequate alternative forum for this suit, in their

view.  See id. at 39 n. 31 (collecting cases concerning threats of retaliation and personal safety).

Notwithstanding some lingering concerns regarding possible hostility towards plaintiffs

in the foreign forum, the Court concludes that under the law Cameroon is nevertheless an

adequate alternative situs for this lawsuit for purposes of *forum non conveniens*.  Plaintiffs'

generalized allegations regarding the state of Cameroon's judiciary are unavailing.  To begin

with, as defendants correctly note, the law review article on which plaintiffs rely was written in

response to a decision of the African Human Rights Counsel.  Mr. Kofele-Kale's article criticizes

that decision, which dismissed certain claims before the Counsel because domestic remedies had

not first been exhausted in Cameroon.  See Defs.' Reply at 17 n. 19.  Responding to that failure

to exhaust, Mr. Kofele-Kale opined that such exhaustion should not be required due to certain

deficiencies in Cameroon's judicial system.  Id.  But whatever the merits of Mr. Kofele-Kale's

argument in that particular context, one author's criticism of Cameroon's judiciary in response to

an adverse decision does not constitute the sort of evidence required to condemn an entire

nation's judicial system as inadequate.

Moreover, binding authority in this jurisdiction defeats plaintiffs' reliance upon the State

Department's report concerning Cameroon's judiciary.  In El-Fadl v. Central Bank of Jordan, the

D.C. Circuit explained that a "foreign forum is not inadequate merely because it has less

favorable substantive law, because it employs different adjudicative procedures, . . . or because

of general allegations of corruption in the judicial system."  75 F.3d 668, 678 (D.C. Cir. 1996)

(emphasis added) (citing Blanco v. Banco Industrial de Venezuela, 997 F.2d 974, 981-82 (2d Cir.

1993)).  Specifically, the court expressly noted that the plaintiff's "repeated reliance on a State

Department report expressing 'concern about the impartiality' of the Jordanian court system, for

example, is unavailing."  Id.  Similarly, in Irwin v. World Wildlife Fund, Inc., the plaintiffs'

challenged "the adequacy of the forum in Gabon . . . [on the basis of ] a report by the . . .

Department of State, which said that 'the judiciary remained subject to government influence'

and that the Gabonese legal system is 'slow, inefficient and subject to corruption.'" 448 F. Supp.

2d 29, 34 (D.D.C. 2006).  Citing El-Fadl, Judge Sullivan rejected the plaintiffs' objection, noting

that "generalized allegations of corruption do not establish that a foreign forum is inadequate."

Id.  As one court has put it, "the argument that the alternative forum is too corrupt to be adequate

-15-

'does not enjoy a particularly impressive track record.'" <u>See</u> <u>Leon v. Millon Air, Inc.</u>, 251 F.3d 1305, 1311-12 (11th Cir. 2001) (quoting <u>Eastman Kodak Co. v. Kavlin</u>, 978 F. Supp. 1078, 1084)).  Indeed, the Eleventh Circuit has even noted that "where the allegations [of inadequacy] are insubstantially supported, as in . . . <u>El-Fadl</u>, a District Court may reject them without considering any evidence from the defendant."  <u>Id.</u> at 1312; <u>see</u> <u>also</u> <u>PT United Can Co. v. Crown, Cork & Seal Co.</u>, 138 F.3d 65, 73 (2d Cir. 1998) ("Considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards.").  Hence, plaintiffs' generalized argument regarding Cameroon's court system is foreclosed by ample authority.

Turning to their next assertion of inadequacy, plaintiffs insist that Cameroon's treatment of Tchoufa is indicative of broad hostility towards plaintiffs.  That suggests, the argument goes, that Cameroon's judiciary would be prejudiced against their lawsuit.  Defendants contend, however, that the "alleged actions relate to Mr. Tchoufa personally rather than the companies MBI and Atlantic."  <u>See</u> Defs.' Reply at 19.  That seems correct.  There is no reason to conclude that other principals from MBI or Atlantic would be subject to adverse treatment by Cameroonian authorities, nor do plaintiffs assert that any counsel that they might secure would be precluded from filing suit in that jurisdiction.  Most importantly, the alleged actions at issue were taken by the <u>executive</u> branch of the Cameroonian government, not by the judiciary.  And defendants have submitted evidence that Cameroon's judiciary is formally independent of the executive as a matter of the nation's Constitution.  As explained above, plaintiffs cannot disturb that presumption of independence by merely pointing to generalized reports that the executive

branch may exert undue influence over the judiciary.[4]

Tchoufa himself has stated that he fears for his safety and liberty should he return to Cameroon. There is some authority to support the contention that fears concerning personal safety may render a particular forum inadequate. See, e.g., Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 13 (1st Cir. 2000) ("There are . . . cases in which courts have discussed the possibility that the dangers inherent in traveling to a proposed forum might make litigation there a practical impossibility (and, thus, no real alternative)."). But the Court is persuaded that other factors mitigate that risk here. Cameroon is a Civil Code jurisdiction and, as such, proceedings are often conducted entirely in writing. See Defs.' Mot. Ngwafor Supp. Decl. ¶ 3. Thus, Tchoufa's testimony may be taken within the safety of the United States but still be employed to full effect in the litigation in Cameroon; there is simply no need to appear for live testimony. Defendants concede as much. See Defs.' Reply at 20 n. 25. Moreover, the right to attend trial, while significant, is not absolute. See Irwin, 448 F. Supp. 2d at 33 (citing Effron v. Sun Line Cruises, 67 F.3d 7, 11 (2d Cir. 1995)). Thus, the mere fact that Tchoufa could not personally travel to the proceedings in Cameroon without fear of reprisal does not establish that Cameroon is an inadequate alternative forum. And there is no suggestion that the litigation cannot go forward in Cameroon absent Tchoufa's physical presence there; in fact, defendants point out that in a civil law jurisdiction, "counsel for plaintiff fully represents the plaintiff . . . [and] [p]laintiffs are not required to appear in person and their testimony can be incorporated in counsels [sic]

---

[4] The affidavit of the Cameroonian attorney submitted by plaintiffs contains no specific basis or reasoning for its conclusion that plaintiffs would not receive a fair trial in Cameroon other than the treatment received by plaintiffs to date at the hands of certain Cameroonian officials in the executive branch. See Pl.'s Opp'n Ex. 8C. Moreover, that affidavit is belied by the competing documentation submitted by defendants. See Defs.' Reply Wolber Decl. ¶¶ 6-7.

submission." See Defs.' Mot. Ngwafor Supp. Decl. ¶ 3.  Finally, defendants contend that

Tchoufa "would not be disqualified as a witness because of the charges pending against him."

Id.

In sum, defendants have submitted ample evidence to demonstrate that Cameroon's

courts would have jurisdiction to entertain this suit and sufficient means to accommodate each of

the claims that plaintiffs have presented in this case.  Moreover, money damages are available in

Cameroon and plaintiffs' suit would not be barred by sovereign immunity in that forum.  As the

First Circuit put it, "[c]ourts generally deem [the alternative forum to be adequate] if the

defendant demonstrates that the alternative forum addresses the types of claims that the plaintiff

has brought and that the defendant is amenable to service of process there."  Iragorri, 203 F.3d at

12.  Defendants have met that burden here.[5]

Nevertheless, in an abundance of caution and to avoid any potential undue prejudice to

plaintiffs, the Court will condition dismissal upon defendants' submitting to jurisdiction in

Cameroon and on the Cameroonian courts' acceptance of the case.  The D.C. Circuit has

expressly authorized this course of action on at least one prior occasion.  See El-Fadl, 75 F.3d at

679 ("If doubts about the availability of an alternative forum remain due to difficulties in

determining Jordanian law, the district court may dismiss for *forum non conveniens*, but only if

---

[5] The fact that plaintiffs have previously consented to suit in Cameroon by way of the forum selection clause contained in two of their agreements with defendants lends further support to the conclusion that Cameroon is an adequate forum for this dispute.  Plaintiffs' only response to that supposition is that forum selection causes should not be enforced if there are "compelling and countervailing reason[s]" not to do so.  See Pl.'s Opp'n at 36 n. 29 (citations omitted).  But that contention is beside the point.  The Court is not enforcing any mandatory forum selection cause contained in those agreements.  Instead, the clause merely serves as evidence of the adequacy of Cameroon as a forum for this dispute.

conditioned on the defendants' submitting to jurisdiction in Jordan and on the Jordaninan courts' acceptance of the case."); see also Bank of Credit & Comm. Int'l (Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 248 (2d Cir. 2001) (noting that "the conditional dismissal device can help to protect the non-moving party in circumstances where the district court remains concerned about the accuracy of its 'justifiable belief' as to a foreign forum's adequacy"). The Court is satisfied that such a condition will alleviate any putative burden raised by a potential inadequacy of the Cameroon forum that may become apparent at a later time. With that condition, the Court finds that Cameroon is an adequate alternative forum and it will now proceed to balance the private and public interests of proceedings in each venue.

### b.    Private interest factors

There is ordinarily a "strong presumption" in favor of a plaintiff's choice of forum. See Piper, 454 U.S. at 265. That presumption,[6] however, "may be overcome . . . when the private and public interest factors clearly point towards trial in [an] alternative forum." Id. at 266. In

_____

[6] The parties quarrel over the appropriate weight to assign to plaintiffs' choice of forum in this case. As plaintiffs would have it, MBI's choice of forum is entitled to the full presumption of appropriateness because it is a U.S. corporation and it has chosen to pursue this lawsuit in its "home" forum. See Pls.' Opp'n at 41 (quoting Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 338-39 (S.D.N.Y. 2003) ("For purposes of a *forum non conveniens* determination, the home forum of any United States resident is any United States Court."). Defendants, however, take issue with that contention. They appear to argue that the cited proposition is unique to the Second Circuit. See Defs.' Reply at 20 n. 27. Moreover, they also point out that Atlantic is a Cameroon corporation. Thus, defendants argue that even if the District of Columbia qualifies as MBI's "home" forum, any deference running to MBI "must be mitigated by countervailing factors -- i.e., that its co-plaintiff, Atlantic, is a Cameroon corporation; that the lawsuit involves a business venture MBI undertook in Cameroon," etc. Id. at 20. These positions are ultimately beside the point, however. Even awarding plaintiffs the highest level of deference available to their forum choice, the Court concludes that the public and private factors dictate that trial is more appropriate in Cameroon. See, e.g., Croesus, 212 F. Supp. 2d at 38 (plaintiff's choice of forum is not conclusive when there are "substantial reasons for favoring" an alternative forum).

short, the Court must determine whether "trial in the chosen forum would be unnecessarily burdensome for the defendant or the court." See id. at n. 23. The pertinent private interest factors are:

> (1) the relative ease of access to sources of proof; (2) the availability of process for compelling unwilling witnesses; (3) the cost for obtaining attendance of willing witnesses; (4) the possibility of inspecting the premises, if appropriate; and (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive.

Irwin, 448 F. Supp. 2d at 34 (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)). In this case, all of the implicated criteria favor proceeding in Cameroon.

First of all, with respect to the relative ease of access to the sources of proof, the Court notes that there is a built-in obstacle here concerning any documents originating or located in Cameroon.[7] That hurdle is translation: as defendants point out, "French is the principal language of Yaounde, the capital of Cameroon, and Douala, its principal commercial city." See Defs.' Mot. at 25. Thus, many, if not all, of the documents that would be produced by CFC and the Cameroonian government would require translation into English. Indeed, that is underscored by the myriad of translated documents that the parties have produced to date even for the limited purposes of this motion. The need for translation would add a substantial overlay of cost to this proceeding, in addition to consuming large amounts of time and effort that might be unnecessary in Cameroon. See Irwin, 448 F. Supp. 2d at 35 (necessity of translating documents and testimony from French to English created "administrative difficulties of trying the case in the

---

[7] Those documents include the "books and records of CFC and other documents related to the alleged housing project." See Defs.' Reply at 23. Moreover, the "site of the alleged project is in Cameroon, the location of the official corporate records of Atlantic and The Falls is in Cameroon, and any documents related to the alleged misappropriation of trade secrets are located in Cameroon." Id.

District of Columbia" that "weigh in favor of dismissal"); Croesus, 212 F. Supp. 2d at 39

(necessity of translating "an abundance of materials from Portugese into English" weighed

against proceeding in the U.S.). Moreover, defendants correctly note that many of the key

witnesses from CFC and the government of Cameroon would also require a translator to give any

live testimony at trial. See Defs.' Mot. at 25. That only further compounds the inefficiency

involved with a trial before this Court.

Defendants have identified no fewer than seven necessary witnesses located in Cameroon,

and that is likely a conservative estimate on their part. Significantly, it appears that any witness

located in Cameroon is beyond the means of this Court's compulsory process. See Irwin, 448 F.

Supp. 2d at 35 ("The availability of process for unwilling witnesses is also a primary concern to

the Court. . . . [T]here is no evidence that any of these potential witnesses reside in the United

States. None of these individuals are subject to subpoena power of this or any other United

States court, and none can be compelled to attend trial."); BPA Int'l, Inc. v. Kingdom of Sweden,

281 F. Supp. 2d 73, 86 (D.D.C. 2003) ("Because [plaintiff's] claims arose out of actions

occurring in Sweden, access to sources of proof would be much easier if the case were heard in

Sweden rather than Washington, D.C. Many, if not most, of the potential witnesses and much of

the evidence will likely be located in Sweden and therefore will likely be beyond the reach of the

Court's compulsory process."); Croesus, 212 F. Supp. 2d at 39 ("Moreover, to the extent that the

parties require testimony from former members of the Brazilian government, these witnesses,

too, are likely to reside in Brazil, outside the reach of compulsory process.").

And just as in Irwin, even if some witnesses are willing to attend trial, "the cost of

bringing [those] witnesses to Washington, D.C. would be significant." 448 F. Supp. 2d at 35.

As noted above, the witnesses from Cameroon will all almost surely require translators in order to present live testimony before this Court. Moreover, those witnesses will have to make the lengthy trip from Cameroon to the United States to give testimony, whereas no similar burden is involved in conducting the litigation in Cameroon. As previously explained, there is no need for the witnesses that reside in the United States to appear in-person before the tribunal in Cameroon. Furthermore, to the extent that any physical presence is required, there are far fewer witnesses from the United States who would need to travel to Cameroon than vice versa. And, of course, if it is necessary to view the area of land that was set aside for the proposed project, that could only take place in Cameroon.

In sum, the balance of private interests strongly tilts towards hearing this case in Cameroon rather than the District of Columbia. As explained below, the public interest factors implicated by this case likewise favor dismissal.

### c. *Public interest factors*

The pertinent public interest factors in the *forum non conveniens* analysis are:

> (1) administrative difficulties caused by foreign litigation congesting local court dockets; (2) local interest in having localized controversies decided at home; (3) imposing jury duty on residents of a jurisdiction having little relation to the case; and (4) avoiding unnecessary problems in choice-of-law and the application of foreign law.

Irwin, 448 F. Supp. 2d at 35 (citing Gilbert, 330 U.S. at 508-09).[8]  With respect to the first factor, as the Irwin court put it, "[t]he administrative difficulties of trying this case 'in a forum

---

[8] As this Court stated in Croesus, "because claims under the FSIA are not eligible for resolution by a jury, there is no particular burden on the community imposed by the litigation here." 212 F. Supp. 2d at 40 (citing 28 U.S.C. § 1330(a); Universal Consol. Cos., Inc. v. Bank of China, 35 F.3d 243, 244-45 (6th Cir. 1994)). Thus, the third public interest factor has no bearing on cases involving the FSIA.

thousands of miles away from the majority of witnesses and the evidence are obvious.'" 448 F.

Supp. 2d at 35-36 (quoting Gonzales v. Naviera Neptuno A.A., 832 F.2d 876, 879 (5th Cir.

1987)).  Indeed, as discussed above, those difficulties abound here and manifest themselves

especially in the need for extensive translation of documents and testimony, as well as the lack of

an adequate means to compel the participation of unwilling witnesses.  See, e.g., Croesus, 212 F.

Supp. 2d at 39 ("Litigating a case on these grounds will require a heavy emphasis on [foreign]

sources of proof (and law), and thus seems likely to be expensive, cumbersome and time-

consuming if conducted here.").

        The next component of the public interest factors analysis -- the interest in having

localized controversies decided at home -- also plainly suggests dismissal.  As defendants aptly

put it, "this dispute centers on Cameroon and almost everything relevant to the dispute occurred

in Cameroon.  The dispute concerns an alleged real estate development project in Cameroon and

will involve Cameroon legal issues, Cameroon witnesses, and events in Cameroon."  See Defs.'

Reply at 21.  To be sure, there are some tenuous connections to the United States[9] involved in

this case.  The initial Memorandum of Agreement was signed in Maryland, for instance, and

certain CFC officials are alleged to have made several trips to the United States in connection

with the proposed building project.  And MBI, of course, is a domestic corporation.  Any interest

that the United States may have in this litigation ends there, however.  Cameroon, by contrast,

clearly has a far stronger stake in this controversy.  This dispute concerns an agreement to build a

_____

        [9] Plaintiffs' asserted "local" interest is actually entirely "national."  There is no suggestion
whatsoever that this matter has anything to do with the District of Columbia, other than the mere
fact that some of the government agencies that played de minimis roles in this affair are located
here.

series of affordable housing projects in Cameroon.  Plaintiffs have also accused officials of the

Cameroonian government -- and CFC, an instrumentality of that government -- of demanding

bribes and, when their overtures were rebuffed, retaliating against plaintiffs by canceling the

housing projects.

Cameroon plainly has a strong interest at stake in this litigation.  The United States,

however, does not.  From the national perspective of the United States, this is simply an ordinary

breach of contract case that just so happens to involve a domestic corporation dealing with an

instrumentality of a foreign sovereign.  Although it is true that the United States has some

national interest in ensuring that its domestic corporations can obtain recourse when they are

aggrieved when engaging in commercial activities abroad, in this case that interest pales in

comparison to Cameroon's stake in adjudicating a dispute that involves accusations of bribery

against government officials and an affordable housing project of national concern.  As between

the two potential fora, Cameroon's substantially more powerful interest in this litigation supports

dismissal.  See, e.g., Croesus, 212 F. Supp. 2d at 40 (dismissing case in part because "[t]he

marginal nature of the United States' interest stands in stark contrast to the magnitude of Brazil's

interest").

Finally, and significantly, this Court's lack of familiarity with Cameroonian law, and

other issues involved with the application of foreign law, weighs heavily in favor of dismissal.

The alleged agreements at issue in this case all expressly call for the application of Cameroonian

law to govern any disputes arising out of them.  Moreover, at least two of the agreements contain

a forum selection clause identifying the High Court of Yaounde, Cameroon as the proper tribunal

to adjudicate any disputes.  As explained above, the applicable portions of that body of law are

based on the Civil Law model rather than the common law. This Court has no *a priori* familiarity with the Civil Law system. Plaintiffs point out that Fed. R. Civ. P. 44.1 would allow foreign law to be proved during the course of the litigation. That is true, but plaintiffs are far too dismissive of the difficulties associated with that course of action. A proceeding before this Court applying Cameroonian law would require the testimony of several legal experts familiar with that body of law. And the testimony of those experts would likely have to be translated from French into English as well. Moreover, as in Croesus, "the Court's analysis of foreign law issues will be impeded by its inability to work directly from the original [foreign-language] legal sources." 212 F. Supp. 2d at 41. Those issues would create substantial administrative difficulties that would significantly prolong the trial, particularly in comparison to simply hearing the case before a court in Cameroon. These concerns weigh very strongly in favor of dismissing this case. See, e.g., Piper, 454 U.S. at 260 (indicating that the Supreme Court has "explicitly held that the need to apply foreign law pointed towards dismissal"); Gilbert, 330 U.S. at 509 ("There is an appropriateness . . . in having the trial . . . in a forum that is at home with the . . . law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.").

In sum, this a case that primarily involves the nation of Cameroon. The supposed agreements contemplated performance in Cameroon in the form of the construction of affordable housing units. The agreements also called for the law of Cameroon to govern any disputes arising out of the endeavor. Moreover, the alleged bribery demands and accompanying breach of the agreements all occurred in Cameroon. Many of the governing documents are located in Cameroon and are written in French. Similarly, most of the key witnesses are located in that

country and also speak French as their native language.  The "nub" of the controversy, in short, is "entirely foreign."  See Sinochem, 127 S. Ct. at 1189.  The contacts with the United States are simply insufficient to overcome the powerful showing that Cameroon is the far more appropriate forum to hear this matter.  Accordingly, the Court will dismiss this action on *forum non conveniens* grounds.

### II.    Plaintiffs' Motion for Discovery

That leaves one final issue.  Plaintiffs have requested jurisdictional discovery on all of the grounds for dismissal raised by defendants, including *forum non conveniens*.  The Court will not belabor this point, particularly because plaintiffs do not appear to have articulated a specific need for discovery on the *forum non conveniens* issue.  In Croesus, this Court indicated that it "does not believe that this is an appropriate issue for exploration through discovery.  If plaintiff had evidence -- through judicial decisions, legal experts or otherwise -- of the mistreatment of foreign plaintiffs in Brazilian courts, they could have offered it."  212 F. Supp. 2d at 38 n. 8.  So, too, here.  Plaintiffs have not identified any facts that could be resolved by discovery that would be pertinent to the *forum non conveniens* inquiry, nor can the Court imagine any that might exist.  And as defendants correctly note, "it is not apparent how the *forum non conveniens* private interest or public interest factors present issues of fact upon which jurisdictional discovery would be appropriate."  See Defs.' Opp'n at 13.  Hence, the Court will deny plaintiffs' motion for jurisdictional discovery.

### CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss for *forum*

*non conveniens* and deny plaintiffs' motion for jurisdictional discovery.  A separate Order

accompanies this Memorandum Agreement.

_____/s/_____
JOHN D. BATES
UNITED STATES DISTRICT JUDGE

Date: June 10, 2008