UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MBI Group, Inc., and<br>Atlantic Group, SCI, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | 1:07-cv-00637-JDB |
| | ) | |
| vs. | ) | |
| | ) | |
| Crédit Foncier du Cameroun, and | ) | |
| The Government of the Republic of | ) | |
| Cameroon, | ) | |
| | ) | |
| *Defendants.* | | |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO VACATE DISMISSAL, FOR RECONSIDERATION, AND TO ALTER OR AMEND JUDGMENT AND ORDER

On June 10, 2008, the Court dismissed this lawsuit on the ground of *forum non conveniens* on the motion of defendants Crédit Foncier du Cameroun and the Government of the Republic of Cameroon ("Defendants"). In its Memorandum Opinion, the Court set out its analysis of the issues involved and the reasons showing that the *forum non conveniens* dismissal should be granted. The Court conditioned its dismissal "upon defendants' submitting to jurisdiction in Cameroon and on the Cameroonian Courts' acceptance of the case." Memorandum Opinion 18.

On June 24, 2008, plaintiffs MBI Group, Inc. ("MBI"), and Atlantic Group, SCI ("Atlantic") (together "Plaintiffs"), filed a motion under Fed. R. Civ. P. 59(e) and 60(b) to vacate the dismissal, for reconsideration, and to alter or amend the Court's judgment and order. In their memorandum in support of the motion ("Plaintiffs' Mem." or "Mem."), Plaintiffs argue that the second part of the Court's conditions on dismissal (i.e., that the

Cameroonian courts accept the case) "cannot and will not be met." Mem. 3. Plaintiffs also argue that this Court should reconsider its determination that Cameroon has a "substantially more powerful interest in this litigation" than the United States (Memorandum Opinion 24) and its determination that the Cameroonian courts are not disqualified as an adequate forum if Plaintiffs' representative cannot physically appear there (Memorandum Opinion 17-18).

Plaintiffs' motion must be denied. The Court's conditions on dismissal can be, and are being, met. And nothing Plaintiffs have submitted in support of their motion furnishes any valid basis for the Court to alter or amend its rulings on *forum non conveniens*.

## STANDARDS APPLICABLE TO PLAINTIFFS' MOTION

Relief under either Fed. R. Civ. P. 59(e) or 60(b) is within the broad discretion of the court. "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Nikbin v. Islamic Republic of Iran*, 517 F.Supp.2d 416, 429 n. 1 (D.D.C. 2007), quoting *Ciralsky v. Cent. Intelligence Agency*, 355 F.3d 661, 671 (D.C. Cir. 2004) (quoting, in turn, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). Similarly, "a district court enjoys significant discretion in deciding whether to grant or deny a Rule 60(b) motion." *Nikbin, supra*, 429 (quoting *Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 Fed. 3d 897, 903 (D.C. Cir. 1996). To come within the ambit of Rule 60(b), the movant must meet the conditions of one of its first five subsections (*e.g.*, mistake, inadvertence, surprise, excusable neglect, or newly discovered evidence) or must

come within the last subsection, Rule 60(b)(6) ("any other reason that justifies relief"). However, "it is well established that Rule 60(b)(6) 'relief should be only sparingly used' in 'extraordinary circumstances.'" *Nikbin, supra*, 429 (citations omitted).

None of the arguments Plaintiffs make in support of their motion meets the test of Rule 59(e) or Rule 60(b). Indeed, Plaintiffs have not even attempted to show how the material they have presented to the Court complies with the requirements of either rule.

## ARGUMENT

### I.    THERE IS NO OBSTACLE TO MEETING THE COURT'S CONDITIONS ON ITS *FORUM NON CONVENIENS* DISMISSAL.

Plaintiffs argue that the Court's conditions on its *forum non conveniens* dismissal have not and cannot be met by the Cameroonian courts. Mem. 2-4. Plaintiffs' argument is based on the declaration of Plaintiff's Cameroonian attorney, Jules Nkana, which states that on June 24, 2008, he submitted for filing on behalf of Plaintiffs in court in Yaoundé, Cameroon, a complaint that is an all material respects the same as Plaintiffs' complaint in this lawsuit. Mr. Nkana states that for the case to be accepted for filing and to proceed in Cameroon, the Plaintiffs would be required to pay a fee equal to five percent of the amount claimed in the complaint. Because the stated amount of the claim in the complaint is equivalent to US$500 million, the required fee would be equivalent to approximately US$25 million. Declaration of Jules Nkana ("Nkana Decl."), Mem. Ex. A.

Plaintiffs' argument is unavailing for several reasons. First, the evidence upon which it purports to be based – i.e., Plaintiffs' attempted filing and the Clerk's fee demand – cannot be claimed to be newly discovered. It merely reflects the fact that upon filing a civil complaint in the Cameroonian court a plaintiff can be required to deposit an amount

3

equal to five percent of its claim. However, this is not new evidence; it is information Plaintiffs' Cameroonian attorney knew, or should have known, when Plaintiffs filed their opposition to Defendants' motion to dismiss on November 5, 2007.[1] Plaintiffs have not "advanced new evidence not previously available to them." *See, Howard v. Gutierrez*, 503 F.Supp.2d 392, 394 (D.D.C. 2007).

Second, the amount of the assessed fee is directly attributable to the fact that the stated amount of the claim both in Plaintiffs' U.S. complaint and in their Cameroonian complaint – US$500 million – exceeds by an enormous margin any amount of damages that Plaintiffs' allegations could support. Plaintiffs' inflated claim for damages cannot be permitted to prevent an otherwise valid *forum non conveniens* dismissal.

Third, Plaintiffs are simply incorrect that they cannot file their Complaint in Cameroon without making a US$25 million deposit. As explained in the Declaration of Akere T. Muna ("Muna Decl."), which is Attachment 1 hereto, the fee ordinarily required to file a lawsuit such as Plaintiffs' in the High Court of Yaoundé is CFA 60,000 (equivalent to approximately US$140). Also, Section 24 of the Cameroon Civil Procedure Code requires that, on the filing of a suit such as Plaintiffs', the plaintiff deposit an amount sufficient to meet the payment of the registration and stamp tax that is due when a judgment is rendered. The Cameroon Tax Code fixes a tax on judgments obtained at 5.25 % of the amount awarded in the judgment. The court registry automatically requests the payment of a deposit on the filing of a suit, which it usually calculates on the basis of 5.25% of the amount claimed. Based on the amount that

---

[1] Plaintiffs have had the benefit of the advice of Jules Nkana, the declarant here, throughout the briefing on Defendants' motion to dismiss. For example, Mr. Nkana provided a letter in support of Plaintiffs' November 5, 2007 opposition to dismissal (Ex. 8C).

Plaintiffs state they claim, such a deposit would (as Mr. Nkana states) amount to close to US$25 million. Muna Decl. ¶7.

However, a plaintiff that brings a claim for damages in a large amount typically requests deferral or other relief from the amount of the deposit. For example, the High Court of Yaoundé may defer the deposit so that the tax is assessed and paid at the conclusion of the lawsuit. Under this procedure, the tax is calculated only on the amount, if any, of the plaintiff's actual recovery. If there is no recovery, there is no amount due. If the recovery is less than the amount claimed, the tax is based on the amount of the recovery, not the total amount claimed. Muna Decl. ¶8.

Counsel for Plaintiffs made no apparent effort whatsoever to obtain the benefit of a procedure such as that described in the preceding paragraph. Instead, Plaintiffs' counsel merely sought a letter from the Court Registrar to support Plaintiffs' assertion that their lawsuit could not be filed. Muna Decl. ¶9.

It is the position of the Defendants that the appropriate forum for the resolution of this lawsuit is the Cameroonian court system, and in particular the High Court of Yaoundé, rather than the courts of the United States. In its Memorandum Opinion, this Court conditioned its *forum non conveniens* dismissal "upon defendants' submitting to jurisdiction in Cameroon and on the Cameroonian courts' acceptance of the case." Memorandum Opinion 18. Accordingly, the Defendants have submitted to the jurisdiction of the High Court of Yaoundé in the lawsuit filed by Plaintiffs on June 24, 2008 in that Court, i.e., their Cameroon lawsuit. The Defendants will not contest the jurisdiction of the High Court of Yaoundé over them in the Cameroon lawsuit, or over the Cameroon lawsuit itself. Muna Decl. ¶11.

Defendants believe that the deposit with respect to the tax should not be permitted to be asserted as a barrier to the acceptance of the case by the High Court of Yaoundé. Additionally, Defendants have an interest in Plaintiffs' lawsuit being accepted for filing in the High Court of Yaoundé because Defendants have counterclaims they intend to assert in such a lawsuit.[2] Accordingly, Defendants asked the High Court of Yaoundé to adopt the procedure described above and accept Plaintiffs' lawsuit for filing and defer the deposit until the termination of the lawsuit, at which time the fee would be calculated on the amount of the damages, if any, actually awarded. Under this procedure, the second part of this Court's condition ("the Cameroonian courts' acceptance of the case") can be fulfilled without the deposit by Plaintiffs of the equivalent of US$25 million. Muna Decl. ¶12.

On 15 July 2008, the High Court of Yaoundé granted the motion to permit the filing of Plaintiffs' lawsuit. A copy of the Defendants' motion and the order of the High Court of Yaoundé is appended as Exhibit B to the Muna Declaration. In accordance with the order, Plaintiffs' lawsuit has been accepted for filing by the High Court of Yaoundé. Plaintiffs will be required to pay only the minimum fee of approximately CFA 60,000 (equivalent to approximately US$140). Muna Decl. ¶13. Thus, Plaintiffs' lawsuit is already underway in the Cameroon Courts.

*        *        *        *        *

---

[2]    Of course, Defendants would also have the right to pursue such counterclaims in the proceeding in this Court if it were determined that the Court has subject matter jurisdiction. A defendant's counterclaims are not required to be made until the first pleading by the defendant. *See* Fed.R.Civ.P. 13(a).

In opposing dismissal, Plaintiffs also cite law review articles critical of the *forum non conveniens* doctrine which refer to a "survey" that purportedly found that only one case of 50 dismissed for *forum non conveniens* "was actually tried in a foreign court" and a "report" that fewer than four percent of cases dismissed under the doctrine "ever reach trial in a foreign court." Mem. 4.   However, even if the survey and the report are accurate, the findings do not constitute a valid indictment of the doctrine of *forum non conveniens*.  The survey and the report purport to count only the cases that *went to trial*. If the statistics for cases filed in the U.S. district courts are examined, the percentages that actually go to trial are comparable, or less.  The data provided by the U.S. Courts show that in each of the five years 2002 through 2006 fewer than two percent (or one in fifty) of the total number of cases that were terminated in that year had gone to trial, and the percentage is as high as four percent only in 1990 and 2007.[3]  Thus, the evidence of the cited survey and report is that the foreign courts provide forums as effective in terms of access to trial as the U.S. courts.

## II.    THE COURT CORRECTLY DETERMINED THAT CAMEROON'S SUBSTANTIALLY MORE POWERFUL INTEREST IN THIS LITIGATION SUPPORTS *FORUM NON CONVENIENS* DISMISSAL.

In its Memorandum Opinion, the Court analyzed the respective interests of the United States and Cameroon in the issues involved in this case and correctly determined that Cameroon "clearly has the far stronger stake in this controversy."  Memorandum

---

[3]    *See* http://www.uscourts.gov/judicialfactsfigures/2006/Table410.pdf for a compilation of the statistics for certain years 1990 through 2006.  A copy of the compilation, Table 4.10, is reproduced as Attachment 2 to this Memorandum.  The corresponding percentage reported for the fiscal year ended September 30, 2007, was 4.1%.  *See* 2007 Annual Report of the Director (James C. Duff), Judicial Business of the United States Courts, Appendix: Detailed Statistical Tables, Table C-4, Cases Terminated, by Nature of Suit and Action Taken, available at http://www.uscourts.gov/judbus2007/appendices/C04Sep07.pdf.   (Both sites were last visited July 18, 2008.)

Opinion 23.  In support of their motion, Plaintiffs simply argue that the Court should reconsider its decision.  However, Plaintiffs introduce no new evidence or legal principle that would warrant reconsideration under either Rule 59(e) or Rule 60(b), and this deficiency is sufficient reason in itself for denying Plaintiffs' request.

In any event, even if the matter were to be considered *de novo*, Plaintiffs present nothing that supports a conclusion different from that reached by the Court.  Plaintiffs argue that the United States has an interest in combating "international bribery."  Mem. 6.  However, the authorities Plaintiffs cite do not suggest that any such interest extends to asserting the exclusive rights to adjudicate civil damage claims based on acts and transactions that took place almost entirely in a foreign country.  For example, in the first decision Plaintiffs cite, *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F.Supp.2d 544 (S.D.N.Y. 2000), the court upheld a subpoena directed to a U.S. corporation ("Corporation") in support of the enforcement of a U.S. criminal statute, the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 *et seq.*, despite the assertion of the Corporation that compliance would be contrary to the law of the unnamed foreign republic ("Republic") whose officials the Corporation was accused of bribing.  The court held that "the interest of the United States in enforcing its criminal laws outweighs any difficulties that the Corporation may face in complying with the subpoena in contravention of Republic law."  218 F.Supp.2d at 547.  In contrast, Plaintiffs' lawsuit is a civil action governed by Cameroonian law.  The United States has no interest comparable to that of enforcing a subpoena against a U.S. corporation in an action under U.S. criminal laws.

Similarly, Plaintiffs' citation of the U.S. Supreme Court's recent decision in *Republic of Philippines v. Pimentel*, ___ U.S. ___, 128 S.Ct. 2180 (2008), undercuts

rather than supports Plaintiffs' argument. Plaintiffs cite *Pimentel* for the unsurprising proposition that combating corruption is a significant international policy. Mem. 6. However, *Pimentel* did not hold that the U.S. courts are the preferred venue for all proceedings involving alleged corruption anywhere in the world. The actual holding of *Pimentel* is that the U.S. interpleader action there involved could not proceed in the absence of the foreign sovereigns, the Republic of the Philippines and the Philippine Presidential Commission on Good Governance, that had asserted claims to the property in question that were being litigated in the Philippines. The Court noted that the international policy of combating corruption "underscores the important comity concerns implicated by the Republic and the Commission in asserting foreign sovereign immunity." ___ U.S. at ___, 128 S.Ct. at 2192. *Pimentel* thus reflects the deference accorded to foreign courts in dealing with cases arising from alleged corruption in their countries.[4]

## III.    THE CORRUPTION CHARGES AGAINST ROGER TCHOUFA DO NOT DISQUALIFY CAMEROON AS A FORUM.

This Court previously considered the same arguments Plaintiffs now present here (Mem. 7-8) and correctly concluded that the Cameroon courts represent an adequate alternative forum even if Roger Tchoufa does not appear in court there. Memorandum

---

[4]    None of Plaintiffs' other arguments support reconsideration of the Court's analysis of the relative interests of Cameroon and the United States. For example, Plaintiffs reiterate their unsupported charge that Mr. Joseph Edou and Mr. Roger Tchoufa were prosecuted in Cameroon because they allegedly refused to participate in bribery and disclosed bribery demands. Mem. 5-6. On the contrary, Mr. Edou and Mr. Tchoufa were prosecuted because, among other things, uncontroverted documentary evidence shows that Mr. Tchoufa permitted a corporation owned by Mr. Edou's brother-in-law (or by Mr. Edou himself) to acquire for a token payment (equivalent to about US$1,800) a 45% interest in the corporation, i.e., Atlantic, that was seeking contracts from Mr. Edou as General Manager of the Government agency, Crédit Foncier du Cameroun. *See, e.g.*, Defendants' September 26, 2007 Memorandum in Support of Motion to Dismiss Plaintiffs' Complaint, 4-6.

9

Opinion 17-18. Plaintiffs merely reargue the points decided by this Court and attempt to distinguish the authority the Court relied upon.

As the Court noted, in a civil law jurisdiction such as the Cameroon court, witnesses are not required to appear in person and their testimony can be incorporated on submission of counsel. Memorandum Opinion 17-18. Thus, Roger Tchoufa's testimony can be taken in the United States or elsewhere and submitted in the proceeding in Cameroon. In this respect, the situation here is at least as compelling as that in *Irwin v. World Wildlife Fund, Inc.*, 448 F.Supp.2d 29, 33 (D.D.C. 2006), which Plaintiffs attempt to distinguish (Mem. 7-8). In *Irwin*, the plaintiff herself would have been at serious risk of medical complications, or death, in traveling to Gabon to testify, but defendants agreed to permit her testimony to be taken in her home country (Scotland) for use in the lawsuit in Gabon. Mr. Tchoufa's testimony can be taken and offered in the same manner. Plaintiffs are already represented by counsel in Cameroon who has already brought an action on their behalf against Defendants in the High Court of Yaoundé. Moreover, there is no barrier to MBI's principal owner, John Kamya, traveling to or appearing in court in Cameroon, or having his testimony taken elsewhere and submitted in the proceeding in Cameroon.

The Court correctly determined that Mr. Tchoufa's absence from Cameroon does not disqualify Cameroon as an adequate alternative forum, and Plaintiffs have provided no valid support for reconsideration of that ruling.

**CONCLUSION**

Plaintiffs have shown no reason why the Court should vacate its *forum non conveniens* dismissal, or reconsider, alter or amend its judgment or order. Plaintiffs' motion must be denied.

Respectfully submitted,

_/s/ Knox Bemis_

Knox Bemis  #14852
Dewey & LeBoeuf LLP
1101 New York Avenue, N.W.
Suite 1100
Washington, DC  20005-4213
(202) 346-8035
(202) 956-3230 (Fax)

July 18, 2008

11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|                                                      |     |                    |
| ---------------------------------------------------- | --- | ------------------ |
| MBI Group, Inc., *et al.,*                           | :   |                    |
|                                                      | :   |                    |
| *Plaintiffs,*                                        | :   |                    |
|                                                      | :   |                    |
| v.                                                   | :   | 1:07-cv-00637-JDB  |
|                                                      | :   |                    |
| Crédit Foncier du Cameroun,                          | :   |                    |
|                                                      | :   |                    |
| and                                                  | :   |                    |
|                                                      | :   |                    |
| The Government of the Republic of Cameroon,          | :   |                    |
|                                                      | :   |                    |
| *Defendants.*                                        | :   |                    |

---

## DECLARATION OF AKERE T. MUNA

AKERE T. MUNA declares pursuant to 28 U.S.C. § 1746:

1.  I am a lawyer admitted to practice before the courts of Cameroon, including the High Court of Yaoundé. I am the Managing Partner of the law firm of Muna, Muna & Associates, and my office address is 724-742 Rue de Narvick, Yaoundé, Cameroon. I am also a Barrister-at-Law and a member of Lincoln's Inn, London. I am a Past President of the Cameroon Bar Association and at present the President of the Pan African Lawyers Union. I am the Vice Chair of Transparency International, a Member of the Council of the International Anti Corruption Conference (IACC), a former Member of the National Law Reform Commission of Cameroon, a Member of the Standing Committee of the African Union, and a Member of the High Level Panel of the 2007 Audit of the African Union.

2.      In the course of my practice, I have represented both plaintiffs and defendants in lawsuits before the High Court of Yaoundé, and I have represented both Cameroonian and foreign individuals and corporations before that Court. I am familiar with the procedures governing lawsuits in the High Court of Yaoundé.

3.      I am familiar with the above-captioned lawsuit, i.e., *MBI Group, Inc., and Atlantic Group, SCI v. Crédit Foncier du Cameroun and the Government of the Republic of Cameroon*, Civil Action No. 07-0637(JDB), U.S. District Court for the District of Columbia (referred to herein as the "U.S. lawsuit"). I am familiar in particular with the April 4, 2007 Complaint of MBI Group, Inc., and Atlantic Group, SCI (referred to herein as "Plaintiffs"), the June 10, 2008 Memorandum Opinion and Order of the Court, and the Plaintiffs' June 24, 2008 Motion to Vacate Dismissal because of Failure of Conditions and for Reconsideration and to Alter or Amend Judgment and Order (referred to herein as the "Motion"), and the Memorandum and Declarations in support of the Motion.

4.      Among the Declarations in support of the Motion is that of Jules Nkana, who states that he is an attorney practicing law in the Republic of Cameroon. Mr. Nkana states that on June 24, 2008, he submitted for filing in the Civil Court in Yaoundé, Cameroon, a Complaint on behalf of Plaintiffs (i.e., the same Plaintiffs as in the U.S. lawsuit) against Crédit Foncier du Cameroun and the Government of the Republic of Cameroon (i.e., the same defendants as in the U.S. lawsuit) (referred to herein as the "Defendants"). Mr. Nkana states that

the Complaint he submitted for filing is in all material respects the same as the Complaint filed by Plaintiffs in the U.S. lawsuit. (This lawsuit filed on June 24, 2008, by Mr. Nkana is referred to herein as the "Cameroon lawsuit.") Mr. Nkana states also that the Chief Court Clerk informed him that for the case to be accepted for filing and for the case to proceed, Plaintiffs would be required to pay a fee equal to 5% of the amount claimed, CFA 205,000,000,000 (equivalent to approximately US$500 million), or a fee of CFA 10,250,000,000 (equivalent to approximately US$24.4 million).

5.     The court in which Mr. Nkana submitted the Cameroon lawsuit is the High Court of Yaoundé, Cameroon (i.e., the "Tribunal de Grande Instance de Yaoundé"). In submitting the Cameroon lawsuit, Plaintiffs caused a Writ of Service to be issued for service upon Defendants. The indicated Writ was served upon Crédit Foncier du Cameroun on June 24, 2008 for appearance on July 9, 2008, and a copy of the Writ so served is appended to this Declaration as Exhibit A. The Writ (which is in French, the language of the High Court of Yaoundé) contains allegations and claims that are the same in all material respects as the Plaintiffs' allegations and claims in their Complaint in the U.S. lawsuit.

6.     I have been retained by the Defendants to represent them in the Cameroon lawsuit before the High Court of Yaoundé.

7.     The fee ordinarily required to file a lawsuit such as Plaintiffs' in the High Court of Yaoundé is CFA 60,000 (equivalent to approximately US$140). Section 24 of the Cameroon Civil Procedure Code also requires that on the

filing of a suit such as Plaintiffs', the plaintiff deposit an amount sufficient to meet the payment of the registration and stamp tax that is due when a judgment is rendered. The Cameroon Tax Code fixes a tax on judgments obtained at 5.25 % of the amount awarded in the judgment. The court registry automatically requests the payment of a deposit on the filing of a suit, which it usually calculates on the basis of 5.25% of the amount claimed. Because Plaintiffs state that they seek to recover CFA 205,000,000,000 (equivalent to approximately US$500 million), such a deposit would (as Mr. Nkana states) amount to approximately CFA 10,250,000,000 (equivalent to close to US$25 million).

8.    However, a plaintiff that brings a claim for damages in a large amount typically requests deferral or other relief from the amount of the deposit. For example, the High Court of Yaoundé may defer the deposit so that the tax is assessed and paid at the conclusion of the lawsuit. Under this procedure, the tax is calculated only on the amount, if any, of the plaintiff's recovery. If there is no recovery, there is no amount due. If the recovery is less than the amount claimed, the tax is based on the amount of the recovery, not the total amount claimed.

9.    Counsel for Plaintiffs made no apparent effort whatsoever to obtain the benefit of a procedure such as that described in the preceding paragraph. Instead, Plaintiffs' counsel merely sought a letter from the Court Registrar to support Plaintiffs' assertion that their lawsuit could not be filed.

10. In its June 10, 2008 Memorandum Opinion, the U.S. Court, on Defendants' motion, dismissed Plaintiffs' U.S. lawsuit on the ground of *forum non conveniens*. In doing so, the U.S. Court "condition[ed] dismissal upon defendants' submitting to jurisdiction in Cameroon and on the Cameroonian courts' acceptance of the case." Slip Op. 18.

11. It is the position of the Defendants that the appropriate forum for the resolution of the lawsuit is the Cameroonian court system, and in particular the High Court of Yaoundé. To that end, the Defendants have submitted to the jurisdiction of the High Court of Yaoundé in the lawsuit filed by Plaintiffs on June 24, 2008 in that Court, i.e., the Cameroon lawsuit. The Defendants will not contest the jurisdiction of the High Court of Yaoundé over them in the Cameroon lawsuit, or over the Cameroon lawsuit itself.

12. Defendants believe that the lawsuit should be resolved by the Cameroonian courts and that the deposit with respect to the registration and stamp tax should not be permitted to be asserted as a barrier to the acceptance of the case by the High Court of Yaoundé. Additionally, Defendants have an interest in Plaintiffs' lawsuit being accepted for filing in the High Court of Yaoundé because Defendants have counterclaims they intend to assert in such a lawsuit. Accordingly, on behalf of the Defendants, I asked the High Court of Yaoundé to adopt the procedure described in Paragraph 8 above to accept Plaintiffs' lawsuit for filing upon deferral of the deposit until the termination of the lawsuit, at which time the fee would be calculated on the amount of the damages, if any, actually awarded. Under this procedure, the second part of

the U.S. Court's condition ("the Cameroonian courts' acceptance of the case") can be fulfilled without the deposit by Plaintiffs of the equivalent of US$25 million.

13.    On 15 July 2008, the High Court of Yaoundé granted the motion to permit the filing of Plaintiffs' lawsuit.  A copy of the Defendants' motion and the order of the High Court of Yaoundé is appended hereto as Exhibit B.  In accordance with the order, Plaintiffs' lawsuit has been accepted for filing by the High Court of Yaoundé.  Plaintiffs will be required to pay only the nominal minimum fee of approximately CFA 60,000 (equivalent to approximately US$140).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 18, 2008.

_____

Akere T. Muna

**ASSIGNATION EN PAIEMENT**

L'an deux mil huit

Et le *vingt-quatre juin à 13h 15 minutes*

A la requête de la société MBI Group, inc. dont le siège social est situé au 7200 Wisconsin Avenue, Suite 702 Bethesda, Maryland 20814 et la société Atlantic Group SCI, dont le siège social est à Douala, sis 40 rue Gallieni, agissant poursuites et diligences de leurs représentants légaux respectifs ;

Lesquelles ont pour conseil Maîtres Philip M. MUSOLINO sis au 1615 L, Street, NW. Suite 440 Washington, D.C. 20036 & Sylvia J. ROLINSKI, sis 14915 River Road, Potomac, Maryland 20854, lesquels font élection de domicile au cabinet de Maître Joseph Jules NKANA, Avocat au Barreau du Cameroun, BP : 7001 Yaoundé tel : (237) 223 42 65 ;

J'ai, Maître *Ngo Bakeng Jeanne* Huissier de justice près la Cour d'Appel du Centre et les tribunaux d'instance de Yaoundé, y demeurant, domicilié et soussigné ;

**DONNE ASSIGNATION A :**

1-Le Crédit Foncier du Cameroun dont le siège Social est à Yaoundé, sis Boulevard du 20 Mai, BP : 1531 Yaoundé, pris en la personne de son représentant légal en ses bureaux où étant et parlant à : *Secrétariat de la Direction du recouvrement qui reçoit copie des présentes pour transmission et vise en marge de l'original*

2- L'Etat du Cameroun représenté par Monsieur le Ministre de l'Economie et des Finances, en son cabinet où étant et parlant à :

D'avoir à se trouver et comparaître le *09 juillet* 2008 à 7 heures 30 minutes par devant Monsieur le Président du Tribunal Grande Instance du Mfoundi, statuant en matière civile et commerciale en la salle ordinaire de ses audiences sise au palais de justice de la dite ville ;

**POUR**

Attendu que la société MBI Group Inc. a pour objet entre autre la conclusion et l'exécution des transactions immobilières dans le district de Columbia ;

1

Que la société ATLANTIC Group, filiale du MBI Group, a également pour objet la conclusion et l'exécution. des transactions immobilières, la construction des bâtiments et autres travaux publics ;

Attendu que la société MBI Group a conçu et développé un projet et un modèle de construction, de marketing, d'opération et de vente d'habitats modernes à des coûts abordables dans les régions et pays ayant une offre insuffisante ou limitée en matière de logements sociaux, programme dénommé (« MBI affordable Housing Program »);

Qu'en 2002, le gouvernement Américain a annoncé la création du programme « Millenium Challenge Corporation » en abrégé « MCC », lequel détermine les nations pouvant bénéficier de l'aide du gouvernement Américain sur la base de ses performances à lutter contre la corruption et à sauvegarder la bonne gouvernance ;

Qu'en 2003, le Gouvernement Américain a crée le marché Africain d'hypothèque dénommé « the U.S initiative » en vue d'assister et de palier l'insuffisance des capitaux en Afrique destinés au développement de d'habitat ;

Que c'est ainsi que l'agence internationale privée Américaine d'investissements (the United State Overseas Private Investment Corporation) en abrégé « OPIC » a été désignée pour piloter à travers le « MCC » et « the US Initiative » en concours avec les Africains pour le développement d'un marché robuste d'habitat avec pour objectif de redynamiser la micro finance et d'encourager le marché des capitaux locaux ;

Qu'afin de réaliser des projets de logement sociaux en Afrique et ailleurs, l'OPIC est entrée en pourparlers avec les investisseurs Américains;

## SUR LES DECLARATIONS DU CREDIT FONCIER

Attendu qu'en novembre 2003, le Crédit Foncier à travers son directeur général d'alors sieur Joseph EDOU a approché le MBI et a sollicité sa participation dans le développement et l'implantation à des prix abordables d'un programme d'habitat social au Cameroun ;

Que le Crédit Foncier a affirmé dans ses premières déclarations au MBI Group en Décembre 2003 à Yaoundé que :

« a-) le Cameroun souffre d'un déficit de plus 600 000 logements ;

a) Il (le Crédit Foncier) a, détient, possède et exerce le contrôle sur des fonds nécessaires pour pourvoir à des prêts avec affectation hypothécaire à plus de 5000 acheteurs ;

2

b)    Il confirme qu'il y a plusieurs personnes éligibles pour acheter des maisons ;

c)    Le Cameroun est confronté à l'insuffisance ou l'inexistence de nouvelles constructions de maison à de prix abordables;

d)    Son intention d'entrer dans une relation contractuelle avec une entité qui doit servir de catalyseur et entreprendre l'étude de marché en vue de réaliser un programme de logement à des prix abordables qui doit s'étendre dans plusieurs villes du Cameroun ;

e)    Il manifeste sa préférence pour le financement et le soutien pour un projet d'habitat social par des agences telles que l'OPIC et l'International Finance Corporation (« IFC ») ;

f)    Il a compris qu'un soutien financier émanant de l'« OPIC » nécessite une participation financière substantielle de la part d'un organisme Américain;

g)    Il a compris que pour attirer un soutien financier émanant des organismes comme l'OPIC, IFC, il doit commencer avec succès un projet d'habitats sociaux et que les organismes tels que l'OPIC, IFC devraient pourvoir au financement pour l'extension de tels projets;

h)    Enfin Il a compris que pour le succès du projet, les parties doivent traiter le projet comme une affaire commerciale profitable, par une industrie aux normes standard ;

Attendu que suite à ces déclarations du Crédit Foncier, les agents du MBI ont séjourné en janvier et en février 2004 au Cameroun pour investiguer et évaluer le potentiel de l'habitat social à proposer au Cameroun ;

Que le 27 février 2004, à la demande du Crédit Foncier, MBI Group lui a fait une manifestation formelle d'intérêt, indiquant en détail et par anticipation les conditions de participation du Cameroun au dit projet ;

Que ces propositions incluaient la construction de 100 à 1200 logements dans la capitale Yaoundé dans sa phase initiale et moyennant la Participation financière du Crédit Foncier et la mise en disponibilité de terrain à cet effet ;

Qu'à la même date, le Crédit Foncier a accepté cette proposition et indiqué au MBI Group qu'il adhérait à ses critères et l'a autorisé à projeter ;

Les plans de masses, évaluer le coût du projet et des travaux, et préparer des études architecturales et techniques ;

3

A la fin de cette rencontre le MBI Group a contacté la firme Sud Africaine SIVEST et ATELIER & ASSOCIATES pour solliciter leur participation dans ledit projet;

Les deux sociétés acceptèrent de participer avec MBI Group au dit projet, particulièrement celui de la phase I de Yaoundé ;

Attendu qu'en date du 24 mars 2004, la société ATLANTIC Group fut créée en vue de participer au développement de l'habitat social par la réalisation de la phase I du projet à Yaoundé ;

Qu'à cette même pour préparer les plans de masse, les études topographiques, géologiques, architecturales et techniques pour le projet initial de logements le Crédit Foncier et la société MBI Group ont retenu la société Sivest laquelle s'est associé la société ATELIER ;

Que courant mars 2004, les sociétés requérantes ont engagé d'autres compagnies pour effectuer les études d'évaluation du sous sol, du terrain, d'ingénieries, technique et structurales y inclus celles hydrauliques, d'évacuation sanitaires, de drainage, d'électrifications et de routes pour le projet ;

## SUR LA NEGOCIATION ET DE LA RATIFICATION DES ACCORDS POUR LE PREMIER PROJET

Attendu que par correspondance en date du 11 mai 2004, Monsieur le Directeur du Crédit Foncier indiquait aux requérantes que son organisme disposait de plus de 50 millions de dollars pour la construction de 200 logements, et était préparé à pourvoir un financement additionnel de 10 000 logements ;

Que le Crédit Foncier a ensuite demandé aux requérantes de confirmer leurs intentions d'exécuter le projet test de 200 unités dans la fourchette de prix indiqué ;

Qu'il a également demandé aux requérantes de lui confirmer que pour le succès de ce projet, leur groupe, ils désigneront et signeront des contrats avec le constructeur, le gestionnaire du projet, et ou tout autre consultant, en conformités aux régulations pertinentes, selon les modalités de compensation définies et acceptées par les parties ;

Qu'aux environs du 9 Mai 2004, Monsieur le directeur général du Crédit Foncier a séjourné aux USA pendant deux semaines dans le but de faciliter le projet de logement du Cameroun, y inclus la phase 1 de Yaoundé et son extension ;

4

Que pendant ce séjour, la société MBI a permis au directeur général et sa délégation de  visiter et d'inspecter plusieurs logements construits dans la métropole de WASHINGTON DC ;

Qu'au cours de ce même voyage, la société MBI Groupe a introduit le directeur général du Crédit Foncier et de sa délégation auprès des responsables de l'OPIC, des  départements d'Etat en charge d'habitat et du développement Urbain, du Trésor, et division internationale de l'OPIC;

Attendu qu'en date du 18 mai 2004, un accord a été signé  à Bethesda Maryland entre le Crédit Foncier, Atlantic Group et la société MBI dénommé « l'accord  de mai 2004 » **(pièce 1)** ;

Que cet accord de mai 2004 s'est appesanti sur les points suivants :

a)   le développement du projet de Yaoundé (phase 1 et ses extensions) au financement évalué à  la somme d'environ $ US 49 000 000 00, soit environ 20 090 000 000 FCFA assorties de  toutes  les  garanties  de  financement nécessaires à sa réalisation;

b)   l'octroi par le Crédit Foncier du terrain sur lequel devrait être construits 1 100 logements de prix moyen ;

c)   l'acceptation de financements par voie d'hypothèque pour permettre l'achat de 1 100 logements  pour la phase I de Yaoundé et ;

d)   l'identification d'un potentiel de plus de 50 000 acheteurs de logements ;

Qu'en outre  cette convention disposait, entre autres, clauses que :

« Les sociétés ATLANTIC Group et MBI Group seront responsables de la sélection et de la supervision des partenaires et du consultant du projet de logement. En outre, ATLANTIC Group et MBI Group seront responsables de la sélection du premier maître d'ouvre qui délivrera 1100 logements  clés à mains (y inclus le développement des infrastructures) ;

MBI Group et Atlantic Group exécuteront les études de faisabilité pour le projet de logement (y inclus mais pas limité à la préparation du plan de masse, des études géologiques, structurelles, et les plans de construction etc....) et auront le rôle de développeur ;

Que les parties à cet accord agiront de bonne foi et doivent se conformer à toutes les dispositions de cette convention. Que l'inexécution des obligations de chacune des parties, ou l'inexécution  de bonne foi, entraînera une compensation pour des pertes directes ou indirectes  ou conséquentes de quelque manière ou de quelque sortes qu'ils soient à la partie (s)  qui en subira un préjudice » ;

Attendu qu'à cette même date du 24 mai 2004, les requérantes ont entamé des discussions avec la société Group Five International, agissant

5

comme agent de Group Five Construction (Pty) Ltd ci- après dénommé (« Group Five ») ;

Attendu que la société Group Five est de notoriété publique une société de droit sud Africain s'occupant des Bâtiments et Travaux publics avec un chiffre d'affaire annuel d'environ cinq cent millions de dollars ($ US 500 000 000.00) ;

Qu'immédiatement après la ratification de l'accord de Mai 2004, et en conformité avec celle- ci, les requérantes ont retenu la société Group Five pour exécuter les études de pré- construction du projet et de préparer une estimation du coût détaillé ;

Attendu qu'au même mois de Mai 2004, les requérantes, les sociétés Sivest, Atelier et Group Five, ont initié et exécuté les études de faisabilité concernant la préparation de plan de masse, des études topographiques et géologiques, architecturales et techniques, de conception et des travaux projet initial de logement ;

Attendu qu'en date du 17 novembre 2004, la société Atlantic Group a remis au Crédit Foncier, en application de l'accord de Mai 2004, les documents relatifs aux études ci-dessus visés ;

Que le Crédit Foncier avait sollicité des modifications de certain de ces documents ;

Attendu que les sociétés Atlantic Group et MBI Group ont promptement et dans les délais réalisé les dites modifications ;

Que date du 8 décembre 2004, la société Atlantic Group a remis en mains propres au Crédit Foncier en conformité avec l'accord de Mai 2004, et les modifications sollicitées par le Crédit Foncier au document de plan de novembre 2004, des documents relatifs aux études de faisabilité, y inclus mais pas limités à la préparation du plan de masse, des études topographiques et géologiques, architecturales et techniques, de conception et des travaux y relatifs et autre travaux sur le projet initial de logement et les études de développement ci - après désigné « les documents de plan de décembre 2004 » ;

Que les documents de plan de décembre 2004 prévoyaient la construction de 1034 logements sur 102 hectares de terrain, y inclus les routes et des aires communes ;

Que le Crédit Foncier a approuvé les documents de plan de décembre 2004 ;

6

Qu'aux environs du 18 janvier 2005, la société Atlantic Group et Group Five ont ratifié la convention de la fédération internationale des ingénieurs conseils (FDIC) pour des travaux d'ingénieries pour la construction de 1034 logements à Olèmbe II, une banlieue de Yaoundé pour un montant d'environ $ US 21 440 223 00 (vingt un millions quatre cent quarante milles deux cent vingt trois dollars US dénommé « Yaoundé phase 1 convention FIDIC) ;

Qu'un représentant du Crédit Foncier a assisté à la signature de la phase 1 de la convention FIDIC de Yaoundé qui prévoit:

« Le Crédit foncier en accord avec les partenaires appropriés vont opérer comme l'employeur du partenaire financier. L'employé du financier donnera des facilités financières directement au cocontractant et le payement garanti à une banque de première classe de renommé internationale acceptable par la société Group Five et assumera la responsabilité de faire le payement directement entre les mains du cocontractant suivant les termes de cette convention pour toutes les sommes détaillées dans le document de plan y annexé ;

Que la phase 1 de la convention FDIC de Yaoundé disposait également, entre autres, que la société Group Five sera payé en avance (« l'acompte de Group Five ») au montant de 20% de la valeur totale du contrat, et Group Five en échange va délivrer au Crédit Foncier, désigné comme le « le financier » un acompte garanti au Crédit Foncier par une société mère de groupe Five en garanti d'exécution ;

Attendu qu'en janvier 2005, la société Group Five, en conformité avec la phase 1 de la convention FDIC de Yaoundé a offert au Crédit Foncier une garantie du payement d'un acompte d'un montant de $ US 4 750 000. 00 (quatre millions sept cent cinquante mille dollars US) représentant 20% des travaux;

Qu'en avril 2005, en application de l'accord de Mai 2004, et de la phase 1 de la convention FDIC de Yaoundé, le Crédit Foncier a libéré cet acompte;

Attendu qu'en date du 11 Mai 2005, en exécution de la phase 1 de la convention FDIC de Yaoundé, et suite à la réception de l'acompte, la société Groupe Five a pourvu au Crédit Foncier une garantie financière de ses filiales en garantie du montant total du contrat;

Qu'en juin 2005, la société MBI a organisé une réunion pour le Crédit Foncier à Washington et à Bethesda, Maryland, avec les hauts cadres de l'OPIC, l'IFC, le bureau national de l'association d'hypothèques (GNMA) du HUD, et la division internationale du département du Trésor des Etats-Unis, pour sécuriser le soutien financier du gouvernement des Etats-Unis pour l'extension du projet Camerounais ;

Qu'en date du 24 juin 2005, le Crédit Foncier déclarait par écrit aux requérantes ce qui suit :

a)  le Crédit Foncier reconnaît et prend acte du « travail assidu et l'investissement pour permettre que des logements sociaux massifs devienne une réalité au Cameroun, commençant par la réalisation de 1034 logements actuellement en cours à Yaoundé » ;

b)  qu'il y a actuellement un déficit de 600 000 logements sociaux au Cameroun ;

c)  que le Crédit Foncier dispose de fonds suffisant pour 5000 à 6000 logements envisagés par le projet du Cameroun au delà des quatre années à venir ;

d)  que les revenus additionnels disponibles au Crédit Foncier devront suffire pour des financements des prêts hypothécaires pour un surplus 2000 logements contemplés par le projet du Cameroun et ;

e)  que le Crédit Foncier donnera son support entier aux efforts des requérantes pour obtenir le financement international pour la construction des logements sociaux pour lesquels le Crédit Foncier trouvera des garanties hypothécaires ;

Attendu qu'en date du 24 juin 2005, le Crédit Foncier a réitéré ses obligations par écrits à savoir :

a)  de pourvoir des crédits hypothécaires pour des acheteurs sélectionnés pour l'ensemble des logements construits par la société Atlantic Group ;

b)  de donner à la société Atlantic Group une liste de 50 000 personnes qualifiées et éligibles pour l'achat des logements ;

c)  de disposer des financements hypothécaires pour 5000 à 6000 logements variant de $ US 25 000 000 à $ US 55 000 000 pour les trois à quatre années à venir ;

Qu'en date du 23 juillet 2005, au cours d'une cérémonie publique, le Crédit Foncier a remis aux requérantes et à la société Group Five 102 hectares de terrain pour la construction et la finition de la phase 1 du projet de Yaoundé ;

Qu'en date du 9 août 2005, le Crédit Foncier à travers ses mandataires, a explicitement approuvé par écrit la conception et le plan de construction de la phase 1 du projet à Yaoundé ;

## SUR LA NEGOCIATION ET LA RATIFICATION DE L'ACCORD D'EXTENSION

Attendu qu'en date du 15 juillet 2005, les requérantes et le Crédit Foncier ont signé un accord d'extension du projet Camerounais dénommé « l'accord de juillet 2005 » (pièce 2);

8

Que cet accord de juillet 2005 dispose entre autres que :

a)    le Crédit Foncier sera le financier par voie d'hypothèque pour la construction et la vente de 1200 logements à Yaoundé en extension de la phase 1 du projet de Yaoundé   dénommé la « phase II du projet de Yaoundé » ;

b)    que le Crédit Foncier devra pouvoir à tous les prêts alloués aux acheteurs sélectionnés assortis de garantie hypothécaire;

c)    que le Crédit Foncier devra mettre à la disposition de la société Atlantic Group la liste de plus de 50 000 acheteurs éligibles ;

d)    que le Crédit Foncier  confirme la disponibilité des fonds assortis de garantie hypothécaires  pour au moins 5000 à 6000 logements dont le prix varie entre US dollars 25 000 à 55 000 au delà de quatre années  et mettra à la disposition des acheteurs des fonds garantis pour toutes les unités des logements de la phase II du projet ;

e)    que les requérantes garantiront l'approvisionnement des financements internationaux pour le projet ;

f)    que la société Atlantic Group trouvera du terrain pour la phase II du projet de Yaoundé ;

g)    que la société Atlantic Group engagera la société en charge de la construction de la phase II du projet de Yaoundé et ;

h)    que chaque partie fera montre du plus grand degré de bonne foi ;

Attendu qu'une convention sera signée en date du 11 juillet 2005 entre la société Group Five, les sociétés  requérantes en exécution duquel Group Five devra démarrer les travaux de construction de la phase II du projet de Yaoundé ;

Qu'en date du 28 juillet 2005, en conformité avec l'accord de juillet 2005, les requérantes ont soumis à l'OPIC à Washington 250 pages de demande de financement pour la construction du projet de Yaoundé phase II ;

Que cette demande correctement projetée en conséquence du projet de Yaoundé phase II a une augmentation significative d'emploi aux Etats-Unis  et une  augmentation significative de la circulation des fonds du Cameroun vers les Etats-Unis annuellement ;

Attendu qu'en date du 11 août 2005, les requérantes et le Crédit Foncier ont signé un accord qui faisait encore une extension du projet du Cameroun (l'accord d'août 2005) **(pièce 3)** ;

9

**Exhibit A**

Attendu que la dite convention d'août 2005 dispose entre autre ce qui suit :

a)    que le Crédit Foncier sera le financier au moyen d'hypothèques pour la construction et la vente de 200 logements à Douala (la phase III du projet, Douala).

b)    que le Crédit Foncier devra pouvoir à tous les prêts alloués aux acheteurs sélectionnés assortis de garanties hypothécaires;

c)    que le Crédit Foncier devra mettre à la disposition de la société Atlantic Group la liste de plus de 50 000 acheteurs éligibles ;

d)    que le Crédit Foncier confirme la disponibilité des fonds assortis de garantie hypothécaires pour au moins 5000 à 6000 logements dont le prix varie entre US dollars 38 000 à 65 000 au delà de quatre années et mettra à la disposition des acheteurs des fonds garantis pour toutes les unités de logement de la phase III du projet ;

e)    que les requérantes garantiront l'approvisionnement des financements internationaux pour le projet ;

f)    que la société Atlantic Group trouvera du terrain pour la phase III du projet à Douala;

g)    que la société Atlantic Group engagera la société en charge de la construction de la phase III du projet à Douala ;

h)    que chaque partie fera montre du plus grand degré de bonne foi ;

Attendu qu'une convention sera signée en date du 11 août 2005 entre la société Five Group, les sociétés requérantes en exécution duquel Group Five devra démarrer les travaux de construction de la phase III du projet à Douala;

Qu'en date du 22 septembre 2005, en exécution de l'accord d'août 2005, les requérantes ont soumis à l'agence multilatérale de garantie d'investissement (« MIGA ») de la Banque une demande préliminaire de garantie pour financement pour la phase III du projet de Douala;

Attendu qu'en date du 23 septembre 2005, MIGA en réponse écrira que « vos investissements apparaissent être éligible à la garantie MIGA, en conséquence je vous délivre un avis d'inscription » pour la phase II du projet à Douala ;

10

## SUR L'EXECUTION DU CONTRAT PAR LES REQUERANTES ET LES VIOLATIONS DU CONTRAT PAR LES REQUIS

Attendu qu'en Mai 2004, les requérantes ont diligemment et promptement commencé et exécuté tous les travaux à eux imposés par la convention de Mai 2004 ;

Qu'en juillet 2005, les requérantes ont diligemment et promptement commencé et exécuté tous les travaux à eux imposés par la convention de Juillet 2005 ;

Qu'en août 2005, les requérantes ont de la même manière diligemment et promptement commencé et exécuté tous les travaux à eux imposés par la convention d'août 2005 ;

Attendu que pour la phase I du projet à Yaoundé, les demanderesses ont, entre autres, outre les affirmations ci-dessus, ponctuellement signé des contrats relatifs aux constructions avec plusieurs sociétés, fait les arrangements nécessaires pour l'importation de matériel spécialement destinés à la construction ; négocié l'arrivée au Cameroun des ingénieurs en bâtiment, et, recruté environ 200 employés ;

Attendu que pour la phase II du projet à Yaoundé, les demanderesses ont, entre autres, outre les affirmations ci-dessus et en septembre 2005, signé des contrats d'acquisition de terrains nécessaires pour le projet de Yaoundé phase II ;

Attendu que pour la phase III du projet à Douala, les demanderesses ont, entre autres, entamées les négociations en vue d'acquisition de terrains nécessaires et signé plus d'un contrat de construction ;

Attendu qu'en septembre 2005, monsieur Joseph EDOU a été limogé de son poste de directeur général du Crédit Foncier et remplacé par sieur Camille EKINDI ;

Que le 27 septembre 2005, monsieur Roger TCHOUFA de la société Atlantic Group et MBI ont rencontré Monsieur EKINDI pour discuter du projet et en particulier de la phase I de Yaoundé ;

Qu'en date du 29 septembre 2005, sieur EKINDI a indiqué à Roger TCHOUFA qu'il a reçu des « instructions » de n'entreprendre aucune action pour la réalisation de la phase I du projet de Yaoundé sans l'approbation des autorités gouvernementales tout en se réservant de révéler l'identité desdites autorités;

Qu'aux environs du 3 octobre 2005, sieur TCHOUFA a appelé sieur EKINDI pour arranger l'acheminement des documents et du matériel en douane ;

Que ce dernier lui a répondu qu'il a les documents, mais doit préalablement informer certaines personnes dans le gouvernement camerounais avant de prendre toute décision ;

Qu'en date du 11 octobre 2005, sieur TCHOUFA a une fois de plus rencontré sieur EKINDI en particulier au sujet de la phase I du projet à Yaoundé et sur les actions à entreprendre, y inclus l'échéance de retrait des fonds du Crédit Foncier ;

Que sieur EKINDI a une fois de plus répondu qu'il ne pouvait aucune action tant qu'il n'a pas reçu les instructions de certaines autorités Camérounaises ;

Attendu que sieur TCHOUFA a fait remarquer  que le Crédit Foncier était lié par ses obligations contractuelles ;

Mais attendu que sieur EKINDI lui rétorqué que le contrat dont s'agit, en particulier celui de la phase I à Yaoundé était un bon projet, mais qu'au Cameroun les personnes de droit privé devaient prendre en considération l'intérêt des autres ;

Que la non prise en compte de ce paramètre a entraîné la chute de sieur EDOU tout en ajoutant que chaque projet doit avoir un « parrain » ;

Attendu que les demanderesses ont refusé d'offrir, de payer, de participer ou de se laisser aller à la corruption ;

Attendu que chacune des demandes des requérantes étaient bien dans le cadre des pouvoirs et des responsabilités du Crédit Foncier ;

Attendu qu'en date du 21 octobre 2005, sieur EKINDI a informé les demanderesses que les défendeurs réduisaient unilatéralement la portion de terrain disponible pour la phase I qui passa de 102 hectares à 70 Hectares ;

Attendu que le Crédit Foncier a de manière unilatérale et sans justification prévue au contrat, relativement au projet de Yaoundé phase I de demander une nouvelle étude entière et complète, allant de la réalisation d'un plan de masse, de la conception architecturale et structurale, d'ingénieries à la réaffectation du personnel expatriés  déjà au Cameroun pour ce projet ;

Attendu que la réduction de la superficie du terrain allouée à la phase I du projet de Yaoundé constitue une violation substantielle de l'accord de Mai 2004 ;

Attendu que la demande de changement faite par le Crédit Foncier sur la phase I du projet de Yaoundé constitue une violation matérielle de la l'accord de Mai 2004 ;

Que les violations répétées du contrat et la demande des changements imposés par le Crédit Foncier a occasionné une augmentation significative des coûts, dépenses et délai ;

Attendu toutefois que les demanderesses se sont engagées à répondre favorablement aux changements sollicités ;

Attendu qu'en date du 26 octobre 2005, les demanderesses ont reçu un terme de référence préliminaire de l'OPIC pour une somme de US dollars de 10 millions de prêt en revolving pour le financement de la construction de la phase II du projet de Yaoundé ;

Attendu que par correspondance en date du 28 octobre 2005, la société Atlantic Group a indiqué au Crédit Foncier que les changements par lui sollicités sur la phase I du projet de Yaoundé devaient coûtés la somme de US dollars 1 300 000 (un million trois cent mille dollars) et nécessiteront des mois de travail ;

Qu'en date du 3 novembre 2005, sieur TCHOUFA a eu une rencontre avec sieur EKINDI à son cabinet et, ce dernier a insisté que les modifications soient effectuées ;

Que par correspondance en date du 10 novembre 2005, les requérantes ont interpellé le Crédit Foncier sur les conséquences que leur causaient les diverses violations du contrat notamment l'augmentation des coûts, dépenses et retard;

Attendu qu'autour du 20 novembre 2005, sieur TCHOUFA a indiqué à sieur EKINDI que la non exécution des demandes émanant des douanes rendait impossible la livraison du matériel d'équipement sur le site de construction ;

Que celui ci lui a répondra qu'il connaissait ce qu'il pouvait faire pour l'aider à soutenir la poursuite du projet ;

Attendu qu'en date du 7 décembre 2005, les requérantes ont organisé une rencontre avec les responsable de l'OPIC à Washington, un responsable de l'ambassade des Etats-Unis au Cameroun, un responsable des sociétés requérantes et sieur EKINDI ;

Que cette rencontre s'est tenue au siège du Crédit Foncier et au cours de laquelle sieur EKINDI a déclaré :

a) que les requis reconnaissaient les conventions signées avec les requérantes, et étaient déterminées à les exécuter fidèlement ;

b) qu'il détenait le mandat pour le projet de logement du Cameroun ;

c) que les requis et lui devront supporter toutes les actions ou initiatives qui seraient conforme au projet de logement du Gouvernement Camerounais ;

d) que la phase I du projet de Yaoundé se déroulait sans aucune difficulté ;

e) que les modifications sollicitées par le Crédit Foncier étaient exécutées à sa satisfaction par les demanderesses ;

f) que le Crédit Foncier devait se conformer à toutes les conventions signées avec les demanderesses ;

g) que les défendeurs étaient honorés et enthousiastes par l'accord de l'OPIC à pourvoir le financement aux demanderesses pour la construction de la phase II du projet de Yaoundé ;

h) que le Crédit Foncier disposait d'un pool important de plus de 50 000 personnes éligibles d'acheteurs de maison ;

i) que le Crédit Foncier disposait d'un pool de fond capable d'avoir d'hypothèque pour le projet du Cameroun et ;

j) qu'il y avait un déficit sévère de logements sociaux au Cameroun ;

Mais attendu que par correspondance en date du 12 décembre 2005, le Crédit Foncier a sans aucune explication ou justification, instruit les requérantes de cesser tous travaux sur le site de la phase I du projet de Yaoundé, et menaçant d'utiliser tout moyen disponible pour faire cesser les travaux des requérantes sur la phase I du projet de Yaoundé ;

Attendu qu'en date du 20 décembre 2005, sieur TCHOUFA a eu une rencontre avec sieur EKINDI à son cabinet ;

Qu'au cours de cette rencontre EKINDI informa sieur TCHOUFA qu'il a reçu des instructions pour trouver un prétexte de résiliation du contrat de construction de logement au Cameroun et en particulier sur la phase I du projet à Yaoundé ;

Attendu que les requérantes ont immédiatement informé la société Groupe Five de la demande faite par les défendeurs ;

Qu'en décembre 2005, la société Groupe Five a, en conséquence des violations répétées des clauses de contrat ; de l'inconduite des requis, et en

14

application des instructions explicites de ces derniers, lesquels ont stoppé les travaux, résilié les contrats et commencé à faire rapatrié ses employés ;

Qu'entre décembre 2005 et février 2006, les requérantes ont fait tous les efforts raisonnables et prudents pour reprendre l'exécution du projet de logement du Cameroun et, en particulier pour la phase I de Yaoundé ;

Qu'à la date du 7 février 2007, les requérantes ont déposé au siège du Crédit Foncier plusieurs cartons de documents contenant les modifications sollicitées par le Crédit Foncier sur le projet de Yaoundé, lesquels documents incluaient la nouvelle conception de l'ensemble des 70 hectares de terrain, la réalisation d'un nouveau plan de masse, de nouvelles études architecturale et structurales, d'ingénieries, réassigner le personnel expatriés ;

Qu'en date du 15 février 2006 sieur TCHOUFA a eu une rencontre avec sieur EKINDI à son cabinet, lequel a admis que les requis n'avaient pas de base pour objecter sur le plan révisé, et que ces plans comme les précédents ont été approuvés par les autorités camerounaises compétentes en charge de développement foncier ;

Attendu que sieur EKINDI a informé sieur TCHOUFA qu'il n'y a avait pas d'espoir à ce que le projet de logement du Cameroun et, en particulier celui de la phase I de Yaoundé connaisse une exécution ;

Que sieur EKINDI a également informé sieur TCHOUFA qu'il exécutait les instructions des autorités gouvernementales camerounaises ;

Attendu que sieur TCHOUFA a réitéré qu'il ne devrait autoriser aucun payement en guise de corruption ;

Attendu que ce dernier est retourné aux Etats – Unis en mars 2006 ;

Que le conseil des requérantes saisira par écrit les requis en compensation du préjudice dont elles ont souffert et du paiement des dommages et intérêts en ces termes :

« MBI décline de faire des spéculations ici concernant les motivations du comportement inexplicable et injustifié du Crédit Foncier, appart le fait de noter qu'un nouveau directeur Général et un conseil d'administration ont été désignés avant qu'intervienne les violations contractuelles sus - décrites et, note en outre qu'une telle conduite est conventionnellement associé aux pratiques malhonnêtes/indélicates et à la corruption » ;

Attendu qu'en août 2006, les autorités Camerounaise sans aucune raison ont fait arrêter la secrétaire de l'épouse de sieur TCHOUFA, l'ont détenu sans aucune charge/accusation pendant une semaine,

15

Que les mêmes autorités ont saisi les biens appartenant aux époux TCHOUFA et, sans aucune raison ont menacé de procéder à l'arrestation de certains membres de leurs familles y inclus un mineur ;

Qu'en septembre 2006, les autorités Camerounaise sans aucune raison ont fait arrêter un membre de la famille de sieur TCHOUFA et, sollicité de cette personne le payement de la somme de deux cent mille dollars US ($ 200 000. 00) en guise de corruption pour la libérer et abandonner les poursuites, tout en menaçant de mort les époux TCHOUFA si l'un d'eux retournait au Cameroun ;

Qu'en dépit des violations répétées des termes du contrat et l'inconduite des requis, les requérantes n'ont ménagé aucun effort pour voir le conflit réglé à l'amiable ;

Que ces efforts, y inclus la correspondance en date du 19 septembre 2006 sont restés vains ;

Que les requérantes ont souffert de pertes, dommages et préjudice du fait des requis

Que les pertes, dommages et préjudices s'étendent aux pertes de profits découlant de la transaction, coûts, dépenses et les obligations légales contractées, détournement et dommages des secrets commerciaux, des informations confidentielles, des pertes d'opportunités et des attentes commerciales ;

Que les requérantes ne peuvent bénéficier d'une justice équitable devant les tribunaux du Cameroun ;

## 1- DE LA VIOLATION DES TERMES DU CONTRAT

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique, les faits ci-dessus relatés ;

Attendu que le Crédit Foncier agissant tant pour son compte personnel que comme agent du Cameroun a signé l'accord de Mai 2004 avec les requérantes ;

Attendu que l'accord de Mai 2004 constitue un contrat synallagmatique ;

Attendu que les requérantes ont rempli leurs obligations nées de l'accord de Mai 2004;

16

Mais attendu que les requis et chacun d'eux pris individuellement ont/a violé les termes de l'accord de Mai 2004 ;

Que les requérantes et, chacun d'eux pris individuellement ont/a souffert des pertes, préjudices et dommages des suites de la violation de l'accord de Mai 2004 ;

Attendu que le Crédit Foncier agissant tant pour son compte personnel que comme agent du Cameroun a signé l'accord de juillet 2005 avec les requérantes ;

Attendu que l'accord de juillet 2005 constitue un contrat synallagmatique ;

Attendu que les requérantes ont rempli leurs obligations nées de l'accord de juillet 2005 ;

Mais attendu que les requis et, chacun d'eux pris individuellement ont/a violé les termes de l'accord de juillet 2005 ;

Que les requérantes et chacun d'eux pris individuellement ont/a souffert des pertes, préjudice et dommages des suites de la violation de juillet 2005 ;

Attendu que le Crédit Foncier agissant tant pour son compte personnel que comme agent du Cameroun a signé l'accord de août 2005 avec les requérantes ;

Attendu que l'accord d'août 2005 constitue un contrat synallagmatique ;

Attendu que les requérantes ont rempli leurs obligations nées de l'accord d'août 2005;

Mais attendu que les requis et, chacun d'eux pris individuellement ont/a violé les termes de l'accord d'août 2005;

Que les requérantes et, chacun d'eux pris individuellement ont/a souffert des pertes, préjudices et dommages des suites de la violation de l'accord d'août 2005 ;

## 2- DE LA FRAUDE, TROMPERIE ET DES DECLARATIONS MENSONGERES

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique,

17

les faits ci-dessus relatés du premier paragraphe jusqu'au présent (paragraphe 107) de l'assignation ;

Attendu que le Cameroun, à travers son agent, le Crédit Foncier a déclaré, représenté et affirmé aux requérantes qu'il devrait exécuter les termes de l'accord de Mai 2004 (les déclarations contenues dans l'accord de Mai 2004);

Qu'en signant l'accord de Mai 2004, le Cameroun, à travers son agent, le Crédit Foncier a représenté aux requérantes qu'il devrait exécuter les termes de l'accord de Mai 2004 (les déclarations de l'accord de Mai 2004) ;

Que les représentations (attitude /comportement/déclarations) de Mai 2004 étaient mensongères ;

Attendu que le Cameroun, à travers son agent, le Crédit Foncier a déclaré, représenté et affirmé aux requérantes qu'il devrait exécuter les termes de l'accord de Juillet 2005 (les déclarations de l'accord de juillet 2005);

Qu'en signant l'accord de juillet 2005, le Cameroun, à travers son agent, le Crédit Foncier a représenté aux requérantes qu'il devrait exécuter les termes de l'accord de juillet 2005, (les déclarations de l'accord de juillet 2005) ;

Que les représentations (attitude /comportement/déclarations) de juillet 2005 étaient mensongères ;

Attendu que le Cameroun, à travers son agent, le Crédit Foncier a déclaré, représenté et affirmé aux requérantes qu'il devrait exécuter les termes de l'accord d'août 2005 (les déclarations de l'accord d'août 2005 ensemble les déclarations contenues dans l'accord de Mai 2004 et celles de juillet 2005, « les déclarations portant sur l'exécution des contrats);

Qu'en signant l'accord d'août 2005, le Cameroun, à travers son agent, le Crédit Foncier a fait une représentation de l'accord d'août 2005 aux requérantes;

Que les représentations (attitude /comportement/déclarations) d'août 2005 étaient mensongères ;

Que le Cameroun savait, à tous moments pertinents des faits contenus dans la présente assignation, que ni lui, ni le Crédit Foncier ne devraient exécuter les termes des accords de Mai 2004, juillet 2005 et d'août 2005 à moins que les autorités camerounaises n'ait reçu de pots – de - vins ;

18

Que ni le Cameroun, ni le Crédit Foncier au moment de la ratification des accords de Mai 2004, juillet 2005 ou d'août 2005 n'avaient l'intention de les exécuter parce que les autorités Camerounaises qui contrôlaient le Crédit Foncier n'avaient aucune intention d'honorer les termes d'aucun contrat pour le projet Cameroun sans avoir reçu de la corruption au préalable;

Que ni le Cameroun, ni le Crédit Foncier n'ont indiqué aux requérantes que la corruption illégale était une condition d'exécution de leurs obligations contenues dans les accords de Mai 2004, de juillet 2005 et d'août 2005 ;

Que le Cameroun et le Crédit Foncier ont représenté aux requérantes, en octobre 2005, au Cameroun, que si celles-ci re- concevait le projet de Yaoundé, Phase I de 102 hectares à 70 hectares, et procédaient aux modifications sur ce projet comme sus décrit, le Cameroun et le Crédit Foncier devraient s'exécuter, suivant les termes de l'accord de Mai 2004 (« les représentations/déclarations relatives aux modifications de mai 2004 ») ;

Que les représentations/déclarations relatives aux modifications de mai 2004 étaient faits par sieur EKINDI à Sieur TCHOUFA au Cameroun dans le cabinet du premier en octobre 2005 ;

Que les représentations/déclarations des modifications de mai 2004 étaient faits par sieur EKINDI aux représentants légaux des requérantes, aux autorités de l'OPIC, aux autorités de l'Ambassade des Etats- Unis et d'autres, dans le cabinet de sieur EKINDI le 7 décembre 2005 ;

Attendu que les représentations/déclarations relatives aux modifications de mai 2004 lorsque faites par sieur EKINDI étaient mensongères ;

Que sieur EKINDI savait que les représentations/déclarations des modifications de mai 2004 étaient mensongères au moment où il les faisait, puisque sieur EKINDI savait que le projet de logement du Cameroun, en particulier, le projet de Yaoundé, phase I ne pouvait être exécuté sans le payement de la corruption, et que ce projet en particulier devait être réalisé sans le payement de la corruption ;

Que le Cameroun n'avait aucune intention en mai 2004 d'exécuter ses obligations découlant de l'accord de mai 2004, ou même de permettre à son agent, le Crédit Foncier de les exécuter ;

Que le Cameroun n'avait aucune intention en Juillet 2005 d'exécuter ses obligations découlant de l'accord de juillet 2005, ou même de permettre à son agent, le Crédit Foncier de les exécuter ;

19

Que le Cameroun n'avait aucune intention en août 2005 d'exécuter ses obligations découlant de l'accord d'août 2004, ou même de permettre à son agent, le Crédit Foncier de les exécuter ;

Attendu que les requérantes se réfèrent et s'appuient sur les déclarations /représentations relatives à l'exécutions des contrats, et que cet appui est raisonnable ;

Que le Cameroun a manqué de déclarer aux requérantes que la corruption était une condition d'exécution de l'accord de mai 2004, ou ses modifications, ou de l'accord de Juillet 2005, ou de l'accord d'août 2005 (« les déclarations relatives à la corruption ») ;

Que les requérantes s'appuient sur l'absence par le Cameroun et par le Crédit Foncier à faire des déclarations relatives à la corruption, et que cet appui est raisonnable ;

Que les requérantes ont souffert des pertes, préjudices et dommages à cause des déclarations/représentations relatives à l'exécution des contrats, des déclarations/représentations relatives aux modifications de mai 2004, et de l'absence de déclaration relative à la corruption ;

Que ces pertes, dommages et préjudices incluent les dépenses financières ; les coûts et obligations contractés et la perte d'opportunités d'affaires ;

## 3- DES DECLARATIONS MENSONGERES NEGLIGENTES

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique, les faits ci-dessus relatés du premier paragraphe jusqu'au présent (paragraphe 130) de l'assignation ;

Que le Cameroun et le Crédit Foncier savaient ou auraient dû savoir que les déclarations/ représentations relatives à l'exécution des contrats étaient mensongères ;

Que le Cameroun et le Crédit Foncier savaient ou auraient dû savoir que déclarations /représentations relatives aux modifications de mai 2004 étaient fausses ;

Que le Cameroun et le Crédit Foncier savaient ou auraient dû savoir que la déclaration relative à la corruption était et devrait être vraisemblable ;

Que le Cameroun et le Crédit Foncier savaient ou auraient dû savoir que les requérantes s'appuieront sur les déclarations relatives à l'exécution des contrats, et la déclaration relative à la modification de mai 2004 et

l'absence de déclaration relative à la corruption, et que cet appui serait raisonnable ;

Que les requérantes ont souffert des pertes, préjudices et dommages à cause des déclarations/représentations relatives à l'exécution des contrats, des déclarations/représentations relatives aux modifications de mai 2004, et de l'absence de déclaration relative à la corruption ;

## 4- DE L'INTERFERENCE INTENTIONNELLE AVEC LE CONTRAT- CAMEROUN

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique, les faits ci-dessus relatés ;

Attendu que le Cameroun connaissait bien l'existence des accords de Mai 2004, de juillet 2005, et d'août 2005 ;

Que le Cameroun a instruit le directeur général du Crédit Foncier de refuser d'exécuter les termes des accords de Mai 2004, de juillet 2005, et d'août 2005 ;

Que le Crédit Foncier a refusé d'exécuter les termes des accords de Mai 2004, de juillet 2005, et d'août 2005 pour de motifs impropres ;

Que le Cameroun a, délibérément, et à tort, volontairement, interférer avec les accords de Mai 2004, de juillet 2005, et d'août 2005 dont la conséquence est l'inexécution par le Crédit Foncier du Cameroun de ces accords ;

Que les requérantes ont souffert des pertes, préjudice et dommages à cause de l'interférence du Cameroun avec les accords de Mai 2004, de juillet 2005, et d'août 2005 ;

## 5- DE L' INTERFERENCE INTENTIONELLE AVEC LES CONTRATS ET DES AVANTAGES PROSPECTIFS – CAMEROUN ET LE CREDIT FONCIER DU CAMEROUN

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique, les faits ci-dessus relatés du premier paragraphe jusqu'au présent (paragraphe 142) de l'assignation ;

Attendu que le Cameroun et le Crédit Foncier savaient que les requérantes avaient reçu un accord préliminaire de l'OPIC en vue du financement de la construction de la phase II du projet de Yaoundé ;

21

Que le Cameroun et le Crédit Foncier savaient que les requérantes avaient déjà obtenu l'enregistrement pour le financement à la MIGA pour la phase II du projet à Douala ;

Que le Cameroun et le Crédit Foncier savaient que les requérantes avaient obtenu avec succès les perspectives d'affaires avantageuses pour un financement international de l'OPIC et auprès d'autres organisations pour le projet l'habitat abordable du MBI ;

Que le Cameroun et le Crédit Foncier savaient que les requérantes recevraient un financement international de l'OPIC et auprès d'autres organisations pour le projet d'habitat abordable du MBI dans plusieurs pays Africain si le projet d'habitat du Cameroun était exécuté suivant les accords de Mai 2004, de juillet 2005, et d'août 2005 ;

Que le Cameroun et le Crédit Foncier savaient ou auraient dû savoir que les requérantes ne recevraient un financement international de l'OPIC et auprès d'autres organisations pour le projet d'habitat abordable de la MBI dans plusieurs pays Africain que si le projet d'habitat du Cameroun était exécuté suivant les accords de Mai 2004, de juillet 2005, et d'août 2005 ;

Que le Cameroun et le Crédit Foncier ont, délibérément, et à tort, volontairement, interférer avec les attentes d'affaires des requérantes avec l'OPIC relativement au projet de Yaoundé phase II, et avec la MIGA relativement à la phase III du projet de Douala ;

Que le Cameroun et le Crédit Foncier ont, délibérément, et à tort, volontairement, interférer avec les attentes d'affaires des requérantes avec l'OPIC et avec la MIGA, et d'autres organisations internationales relativement au financement du programme d'habitat abordables dans plusieurs autres pays Africains;

Que les requérantes ont souffert des pertes, préjudices et dommages à cause de l'interférence du Cameroun et du Crédit Foncier avec les attentes d'affaires pour le financement du programme d'habitats abordables de la MBI au Cameroun et dans plusieurs autres pays Africains ;

## 6- DU DETOURNEMENT DES SECRETS COMMERCIAUX ET D'INFORMATION APPARTENANT AU TIERS

Attendu que les requérantes adoptent et incorporent dans ce chapitre par référence et, comme s'ils étaient autant décrits de manière spécifique, les faits ci-dessus relatés ;

Attendu que le programme MBI d'habitats abordables constituait des secrets commerciaux pour les requérantes (les secrets commerciaux du programme) et compreniaient des informations confidentielles de tiers ;

Que la conception, les plans, les dessins pour la phase I du projet à Yaoundé étaient des secrets commerciaux pour les requérantes (« les secrets commerciaux du projet », collectivement avec les secrets commerciaux du programme, les « secrets commerciaux ») et comprenaient au moins en partie une information confidentielle de tiers ;

Attendu que les requérantes attendaient des sommes d'argent importantes du développement des secrets commerciaux ;

Que les requérantes ont entrepris des efforts prudents et raisonnables pour protéger la confidentialité des secrets commerciaux ;

Que les secrets commerciaux n'étaient connus que de certains employés des sociétés requérantes ;

Que la connaissance des secrets commerciaux devrait procurer un avantage aux concurrents des sociétés requérantes ;

Que les requis se sont appropriés, détournés et pris control des secrets commerciaux, et, en vertu de leurs violations de leur contrat et de leurs inconduites comme sus - décrites, ont pris et retenu pour leurs propres usage et bénéfice, les secrets commerciaux et ce à tort;

Que les requérantes ont souffert des pertes, préjudices et dommages à cause du détournement par les requis des secrets commerciaux ;

Que dans ces conditions les requérantes sont admises à obtenir des dommages intérêts à la hauteur du gain qu'ils devaient que l'exécution du contrat leur aurait profité en application des articles 1146,1147 1148 et 1149 du Code Civil camerounais ;

**PAR CES MOTIFS :**

Et tous autres à déduire ou à suppléer même d'office ;

Y venir le Crédit Foncier du Cameroun et l'Etat du Cameroun pris en la personne du Ministère de l'Economie et des Finances ;

Recevoir les sociétés requérantes en leur action ;

**AU FOND**

Voir constater que les parties ont signé les conventions en mai 2004, de juillet 2005, et d'août 2005 en vue de la réalisation des projets sociaux ;

23

Voir constater qu'alors que les requérantes ont mis tous en œuvre pour exécuter leur part d'obligations contractuelles, les requis se sont évertués à multiplier des prétextes pour retarder l'évolution positive du projet débouchant en fin à sa unilatérale ;

Voir constater que le Crédit Foncier pour justifier la rupture abusive des relations contractuelle a d'abord excipé l'attente des instructions de la tutelle, ensuite la suspension provisoire des travaux et en fin la sommation définitive d'arrêt de ceux-ci ;

Voir constater le silence complice de l'Etat du Cameroun qui n'a réservé aucune suite aux multiples relances d'intermédiation des requérantes ;

Dire et juger que la carence de réaction de l'Etat du Cameroun confirme son opposition à la poursuite du projet dont s'agit ;

Dire que la violation des conventions a cause aux requérantes un énorme préjudice financier dont elles sollicitent réparation ;

### EN CONSEQUENCE

Condamner individuellement et solidairement l'Etat du Cameroun et le Crédit Foncier du Cameroun à payer aux sociétés requérantes la somme de cinq cent millions de dollars (**$ 500 000 000 .00**) soit la somme de deux cent cinq cents milliards de francs CFA (**FCFA 205 000 000 000**);

Condamner les requis à payer les intérêts de droit sur la montant de la condamnation à intervenir ;

Allouer aux bénéfices des sociétés requérantes toutes autres condamnations des requis tel qu'il appartiendra ;

Condamner les requis aux dépens de la procédure ;

### SOUS TOUTES RESERVES

Et afin qu'ils n'en ignorent, je leur ai ou étant et parlant comme dessus, remis et laissé copie du présent exploit dont le coût est de : *cinquante mille francs*

€ 4000
+ 4000
1000

800

39 755
100
345

50 000

*Employés pour Original et copie quatre feuilles de la dimension du timbre à 1000 francs soit 4000 francs, somme incluse dans le coût de l'ac!*

24

# REQUETE AUX FINS D'ENROLEMENT

/-)

Madame le Président du
Tribunal de Grande Instance de
YAOUNDE

L'Etat du Cameroun représenté par le Ministre des Finances et le **Crédit Foncier du Cameroun**, Société a Capital public, représenté par son Directeur Général, ayant son siège à Yaoundé) et ayant pour Conseils la SCP MUNA, MUNA et Associes, Avocats au Barreau du Cameroun B.P. 307 Tél. 22 23 5574 en l'Etude desquels élection de domicile est faite pour la présente et ses suites :

## ONT L'HONNEUR DE VOUS EXPOSER

Que par exploit d'assignation en date du 24 Juin 2008 les sociétés MBI Group et Atlantic SCI ont assigné l'Etat du Cameroun et le Crédit Foncier du Cameroun par devant le Tribunal de Grande Instance de Céans pour l'audience du 09 Juillet 2008 en vertu de l'exploit du Ministère de Me Ngo Bakang Jeanne Huissier de Justice à Yaoundé aux fins de s'entendre condamner individuellement et solidairement au paiement en leur faveur de la somme de 500 millions de dollars soit deux cent cinq cents milliards de francs CFA ( FCFA 205.000.000.000) à leurs profits, ainsi qu'au paiement des intérêts de droit sur le montant de la condamnation à intervenir sans préjudice de leur allouer toutes autres condamnations des exposants tel qu'il appartiendra ainsi qu'aux dépens.

Mais attendu qu'à la date du 09 juillet 2008, l'affaire n'a pas été appelée faute par icelles de n'avoir pas payé la consignation exigée par l'article 24 du Code de Procédure Civile, toute chose qui les a amené les sociétés demanderesses à obtenir auprès du Greffe du Tribunal de Céans un certificat de non enrôlement.

Qu'en application des 5% exigé par le Code Général des Impôts relativement à l'enregistrement des actes de justice, icelles se devaient de payer au Greffe du Tribunal de Céans la somme de 10.250.000.000 de francs CFA ( Dix milliards deux cent cinquante millions) à titre de consignation suffisante.

Mais qu'au lieu de solliciter l'enrôlement de ladite assignation au droit fixe, celles-ci se sont empressées d'obtenir auprès du greffe un certificat de non enrôlement étant entendu que l'objectif de ladite procédure purement spéculative et vexatoire est de démontrer à la Justice Américaine que l'accès à la justice camerounaise est difficile.

**Exhibit B**

Alors que l'article 286 du Code Général des Impôts qui permet de suppléer à l'exigence de l'article 24 du Code de Procédure Civile stipule que : « *Pour les actes et jugements définitifs portant condamnation, collocation, liquidation ou transmission, la valeur est déterminée par le montant des condamnations.* ».

Que dans le souci de protéger les intérêts de l'Etat du Cameroun et du Crédit Foncier du Cameroun dans la mesure où ils entendent <u>engager une demande reconventionnelle en paiement</u> <u>contre les pseudo demandeurs</u>, il est opportun d'avoir à autoriser à Madame le Greffier en Chef du Tribunal de Grande Instance de Céans à enrôler l'assignation querellée sous réserve du paiement des frais d'enregistrement à la fin de la procédure en application de l'article 286 du Code Général des Impôts.

### C'EST POURQUOI LES REQUERANTS SOLLICITENT QU'IL VOUS PLAISE MADAME LE PRESIDENT

Vu la requête,
Vu les pièces à l'appui,
Vu les dispositions de la loi,

Prendre acte de ce que les sociétés MBI Group et Atlantic SCI ont assigné l'Etat du Cameroun et le Crédit Foncier du Cameroun devant le Tribunal de Céans sans enrôler la procédure alors que l'article 286 du Code Général des impôts détermine la valeur des actes et jugements définitifs portant condamnation, collocation, liquidation ou transmission, par le montant des condamnations.

S'entendre autoriser l'enrôlement de ladite procédure au droit fixe

S'ENTENDRE EN CONSEQUENCE Ordonner à Madame le Greffier en Chef du Tribunal de céans à enrôler à l'audience du 23 Juillet 2008, l'assignation, objet de l'exploit de Me Ngo Bakang Jeanne huissier de Justice à Yaoundé.

Dire votre ordonnance exécutoire sur minute et avant enregistrement.

SOUS TOUTES RESERVES

*Yaoundé, le 14 /07/08*

Akere T. MUNA
Of Lincoln's Inn London (Barrister-at-Law)
Ancien Bâtonnier de l'Ordre des Avocats
Président de l'Union Panafricaine des Avocats

**Exhibit B**

## ORDONNANCE N° .....................

Nous, ................................... Présidente du Tribunal de Grande Instance de Mfoundi Yaoundé,

Vu la requête,
Vu les pièces à l'appui,
Vu les dispositions de la loi,

- Prenons acte de ce que les sociétés MBI Group et Atlantic SCI ont assigné l'Etat du Cameroun et le Crédit Foncier du Cameroun devant le Tribunal de Céans sans enrôler la demande ;

- EN CONSEQUENCE Ordonnons à Madame le Greffier en Chef du Tribunal de Céans à enrôler à l'audience du 23 Juillet 2008, l'assignation, objet de l'exploit de Me Ngo Bakang Jeanne huissier de Justice à Yaoundé au droit fixe ;

- Disons notre ordonnance exécutoire sur minute et avant enregistrement.



*Fait en notre Cabinet sis au Palais de Justice de Yaoundé le*

POUR EXPÉ...    YAOUNDE, le **15 JUIL 2008**

FANTA ... Elisabeth
GREFFIER PRINCIPAL

**Exhibit B**



## SIGNIFICATION D'UNE ORDONNANCE AUX FINS
## D'ENROLEMENT

**L'AN DEUX MIL HUIT**

**ET LE** *Seize juillet*

    A la requête de l'Etat du Cameroun représenté par le Ministre des Finances et le Crédit Foncier du Cameroun, Société à Capital Public, représenté par son Directeur Général, ayant son siège à Yaoundé et ayant pour Conseils Mes Muna, Muna et Associés, Avocats à Yaoundé en l'Etude desquels Election de domicile est faite pour les présentes et ses suites ;

    EBODE Raphaël

    J'ai, Me

    Huissier de Justice près la Cour d'Appel du Centre et les Tribunaux de Yaoundé, y demeurant, domicilié et soussigné ;

### SIGNIFIE ET LAISSE A :

**La Société MBI GROUP, Inc**, dont le siège social est situé au 7200 Wisconsin Avenue, suite 702 Bethesda, Maryland 20814, agissant poursuites et diligences de son représentant légal, laquelle a fait élection de domicile au Cabinet de Me Joseph Jules NKANA, Avocat au Barreau du Cameroun, B.P. 7001 Yaoundé, Tel : 2223 42 65, en son Cabinet où étant et parlant à : *Me NKANA Joseph Jules en personne qui reçoit la pièce ci-dessous visée, ainsi que copie du présent exploit et vise l'original.*

la Société Atlantic Group SCI, dont le siège social est à Douala, sis 40 Rue Gallieni, agissant poursuites et diligences de son représentant légal, laquelle a fait élection de domicile au Cabinet de Me Joseph Jules NKANA, Avocat au Barreau du Cameroun, B.P. 7001 Yaoundé, Tel : 2223 42 65, en son Cabinet où étant et parlant à : *Me NKANA Joseph Jules en personne qui reçoit la pièce ci-dessous visée, ainsi que copie du présent exploit et vise l'original.*

**Exhibit B**

      **Copie de l'expédition de l'Ordonnance N° 08 du 25 Juillet 2008 de Madame la Présidente du Tribunal de Grande Instance du Mfoundi-Yaoundé**, ordonnant à Madame le Greffier en Chef du Tribunal de Grande Instance de Yaoundé à enrôler à l'audience **du 23 Juillet 2008**, l'assignation, objet de l'exploit de Me NGO Bakang Jeanne, Huissier de Justice à Yaoundé au droit fixe ;

      En conséquence, j'ai huissier de Justice ci-dessus soussigné, vous rappelle que la date d'audience a été fixée pour le **23/07/08**.

## SOUS TOUTES RESERVES

      Et afin qu'elles n'en ignorent, je leur ai, où étant et parlant comme ci-dessus, remis et laissé à chacune, tant copie de l'expédition de l'Ordonnance N° 08 du 15/07/08 de Madame la Présidente du Tribunal de Grande Instance du Mfoundi-Yaoundé que du présent exploit dont le coût est de : *dix huit mille fr*

      Employé pour copie une feuille de papier de la dimension du timbre à 1000 FCFA somme incluse dans le coût de l'acte.

**Attachment 2**

Table 4.10
U.S. District Courts. Civil Cases Terminated by Action Taken

| Fiscal Year | Total | No Court Action | Total | Before Pretrial | During or After Pretrial | During or After Trial | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Total | Nonjury | Jury | % Reaching Trial |
| 1990* | 213,429 | 51,630 | 161,799 | 127,017 | 25,519 | 9,263 | 4,480 | 4,783 | 4.3% |
| 1995 | 229,325 | 36,558 | 192,767 | 166,017 | 19,307 | 7,443 | 3,317 | 4,126 | 3.2% |
| 2000 | 259,234 | 43,281 | 215,953 | 189,808 | 20,365 | 5,780 | 2,001 | 3,779 | 2.2% |
| 2002 | 258,992 | 41,585 | 217,407 | 192,030 | 20,808 | 4,569 | 1,563 | 3,006 | 1.8% |
| 2003 | 252,197 | 41,054 | 211,143 | 186,472 | 20,465 | 4,206 | 1,532 | 2,674 | 1.7% |
| 2004 | 252,016 | 54,273 | 197,743 | 174,212 | 19,580 | 3,951 | 1,422 | 2,529 | 1.6% |
| 2005 | 270,973 | 62,661 | 208,312 | 183,072 | 21,341 | 3,899 | 1,289 | 2,610 | 1.4% |
| 2006 | 272,644 | 60,863 | 211,781 | 170,028 | 38,198 | 3,555 | 1,140 | 2,415 | 1.3% |

*Twelve month period ended June 30.

NOTE: Land Condemnation cases omitted.

Source: Statistical Table C-4

[Note: Available at the web site of the U.S. Courts - http://www.uscourts.gov/judicialfactsfigures/2006/Table410.pdf.]

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MBI Group, Inc., and<br>Atlantic Group, SCI,<br><br>             *Plaintiffs,*<br><br>    vs.<br><br>Crédit Foncier du Cameroun, and<br>The Government of the Republic of Cameroon,<br><br>          *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:07-cv-00637-JDB |

## <u>ORDER</u>

On consideration of Plaintiffs' Motion to Vacate Dismissal because of Failure of Conditions and for Reconsideration and to Alter or Amend Judgment and Order, Defendants' Memorandum in Opposition thereto, and the entire record herein;

It is ordered that Plaintiffs' Motion be denied.

So ordered.

_____
Judge John D. Bates
United States District Court
For the District of Columbia